**VOLUME I of II, Pages Appx1-1478**

**2020-2118, -2181, 2021-1664, -1667**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

### BRIGHT DATA LTD.,

*Plaintiff-Cross-Appellant*

**v.**

### BI SCIENCE (2009) LTD.,

*Defendant-Appellant*

### BI SCIENCE INC.,

*Defendant*.

---

Appeals from the United States District Court for the Eastern District of Texas in No. 2:18-cv-00483-JRG, Chief Judge J. Rodney Gilstrap.

---

### NON-CONFIDENTIAL JOINT APPENDIX

---

Robert Harkins
Korula T. Cherian
**RUYAKCHERIAN LLP**
1936 University Ave, Ste. 350
Berkeley, CA 94704
(510) 944-0190

Ronald Wielkopolski
Colby Davis
**RUYAKCHERIAN LLP**
1901 L St. NW, Suite 700
Washington, DC 20036
(202) 838-1560

*Counsel for Plaintiff Bright Data Ltd.*

John Christopher Rozendaal
William H. Milliken
**STERNE KESSLER GOLDSTEIN & FOX**
1100 New York Avenue, NW
Washington, DC 20005
(202) 371-2600

Michael A. Charish
**CHARISH LAW GROUP P.C.**
347 Fifth Avenue, Suite 1402
New York, New York 10016
(646) 328-0183

*Counsel for Appellant BI Science (2009) Ltd.*

Dated: May 31, 2022

## Volume I

| Docket Entry | Description | Page No. |
|---|---|---|
| 254 | Order and Correct Final Judgment (2021/02/01) | Appx0001-Appx0013 |
| 220 | Order and Final Judgment (2020/07/02) | Appx0014-Appx0026 |
| 3 | Docket Sheet | Appx0027-Appx0054 |
| 1-01 | U.S. Patent No. 9,241,044 | Appx0055-Appx0281 |
| 1 | Complaint (2018/11/08) | Appx0282-Appx0309 |
| 15 | Motion to Dismiss (2019/01/28) | Appx0536-Appx0556 |
| 21 | Response to Motion to Dismiss Near Final (TOA TOC) (2019/02/12) | Appx0599-Appx0618 |
| 21-05 | Exhibit 4 (2019/02/05) | Appx0632-Appx0636 |
| 28 | Amended Complaint (2019/02/19) | Appx0656-Appx0689 |
| 28-03 | Exhibit C (2019/02/19) | Appx0690-Appx0696 |
| 28-04 | Exhibit D (2019/02/19) | Appx0697-Appx0712 |
| 28-05 | Exhibit E (2019/02/19) | Appx0713-Appx0717 |
| 36 | Motion to Dismiss Amended Complaint (2019/03/04) | Appx0718-Appx0741 |
| 36-01 | Kfir Moyal Declaration (2019/03/04) | Appx0742-Appx0746 |
| 36-02 | Ex. A (2019/03/04) | Appx0747-Appx0748 |
| 36-03 | Ex. B (2019/03/04) | Appx0749-Appx0750 |
| 36-04 | Ex. C (2019/03/04) | Appx0751-Appx0752 |
| 82 | Memorandum Opinion and Order re Motion to Dismiss (2019/05/13) | Appx0853-Appx0875 |
| 85 | Answer to Amended Complaint (2019/05/28) | Appx0876-Appx0899 |
| 109-05 | Exhibit D (2019/10/15) | Appx1044-Appx1057 |
| 110-01 | Exhibit Tutorial (2019/10/16) | Appx1089-Appx1109 |
| 130 | MARKMAN OPINION AND ORDER (2019/12/06) | Appx1355-Appx1410 |
| 144 | ORDER re mediation session (2020/02/04) | Appx1449-Appx1449 |
| 166 | Joint Motion to Stay All Deadlines (2020/02/23) | Appx1474-Appx1475 |
| 167 | ORDER Granting [166] (2020/02/23) | Appx1477-Appx1477 |
| 168 | Mediation Report (2020/02/24) | Appx1478-Appx1478 |

## Volume II

| Docket Entry | Description | Page No. |
|---|---|---|
| 170 | Draft Plaintiff's Mot. to Enforce Settlement Agreement FINAL (2020/03/18) | Appx1479-Appx1495 |
| 170-01 | Wielkopolski Declaration in support of motion to enforce (2020/03/18) | Appx1496-Appx1498 |
| 170-02 | Ex. A (2020/03/18) | Appx1499-Appx1500 |
| 170-03 | Ex. B (2020/03/18) | Appx1501-Appx1501 |
| 170-04 | Ex. C (2020/03/18) | Appx1502-Appx1503 |

| 170-06 | Ex. E (2020/03/18) | Appx1506-Appx1506 |
|---|---|---|
| 170-07 | Ex. F (2020/03/18) **[contains confidential information]** | Appx1507-Appx1508 |
| 170-08 | Ex. G (2020/03/18) **[contains confidential information]** | Appx1509-Appx1510 |
| 170-09 | Ex. H (2020/03/18) **[contains confidential information]** | Appx1511-Appx1512 |
| 170-10 | Ex. I (2020/03/18) | Appx1513-Appx1513 |
| 170-11 | Ex. J (2020/03/18) **[contains confidential information]** | Appx1514-Appx1516 |
| 170-13 | Ex. L (2020/03/18) | Appx1518-Appx1518 |
| 170-14 | Ex. M (2020/03/18) **[contains confidential information]** | Appx1519-Appx1521 |
| 170-15 | Ex. N (2020/03/18) | Appx1522-Appx1524 |
| 170-16 | Ex. O (2020/03/18) | Appx1525-Appx1532 |
| 170-17 | Ex. P (2020/03/18) | Appx1533-Appx1536 |
| 175 | Response to Motion to Enforce Settlement Agreement (2020/03/25) | Appx1547-Appx1554 |
| 183 | Transcript - April 13, 2020 | Appx1652-Appx1698 |
| 184-01 | Exhibit A (2020/04/28) | Appx1701-Appx1704 |
| 184-02 | Exhibit B (2020/04/28) | Appx1705-Appx1708 |
| 187 | Plaintiff Motion for Sanctions (2020/05/01) | Appx1716-Appx1733 |
| 194 | Plaintiff Motion to Enforce Settlement Agreement and Arbitration Award (2020/05/08) | Appx1762-Appx1770 |
| 194-06 | Ex. E (2020/05/08) | Appx1773-Appx1782 |
| 194-07 | Ex. F (2020/05/08) | Appx1783-Appx1783 |
| 198-02 | Exhibit 1 (2020/05/18) | Appx1816-Appx1816 |
| 202 | Reply ISO Motion to Enforce Settlement Near Final (2020/05/21) | Appx1825-Appx1832 |
| 202-03 | Ex. E (2020/05/21) | Appx1835-Appx1844 |
| 203 | Response to Motion to Enforce (2020/05/22) | Appx1845-Appx1848 |
| 205 | Reply ISO Motion for Sanctions (2020/05/26) | Appx1850-Appx1857 |
| 210 | Reply ISO Motion to Enforce (2020/05/29) | Appx1859-Appx1866 |
| 213-06 | Motion to Prevent Scanning Of Documents to the Net Hamishpat Network and to Prevent Third Parties from Viewing these Documents - Original Hebrew (2020/06/03) | Appx1979-Appx2006 |
| 228 | Notice of Appeal (2020/07/29) | Appx2058-Appx2060 |
| 231-01 | Moyal Declaration (2020/08/07) | Appx2078-Appx2082 |
| 234 | Defendant's Opposed Motion to Stay Enforcement of the Final Judgment (2020/08/12) | Appx2084-Appx2103 |
| 236 | Luminati's Reply ISO Motion to Make Final Judgment Public (2020/08/14) | Appx2107-Appx2114 |
| 238 | Notice of Appeal (2020/08/18) | Appx2115-Appx2116 |

| 242 | Luminati's Opposition to BI Science's Motion for Stay Enforcement of Final Judgment (2020/08/27) | Appx2125-Appx2145 |
|---|---|---|
| 246 | BI Science's Reply ISO Motion to Stay Enforcement of the Final Judgment (2020/09/03) | Appx2147-Appx2154 |
| 246-01 | Moyal Reply Declaration (2020/09/03) | Appx2155-Appx2158 |
| 248 | Luminati Sur-Reply on Motion to Stay Enforcement (2020/09/11) | Appx2159-Appx2166 |
| 194-04 | Ex. C (2020/05/08) | Appx2205-Appx2212 |

## CONFIDENTIAL MATERIAL OMITTED

The information deleted from pages Appx1508, Appx1510, Appx1511, Appx1515, and Appx1520 relates to certain confidential business information of the parties that was subject to a protective order in the district court.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| LUMINATI NETWORKS LTD. | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | CIVIL ACTION NO. 2:18-CV-00483-JRG |
| | § | |
| BI SCIENCE, INC., BI SCIENCE (2009) | § | FILED UNDER SEAL |
| LTD., | § | |
| | § | |
| *Defendants*. | § | |

### <u>ORDER AND CORRECTED FINAL JUDGMENT</u>

Before the Court is the Joint Motion to Correct Final Judgment (the "Motion").  (Dkt. No. 223.)   In the Motion, Plaintiff Luminati Networks Ltd. ("Luminati") and Defendants Bi Science, Inc. and Bi Science (2009) Ltd. (collectively, "Defendants") (together, the "Parties") move to correct the Court's Final Judgment (Dkt. No. 220) to include the Court's finding that claim 108 of U.S. Patent No. 9,241,044 is indefinite, pursuant to the Court's Claim Construction Order (Dkt. No. 130 at 56).  Having considered the Motion, the Court is of the opinion that it should be and hereby is **GRANTED**.  It is therefore **ORDERED** that corrected Final Judgment is entered as set out below.

Before the Court are the following motions:

- Motion for Enforcement of Settlement Agreement and Arbitrator's Award (Dkt. No. 185) filed by Plaintiff Luminati Networks Ltd. ("Luminati" or "Plaintiff");

- Motion for Sanctions (Dkt. No. 187) filed by Luminati;

- Motion to Withdraw Findlay Craft P.C. As Counsel and to Stay the Case for Substitute Counsel to Appear ("Motion to Withdraw Findlay Craft") (Dkt. No. 188)

**Appx1**

filed by Defendant BIScience Inc.[1] ("BIScience" or "Defendant");

- Unopposed Motion to Withdraw Ronal Abramson and M. Michael Lewis as Counsel for Defendant ("Motion to Withdraw Abramson and Lewis") (Dkt. No. 193) filed by BIScience; and

- Motion to Enforce Settlement Agreement and Arbitration Award (Dkt. No. 194) filed by Luminati.

(collectively, the "Motions").

Having considered each of the Motions, the related briefing, and the relevant authorities, the Court concludes that the Motions should be and hereby are **GRANTED-IN-PART** and **DENIED-IN-PART** as follows:

- The Court **CONFIRMS** the Final Arbitration Award (April 29, 2020) ("Arbitration Award") (Dkt. No. 217) in its entirety pursuant to 9 U.S.C. § 9. Under the Arbitration Award and the Court's April 13, 2020 ruling, the Luminati v. BI Science – Mediated Settlement (February 25, 2020) (Dkt. No. 170-4) ("Settlement Agreement") is a valid, binding agreement between the parties;

- The Court hereby **DENIES** Luminati's Motion for Sanctions;

- The Court hereby **GRANTS-IN-PART** the Motion to Withdraw Findlay Craft. It is **ORDERED** that Findlay Craft, P.C. be permitted to withdraw as counsel of record for BIScience in this matter. ECF notifications to the aforementioned counsel are to be terminated in the above-captioned case. In light of the ruling herein, the Court hereby **DENIES** BIScience's request for a stay of the case;

---

[1] Plaintiff represents that BI Science (2009) Ltd. is also known as BI Science Inc. (*See, e.g.,* Dkt. No. 194 at 1.) Defendant seems to indirectly reject this contention. (*See, e.g.,* Dkt. No. 203 at 2) ("Defendant BIScience (2009) Ltd (which Plaintiff alleges is also known as BIScience Inc.) . . ."). The Parties also inconsistently use spaces when referring to BiScience. (*Compare, e.g.,* Dkt. No. 194 ("BI Science") and Dkt. No. 203 ("BIScience").) The Court will adopt Defendants' recent notation and refer to Defendants as "BIScience," which will include BI Science Inc. and BI Science (2009) Ltd. collectively, unless specified otherwise.

- The Court hereby **GRANTS** the Motion to Withdraw Abramson and Lewis. It is **ORDERED** that Mr. Ronald Abramson and Mr. Mord Michael Lewis be permitted to withdraw as counsel of record for BIScience in this matter. ECF notifications to the aforementioned attorneys are to be terminated in the above-captioned case.

Further, pursuant to 9 U.S.C. § 13, the Court hereby **ENTERS FINAL JUDGMENT** pursuant to and fully incorporating herein by reference for all purposes (as if set forth hereinverbatim) all the terms of the attached Settlement Agreement (Dkt. No. 170-4) (attached hereto as Exhibit A) and the Arbitration Award (Dkt. No. 217) (attached hereto as Exhibit B), as well as the Court's finding that claim 108 of the U.S. Patent No. 9,241,044 is invalid for indefiniteness  (Dkt. No. 130). Further, this Court expressly retains jurisdiction to enforce the terms of this judgment between these parties, their successors and assigns.

All other relief not expressly granted herein is **DENIED AS MOOT**. The Clerk of the Court is directed to **CLOSE** the case.

**So ORDERED and SIGNED this 1st day of February, 2021.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

# Exhibit A

*RESTRICTED -ATTORNEYS' EYES ONLY - Protected by Fed. R. Evid. 408*

## Luminati v. BI Science - Mediated Settlement

Mediator William Cornelius's settlement proposal accepted by parties Luminati Networks Ltd. ("Luminati") and Defendant BI Science (2009) Ltd., also known as BI Science Inc., ("BI Science") (collectively, "Parties") on February 23, 2020 resulting in resolution of the following district court cases and proceedings before the PTAB ("BI Science Proceedings"):

- *Luminati Networks Ltd. v. BI Science Inc.,* Case No 2:18-cv-483, E.D. Texas;
- *Luminati Networks Ltd. v. BI Science (2009) Ltd.,* Case No 2:19-cv-352, E.D. Texas;
- *Luminati Networks Ltd. v. BI Science (2009) Ltd.,* Case No 2:19-cv-397, E.D. Texas;
- Petition for *Inter Partes* Review of U.S. Patent No. 9,241,044, IPR2020-166; and
- Petition for *Inter Partes* Review of U.S. Patent No. 9,742,866, IPR2020-167.

The Parties entered into a global settlement including resolution of patent infringement and invalidity claims involving U.S. Patent Nos. 9,241,044, 9,742,866, 10,257,319, 10,410,244, 10,469,614, 10,484,510, and 10,484,511 ("Patents in Suit") involving BI Science's residential proxy and data center proxy services, including under the "Geosurf" brand ("Proxy Services") proxy service. The Parties agreed to the following:

I. Both Parties dismiss all claims in Case No 2:18-cv-483 with prejudice except for the claim of invalidity with regard to claim I 08 of U.S. Patent No. 9,241,044 ("'044 Patent");

2. The Parties shall move for entry of final judgment with regard to claim 108 of the '044 Patent;

3. Luminati dismisses Case No. 2:19-cv-352 and Case No 2:19-cv-397 without prejudice;

4. BI Science withdraws its *inter partes* review petitions (IPR2020-166 and IPR2020-167) against certain Patents-in-Suit;

5. BI Science leaves the Proxy Services business world-wide permanently;

6. BI Science enters a stipulated injunction that BI Science will not use, offer to sell, or sell, Proxy Services in the United States or import Proxy Services into the United States to the extent it is not licensed by Luminati to do so;

7. BI Science may continue providing its Urban VPN application to the extent it does not practice Luminati' s patents;

8. Luminati makes monthly payments to BI Science of 37% of the gross (invoiced) revenue generated by any BI Science customer of Proxy Services transferred by BI Science and accepted by Luminati to Luminati's Proxy Services as part of this agreement for a period up to 27 months (Luminati shall not arbitrarily reject BI Science proxy service customers transferred under the settlement agreement.  Any rejection shall be supported by legitimate and reasonable grounds including the existing Luminati compliance procedures. Any disputed rejection shall be submitted to arbitration by William Cornelius.);

*RESTRICTED – ATTORNEYS' EYES ONLY – Protected by Fed. R. Evid. 408*

9. Luminati will set up an escrow account of $350,000 from which payments are to be made to BI Science;

10. Luminati agrees not to file a post grant review petition, inter partes review petition or other reexamination petition against BI Science's U.S. Patent No. 10,410,244 ("'244 Patent") and other BI Science patents to the extent that BI Science does not threaten or otherwise asserts its patents against Luminati, its customers, licensees or affiliates, in which case there is no restriction on Luminati's ability to challenge one or more of the BI Science patents;

11. BI Science agrees not to file a post grant review petition, inter partes review petition or other reexamination petition against the Patents in Suit or any other patents assigned to Luminati; and

12. BI Science assigns the '244 Patent and related patent applications, continuations, and continuations in part to Luminati.

13. Luminati agrees to provide its Residential proxy network service to BI Science at a lowered, fixed price of $0.40/GB for up to 50 TB/month for 5 years solely in support of BI Science's Adclarity business, under the strict prohibition against Bi Science reselling access to Luminati's residential proxy network;

14. The parties agree to a 3-year litigation stand down, during which neither party shall institute legal action of any kind against the other except as may be necessary to enforce any settlement reached as a result of this proposal;

15. The parties are to release a mutually agreed press release;

16. Each side will bear its own costs and attorney's fees; and

17. The parties agree to submit any disputes regarding the terms and provisions of the settlement to binding arbitration by William Cornelius.

**MEDIATOR**

By: *[signature]*

Name: William Cornelius

Dated: 2-24- 2020

The undersigned Parties agree that the terms of this agreement are confidential and shall not be disclosed except as reasonably necessary to attorneys, financial representatives, and lenders or as reasonably necessary to comply with governmental laws, regulations, court orders and subpoenas.

| LUMINATI NETWORKS LTD. | BI SCIENCE (2009) LTD. |
|---|---|
| By: *Or Lenchner* | By: |
| Name: Or Lenchner | Name: |
| Dated: 25-Feb-2020 | Dated: |

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS, LTD** | § | |
| | § | |
| **V.** | § | **CASE NO. 2:18-CV-00483-JRG** |
| | § | |
| **BI SCIENCE, INC.** | § | **FILED UNDER SEAL** |

**FINAL ARBITRATION AWARD**

This matter was submitted to the undersigned as Arbitrator in accordance with Term 17 of the Settlement Agreement dated February 24, 2020. The scope of the Arbitrator's role is to "***resolve by binding arbitration disputes regarding the terms and provisions of the settlement.***" After due consideration of the briefing submitted by the parties, the Arbitrator makes the following general findings.

1. The 17-point agreement executed by William Cornelius as Mediator on February 24, 2020, which is part of the Court's record, is confidential.

2. Any motion to enforce this Arbitration Award shall be filed in the Eastern District of Texas, Marshall Division, and shall be governed by the laws of the state of Texas.

3. An implementation schedule is essential here in order to give meaning and effect to the Arbitrator's resolution of the disputed terms, and hopefully to bring finality to the dispute.

4. The Arbitrator finds that Luminati's request for attorney's fees falls outside the scope of his role as set forth in Term 17, and therefore declines to rule on the merits of such request.

**DISPUTED TERMS**

As for the following terms in dispute the Arbitrator has recited the term language followed by his ruling as to the interpretation and implementation of such language.

**Term 5**

*"BI Science leaves the Proxy Services business world-wide permanently."*

**Arbitrator's ruling**

BI Science shall take all necessary steps, including but not limited to those set forth in the implementation schedule below, to completely exit the Proxy Services business on a permanent and world-wide basis, not later than 28 days after issuance of the Arbitration Award.

**Term 6**

*"BI Science enters a stipulated injunction that BI Science will not use, offer to sell, or sell, Proxy Services in the United States or import Proxy Services into the United States to the extent it is not licensed to do so."*

**Arbitrator's ruling**

Activities prohibited under such injunction shall include any use by BI Science of proxy services for its own internal non-commercial use.

**Term 7**

*"BI Science may continue providing its Urban VPN application to the extent it does not practice Luminati's patents."*

**Arbitrator's ruling**

BI Science shall disable any features of the Urban VPN application that cause it to infringe Luminati's patents and disclose to Luminati the alterations used to disable such features not later than 7 days after BI Science completes its exit from the Proxy Services business.

**Term 8**

*"Luminati makes monthly payments to BI Science of 37% of the gross (invoiced) revenue generated by any BI Science customer of Proxy Services transferred by BI Science and accepted by Luminati to Luminati's Proxy Services as part of this agreement for a period of up to 27 months (Luminati shall not arbitrarily reject BI Science proxy service customers transferred under the settlement agreement. Any rejection shall be supported by legitimate and reasonable grounds including the existing Luminati compliance procedures. Any disputed rejection shall be submitted to arbitration by William Cornelius.)"*

**Arbitrator's ruling**

- BI Science shall identify its Proxy Services customers to Luminati not later than 5 days after issuance of the Arbitration Award;
- BI Science shall refer (transfer) such Proxy Services customers to Luminati not later than 8 days after issuance of the Arbitration Award;
- Luminati shall notify BI Science within 3 days of referral of any customer rejection;

2

**Appx9**

- Luminati shall provide to BI Science its supporting grounds for any rejection with a reasonable degree of detail including, if applicable, which of its compliance procedures forms a basis for the rejection;
- BI Science may dispute the rejection not later than 3 days after being notified of the rejection;
- For any disputed rejection submitted to the arbitrator for resolution:
  - o       If the rejection is upheld, BI Science shall pay the fees incurred by the arbitrator;
  - o       If the rejection is reversed, Luminati shall pay the fees incurred by the arbitrator;
- Term 8 shall not apply to any pre-existing or current Luminati Proxy Services customer even if also a BI Science Proxy Services customer; nor to any customer referred or recommended to Luminati by BI Science after its exit from the Proxy Services business;
- The monthly payments called for in Term 8 are to commence within 30 days after the initial generation of gross revenue by any transferred and accepted BI Science Proxy Services customers, and shall continue for each of the following 27 months in which such gross revenue continues to be generated;
- Once accepted, Luminati shall not arbitrarily terminate any transferred BI Science Proxy Services customer;

**Term 9**

  *"Luminati will set up an escrow account of $350,000 from which payments are to be made to BI Science."*

  **Arbitrator's ruling**

- Luminati shall identify a proposed escrow vendor not later than 7 days after issuance of the Arbitration Award;
- Not later than 7 days thereafter BI Science shall provide its account information;
- Luminati shall transfer the funds not later than 30 days after BI Science exits the Proxy Services business;
- After initial funding of the escrow account Luminati shall maintain sufficient funds in the account to cover monthly payments required under Term 8;
- After making the last required monthly payment to BI Science under Term 8, any funds remaining in the escrow account shall be returned to Luminati.

**Term 12**

  *"BI Science assigns the '244 Patent and related patent applications, continuations, and continuations in part to Luminati."*

3

**Arbitrator's ruling**

BI Science shall identify to Luminati all patent applications, continuations and continuations in part related to the '244 patent not later than 7 days after issuance of the Arbitration Award. The parties shall execute an appropriate *assignment* of such patent and related materials not later than 30 days after issuance of the Arbitration Award.

**Term 14**

*"The parties agree to a 3-year litigation stand down, during which neither party shall institute legal action of any kind against the other except as may be necessary to enforce any settlement reached as a result of the proposal."*

**Arbitrators' ruling**

The 3-year litigation stand down shall run from April 13, 2020.

**UNDISPUTED TERMS**

Other than certain timing issues which are dealt with in the following Implementation Schedule, there are no disputes known to the Arbitrator regarding Terms 1, 2, 3, 4, 9, 10, 11, 13, 15, 16, and 17 of the Settlement Agreement.

4

**IMPLEMENTATION SCHEDULE**

| | Task | Deadline | Applicable Term(s) |
|---|---|---|---|
| 1. | Parties file motions for joint termination of IPRs and to file settlement agreement under seal | Done as directed by Arbitrator on April 24th | 4 |
| 2. | Parties file joint motions to dismiss BI Science II and BI Science III | 3 days after issuance of Arbitration Award | 3 |
| 3. | BI Science identifies its Proxy Services customers to Luminati | 5 days after issuance of Arbitration Award | 8 |
| 4. | Parties file the joint stipulation, joint motions to dismiss and joint motion for entry of final judgment for claim 108 in BI Science I | 7 days after issuance of Arbitration Award | 1, 2, and 6 |
| 5. | Luminati proposes escrow vendor | 7 days after issuance of Arbitration Award | 9 |
| 6. | BI Science provides its account information for payment from escrow account | 7 days after identification of escrow vendor | 9 |
| 7. | BI Science identifies the patent applications, continuations, and continuations in part related to '244 patent | 7 days after issuance of Arbitration Award | 12 |
| 8. | BI Science shall refer (transfer) its Proxy Services customers to Luminati. | 8 days after issuance of Arbitration Award | 8 |
| 9. | Luminati notifies BI Science of any referred customer it rejects | 3 days after referral of customer | 8 |
| 10. | BI Science may dispute rejection of any referred customer | 3 days after being notified of rejection | 8 |
| 11. | BI Science ceases and shuts down all Proxy Services business, including but not limited to (a) shutting down BI Science webpages offering the Proxy Services, (b) withdrawing BI Science | 28 days after issuance of Arbitration Award | 5 |

5

**Appx12**

|  | Geosurf application from web stores, including the Chrome store, and (c) notifying BI Science active customers of the shutdown of its Proxy Services business and referring/transferring such customers to Luminati's referral system and landing page | | |
|---|---|---|---|
| 12. | Parties execute assignment of '244 patent and related patent applications, continuations and continuations in part | 30 days after issuance of Arbitration Award | 12 |
| 13. | BI Science shall disable any features of the Urban VPN application that cause it to infringe Luminati's patents and disclose to Luminati the steps taken to disable such features | 7 days after BI Science exit from Proxy Services business | 7 |
| 14. | Luminati transfers $350,000 to escrow account | 30 days after BI Science exit from Proxy Services business | 9 |

_William Cornelius_
William Cornelius
Arbitrator
April 29, 2020

6

**Appx13**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| LUMINATI NETWORKS LTD., | § | |
| | § | |
| | § | CIVIL ACTION NO.  2:18-CV-00483-JRG |
| Plaintiff, | § | |
| | § | |
| v. | § | FILED UNDER SEAL |
| | § | |
| BI SCIENCE INC., BI SCIENCE (2009) | § | |
| LTD., | § | |
| | § | |
| | § | |
| Defendants. | | |

## <u>ORDER AND FINAL JUDGMENT</u>

Before the Court are the following motions:

- Motion for Enforcement of Settlement Agreement and Arbitrator's Award (Dkt. No. 185) filed by Plaintiff Luminati Networks Ltd. ("Luminati" or "Plaintiff");

- Motion for Sanctions (Dkt. No. 187) filed by Luminati;

- Motion to Withdraw Findlay Craft P.C. As Counsel and to Stay the Case for Substitute Counsel to Appear ("Motion to Withdraw Findlay Craft") (Dkt. No. 188) filed by Defendant BIScience Inc.[1] ("BIScience" or "Defendant");

- Unopposed Motion to Withdraw Ronal Abramson and M. Michael Lewis as Counsel for Defendant ("Motion to Withdraw Abramson and Lewis") (Dkt. No. 193) filed by BIScience; and

---

[1] Plaintiff represents that BI Science (2009) Ltd. is also known as BI Science Inc.  (*See, e.g.,* Dkt. No. 194 at 1.)  Defendant seems to indirectly reject this contention.  (*See, e.g.,* Dkt. No. 203 at 2) ("Defendant BIScience (2009) Ltd (which Plaintiff alleges is also known as BIScience Inc.) . . .").  The Parties also inconsistently use spaces when referring to BiScience.  (*Compare, e.g.,* Dkt. No. 194 ("BI Science") and Dkt. No. 203 ("BIScience").)  The Court will adopt Defendants' recent notation and refer to Defendants as "BIScience," which will include BI Science Inc. and BI Science (2009) Ltd. collectively, unless specified otherwise.

- Motion to Enforce Settlement Agreement and Arbitration Award (Dkt. No. 194) filed by Luminati.

(collectively, the "Motions").

Having considered each of the Motions, the related briefing, and the relevant authorities, the Court concludes that the Motions should be and hereby are **GRANTED-IN-PART** and **DENIED-IN-PART** as follows:

- The Court **CONFIRMS** the Final Arbitration Award (April 29, 2020) ("Arbitration Award") (Dkt. No. 217) in its entirety pursuant to 9 U.S.C. § 9.  Under the Arbitration Award and the Court's April 13, 2020 ruling, the Luminati v. BI Science – Mediated Settlement (February 25, 2020) (Dkt. No. 170-4) ("Settlement Agreement") is a valid, binding agreement between the parties;

- The Court hereby **DENIES** Luminati's Motion for Sanctions;

- The Court hereby **GRANTS-IN-PART** the Motion to Withdraw Findlay Craft.  It is **ORDERED** that Findlay Craft, P.C. be permitted to withdraw as counsel of record for BIScience in this matter.  ECF notifications to the aforementioned counsel are to be terminated in the above-captioned case.  In light of the ruling herein, the Court hereby **DENIES** BIScience's request for a stay of the case;

- The Court hereby **GRANTS** the Motion to Withdraw Abramson and Lewis.  It is **ORDERED** that Mr. Ronald Abramson and Mr. Mord Michael Lewis be permitted to withdraw as counsel of record for BIScience in this matter.  ECF notifications to the aforementioned attorneys are to be terminated in the above-captioned case.

Further, pursuant to 9 U.S.C. § 13, the Court hereby **ENTERS FINAL JUDGMENT** pursuant to and fully incorporating herein by reference for all purposes (as if set forth herein

verbatim) all the terms of the attached Settlement Agreement (Dkt. No. 170-4) (attached hereto as Exhibit A) and the Arbitration Award (Dkt. No. 217) (attached hereto as Exhibit B).  Further, this Court expressly retains jurisdiction to enforce the terms of this judgment between these parties, their successors and assigns.

All other relief not expressly granted herein is **DENIED AS MOOT**.  The Clerk of the Court is directed to **CLOSE** the case.

**So ORDERED and SIGNED this 2nd day of July, 2020.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

*RESTRICTED – ATTORNEYS' EYES ONLY – Protected by Fed. R. Evid. 408*

### Luminati v. BI Science – Mediated Settlement

Mediator William Cornelius's settlement proposal accepted by parties Luminati Networks Ltd. ("Luminati") and Defendant BI Science (2009) Ltd., also known as BI Science Inc., ("BI Science") (collectively, "Parties") on February 23, 2020 resulting in resolution of the following district court cases and proceedings before the PTAB ("BI Science Proceedings"):

- *Luminati Networks Ltd. v. BI Science Inc.*, Case No 2:18-cv-483, E.D. Texas;
- *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, Case No 2:19-cv-352, E.D. Texas;
- *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, Case No 2:19-cv-397, E.D. Texas;
- Petition for *Inter Partes* Review of U.S. Patent No. 9,241,044, IPR2020-166; and
- Petition for *Inter Partes* Review of U.S. Patent No. 9,742,866, IPR2020-167.

The Parties entered into a global settlement including resolution of patent infringement and invalidity claims involving U.S. Patent Nos. 9,241,044, 9,742,866, 10,257,319, 10,410,244, 10,469,614, 10,484,510, and 10,484,511 ("Patents in Suit") involving BI Science's residential proxy and data center proxy services, including under the "Geosurf" brand ("Proxy Services") proxy service. The Parties agreed to the following:

1. Both Parties dismiss all claims in Case No 2:18-cv-483 with prejudice except for the claim of invalidity with regard to claim 108 of U.S. Patent No. 9,241,044 ("'044 Patent");

2. The Parties shall move for entry of final judgment with regard to claim 108 of the '044 Patent;

3. Luminati dismisses Case No. 2:19-cv-352 and Case No 2:19-cv-397 without prejudice;

4. BI Science withdraws its *inter partes* review petitions (IPR2020-166 and IPR2020-167) against certain Patents-in-Suit;

5. BI Science leaves the Proxy Services business world-wide permanently;

6. BI Science enters a stipulated injunction that BI Science will not use, offer to sell, or sell, Proxy Services in the United States or import Proxy Services into the United States to the extent it is not licensed by Luminati to do so;

7. BI Science may continue providing its Urban VPN application to the extent it does not practice Luminati's patents;

8. Luminati makes monthly payments to BI Science of 37% of the gross (invoiced) revenue generated by any BI Science customer of Proxy Services transferred by BI Science and accepted by Luminati to Luminati's Proxy Services as part of this agreement for a period up to 27 months (Luminati shall not arbitrarily reject Luminati proxy service customers transferred under the settlement agreement.  Any rejection shall be supported by legitimate and reasonable grounds including the existing Luminati compliance procedures. Any disputed rejection shall be submitted to arbitration by William Cornelius.);

*RESTRICTED – ATTORNEYS' EYES ONLY – Protected by Fed. R. Evid. 408*

9.  Luminati will set up an escrow account of $350,000 from which payments are to be made to BI Science;

10. Luminati agrees not to file a post grant review petition, inter partes review petition or other reexamination petition against BI Science's U.S. Patent No. 10,410,244 ("'244 Patent") and other BI Science patents to the extent that BI Science does not threaten or otherwise asserts its patents against Luminati, its customers, licensees or affiliates, in which case there is no restriction on Luminati's ability to challenge one or more of the BI Science patents;

11. BI Science agrees not to file a post grant review petition, inter partes review petition or other reexamination petition against the Patents in Suit or any other patents assigned to Luminati; and

12. BI Science assigns the '244 Patent and related patent applications, continuations, and continuations in part to Luminati.

13. Luminati agrees to provide its Residential proxy network service to BI Science at a lowered, fixed price of $0.40/GB for up to 50 TB/month for 5 years solely in support of BI Science's Adclarity business, under the strict prohibition against Bi Science reselling access to Luminati's residential proxy network;

14. The parties agree to a 3-year litigation stand down, during which neither party shall institute legal action of any kind against the other except as may be necessary to enforce any settlement reached as a result of this proposal;

15. The parties are to release a mutually agreed press release;

16. Each side will bear its own costs and attorney's fees; and

17. The parties agree to submit any disputes regarding the terms and provisions of the settlement to binding arbitration by William Cornelius.

**MEDIATOR**

By: _William Cornelius_

Name: William Cornelius

Dated: 2-24-2020

The undersigned Parties agree that the terms of this agreement are confidential and shall not be disclosed except as reasonably necessary to attorneys, financial representatives, and lenders or as reasonably necessary to comply with governmental laws, regulations, court orders and subpoenas.

LUMINATI NETWORKS LTD.

By: _Or Lenchner_

Name: Or Lenchner

Dated: 25-Feb-2020

BI SCIENCE (2009) LTD.

By:

Name:

Dated:

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS, LTD** | § | |
| | § | |
| **V.** | § | **CASE NO. 2:18-CV-00483-JRG** |
| | § | |
| **BI SCIENCE, INC.** | § | **FILED UNDER SEAL** |

**FINAL ARBITRATION AWARD**

This matter was submitted to the undersigned as Arbitrator in accordance with Term 17 of the Settlement Agreement dated February 24, 2020. The scope of the Arbitrator's role is to "***resolve by binding arbitration disputes regarding the terms and provisions of the settlement.***" After due consideration of the briefing submitted by the parties, the Arbitrator makes the following general findings.

1.  The 17-point agreement executed by William Cornelius as Mediator on February 24, 2020, which is part of the Court's record, is confidential.

2.  Any motion to enforce this Arbitration Award shall be filed in the Eastern District of Texas, Marshall Division, and shall be governed by the laws of the state of Texas.

3.  An implementation schedule is essential here in order to give meaning and effect to the Arbitrator's resolution of the disputed terms, and hopefully to bring finality to the dispute.

4.  The Arbitrator finds that Luminati's request for attorney's fees falls outside the scope of his role as set forth in Term 17, and therefore declines to rule on the merits of such request.

**DISPUTED TERMS**

As for the following terms in dispute the Arbitrator has recited the term language followed by his ruling as to the interpretation and implementation of such language.

**Term 5**

*"BI Science leaves the Proxy Services business world-wide permanently."*

1

**Arbitrator's ruling**

BI Science shall take all necessary steps, including but not limited to those set forth in the implementation schedule below, to completely exit the Proxy Services business on a permanent and world-wide basis, not later than 28 days after issuance of the Arbitration Award.

**Term 6**

*"BI Science enters a stipulated injunction that BI Science will not use, offer to sell, or sell, Proxy Services in the United States or import Proxy Services into the United States to the extent it is not licensed to do so."*

**Arbitrator's ruling**

Activities prohibited under such injunction shall include any use by BI Science of proxy services for its own internal non-commercial use.

**Term 7**

*"BI Science may continue providing its Urban VPN application to the extent it does not practice Luminati's patents."*

**Arbitrator's ruling**

BI Science shall disable any features of the Urban VPN application that cause it to infringe Luminati's patents and disclose to Luminati the alterations used to disable such features not later than 7 days after BI Science completes its exit from the Proxy Services business.

**Term 8**

*"Luminati makes monthly payments to BI Science of 37% of the gross (invoiced) revenue generated by any BI Science customer of Proxy Services transferred by BI Science and accepted by Luminati to Luminati's Proxy Services as part of this agreement for a period of up to 27 months (Luminati shall not arbitrarily reject BI Science proxy service customers transferred under the settlement agreement.  Any rejection shall be supported by legitimate and reasonable grounds including the existing Luminati compliance procedures. Any disputed rejection shall be submitted to arbitration by William Cornelius.)"*

**Arbitrator's ruling**

- BI Science shall identify its Proxy Services customers to Luminati not later than 5 days after issuance of the Arbitration Award;
- BI Science shall refer (transfer) such Proxy Services customers to Luminati not later than 8 days after issuance of the Arbitration Award;
- Luminati shall notify BI Science within 3 days of referral of any customer rejection;

2

- Luminati shall provide to BI Science its supporting grounds for any rejection with a reasonable degree of detail including, if applicable, which of its compliance procedures forms a basis for the rejection;
- BI Science may dispute the rejection not later than 3 days after being notified of the rejection;
- For any disputed rejection submitted to the arbitrator for resolution:
    o    If the rejection is upheld, BI Science shall pay the fees incurred by the arbitrator;
    o    If the rejection is reversed, Luminati shall pay the fees incurred by the arbitrator;
- Term 8 shall not apply to any pre-existing or current Luminati Proxy Services customer even if also a BI Science Proxy Services customer; nor to any customer referred or recommended to Luminati by BI Science after its exit from the Proxy Services business;
- The monthly payments called for in Term 8 are to commence within 30 days after the initial generation of gross revenue by any transferred and accepted BI Science Proxy Services customers, and shall continue for each of the following 27 months in which such gross revenue continues to be generated;
- Once accepted, Luminati shall not arbitrarily terminate any transferred BI Science Proxy Services customer;

**Term 9**

*"Luminati will set up an escrow account of $350,000 from which payments are to be made to BI Science."*

**Arbitrator's ruling**

- Luminati shall identify a proposed escrow vendor not later than 7 days after issuance of the Arbitration Award;
- Not later than 7 days thereafter BI Science shall provide its account information;
- Luminati shall transfer the funds not later than 30 days after BI Science exits the Proxy Services business;
- After initial funding of the escrow account Luminati shall maintain sufficient funds in the account to cover monthly payments required under Term 8;
- After making the last required monthly payment to BI Science under Term 8, any funds remaining in the escrow account shall be returned to Luminati.

**Term 12**

*"BI Science assigns the '244 Patent and related patent applications, continuations, and continuations in part to Luminati."*

3

**Arbitrator's ruling**

BI Science shall identify to Luminati all patent applications, continuations and continuations in part related to the '244 patent not later than 7 days after issuance of the Arbitration Award. The parties shall execute an appropriate ***assignment*** of such patent and related materials not later than 30 days after issuance of the Arbitration Award.

**Term 14**

*"The parties agree to a 3-year litigation stand down, during which neither party shall institute legal action of any kind against the other except as may be necessary to enforce any settlement reached as a result of the proposal."*

**Arbitrators' ruling**

The 3-year litigation stand down shall run from April 13, 2020.


**UNDISPUTED TERMS**

Other than certain timing issues which are dealt with in the following Implementation Schedule, there are no disputes known to the Arbitrator regarding Terms 1, 2, 3, 4, 9, 10, 11, 13, 15, 16, and 17 of the Settlement Agreement.

4

**IMPLEMENTATION SCHEDULE**

| | Task | Deadline | Applicable Term(s) |
|---|---|---|---|
| 1. | Parties file motions for joint termination of IPRs and to file settlement agreement under seal | Done as directed by Arbitrator on April 24th | 4 |
| 2. | Parties file joint motions to dismiss BI Science II and BI Science III | 3 days after issuance of Arbitration Award | 3 |
| 3. | BI Science identifies its Proxy Services customers to Luminati | 5 days after issuance of Arbitration Award | 8 |
| 4. | Parties file the joint stipulation, joint motions to dismiss and joint motion for entry of final judgment for claim 108 in BI Science I | 7 days after issuance of Arbitration Award | 1, 2, and 6 |
| 5. | Luminati proposes escrow vendor | 7 days after issuance of Arbitration Award | 9 |
| 6. | BI Science provides its account information for payment from escrow account | 7 days after identification of escrow vendor | 9 |
| 7. | BI Science identifies the patent applications, continuations, and continuations in part related to '244 patent | 7 days after issuance of Arbitration Award | 12 |
| 8. | BI Science shall refer (transfer) its Proxy Services customers to Luminati. | 8 days after issuance of Arbitration Award | 8 |
| 9. | Luminati notifies BI Science of any referred customer it rejects | 3 days after referral of customer | 8 |
| 10. | BI Science may dispute rejection of any referred customer | 3 days after being notified of rejection | 8 |
| 11. | BI Science ceases and shuts down all Proxy Services business, including but not limited to (a) shutting down BI Science webpages offering the Proxy Services, (b) withdrawing BI Science | 28 days after issuance of Arbitration Award | 5 |

**Appx25**

|     |     |     |     |
| --- | --- | --- | --- |
|     | Geosurf application from web stores, including the Chrome store, and (c) notifying BI Science active customers of the shutdown of its Proxy Services business and referring/transferring such customers to Luminati's referral system and landing page |     |     |
| 12. | Parties execute assignment of '244 patent and related patent applications, continuations and continuations in part | 30 days after issuance of Arbitration Award | 12 |
| 13. | BI Science shall disable any features of the Urban VPN application that cause it to infringe Luminati's patents and disclose to Luminati the steps taken to disable such features | 7 days after BI Science exit from Proxy Services business | 7 |
| 14. | Luminati transfers $350,000 to escrow account | 30 days after BI Science exit from Proxy Services business | 9 |

*William Cornelius*
William Cornelius
Arbitrator
April 29, 2020

6

**Appx26**

<span style="color:green">APPEAL,JRG3,JURY,MARKMANREF,PATENT/TRADEMARK,PROTECTIVE-ORDER,STAYED</span>

## U.S. District Court
## Eastern District of TEXAS [LIVE] (Marshall)
## CIVIL DOCKET FOR CASE #: 2:18-cv-00483-JRG

Luminati Networks Ltd. v. BI Science Inc.                     Date Filed: 11/08/2018
Assigned to: District Judge Rodney Gilstrap              Date Terminated: 07/02/2020
Case in other court:  USCA FEDERAL CURCUIT, 20-02118    Jury Demand: Both
                      FEDERAL CIRCUIT, 20-02181    Nature of Suit: 830 Patent
                      Federal Circuit, 21-01664    Jurisdiction: Federal Question
                      Federal Circuit, 21-01667
Cause: 35:271 Patent Infringement

**Mediator**

**William Joseph Cornelius**
One American Center
909 ESE Loop 323
Suite 400
P.O. Box 7339
Tyler, TX 75711-7339
903-509-5004
*wc@wilsonlawfirm.com*

**Technical Advisor**

**Donald E Tiller**
D. Tiller Law PLLC
1525 Merrimac Circle
Suite 210
Fort Worth, TX 76107
*don.tiller@dtillerlawpllc.com*

**Plaintiff**

**Luminati Networks Ltd.**                    represented by    **Amadou Kilkenny Diaw**
                                            RuyakCherian LLP
                                            1901 L Street NW
                                            Suite 700
                                            Washington, DC 20006
                                            202-838-1564
                                            Fax: 202-478-1715
                                            Email: amadoukd@ruyakcherian.com
                                            *ATTORNEY TO BE NOTICED*

                                            **Elizabeth L DeRieux**
                                            Capshaw DeRieux LLP
                                            114 E Commerce Avenue
                                            Gladewater, TX 75647
                                            (903) 845-5770
                                            Email: ederieux@capshawlaw.com
                                            *ATTORNEY TO BE NOTICED*

**Appx27**

**Gregory Blake Thompson**
Mann Tindel & Thompson
201 E. Howard Street
Henderson, TX 75654
903/657-8540
Fax: 903-657-6003
Email: Blake@TheMannFirm.com
*ATTORNEY TO BE NOTICED*

**James Mark Mann**
Mann Tindel & Thompson
201 E. Howard Street
Henderson, TX 75654
903/657-8540
Fax: 903-657-6003
Email: Mark@TheMannFirm.com
*ATTORNEY TO BE NOTICED*

**Robert M Harkins , Jr**
RuyakCherian LLP - Berkley
1936 University Avenue
Suite 350
Berkeley, CA 94704
510-944-0187
Fax: 202-478-1715
Email: bobh@ruyakcherian.com
*ATTORNEY TO BE NOTICED*

**Ronald Wielkopolski**
RuyakCherian LLP
1700 K St NW, Suite 810
Washington, DC 20006
202.838.1568
Fax: 202-478-1715
Email: ronw@ruyakcherian.com
*ATTORNEY TO BE NOTICED*

**Sidney Calvin Capshaw , III**
Capshaw DeRieux LLP
114 E Commerce Avenue
Gladewater, TX 75647
903-845-5770
Email: ccapshaw@capshawlaw.com
*ATTORNEY TO BE NOTICED*

**Korula T Cherian**
RuyakCherian LLP - Berkley
1936 University Avenue
Suite 350
Berkeley, CA 94704
510.944.0185
Email: sunnyc@ruyakcherian.com
*ATTORNEY TO BE NOTICED*

**Appx28**

V.

**Defendant**

**BI Science Inc.**                          represented by     **Eric Hugh Findlay**
Findlay Craft PC
102 N College Avenue
Suite 900
Tyler, TX 75702
903/534-1100
Fax: 903/534-1137
Email: efindlay@findlaycraft.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
Findlay Craft PC
102 N College Avenue
Suite 900
Tyler, TX 75702
903.534.1100
Fax: 903.534.1137
Email: dgunter@findlaycraft.com
*ATTORNEY TO BE NOTICED*

**Gregory Phillip Love**
Love Law Firm PC
P.O. Box 948 (Henderson, TX 75653)
107 East Main Street
Henderson, TX 75652
903-212-4444
Fax: 903-392-2267
Email: greg@lovetrialfirm.com
*ATTORNEY TO BE NOTICED*

**John Christopher Rozendaal**
Sterne Kessler Goldstein & Fox PLLC -
Washington
1100 New York Ave NW
Suite 600
Washington, DC 20005-3934
202-772-8747
Fax: 202-371-2540
Email: jcrozendaal@sternekessler.com
*ATTORNEY TO BE NOTICED*

**Kelce Steven Wilson**
Findlay Craft PC
102 N College Avenue
Suite 900
Tyler, TX 75702
972-955-2348
Fax: 903-534-1137
Email: kwilson@findlaycraft.com

*ATTORNEY TO BE NOTICED*

**Michael A. Charish**
Charish Law Group P.C.
347 Fifth Avenue
Suite 1402
New York, NY 10016
646-328-0183
Fax: 646-915-1663
Email: michael@charish.law
*ATTORNEY TO BE NOTICED*

**Mord Michael Lewis**
Liston Abramson LLP
405 Lexington Ave.
46th Floor
New York,, NY 10174
212-257-1630
Fax: 917-633-5568
Email: michael.lewis@listonabramson.com
*ATTORNEY TO BE NOTICED*

**Roger Brian Craft**
Findlay Craft PC
102 N College Avenue
Suite 900
Tyler, TX 75702
903/534-1100
Fax: 903/534-1137
Email: bcraft@findlaycraft.com
*ATTORNEY TO BE NOTICED*

**Ronald Abramson**
Liston Abramson LLP
405 Lexington Ave.
46th Floor
New York,, NY 10174
212-257-1630
Fax: 917-633-5568
Email: ron.abramson@listonabramson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**BI Science (2009) Ltd.**                  represented by   **Debra Elaine Gunter**
*agent of*                                                   (See above for address)
BI Science Inc.                                              *ATTORNEY TO BE NOTICED*

                                                             **Eric Hugh Findlay**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Gregory Phillip Love**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**John Christopher Rozendaal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelce Steven Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael A. Charish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mord Michael Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Brian Craft**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ronald Abramson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**BI Science (2009) Ltd.**                   represented by   **Eric Hugh Findlay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Brian Craft**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**BI Science Inc.**                          represented by   **Eric Hugh Findlay**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger Brian Craft**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Hola Networks Ltd.**                       represented by   **Robert M Harkins , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Luminati Networks Ltd.**                   represented by   **Amadou Kilkenny Diaw**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth L DeRieux**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert M Harkins , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ronald Wielkopolski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidney Calvin Capshaw , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Korula T Cherian**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/08/2018 | 1 | COMPLAINT *for Patent Infringement* against BI Science Inc. ( Filing fee $ 400 receipt number 0540-7019529.), filed by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A - '044 Patent, # 2 Exhibit B - '866 Patent, # 3 Civil Cover Sheet)(Cherian, Korula) (Entered: 11/08/2018) |
| 11/08/2018 | 2 | CORPORATE DISCLOSURE STATEMENT filed by Luminati Networks Ltd. identifying Corporate Parent IPPN Group Ltd. for Luminati Networks Ltd.. (Cherian, Korula) (Entered: 11/08/2018) |
| 11/08/2018 | 3 | DEMAND for Trial by Jury by Luminati Networks Ltd.. (Cherian, Korula) (Entered: 11/08/2018) |
| 11/08/2018 | 4 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Cherian, Korula) (Entered: 11/08/2018) |
| 11/08/2018 | 5 | NOTICE of Designation of Attorney in Charge to Korula T Cherian on behalf of Luminati Networks Ltd. (Cherian, Korula) (Entered: 11/08/2018) |
| 11/08/2018 | 6 | NOTICE of Attorney Appearance by Elizabeth L DeRieux on behalf of Luminati Networks Ltd. (DeRieux, Elizabeth) (Entered: 11/08/2018) |
| 11/08/2018 | 7 | NOTICE of Attorney Appearance by Sidney Calvin Capshaw, III on behalf of Luminati Networks Ltd. (Capshaw, Sidney) (Entered: 11/08/2018) |
| 11/08/2018 | | Case assigned to District Judge Rodney Gilstrap. (ch, ) (Entered: 11/08/2018) |
| 11/08/2018 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non-jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically |

|  |  | using the event *Notice Regarding Consent to Proceed Before Magistrate Judge*. (ch, ) (Entered: 11/08/2018) |
|---|---|---|
| 11/09/2018 | 8 | NOTICE of Attorney Appearance by Ronald Wielkopolski on behalf of Luminati Networks Ltd. (Wielkopolski, Ronald) (Entered: 11/09/2018) |
| 11/19/2018 | 9 | SUMMONS Issued as to BI Science Inc.. (nkl, ) (Entered: 11/19/2018) |
| 11/27/2018 | 10 | MOTION for Appointment of International Process Server by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 11/27/2018) |
| 11/28/2018 | 11 | ORDER granting 10 MOTION for Appointment of International Process Server. Signed by District Judge Rodney Gilstrap on 11/28/2018. (ch, ) (Entered: 11/28/2018) |
| 12/04/2018 | 12 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re BI Science Inc..( Findlay, Eric) (Entered: 12/04/2018) |
| 12/04/2018 |  | Defendant's Unopposed FIRST Application for Extension of Time to Answer Complaint is granted pursuant to Local Rule CV-12 for BI Science Inc. to 1/11/2019. 30 Days Granted for Deadline Extension.( ch, ) (Entered: 12/04/2018) |
| 01/10/2019 | 13 | Defendant's Unopposed Second Application for Extension of Time to Answer Complaint re BI Science Inc..( Findlay, Eric) (Entered: 01/10/2019) |
| 01/10/2019 |  | Defendant's Unopposed Second Application for Extension of Time to Answer Complaint is granted pursuant to Local Rule CV-12 for BI Science Inc. to 1/28/2019. 15 Days Granted for Deadline Extension.( nkl, ) (Entered: 01/10/2019) |
| 01/28/2019 | 14 | Unopposed MOTION to Seal Document *DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 01/28/2019) |
| 01/28/2019 | 15 | SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Findlay, Eric) (Entered: 01/28/2019) |
| 01/28/2019 | 16 | CORPORATE DISCLOSURE STATEMENT filed by BI Science Inc. identifying Corporate Parent None for BI Science Inc.. (Findlay, Eric) (Entered: 01/28/2019) |
| 01/30/2019 | 17 | ORDER granting 14 Unopposed MOTION to Seal Document DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE. Signed by District Judge Rodney Gilstrap on 1/30/2019. (ch, ) (Entered: 01/30/2019) |
| 01/30/2019 | 18 | NOTICE of Attorney Appearance by Robert M Harkins, Jr on behalf of Luminati Networks Ltd. (Harkins, Robert) (Entered: 01/30/2019) |
| 01/31/2019 | 19 | REDACTION to 15 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Findlay, Eric) (Entered: 01/31/2019) |
| 02/06/2019 | 20 | NOTICE of Readiness for Scheduling Conference by Luminati Networks Ltd. (Harkins, Robert) (Entered: 02/06/2019) |
| 02/12/2019 | 21 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 15 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by Luminati Networks Ltd..* (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Affidavit Dell'Olio, # 10 Exhibit A, # 11 Exhibit B, # 12 Exhibit C, # 13 Exhibit D, # 14 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 02/12/2019) |

| 02/12/2019 | 22 | SEALED PATENT MOTION *for Early Venue Discovery* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Affidavit Dell'Olio, # 10 Exhibit A, # 11 Exhibit B, # 12 Exhibit C, # 13 Exhibit D, # 14 Text of Proposed Order) (Wielkopolski, Ronald) (Entered: 02/12/2019) |
| 02/12/2019 | 23 | REDACTION to 21 Sealed Patent Response to Sealed Patent Motion,, by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Affidavit Dell'Olio, # 10 Exhibit A, # 11 Exhibit B, # 12 Exhibit C, # 13 Exhibit D, # 14 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 02/12/2019) |
| 02/12/2019 | 24 | REDACTION to 22 SEALED PATENT MOTION *for Early Venue Discovery* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Affidavit Dell'Olio, # 10 Exhibit A, # 11 Exhibit B, # 12 Exhibit C, # 13 Exhibit D, # 14 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 02/12/2019) |
| 02/13/2019 | 25 | Unopposed MOTION to Seal *Dkts. 21 and 22* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 02/13/2019) |
| 02/14/2019 | 26 | ORDER granting 25 Motion for Leave to Seal Document 21 and 22. Signed by District Judge Rodney Gilstrap on 2/14/2019. (ch, ) (Entered: 02/15/2019) |
| 02/15/2019 | 27 | Unopposed MOTION for Extension of Time to File Response/Reply as to 15 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 02/15/2019) |
| 02/19/2019 | 28 | AMENDED COMPLAINT *for Patent Infringement* against BI Science (2009) Ltd., filed by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A - '044 Patent, # 2 Exhibit B - '866 Patent, # 3 Exhibit C - blog post, # 4 Exhibit D - blog post, # 5 Exhibit E - Guide) (Cherian, Korula) (Entered: 02/19/2019) |
| 02/21/2019 | 29 | ORDER granting 27 Motion for Extension of Time to File Response/Reply re 15 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* Replies due by 2/25/2019.. Signed by District Judge Rodney Gilstrap on 2/21/2019. (ch, ) (Entered: 02/21/2019) |
| 02/25/2019 | 30 | ORDER - Scheduling Conference set for 3/18/2019 02:30 PM before District Judge Rodney Gilstrap. Signed by District Judge Rodney Gilstrap on 2/25/2019. (ch, ) (Entered: 02/26/2019) |
| 02/27/2019 | 31 | RESPONSE to Motion re 22 SEALED PATENT MOTION *for Early Venue Discovery filed by BI Science (2009) Ltd., BI Science Inc..* (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 02/27/2019) |
| 02/28/2019 | 32 | Unopposed MOTION for Extension of Time to Complete Discovery *re P.R. 3-1 and 3-2* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 02/28/2019) |
| 03/01/2019 | 33 | REPLY to Response to Motion re 22 SEALED PATENT MOTION *for Early Venue Discovery and Notice of Readiness for Ruling on Pending Motion to Dismiss or Transfer (Dkt. 15) - No Reply Filed filed by Luminati Networks Ltd..* (Wielkopolski, Ronald) (Entered: 03/01/2019) |
| 03/01/2019 | 34 | NOTICE by Luminati Networks Ltd. re 15 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE of Readiness for Ruling - No Reply Filed* (Wielkopolski, Ronald) (Entered: 03/01/2019) |

**Appx34**

| 03/04/2019 | | ***DISREGARD THE FILED IN ERROR******FILED IN ERROR. FILED UNDER THE WRONG EVENT Document # 34, Notice. PLEASE IGNORE.*** (ch, ) Modified on 3/4/2019 (ch, ). (Entered: 03/04/2019) |
|---|---|---|
| 03/04/2019 | | NOTICE FROM CLERK - disregard the filed in error on #34, clerk error. (ch, ) (Entered: 03/04/2019) |
| 03/04/2019 | 35 | Unopposed MOTION to Seal Document *DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 03/04/2019) |
| 03/04/2019 | 36 | SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Moyal Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Text of Proposed Order)(Findlay, Eric) (Entered: 03/04/2019) |
| 03/05/2019 | 37 | ORDER granting 32 Motion for Extension of Time to Complete Discovery. Signed by District Judge Rodney Gilstrap on 3/5/19. (ch, ) (Entered: 03/05/2019) |
| 03/05/2019 | 38 | ORDER granting 35 Unopposed MOTION to Seal Document DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE. Signed by District Judge Rodney Gilstrap on 3/5/2019. (ch, ) (Entered: 03/06/2019) |
| 03/06/2019 | 39 | REDACTION to 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Exhibit 1 - Moyal Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Text of Proposed Order)(Findlay, Eric) (Entered: 03/06/2019) |
| 03/12/2019 | 40 | Opposed MOTION to Strike 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Dell'Olio, # 2 Exhibit A, # 3 Text of Proposed Order) (Wielkopolski, Ronald) (Entered: 03/12/2019) |
| 03/15/2019 | 41 | NOTICE of Discovery Disclosure by Luminati Networks Ltd. *re P.R. 3-1 and 3-2* (Harkins, Robert) (Entered: 03/15/2019) |
| 03/18/2019 | 42 | NOTICE of Attorney Appearance by Roger Brian Craft on behalf of BI Science (2009) Ltd., BI Science Inc. (Craft, Roger) (Entered: 03/18/2019) |
| 03/18/2019 | | Minute Entry for proceedings held before Judge Rodney Gilstrap: Scheduling Conference held on 3/18/2019. Counsel for the parties appeared and were asked if they consented to a trial before the United States Magistrate Judge. The Court then gave Markman and Jury Selection dates; deadlines for submitting Mediator names (3 days); and deadlines for submitting Agreed Scheduling and Discovery Orders (14 days). (Court Reporter Shelly Holmes, CSR-TCRR.)(jml) Modified on 3/20/2019 (jml, ). (Entered: 03/19/2019) |
| 03/19/2019 | 43 | Unopposed MOTION to Seal *Response to Defendant's Motion to Dismiss, and in the Alternative, Motion to Transfer Venue* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 03/19/2019) |
| 03/19/2019 | 44 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by Luminati Networks Ltd..* (Attachments: # 1 Affidavit Dell'Olio, # 2 Exhibit A, # 3 Affidavit Wielkopolski, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 03/19/2019) |

| 03/20/2019 | 45 | REDACTION to 44 Sealed Patent Response to Sealed Patent Motion, by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Dell'Olio, # 2 Exhibit A, # 3 Affidavit Wielkopolski, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 03/20/2019) |
| 03/20/2019 | 46 | NOTICE of Designation of Mediator, William Cornelius, filed by Luminati Networks Ltd.. (Harkins, Robert) (Entered: 03/20/2019) |
| 03/21/2019 | 47 | ORDER granting 43 Motion for Leave to file under seal. Signed by District Judge Rodney Gilstrap on 3/21/2019. (ch, ) (Entered: 03/21/2019) |
| 03/21/2019 | 48 | ORDER REFERRING CASE to Mediator William Cornelius, One American Center, 909 ESE Loop 323, Suite 400, Tyler, Texas 75701, telephone number 903-509-5004 and fax number 903-509- 5091, is hereby appointed as mediator. Signed by District Judge Rodney Gilstrap on 3/21/2019. (ch, ) (Entered: 03/22/2019) |
| 03/22/2019 | 49 | Unopposed MOTION for Extension of Time to File Response/Reply as to 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 03/22/2019) |
| 03/26/2019 | 50 | ORDER granting 49 Motion for Extension of Time to File Response/Reply re 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* Replies due by 4/1/2019.. Signed by District Judge Rodney Gilstrap on 3/26/2019. (nkl, ) (Entered: 03/26/2019) |
| 03/26/2019 | 51 | RESPONSE to Motion re 40 Opposed MOTION to Strike 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by BI Science (2009) Ltd., BI Science Inc..* (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 03/26/2019) |
| 04/01/2019 | 52 | Unopposed MOTION to Seal Document *DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 04/01/2019) |
| 04/01/2019 | 53 | SEALED REPLY to Response to Motion re 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* filed by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Supplemental Declaration of Kfir Moyal, # 2 Exhibit D)(Findlay, Eric) (Entered: 04/01/2019) |
| 04/01/2019 | 54 | Joint MOTION for Entry of Proposed Agreed Docket Control Order by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/01/2019) |
| 04/01/2019 | 55 | Joint MOTION for Entry of Partially Disputed Proposed Discovery Order by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/01/2019) |
| 04/02/2019 | 56 | Unopposed MOTION to Seal *Reply in Support of Motion to Strike Portions of Defendant's Motion to Dismiss, and in the Alternative, Motion to Transfer Venue* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/02/2019) |
| 04/02/2019 | 57 | SEALED PATENT REPLY to Response to PATENT Motion re 40 Opposed MOTION to Strike 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by Luminati Networks Ltd..* (Wielkopolski, Ronald) (Entered: 04/02/2019) |

| 04/02/2019 | 58 | ORDER granting 52 Unopposed MOTION to Seal Document DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE 53 Sealed Reply to Response to Motion. Signed by District Judge Rodney Gilstrap on 4/2/2019. (ch, ) (Entered: 04/03/2019) |
|---|---|---|
| 04/02/2019 | 59 | DOCKET CONTROL ORDER granting 54 Joint MOTION for Entry of Proposed Agreed Docket Control Order. Pretrial Conference set for 4/27/2020 09:00 AM before District Judge Rodney Gilstrap., Amended Pleadings due by 9/10/2019., Jury Selection set for 6/1/2020 09:00AM before District Judge Rodney Gilstrap., Mediation Completion due by 12/24/2019., Markman Hearing set for 11/26/2019 01:30 PM before District Judge Rodney Gilstrap., Motions due by 4/6/2020., Proposed Pretrial Order due by 4/20/2020. Signed by District Judge Rodney Gilstrap on 4/2/2019. (ch, ) (Entered: 04/03/2019) |
| 04/03/2019 | 60 | REDACTION to 53 Sealed Reply to Response to Motion, *MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Supplemental Declaration of Kfir Moyal, # 2 Exhibit D - Redacted in Full)(Findlay, Eric) (Entered: 04/03/2019) |
| 04/04/2019 | 61 | ORDER granting 56 Motion to Seal. ORDERED that Plaintiffs Reply in Support of Its Motion to Strike Portions of Defendants Motion to Dismiss, and in the Alternative, Motion to Transfer Venue (Dkt. No. 57) is filed under seal. Signed by District Judge Rodney Gilstrap on 4/3/2019. (ch, ) (Entered: 04/04/2019) |
| 04/04/2019 | 62 | DISCOVERY ORDER granting 55 Joint MOTION for Entry of Partially Disputed Proposed Discovery Order. Signed by District Judge Rodney Gilstrap on 4/4/2019. (ch, ) (Entered: 04/04/2019) |
| 04/04/2019 | 63 | REDACTION to 57 Sealed PATENT Reply to Response to PATENT Motion by Luminati Networks Ltd.. (Wielkopolski, Ronald) (Entered: 04/04/2019) |
| 04/05/2019 | 64 | SUR-REPLY to Reply to Response to Motion re 40 Opposed MOTION to Strike 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by BI Science (2009) Ltd., BI Science Inc.*. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Findlay, Eric) (Entered: 04/05/2019) |
| 04/08/2019 | 65 | Opposed MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION TO PLAINTIFF LUMINATI NETWORKS LTD.'S INFRINGEMENT CONTENTIONS by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order) (Findlay, Eric) (Entered: 04/08/2019) |
| 04/08/2019 | 66 | Unopposed MOTION to Seal Document *DEFENDANTS' ADDITIONAL ATTACHMENT TO THEIR MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION TO PLAINTIFF LUMINATI NETWORKS LTD.'S INFRINGEMENT CONTENTIONS* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 04/08/2019) |
| 04/08/2019 | 67 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 65 Opposed MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION TO PLAINTIFF LUMINATI NETWORKS LTD.'S INFRINGEMENT CONTENTIONS . (Attachments: # 1 Exhibit A - Plaintiff's Patent Local Rule 3-1 and 3-2 Disclosures)(Findlay, Eric) (Entered: 04/08/2019) |
| 04/08/2019 | 68 | Opposed MOTION to Expedite *BRIEFING ON ITS MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION FROM PLAINTIFF'S INFRINGEMENT CONTENTIONS* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 04/08/2019) |

| 04/08/2019 | 69 | Joint MOTION for Protective Order *(Agreed)* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/08/2019) |
| 04/08/2019 | 70 | NOTICE of Discovery Disclosure by Luminati Networks Ltd. *re Initial and Additional Disclosures* (Harkins, Robert) (Entered: 04/08/2019) |
| 04/08/2019 | 71 | NOTICE of Discovery Disclosure by BI Science (2009) Ltd., BI Science Inc. *OF COMPLIANCE REGARDING INITIAL AND ADDITIONAL DISCLOSURES* (Findlay, Eric) (Entered: 04/08/2019) |
| 04/09/2019 | 72 | Unopposed MOTION to Seal *Sur-Reply to Motion to Dismiss, and in the Alternative, Motion to Transfer* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/09/2019) |
| 04/09/2019 | 73 | SEALED PATENT SUR-REPLY to Reply to Response to PATENT Motion re 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by* Luminati Networks Ltd.. (Wielkopolski, Ronald) (Entered: 04/09/2019) |
| 04/09/2019 | 74 | ORDER granting 66 Unopposed MOTION to Seal Document DEFENDANTS' ADDITIONAL ATTACHMENT TO THEIR MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION TO PLAINTIFF LUMINATI NETWORKS LTD.'S INFRINGEMENT CONTENTIONS. Signed by District Judge Rodney Gilstrap on 4/9/2019. (ch, ) (Entered: 04/10/2019) |
| 04/09/2019 | 76 | PROTECTIVE ORDER granting 69 Joint MOTION for Protective Order (Agreed). Signed by District Judge Rodney Gilstrap on 4/9/2019. (ch, ) (Entered: 04/10/2019) |
| 04/10/2019 | 75 | ORDER granting 68 Opposed MOTION to Expedite BRIEFING ON ITS MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION FROM PLAINTIFF'S INFRINGEMENT CONTENTIONS. Signed by District Judge Rodney Gilstrap on 4/9/2019. (ch, ) (Entered: 04/10/2019) |
| 04/10/2019 | 77 | REDACTION to 67 Sealed Additional Attachments to Main Document, by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Exhibit A - Redacted)(Findlay, Eric) (Entered: 04/10/2019) |
| 04/10/2019 | 78 | ORDER granting 72 Unopposed Motion for Leave to File Under Seal. Signed by District Judge Rodney Gilstrap on 4/10/2019. (ch, ) (Entered: 04/11/2019) |
| 04/11/2019 | 79 | REDACTION to 73 Sealed PATENT Sur-Reply to Reply to Response to PATENT Motion by Luminati Networks Ltd.. (Wielkopolski, Ronald) (Entered: 04/11/2019) |
| 04/12/2019 | 80 | RESPONSE in Opposition re 65 Opposed MOTION TO REMOVE THE CONFIDENTIAL DESIGNATION TO PLAINTIFF LUMINATI NETWORKS LTD.'S INFRINGEMENT CONTENTIONS *filed by Luminati Networks Ltd..* (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/12/2019) |
| 04/24/2019 | 81 | ORDER granting in part and denying in part 65 Motion Remove the Confidential Designation to Plaintiff Luminati Networks Ltd.s (Luminati) Infringement Contentions. Signed by District Judge Rodney Gilstrap on 4/24/2019. (nkl, ) (Entered: 04/24/2019) |
| 05/13/2019 | 82 | MEMORANDUM OPINION AND ORDER re 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by* BI Science Inc., BI Science (2009) Ltd., 22 SEALED PATENT MOTION *for Early Venue Discovery* filed by Luminati Networks Ltd., 15 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE filed by* BI Science Inc., 40 Opposed MOTION to Strike 36 SEALED MOTION *TO DISMISS, AND IN THE ALTERNATIVE,* |

| | | |
|---|---|---|
| | | *MOTION TO TRANSFER VENUE* filed by Luminati Networks Ltd... Signed by District Judge Rodney Gilstrap on 5/13/2019. (nkl, ) (Entered: 05/13/2019) |
| 05/17/2019 | 83 | Unopposed MOTION for Extension of Time to Complete Discovery *regarding Compliance with P.R. 3-3 and 3-4 Disclosures* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 05/17/2019) |
| 05/21/2019 | 84 | ORDER granting 83 Motion for Extension of Time to Complete Discovery regarding Compliance with P.R. 3-3 and 3-4 Disclosures. Signed by District Judge Rodney Gilstrap on 5/20/2019. (nkl, ) (Entered: 05/21/2019) |
| 05/28/2019 | 85 | ANSWER to 28 Amended Complaint, *Affirmative Defenses and*, COUNTERCLAIM against Luminati Networks Ltd., Hola Networks Ltd. by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Exhibit A - TheMarker Article)(Findlay, Eric) (Entered: 05/28/2019) |
| 05/29/2019 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non-jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event *Notice Regarding Consent to Proceed Before Magistrate Judge*. (ch, ) (Entered: 05/29/2019) |
| 06/18/2019 | 86 | Unopposed MOTION for Extension of Time to File Answer re 85 Answer to Amended Complaint,, Counterclaim, by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 06/18/2019) |
| 06/19/2019 | 87 | MEMORANDUM OPINION AND ORDER re 86 Unopposed Motion to Extend Time to Answer Counterclaims. Signed by District Judge Rodney Gilstrap on 6/19/2019. (nkl, ) (Entered: 06/19/2019) |
| 06/19/2019 | 88 | MOTION to Dismiss *Counterclaims of False Advertising and Monopolization* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 06/19/2019) |
| 06/27/2019 | 89 | Unopposed MOTION for Extension of Time to File Response/Reply as to 88 MOTION to Dismiss *Counterclaims of False Advertising and Monopolization* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 06/27/2019) |
| 07/01/2019 | 90 | ORDER granting 89 Motion for Extension of Time to File Response/Reply re 88 MOTION to Dismiss *Counterclaims of False Advertising and Monopolization* Responses due by 7/12/2019. Signed by District Judge Rodney Gilstrap on 7/1/19. (ch, ) (Entered: 07/02/2019) |
| 07/12/2019 | 91 | RESPONSE to Motion re 88 MOTION to Dismiss *Counterclaims of False Advertising and Monopolization filed by BI Science (2009) Ltd., BI Science Inc.*. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 07/12/2019) |
| 07/22/2019 | 92 | ***WITHDRAWN PER ORDER #96***REPLY to Response to Motion re 88 MOTION to Dismiss *Counterclaims of False Advertising and Monopolization filed by Luminati Networks Ltd.*. (Wielkopolski, Ronald) Modified on 7/30/2019 (ch, ). (Entered: 07/22/2019) |
| 07/23/2019 | 93 | NOTICE of Discovery Disclosure by Luminati Networks Ltd. *re P.R. 4-1* (Wielkopolski, Ronald) (Entered: 07/23/2019) |
| 07/23/2019 | 94 | NOTICE of Discovery Disclosure by BI Science (2009) Ltd., BI Science Inc. |

| | | *REGARDING P.R. 4-1 DISCLOSURES* (Findlay, Eric) (Entered: 07/23/2019) |
|---|---|---|
| 07/24/2019 | 95 | Agreed MOTION to Withdraw 92 Reply to Response to Motion *and Resubmit* by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A - Reply, # 2 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 07/24/2019) |
| 07/29/2019 | 96 | ORDER granting 95 Motion to Withdraw 92 Reply to Response to Motion. Signed by District Judge Rodney Gilstrap on 7/29/19. (ch, ) (Entered: 07/30/2019) |
| 07/30/2019 | 97 | REPLY to Response to Motion re 88 MOTION to Dismiss *Counterclaims of False Advertising and Monopolization filed by Luminati Networks Ltd..* (Wielkopolski, Ronald) (Entered: 07/30/2019) |
| 08/01/2019 | 98 | SUR-REPLY to Reply to Response to Motion re 88 MOTION to Dismiss *Counterclaims of False Advertising and Monopolization filed by BI Science (2009) Ltd., BI Science Inc..* (Findlay, Eric) (Entered: 08/01/2019) |
| 08/13/2019 | 99 | NOTICE of Discovery Disclosure by Luminati Networks Ltd. *re P.R. 4-2* (Wielkopolski, Ronald) (Entered: 08/13/2019) |
| 08/14/2019 | 100 | NOTICE of Discovery Disclosure by BI Science (2009) Ltd., BI Science Inc. *of Compliance re 4-2 Disclosures* (Findlay, Eric) (Entered: 08/14/2019) |
| 09/03/2019 | 101 | Joint MOTION to Amend/Correct *EXTEND THE DEADLINE FOR COMPLIANCE WITH P.R. 4-3* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order First Amended Docket Control Order)(Findlay, Eric) (Entered: 09/03/2019) |
| 09/05/2019 | 102 | FIRST AMENDED DOCKET CONTROL ORDER granting 101 Joint MOTION to Amend/Correct EXTEND THE DEADLINE FOR COMPLIANCE WITH P.R. 4-3. Signed by District Judge Rodney Gilstrap on 9/5/2019. (ch, ) (Entered: 09/05/2019) |
| 09/06/2019 | 103 | P.R. 4-3 Joint Claim Construction and Prehearing Statement by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Exhibit A - Disputed Constructions and Supporting Evidence)(Findlay, Eric) (Entered: 09/06/2019) |
| 09/17/2019 | 104 | NOTICE of Attorney Appearance - Pro Hac Vice by Mord Michael Lewis on behalf of BI Science (2009) Ltd., BI Science Inc.. Filing fee $ 100, receipt number 0540-7438775. (Lewis, Mord) (Entered: 09/17/2019) |
| 09/17/2019 | 105 | NOTICE of Attorney Appearance - Pro Hac Vice by Ronald Abramson on behalf of BI Science (2009) Ltd., BI Science Inc.. Filing fee $ 100, receipt number 0540-7438795. (Abramson, Ronald) (Entered: 09/17/2019) |
| 10/09/2019 | 106 | Joint MOTION for Entry of Order Regarding E-Discovery in Patent Cases by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 10/09/2019) |
| 10/10/2019 | 107 | ORDER REGARDING E-DISCOVERY IN PATENT CASES granting 106 Joint MOTION for Entry of Order Regarding E-Discovery in Patent Cases. Signed by District Judge Rodney Gilstrap on 10/9/2019. (ch, ) (Entered: 10/10/2019) |
| 10/15/2019 | 108 | ***FILED IN ERROR*** <br><br> NOTICE by Luminati Networks Ltd. *of Technology Tutorial* (Wielkopolski, Ronald) Modified on 10/16/2019 (ch, ). (Entered: 10/15/2019) |
| 10/15/2019 | 109 | OPENING CLAIM CONSTRUCTION BRIEF filed by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # |

| | | |
|---|---|---|
| | | 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L)(Harkins, Robert) (Entered: 10/15/2019) |
| 10/16/2019 | | **\*\*\*FILED IN ERROR. FILE A NOTICE AND ATTACH AS ATTACHMENT Document # 108, NOTICE by Luminati Networks Ltd. of Technology Tutorial. PLEASE IGNORE.\*\*\*** <br><br> (ch, ) (Entered: 10/16/2019) |
| 10/16/2019 | 110 | NOTICE by Luminati Networks Ltd. *of Technology Tutorial* (Attachments: # 1 Exhibit Tutorial)(Wielkopolski, Ronald) (Entered: 10/16/2019) |
| 10/18/2019 | 111 | Unopposed MOTION to Amend/Correct *First Amended Docket Control Order* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order Second Amended Docket Control Order)(Findlay, Eric) (Entered: 10/18/2019) |
| 10/22/2019 | 112 | Order Referring Case for Claim Construction Purposes Only to Judge Roy S Payne. Signed by District Judge Rodney Gilstrap on 10/22/2019. (ch, ) (Entered: 10/22/2019) |
| 10/22/2019 | 113 | ORDER granting 111 Unopposed MOTION to Amend/Correct First Amended Docket Control Order. Signed by District Judge Rodney Gilstrap on 10/22/2019. (ch, ) (Entered: 10/22/2019) |
| 10/22/2019 | | NOTICE of Hearing:Markman Hearing set for 11/26/2019 01:30 PM before Magistrate Judge Roy S. Payne. (bga, ) (Entered: 10/22/2019) |
| 10/22/2019 | 114 | ORDER - Court appoints Don Tiller as the technical advisor. Signed by Magistrate Judge Roy S. Payne on 10/22/2019. (ch, ) (Entered: 10/22/2019) |
| 11/04/2019 | 115 | Sealed Document - RESPONSIVE CLAIM CONSTRUCTION BRIEF filed by BI Science (2009) Ltd and BI Science Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Findlay, Eric) (Entered: 11/04/2019) |
| 11/06/2019 | 116 | REDACTION to 115 Sealed Document *RESPONSIVE CLAIM CONSTRUCTION BRIEF* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B - Redacted in Full)(Findlay, Eric) (Entered: 11/06/2019) |
| 11/07/2019 | 117 | NOTICE of Attorney Appearance by Kelce Steven Wilson on behalf of BI Science (2009) Ltd., BI Science Inc. (Wilson, Kelce) (Entered: 11/07/2019) |
| 11/07/2019 | 118 | NOTICE of Attorney Appearance by Debra Elaine Gunter on behalf of BI Science (2009) Ltd., BI Science Inc. (Gunter, Debra) (Entered: 11/07/2019) |
| 11/14/2019 | 119 | REPLY to 109 Claim Construction Brief, *filed by Luminati Networks Ltd..* (Harkins, Robert) (Entered: 11/14/2019) |
| 11/14/2019 | 120 | SEALED PATENT MOTION *to Compel Production of Documents* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 11/14/2019) |
| 11/15/2019 | 121 | Joint MOTION to Amend/Correct 113 Order on Motion to Amend/Correct by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 11/15/2019) |
| 11/15/2019 | 122 | P.R. 4-5(d) Joint Claim Construction Chart by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A - Chart)(Wielkopolski, Ronald) (Entered: 11/15/2019) |
| 11/18/2019 | 123 | REDACTION to 120 SEALED PATENT MOTION *to Compel Production of Documents* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 11/18/2019) |

| 11/19/2019 | 124 | THIRD AMENDED DOCKET CONTROL ORDER granting 121 Joint MOTION to Amend/Correct 113 Order on Motion to Amend/Correct. Pretrial Conference set for 4/27/2020 09:00 AM before District Judge Rodney Gilstrap., Jury Selection set for 6/1/2020 09:00AM before District Judge Rodney Gilstrap., Mediation Completion due by 12/24/2019., Markman Hearing set for 11/26/2019 01:30 PM before District Judge Rodney Gilstrap., Motions due by 4/13/2020., Proposed Pretrial Order due by 4/20/2020. Signed by District Judge Rodney Gilstrap on 11/19/19. (ch, ) (Entered: 11/19/2019) |
|---|---|---|
| 11/19/2019 | 125 | Unopposed MOTION for Extension of Time to File Response/Reply as to 120 SEALED PATENT MOTION *to Compel Production of Documents* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 11/19/2019) |
| 11/20/2019 | | NOTICE of Hearing:Markman Hearing set for 11/26/2019 01:30 PM before Magistrate Judge Roy S. Payne. (bga, ) (Entered: 11/20/2019) |
| 11/26/2019 | 126 | Minute Entry for proceedings held before Magistrate Judge Roy S. Payne: Markman Hearing held on 11/26/2019. (Court Reporter Shelly Holmes.) (bga, ) (Entered: 11/26/2019) |
| 12/01/2019 | 127 | NOTICE by Luminati Networks Ltd. *of Markman Hearing Presentation Slides* (Attachments: # 1 Exhibit Slides)(Harkins, Robert) (Entered: 12/01/2019) |
| 12/03/2019 | 128 | RESPONSE to Motion re 120 SEALED PATENT MOTION *to Compel Production of Documents filed by BI Science (2009) Ltd., BI Science Inc.*. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 12/03/2019) |
| 12/05/2019 | 129 | ORDER - The Court has received Mr. Tillers invoice for services through December 4, 2019, the court hereby ORDERS payment to be promptly made as follows hereIn. Signed by Magistrate Judge Roy S. Payne on 12/5/19. (ch, ) (Entered: 12/06/2019) |
| 12/06/2019 | 130 | CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER. Signed by Magistrate Judge Roy S. Payne on 12/6/19. (ch, ) (Entered: 12/06/2019) |
| 12/17/2019 | 131 | PAPER TRANSCRIPT REQUEST by BI Science Inc. for proceedings held on 11/26/19 Claim Construction Hearing before Judge Payne. (Findlay, Eric) (Forwarded to Court Reporter, Shelly Holmes, on 12/17/2019) (slo). (Entered: 12/17/2019) |
| 12/30/2019 | 132 | REPORT of Mediation by William Joseph Cornelius. Mediation result: impasse(Cornelius, William) (Entered: 12/30/2019) |
| 01/08/2020 | 133 | Opposed MOTION to Compel *Responses to Plaintiff's First Set of Interrogatories* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Text of Proposed Order)(Cherian, Korula) (Entered: 01/08/2020) |
| 01/08/2020 | 134 | Opposed MOTION to Compel *Production of Electronic Discovery* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkolpolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 01/08/2020) |
| 01/22/2020 | 135 | RESPONSE in Opposition re 133 Opposed MOTION to Compel *Responses to Plaintiff's First Set of Interrogatories filed by BI Science Inc.*. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Findlay, Eric) (Entered: 01/22/2020) |
| 01/22/2020 | 136 | RESPONSE in Opposition re 134 Opposed MOTION to Compel *Production of Electronic Discovery filed by BI Science Inc.*. (Attachments: # 1 Text of Proposed Order) (Findlay, Eric) (Entered: 01/22/2020) |
| 01/23/2020 | 137 | Unopposed MOTION for Hearing *to Resolve Pending Discovery Disputes* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) |

| | | (Entered: 01/23/2020) |
|---|---|---|
| 01/27/2020 | [138](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 11/26/19 (Claim Construction Hearing) before Judge Roy S. Payne. Court Reporter/Transcriber: Shelly Holmes CSR, TCRR,Telephone number: (903) 923-7464 (Shelly_Holmes@txed.uscourts.gov). <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P>** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 2/17/2020. Release of Transcript Restriction set for 4/27/2020. (sholmes, ) (Entered: 01/27/2020) |
| 01/30/2020 | [139](#) | ORDER granting 137 Unopposed MOTION for Hearing *to Resolve Pending Discovery Disputes. ORDER Setting Hearing on Motion 120 SEALED PATENT MOTION to Compel Production of Documents, 133 Opposed MOTION to Compel Responses to Plaintiff's First Set of Interrogatories, 134 Opposed MOTION to Compel Production of Electronic Discovery. Motion Hearing set for 2/3/2020 02:00 PM before District Judge Rodney Gilstrap. Signed by District Judge Rodney Gilstrap on 1/30/2020. (ch, ) (Entered: 01/30/2020)* |
| 02/03/2020 | [140](#) | NOTICE by BI Science Inc. re 139 Order,,, Terminate Motions,,, Order Setting Hearing on Motion,, *of Compliance* (Findlay, Eric) (Entered: 02/03/2020) |
| 02/03/2020 | [141](#) | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Motion Hearing held on 2/3/2020 re 120 SEALED PATENT MOTION *to Compel Production of Documents* 133 Opposed MOTION to Compel *Responses to Plaintiff's First Set of Interrogatories* 125 Unopposed MOTION for Extension of Time to File Response/Reply 134 Opposed MOTION to Compel *Production of Electronic Discovery* (Court Reporter Shelly Holmes, CSR-TCRR.) (Attachments: # 1 Attorney Attendance Sheet) (jml) (Entered: 02/03/2020) |
| 02/04/2020 | [142](#) | ORDER MEMORIALIZING. Signed by District Judge Rodney Gilstrap on 2/4/2020. (ch, ) (Entered: 02/04/2020) |
| 02/04/2020 | [143](#) | PAPER TRANSCRIPT REQUEST by BI Science Inc. for proceedings held on 02/03/2020 Hearing on Motions to Compel before Judge Gilstrap. (Findlay, Eric) (Forwarded to court reporter, Shelly Holmes, on 2/4/2020) (slo) (Entered: 02/04/2020) |
| 02/04/2020 | [144](#) | ORDER - ORDERED that the parties shall conduct a mediation session with Mediator William Cornelius not later than ten (10) days after the deadline to complete fact discovery. Signed by District Judge Rodney Gilstrap on 2/4/2020. (ch, ) (Entered: 02/04/2020) |
| 02/07/2020 | [145](#) | NOTICE by Luminati Networks Ltd. *of Third-Party Subpoenas* (Attachments: # 1 Exhibit Subpoena, # 2 Exhibit Subpoena, # 3 Exhibit Subpoena)(Harkins, Robert) (Entered: 02/07/2020) |
| 02/07/2020 | [146](#) | NOTICE of Attorney Appearance by Amadou Kilkenny Diaw on behalf of Luminati Networks Ltd. (Diaw, Amadou) (Entered: 02/07/2020) |
| 02/10/2020 | [147](#) | Unopposed MOTION to Substitute Attorney *(Lead Attorney)* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 02/10/2020) |
| 02/10/2020 | [148](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 2/3/20 |

| | | |
|---|---|---|
| | | (Motion Hearing) before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shelly Holmes CSR, TCRR,Telephone number: (903) 923-7464 (Shelly_Holmes@txed.uscourts.gov). <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P>** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 3/2/2020. Release of Transcript Restriction set for 5/11/2020. (sholmes, ) (Entered: 02/10/2020) |
| 02/10/2020 | 149 | Unopposed MOTION for Leave to File Excess Pages by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 02/10/2020) |
| 02/10/2020 | 150 | Opposed MOTION for Judgment on the Pleadings *Under Rule 12(c) and 35 U.S.C. § 101* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order) (Findlay, Eric) (Entered: 02/10/2020) |
| 02/10/2020 | 151 | Opposed MOTION to Compel *SETTLEMENT AGREEMENT AND DEPOSITIONS AND TO SHORTEN RESPONSE PERIOD* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1)(Findlay, Eric) (Entered: 02/10/2020) |
| 02/11/2020 | 152 | RESPONSE in Opposition re 151 Opposed MOTION to Compel *SETTLEMENT AGREEMENT AND DEPOSITIONS AND TO SHORTEN RESPONSE PERIOD filed by Luminati Networks Ltd..* (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 02/11/2020) |
| 02/11/2020 | 153 | ORDER denying without prejudice 147 Unopposed MOTION to Substitute Attorney (Lead Attorney). Signed by District Judge Rodney Gilstrap on 2/11/2020. (ch, ) (Entered: 02/11/2020) |
| 02/11/2020 | 154 | ORDER re 151 Opposed MOTION to Compel *SETTLEMENT AGREEMENT AND DEPOSITIONS AND TO SHORTEN RESPONSE PERIOD. ORDERS that Luminati shall file its response to the Motion no later than Tuesday, February 18, 2020. Signed by District Judge Rodney Gilstrap on 2/11/2020. (ch, ) (Entered: 02/11/2020)* |
| 02/11/2020 | 155 | ORDER granting 149 Motion for Leave to File Excess Pages. Signed by District Judge Rodney Gilstrap on 2/11/2020. (ch, ) (Entered: 02/11/2020) |
| 02/11/2020 | 156 | SEALED MOTION *TO STRIKE PLAINTIFF'S AMENDED INFRINGEMENT CONTENTIONS* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Findlay, Eric) (Entered: 02/11/2020) |
| 02/14/2020 | 157 | REDACTION to 156 SEALED MOTION *TO STRIKE PLAINTIFF'S AMENDED INFRINGEMENT CONTENTIONS* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C - Redacted in Full, # 5 Exhibit D - Redacted in Full)(Findlay, Eric) (Entered: 02/14/2020) |
| 02/18/2020 | 158 | RESPONSE in Opposition re 151 Opposed MOTION to Compel *SETTLEMENT AGREEMENT AND DEPOSITIONS AND TO SHORTEN RESPONSE PERIOD filed by Luminati Networks Ltd..* (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 02/18/2020) |

| | | |
|---|---|---|
| 02/19/2020 | 159 | Opposed SEALED PATENT MOTION *to Compel Depositions and Sanction Defendant BI Science* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Harkins, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Text of Proposed Order)(Cherian, Korula) (Entered: 02/19/2020) |
| 02/19/2020 | 160 | Opposed MOTION for Protective Order by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Findlay, Eric) (Entered: 02/19/2020) |
| 02/19/2020 | 161 | Opposed SEALED PATENT MOTION *To Compel Documents from Defendant BI Science* by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Cherian, Korula) (Entered: 02/19/2020) |
| 02/20/2020 | 162 | ORDER Setting Hearing on Motion 160 Opposed MOTION for Protective Order , 161 Opposed SEALED PATENT MOTION *To Compel Documents from Defendant BI Science*, 159 Opposed SEALED PATENT MOTION *to Compel Depositions and Sanction Defendant BI Science* : Motion Hearing set for 2/24/2020 01:30 PM before District Judge Rodney Gilstrap.. Signed by District Judge Rodney Gilstrap on 2/20/2020. (ch, ) (Entered: 02/20/2020) |
| 02/21/2020 | 163 | REDACTION to 161 Opposed SEALED PATENT MOTION *To Compel Documents from Defendant BI Science* by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A - Remains Under Seal, # 2 Text of Proposed Order)(Cherian, Korula) (Entered: 02/21/2020) |
| 02/21/2020 | 164 | REDACTION to 159 Opposed SEALED PATENT MOTION *to Compel Depositions and Sanction Defendant BI Science* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Harkins, # 2 Exhibit A - Remains Under Seal, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Text of Proposed Order)(Cherian, Korula) (Entered: 02/21/2020) |
| 02/21/2020 | 165 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 160 Opposed MOTION for Protective Order *filed by Luminati Networks Ltd.*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 02/21/2020) |
| 02/23/2020 | 166 | Joint MOTION to Stay *All Deadlines Due to Settlement* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Harkins, Robert) Modified on 2/24/2020 (ch, ). (Entered: 02/23/2020) |
| 02/23/2020 | 167 | ORDER granting 166 Motion to Stay. Signed by District Judge Rodney Gilstrap on 2/23/2020. (jrg3, ) (Entered: 02/23/2020) |
| 02/24/2020 | 168 | REPORT of Mediation by William Joseph Cornelius. Mediation result: settled(Cornelius, William) (Entered: 02/24/2020) |
| 02/24/2020 | 169 | REDACTION to 165 Sealed Patent Response to Sealed Patent Motion, by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A - Remains Under Seal, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 02/24/2020) |
| 03/18/2020 | 170 | SEALED PATENT MOTION *To Enforce Settlement Agreement* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Text of Proposed Order)(Cherian, Korula) (Entered: 03/18/2020) |
| 03/19/2020 | 171 | Unopposed MOTION to Expedite *BRIEFING ON PLAINTIFF LUMINATI NETWORKS LTD.S MOTION TO ENFORCE SETTLEMENT AGREEMENT* by Luminati Networks |

| | | |
|---|---|---|
| | | Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 03/19/2020) |
| 03/20/2020 | 172 | REDACTION to 170 SEALED PATENT MOTION *To Enforce Settlement Agreement* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, C-J, N, and P-R Remain Under Seal, # 3 Exhibit B, # 4 Exhibit K, # 5 Exhibit L, # 6 Exhibit M, # 7 Exhibit O, # 8 Text of Proposed Order)(Cherian, Korula) (Entered: 03/20/2020) |
| 03/23/2020 | 173 | NOTICE of Attorney Appearance by James Mark Mann on behalf of Luminati Networks Ltd. (Mann, James) (Entered: 03/23/2020) |
| 03/23/2020 | 174 | ORDER granting 171 Unopposed MOTION to Expedite BRIEFING ON PLAINTIFF LUMINATI NETWORKS LTD.S MOTION TO ENFORCE SETTLEMENT AGREEMENT. Signed by District Judge Rodney Gilstrap on 3/23/2020. (ch, ) (Entered: 03/24/2020) |
| 03/25/2020 | 175 | SEALED RESPONSE to Motion re 170 SEALED PATENT MOTION *To Enforce Settlement Agreement* filed by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Findlay, Eric) (Entered: 03/25/2020) |
| 03/25/2020 | 176 | Sealed Document - Supplemental Exhibit A to 175 Defendant's Opposition to Plaintiff's Motion to Enforce Settlement Agreement. (Attachments: # 1 Exhibit A - Declaration of Kfir Moyal)(Findlay, Eric) (Entered: 03/25/2020) |
| 03/27/2020 | 177 | REDACTION to 175 Sealed Response to Motion, *to Enforce Settlement Agreement* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Exhibit A - Redacted in Full, # 2 Exhibit B - Redacted in Full, # 3 Exhibit C - Redacted in Full, # 4 Exhibit D - Redacted in Full, # 5 Text of Proposed Order)(Findlay, Eric) (Entered: 03/27/2020) |
| 03/29/2020 | 178 | NOTICE of Attorney Appearance by Gregory Blake Thompson on behalf of Luminati Networks Ltd. (Thompson, Gregory) (Entered: 03/29/2020) |
| 03/31/2020 | 179 | NOTICE by Luminati Networks Ltd. *OF ADDITIONAL ACTIONS IN RELATED MATTERS* (Attachments: # 1 Exhibit A)(Cherian, Korula) (Entered: 03/31/2020) |
| 04/03/2020 | | NOTICE of Hearing: TELEPHONIC Status Conference re 170 SEALED PATENT MOTION To Enforce Settlement Agreement and 175 SEALED RESPONSE to Motion set for 4/6/2020 01:00 PM before District Judge Rodney Gilstrap. ***The Court's telephone conference number is 877-336-1839. The Access Code is 5737419#. *Participants should use a landline phone connection, unless use of a cellular connection is the only viable means available. Participants shall mute themselves upon joining the conference and stay muted unless speaking. Further participants shall identify themselves each and every time they speak.*** (jml) (Entered: 04/03/2020) |
| 04/06/2020 | | Minute Entry for proceedings held before District Judge Rodney Gilstrap: TELEPHONIC Status Conference held on 4/6/2020. The Court held the Status Conference to discuss 170 SEALED PATENT MOTION To Enforce Settlement Agreement filed by Luminati Networks Ltd. Mr. Diaw, Mr. Mann, Mr. Harkins, Mr. Wielkopolski, Mr. Capshaw, and Mr. Cherian appeared as counsel for Plaintiff. Mr. Findlay and Ms. Gunter appeared as counsel for Defendant. (Court Reporter Shelly Holmes, CSR-TCRR.) (klc, ) (Entered: 04/06/2020) |
| 04/06/2020 | | NOTICE of Video Hearing on Motion 170 SEALED PATENT MOTION *To Enforce Settlement Agreement* and 175 Response to Motion: Motion Hearing set for 4/13/2020 02:00 PM before District Judge Rodney Gilstrap. ***The Court will email instructions to Counsel in advance of the hearing.***(jml) (Entered: 04/06/2020) |
| 04/08/2020 | | NOTICE of Video Hearing on Motion 170 SEALED PATENT MOTION To Enforce Settlement Agreement and 175 Response to Motion: Motion Hearing RESET for |

| | | |
|---|---|---|
| | | 4/13/2020 03:00 PM before District Judge Rodney Gilstrap. ***The Court will email instructions to Counsel in advance of the hearing.***(jml) (Entered: 04/08/2020) |
| 04/08/2020 | 180 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/6/20 (Telephonic Status Conference) before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shelly Holmes CSR, TCRR,Telephone number: (903) 923-7464 (Shelly_Holmes@txed.uscourts.gov). <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P>** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 4/29/2020. Release of Transcript Restriction set for 7/7/2020. (sholmes, ) (Entered: 04/08/2020) |
| 04/13/2020 | 181 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: VIDEO Motion Hearing held on 4/13/2020 re 170 SEALED PATENT MOTION *To Enforce Settlement Agreement* filed by Luminati Networks Ltd.. (Court Reporter Shelly Holmes, CSR-TCRR.) (jml) (Entered: 04/13/2020) |
| 04/15/2020 | 182 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/13/20 (Motion Hearing) before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shelly Holmes CSR, TCRR,Telephone number: (903) 923-7464 (Shelly_Holmes@txed.uscourts.gov). <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P>** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 5/6/2020. Release of Transcript Restriction set for 7/14/2020. (sholmes, ) (Entered: 04/15/2020) |
| 04/15/2020 | 183 | Sealed Transcript. (sholmes, ) (Entered: 04/15/2020) |
| 04/28/2020 | 184 | NOTICE by Luminati Networks Ltd. *of Relevant Determination* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Cherian, Korula) (Entered: 04/28/2020) |
| 04/29/2020 | 185 | Opposed SEALED MOTION *For Enforcement of Settlement Agreement and Arbitrator's Award* by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Mann, James) (Entered: 04/29/2020) |
| 05/01/2020 | 186 | REDACTION to 185 Opposed SEALED MOTION *For Enforcement of Settlement Agreement and Arbitrator's Award* by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A-C Remain Under Seal, # 2 Text of Proposed Order)(Cherian, Korula) (Entered: 05/01/2020) |
| 05/01/2020 | 187 | SEALED PATENT MOTION *for Sanctions* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Text of Proposed Order)(Cherian, Korula) (Entered: 05/01/2020) |
| 05/01/2020 | 188 | Opposed SEALED MOTION *TO WITHDRAW FINDLAY CRAFT, P.C. AS COUNSEL AND TO STAY CASE FOR SUBSTITUTE COUNSEL TO APPEAR* by BI Science (2009) |

| | | |
|---|---|---|
| | | Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Eric H. Findlay)(Findlay, Eric) (Entered: 05/01/2020) |
| 05/04/2020 | 189 | REDACTION to 187 SEALED PATENT MOTION *for Sanctions* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, E, F, G, and J Remain Under Seal, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit H, # 7 Exhibit I, # 8 Text of Proposed Order)(Cherian, Korula) (Entered: 05/04/2020) |
| 05/05/2020 | 190 | REDACTION to 188 Opposed SEALED MOTION *TO WITHDRAW FINDLAY CRAFT, P.C. AS COUNSEL AND TO STAY CASE FOR SUBSTITUTE COUNSEL TO APPEAR* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Eric H. Findlay)(Findlay, Eric) (Entered: 05/05/2020) |
| 05/06/2020 | 191 | (Sealed Document) Plaintiff Luminati Networks Ltd.'s Notice of Addendum to Final Arbitration Award (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Mann, James) (Entered: 05/06/2020) |
| 05/06/2020 | 192 | REDACTION to 191 Sealed Document *Plaintiff Luminati Networks Ltd.'s Notice of Addendum to Final Arbitration Award* by Luminati Networks Ltd.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Mann, James) (Entered: 05/06/2020) |
| 05/06/2020 | 193 | MOTION to Withdraw as Attorney by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order for Motion to Withdraw Ronald Abramson and M. Michael Lewis as Counsel for Defendant)(Lewis, Mord) (Entered: 05/06/2020) |
| 05/08/2020 | 194 | SEALED PATENT MOTION *to Enforce Settlement Agreement and Arbitration Award* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Text of Proposed Order) (Cherian, Korula) (Entered: 05/08/2020) |
| 05/11/2020 | 195 | REDACTION to 194 SEALED PATENT MOTION *to Enforce Settlement Agreement and Arbitration Award* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A-K Remain Under Seal, # 3 Text of Proposed Order)(Cherian, Korula) (Entered: 05/11/2020) |
| 05/13/2020 | 196 | SEALED RESPONSE to Motion re 185 Opposed SEALED MOTION *For Enforcement of Settlement Agreement and Arbitrator's Award* filed by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 05/13/2020) |
| 05/14/2020 | 197 | REDACTION to 196 Sealed Response to Motion *for Enforcement of Settlement Agreement and Arbitrator's Award* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 05/14/2020) |
| 05/18/2020 | 198 | SEALED RESPONSE to Motion re 187 SEALED PATENT MOTION *for Sanctions* filed by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Findlay, Eric) (Entered: 05/18/2020) |
| 05/18/2020 | 199 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 188 Opposed SEALED MOTION *TO WITHDRAW FINDLAY CRAFT, P.C. AS COUNSEL AND TO STAY CASE FOR SUBSTITUTE COUNSEL TO APPEAR filed by Luminati Networks Ltd.*. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Cherian, Korula) (Entered: 05/18/2020) |
| 05/20/2020 | 200 | REDACTION to 199 Sealed Patent Response to Sealed Patent Motion, by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A and B Remain Under Seal, # 3 Text of Proposed Order)(Cherian, Korula) (Entered: 05/20/2020) |

| 05/20/2020 | 201 | REDACTION to 198 Sealed Response to Motion, by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1 - REDACTED IN FULL, # 3 Exhibit 2 - REDACTED IN FULL, # 4 Exhibit 3 - REDACTED IN FULL, # 5 Exhibit 4 - REDACTED IN FULL)(Findlay, Eric) (Entered: 05/20/2020) |
|---|---|---|
| 05/21/2020 | 202 | SEALED PATENT REPLY to Response to PATENT Motion re 185 Opposed SEALED MOTION For Enforcement of Settlement Agreement and Arbitrator's Award by Luminati Networks Ltd. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit D, # 3 Exhibit E) (Cherian, Korula) Modified on 5/21/2020 (ch, ). (Entered: 05/21/2020) |
| 05/22/2020 | 203 | SEALED RESPONSE to Motion re 194 SEALED PATENT MOTION *to Enforce Settlement Agreement and Arbitration Award* filed by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 05/22/2020) |
| 05/26/2020 | 204 | REDACTION to 203 Sealed Response to Motion *to Enforce Settlement Agreement and Arbitration Award* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 05/26/2020) |
| 05/26/2020 | 205 | SEALED REPLY to Response to Motion re 187 SEALED PATENT MOTION *for Sanctions* filed by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit K)(Cherian, Korula) (Entered: 05/26/2020) |
| 05/26/2020 | 206 | REDACTION to 202 Sealed PATENT Reply to Response to PATENT Motion, by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit D and E Remain Under Seal)(Cherian, Korula) (Entered: 05/26/2020) |
| 05/26/2020 | 207 | SEALED REPLY to Response to Motion re 188 Opposed SEALED MOTION *TO WITHDRAW FINDLAY CRAFT, P.C. AS COUNSEL AND TO STAY CASE FOR SUBSTITUTE COUNSEL TO APPEAR* filed by BI Science (2009) Ltd., BI Science Inc.. (Findlay, Eric) (Entered: 05/26/2020) |
| 05/27/2020 | 208 | REDACTION to 207 Sealed Reply to Response to Motion *TO WITHDRAW FINDLAY CRAFT, P.C. AS COUNSEL AND TO STAY CASE FOR SUBSTITUTE COUNSEL TO APPEAR* by BI Science (2009) Ltd., BI Science Inc.. (Findlay, Eric) (Entered: 05/27/2020) |
| 05/28/2020 | 209 | REDACTION to 205 Sealed Reply to Response to Motion by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit K - Remains Under Seal)(Cherian, Korula) (Entered: 05/28/2020) |
| 05/29/2020 | 210 | SEALED PATENT REPLY to Response to PATENT Motion re 194 SEALED PATENT MOTION *to Enforce Settlement Agreement and Arbitration Award filed by Luminati Networks Ltd..* (Cherian, Korula) (Entered: 05/29/2020) |
| 06/01/2020 | 211 | REDACTION to 210 Sealed PATENT Reply to Response to PATENT Motion by Luminati Networks Ltd.. (Cherian, Korula) (Entered: 06/01/2020) |
| 06/03/2020 | 212 | SEALED PATENT SUR-REPLY to Reply to Response to PATENT Motion re 188 Opposed SEALED MOTION *TO WITHDRAW FINDLAY CRAFT, P.C. AS COUNSEL AND TO STAY CASE FOR SUBSTITUTE COUNSEL TO APPEAR filed by Luminati Networks Ltd..* (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit C, # 3 Exhibit D) (Cherian, Korula) (Entered: 06/03/2020) |
| 06/03/2020 | 213 | SEALED NOTICE. (Attachments: # 1 Exhibit 1 - Hebrew, # 2 Exhibit 1 - English, # 3 Exhibit 2 - Hebrew, # 4 Exhibit 2 - English, # 5 Exhibit 3 - English, # 6 Exhibit 3 - Hebrew, # 7 Exhibit 4 - Translation, # 8 Exhibit 4 - Decision)(Cherian, Korula) (Entered: 06/03/2020) |

| 06/05/2020 | 214 | REDACTION to 213 Sealed Patent Document, by Luminati Networks Ltd.. (Attachments: # 1 Exhibit Remain Under Seal)(Cherian, Korula) (Entered: 06/05/2020) |
| 06/05/2020 | 215 | REDACTION to 212 Sealed PATENT Sur-Reply to Reply to Response to PATENT Motion, by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit C and D Remain Under Seal)(Cherian, Korula) (Entered: 06/05/2020) |
| 06/25/2020 | 216 | Joint MOTION to Amend/Correct 76 Protective Order by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 06/25/2020) |
| 06/25/2020 | 217 | Sealed Document. FINAL ARBITRATION AWARD(Cornelius, William) (Entered: 06/25/2020) |
| 06/25/2020 | 218 | Sealed Document. ADDENDUM TO FINAL ARBITRATION AWARD(Cornelius, William) (Entered: 06/25/2020) |
| 06/26/2020 | 219 | AMENDED PROTECTIVE ORDER granting 216 Joint MOTION to Amend/Correct 76 Protective Order. Signed by District Judge Rodney Gilstrap on 6/26/2020. (ch, ) (Entered: 06/29/2020) |
| 07/02/2020 | 220 | ORDER AND FINAL JUDGMENT. Signed by District Judge Rodney Gilstrap on 7/2/2020. (ch, ) (Entered: 07/02/2020) |
| 07/09/2020 | 221 | NOTICE of Attorney Appearance - Pro Hac Vice by Michael A. Charish on behalf of BI Science (2009) Ltd., BI Science Inc.. Filing fee $ 100, receipt number 0540-7883293. (Charish, Michael) (Entered: 07/09/2020) |
| 07/21/2020 | 222 | NOTICE of Attorney Appearance - Pro Hac Vice by John Christopher Rozendaal on behalf of BI Science (2009) Ltd., BI Science Inc.. Filing fee $ 100, receipt number 0540-7903545. (Rozendaal, John) (Entered: 07/21/2020) |
| 07/24/2020 | 223 | Joint SEALED PATENT MOTION *to Correct Final Judgment* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 07/24/2020) |
| 07/24/2020 | 224 | Opposed SEALED PATENT MOTION *to Make Final Judgment Public* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 07/24/2020) |
| 07/27/2020 | 225 | SEALED PATENT DOCUMENT Notice of Action is a Related Matter. (Attachments: # 1 Exhibit English Version, # 2 Exhibit Original Version)(Cherian, Korula) (Entered: 07/27/2020) |
| 07/27/2020 | 226 | REDACTION to 223 Joint SEALED PATENT MOTION *to Correct Final Judgment* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order Remain Under Seal) (Cherian, Korula) (Entered: 07/27/2020) |
| 07/27/2020 | 227 | REDACTION to 224 Opposed SEALED PATENT MOTION *to Make Final Judgment Public* by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 07/27/2020) |
| 07/29/2020 | 228 | NOTICE OF APPEAL - FEDERAL CIRCUIT as to 220 Order, Judgment by BI Science (2009) Ltd., BI Science Inc.. Filing fee $ 505, receipt number 0540-7917779. (Rozendaal, John) (Entered: 07/29/2020) |
| 07/29/2020 | | Transmission of Notice of Appeal FEDERAL CIRCUIT, Order and Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 228 Notice of Appeal - FEDERAL CIRCUIT (ch, ) (Entered: 07/29/2020) |
| 07/29/2020 | 229 | REDACTION to 225 Sealed Patent Document by Luminati Networks Ltd.. (Attachments: # 1 Exhibit Exhibits Remain Under Seal)(Cherian, Korula) (Entered: 07/29/2020) |

| 08/04/2020 | 230 | NOTICE of Docketing Notice of Appeal from USCA re 228 Notice of Appeal - FEDERAL CIRCUIT filed by BI Science Inc., BI Science (2009) Ltd. Entry of Appearance due 08/18/2020. Certificate of Interest is due on 08/18/2020. Docketing Statement due 08/18/2020. Appellant's brief due 10/05/2020. USCA Case Number 20-2118 (ch, ) Modified on 8/4/2020 (ch, ). (Entered: 08/04/2020) |
|---|---|---|
| 08/07/2020 | 231 | SEALED RESPONSE to Motion re 224 Opposed SEALED PATENT MOTION *to Make Final Judgment Public* filed by BI Science (2009) Ltd.. (Attachments: # 1 Declaration of Kfir Moyal, # 2 Text of Proposed Order Proposed Order)(Rozendaal, John) (Entered: 08/07/2020) |
| 08/10/2020 | 232 | REDACTION to 231 Sealed Response to Motion *to Make Final Judgment Public* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 REDACTED Declaration of Kfir Moyal, # 2 Text of Proposed Order)(Rozendaal, John) (Entered: 08/10/2020) |
| 08/12/2020 | 233 | ***FILED IN ERROR***<br><br>NOTICE by Luminati Networks Ltd. *of Appeal* (Cherian, Korula) Modified on 8/18/2020 (ch, ). (Entered: 08/12/2020) |
| 08/12/2020 | 234 | Opposed SEALED PATENT MOTION *to Stay Enforcement of the Final Judgment* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Supplemental Declaration of Kfir Moyal, # 2 Text of Proposed Order)(Rozendaal, John) (Entered: 08/12/2020) |
| 08/14/2020 | 235 | REDACTION to 234 Opposed SEALED PATENT MOTION *to Stay Enforcement of the Final Judgment* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 REDACTED Supplemental Declaration of Kfir Moyal, # 2 Text of Proposed Order) (Rozendaal, John) (Entered: 08/14/2020) |
| 08/14/2020 | 236 | SEALED PATENT REPLY to Response to PATENT Motion re 224 Opposed SEALED PATENT MOTION *to Make Final Judgment Public filed by Luminati Networks Ltd.*. (Cherian, Korula) (Entered: 08/14/2020) |
| 08/17/2020 | 237 | REDACTION to 236 Sealed PATENT Reply to Response to PATENT Motion by Luminati Networks Ltd.. (Cherian, Korula) (Entered: 08/17/2020) |
| 08/18/2020 | 238 | NOTICE OF APPEAL - FEDERAL CIRCUIT re 220 Final Judgment and 130 Claim Construction Order by Luminati Networks Ltd.. Filing fee $ 505, receipt number 0540-7953136. (Cherian, Korula) Modified on 8/18/2020 (ch, ). (Entered: 08/18/2020) |
| 08/18/2020 |  | Transmission of Notice of Appeal, Order and Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 238 Notice of Appeal - FEDERAL CIRCUIT (ch, ) (Entered: 08/18/2020) |
| 08/20/2020 | 239 | NOTICE of Docketing Notice of Appeal from USCA re 238 Notice of Appeal - FEDERAL CIRCUIT filed by Luminati Networks Ltd.. USCA Case Number 20-2181 (Attachments: # 1 Notice of Appeal)(ch, ) (Entered: 08/20/2020) |
| 08/21/2020 | 240 | SEALED PATENT SUR-REPLY to Reply to Response to PATENT Motion re 224 Opposed SEALED PATENT MOTION *to Make Final Judgment Public filed by BI Science (2009) Ltd.* . (Rozendaal, John) (Entered: 08/21/2020) |
| 08/24/2020 | 241 | REDACTION to 240 Sealed PATENT Sur-Reply to Reply to Response to PATENT Motion by BI Science (2009) Ltd.. (Rozendaal, John) (Entered: 08/24/2020) |
| 08/27/2020 | 242 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 234 Opposed SEALED PATENT MOTION *to Stay Enforcement of the Final Judgment filed by Luminati Networks Ltd.*. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 08/27/2020) |

| 08/31/2020 | 243 | REDACTION to 242 Sealed Patent Response to Sealed Patent Motion by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 08/31/2020) |
|---|---|---|
| 09/02/2020 | 244 | ORDER of USCA Federal Circuit as to 228 Notice of Appeal - FEDERAL CIRCUIT filed by BI Science Inc., BI Science (2009) Ltd., 238 Notice of Appeal - FEDERAL CIRCUIT filed by Luminati Networks Ltd. (nkl, ) (Entered: 09/02/2020) |
| 09/03/2020 | 245 | ***FILED IN ERROR***<br><br>SEALED PATENT REPLY to Response to PATENT Motion re 234 Opposed SEALED PATENT MOTION *to Stay Enforcement of the Final Judgment filed by BI Science (2009) Ltd.* . (Attachments: # 1 Reply Declaration of Kfir Moyal)(Rozendaal, John) Modified on 9/4/2020 (ch, ). (Entered: 09/03/2020) |
| 09/04/2020 | | ***FILED IN ERROR. PER ATTORNEY Document # 245, Sealed Reply. PLEASE IGNORE.***<br><br>(ch, ) (Entered: 09/04/2020) |
| 09/04/2020 | 246 | SEALED PATENT REPLY to Response to PATENT Motion re 234 Opposed SEALED PATENT MOTION *to Stay Enforcement of the Final Judgment filed by BI Science (2009) Ltd.* . (Attachments: # 1 Reply Declaration of Kfir Moyal)(Rozendaal, John) (Entered: 09/04/2020) |
| 09/08/2020 | 247 | REDACTION to 246 Sealed PATENT Reply to Response to PATENT Motion, by BI Science (2009) Ltd.. (Attachments: # 1 REDACTED Reply Declaration of Kfir Moyal)(Rozendaal, John) (Entered: 09/08/2020) |
| 09/11/2020 | 248 | SEALED PATENT SUR-REPLY to Reply to Response to PATENT Motion re 234 Opposed SEALED PATENT MOTION *to Stay Enforcement of the Final Judgment filed by Luminati Networks Ltd.*. (Wielkopolski, Ronald) (Entered: 09/11/2020) |
| 09/14/2020 | 249 | REDACTION to 248 Sealed PATENT Sur-Reply to Reply to Response to PATENT Motion by Luminati Networks Ltd.. (Wielkopolski, Ronald) (Entered: 09/14/2020) |
| 11/30/2020 | 250 | Unopposed MOTION FOR PRODUCTION OF CERTAIN DOCUMENTS IN RELATED CASE by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Cherian, Korula) (Entered: 11/30/2020) |
| 12/04/2020 | 251 | SEALED NOTICE. (Attachments: # 1 Exhibit)(Cherian, Korula) (Entered: 12/04/2020) |
| 12/07/2020 | 252 | REDACTION to 251 Sealed Patent Document by Luminati Networks Ltd.. (Attachments: # 1 Exhibit)(Cherian, Korula) (Entered: 12/07/2020) |
| 12/28/2020 | 253 | NOTICE by BI Science (2009) Ltd. *of Action in Related Matter* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rozendaal, John) (Entered: 12/28/2020) |
| 02/03/2021 | 255 | ORDER denying 224 Opposed SEALED PATENT MOTION *to Make Final Judgment Public.* Signed by District Judge Rodney Gilstrap on 2/3/2021. (ch, ) (Entered: 02/03/2021) |
| 02/16/2021 | 256 | NOTICE OF APPEAL - FEDERAL CIRCUIT by BI Science (2009) Ltd.. Filing fee $ 505, receipt number 0540-8249922. (Rozendaal, John) (Entered: 02/16/2021) |
| 02/16/2021 | | Transmission of Notice of Appeal, Order and Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 228 Notice of Appeal - FEDERAL CIRCUIT (ch, ) (Entered: 02/16/2021) |
| 02/16/2021 | 257 | NOTICE OF APPEAL - FEDERAL CIRCUIT as to 130 Memorandum & Opinion by |

| | | |
|---|---|---|
| | | Luminati Networks Ltd.. Filing fee $ 505, receipt number 0540-8250388. (Cherian, Korula) (Entered: 02/16/2021) |
| 02/16/2021 | | Transmission of Notice of Appeal, Order and Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 257 Notice of Appeal - FEDERAL CIRCUIT (ch, ) (Entered: 02/16/2021) |
| 02/18/2021 | 258 | NOTICE of Docketing Notice of Appeal from USCA re 256 Notice of Appeal - FEDERAL CIRCUIT filed by BI Science (2009) Ltd.. USCA Case Number 21-1664 (ch, ) (Entered: 02/18/2021) |
| 02/18/2021 | 259 | NOTICE of Docketing Notice of Appeal from USCA re 257 Notice of Appeal - FEDERAL CIRCUIT filed by Luminati Networks Ltd.. USCA Case Number 21-1667 (ch, ) (Entered: 02/18/2021) |
| 02/25/2021 | 260 | ORDER of USCA as to 228 Notice of Appeal - FEDERAL CIRCUIT filed by BI Science Inc., BI Science (2009) Ltd., 238 Notice of Appeal - FEDERAL CIRCUIT filed by Luminati Networks Ltd., 257 Notice of Appeal - FEDERAL CIRCUIT filed by Luminati Networks Ltd., 256 Notice of Appeal - FEDERAL CIRCUIT filed by BI Science (2009) Ltd.. (nkl, ) (Entered: 02/25/2021) |
| 03/30/2021 | 261 | SEALED MOTION *FOR CONTEMPT* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 03/30/2021) |
| 03/31/2021 | 262 | NOTICE of Attorney Appearance by Gregory Phillip Love on behalf of BI Science (2009) Ltd., BI Science Inc. (Love, Gregory) (Entered: 03/31/2021) |
| 04/01/2021 | 263 | REDACTION to 261 SEALED MOTION *FOR CONTEMPT* by Luminati Networks Ltd.. (Attachments: # 1 Affidavit Wielkopolski, # 2 Exhibit A, # 3 Text of Proposed Order) (Wielkopolski, Ronald) (Entered: 04/01/2021) |
| 04/05/2021 | 264 | Unopposed MOTION for Extension of Time to File Response/Reply as to 261 SEALED MOTION *FOR CONTEMPT* by BI Science (2009) Ltd., BI Science Inc.. (Attachments: # 1 Text of Proposed Order)(Love, Gregory) (Entered: 04/05/2021) |
| 04/05/2021 | 265 | Opposed SEALED MOTION *to Stay Enforcement of the Corrected Final Judgment* by BI Science (2009) Ltd.. (Attachments: # 1 Affidavit Declaration of Kfir Moyal, # 2 Text of Proposed Order)(Love, Gregory) (Entered: 04/05/2021) |
| 04/11/2021 | 266 | REDACTION to 265 Opposed SEALED MOTION *to Stay Enforcement of the Corrected Final Judgment* by BI Science (2009) Ltd.. (Attachments: # 1 Affidavit Declaration of Kfir Moyal)(Love, Gregory) (Entered: 04/11/2021) |
| 04/14/2021 | 267 | ORDER granting 264 Motion for Extension of Time to File Response/Reply re 261 SEALED MOTION *FOR CONTEMPT* Responses due by 4/21/2021. Signed by District Judge Rodney Gilstrap on 4/14/2021. (ch, ) (Entered: 04/14/2021) |
| 04/19/2021 | 268 | SEALED RESPONSE to Motion re 265 Opposed SEALED MOTION *to Stay Enforcement of the Corrected Final Judgment* filed by Luminati Networks Ltd.. (Attachments: # 1 Text of Proposed Order)(Wielkopolski, Ronald) (Entered: 04/19/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/21/2021 08:13:10 | | | |
| **PACER** | ryankaiserskgf:5117002:3925319 | **Client** | 9999.2060000 |

| Login: | | Code: | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-00483-JRG |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

**Appx54**



US009241044B2

(12) **United States Patent**      (10) **Patent No.:**      **US 9,241,044 B2**

Shribman et al.                     (45) **Date of Patent:**      **Jan. 19, 2016**

(54) **SYSTEM AND METHOD FOR IMPROVING INTERNET COMMUNICATION BY USING INTERMEDIATE NODES**

(71) Applicant: **Hola Networks Ltd.**, Netanya (IL)

(72) Inventors: **Derry Shribman**, Netanya (IL); **Ofer Vilenski**, Netanya (IL)

(73) Assignee: **Hola Networks, Ltd.**, Netanya (IL)

(*) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/468,836**

(22) Filed:     **Aug. 26, 2014**

(65)             **Prior Publication Data**

US 2015/0067819 A1      Mar. 5, 2015

**Related U.S. Application Data**

(60) Provisional application No. 61/870,815, filed on Aug. 28, 2013.

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 29/08* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *H04N 21/462* | (2011.01) |

(52) **U.S. Cl.**
CPC ............. *H04L 67/32* (2013.01); *H04L 63/029* (2013.01); *H04L 65/4084* (2013.01); *H04L 67/02* (2013.01); *H04L 67/06* (2013.01); *H04L 67/2838* (2013.01); *H04N 21/4622* (2013.01)

(58) **Field of Classification Search**
CPC .............................. H04L 67/029; H04L 67/32
USPC ..................................... 709/218/220/222/223
See application file for complete search history.

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,962,539 A | 6/1976 | Ehrsam et al. |
| 4,405,829 A | 9/1983 | Rivest et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2597869 A1 | 5/2013 |
| WO | 2010090562 A1 | 8/2010 |
| WO | 2011068784 A1 | 6/2011 |

OTHER PUBLICATIONS

"On the Leakage of Personally Identifiable Information via Online Social Networks"—Wills et al. AT&T, Apr. 2009 http://www2.research.att.com/~bala/papers/wosn09.pdf.*

(Continued)

*Primary Examiner* — Randy Scott

(74) *Attorney, Agent, or Firm* — Peter A. Nieves; Sheehan Phinney Bass + Green PA

(57)                **ABSTRACT**

A method for fetching a content from a web server to a client device is disclosed, using tunnel devices serving as intermediate devices. The client device access an acceleration server to receive a list of available tunnel devices. The requested content is partitioned into slices, and the client device sends a request for the slices to the available tunnel devices. The tunnel devices in turn fetch the slices from the data server, and send the slices to the client device, where the content is reconstructed from the received slices. A client device may also serve as a tunnel device, serving as an intermediate device to other client devices. Similarly, a tunnel device may also serve as a client device for fetching content from a data server. The selection of tunnel devices to be used by a client device may be in the acceleration server, in the client device, or in both. The partition into slices may be overlapping or non-overlapping, and the same slice (or the whole content) may be fetched via multiple tunnel devices.

**108 Claims, 134 Drawing Sheets**



## US 9,241,044 B2
Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,464,650 | A | 8/1984 | Eastman et al. |
| 4,558,302 | A | 12/1985 | Welch |
| 4,814,746 | A | 3/1989 | Miller et al. |
| 6,236,652 | B1 | 5/2001 | Preston et al. |
| 6,266,704 | B1 | 7/2001 | Reed et al. |
| 7,027,418 | B2 | 4/2006 | Gan et al. |
| 7,203,741 | B2 | 4/2007 | Marco et al. |
| 7,865,585 | B2 | 1/2011 | Samuels et al. |
| 7,929,535 | B2 | 4/2011 | Chen et al. |
| 7,941,525 | B1 | 5/2011 | Yavilevich |
| 8,108,245 | B1 | 1/2012 | Hosea et al. |
| 8,135,912 | B2 | 3/2012 | Shribman et al. |
| 8,234,370 | B2 | 7/2012 | Hammer et al. |
| 8,452,901 | B1 | 5/2013 | Sandstrom et al. |
| 8,560,604 | B2 | 10/2013 | Shribman et al. |
| 8,671,221 | B2 | 3/2014 | Shribman et al. |
| 8,832,179 | B2* | 9/2014 | Owen ................. H04L 63/029 |
| | | | 709/203 |
| 2002/0069241 | A1 | 6/2002 | Narlikar Girija et al. |
| 2003/0204602 | A1 | 10/2003 | Hudson |
| 2005/0018645 | A1 | 1/2005 | Mustonen et al. |
| 2006/0187830 | A1 | 8/2006 | Nam |
| 2008/0046562 | A1 | 2/2008 | Butler |
| 2010/0002882 | A1 | 1/2010 | Rieger et al. |
| 2012/0099566 | A1* | 4/2012 | Laine ................. H04M 1/7253 |
| | | | 370/338 |
| 2012/0124173 | A1 | 5/2012 | De Pradipta et al. |
| 2012/0166582 | A1 | 6/2012 | Binder |
| 2013/0201316 | A1* | 8/2013 | Binder ................. H04L 67/12 |
| | | | 348/72 |

OTHER PUBLICATIONS

Fielding, R. et al : RFC 2616: Hypertext Transfer Protocol—HTTP/
1.1; Internet citation, Jun. 1999, XP002196143, retrieved from the
Internet: http://rfc-editor.org [retrieved Apr. 15, 2002].
Partial European Search Report for EP14182547, dated Feb. 24,
2015.
Syverson P., "Making Anonymous Communication", Generation 2
Onion Routing briefing slides, Center for High Assurance Computer
Systems, Naval Research Laboratory, Presented at the National Sci-
ence Foundation, Jun. 8, 2004 (64 pages).
Syverson P., Reed M. G., Goldschlag D. M., "Onion Routing Access
Configurations. DISCEX 2000: Proceedings of the DARPA Informa-
tion Survivability Conference and Exposition", vol. I Hilton Head,
SC, IEEE CS Press, Jan. 2000, pp. 34-40 (7 pages).
Syverson P., Reed M. G., Goldschlag D. M., "Onion Routing for
Anonymous and Private Internet Connections," Communications of
the ACM, vol. 42, No. 2, Feb. 1999 (5 pages).
Syverson P. F., Reed M. G., Goldschlag D. M., "Anonymous Con-
nections and Onion Routing," IEEE Journal on Selected Areas in
Communication Special Issue on Copyright and Privacy Protection,
1998 (14 pages).
Syverson P., Tsudik G., Reed M., Landwehr C., "Towards an Analy-
sis of Onion Routing Security," Workshop on Design Issues in Ano-
nymity and Unobservability Berkeley, CA, Jul. 2000 (14 pages).
Dingledine R., Mathewson N., Syverson P., "Tor: The Second-Gen-
eration Onion Router", in Proceedings of the 13th USENIX Security
Symposium, Aug. 2004 (17 pages).
Dingledine R., Mathewson N., "Tor Protocol Specification", down-
loaded Nov. 2010 from www.torproject.org (12 pages).
"Tor Directory Protocol, Version 3", downloaded Nov. 2010 from
www.torproject.org (29 pages).
"TC: A Tor control protocol (Version 1)", downloaded Nov. 2010
from www.torproject.org (24 pages).
"Filter Driver Development Guide" Version 1.0a by Microsoft Cor-
poration, dated 2004 (28 pages).
Brian Mariani, "Inline Hooking in Windows", by High-Tech Bridge
SA dated Sep. 6, 2011 (26 pages).
Brian Mariani, "Userland Hooking in Windows", High-Tech Bridge
SA dated Aug. 3, 2011 (33 pages).

Publication No. 1-587005-001-3 by Cisco Systems, Inc. (Jun. 1999)
"Internetworking Technologies Handbook",Chapter 45: "OSI Rout-
ing" pp. 45-1 to 45-8 (8 pages).
International Organization for Standardization, ISO 8601, Data ele-
ments and interchange formats—Information interchange—Repre-
sentation of dates and times, 1988 (19 pages).
Internet Engineering Task Force (IETF) RFC 675 "Specification of
Internet Transmission Control Program", Dec. 1974 (70 pages).
Internet Engineering Task Force (IETF) RFC 792 "Internet Control
Message Protocol: DARPA Internet Program Protocol Specifica-
tion", Sep. 1981 (21 pages).
Internet Engineering Task Force (IETF) RFC 793 "DARPA Internet
Program Protocol Specification", Sep. 1981 (89 pages).
Internet Engineering Task Force (IETF) RFC 1072 "TCP Extensions
for Long-Delay Paths", Oct. 1988 (16 pages).
Internet Engineering Task Force (IETF) RFC 1323 "TCP Extensions
for High Performance", May 1992 (37 pages).
Internet Engineering Task Force (IETF) RFC 1825 "Security Archi-
tecture for the Internet Protocol", Aug. 1995 (22 pages).
Internet Engineering Task Force (IETF) RFC 1826 "IP Authentica-
tion Header", Aug. 1995 (13 pages).
Internet Engineering Task Force (IETF) RFC 1827 "IP Encapsulating
Payload (ESP)", Aug. 1995 (12 pages).
Internet Engineering Task Force (IETF) RFC 1828 "IP Authentica-
tion using Keyed MD5", Aug. 1995 (6 pages).
Internet Engineering Task Force (IETF) RFC 1829 "The ESP DES-
CBC Transform", Aug. 1995 (11 pages).
Internet Engineering Task Force (IETF) RFC 1885 "Internet Control
Message Protocol (ICMPv6)—for the Internet Protocol Version 6
(IPv6)—Specification", Dec. 1995 (20 pages).
Internet Engineering Task Force (IETF) RFC 1918 "Address Alloca-
tion for Private Internets", Feb. 1996 (9 pages).
Internet Engineering Task Force (IETF) RFC 2401 "Security Archi-
tecture for the Internet Protocol", Nov. 1998 (66 pages).
Internet Engineering Task Force (IETF) RFC 2463 "Internet Control
Message Protocol (ICMPv6)—for the Internet Protocol Version 6
(IPv6)—Specification", Dec. 1998 (18 pages).
Internet Engineering Task Force (IETF) RFC 2464 "Transmission of
IPv6 Packets over Ethernet Networks", Dec. 1998 (7 pages).
Internet Engineering Task Force (IETF) RFC 2547 "BGP/MPLS
VPNs", Mar. 1999 (25 pages).
Internet Engineering Task Force (IETF) RFC 2547 "Hypertext Trans-
fer Protocol—HTTP/1.1", Jun. 1999 (114 pages).
Internet Engineering Task Force (IETF) RFC 2914 "Congestion Con-
trol Principles", Sep. 2000 (17 pages).
Internet Engineering Task Force (IETF) RFC 3207 "SMTP Service
Extension for Secure SMTP over Transport Layer Security", Feb.
2002 (9 pages).
Internet Engineering Task Force (IETF) RFC 3489 "STUN—Simple
Traversal of User Datagram Protocol (UDP)—Through Network
Address Translators (NATs)", Mar. 2003 (47 pages).
Internet Engineering Task Force (IETF) RFC 4026 "Provider Provi-
sioned Virtual Private Network (VPN) Terminology", Mar. 2005 (20
pages).
Internet Engineering Task Force (IETF) RFC 4301 "Security Archi-
tecture for the Internet Protocol", Dec. 2005 (101 pages).
Internet Engineering Task Force (IETF) RFC 4309 "Using Advanced
Encryption Standard (AES) CCM Mode—with IPsec Encapsulating
Security Payload (ESP)", Dec. 2005 (13 pages).
Internet Engineering Task Force (IETF) RFC 5246 "The Transport
Layer Security (TLS) Protocol—Version 1.2", Aug. 2008 (104
pages).
Internet Engineering Task Force (IETF) RFC 6520 "Transport Layer
Security (TLS) and Datagram Transport Layer Security (DTLS)
Heartbeat Extension", Feb. 2012 (9 pages).
Internet Engineering Task Force (IETF) RFC 7230 "Hypertext Trans-
fer Protocol (HTTP/1.1): Message Syntax and Routing", Jun. 2014
(89 pages).
Internet Engineering Task Force (IETF) RFC 7231 "Hypertext Trans-
fer Protocol (HTTP/1.1): Semantics and Content", Jun. 2014 (101
pages)

**US 9,241,044 B2**

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

Internet Engineering Task Force (IETF) RFC 7232 "Hypertext Transfer Protocol (HTTP/1.1): Conditional Requests", Jun. 2014 (28 pages).
Internet Engineering Task Force (IETF) RFC 7233 "Hypertext Transfer Protocol (HTTP/1.1): Range Requests", Jun. 2014 (25 pages).
Internet Engineering Task Force (IETF) RFC 7234 "Hypertext Transfer Protocol (HTTP/1.1): Caching", Jun. 2014 (43 pages).
Internet Engineering Task Force (IETF) RFC 7235 "Hypertext Transfer Protocol (HTTP/1.1): Authentication", Jun. 2014 (19 pages).
Peter Snyder, "tmpfs: a Virtual Memory File System", by Sun Microsystems Inc., date unknown, downloaded Jul. 2014 (8 pages).
Internet Engineering Task Force (IETF) RFC 2198 "RTP Payload for Redundant Audio Data", Sep. 1997 (11 pages).
Hubert Kirrmann, "Highly Available Automation Networks Standard Redundancy Methods—Rationale behind the IEC 63429 standard suite" by ABB Switzerland Ltd, 2012 presentation, downloaded Jul. 2014 (51 pages).
Prof. Hans Weibel, Tutorial on Parallel Redundancy Protocol (PRP), by Zurich University of Applied Sciences, date unknown, downloaded Jul. 2014 (20 pages).
IEEE Std 802.3ae-2002, IEEE Standard for Information Technology—Telecommunications and information exchange between systems—Local and metropolitan area networks—Specific requirements Part 3: Carrier Sense Multiple Access with Collision Detection (CSMA/CD) Access Method and Physical Layer Specifications, by Electrical and Electronics Engineers, Inc., Aug. 30, 2002 (529 pages).
IEEE P802.3ba-2010, IEEE Standard for Information technology—Telecommunications and information exchange between systems—Local and metropolitan area networks—Specific requirements Part 3: Carrier Sense Multiple Access with Collision Detection (CSMA/CD) Access Method and Physical Layer Specifications, by LAN/MAN Standards Committee, Jun. 22, 2010 (457 pages).
Robert D. Doverspike, K.K. Ramakrishnan, and Chris Chase, "Guide to Reliable Internet Services and Applications" Chapter 2: "Structural Overview of ISP Networks", published 2010 (ISBN: 978-1-84882-827-8) (76 pages).
Jesse Burstyn et al., Assignment 1—Conceptual Architecture of Google Chrome, CISC 322, Fall 2009 (18 pages).
Information Systems Audit and Control Association (ISACA) whitepaper, "Geolocation: Risk, Issues and Strategies", 2011 (13 pages).
Ingmar Poese, Steve Uhlig, et al, IP Geolocation Databases: Unreliable?, date unknown, Downloaded Jul. 2014 (4 pages).
Yong Wang et al., "Towards Street-Level Client-Independent IP Geolocation", downloaded from the Internet on Jul. 2014 (14 pages).
Cloud optimize your business—Windows Server 2012, published Oct. 7, 2013 by Microsoft (34 pages).
W3C Recommendation for the geolocation API specifications draft dated Oct. 24, 2013, is available from the web-site http://www.w3.org/TR/2013/REC-geolocation-API-20131024 (10 pages).
Melekam Tsegaye and Ricahrd Foss, "A Comparison of the Linux and Windows Device Driver Architectures", Rhodes University, South-Africa, downloaded from the Internet on Jul. 2014 (26 pages).
Whitepaper by E-Nor, Inc., "A 7-Step Analytics Reporting Framework—Marketing Optimization Whitepaper" by Feras Alhlou, downloaded on Aug. 2014 (13 pages).
Mohamad (Hani) Atassy, submitted to Dr. Dennis R. Hafermann, "Microsoft Windows Driver Model (WDM)", Jan. 28, 2002 (12 pages).
Prof. M. Saeed "Welcome to Version 2.0 of the Win32 API Tutorial" published by Brook Miles, downloaded from the Internet on Jul. 2014 (108 pages).
IBM Corporation (headquartered in Armonk, New-York, U.S.A.) publication No. SC34-2597-03 "Device Drivers, Features, and Commands on Red Hat Enterprise Linux 6.3", downloaded from the Internet on Jul. 2014 (580 pages).

University of Michigan paper "Dictionary-Based Compression for Long Time-Series Similarity"by Willis Lang, Michael Morse, and Jignesh M. Patel, downloaded from http://pages.cs.wisc.edu on Aug. 2014 (14 pages).
Koozai Ltd. guide "The Practical Guide to Google Analytics for Business", 2nd Edition, published 2013, by Anna Lewis, Graeme Benge, and Gemma Holloway (77 pages).
Carnegie Mellon University, chapter: "Introduction to Data Compression"by Guy E. Blelloch, dated Jan. 31, 2013 (55 pages).
University of Toronto, Department of Computer Science presentation "Tutorial on Socket Programming"by Amin Tootoonchian, downloaded on Aug. 2014 (27 pages).
Wiley Publishing, Inc. publication "Professional Linux Kernel Architecture", by Wolfgang Mauerer published 2008 (1370 pages).
"WiFi Technology" by Telecom Regulatory Authority, published on Jul. 2003 (60 pages).
SAS Institute Inc. SHARE Session 5958 tutorial 'C Socket Programming Tutorial", "Writing Client / Server Programs in C Using Sockets (A Tutorial) Part I", by Greg Granger, dated Feb. 1998 (31 pages).
Internet Engineering Task Force (IETF) RFC 3467 "Role of the Domain Name System (DNS)", Feb. 2003 (31 pages).
Internet Engineering Task Force (IETF) RFC 6195 "Domain Name System (DNS) IANA Considerations", Mar. 2011 (17 pages).
Internet Engineering Task Force (IETF) RFC 1591 "Domain Name System Structure and Delegation", Mar. 1994 (7 pages).
Peter Jay Salzman, Michael Burian, and Ori Pomerantz, "The Linux Kernel Module Programming Guide"ver. 2.6.4, dated May 18, 2007 (82 pages).
'Operating Systems', Chapter 9 "Interprocess Communication", by Marko Vuskovic, 1998-2002 (pp. 9-1 to 9-19).
"IOS Tutorial", downloaded from tutorialspoint.com on Jul. 2014 (185 pages).
"Android Tutorial", downloaded from tutorialspoint.com on Jul. 2014 (216 pages).
Samsung Electronics Co., Ltd. presentation "Google™ Chrome OS User Guide", published 2011, version 1.00 (41 pages).
"UNIX Tutorial" by tutorialspoint.com, downloaded on Jul. 2014 (152 pages).
Internet Engineering Task Force (IETF) RFC 6323 "Sender RTT Estimate Option for the Datagram Congestion Control Protocol (DCCP)", Jul. 2011 (13 pages).
Karn, Phil and Craig Partridge "Improving Round-Trip Time Estimates in Reliable Transport Protocols", ACM SIGCOMM '87, Computer Communication Review (pp. 67-74).
"Safari Web Content Guide", Apple Inc., Mar. 10, 2014 (113 pages).
"Step by Step Tutorials for Microsoft Internet Explorer 8 Accessibility Options", Microsoft Corporation, 2009 (25 pages).
Alan Grosskurth and Michael W. Godfrey "Architecture and evolution of the modern web browser", University of Waterloo in Canada, dated Jun. 20, 2006 (24 pages).
Philip Koopman "32-Bit Cyclic Redundancy Codes for Internet Applications", Carnegie Mellon University, presented at The International Conference on Dependable Systems and Networks (DSN) 2002 (10 pages).
Mark Russinovich, David A. Solomon, and Alex Ioescu "Windows Internals—Part 1" published by Microsoft Press in 2012, 6th edition (752 pages).
Mark Russinovich, David A. Soloman, and Alex Ioescu "Windows Internals—Part 1" published by Microsoft Press in 2012, 6th edition (672 pages).
William R. Stanek "Inside-Out Windows Server 2012", published by Microsoft Press in 2013 (1584 pages).
Jerry Honeycutt "Introducing Windows 8—An Overview for IT Professionals" by Microsoft Press 2012 (168 pages).
Publication No. 1-587005-001-3 by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Handbook", Chapter 5: "Routing Basics", pp. 5-1 to 5-10 (10 pages).
Publication No. 1-587005-001-3 by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Handbook",Chapter 30: "Open System Interconnection Protocols"pp. 30-1 to 30-16 (16 pages).
Publication No. 1-587005-001-3 by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Handbook",Chapter 32: "IPv6" pp. 32-1 to 32-6 (6 pages).

## US 9,241,044 B2

Page 4

(56)                **References Cited**

OTHER PUBLICATIONS

Publication by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Overview",Chapter 30: "Internet Protocols" pp. 30-1 to 32-16 (16 pages).
Publication No. 1-587005-001-3 by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Handbook",Chapter 31: "Security Technologies" pp. 51-1 to 51-12 (12 pages).
IBM Corporation, International Technical Support Organization Redbook Documents No. SG24-4756-00 "Local Area Network Concepts and Products: LAN Operations Systems and management", 1st Edition May 1996 (216 pages).
IBM Corporation, International Technical Support Organization Redbook Document No. GG24-4338-00 "Introduction to Networking Technologies", 1st Edition Apr. 1994 (220 pages).
IBM Corporation, International Technical Support Organization, Redbook Document No. SG24-2580-01 "IP Network Design Guide", 2nd Edition Jun. 1999 (324 pages).
IBM Corporation, International Technical Support Organization, Redbook Document No. GG24-3376-07 "TCP/IP Tutorial and Technical Overview", ISBN 0738494682 8th Edition Dec. 2006 (1004 pages).
Publication by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Overview", Chapter 18: "Multiservice Access Technologies", pp. 18-1 to 18-10 (18 pages).
Publication No. 1-587005-001-3 by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Handbook", Chapter 19: "Voice / Data Integration Technoligies", pp. 19-1 to 19-30 (30 pages).
Cisco Systems, Inc. Publication No. 1-587005-001-3 (Jul. 1999) "Internetworking Technologies Handbook", Chapter 7: "Ethernet Technologies", pp. 7-1 to 7-30 (38 pages).
The Standard Microsystems Corporation (SMSC) data-sheet "LAN91C111 10/100 Non-PCI Ethernet Single Chip MAC + PHY"Data-Sheet, Rev. 15 (Feb. 20, 2004) (127 pages).
Internet Engineering Task Force (IETF) RFC 2544 "Benchmarking Methodology for Network Interconnect Devices", Mar. 1999 (32 pages).
ITU-TY.1564 "Ethernet Service Activation Test Methodology", Mar. 2011 (38 pages).
Publication by Cisco Systems, Inc. (Jul. 1999) "Internetworking Technologies Overview", Chapter 5: "Routing Basics", pp. 5-1 to 5-8 (8 pages).
ITU-T H.323 "Packet-based multimedia communications systems", Dec. 2009 (320 pages).
Internet Engineering Task Force (IETF) RFC 4098 "Terminology for Benchmarking BGP Device Convergence in the Control Plane", Jun. 2005 (37 pages).

Internet Engineering Task Force (IETF) RFC 3550 "RTP: A Transport Protocol for Real-Time Applications", Jul. 2003 (89 pages).
Internet Engineering Task Force (IETF) RFC 3315 "Dynamic Host Configuration Protocol for IPv6 (DHCPv6)", Jul. 2003 (102 pages).
Internet Engineering Task Force (IETF) RFC 3261 "SIP: Session Initiation Protocol", Jun. 2002 (269 pages).
Internet Engineering Task Force (IETF) RFC 2460 "Internet Protocol, Version 6 (IPv6) Specification", Dec. 1998 (40 pages).
Internet Engineering Task Force (IETF) RFC 2131 "Dynamic Host Configuration Protocol", Mar. 1997 (46 pages).
Internet Engineering Task Force (IETF) RFC 1349 "Type of Service in the Internet Protocol Suite", Jul. 1992 (29 pages).
Internet Engineering Task Force (IETF) RFC 1034 "Domain Names—Concepts and Facilities", Nov. 1987 (56 pages).
Internet Engineering Task Force (IETF) RFC 1035 "Domain Names—Implementation and Specification", Nov. 1987 (56 pages).
Internet Engineering Task Force (IETF) RFC 791 "Internet Protocol", Sep. 1981 (52 pages).
Internet Engineering Task Force (IETF) RFC 1750 "Randomness Recommendations for Security", (Dec. 1994) (31 pages).
Cisco Systems, Inc. (1992), "An Introduction to IP Security (IPSec) Encryption", (28 pages).
Feigenbaum J., Johnson A., Syverson P., "Probabilistic Analysis of Onion Routing in a Black-box Model [Extended Abstract]", WPES'07: Proceedings of the 2007 ACM Workshop on Privacy in Electronic Society, ACM Press, Oct. 2007, pp. 1-10 (10 pages).
Feigenbaum J., Johnson A., Syverson P., "A Model of Onion Routing with Provable Anonymity ", In Proceedings of Financial Cryptography and Data Security '07 (FC 2007), pp. 57-71 (15 pages).
Feigenbaum J., Johnson A., Syverson P., "A Model of Onion Routing with Provable Anonymity", Financial Cryptography and Data Security. 11th International Conference, FC 2007, LNCS forthcoming (15 pages).
Overlier L., Syverson P., "Improving Efficiency and Simplicity of Tor circuit establishment and hidden services", Proceedings of the 2007 Privacy Enhancing Technologies Symposium, Springer-Verlag, LNCS 4776 (20 pages).
Chaum D., "Untraceable electronic mail, return addresses, and digital pseudonyms", In Communications of the ACM 24(2), Feb. 1981, pp. 84-88 (5 pages).
Overlier L., Syverson P., "Valet Services: Improving Hidden Servers with a Personal Touch", Proceedings of the 2006 Privacy Enhancing Technologies Workshop, Springer-Verlag, LNCS 4285 (22 pages).
European Search Report for EP14182547.1, dated Aug. 7, 2015

* cited by examiner

Case: 20-2118     Document: 90-1     Page: 63     Filed: 05/31/2022



FIG. 1 (Prior Art)

Appx59

Appx60



**FIG. 2 (Prior Art)**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 7 of 227 PageID #: 35



FIG. 2a (Prior Art)

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 8 of 227 PageID #: 36



FIG. 2b (Prior Art)

U.S. Patent   Jan. 19, 2016   Sheet 5 of 134   US 9,241,044 B2

Appx63



FIG. 3 (Prior Art)

Case: 20-2118     Document: 90-1     Page: 68     Filed: 05/31/2022

U.S. Patent     Jan. 19, 2016     Sheet 6 of 134     US 9,241,044 B2

Appx64



FIG. 3a (Prior Art)

Appx65



FIG. 4 (Prior Art)

U.S. Patent Jan. 19, 2016 Sheet 8 of 134 US 9,241,044 B2

Appx66



FIG. 4a (Prior Art)

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 13 of 227 PageID #: 41



FIG. 5



FIG. 5a

U.S. Patent

Jan. 19, 2016

Sheet 10 of 134

US 9,241,044 B2

U.S. Patent    Jan. 19, 2016    Sheet 11 of 134    US 9,241,044 B2

Appx69



FIG. 5b

Case: 20-2118    Document: 90-1    Page: 74    Filed: 05/31/2022

**U.S. Patent**

Jan. 19, 2016

Sheet 12 of 134

US 9,241,044 B2

**Appx70**



FIG. 6

Case: 20-2118     Document: 90-1     Page: 75     Filed: 05/31/2022

Appx71

U.S. Patent          Jan. 19, 2016          Sheet 13 of 134          US 9,241,044 B2



**FIG. 7**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 18 of 227 PageID #: 46



**FIG. 7a**

Case 2:18-cv-00483-JRG    Document 1-1    Filed 11/08/18    Page 19 of 227 PageID #: 47



FIG. 7b

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 20 of 227 PageID #:  48

**U.S. Patent**        Jan. 19, 2016        Sheet 16 of 134        US 9,241,044 B2





FIG. 8

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 21 of 227 PageID #: 49





**FIG. 9**

Case: 20-2118     Document: 90-1     Page: 80     Filed: 05/31/2022

U.S. Patent

Jan. 19, 2016

Sheet 18 of 134

US 9,241,044 B2

Appx76



FIG. 10

Appx77



FIG. 10a



**FIG. 11**

U.S. Patent

Jan. 19, 2016

Sheet 21 of 134

US 9,241,044 B2

Appx79



**FIG. 11a**

Appx80



**FIG. 11b**

U.S. Patent

Jan. 19, 2016

Sheet 23 of 134

US 9,241,044 B2

Appx81



**FIG. 11c**

Case 2:18-cv-00483-JRG　Document 1-1　Filed 11/08/18　Page 28 of 227 PageID #: 56



FIG. 12

U.S. Patent

Jan. 19, 2016

Sheet 25 of 134

US 9,241,044 B2

Appx83



**FIG. 12a**

Case: 20-2118      Document: 90-1      Page: 88      Filed: 05/31/2022

Appx84



**FIG. 13**

Case: 20-2118   Document: 90-1   Page: 89   Filed: 05/31/2022

U.S. Patent     Jan. 19, 2016     Sheet 27 of 134     US 9,241,044 B2

Appx85



FIG. 14



150

| 152 → | DATE / TIME | TUNNEL IP ADDRESS | SERVER IP ADDRESS | URL | BW (Kb/s) | RTT (ms) |
|---|---|---|---|---|---|---|
| 152a → | 13/3 9:23 | 229.155.81.168 | 128.164.35.142 | www.111.com/22.mpg | 1000 | 30 |
| 152b → | 13/3 9:46 | 248.107.109.10 | 49.154.2.5 | www.xxx.com/hy.avi | 350 | 70 |
| 152c → | 15/4 11:22 | 158.217.19.195 | 72.251.238.51 | www.yyy.com/t6.php | 2500 | 540 |
| 152d → | 16/4 16:43 | 253.6.96.135 | 169.101.27.217 | www.1er.com/5.shtml | 1400 | 170 |
| | | | | | | |

151a   151b   151c   151d   151e   151f

**FIG. 15**

Appx86



U.S. Patent

Jan. 19, 2016

Sheet 29 of 134

US 9,241,044 B2

Case: 20-2118    Document: 90-1    Page: 91    Filed: 05/31/2022

Appx87



150a

| 153a | 153b | 153c | 153d | 153e | 153f |

| | DATE / TIME | TUNNEL IP ADDRESS | SERVER IP ADDRESS | URL | BW (Kb/s) | RTT (ms) |
|---|---|---|---|---|---|---|
| 154a | 13/3 9:23 | 139.230.154.213 | 49.154.2.5 | https://www.youtube.com/watch?v=cJwNwCD6CAE | 1000 | 30 |
| 154b | 13/3 9:46 | 132.171.60.197 | 49.154.2.5 | https://www.youtube.com/watch?v=FRAbW6oCgHM | 350 | 70 |
| 154c | 15/4 11:22 | 248.46.80.36 | 49.154.2.5 | https://www.youtube.com/watch?v=CQQIEQh8pU0 | 2500 | 540 |
| 154d | 16/4 16:43 | 31.16.208.171 | 49.154.2.5 | https://www.youtube.com/watch?v=KJbtX1xWyMA | 1400 | 170 |
| | | | | | | |

154

**FIG. 15a**

Appx88



FIG. 16

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 35 of 227 PageID #: 63



170



171a — URL Identified

171b — Update Analytics Server

171c — Analytics Server Response

171d — Request to Data Server

**FIG. 17 (Prior Art)**



FIG. 17a

U.S. Patent

Jan. 19, 2016

Sheet 32 of 134

US 9,241,044 B2

Appx90



FIG. 18 (Prior Art)

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 38 of 227 PageID #: 66



FIG. 18a (Prior Art)

Case: 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 39 of 227 PageID #:  67

Case: 20-2118   Document: 90-1   Page: 97   Filed: 05/31/2022

Appx93



**FIG. 19**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 40 of 227 PageID #: 68



FIG. 20

U.S. Patent   Jan. 19, 2016   Sheet 37 of 134   US 9,241,044 B2

Case: 20-2118    Document: 90-1    Page: 99    Filed: 05/31/2022

Appx95



**FIG. 21**

Case 2:18-cv-00483-JRG    Document 1-1    Filed 11/08/18    Page 42 of 227 PageID #: 70



FIG. 21a

U.S. Patent

Jan. 19, 2016

Sheet 39 of 134

US 9,241,044 B2



**FIG. 21b**

Appx97

Case: 20-2118   Document: 90-1   Page: 101   Filed: 05/31/2022

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 44 of 227 PageID #:  72



**FIG. 21c**

**FIG. 22**

Case: 20-2118 Document: 90-1 Page: 103 Filed: 05/31/2022

U.S. Patent Jan. 19, 2016 Sheet 41 of 134 US 9,241,044 B2

Appx99

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 46 of 227 PageID #: 74



FIG. 23

Case: 20-2118      Document: 90-1      Page: 105      Filed: 05/31/2022



**FIG. 23a**

U.S. Patent    Jan. 19, 2016    Sheet 43 of 134    US 9,241,044 B2

Appx101



FIG. 23b

Appx102

Appx103

U.S. Patent     Jan. 19, 2016     Sheet 45 of 134     US 9,241,044 B2



FIG. 24a

FIG. 24

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 50 of 227 PageID #: 78

**U.S. Patent**    Jan. 19, 2016    Sheet 46 of 134    US 9,241,044 B2



**FIG. 25**

U.S. Patent

Jan. 19, 2016

Sheet 47 of 134

US 9,241,044 B2

**Appx105**



250a

| 252a | 252b | 252c | 252d |

| 253 → | TYPE | IP ADDRESS | SIGN-IN DATE / TIME | LOCATION |
|---|---|---|---|---|
| 253a → | Agent | 73.0.82.8 | 24/3 8:35 | Miami, FL, USA |
| 253b → | Agent | 68.78.78.3 | 25/3 10:59 | Berlin, Germany |
| 253c → | Peer | 111.13.69.78 | 28/3 11:49 | Melbourne, Australia |
| 253d → | Client | 125.90.25.92 | 29/3 14:23 | Jerusalem, Israel |
| 253e → | Agent / Peer | 95.33.37.80 | 16/3 21:53 | Beijing, China |

**FIG. 25a**

Case: 20-2118    Document: 90-1    Page: 110    Filed: 05/31/2022

U.S. Patent    Jan. 19, 2016    Sheet 48 of 134    US 9,241,044 B2

Appx106



FIG. 26



FIG. 26a

U.S. Patent

Jan. 19, 2016

Sheet 49 of 134

US 9,241,044 B2

Appx107

Appx108



**FIG. 26b**

U.S. Patent

Jan. 19, 2016

Sheet 51 of 134

US 9,241,044 B2

Case: 20-2118    Document: 90-1    Page: 113    Filed: 05/31/2022

Appx109



**FIG. 26c**

U.S. Patent

Jan. 19, 2016

Sheet 52 of 134

US 9,241,044 B2

Appx110



**FIG. 26d**

U.S. Patent     Jan. 19, 2016     Sheet 53 of 134     US 9,241,044 B2

Appx111

Case: 20-2118     Document: 90-1     Page: 115     Filed: 05/31/2022



**FIG. 27**

Appx112



280

| | DATE / TIME | PEER IP ADDRESS | SERVER IP ADDRESS | URL | BW (Kb/s) | RTT (ms) |
|---|---|---|---|---|---|---|
| 282 → | | | | | | |
| 282a → | 13/3 9:23 | 229.155.81.168 | 128.164.35.142 | www.111.com/22.mpg | 1000 | 30 |
| 282b → | 13/3 9:46 | 248.107.109.10 | 49.154.2.5 | www.xxx.com/hy.avi | 350 | 70 |
| 282c → | 15/4 11:22 | 158.217.19.195 | 72.251.238.51 | www.yyy.com/t6.php | 2500 | 540 |
| 282d → | 16/4 16:43 | 253.6.96.135 | 169.101.27.217 | www.1er.com/5.shtml | 1400 | 170 |
| | | | | | | |

281a 281b 281c 281d 281e 281f

**FIG. 28**

U.S. Patent    Jan. 19, 2016    Sheet 54 of 134    US 9,241,044 B2

U.S. Patent

Jan. 19, 2016

Sheet 55 of 134

US 9,241,044 B2

Case: 20-2118    Document: 90-1    Page: 117    Filed: 05/31/2022

Appx113



280a

| 283a | 283b | 283c | 283d | 283e | 283f |
|------|------|------|------|------|------|

| DATE / TIME | TUNNEL IP ADDRESS | SERVER IP ADDRESS | URL | BW (Kb/s) | RTT (ms) |
|-------------|-------------------|-------------------|-----|-----------|----------|
| 13/3 9:23 | 139.230.154.213 | 49.154.2.5 | https://www.youtube.com/watch?v=cJwNwCD6CAE | 1000 | 30 |
| 13/3 9:46 | 132.171.60.197 | 49.154.2.5 | https://www.youtube.com/watch?v=FRAbW6oCgHM | 350 | 70 |
| 15/4 11:22 | 248.46.80.36 | 49.154.2.5 | https://www.youtube.com/watch?v=CQQIEQh8pU0 | 2500 | 540 |
| 16/4 16:43 | 31.16.208.171 | 49.154.2.5 | https://www.youtube.com/watch?v=KJbtX1xWyMA | 1400 | 170 |
|  |  |  |  |  |  |

284 → (DATE / TIME row)
284a → (13/3 9:23 row)
284b → (13/3 9:46 row)
284c → (15/4 11:22 row)
284d → (16/4 16:43 row)

FIG. 28a

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 60 of 227 PageID #:  88

**U.S. Patent**    Jan. 19, 2016    Sheet 56 of 134    US 9,241,044 B2



FIG. 29

**Appx115**

(1)  Total Latency: $T = \max_i (T_i) = \max_i ( RTT_i + X_i / BW_i )$ ⟵ **292a**

(2)  Target: Minimize (T) subject to : $X = \sum_{i=1}^{N} X_i$ ⟵ **292b**

(3) $T = T_1 = T_2 = \ldots = T_N$ ⟵ **292c**

(4) $X_i = BW_i * [ (( X + \sum_{i=1}^{N} RTT_i * BW_i ) / \sum_{i=1}^{N} BW_i ) - RTT_i ]$ ⟵ **292d**

(5) $T = T_1 = \ldots = T_N = [ X + \sum_{i=1}^{N} (RTT_i * BW_i) ] / \sum_{i=1}^{N} BW_i$ ⟵ **292e**



| A | B | C | D | E | F |

293a  293b  293c  293d  293e  293f     293

**FIG. 29a**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 62 of 227 PageID #: 90

**U.S. Patent**     Jan. 19, 2016     Sheet 58 of 134     US 9,241,044 B2



FIG. 29b



FIG. 29c

U.S. Patent    Jan. 19, 2016    Sheet 60 of 134    US 9,241,044 B2

Appx118



FIG. 29d

Case: 20-2118     Document: 90-1     Page: 123     Filed: 05/31/2022

Appx119



FIG. 29e

U.S. Patent

Jan. 19, 2016

Sheet 62 of 134

US 9,241,044 B2

Case: 20-2118    Document: 90-1    Page: 124    Filed: 05/31/2022

Appx120



FIG. 29f

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 67 of 227 PageID #:  95

**U.S. Patent**      Jan. 19, 2016      Sheet 63 of 134      US 9,241,044 B2



FIG. 30

Appx122



FIG. 31

U.S. Patent     Jan. 19, 2016     Sheet 64 of 134     US 9,241,044 B2

Case: 20-2118    Document: 90-1    Page: 127    Filed: 05/31/2022

U.S. Patent    Jan. 19, 2016    Sheet 65 of 134    US 9,241,044 B2

**Appx123**



320

FIG. 32

321a — Congested Message ?
NO → Mark as Online (321b)
YES → Mark as Congested (321c)
Replace Device (321d)
Start Timer (321e)
321f — Message Received ?
YES
NO
321g — Timer Elapsed ?
NO
YES → Mark as Offline (321h)

U.S. Patent     Jan. 19, 2016     Sheet 66 of 134     US 9,241,044 B2

Appx124



**FIG. 33**

U.S. Patent

Jan. 19, 2016

Sheet 67 of 134

US 9,241,044 B2



**FIG. 34**

Appx125

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 72 of 227 PageID #:  100

**U.S. Patent**     Jan. 19, 2016     Sheet 68 of 134     US 9,241,044 B2



FIG. 35

Case 2:18-cv-00483-JRG  Document 1-1  Filed 11/08/18  Page 73 of 227 PageID #: 101



FIG. 36

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 74 of 227 PageID #: 102



FIG. 36a

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 75 of 227 PageID #:  103



FIG. 36b

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 76 of 227 PageID #:  104

**U.S. Patent**     Jan. 19, 2016     Sheet 72 of 134     US 9,241,044 B2



FIG. 37

Case 2:18-cv-00483-JRG  Document 1-1  Filed 11/08/18  Page 77 of 227 PageID #:  105



**FIG. 37a**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 78 of 227 PageID #: 106



FIG. 38

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 79 of 227 PageID #:  107

**U.S. Patent**      Jan. 19, 2016      Sheet 75 of 134      US 9,241,044 B2



FIG. 39

Appx134

Case: 20-2118        Document: 90-1        Page: 138        Filed: 05/31/2022



FIG. 40

Case: 20-2118    Document: 90-1    Page: 139    Filed: 05/31/2022



**FIG. 41**

Appx135



FIG. 42

Case: 20-2118        Document: 90-1        Page: 141        Filed: 05/31/2022

Appx137

410



FIG. 43

U.S. Patent    Jan. 19, 2016    Sheet 80 of 134    US 9,241,044 B2

Appx138



**FIG. 44**

U.S. Patent

Jan. 19, 2016

Sheet 81 of 134

US 9,241,044 B2

Appx139

Case: 20-2118     Document: 90-1     Page: 143     Filed: 05/31/2022



FIG. 45

U.S. Patent Jan. 19, 2016 Sheet 82 of 134 US 9,241,044 B2

Appx140



FIG. 46

Appx141





**FIG. 47**

U.S. Patent          Jan. 19, 2016          Sheet 84 of 134          US 9,241,044 B2



FIG. 48

Appx142

Case: 20-2118     Document: 90-1     Page: 146     Filed: 05/31/2022

U.S. Patent

Jan. 19, 2016

Sheet 85 of 134

US 9,241,044 B2

Appx143



**FIG. 48a**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 90 of 227 PageID #:  118



FIG. 49

U.S. Patent       Jan. 19, 2016       Sheet 87 of 134       US 9,241,044 B2

Appx145

Case: 20-2118       Document: 90-1       Page: 149       Filed: 05/31/2022



**FIG. 49a**

Case 2:18-cv-00483-JRG  Document 1-1  Filed 11/08/18  Page 92 of 227 PageID #: 120





**FIG. 49b**

490b

Case 2:18-cv-00483-JRG  Document 1-1  Filed 11/08/18  Page 93 of 227 PageID #: 121

**U.S. Patent**    Jan. 19, 2016    Sheet 89 of 134    US 9,241,044 B2



FIG. 50 (Prior Art)

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 94 of 227 PageID #: 122



**FIG. 51**

Case: 20-2118    Document: 90-1    Page: 153    Filed: 05/31/2022



FIG. 51a

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 96 of 227 PageID #: 124



FIG. 52

Case 2:18-cv-00483-JRG  Document 1-1  Filed 11/08/18  Page 97 of 227 PageID #: 125

**U.S. Patent**      Jan. 19, 2016      Sheet 93 of 134      US 9,241,044 B2



**FIG. 53**



**FIG. 54**

Case 2:18-cv-00483-JRG　Document 1-1　Filed 11/08/18　Page 99 of 227 PageID #: 127

Appx153



FIG. 55



FIG. 56

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 101 of 227 PageID #:  129



FIG. 57

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 102 of 227 PageID #:  130



FIG. 58

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 103 of 227 PageID #:  131



**FIG. 59**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 104 of 227 PageID #:  132



FIG. 60

U.S. Patent

Jan. 19, 2016

Sheet 101 of 134

US 9,241,044 B2

Appx159

Case: 20-2118      Document: 90-1      Page: 163      Filed: 05/31/2022



**FIG. 61**

Appx160



FIG. 62

U.S. Patent

Jan. 19, 2016

Sheet 103 of 134

US 9,241,044 B2

Appx161

Case: 20-2118     Document: 90-1     Page: 165     Filed: 05/31/2022

## API (SIMILAR TO THE FILE API IN POSIX)

**FILEDS NDCACHE_OPEN("NAME", CREATE_FLAG, TRUNCATE_FLAG)**
- DESCRIPTION: OPEN AN NDCACHE CALLED 'NAME' FOR READING OR WRITING AND RECEIVE A HANDLE [FILEDS] TO IT.
- NAME                    - THE NAME OF THE NDCACHE TO OPEN OR CREATE THIS NAME CAN BE USED BETWEEN DIFFERENT PROCESSES ACCESSING THIS PAGE. SIMILAR TO HOW A FILENAME IS USED
- CREATE_FLAG         - IS TURNED ON TO CREATE THE CACHE IF SUCH AN NDCACHE CALLED <NAME> DOES NOT EXIST
- TRUNCATE_FLAG     - IS TURNED ON TO ERASE THE NDCACHE CALLED <NAME> IF IT ALREADY EXISTS
- RETURN VALUE       - THE NDCACHE_OPEN RETURNS A FILE DESCRIPTOR (FILEDS) TO BE USED AS A HANDLE FOR THE OTHER NDCACHE APIS

65402

**NDCACHE_READ(FILEDS, BUFFER, SIZE)**
**NDCACHE_WRITE(FILEDS, BUFFER, SIZE)**
- DESCRIPTION: READ OR WRITE TO THE NDCACHE REFERENCED BY FILEDS
- FILEDS   - THE FILE DESCRIPTOR OF THE OPEN NDCACHE TO READ FROM OR WRITE TO. RECEIVED FROM NDCACHE_OPEN
- BUFFER   - [FOR READ] THE BUFFER TO READ THE INFORMATION IN TO. [FOR WRITE]    TO WRITE FROM
- OFFSET   - THE OFFSET WITHIN THE NDCACHE TO START THE READ OR WRITE FROM
- SIZE        - THE NUMBER OF BYTES TO READ OR WRITE

65404

**NDCACHE_CLOSE(FILEDS)**
- DESCRIPTION: CLOSES THE HANDLE TO THE NDCACHE DESCRIBED BY FILEDS. AFTER ALL HANDLES TO AN NDCACHE ARE CLOSED, THE OS MAY DECIDE TO SWAP IT OUT BASED ON ITS EVICTION ALGORITHM
- FILEDS   - THE FILE DESCRIPTOR OF THE OPEN NDCACHE TO CLOSE

65406

**NDCACHE_UNLINK(FILEDS)**
- DESCRIPTION: REMOVE AN NDCACHE ENTRY FROM THE PAGE TABLE
- FILEDS   - THE FILE DESCRIPTOR OF THE OPEN NDCACHE TO REMOVE FROM THE PAGE TABLE

65408

## FIG. 63

**U.S. Patent**     Jan. 19, 2016     Sheet 104 of 134     US 9,241,044 B2



FIG. 64

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 109 of 227 PageID #:  137

**U.S. Patent**        Jan. 19, 2016        Sheet 105 of 134        US 9,241,044 B2



FIG. 65

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 110 of 227 PageID #:  138



FIG. 66



FIG. 67

U.S. Patent

Jan. 19, 2016

Sheet 108 of 134

US 9,241,044 B2

Appx166

WRITING TO (AND ALLOCATING) THE NDCACHE:

```
FILEDS *FILEDS=OPEN("NDCACHE_DRIVER/NDCACHE_NAME");
/* NDCACHE_DRIVER IS THE KERNEL MODULE FOR NDCACHE EVENTS
  NDCACHE_NAME IS THE NAME OF THIS NDCACHE, TO BE SHARED
  BETWEEN DIFFERENT PROCESSES */

INT *P=NDCACHE_LOOKUP(NDCACHE_NAME);  // GET PTR TO THE NDCACHE

IF (!P)
{
   // NO SUCH NDCACHE EXISTS, AND THUS NEEDS TO BE CREATED

   INT *P = MMAP(1MB, SHARED MEMORY, FILEDES);
   // 1MB AS AN EXMAPLE NDCACHE MEM SIZE REQUESTED
   // SHARED MEMORY SO THAT CAN BE USED BY MULTIPLE PROCESSES

   (INT* P)[0]++;  // INDICATES THAT THERE IS CONTENT IN THE NDCACHE
   P[N]=...;  // WRITE THE NEW CONTENT TO THE NDCACHE

}
ELSE
   DO NDCACHE_WRITE();  // THIS NDCACHE EXISTS, WRITE TO IT
```
67402

**FIG. 68**

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 113 of 227 PageID #: 141



**FIG. 69**

U.S. Patent

Jan. 19, 2016

Sheet 110 of 134

US 9,241,044 B2

Appx168

```
NDCACHE_READ() / NDCACHE_WRITE():

// CHECK IF THE NDCACHE STILL EXISTS (IF IT WAS SWAPPED OUT BY THE
OS, IT NO LONGER EXISTS)
IF (!P[0]) RETURN MEM_NOT_FOUND;

// COULD BE THAT AT THIS POINT THE OS SWAPPED OUT THIS NDCACH, SO
// CHECK IF THE NDCACHE STILL EXISTS, AND LOCK IT FOR THE DURATION
// OF THE READ/WRITE
IF ((++P[0])==1)
{
  P[0]--;
  RETURN MEM_NOT_FOUND;
}

// READ/WRITE CONTENT FROM/TO THE NDCACHE
BUF = P[N];   // FOR READ
OR
P[N] = ...;   // FOR WRITE

// DECREMENT THE LOCK_FLAG BY ONE (LOCK_FLAG--), INDICATING THAT
THE NDCACHE LOCK FOR THIS READ/WRITE IS RELEASED
P[0]--;

RETURN;
                                                                67602
```

## FIG. 70

**Appx169**

NDCACHE KERNEL MODULE (NDCACHE_DRIVER)

EVICTION ALGORITHM -- WHEN THE OS NEEDS MORE PHYSICAL MEMORY
AND IS CONSIDERING WHICH PHYSICAL MEMORY TO EVICT:

FOR EACH OF THE MEMORY RANGES HANDLED BY THE NDCACHE DRIVER,
WHERE LOCK_FLAG=MEM_RANGE[0]:

IF LOCK_FLAG == 0    // MEM RANGE NOT IN USE
    THEN SWAP OUT THIS MEMORY RANGE

IF LOCK_FLAG == 1    // NDCACHE MEM RANGE IS IN USE, BUT NOT LOCKED
    THEN PREFER NOT TO SWAP OUT THIS MEMORY RANGE

IF LOCK_FLAG > 1    // NDCACHE MEM RANGE IS IN USE AND LOCKED
    DON'T SWAP OUT THIS MEMORY RANGE

67802

ON SWAP OF THE NDCACHE MEMORY (I.E. WHEN THE OS'S EVICTION
ALGORITHM DECIDES TO SWAP OUT THE NDCACHE'S PHYSICAL MEMORY
ALLOCATION):

MAP THE VIRTUAL MEMORY POINTERS TO AN 'ALL ZERO' RANGE IN READ
ONLY MODE (FOR EXAMPLE BY MAPPING TO DEVZERO)

67804

**FIG. 71**

U.S. Patent

Jan. 19, 2016

Sheet 112 of 134

US 9,241,044 B2

Appx170

FOURTH METHOD – ONE MANAGEMENT AREA PER PAGE:



FIG. 72



FIG. 73

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 118 of 227 PageID #:  146



FIG. 74

Appx173



NEW NDCACHE ELEMENT ALLOCATION: P = NDCACHE_CREATE(SIZE):

ALLOCATE MEMORY (P) FOR THE NDCACHE ACCORDING TO THE
SIZE REQUESTED BY THE CALLER (SIZE) + SIZEOF(T) WHERE T IS
THE SPACE REQUIRED FOR THE SECONDARY MANAGEMENT AREA
(SIZEOF(POINTER) + SIZEOF(INT))
69202

ALLOCATE A MANAGEMENT AREA FOR THE PAGES' LOCK FLAGS
(THE SIZE OF IT IS ONE INTEGER * NUMBER OF PAGES REQUIRED
FOR THE NDCACHE)
69204

DEFINE A MANAGEMENT AREA (T) AT THE START OF P, AND INSERT
INTO IT A POINTER TO THE MANAGEMENT AREA (T-PTR) AND AN
INTEGER (T->N) THAT REPRESENTS THE NUMBER OF PAGES IN THIS
NDCACHE'S MEMORY RANGE
69206

P=P+SIZEOF(T) -- SO THAT P NOW POINTS TO THE MAIN MEMORY
RANGE (RIGHT AFTER THE SECONDARY MANAGEMENT AREA)
69208

RETURN (P+SIZEOF(T)) - (RETURNS A POINTER TO THE PLACE IN THE
MEMORY WHERE THE NDCACHE MEMORY ITSELF STARTS (RIGHT
AFTER THE SECONDARY MANAGEMENT SECTION)
69210

FIG. 75

U.S. Patent

Jan. 19, 2016

Sheet 116 of 134

US 9,241,044 B2

READING FROM OR WRITING TO THE NDCACHE ELEMENT:

USE THE SAME ALGORITHM AS IN THE FOURTH IMPLEMENTATION,
WITH TWO EXCEPTIONS:

1. LOCK(P) / UNLOCK(P) –
 A. FIRST EVALUATES THAT T->N IS NOT ZERO. IF IT IS, THEN THE
NDCACHE WAS SWAPPED AND NEEDS TO RETURN
MEM_NOT_FOUND.
 B. IF T->N IS NOT ZERO, LOCK ALL PAGES THAT THIS NDCACHE
ELEMENT SPANS BY LOCKING THE N LOCK_FLAGS STARTING AT THE
T->PTR LOCK_FLAG

2. WHEN READING OR WRITING, NOT LIMITED TO ONE PAGE OF
MEMORY (CAN USE THE ALLOCATED SIZE)

69602

DELETING THE ALLOCATION: NDCACHE_CLOSE (P)

FREE (P - SIZEOF(T)) – FREES THE SECONDARY MANAGEMENT AREA
AS WELL AS THE MAIN MEMORY AREA ALLOCATED TO THIS
NDCACHE ELEMENT

69608

## FIG. 76

Appx175



FIG. 77

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 122 of 227 PageID #:  150

U.S. Patent       Jan. 19, 2016       Sheet 118 of 134       US 9,241,044 B2



FIG. 78

Appx177



**FIG. 79**

U.S. Patent

Jan. 19, 2016

Sheet 120 of 134

US 9,241,044 B2

Appx178

CREATE LIST OF ACCESS POINTS (AP_LIST) THAT ARE SEEN BY THE
CLIENT'S WIFI DRIVER.  FOR EACH AP, STORE THE FOLLOWING
INFORMATION.

SIGNAL STRENGTH, AUTHENTICATION TYPE          42002

ADD TO EACH OF THE ACCESS POINTS IN THE AP_LIST THE FOLLOWING
INFORMATION, BASED ON THE DATABASE OF PREVIOUS CONNECTIONS
THAT THIS CLIENT HAS WITH THE ACCESS POINTS AROUND IT:

HAS CLIENT EVER TRIED TO CONNECT TO THIS AP?, HAS THIS CLIENT
SUCCEEDED IN CONNECTING TO THIS AP IN THE PAST?  WAS THE
INTERNET CONNECTION VERIFIED? TO WHICH AP WAS THIS CLIENT
CONNECT TO LAST?, WHAT WAS THE LAST REASON FOR DISCONNECT?
                                                        42004

TRY TO CONNECT TO THE APS IN THE AP_LIST ACCORDING TO THE
FOLLOWING ORDER (WHERE THERE ARE SEVERAL CANDIDATES FOR EACH
STAGE, SORT THEM BY SIGNAL STRENGTH):

• LOCKED ACCESS POINTS THAT THIS HOST VERIFIED CONNECTION TO
  INTERNET WITH TO IN THE PAST
• OPEN ACCESS POINTS THAT THIS HOST VERIFIED CONNECTION TO
  INTERNET WITH IN THE PAST
• OPEN ACCESS POINTS THAT THIS HOST NEVER VERIFIED WITH IN THE
  PAST
• OPTIONAL: LOCKED APS THAT WERE NEVER VERIFIED WITH BY THIS
  HOST, WITH GUESSED PASSWORD (SEE OTHER SECTION ON HOW TO
  GUESS)
• THE REST OF THE ACCESS POINTS IN THE LIST

                                                        42006

ONCE CONNECTED AND VERIFIED, ADD INFORMATION ABOUT THIS
ACCESS POINT AND ABOUT THE CONNECTION TO THE DATABASE OF
PREVIOUS CONNECTIONS ON THIS HOST
                                                        42008

FIG. 80

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 125 of 227 PageID #:  153

U.S. Patent        Jan. 19, 2016        Sheet 121 of 134        US 9,241,044 B2



FIG. 81 (Prior Art)



FIG. 82

Appx181



FIG. 83

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 128 of 227 PageID #: 156

**U.S. Patent**    Jan. 19, 2016    Sheet 124 of 134    US 9,241,044 B2



FIG. 84 (Prior Art)



FIG. 85

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 130 of 227 PageID #:  158



FIG. 86

U.S. Patent          Jan. 19, 2016          Sheet 127 of 134          US 9,241,044 B2



FIG. 87



FIG. 88

Case: 20-2118    Document: 90-1    Page: 191    Filed: 05/31/2022

U.S. Patent    Jan. 19, 2016    Sheet 129 of 134    US 9,241,044 B2

Appx187



GET FROM ROUTING UNIT THE NUMBER OF ROUTES AVAILABLE, AND THE RELIABILITY OF EACH ONE
24702

BASED ON THE DESIRED RELIABILITY (DR), DETERMINE WHICH ROUTES TO USE FOR THIS COMMUNICATION. DO THIS BY ORDERING THE ROUTES FROM THE HIGHEST RELIABILITY (R1) TO THE LOWEST RELIABILITY (RN), AND MULTIPLY (1-R1)*(1-R2)*…. UNTIL THIS PRODUCT IS LOWER THAN (1-DR). THESE ARE THE ROUTES TO USE.
24704

FOR EACH PACKET TO BE TRANSMITTED, TRANSMIT IT OVER ALL CHOSEN ROUTES
24706

FOR EACH UNIQUE PACKET OF COMMUNICATION RECEIVED, SEND IT TO THE APPLICATION, AND DISCARD THE OTHER SIMILAR PACKETS RECEIVED FROM THE OTHER ROUTES
24708

FIG. 89



**FIG. 90**

FIG. 91

U.S. Patent

Jan. 19, 2016

Sheet 132 of 134

US 9,241,044 B2

Appx190



CLIENT HAS DATABASE OF ALL NETWORK ELEMENTS THAT IT
COMMUNICATED WITH, WITH THE BW AND RTT IN EACH OF THE PAST
SEVERAL CONNECTIONS   NETWORK ELEMENTS ARE SORTED FROM
ELEMENT_1 TO ELEMENT_N, BY THE IP_DISTANCE (**) BETWEEN THEM
AND THE CLIENT (WHERE ELEMENT_X IS CLOSER TO CLIENT THAN
ELEMENT_{X+1})                                                    21002

CLIENT WANTS TO ASSES THE BW AND RTT TO SOURCE_X          21004

INFORMATION IN CLIENT'S DATABASE EXISTS ONLY TO SOURCE_L AND
SOURCE_M, WHERE L<X<M                                             21006

BEST CASE IS THE AVERAGE OF INFORMATION IN DATABASE (FOR BW
AND RTT) FOR SOURCE_L AND WORST CASE IS THE AVERAGE OF
INFORMATION IN DATABASE (FOR BW AND RTT) FOR SOURCE_M     21008

AFTER TRANSACTION, CLIENT UPDATES DATABASE WITH THE BW AND
RTT OF SOURCE_X FOR THIS CURRENT TRANSACTION (IF DATA ALREADY
EXISTS, CAN STORE MULTIPLE ENTRIES, USING LAST FEW ENTRIES'
AVERAGE AS THE DATA)                                              21010

**FIG. 92**

U.S. Patent    Jan. 19, 2016    Sheet 133 of 134    US 9,241,044 B2

Appx191



INITIALIZE – ON SYSTEM START: OPEN DATABASE THAT INCLUDES ENTRIES ONLY OF LOGARITHMIC IP DISTANCES FROM THE HOST MACHINE (I.E. FIRST ENTRY IS OF THE BW AND RTT OF THE HOSTS THAT ARE ONE IP DISTANCE AWAY (122.104.11.99 IS ONE IP DISTANCE FROM 122.104.11.100 AND FROM 122.104.11.98). THE SECOND ENTRY IS OF THE BW AND RTT OF THE HOSTS THAT ARE 2 IP DISTANCES AWAY THEN 4 DISTANCES, THEN 8 DISTANCES, THEN 16 DISTANCES, ETC)
21202

DATABASE ACCESSED FOR READ OR WRITE?
21204

NO

YES

CALCULATE IP DISTANCE (IP_DISTANCE) BETWEEN HOST_IP AND IP_NEW
21206

DIST = ROUND DOWN OF LOG IN BASE 2 OF IP_DISTANCE (E.G. IF IP DISTANCE IS 200, THEN THE IP DISTANCE IS ROUND_DOWN(LOG2(200))=7
21208

DATABASE ACTION
21210

LOOK UP BW AND RTT OF IP_NEW

RECEIVED BW AND RTT OF A TRANSACTION WITH IP_RECENT

READ BW AND RTT FROM ENTRY (DIST)
21212

WRITE BW AND RTT IN TO ENTRY (DIST)
21214

FIG. 93



**FIG. 94**

Appx192

US 9,241,044 B2

| 1 | 2 |

## SYSTEM AND METHOD FOR IMPROVING INTERNET COMMUNICATION BY USING INTERMEDIATE NODES

### RELATED APPLICATION

This patent claims priority from U.S. Provisional Application Ser. No. 61/870,815, which was filed on Aug. 28, 2013, and which is hereby incorporated herein by reference.

### TECHNICAL FIELD

This disclosure relates generally to an apparatus and method for improving communication over the Internet by using intermediate nodes, and in particular, to using devices that may doubly function as an end-user and as an intermediate node.

### BACKGROUND

Unless otherwise indicated herein, the materials described in this section are not prior art to the claims in this application and are not admitted to be prior art by inclusion in this section.

The Internet is a global system of interconnected computer networks that use the standardized Internet Protocol Suite (TCP/IP), including Transmission Control Protocol (TCP) and the Internet Protocol (IP), to serve billions of users worldwide. It is a network of networks that consists of millions of private, public, academic, business, and government networks, of local to global scope, that are linked by a broad array of electronic and optical networking technologies. The Internet carries a vast range of information resources and services, such as the interlinked hypertext documents on the World Wide Web (WWW) and the infrastructure to support electronic mail. The Internet backbone refers to the principal data routes between large, strategically interconnected networks and core routers in the Internet. These data routes are hosted by commercial, government, academic, and other high-capacity network centers, the Internet exchange points and network access points that interchange Internet traffic between the countries, continents and across the oceans of the world. Traffic interchange between Internet service providers (often Tier 1 networks) participating in the Internet backbone exchange traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering.

The Transmission Control Protocol (TCP) is one of the core protocols of the Internet protocol suite (IP) described in RFC 675 and RFC 793, and the entire suite is often referred to as TCP/IP. TCP provides reliable, ordered and error-checked delivery of a stream of octets between programs running on computers connected to a local area network, intranet or the public Internet. It resides at the transport layer. Web browsers typically use TCP when they connect to servers on the World Wide Web, and used to deliver email and transfer files from one location to another. HTTP, HTTPS, SMTP, POP3, IMAP, SSH, FTP, Telnet and a variety of other protocols that are typically encapsulated in TCP. As the transport layer of TCP/IP suite, the TCP provides a communication service at an intermediate level between an application program and the Internet Protocol (IP). Due to network congestion, traffic load balancing, or other unpredictable network behavior, IP packets can be lost, duplicated, or delivered out of order. TCP detects these problems, requests retransmission of lost data, rearranges out-of-order data, and even helps minimize network congestion to reduce the occurrence of the other problems. Once the TCP receiver has reassembled the sequence of octets originally transmitted, it passes them to the receiving application. Thus, TCP abstracts the application's communication from the underlying networking details. The TCP is utilized extensively by many of the Internet's most popular applications, including the World Wide Web (WWW), E-mail, File Transfer Protocol, Secure Shell, peer-to-peer file sharing, and some streaming media applications.

While IP layer handles actual delivery of the data, TCP keeps track of the individual units of data transmission, called segments, which a message is divided into for efficient routing through the network. For example, when an HTML file is sent from a web server, the TCP software layer of that server divides the sequence of octets of the file into segments and forwards them individually to the IP software layer (Internet Layer). The Internet Layer encapsulates each TCP segment into an IP packet by adding a header that includes (among other data) the destination IP address. When the client program on the destination computer receives them, the TCP layer (Transport Layer) reassembles the individual segments and ensures they are correctly ordered and error free as it streams them to an application.

The TCP protocol operations may be divided into three phases. Connections must be properly established in a multistep handshake process (connection establishment) before entering the data transfer phase. After data transmission is completed, the connection termination closes established virtual circuits and releases all allocated resources. A TCP connection is typically managed by an operating system through a programming interface that represents the local end-point for communications, the Internet socket. During the duration of a TCP connection, the local end-point undergoes a series of state changes.

Since TCP/IP is based on the client/server model of operation, the TCP connection setup involves the client and server preparing for the connection by performing an OPEN operation. A client process initiates a TCP connection by performing an active OPEN, sending a SYN message to a server. A server process using TCP prepares for an incoming connection request by performing a passive OPEN. Both devices create for each TCP session a data structure used to hold important data related to the connection, called a Transmission Control Block (TCB).

There are two different kinds of OPEN, named 'Active OPEN' and 'Passive OPEN'. In Active OPEN the client process using TCP takes the "active role" and initiates the connection by actually sending a TCP message to start the connection (a SYN message). In Passive OPEN the server process designed to use TCP is contacting TCP and saying: "I am here, and I am waiting for clients that may wish to talk to me to send me a message on the following port number". The OPEN is called passive because aside from indicating that the process is listening, the server process does nothing. A passive OPEN can in fact specify that the server is waiting for an active OPEN from a specific client, though not all TCP/IP APIs support this capability. More commonly, a server process is willing to accept connections from all corners. Such a passive OPEN is said to be unspecified.

In passive OPEN, the TCP uses a three-way handshake, and before a client attempts to connect with a server, the server must first bind to and listen at a port to open it up for connections. Once the Passive OPEN is established, a client may initiate an Active OPEN. To establish a connection, the three-way (or 3-step) handshake OPEN occurs:

   1. SYN: The active open is performed by the client sending a SYN to the server. The client sets the segment's sequence number to a random value A.

US 9,241,044 B2

**3**

2. SYN-ACK: In response, the server replies with a SYN-ACK. The acknowledgement number is set to one more than the received sequence number, i.e. A+1, and the sequence number that the server chooses for the packet is another random number, B.

3. ACK: Finally, the client sends an ACK back to the server. The sequence number is set to the received acknowledgement value, i.e. A+1, and the acknowledgement number is set to one more than the received sequence number i.e. B+1.

At this point, both the client and server have received an acknowledgement of the connection. The steps 1, 2 establish the connection parameter (sequence number) for one direction and it is acknowledged. The steps 2, 3 establish the connection parameter (sequence number) for the other direction and it is acknowledged, and then a full-duplex communication is established.

The Internet Protocol (IP) is the principal communications protocol used for relaying datagrams (packets) across a network using the Internet Protocol Suite. Responsible for routing packets across network boundaries, it is the primary protocol that establishes the Internet. IP is the primary protocol in the Internet Layer of the Internet Protocol Suite and has the task of delivering datagrams from the source host to the destination host based on their addresses. For this purpose, IP defines addressing methods and structures for datagram encapsulation. Internet Protocol Version 4 (IPv4) is the dominant protocol of the Internet. IPv4 is described in Internet Engineering Task Force (IETF) Request for Comments (RFC) 791 and RFC 1349, and the successor, Internet Protocol Version 6 (IPv6), is currently active and in growing deployment worldwide. IPv4 uses 32-bit addresses (providing 4 billion: $4.3 \times 10^9$ addresses), while IPv6 uses 128-bit addresses (providing 340 undecillion or $3.4 \times 10^{38}$ addresses), as described in RFC 2460.

An overview of an IP-based packet 15 is shown in FIG. 2a. The packet may be generally segmented into the IP data 16b to be carried as payload, and the IP header 16f. The IP header 16f contains the IP address of the source as Source IP Address field 16d and the Destination IP Address field 16c. In most cases, the IP header 16f and the payload 16b are further encapsulated by adding a Frame Header 16e and Frame Footer 16a used by higher layer protocols.

The Internet Protocol is responsible for addressing hosts and routing datagrams (packets) from a source host to the destination host across one or more IP networks. For this purpose the Internet Protocol defines an addressing system that has two functions. Addresses identify hosts and provide a logical location service. Each packet is tagged with a header that contains the meta-data for the purpose of delivery. This process of tagging is also called encapsulation. IP is a connectionless protocol for use in a packet-switched Link Layer network, and does not need circuit setup prior to transmission. The aspects of guaranteeing delivery, proper sequencing, avoidance of duplicate delivery, and data integrity are addressed by an upper transport layer protocol (e.g., TCP-Transmission Control Protocol and UDP—User Datagram Protocol).

The main aspects of the IP technology are IP addressing and routing. Addressing refers to how IP addresses are assigned to end hosts and how sub-networks of IP host addresses are divided and grouped together. IP routing is performed by all hosts, but most importantly by internetwork routers, which typically use either Interior Gateway Protocols (IGPs) or External Gateway Protocols (EGPs) to help make IP datagram forwarding decisions across IP connected networks. Core routers serving in the Internet backbone com-

**4**

monly use the Border Gateway Protocol (BGP) as per RFC 4098 or Multi-Protocol Label Switching (MPLS). Other prior art publications relating to Internet related protocols and routing include the following chapters of the publication number 1-587005-001-3 by Cisco Systems, Inc. (July 1999) entitled: "Internetworking Technologies Handbook", which are all incorporated in their entirety for all purposes as if fully set forth herein: Chapter 5: "Routing Basics" (pages 5-1 to 5-10), Chapter 30: "Internet Protocols" (pages 30-1 to 30-16), Chapter 32: "IPv6" (pages 32-1 to 32-6), Chapter 45: "OSI Routing" (pages 45-1 to 45-8) and Chapter 51: "Security" (pages 51-1 to 51-12), as well as in a IBM Corporation, International Technical Support Organization Redbook Documents No. GG24-4756-00, entitled: "Local area Network Concepts and Products: LAN Operation Systems and management", 1st Edition May 1996, Redbook Document No. GG24-4338-00, entitled: "Introduction to Networking Technologies", 1st Edition April 1994, Redbook Document No. GG24-2580-01 "IP Network Design Guide", 2nd Edition June 1999, and Redbook Document No. GG24-3376-07 "TCP/IP Tutorial and Technical Overview", ISBN 0738494682 8th Edition December 2006, which are incorporated in their entirety for all purposes as if fully set forth herein.

An Internet packet typically includes a value of Time-to-live (TTL) for avoiding the case of packet looping endlessly. The initial TTL value is set in the header of the packet, and each router in the packet path subtracts one from the TTL field, and the packet is discarded upon the value exhaustion. Since the packets may be routed via different and disparately located routers and servers, the TTL of the packets reaching the ultimate destination computer are expected to vary.

The Internet architecture employs a client-server model, among other arrangements. The terms 'server' or 'server computer' relates herein to a device or computer (or a plurality of computers) connected to the Internet and is used for providing facilities or services to other computers or other devices (referred to in this context as 'clients') connected to the Internet. A server is commonly a host that has an IP address and executes a 'server program', and typically operates as a socket listener. Many servers have dedicated functionality such as web server, Domain Name System (DNS) server (described in RFC 1034 and RFC 1035), Dynamic Host Configuration Protocol (DHCP) server (described in RFC 2131 and RFC 3315), mail server, File Transfer Protocol (FTP) server and database server. Similarly, the term 'client' is used herein to include, but not limited to, a program or to a device or a computer (or a series of computers) executing this program, which accesses a server over the Internet for a service or a resource. Clients commonly initiate connections that a server may accept. For non-limiting example, web browsers are clients that connect to web servers for retrieving web pages, and email clients connect to mail storage servers for retrieving mails.

The Hypertext Transfer Protocol (HTTP) is an application protocol for distributed, collaborative, hypermedia information systems, commonly used for communication over the Internet. Hypertext is. HTTP is the protocol to exchange or transfer hypertext, which is a structured text that uses logical links (hyperlinks) between nodes containing text. HTTP version 1.1 was standardized as RFC 2616 (June 1999), which was replaced by a set of standards (obsoleting RFC 2616), including RFC 7230-HTTP/1.1: Message Syntax and Routing, RFC 7231-HTTP/1.1: Semantics and Content, RFC 7232-HTTP/1.1: Conditional Requests, RFC 7233-HTTP/1.1: Range Requests, RFC 7234-HTTP/1.1: Caching, and RFC 7235-HTTP/1.1: Authentication. HTTP functions as a

US 9,241,044 B2

5

request-response protocol in the client-server computing model. A web browser, for example, may be the client and an application running on a computer hosting a website may be the server. The client submits an HTTP request message to the server. The server, which provides resources such as HTML files and other content, or performs other functions on behalf of the client, returns a response message to the client. The response contains completion status information about the request and may also contain requested content in its message body. A web browser is an example of a user agent (UA). Other types of user agent include the indexing software used by search providers (web crawlers), voice browsers, mobile apps and other software that accesses, consumes or displays web content.

HTTP is designed to permit intermediate network elements to improve or enable communications between clients and servers. High-traffic websites often benefit from web cache servers that deliver content on behalf of upstream servers to improve response time. Web browsers cache previously accessed web resources and reuse them when possible, to reduce network traffic. HTTP proxy servers at private network boundaries can facilitate communication for clients without a globally routable address, by relaying messages with external servers. HTTP is an application layer protocol designed within the framework of the Internet Protocol Suite. Its definition presumes an underlying and reliable transport layer protocol, and Transmission Control Protocol (TCP) is commonly used. However, HTTP can use unreliable protocols such as the User Datagram Protocol (UDP), for example, in the Simple Service Discovery Protocol (SSDP). HTTP resources are identified and located on the network by Uniform Resource Identifiers (URIs) or, more specifically, Uniform Resource Locators (URLs), using the http or https URI schemes. URIs and hyperlinks in Hypertext Markup Language (HTML) documents form webs of inter-linked hypertext documents. An HTTP session is a sequence of network request-response transactions. An HTTP client initiates a request by establishing a Transmission Control Protocol (TCP) connection to a particular port on a server. An HTTP server listening on that port waits for a client's request message. Upon receiving the request, the server sends back a status line, such as "HTTP/1.1 200 OK", and a message of its own. The body of this message is typically the requested resource, although an error message or other information may also be returned. HTTP is a stateless protocol. A stateless protocol does not require the HTTP server to retain information or status

HTTP persistent connection, also called HTTP keep-alive, or HTTP connection reuse, refers to using a single TCP connection to send and receive multiple HTTP requests/responses, as opposed to opening a new connection for every single request/response pair. Persistent connections provide a mechanism by which a client and a server can signal the close of a TCP connection. This signaling takes place using the Connection header field. The HTTP persistent connection is described in IETF RFC 2616, entitled: "*Hypertext Transfer Protocol—HTTP/1.1*". In HTTP 1.1, all connections are considered persistent unless declared otherwise. The HTTP persistent connections do not use separate keepalive messages, but they allow multiple requests to use a single connection. The advantages of using persistent connections involve lower CPU and memory usage (because fewer connections are open simultaneously), enabling HTTP pipelining of requests and responses, reduced network congestion (due to fewer TCP connections), and reduced latency in subsequent requests (due to minimal handshaking). Any connection herein may use, or be based on, an HTTP persistent connection.

6

An Operating System (OS) is software that manages computer hardware resources and provides common services for computer programs. The operating system is an essential component of any system software in a computer system, and most application programs usually require an operating system to function. For hardware functions such as input and output and memory allocation, the operating system acts as an intermediary between programs and the computer hardware, although the application code is usually executed directly by the hardware and will frequently make a system call to an OS function or be interrupted by it. Common features typically supported by operating systems include process management, interrupts handling, memory management, file system, device drivers, networking (such as TCP/IP and UDP), and Input/Output (I/O) handling. Examples of popular modern operating systems include Android, BSD, iOS, Linux, OS X, QNX, Microsoft Windows, Windows Phone, and IBM z/OS.

A server device (in server/client architecture) typically offers information resources, services, and applications to clients, and is using a server dedicated or oriented operating system. Current popular server operating systems are based on Microsoft Windows (by Microsoft Corporation, headquartered in Redmond, Wash., U.S.A.), Unix, and Linux-based solutions, such as the 'Windows Server 2012' server operating system is part of the Microsoft 'Windows Server' OS family, that was released by Microsoft on 2012, providing enterprise-class datacenter and hybrid cloud solutions that are simple to deploy, cost-effective, application-focused, and user-centric, and is described in Microsoft publication entitled: "*Inside-Out Windows Server 2012*", by William R. Stanek, published 2013 by Microsoft Press, which is incorporated in its entirety for all purposes as if fully set forth herein.

Unix operating systems are widely used in servers. Unix is a multitasking, multiuser computer operating system that exists in many variants, and is characterized by a modular design that is sometimes called the "Unix philosophy," meaning the OS provides a set of simple tools that each perform a limited, well-defined function, with a unified filesystem as the main means of communication, and a shell scripting and command language to combine the tools to perform complex workflows. Unix was designed to be portable, multi-tasking and multi-user in a time-sharing configuration, and Unix systems are characterized by various concepts: the use of plain text for storing data; a hierarchical file system; treating devices and certain types of Inter-Process Communication (IPC) as files; and the use of a large number of software tools, small programs that can be strung together through a command line interpreter using pipes, as opposed to using a single monolithic program that includes all of the same functionality. Under Unix, the operating system consists of many utilities along with the master control program, the kernel. The kernel provides services to start and stop programs, handles the file system and other common "low level" tasks that most programs share, and schedules access to avoid conflicts when programs try to access the same resource or device simultaneously. To mediate such access, the kernel has special rights, reflected in the division between user-space and kernel-space. Unix is described in a publication entitled: "UNIX Tutorial" by tutorialspoint.com, downloaded on July 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

A client device (in server/client architecture) typically receives information resources, services, and applications from servers, and is using a client dedicated or oriented operating system. Current popular server operating systems are based on Microsoft Windows (by Microsoft Corporation,

US 9,241,044 B2

**7**

headquartered in Redmond, Wash., U.S.A.), which is a series of graphical interface operating systems developed, marketed, and sold by Microsoft. Microsoft Windows is described in Microsoft publications entitled: "Windows Internals—Part 1" and *"Windows Internals—Part 2"*, by 5 Mark Russinovich, David A. Solomon, and Alex Ioescu, published by Microsoft Press in 2012, which are both incorporated in their entirety for all purposes as if fully set forth herein. Windows 8 is a personal computer operating system developed by Microsoft as part of Windows NT family of 10 operating systems, that was released for general availability on October 2012, and is described in Microsoft Press 2012 publication entitled: *"Introducing Windows 8—An Overview for IT Professionals"* by Jerry Honeycutt, which is incorporated in its entirety for all purposes as if fully set forth herein. 15

Chrome OS is a Linux kernel-based operating system designed by Google Inc. out of Mountain View, Calif., U.S.A., to work primarily with web applications. The user interface takes a minimalist approach and consists almost entirely of just the Google Chrome web browser; since the 20 operating system is aimed at users who spend most of their computer time on the Web, the only "native" applications on Chrome OS are a browser, media player and file manager, and hence the Chrome OS is almost a pure web thin client OS.

The Chrome OS is described as including a three-tier archi- 25 tecture: firmware, browser and window manager, and system-level software and userland services. The firmware contributes to fast boot time by not probing for hardware, such as floppy disk drives, that are no longer common on computers, especially netbooks. The firmware also contributes to secu- 30 rity by verifying each step in the boot process and incorporating system recovery. The system-level software includes the Linux kernel that has been patched to improve boot performance. The userland software has been trimmed to essentials, with management by Upstart, which can launch services 35 in parallel, re-spawn crashed jobs, and defer services in the interest of faster booting. The Chrome OS user guide is described in the Samsung Electronics Co., Ltd. presentation entitled: "Google™ Chrome OS USER GUIDE" published 2011, which is incorporated in its entirety for all purposes as 40 if fully set forth herein.

A mobile operating system (also referred to as mobile OS), is an operating system that operates a smartphone, tablet, PDA, or other mobile device. Modern mobile operating systems combine the features of a personal computer operating 45 system with other features, including a touchscreen, cellular, Bluetooth, Wi-Fi, GPS mobile navigation, camera, video camera, speech recognition, voice recorder, music player, near field communication and infrared blaster. Currently popular mobile OS are Android, Symbian, Apple iOS, Black- 50 Berry, MeeGo, Windows Phone, and Bada. Mobile devices with mobile communications capabilities (e.g. smartphones) typically contain two mobile operating systems—the main user-facing software platform is supplemented by a second low-level proprietary real-time operating system which oper- 55 ates the radio and other hardware.

Android is an open source and Linux-based mobile operating system (OS) based on the Linux kernel that is currently offered by Google. With a user interface based on direct manipulation, Android is designed primarily for touchscreen 60 mobile devices such as smartphones and tablet computers, with specialized user interfaces for televisions (Android TV), cars (Android Auto), and wrist watches (Android Wear). The OS uses touch inputs that loosely correspond to real-world actions, such as swiping, tapping, pinching, and reverse 65 pinching to manipulate on-screen objects, and a virtual keyboard. Despite being primarily designed for touchscreen

**8**

input, it also has been used in game consoles, digital cameras, and other electronics. The response to user input is designed to be immediate and provides a fluid touch interface, often using the vibration capabilities of the device to provide haptic feedback to the user. Internal hardware such as accelerometers, gyroscopes and proximity sensors are used by some applications to respond to additional user actions, for example adjusting the screen from portrait to landscape depending on how the device is oriented, or allowing the user to steer a vehicle in a racing game by rotating the device, simulating control of a steering wheel.

Android devices boot to the homescreen, the primary navigation and information point on the device, which is similar to the desktop found on PCs. Android homescreens are typically made up of app icons and widgets; app icons launch the associated app, whereas widgets display live, auto-updating content such as the weather forecast, the user's email inbox, or a news ticker directly on the homescreen. A homescreen may be made up of several pages that the user can swipe back and forth between, though Android's homescreen interface is heavily customizable, allowing the user to adjust the look and feel of the device to their tastes. Third-party apps available on Google Play and other app stores can extensively re-theme the homescreen, and even mimic the look of other operating systems, such as Windows Phone. The Android OS is described in a publication entitled: *"Android Tutorial"*, downloaded from tutorialspoint.com on July 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

iOS (previously iPhone OS) from Apple Inc. (headquartered in Cupertino, Calif., U.S.A.) is a mobile operating system distributed exclusively for Apple hardware. The user interface of the iOS is based on the concept of direct manipulation, using multi-touch gestures. Interface control elements consist of sliders, switches, and buttons. Interaction with the OS includes gestures such as swipe, tap, pinch, and reverse pinch, all of which have specific definitions within the context of the iOS operating system and its multi-touch interface. Internal accelerometers are used by some applications to respond to shaking the device (one common result is the undo command) or rotating it in three dimensions (one common result is switching from portrait to landscape mode). The iOS is described in the publication entitled: *"iOS Tutorial"*, downloaded from tutorialspoint.com on July 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

Operating Systems:

An Operating System (OS) is software that manages computer hardware resources and provides common services for computer programs. The operating system is an essential component of any system software in a computer system, and most application programs usually require an operating system to function. For hardware functions such as input and output and memory allocation, the operating system acts as an intermediary between programs and the computer hardware, although the application code is usually executed directly by the hardware and will frequently make a system call to an OS function or be interrupted by it. Common features typically supported by operating systems include process management, interrupts handling, memory management, file system, device drivers, networking (such as TCP/IP and UDP), and Input/Output (I/O) handling. Examples of popular modern operating systems include Android, BSD, iOS, Linux, OS X, QNX, Microsoft Windows, Windows Phone, and IBM z/OS.

Process Management:

The operating system provides an interface between an application program and the computer hardware, so that an

US 9,241,044 B2

9

application program can interact with the hardware only by obeying rules and procedures programmed into the operating system. The operating system is also a set of services which simplify development and execution of application programs. Executing an application program involves the creation of a process by the operating system kernel which assigns memory space and other resources, establishes a priority for the process in multi-tasking systems, loads program binary code into memory, and initiates execution of the application program which then interacts with the user and with hardware devices. The OS must allocate resources to processes, enable processes to share and exchange information, protect the resources of each process from other processes, and enable synchronization among processes. The OS maintains a data structure for each process, which describes the state and resource ownership of that process, and which enables the OS to exert control over each process.

In many modern operating systems, there can be more than one instance of a program loaded in memory at the same time; for example, more than one user could be executing the same program, each user having separate copies of the program loaded into memory. With some programs, known as re-entrant type, it is possible to have one copy loaded into memory, while several users have shared access to it so that they each can execute the same program-code. The processor at any instant can only be executing one instruction from one program but several processes can be sustained over a period of time by assigning each process to the processor at intervals while the remainder become temporarily inactive. A number of processes being executed over a period of time instead of at the same time is called concurrent execution. A multiprogramming or multitasking OS is a system executing many processes concurrently. A multiprogramming requires that the processor be allocated to each process for a period of time, and de-allocated at an appropriate moment. If the processor is de-allocated during the execution of a process, it must be done in such a way that it can be restarted later as easily as possible.

There are two typical ways for an OS to regain control of the processor during a program's execution in order for the OS to perform de-allocation or allocation: The process issues a system call (sometimes called a software interrupt); for example, an I/O request occurs requesting to access a file on hard disk. Alternatively, a hardware interrupt occurs; for example, a key was pressed on the keyboard, or a timer runs out (used in pre-emptive multitasking). The stopping of one process and starting (or restarting) of another process is called a context switch or context change. In many modern operating systems, processes can consist of many sub-processes. This introduces the concept of a thread. A thread may be viewed as a sub-process; that is, a separate, independent sequence of execution within the code of one process. Threads are becoming increasingly important in the design of distributed and client-server systems and in software run on multi-processor systems.

Modes:

Many contemporary processors incorporate a mode bit to define the execution capability of a program in the processor. This bit can be set to a kernel mode or a user mode. A kernel mode is also commonly referred to as supervisor mode, monitor mode or ring 0. In kernel mode, the processor can execute every instruction in its hardware repertoire, whereas in user mode, it can only execute a subset of the instructions. Instructions that can be executed only in kernel mode are called kernel, privileged or protected instructions to distinguish them from the user mode instructions. For example, I/O instructions are privileged. So, if an application program executes in user mode, it cannot perform its own I/O, and

10

must request the OS to perform I/O on its behalf. The system may logically extend the mode bit to define areas of memory to be used when the processor is in kernel mode versus user mode. If the mode bit is set to kernel mode, the process executing in the processor can access either the kernel or user partition of the memory. However, if user mode is set, the process can reference only the user memory space, hence two classes of memory are defined, the user space and the system space (or kernel, supervisor or protected space). In general, the mode bit extends the operating system's protection rights, and is set by the user mode trap instruction, also called a supervisor call instruction. This instruction sets the mode bit, and branches to a fixed location in the system space. Since only the system code is loaded in the system space, only the system code can be invoked via a trap. When the OS has completed the supervisor call, it resets the mode bit to user mode prior to the return.

Computer operating systems provide different levels of access to resources, and these hierarchical protection domains are often referred to as 'protection rings', and are used to protect data and functionality from faults (by improving fault tolerance) and malicious behaviour (by providing computer security). A protection ring is one of two or more hierarchical levels or layers of privilege within the architecture of a computer system. These levels may be hardware-enforced by some CPU architectures that provide different CPU modes at the hardware or microcode level. Rings are arranged in a hierarchy from most privileged (most trusted, usually numbered zero) to least privileged (least trusted, usually with the highest ring number). On most operating systems, kernel mode or 'Ring 0' is the level with the most privileges and interacts most directly with the physical hardware such as the CPU and memory. Special gates between rings are provided to allow an outer ring to access an inner ring's resources in a predefined manner, as opposed to allowing arbitrary usage. Correctly gating access between rings can improve security by preventing programs from one ring or privilege level from misusing resources intended for programs in another. For example, spyware running as a user program in Ring 3 should be prevented from turning on a web camera without informing the user, since hardware access should be a Ring 1 function reserved for device drivers. Programs such as web browsers running in higher numbered rings must request access to the network, a resource restricted to a lower numbered ring.

Kernel:

With the aid of the firmware and device drivers, the kernel provides the most basic level of control over all of the computer's hardware devices. It manages memory access for programs in the RAM, it determines which programs get access to which hardware resources, it sets up or resets the CPU's operating states for optimal operation at all times, and it organizes the data for long-term non-volatile storage with file systems on such media as disks, tapes, flash memory, etc. The part of the system executing in kernel supervisor state is called the kernel, or nucleus, of the operating system. The kernel operates as trusted software, meaning that when it was designed and implemented, it was intended to implement protection mechanisms that could not be covertly changed through the actions of untrusted software executing in user space. Extensions to the OS execute in user mode, so the OS does not rely on the correctness of those parts of the system software for correct operation of the OS. Hence, a fundamental design decision for any function to be incorporated into the OS is whether it needs to be implemented in the kernel. If it is implemented in the kernel, it will execute in kernel (supervisor) space, and have access to other parts of the kernel. It will

US 9,241,044 B2

11

also be trusted software by the other parts of the kernel. If the function is implemented to execute in user mode, it will have no access to kernel data structures.

There are two techniques by which a program executing in user mode can request the kernel's services, namely 'System call' and 'Message passing'. Operating systems are typically with one or the other of these two facilities, but commonly not both. Assuming that a user process wishes to invoke a particular target system function, in the system call approach, the user process uses the trap instruction, so the system call should appear to be an ordinary procedure call to the application program; the OS provides a library of user functions with names corresponding to each actual system call. Each of these stub functions contains a trap to the OS function, and when the application program calls the stub, it executes the trap instruction, which switches the CPU to kernel mode, and then branches (indirectly through an OS table), to the entry point of the function which is to be invoked. When the function completes, it switches the processor to user mode and then returns control to the user process; thus simulating a normal procedure return. In the message passing approach, the user process constructs a message, that describes the desired service, and then it uses a trusted send function to pass the message to a trusted OS process. The send function serves the same purpose as the trap; that is, it carefully checks the message, switches the processor to kernel mode, and then delivers the message to a process that implements the target functions. Meanwhile, the user process waits for the result of the service request with a message receive operation. When the OS process completes the operation, it sends a message back to the user process.

Interrupts Handling:

Interrupts are central to operating systems, as they provide an efficient way for the operating system to interact with and react to its environment. Interrupts are typically handled by the operating system's kernel, and provide a computer with a way of automatically saving local register contexts, and running specific code in response to events. When an interrupt is received, the computer's hardware automatically suspends whatever program is currently running, saves its status, and runs computer code previously associated with the interrupt. When a hardware device triggers an interrupt, the operating system's kernel decides how to deal with this event, generally by running some processing code. The amount of code being run depends on the priority of the interrupt, and the processing of hardware interrupts is executed by a device driver, which may be either part of the operating system's kernel, part of another program, or both. Device drivers may then relay information to a running program by various means. A program may also trigger an interrupt to the operating system. For example, if a program wishes to access an hardware (such as a peripheral), it may interrupt the operating system's kernel, which causes control to be passed back to the kernel. The kernel will then process the request. If a program wishes additional resources (or wishes to shed resources) such as memory, it will trigger an interrupt to get the kernel's attention. Each interrupt has its own interrupt handler. The number of hardware interrupts is limited by the number of interrupt request (IRQ) lines to the processor, but there may be hundreds of different software interrupts. Interrupts are a commonly used technique for computer multitasking, especially in real-time computing systems, which are commonly referred to as interrupt-driven systems.

Memory Management:

A multiprogramming operating system kernel is responsible for managing all system memory which is currently in use by programs, ensuring that a program does not interfere

12

with memory already in use by another program. Since programs time share, each program must have independent access to memory. Memory protection enables the kernel to limit a process' access to the computer's memory. Various methods of memory protection exist, including memory segmentation and paging. In both segmentation and paging, certain protected mode registers specify to the CPU what memory address it should allow a running program to access. Attempts to access other addresses will trigger an interrupt which will cause the CPU to re-enter supervisor mode, placing the kernel in charge. This is called a segmentation violation (or Seg-V), and the kernel will generally resort to terminating the offending program, and will report the error.

Memory management further provides ways to dynamically allocate portions of memory to programs at their request, and free it for reuse when no longer needed. This is critical for any advanced computer system where more than a single process might be underway at any time. Several methods have been devised that increase the effectiveness of memory management. Virtual memory systems separate the memory addresses used by a process from actual physical addresses, allowing separation of processes and increasing the effectively available amount of RAM using paging or swapping to secondary storage. The quality of the virtual memory manager can have an extensive effect on overall system performance.

File System:

Commonly a file system (or filesystem) is used to control how data is stored and retrieved. By separating the data into individual pieces, and giving each piece a name, the information is easily separated and identified, where each piece of data is called a "file". The structure and logic rules used to manage the groups of information and their names is called a "file system". There are many different kinds of file systems. Each one has a different structure and logic, properties of speed, flexibility, security, size and more. Some file systems have been designed to be used for specific applications. For example, the ISO 9660 file system is designed specifically for optical discs. File systems can be used on many different kinds of storage devices. Some file systems are used on local data storage devices; others provide file access via a network protocol (for example, NFS, SMB, or 9P clients). Some file systems are "virtual", in that the "files" supplied are computed on request (e.g. procfs) or are merely a mapping into a different file system used as a backing store. The file system manages access to both the content of files and the metadata about those files. It is responsible for arranging storage space; reliability, efficiency, and tuning with regard to the physical storage medium are important design considerations.

A disk file system takes advantages of the ability of disk storage media to randomly address data in a short amount of time. Additional considerations include the speed of accessing data following that initially requested and the anticipation that the following data may also be requested. This permits multiple users (or processes) access to various data on the disk without regard to the sequential location of the data. Examples include FAT (FAT12, FAT16, FAT32), exFAT, NTFS, HFS and HFS+, HPFS, UFS, ext2, ext3, ext4, XFS, btrfs, ISO 9660, Files-11, Veritas File System, VMFS, ZFS, ReiserFS and UDF. Some disk file systems are journaling file systems or versioning file systems.

TMPFS.

TMPFS (or tmpfs) is a common name for a temporary file storage facility on many Unix-like operating systems. While intended to appear as a mounted file system, it is stored in volatile memory instead of a non-volatile storage device. A similar construction is a RAM disk, which appears as a virtual

US 9,241,044 B2

13

disk drive and hosts a disk file system. The tmpfs is typically a file system based on SunOS virtual memory resources, which does not use traditional non-volatile media to store file data; instead, tmpfs files exist solely in virtual memory maintained by the UNIX kernel. Because tmpfs file systems do not use dedicated physical memory for file data, but instead use VM system resources and facilities, they can take advantage of kernel resource management policies. Tmpfs is designed primarily as a performance enhancement to allow short-lived files to be written and accessed without generating disk or network I/O. Tmpfs maximizes file manipulation speed while preserving UNIX file semantics. It does not require dedicated disk space for files and has no negative performance impact. The tmpfs is described in a Sun Microsystem Inc. paper entitled: "tmpfs: A Virtual Memory File System" by Peter Snyder, downloaded on July 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

Device Drivers:

A device driver is a specific type of computer software developed to allow interaction with hardware devices. Typically, this constitutes an interface for communicating with the device, through the specific computer bus or communications subsystem that the hardware is connected to, providing commands to and/or receiving data from the device, and on the other end, the requisite interfaces to the operating system and software applications. It is a specialized hardware-dependent computer program which is also operating system specific that enables another program, typically an operating system or applications software package or computer program running under the operating system kernel, to interact transparently with a hardware device, and usually provides the requisite interrupt handling necessary for any necessary asynchronous time-dependent hardware interfacing needs.

Networking:

Most operating systems support a variety of networking protocols, hardware, and applications for using them, allowing computers running dissimilar operating systems to participate in a common network, for sharing resources such as computing, files, printers, and scanners, using either wired or wireless connections. Networking can essentially allow a computer's operating system to access the resources of a remote computer, to support the same functions as it could if those resources were connected directly to the local computer. This includes everything from simple communication, to using networked file systems, or sharing another computer's graphics or sound hardware. Some network services allow the resources of a computer to be accessed transparently, such as SSH, which allows networked users direct access to a computer's command line interface. A client/server networking allows a program on a computer, called a client, to connect via a network to another computer, called a server. Servers offer (or host) various services to other network computers and users. These services are usually provided through ports or numbered access points beyond the server's network address. Each port number is usually associated with a maximum of one running program, which is responsible for handling requests to that port. A daemon, being a user program, can in turn access the local hardware resources of that computer by passing requests to the operating system kernel.

Input/Output (I/O) Handling:

An input/output (or I/O) is the communication between an information processing system (such as a computer) and the outside world, possibly a human or other information processing system. The inputs are typically the signals or data received by the system, and the outputs are the signals or data sent from it. I/O devices may be used by a person (or other

14

system) to communicate with a computer. For instance, a keyboard or a mouse may be an input device for a computer, while monitors and printers are considered output devices for a computer. Devices for communication between computers, such as modems and network cards, typically serve for both input and output.

User Interface:

Every computer that is to be operated by a human being requires a user interface, usually referred to as a 'shell', and is essential if human interaction is to be supported. The user interface views the directory structure and requests services from the operating system that will acquire data from input hardware devices, such as a keyboard, mouse or credit card reader, and requests operating system services to display prompts, status messages and such on output hardware devices, such as a video monitor or printer. The two most common forms of a user interface have historically been the command-line interface, where computer commands are typed out line-by-line, and the Graphical User Interface (GUI), where a visual environment (most commonly a WIMP) is present. Typically the GUI is integrated into the kernel, allowing the GUI to be more responsive by reducing the number of context switches required for the GUI to perform its output functions.

WDM.

The Windows Driver Model (WDM), also known as the Win32 Driver Model, is a standard model defining a framework for device drivers specified by Microsoft, providing unified driver models. The WDM model is based on WDM drivers that are layered in a complex hierarchy and communicate with each other via I/O Request Packets (IRPs). The WDM was introduced with Windows 98 and Windows 2000 to replace VxD which was used on older versions of Windows such as Windows 95 and Windows 3.1, as well as the Windows NT Driver Model, and WDM drivers are usable on all of Microsoft's operating systems of Windows 95 and later. The WDM is described in the publication entitled: "*Microsoft Windows Driver Model (WDM)*", by Mohamad (Hani) Atassy, submitted to Dr. Dennis R. Hafermann dated Jan. 28, 2002, and in publication entitled: "*A Comparison of the Linux and Windows Device Driver Architecture*", by Melekam Tsegaye and Ricahrd Foss, both from Rhodes University, South-Africa, downloaded from the Internet on July 2014, both are incorporated in their entirety for all purposes as if fully set forth herein.

A general schematic view of the WDM architecture **430** is shown on FIG. **3**. In the example shown, three applications designated as application #1 **431***a*, application #2 **431***b*, and application #3 **431***c*, are accessing three peripheral hardware devices, designated as peripheral #1 **439***a*, peripheral #2 **439***b*, and peripheral #3 **439***c*. The model involves three layers. The lower layer is the hardware layer **50***c*, which includes the hardware devices and peripherals, accessed by the processor (such as processor **27**) via the hardware bus **430***d*, which may correspond to internal bus **13** shown in FIG. **1**. The highest layer is a 'user space' layer **430***a*, corresponding to the user mode nd to the higher 'ring' layers such as Ring 3, and is relating to the space is the memory area where application software and some drivers execute. The kernel of the operating system provides the services as part of a 'kernel space' layer **430***b*, serving as an intermediate layer between the user space layer **430***a* and the hardware layer **430***c*. The kernel space **430***b* operates in a highly privileged hierarchical protection domain, and is strictly reserved for running privileged kernel, kernel extensions, and most device drivers, and is typically corresponding to the kernel mode and to the 'ring-0'

Case 2:18-cv-00483-JRG    Document 1-1    Filed 11/08/18    Page 146 of 227 PageID #:  174

US 9,241,044 B2

15

layer (in x86 processors). The kernel mode may be supported by the processor hardware, or may be supported by a code segment level.

The user mode applications (such as application #1 431a, application #2 431b, and application #3 431c) access the kernel space 430b by the invoking of system calls respectively denoted as connections 432a, 432b and 432c. Typically, such system calls are processed via intermediating entity known as Windows API, such as a Win32 API 433, which access the kernel space 430b via a standard messaging 434. The Win32 API 433 is an example of a Windows API (informally WinAPI), which is Microsoft's core set of Application Programming Interfaces (APIs) available in the Microsoft Windows operating systems. Almost all Windows programs interact with the Windows API; on the Windows NT line of operating systems, a small number (such as programs started early in the Windows startup process) uses the Native API. Supporting for developers is in the form of the Windows Software Development Kit (SDK), providing documentation and tools necessary to build software based upon the Windows API and associated Windows interfaces. The Win32 API 433 is the 32-bit API for modern versions of Windows, and consists of functions implemented, as with Win16, in system DLLs. The core DLLs of the Win32 include the kernel32.dll, user32.dll, and gdi32.dll. The Win32 API is described in the tutorial entitled: *"Welcome to Version 2.0 of the Win32 API Tutorial"* by Prof. M. Saeed, published by Brook Miles, downloaded from the Internet on July 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

System calls provide an essential interface between a process and the operating system. A system call is how a program requests a service from an operating system's kernel. This may include hardware related services (e.g., accessing the hard disk), creating and executing new processes, and communicating with integral kernel services (such as scheduling). A system call is typically processed in the kernel mode, which is accomplished by changing the processor execution mode to a more privileged one. The hardware sees the world in terms of the execution mode according to the processor status register, and processes are an abstraction provided by the operating system. A system call does not require a context switch to another process, it is processed in the context of whichever process invoked it. The system calls are often executed via traps or interrupts: that automatically puts the CPU into some required privilege level, and then passes control to the kernel, which determines whether the calling program should be granted the requested service. If the service is granted, the kernel executes a specific set of instructions over which the calling program has no direct control, returns the privilege level to that of the calling program, and then returns control to the calling program. Implementing system calls requires a control transfer, which involves some sort of architecture-specific feature.

System calls can be roughly grouped into five major categories: Process control, such as load, execute, create/terminate process, get/set process attributes, wait for time, wait event, and signal event; file management, such as request/release device, create/delete file, open/close file, read/write/reposition file, and get/set file attributes; device management, such as read/write/reposition device, get/set device attributes, and logically attach/detach devices; information maintenance, such as get/set time or date, get/set system data, and get/set process, file, or device attributes; and communication such as create, delete communication connection, transfer status information, and attach or detach remote devices.

16

The system calls are commonly handled by the I/O manager 435b, which allows devices to communicate with user-mode subsystems. It translates user-mode read and write commands into read or write IRPs which it passes to device drivers. It accepts file system I/O requests and translates them into device specific calls, and can incorporate low-level device drivers that directly manipulate hardware to either read input or write output. It also includes a cache manager to improve disk performance by caching read requests and write to the disk in the background. The I/O manager 435b may interface the power manager 435c, which deals with power events (power-off, stand-by, hibernate, etc.) and notifies affected drivers with special IRPs (Power IRPs).

The PnP manager 435a handles 'Plug and Play' and supports device detection and installation at boot time. It also has the responsibility to stop and start devices on demand, that can happen when a bus (such as USB or FireWire) gains a new device and needs to have a device driver loaded to support it. The PnP manager 435a may be partly implemented in user mode, in the Plug and Play Service, which handles the often complex tasks of installing the appropriate drivers, notifying services and applications of the arrival of new devices, and displaying GUI to the user.

I/O Request Packets (IRPs) are kernel mode structures that are used to communicate with each other and with the operating system. They are data structures that describe I/O requests, to a driver, all of these parameters (such as buffer address, buffer size, I/O function type, etc.) are passed via a single pointer to this persistent data structure. The IRP with all of its parameters can be put on a queue if the I/O request cannot be performed immediately. I/O completion is reported back to the I/O manager by passing its address to a routine for that purpose, IoCompleteRequest. The IRP may be repurposed as a special kernel APC object if such is required to report completion of the I/O to the requesting thread. IRPs are typically created by the I/O Manager in response to I/O requests from user mode. However, IRPs are sometimes created by the plug-and-play manager, power manager, and other system components, and can also be created by drivers and then passed to other drivers.

The WDM uses kernel-mode device drivers to enable it to interact with hardware devices, where each of the drivers has well defined system routines and internal routines that it exports to the rest of the operating system. DriverEntry is the first routine called after a driver is loaded, and is responsible for initializing the driver. All devices are seen by user mode code as a file object in the I/O manager, though to the I/O manager itself the devices are seen as device objects, which it defines as either file, device or driver objects. The drivers may be aggregated as a driver stack 436, including kernel mode drivers in three levels: highest level drivers 436a, intermediate drivers 436b, and low level drivers 436c. The highest level drivers 436a, such as file system drivers for FAT and NTFS, rely on the intermediate drivers 436b, which consist of function drivers or main driver for a device, that are optionally sandwiched between lower and higher level filter drivers. The highest level drivers typically know how files are represented on disk, but not the details of how to actually fetch the data; the intermediate level drivers process the requests from the highest level driver by breaking down a large request into a series of small chunks. The function driver commonly possesses the details relating to how the hardware of the peripheral works, typically relies on a bus driver, or a driver that services a bus controller, adapter, or bridge, which can have an optional bus filter driver that sits between itself and the function driver. For example, a PCI bus driver detects the PCI-slot plugged card or hardware, and determines the I/O-

US 9,241,044 B2

17

mapped or the memory-mapped connection with the host. Intermediate drivers 436*b* rely on the low level drivers 436*c* to function. The lowest level drivers 436*c* are either legacy device drivers that control a device directly, or can be a PnP hardware bus. These lower level drivers 436*c* directly control hardware and do not rely on any other drivers. The I/O manager 435*c* communicate with the high-level driver 436*a* using IRP 437*a*, the high-level driver 436*a* communicate with the intermediate level driver 436*b* using IRP 437*b*, the intermediate level driver 436*b* communicate with the low-level driver 436*c* using IRP 437*c*, and the low-level driver 436*b* communicate with the HAL 438 using IRP 437*d*.

WDM drivers can be classified into the following types and sub-types: Device function drivers, bus drivers, and filter drivers. A function driver is the main driver for a device. A function driver is typically written by the device vendor and is required (unless the device is being used in raw mode). A function driver can service one or more devices. Miniport drivers are a type of function drivers for interfaces such as USB, audio, SCSI and network adapters. They are hardware specific, but the control access to the hardware is through a specific bus class driver. Class drivers are a type of function drivers and can be thought of as built-in framework drivers that miniport and other class drivers can be built on top of. The class drivers provide interfaces between different levels of the WDM architecture. Common functionality between different classes of drivers can be written into the class driver and used by other class and miniport drivers. The lower edge of the class driver will have its interface exposed to the miniport driver, while the upper edge of top level class drivers is operating system specific. Class drivers can be dynamically loaded and unloaded at will. They can do class specific functions that are not hardware or bus-specific (with the exception of bus-type class drivers) and in fact sometimes only do class specific functions such as enumeration.

A bus driver services a bus controller, adapter, or bridge. Microsoft provides bus drivers for most common buses, such as Advanced configuration and Power Interface (ACPI), Peripheral Component Interconnect (PCI), PnPISA, SCSI, Universal Serial Bus (USB), and FireWire. A bus driver can service more than one bus if there is more than one bus of the same type on the machine. The ACPI bus driver interacts with the ACPI BIOS to enumerate the devices in the system and control their power use, the PCI bus driver (such as pci.sys) enumerates and configures devices connected via the PCI bus, the FireWire and the USB bus driver respectively enumerates and controls devices connected via the IEEE 1394 high speed bus and the USB. The stream class driver provides a basic processing supporting high bandwidth, time critical, and video and audio data related hardware, and uses minidrivers for interfacing the actual hardware, and hard-disk, floppies, CDs, and DVDs are interfaces using SCSI and CDROM/DVD class driver. The Human Input Device (HID) provides an abstract view of input devices, and the Still Image Architecture (SIA) class driver is used to obtain content from a scanner and a still camera, using minidrivers. For example, accessing an hard disk (such as HDD 30) involves a file system driver to high-level driver, a volume manager driver as intermediate level driver, and a disk driver as a low-level driver.

Filter drivers are optional drivers that add value to or modify the behavior of a device and may be non-device drivers. A filter driver can also service one or more devices. Upper level filter drivers sit above the primary driver for the device (the function driver), while lower level filter drivers sit below the function driver and above the bus driver. A driver

18

service is a type of kernel-level filter driver implemented as a Windows service that enables applications to work with devices.

The Hardware Abstraction Layer 438, or HAL, is a layer between the physical hardware layer 430*c* of the computer and the rest of the operating system. It was designed to hide differences in hardware and therefore provide a consistent platform on which the kernel is run. The HAL 438 includes hardware-specific code that controls I/O interfaces, interrupt controllers and multiple processors. Typically the particular hardware abstraction does not involve abstracting the instruction set, which generally falls under the wider concept of portability. Abstracting the instruction set, when necessary (such as for handling the several revisions to the x86 instruction set, or emulating a missing math coprocessor), is performed by the kernel, or via platform virtualization.

Linux is a Unix-like and mostly POSIX-compliant computer operating system assembled under the model of free and open source software development and distribution. The defining component of Linux is the Linux kernel, an operating system kernel first released on 5 Oct. 1991 by Linus Torvalds. Linux was originally developed as a free operating system for Intel x86-based personal computers, but has since been ported to more computer hardware platforms than any other operating system. Linux also runs on embedded systems such as mobile phones, tablet computers, network routers, facility automation controls, televisions, and video game consoles. Android, which is a widely used operating system for mobile devices, is built on top of the Linux kernel. Typically, Linux is packaged in a format known as a Linux distribution for desktop and server use.

Linux distributions include the Linux kernel, supporting utilities and libraries and usually a large amount of application software to fulfill the distribution's intended use. A Linux-based system is a modular Unix-like operating system. Such a system uses a monolithic kernel, the Linux kernel, which handles process control, networking, and peripheral and file system access. Device drivers are either integrated directly with the kernel or added as modules loaded while the system is running. Some components of an installed Linux system are a bootloader, for example GNU GRUB or LILO, which is executed by the computer when it is first turned on, and loads the Linux kernel into memory; an init program, which is the first process launched by the Linux kernel, and is at the root of the process tree, and starts processes such as system services and login prompts (whether graphical or in terminal mode); Software libraries which contain code which can be used by running processes; and user interface programs such as command shells or windowing environments. A version of Linux is described, for example, in IBM Corporation (headquartered in Armonk, New-York, U.S.A.) publication No. SC34-2597-03 entitled: "*Device Drivers, Features, and Commands on Red Hat Enterprise Linux 6.3*", downloaded from the Internet on July 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

The general schematic Linux driver architecture 450 is shown in FIG. 3*a*, and the Linux kernel is further described in Wiley Publishing, Inc. publication entitled: "*Professional Linux Kernel Architecture*", by Wofgang Mauerer published 2008, and Linux programming is described in the book entitled: "*The Linux Kernel Module Programming Guide*" ver. 2.6.4 by Peter Jay Salzman, Michael Burian, and Ori Pomerantz, dated May 18, 2007, and in the publication entitled: "*A Comparison of the Linux and Windows Device Driver Architecture*", by Melekam Tsegaye and Richard Foss, both from Rhodes University, South-Africa, down-

Case 2:18-cv-00483-JRG    Document 1-1    Filed 11/08/18    Page 148 of 227 PageID #:  176

US 9,241,044 B2

19

loaded from the Internet on July 2014, which are all incorporated in their entirety for all purposes as if fully set forth herein.

Similar to the WDM 430 shown in FIG. 3, the Linux kernel involves a 'System Call Interface' 453, receiving system calls 452a, 452b, and 452c from the respective applications such as an application #1 431a, an application #2 431b, and an application #3 431c, and serves as the denomination for the entirety of all implemented and available system calls in a kernel. The Linux kernel is based on a layered modules stack 454, which may include three levels of modules, such as module #1 454a, module #2 454b, and module #3 454c, where the module #1 454a communicate over connection 455a with the system call interface 453, the module #2 454b communicates with the module #1 454a over connection 455b, the module #3 454c communicates over the connection 455c with the module #2 454b and over a connection 455d with the HAL 438.

Similar to the WDM 430 shown in FIG. 3, the Linux kernel shown as the arrangement 450 in FIG. 3a, is using the concept of layered architecture of a modules stack 454, which may comprise module #1 454a, module #2 454b, and module #3 454c, communicating using messaging mechanism, such as a connection 455a between the system call interface 453 and the module #1 454a, a connection 455b between the module #1 454a and the module #2 454b, a connection 455c between the module #2 454b and the module #3 454c, and a connection 455d between the module #3 454c and the HAL 438.

The modules in the modules stack 454, typically referred to as Loadable Kernel Modules (or LKM), are object files that contain code to extend the running Linux kernel, or so-called base kernel. LKMs are typically used to add support for new hardware and/or filesystems, or for adding system calls. When the functionality provided by a LKM is no longer required, it can be unloaded in order to free memory and other resources. Loadable kernel modules in Linux are located in /lib/modules and have had the extension '.ko' ("kernel object") since version 2.6 (previous versions used the .o extension), and are loaded (and unloaded) by the modprobe command. The lsmod command lists the loaded kernel modules. In emergency cases, when the system fails to boot (due to e.g. broken modules), specific modules can be enabled or disabled via the kernel boot parameters list (for example, if using GRUB, by pressing 'e' in the GRUB start menu, then editing the kernel parameter line). Linux allows disabling module loading via sysctl option /proc/sys/kernel/modules_disabled. An initramfs system may load specific modules needed for a machine at boot and then disable module loading.

A web browser (commonly referred to as a browser) is a software application for retrieving, presenting, and traversing information resources on the World Wide Web. An information resource is identified by a Uniform Resource Identifier (URI/URL) and may be part of a web page, a web-page, an image, a video, or any other piece of content. Hyperlinks present in resources enable users easily to navigate their browsers to related resources. Although browsers are primarily intended to use the World Wide Web, they can also be used to access information provided by web servers in private networks or files in file systems. The primary purpose of a web browser is to bring information resources to the user ("retrieval" or "fetching"), allowing them to view the information ("display", "rendering"), and then access other information ("navigation", "following links"). Currently the major web browsers are known as Firefox, Internet Explorer, Google Chrome, Opera, and Safari.

20

The process begins when the user inputs a Uniform Resource Locator (URL), for example 'http://en.wikipedia.org/', into the browser. The prefix of the URL, the Uniform Resource Identifier or URI, determines how the URL will be interpreted. The most commonly used kind of URI starts with http: and identifies a resource to be retrieved over the Hypertext Transfer Protocol (HTTP). Many browsers also support a variety of other prefixes, such as https: for HTTPS, ftp: for the File Transfer Protocol, and file: for local files. Prefixes that the web browser cannot directly handle are often handed off to another application entirely. For example, mailto: URIs are usually passed to the user's default e-mail application, and news: URIs are passed to the user's default newsgroup reader. In the case of http, https, file, and others, once the resource has been retrieved the web browser will display it. HTML and associated content (image files, formatting information such as CSS, etc.) is passed to the browser's layout engine to be transformed from markup to an interactive document, a process known as "rendering". Aside from HTML, web browsers can generally display any kind of content that can be part of a web page. Most browsers can display images, audio, video, and XML. files, and often have plug-ins to support Flash applications and Java applets. Upon encountering a file of an unsupported type or a file that is set up to be downloaded rather than displayed, the browser prompts the user to save the file to disk. Information resources may contain hyperlinks to other information resources. Each link contains the URI of a resource to go to. When a link is clicked, the browser navigates to the resource indicated by the link's target URI, and the process of bringing content to the user begins again. The architecture of a web browser is described in the publication entitled: "Architecture and evolution of the modern web browser" by Alan Grosskurth and Michael W. Godfrey of the University of Waterloo in Canada, dated Jun. 20, 2006, which is incorporated in its entirety for all purposes as if fully set forth herein.

A currently popular web browser is the Internet Explorer (formerly Microsoft Internet Explorer and Windows Internet Explorer, commonly abbreviated IE or MSIE) from Microsoft Corporation, headquartered in Redmond, Wash., U.S.A., which is a series of graphical web browsers developed by Microsoft and included as part of the Microsoft Windows line of operating systems. The Internet Explorer 8 is described, for example, in Microsoft 2009 publication entitled: "Step by Step Tutorials for Microsoft Internet Explorer 8 Accessibility Options", which is incorporated in its entirety for all purposes as if fully set forth herein. Another popular web browser is the Google Chrome which is a freeware web browser developed by Google, headquartered in Googleplex, Mountain View, Calif., U.S.A. Google Chrome aims to be secure, fast, simple, and stable, providing strong application performance and JavaScript processing speed.

A mobile browser, also called a microbrowser, minibrowser, or Wireless Internet Browser (WIB), is a web browser designed for use on a mobile device such as a mobile phone or PDA. Mobile browsers are optimized so as to display Web content most effectively for small screens on portable devices. Mobile browser software must be small and efficient to accommodate the low memory capacity and low-bandwidth of wireless handheld devices. Some mobile browsers can handle more recent technologies like CSS 2.1, JavaScript, and Ajax. Websites designed for access from these browsers are referred to as wireless portals or collectively as the Mobile Web. They may automatically create "mobile" versions of each page, for example this one

The mobile browser typically connects via cellular network, via Wireless LAN, or via other wireless networks, and

US 9,241,044 B2

**21**

are using standard HTTP over TCP/IP, and displays web pages written in HTML, XHTML Mobile Profile (WAP 2.0), or WML (which evolved from HDML). WML and HDML are stripped-down formats suitable for transmission across limited bandwidth, and wireless data connection called WAP. WAP 2.0 specifies XHTML Mobile Profile plus WAP CSS, subsets of the W3C's standard XHTML and CSS with minor mobile extensions. Some mobile browsers are full-featured Web browsers capable of HTML, CSS, ECMAScript, as well as mobile technologies such as WML, i-mode HTML, or cHTML. To accommodate small screens, some mobile browsers use Post-WIMP interfaces. An example of a mobile browser is Safari, which is a mobile web browser developed by Apple Inc. (headquartered in Apple Campus, Cupertino, Calif., U.S.A), included with the OS X and iOS operating systems, and described in Apple publication entitled: *"Safari Web Content Guide"*, dated March 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

FIG. **1** shows a block diagram that illustrates a system **10** including a computer system **11** and the associated Internet **113** connection. Such configuration is typically used for computers (hosts) connected to the Internet **113** and executing a server or a client (or a combination) software. The system **11** may be used as a portable electronic device such as a notebook/laptop computer, a media player (e.g., MP3 based or video player), a desktop computer, a laptop computer, a cellular phone, a Personal Digital Assistant (PDA), an image processing device (e.g., a digital camera or video recorder), and/or any other handheld or fixed location computing devices, or a combination of any of these devices. Note that while FIG. **1** illustrates various components of a computer system, it is not intended to represent any particular architecture or manner of interconnecting the components; as such details are not germane. It will also be appreciated that network computers, handheld computers, cell phones and other data processing systems which have fewer components or perhaps more components may also be used. The computer system of FIG. **1** may, for example, be an Apple Macintosh computer or Power Book, or an IBM compatible PC. The computer system **11** includes a bus **13**, an interconnect, or other communication mechanism for communicating information, and a processor **27**, commonly in the form of an integrated circuit, coupled to the bus **13** for processing information and for executing the computer executable instructions. Computer system **11** also includes a main memory **12**a, such as a Random Access Memory (RAM) or other dynamic storage device, coupled to bus **13** for storing information and instructions to be executed by processor **27**. Main memory **12**a also may be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor **27**. The computer system **11** further includes a Read Only Memory (ROM) **12**b (or other nonvolatile memory) or other static storage device coupled to the bus **13** for storing static information and instructions for the processor **27**. A storage device **12**c, such as a magnetic disk or optical disk, a hard disk drive (HDD) for reading from and writing to a hard disk, a magnetic disk drive for reading from and writing to a magnetic disk, and/or an optical disk drive (such as DVD) for reading from and writing to a removable optical disk, is coupled to bus **13** for storing information and instructions. The hard disk drive, magnetic disk drive, and optical disk drive may be connected to the system bus by a hard disk drive interface, a magnetic disk drive interface, and an optical disk drive interface, respectively. The drives and their associated computer-readable media provide non-volatile storage of computer readable instructions, data structures, program modules and other data for the general purpose

**22**

computing devices. Typically, the computer system **11** includes an Operating System (OS) stored in a non-volatile storage for managing the computer resources and provides the applications and programs with an access to the computer resources and interfaces. An operating system commonly processes system data and user input, and responds by allocating and managing tasks and internal system resources, such as controlling and allocating memory, prioritizing system requests, controlling input and output devices, facilitating networking and managing files. Non-limiting examples of operating systems are Microsoft Windows, Mac OS X, and Linux.

The term "processor" is used herein to include, but not limited to, any integrated circuit or other electronic device (or collection of devices) capable of performing an operation on at least one instruction, including, without limitation, Reduced Instruction Set Core (RISC) processors, CISC microprocessors, Microcontroller Units (MCUs), CISC-based Central Processing Units (CPUs), and Digital Signal Processors (DSPs). The hardware of such devices may be integrated onto a single substrate (e.g., silicon "die"), or distributed among two or more substrates. Furthermore, various functional aspects of the processor may be implemented solely as software or firmware associated with the processor.

The computer system **11** may be coupled via a bus **13** to a display **17**, such as a Cathode Ray Tube (CRT), a Liquid Crystal Display (LCD), a flat screen monitor, a touch screen monitor or similar means for displaying text and graphical data to a user. The display may be connected via a video adapter for supporting the display. The display allows a user to view, enter, and/or edit information that is relevant to the operation of the system. An input device **18**, including alpha-numeric and other keys, is coupled to the bus **13** for communicating information and command selections to the processor **27**. Another type of user input device is a cursor control **19**, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to the processor **27** and for controlling cursor movement on the display **17**. This input device typically has two degrees of freedom in two axes, a first axis (e.g., x) and a second axis (e.g., y), that allows the device to specify positions in a plane.

The computer system **11** may be used for implementing the methods and techniques described herein. According to one embodiment, those methods and techniques are performed by the computer system **11** in response to the processor **27** executing one or more sequences of one or more instructions contained in a main memory **25**a. Such instructions may be read into the main memory **25**a from another computer-readable medium, such as a storage device **123**. Execution of the sequences of instructions contained in the main memory **25**a causes the processor **27** to perform the process steps described herein. In alternative embodiments, hard-wired circuitry may be used in place of or in combination with software instructions to implement the arrangement. Thus, embodiments of the invention are not limited to any specific combination of hardware circuitry and software.

The term "computer-readable medium" (or "machine-readable medium") is used herein to include, but not limited to, any medium or any memory, that participates in providing instructions to a processor, (such as the processor **27**) for execution, or any mechanism for storing or transmitting information in a form readable by a machine (e.g., a computer). Such a medium may store computer-executable instructions to be executed by a processing element and/or control logic, and data which is manipulated by a processing element and/or control logic, and may take many forms, including but not limited to, non-volatile medium, volatile medium, and trans-

US 9,241,044 B2

23

mission medium. Transmission media includes coaxial cables, copper wire and fiber optics, including the wires that comprise the bus **13**. Transmission media can also take the form of acoustic or light waves, such as those generated during radio-wave and infrared data communications, or other form of propagating signals (e.g., carrier waves, infra-red signals, digital signals, etc.). Common forms of com-puter-readable media include, for example, a floppy disk, a flexible disk, hard disk, magnetic tape, or any other magnetic medium, a CD-ROM, any other optical medium, punch-cards, paper-tape, any other physical medium with patterns of holes, a RAM, a PROM, and EPROM, a FLASH-EPROM, any other memory chip or cartridge, a carrier wave as described hereinafter, or any other medium from which a computer can read.

Various forms of computer-readable media may be involved in carrying one or more sequences of one or more instructions to the processor **27** for execution. For example, the instructions may initially be carried on a magnetic disk of a remote computer. The remote computer can load the instructions into its dynamic memory and send the instruc-tions over a telephone line using a modem. A modem local to the computer system **11** can receive the data on the telephone line and use an infrared transmitter to convert the data to an infrared signal. An infrared detector can receive the data carried in the infrared signal and appropriate circuitry can place the data on the bus **13**. The bus **13** carries the data to the main memory **25a**, from which the processor **27** retrieves and executes the instructions. The instructions received by the main memory **25a** may optionally be stored on the storage device **25c** either before or after execution by the processor **27**.

The computer system **11** commonly includes a communi-cation interface **29** coupled to the bus **13**. The communication interface **29** provides a two-way data communication cou-pling to a network link **28** that is connected to a local network **14**. For example, the communication interface **29** may be an Integrated Services Digital Network (ISDN) card or a modem to provide a data communication connection to a correspond-ing type of telephone line. As another non-limiting example, the communication interface **29** may be a local area network (LAN) card to provide a data communication connection to a compatible LAN. For example, Ethernet based connection based on IEEE802.3 standard may be used, such as 10/100BaseT, 1000BaseT (gigabit Ethernet), 10 gigabit Eth-ernet (10 GE or 10 GbE or 10 GigE per IEEE Std. 802.3ae-2002 as standard), 40 Gigabit Ethernet (40 GbE), or 100 Gigabit Ethernet (100 GbE as per Ethernet standard IEEE P802.3ba). These technologies are described in Cisco Sys-tems, Inc. Publication number 1-587005-001-3 (June 1999), "*Internetworking Technologies Handbook*", Chapter 7: "Eth-ernet Technologies", pages 7-1 to 7-38, which is incorporated in its entirety for all purposes as if fully set forth herein. In such a case, the communication interface **29** typically includes a LAN transceiver or a modem, such as Standard Microsystems Corporation (SMSC) LAN91C111 10/100 Ethernet transceiver, described in a Standard Microsystems Corporation (SMSC) data-sheet "LAN91C111 10/100 Non-PCI Ethernet Single Chip MAC+PHY" Data-Sheet, Rev. 15 (02-20-04), which is incorporated in its entirety for all pur-poses as if fully set forth herein.

The Internet **113** is a global system of interconnected com-puter networks that use the standardized Internet Protocol Suite (TCP/IP), including Transmission Control Protocol (TCP) and the Internet Protocol (IP), to serve billions of users worldwide. It is a network of networks that consists of mil-lions of private, public, academic, business, and government

24

networks, of local to global scope, that are linked by a broad array of electronic and optical networking technologies. The Internet carries a vast range of information resources and services, such as the interlinked hypertext documents on the World Wide Web (WWW) and the infrastructure to support electronic mail. The Internet backbone refers to the principal data routes between large, strategically interconnected net-works and core routers in the Internet. These data routes are hosted by commercial, government, academic and other high-capacity network centers, the Internet exchange points and network access points that interchange Internet traffic between the countries, continents and across the oceans of the world. Traffic interchange between Internet service providers (often Tier 1 networks) participating in the Internet backbone exchange traffic by privately negotiated interconnection agreements, primarily governed by the principle of settle-ment-free peering.

An Internet Service Provider (ISP) **12** is an organization that provides services for accessing, using, or participating in the Internet **113**. Internet Service Providers may be organized in various forms, such as commercial, community-owned, non-profit, or otherwise privately owned. Internet services typically provided by ISPs include Internet access, Internet transit, domain name registration, web hosting, and coloca-tion. Various ISP Structures are described in Chapter 2: "Structural Overview of ISP Networks" of the book entitled: "*Guide to Reliable Internet Services and Applications*", by Robert D. Doverspike, K. K. Ramakrishnan, and Chris Chase, published 2010 (ISBN: 978-1-84882-827-8), which is incor-porated in its entirety for all purposes as if fully set forth herein.

A mailbox provider is an organization that provides ser-vices for hosting electronic mail domains with access to stor-age for mailboxes. It provides email servers to send, receive, accept, and store email for end users or other organizations. Internet hosting services provide email, web-hosting, or online storage services. Other services include virtual server, cloud services, or physical server operation. A virtual ISP (VISP) is an operation that purchases services from another ISP, sometimes called a wholesale ISP in this context, which allow the VISP's customers to access the Internet using ser-vices and infrastructure owned and operated by the wholesale ISP. It is akin to mobile virtual network operators and com-petitive local exchange carriers for voice communications. A Wireless Internet Service Provider (WISP) is an Internet ser-vice provider with a network based on wireless networking. Technology may include commonplace Wi-Fi wireless mesh networking, or proprietary equipment designed to operate over open 900 MHz, 2.4 GHz, 4.9, 5.2, 5.4, 5.7, and 5.8 GHz bands or licensed frequencies in the UHF band (including the MMDS frequency band) and LMDS.

ISPs may engage in peering, where multiple ISPs intercon-nect at peering points or Internet exchange points (IXs), allowing routing of data between each network, without charging one another for the data transmitted—data that would otherwise have passed through a third upstream ISP, incurring charges from the upstream ISP. ISPs requiring no upstream and having only customers (end customers and/or peer ISPs), are referred to as Tier 1 ISPs.

A multitasking is a method where multiple tasks (also known as processes or programs) are performed during the same period of time—they are executed concurrently (in overlapping time periods, new tasks starting before others have ended) instead of sequentially (one completing before the next starts). The tasks share common processing resources, such as a CPU and main memory. Multitasking does not necessarily mean that multiple tasks are executing at

US 9,241,044 B2

25

exactly the same instant. In other words, multitasking does not imply parallelism, but it does mean that more than one task can be part-way through execution at the same time, and more than one task is advancing over a given period of time.

In the case of a computer with a single CPU, only one task is said to be running at any point in time, meaning that the CPU is actively executing instructions for that task. Multitasking solves the problem by scheduling which task may be the one running at any given time, and when another waiting task gets a turn. The act of reassigning a CPU from one task to another one is called a context switch. When context switches occur frequently enough, the illusion of parallelism is achieved. Even on computers with more than one CPU (called multiprocessor machines) or more than one core in a given CPU (called multicore machines), where more than one task can be executed at a given instant (one per CPU or core), multitasking allows many more tasks to be run than there are CPUs.

Operating systems may adopt one of many different scheduling strategies. In multiprogramming systems, the running task keeps running until it performs an operation that requires waiting for an external event (e.g. reading from a tape) or until the computer's scheduler forcibly swaps the running task out of the CPU. Multiprogramming systems are designed to maximize CPU usage. In time-sharing systems, the running task is required to relinquish the CPU, either voluntarily or by an external event such as a hardware interrupt. Time sharing systems are designed to allow several programs to execute apparently simultaneously. In real-time systems, some waiting tasks are guaranteed to be given the CPU when an external event occurs. Real time systems are designed to control mechanical devices such as industrial robots, which require timely processing.

Encryption based mechanisms are commonly end-to-end processes involving only the sender and the receiver, where the sender encrypts the plain text message by transforming it using an algorithm, making it unreadable to anyone, except the receiver which possesses special knowledge. The data is then sent to the receiver over a network such as the Internet, and when received the special knowledge enables the receiver to reverse the process (decrypt) to make the information readable as in the original message. The encryption process commonly involves computing resources such as processing power, storage space and requires time for executing the encryption/decryption algorithm, which may delay the delivery of the message.

Transport Layer Security (TLS) and its predecessor Secure Sockets Layer (SSL) are non-limiting examples of end-to-end cryptographic protocols, providing secured communication above the OSI Transport Layer, using keyed message authentication code and symmetric cryptography. In client/server applications, the TLS client and server negotiate a stateful connection by using a handshake procedure, during which various parameters are agreed upon, allowing a communication in a way designed to prevent eavesdropping and tampering. The TLS 1.2 is defined in RFC 5246, and several versions of the protocol are in widespread use in applications such as web browsing, electronic mail, Internet faxing, instant messaging and Voice-over-IP (VoIP). In application design, TLS is usually implemented on top of any of the Transport Layer protocols, encapsulating the application-specific protocols such as HTTP, FTP, SMTP, NNTP, and XMPP. Historically, it has been used primarily with reliable transport protocols such as the Transmission Control Protocol (TCP). However, it has also been implemented with datagram-oriented transport protocols, such as the User Datagram Protocol (UDP) and the Datagram Congestion Control Pro-

26

tocol (DCCP), a usage which has been standardized independently using the term Datagram Transport Layer Security (DTLS). A prominent use of TLS is for securing World Wide Web traffic carried by HTTP to form HTTPS. Notable applications are electronic commerce and asset management. Increasingly, the Simple Mail Transfer Protocol (SMTP) is also protected by TLS (RFC 3207). These applications use public key certificates to verify the identity of endpoints. Another Layer 4 (Transport Layer) and upper layers encryption-based communication protocols include SSH (Secure Shell) and SSL (Secure Socket Layer).

Layer 3 (Network Layer) and lower layer encryption based protocols include IPsec, L2TP (Layer 2 Tunneling Protocol) over IPsec, and Ethernet over IPsec. The IPsec is a protocol suite for securing IP communication by encrypting and authenticating each IP packet of a communication session. The IPsec standard is currently based on RFC 4301 and RFC 4309, and was originally described in RFCs 1825-1829, which are now obsolete, and uses the Security Parameter Index (SPI, as per RFC 2401) as an identification tag added to the header while using IPsec for tunneling the IP traffic. An IPsec overview is provided in Cisco Systems, Inc. document entitled: "*An Introduction to IP Security (IPSec) Encryption*", which is incorporated in its entirety for all purposes as if fully set forth herein.

Two common approaches to cryptography are found in U.S. Pat. No. 3,962,539 to Ehrsam et al., entitled "Product Block Cipher System for Data Security", and in U.S. Pat. No. 4,405,829 to Rivest et al., entitled "Cryptographic Communications System and Method", which are both incorporated in their entirety for all purposes as if fully set forth herein. The Ehrsam patent discloses what is commonly known as the Data Encryption Standard (DES), while the Rivest patent discloses what is commonly known as the RSA algorithm (which stands for Rivest, Shamir and Adleman who first publicly described it), which is widely used in electronic commerce protocols. The RSA involves using a public key and a private key. DES is based upon secret-key cryptography, also referred to as symmetric cryptography, and relies upon a 56-bit key for encryption. In this form of cryptography, the sender and receiver of cipher text both possess identical secret keys, which are, in an ideal world, completely unique and unknown to the world outside of the sender and receiver. By encoding plain text into cipher text using the secret key, the sender may send the cipher text to the receiver using any available public or otherwise insecure communication system. The receiver, having received the cipher text, decrypts it using the secret key to arrive at the plain text.

A proxy server is a server (a computer system or an application) that acts as an intermediary for requests from clients seeking resources from other servers. A client connects to the proxy server, requesting some service, such as a file, connection, web page, or other resource, available from a different server and the proxy server evaluates the request as a way to simplify and control its complexity. Proxies may be used to add structure and encapsulation to distributed systems. Today, most proxies are web proxies, facilitating access to content on the World Wide Web and providing anonymity. A proxy server may reside on the user's local computer, or at various points between the user's computer and destination servers on the Internet. A proxy server that passes requests and responses unmodified is usually called a gateway or sometimes a tunneling proxy. A forward proxy is an Internet-facing proxy used to retrieve from a wide range of sources (in most cases anywhere on the Internet). Forward proxies are proxies in which the client server names the target server to connect to, and are able to retrieve from a wide range of

US 9,241,044 B2

27

sources (in most cases anywhere on the Internet). An open proxy is a forwarding proxy server that is accessible by any Internet user, while browsing the Web or using other Internet services. There are varying degrees of anonymity, however, as well as a number of methods of 'tricking' the client into revealing itself regardless of the proxy being used. A reverse proxy is usually an Internet-facing proxy used as a front-end to control and protect access to a server on a private network. A reverse proxy commonly also performs tasks such as load-balancing, authentication, decryption or caching.

Randomness is commonly implemented by using random numbers, defined as a sequence of numbers or symbols that lack any pattern and thus appear random, are often generated by a random number generator. Randomness for security is also described in IETF RFC 1750 *"Randomness Recommen-dations for Security"* (December 1994), which is incorporated in its entirety for all purposes as if fully set forth herein. A random number generator (having either analog or digital output) can be hardware based, using a physical process such as thermal noise, shot noise, nuclear decaying radiation, pho-toelectric effect or other quantum phenomena. Alternatively, or in addition, the generation of the random numbers can be software based, using a processor executing an algorithm for generating pseudo-random numbers which approximates the properties of random numbers.

Onion routing (OR) is a technique for anonymous communi-cation over the Internet or any other computer network. Messages are repeatedly encrypted and then sent through several network nodes called onion routers. Each onion router removes a layer of encryption to uncover routing instructions, and sends the message to the next router where this is repeated. This prevents these intermediary nodes from know-ing the origin, destination, and contents of the message. To prevent an adversary from eavesdropping on message con-tent, messages are encrypted between routers. The advantage of onion routing (and mix cascades in general) is that it is not necessary to trust each cooperating router; if one or more routers are compromised, anonymous communication can still be achieved. This is because each router in an OR net-work accepts messages, re-encrypts them, and transmits to another onion router. The idea of onion routing (OR) is to protect the privacy of the sender and the recipient of a mes-sage, while also providing protection for message content as it traverses a network. Onion routing accomplishes this according to the principle of Chaum mix cascades: messages travel from source to destination via a sequence of proxies ("onion routers"), which re-route messages in an unpredict-able path.

Routing onions are data structures used to create paths through which many messages can be transmitted. To create an onion, the router at the head of a transmission selects a number of onion routers at random and generates a message for each one, providing it with symmetric keys for decrypting messages, and instructing it which router will be next in the path. Each of these messages, and the messages intended for subsequent routers, is encrypted with the corresponding rout-er's public key. This provides a layered structure, in which it is necessary to decrypt all outer layers of the onion in order to reach an inner layer. Onion routing is described in U.S. Pat. No. 6,266,704 to Reed et al., entitled: "Onion Routing Net-work for Securely Moving data through Communication Net-works", which is incorporated in its entirety for all purposes as if fully set forth herein. Other prior art publications relating to onion routing are the publications *"Probabilistic Analysis of Onion Routing in a Black-box Model [Extended Abstract]"* presented in WPES'07: Proceedings of the 2007 ACM Work-shop on Privacy in Electronic Society, *"A Model of Onion*

28

*Routing with Provable Anonymity"* presented in Proceedings of Financial Cryptography and Data Security '07, and *"A Model of Onion Routing with Provable Anonymity"*, pre-sented in the Financial Cryptography and Data Security, 11th International Conference, all by Feigenbaum J., Johnson J. and Syverson P., publications *"Improving Efficiency and Sim-plicity of Tor circuit establishment and hidden services"*, Pro-ceedings of the 2007 Privacy Enhancing Technologies Sym-posium, Springer-Verlag, LNCS 4776, publication *"Untraceable electronic mail, return addresses, and digital pseudonyms"* by Chaum D., in Communications of the ACM 24(2), February 1981, and *"Valet Services: Improving Hidden Servers with a Personal Touch"*, Proceedings of the 2006 Privacy Enhancing Technologies Workshop, Springer-Ver-lag, LNCS 4285, both by Overlier L., Syverson P., publica-tions *"Making Anonymous Communication"*, Generation 2 Onion Routing briefing slides, Center for High Assurance Computer Systems, naval Research Laboratory, Presented at the National Science Foundation, Jun. 8, 2004 by Syverson P., publications *"Onion Routing Access Configurations, DIS-CEX 2000: Proceedings of the DARPA Information Surviv-ability Conference and Exposition"*, Volume 1 Hilton Head, S.C., IEEE CS Press, January 2000. *"Onion Routing for Anonymous and Private Internet Connections"* Communica-tions of the ACM, vol. 42, num. 2, February 1999, and *"Anonymous Connections and Onion Routing"* IEEE Journal on Selected Areas in Communication Special Issue on Copy-right and Privacy Protection, 1998, all by Syverson P., Reed M. G., Goldschlag M., publication *"Towards an Analysis of Onion Routing Security"*, and *"Workshop on Design Issues in Anonymity and Unobservability"*, Berkeley, Calif., July 2000 by Syverson P., Tsudik G., Reed M. G., and Landwehr C., which are incorporated in their entirety for all purposes as if fully set forth herein.

'Tor' is an anonymizing network based on the principles of 'onion routing', and involves a system which selects a ran-domly chosen route for each connection, via the routers present in the Tor network. The last server appears herein as an 'exit node' and sends the data to the final recipient after leaving the Tor cloud. At this point, it is no longer possible for an observer constantly watching the 'exit node' to determine who the sender of the message was. This concept and its components are known from the 'Tor' project in http://www-.torproject.org. The Tor network concept is described in U.S. Patent Application Publication 2010/0002882 to Rieger et al., in the publication *"Tor: The Second-Generation Onion Router"*, in Proceedings of the 13th USENIX Security Sym-posium August 2004, by Dingledine R., Mathewson N., Syverson P., in the publication *"Tor Protocol specification"* by Dingledine R. and Mathewson N., in the publication *"Tor Directory Protocol, Version 3"*, and the publication *"TC: A Tor Control Protocol"* downloaded from the Tor web-site, which are incorporated in their entirety for all purposes as if fully set forth herein.

Computer networks may use a tunneling protocol where one network protocol (the delivery protocol) encapsulates a different payload protocol. Tunneling enables the encapsula-tion of a packet from one type of protocol within the datagram of a different protocol. For example, VPN uses PPTP to encapsulate IP packets over a public network, such as the Internet. A VPN solution based on Point-to-Point Tunneling Protocol (PPTP), Layer Two Tunneling Protocol (L2TP), or Secure Socket Tunneling Protocol (SSTP) can be configured. By using tunneling a payload may be carried over an incom-patible delivery-network, or provide a secure path through an untrusted network. Typically, the delivery protocol operates at an equal or higher OSI layer than does the payload protocol.

US 9,241,044 B2

29

In one example of a network layer over a network layer, Generic Routing Encapsulation (GRE), a protocol running over IP (IP Protocol Number 47), often serves to carry IP packets, with RFC 1918 private addresses, over the Internet using delivery packets with public IP addresses. In this case, the delivery and payload protocols are compatible, but the payload addresses are incompatible with those of the delivery network. In contrast, an IP payload might believe it sees a data link layer delivery when it is carried inside the Layer 2 Tunneling Protocol (L2TP), which appears to the payload mechanism as a protocol of the data link layer. L2TP, however, actually runs over the transport layer using User Datagram Protocol (UDP) over IP. The IP in the delivery protocol could run over any data-link protocol from IEEE 802.2 over IEEE 802.3 (i.e., standards-based Ethernet) to the Point-to-Point Protocol (PPP) over a dialup modem link.

Tunneling protocols may use data encryption to transport insecure payload protocols over a public network (such as the Internet), thereby providing VPN functionality. IPsec has an end-to-end Transport Mode, but can also operate in a tunneling mode through a trusted security gateway. HTTP tunneling is a technique by which communications performed using various network protocols are encapsulated using the HTTP protocol, the network protocols in question usually belonging to the TCP/IP family of protocols. The HTTP protocol therefore acts as a wrapper for a channel that the network protocol being tunneled uses to communicate. The HTTP stream with its covert channel is termed an HTTP tunnel. HTTP tunnel software consists of client-server HTTP tunneling applications that integrate with existing application software, permitting them to be used in conditions of restricted network connectivity including firewalled networks, networks behind proxy servers, and network address translation.

Virtual Private Networks (VPNs) are point-to-point connections across a private or public network, such as the Internet. A VPN client typically uses special TCP/IP-based protocols, called tunneling protocols, to make a virtual call to a virtual port on a VPN server. In a typical VPN deployment, a client initiates a virtual point-to-point connection to a remote access server over the Internet, then the remote access server answers the call, authenticates the caller, and transfers data between the VPN client and the organization's private network. To emulate a point-to-point link, data is encapsulated, or wrapped, with a header. The header provides routing information that enables the data to traverse the shared or public network to reach its endpoint. To emulate a private link, the data being sent is encrypted for confidentiality. Packets that are intercepted on the shared or public network are indecipherable without the encryption keys. The link in which the private data is encapsulated and encrypted is known as a VPN connection. Commonly there are two types of VPN connections, referred to as Remote Access VPN and Site-to-Site VPN. Popular VPN connections use PPTP, L2TP/IPsec, or SSTP protocols. The RFC 4026 provides 'Provider Provisioned Virtual Private Network (VPN) Terminology', and RFC 2547 provides a VPN method based on MPLS (Multiprotocol Label Switching) and BGP (Border Gateway Protocol).

Remote access VPN connections enable users working at home or on the road to access a server on a private network using the infrastructure provided by a public network, such as the Internet. From the user's perspective, the VPN is a point-to-point connection between the computer (the VPN client) and an organization's server. The exact infrastructure of the shared or public network is irrelevant because it appears logically as if the data is sent over a dedicated private link.

30

Site-to-site VPN connections (also known as router-to-router VPN connections) enable organizations to have routed connections between separate offices or with other organizations over a public network while helping to maintain secure communications. A routed VPN connection across the Internet logically operates as a dedicated wide area network (WAN) link. When networks are connected over the Internet, a router forwards packets to another router across a VPN connection. To the routers, the VPN connection operates as a data-link layer link. A site-to-site VPN connection connects two portions of a private network. The VPN server provides a routed connection to the network to which the VPN server is attached. The calling router (the VPN client) authenticates itself to the answering router (the VPN server), and, for mutual authentication, the answering router authenticates itself to the calling router. In the site-to-site VPN connection, the packets sent from either router across the VPN connection typically do not originate at the routers.

There is a growing widespread use of the Internet for carrying multimedia, such as a video and audio. Various audio services include Internet-radio stations and VoIP (Voice-over-IP). Video services over the Internet include video conferencing and IPTV (IP Television). In most cases, the multimedia service is a real-time (or near real-time) application, and thus sensitive to delays over the Internet. In particular, two-way services such a VoIP or other telephony services and video-conferencing are delay sensitive. In some cases, the delays induced by the encryption process, as well as the hardware/software costs associated with the encryption, render encryption as non-practical. Therefore, it is not easy to secure enough capacity of the Internet accessible by users to endure real-time communication applications such as Internet games, chatting, VoIP, and MoIP (Multimedia-over-IP), so there may be a data loss, delay or severe jitter in the course of communication due to the property of an Internet protocol, thereby causing inappropriate real-time video communication. The following chapters of the publication number 1-587005-001-3 by Cisco Systems, Inc. (July 1999), entitled: "Internetworking Technologies Handbook", relate to multimedia carried over the Internet, and are all incorporated in their entirety for all purposes as if fully set forth herein: Chapter 18: "Multiservice Access Technologies" (pages 18-1 to 18-10), and Chapter 19: "Voice/Data Integration Technologies" (pages 19-1 to 19-30).

VoIP systems in widespread use today fall into three groups: systems using the ITU-T H.323 protocol, systems using the SIP protocol, and systems that use proprietary protocols. H.323 is a standard for teleconferencing that was developed by the International Telecommunications Union (ITU). It supports full multimedia, audio, video and data transmission between groups of two or more participants, and it is designed to support large networks. H.323 is network-independent: it can be used over networks using transport protocols other than TCP/IP. H.323 is still a very important protocol, but it has fallen out of use for consumer VoIP products due to the fact that it is difficult to make it work through firewalls that are designed to protect computers running many different applications. It is a system best suited to large organizations that possess the technical skills to overcome these problems.

Session Initiation Protocol (SIP) is an Internet Engineering Task Force (IETF) standard signaling protocol for teleconferencing, telephony, presence and event notification and instant messaging. It provides a mechanism for setting up and managing connections, but not for transporting the audio or video data. It is probably now the most widely used protocol for managing Internet telephony. Similar to the IETF protocols,

US 9,241,044 B2

31

SIP is defined in a number of RFCs, principally RFC 3261. A SIP-based VoIP implementation may send the encoded voice data over the network in a number of ways. Most implementations use a Real-time Transport Protocol (RTP), which is defined in RFC 3550. Both SIP and RTP are implemented on UDP, which, as a connectionless protocol, can cause difficulties with certain types of routers and firewalls. Usable SIP phones therefore also need to use Simple Traversal of UDP over NAT (STUN), a protocol defined in RFC 3489 that allows a client behind a NAT router to find out its external IP address and the type of NAT device.

FIG. 2 shows arrangement 20 of devices communicating over the Internet. Various devices such as client #1 24a, client #2 24b, client #3 24c, client #4 24d, and client #5 24e, may communicate over the Internet 113 for obtaining data from a data server #1 22a and a data server #2 22b. In one example, the servers are HTTP servers, sometimes known as web servers. A method describing a more efficient communication over the Internet is described in U.S. Pat. No. 8,560,604 to Shribman et al., entitled: "System and Method for Providing Faster and More Efficient Data Communication" (hereinafter the "'604 patent'"), which is incorporated in its entirety for all purposes as if fully set forth herein. The method described in the '604 patent uses an acceleration server 32 for managing the traffic in the network, as shown in FIG. 2. A splitting of a message or a content into slices, and transferring each of the slices over a distinct data path is described in U.S. Patent Application No. 2012/0166582 to Binder entitled: "System and Method for Routing-Based Internet Security", which is incorporated in its entirety for all purposes as if fully set forth herein.

A Cyclic Redundancy Check (CRC) is an error-detecting code commonly used in digital networks and storage devices to detect accidental changes to raw data. Blocks of data entering these systems get a short check value attached, based on the remainder of a polynomial division of their contents; on retrieval the calculation is repeated, and corrective action can be taken against presumed data corruption if the check values do not match. Ethernet commonly uses 32-bit CRC function. Specification of a CRC code requires definition of a so-called generator polynomial. The polynomial becomes a divisor in a polynomial long division, which takes the message as the dividend, and in which the quotient is discarded and the remainder becomes the result. The important caveat that the polynomial coefficients are calculated according to the arithmetic of a finite field, so the addition operation can always be performed bitwise-parallel (there is no carry between digits). The length of the remainder is always less than the length of the generator polynomial, which therefore determines how long the result can be. In practice, all commonly used CRCs employ the finite field GF(2). This is the field of two elements, usually called 0 and 1, comfortably matching computer architecture.

A CRC is referred to as an n-bit CRC when its check value is n bits. For a given n, multiple CRCs are possible, each with a different polynomial. Such a polynomial has highest degree n, which means it has n+1 terms. In other words, the polynomial has a length of n+1; its encoding requires n+1 bits. Note that most integer encodings either drop the Most Significant Bit (MSB) or Least Significant Bit (LSB), since they are always 1. The CRC and associated polynomial typically have a name of the form CRC-n-XXX. The simplest error-detection system, the parity bit, is in fact a trivial 1-bit CRC: it uses the generator polynomial x+1 (two terms), and has the name CRC-1. Computation of a cyclic redundancy check is derived from the mathematics of polynomial division, modulo two. In practice, it resembles long division of the binary message

32

string, with a fixed number of zeroes appended, by the "generator polynomial" string except that exclusive OR operations replace subtractions. Division of this type is efficiently realised in hardware by a modified shift register and in software by a series of equivalent algorithms, starting with simple code close to the mathematics and becoming faster through byte-wise parallelism and space-time tradeoffs.

Various CRC standards extend the polynomial division algorithm by specifying an initial shift register value, a final exclusive OR step and, most critically, a bit ordering (endianness). As a result, the code seen in practice deviates confusingly from "pure" division, and the register may shift left or right. The most important attribute of the polynomial is its length (largest degree−exponent−+1) of any one term in the polynomial), because of its direct influence on the length of the computed check value. The most commonly used polynomial lengths are 9 bits (CRC-8), 17 bits (CRC-16), 33 bits (CRC-32), and 65 bits (CRC-64). A calculation of CRC-32 is described in the publication entitled: "32-Bit Cyclic Redundancy Codes for Internet Applications" by Philip Koopman of Carnegie Mellon University, presented at The International Conference on Dependable Systems and Networks (DSN) 2002.

A CRC is an example of a hash function, which refers to any function that can be used to map data of arbitrary size to data of fixed size, with slight differences in input data producing very big differences in an output data. Values returned by the hash function are called hash values, hash codes, hash sums, or simply hashes. Hash values are commonly used to differentiate between data. For example, in implementing a set in software, one has to avoid including an element more than once. Recent developments in internet payment networks also uses a form of 'hashing' for producing checksums, bringing additional attention to the term. Hash functions are primarily used to generate fixed-length output data that act as a shortened reference to the original data. This is useful when the original data is too cumbersome to use in its entirety. Hash functions commonly include checksums, check digits, fingerprints, randomization functions, error-correcting codes, and ciphers.

One practical use is a data structure called a hash table where the data is stored associatively. Searching linearly for a person's name in a list becomes cumbersome as the length of the list increases, but the hashed value can be used to store a reference to the original data and retrieve constant time (barring collisions). Another use is in cryptography, the science of encoding and safeguarding data. It is easy to generate hash values from input data and easy to verify that the data matches the hash, but for certain hash functions hard to 'fake' a hash value to hide malicious data. Hash functions are also frequently used to accelerate table lookup or data comparison tasks such as finding items in a database, detecting duplicated or similar records in a large file and finding similar stretches in DNA sequences. A hash function should be deterministic: when it is invoked twice on identical data (e.g. two strings containing exactly the same characters), the function should produce the same value. This is crucial to the correctness of virtually all algorithms based on hashing. In the case of a hash table, the lookup operation should look at the slot where the insertion algorithm actually stored the data that is being sought for, as it needs the same hash value.

Hash functions used to accelerate data searches typically produce smaller hash values, such as a 32 bit integer. On the other hand, cryptographic hash functions produce much larger hash value, in order to ensure the computational complexity of brute-force inversion. For example SHA-1, one of the most widely used cryptographic hash functions, produces

US 9,241,044 B2

33

a 160-bit value. In both cases, the hash function breaks the input data into chunks of specific size. Hash functions used for data searches use an arithmetic expression which iteratively processes those chunks (such as the characters in a string) to produce the hash value. In cryptographic hash functions, these chunks are processed by a one-way compression function, with the last chunk being padded if necessary. In this case, their size, which is called block size, is much bigger than the size of the hash value. For example, in SHA-1, the hash value is 160 bits and the block size 512 bits.

A hash table (a.k.a. Hash map) is a data structure that associates keys with values, and is commonly used to support a lookup: given a key (e.g., a person's name), find the corresponding value (e.g., that person's telephone number), thus allowing to use a number to locate a desired value in a table. Hash tables are typically used to implement an associative array, a structure that can map keys to values. A hash table uses a hash function to compute an index into an array of buckets or slots, from which the correct value can be found. The hash function may assign each key to a unique bucket, but typically hash table designs assume that hash collisions—different keys that are assigned by the hash function to the same bucket—will occur and must be accommodated in some way. In a well-dimensioned hash table, the average cost (number of instructions) for each lookup is independent of the number of elements stored in the table. Many hash table designs also allow arbitrary insertions and deletions of key-value pairs, at a constant average cost per operation. In many situations, hash tables turn out to be more efficient than search trees or any other table lookup structure, and thus are widely used in many kinds of computer software, particularly for associative arrays, database indexing, caches, and sets.

Filter driver. A filter driver is a Microsoft Windows compatible driver that extends or modifies the function of peripheral devices or supports a specialized device in a personal computer. It is a driver or program or module that is inserted into the existing driver stack to perform some specific function, while not affecting the normal working of the existing driver stack in any major way. Any number of filter drivers can be added to Windows, where upper level filter drivers sit above the primary driver for the device (the function driver), while lower level filter drivers sit below the function driver and above a bus driver. Filter drivers may work on a certain brand of device such as a mouse or keyboard, or they may perform some operation on a class of devices, such as any mouse or any keyboard. A filter driver may be developed using the guide entitled: "*Filter Driver Development Guide*" Version 1.0a by Microsoft Corporation, dated 2004, which is incorporated in its entirety for all purposes as if fully set forth herein.

Hook. A hook (also known as a hook procedure or hook function) is a mechanism by which an application can intercept events, such as messages, mouse actions, and keystrokes, and generally refers to a function provided by a software application that receives certain data before the normal or intended recipient of the data. The hook function can thus examine or modify certain data before passing on the data. Therefore, a hook function allows a software application to examine data before the data is passed to the intended recipient. A function that intercepts a particular type of event is known as a hook procedure. The hook procedure can act on each event it receives, and then modify or discard the event. The term 'hooking' is used herein to include, but not limited to, a range of techniques used to alter or augment the behavior of an operating system, of applications, or of other software components by intercepting function calls, messages, or events passed between software components. A code that

34

handles such intercepted function calls, events or messages is called a "hook". Hooking is used for many purposes, including debugging and extending functionality. Examples might include intercepting keyboard or mouse event messages before they reach an application, or intercepting operating system calls in order to monitor behavior or modify the function of an application or other component. It is also widely used in benchmarking programs, for example frame rate measuring in 3D games, where the output and input is done through hooking. Hooking is described, for example, in the presentations by High-Tech Bridge SA and titled: "*Userland Hooking in Windows*" dated August 2011, and "*Inline Hooking in Windows*" dated September 2011, both by Brian Mariani, and both incorporated in their entirety for all purposes as if fully set forth herein.

Physical modification. An hooking may be achieved by physically modifying an executable or library before an application is running through techniques of reverse engineering. This is typically used to intercept function calls to either monitor or replace them entirely. For example, by using a disassembler, the entry point of a function within a module can be found. It can then be altered to instead dynamically load some other library module and then have it execute desired methods within that loaded library. If applicable, another related approach by which hooking can be achieved is by altering an import table of an executable. This table can be modified to load any additional library modules as well as changing what external code is invoked when a function is called by an application. An alternate method for achieving the function of hooking is by intercepting function calls through a wrapper library. When creating a wrapper, you make your own version of a library that an application loads, with all the same functionality of the original library that it will replace, so all the functions that are accessible are essentially the same between the original and the replacement. This wrapper library can be designed to call any of the functionality from the original library, or replace it with an entirely new set of logic.

Runtime modification. Operating systems and software may provide the means to easily insert event hooks at runtime, as long as the process inserting the hook is granted enough permission to do so. Microsoft Windows allows to insert hooks that can be used to process or modify system events and application events for dialogs, scrollbars, and menus, as well as other items. It also allows a hook to insert, remove, process, or modify keyboard and mouse events. Linux provides another example where hooks can be used in a similar manner to process network events within the kernel through NetFilter. When such functionality is not provided, a special form of hooking employs intercepting library function calls that are made by a process. Function hooking is implemented by changing the very first few code instructions of the target function to jump to an injected code. Alternatively on systems using the shared library concept, the interrupt vector table or the import descriptor table can be modified in memory.

A hook chain is a list of pointers to special, application-defined callback functions called hook procedures. When a message occurs that is associated with a particular type of hook, the operating system passes the message to each hook procedure referenced in the hook chain, one after the other. The action of a hook procedure can depend on the type of hook involved. For example, the hook procedures for some types of hooks can only monitor messages, others can modify the messages or stop their progress through the chain, restricting them from reaching the next hook procedure or a destination window.

US 9,241,044 B2

**35**

Plug-in. A plug-in (or 'plugin', 'extension', or 'add-on'/ 'addon') is a software component that adds a specific feature to an existing software application, for example for enabling customization. The common examples are the plug-ins used in web browsers to add new features such as search-engines, virus scanners, or the ability to utilize a new file type such as a new video format. An 'Add-on' (or 'addon') is the general term for what enhances an application, and comprises snap-in, plug-in, theme, and skin. An extension add-on tailors the core features of an application by adding an optional module, whereas a plug-in add-on would tailor the outer layers of an application to personalize functionality. A theme or a skin add-on is a preset package containing additional or changed graphical appearance details, achieved by the use of a Graphical User Interface (GUI) that can be applied to a specific software and websites to suit the purpose, topic, or tastes of different users to customize the look and feel of a piece of computer software or an operating system front-end GUI (and window managers).

Typically, the host application provides services which the plug-in can use, including a way for plug-ins to register themselves with the host application and a protocol for the exchange of data with plug-ins. Plug-ins depend on the services provided by the host application and do not usually work by themselves. Conversely, the host application operates independently of the plug-ins, making it possible for end-users to add and update the plug-ins dynamically without needing to make changes to the host application. The term 'plug-in' is used herein to include, but not limited to, a software extension, which is software that serves to extend the capabilities of, or data available to an existing software application; it becomes included in the program. Therefore, after integration, extensions can be seen as part of the browser itself, tailored from a set of optional modules.

IPC. An Inter-Process Communication (IPC) (also be referred to as inter-thread communication and inter-application communication) is a set of methods for the exchange of data between multiple threads, in one or more processes. IPC methods may use message passing, synchronization, shared memory, and Remote Procedure Calls (RPC). IPC provides an environment that allows process cooperation, and may be used for providing Information sharing, computational speedup, modularity, convenience, and privilege separation. In the Windows operating system environment, the IPC provides mechanisms for facilitating communications and data sharing between processes or applications.

Common IPC methods include file sharing, where a record (or any other information) stored on disk (or any other memory) can be accessed by name by any process; a signal which is an asynchronous notification sent to a process or to a specific thread within the same process in order to notify it of an event that occurred; a socket which is a data stream sent over a network interface, either to a different process on the same computer or to another computer, such as Internet sockets; a pipe (or pipeline) which is a two-way data stream interfaced through standard input and output and is read character by character, commonly used in Unix-like computer operating systems; message queues which are anonymous data stream similar to the pipe that stores and retrieves information in packets, providing an asynchronous communications protocol; a semaphore which is a variable or abstract data type that is used for controlling access to a common resource; a shared memory which is a memory that may be simultaneously accessed by multiple programs with an intent to provide communication among them or avoid redundant copies, such as where one process creates an area in RAM which other processes can access; and memory mapped file,

**36**

where a file that is physically present on-disk, but can also be a device, shared memory object, or other resource that the operating system can reference through a file descriptor. Few IPC mechanisms are described in the Marko Vuskovic publication 'Operating Systems' in Chapter 9 entitled: "*INTER-PROCESS COMMUNICATION*", which is incorporated in its entirety for all purposes as if fully set forth herein.

The Windows operating system supports IPC mechanisms such as a clipboard, where the clipboard acts as a central depository for data sharing among applications, so when a user performs a cut or copy operation in an application, the application puts the selected data on the clipboard in one or more standard or application-defined formats, and any other application can then retrieve the data from the clipboard, choosing from the available formats that it understands; using Component Object Model (COM), where applications that use Object Linking and Embedding (OLE) manage compound documents can be used to call on other applications for data editing; Using Data Copy enabling an application to send information to another application using the WM_COPY-DATA message; DDE protocol that enables applications to exchange data in a variety of formats; and mailslots providing one-way communication where processes write messages to their mailslot.

Browser extension. A browser extension is a computer program that extends the functionality of a web browser in some way. Extensions can be created through use of web technologies such as HTML, JavaScript, and CSS. Browser extensions can also improve the user interface of the web browser without directly affecting viewable content of a web page, which can be achieved through a variety of add ons such as toolbars and plug-ins. Microsoft Internet Explorer started supporting extensions from version 5 released in 1999. Mozilla Firefox has supported extensions since its launch in 2004. The Opera desktop web browser supported extensions from version 10 released in 2009. Google Chrome started supporting extensions from version 4 released in 2010. The Apple Safari web browser started supporting native extensions from version 5 released in 2010. The syntax for extensions may differ from browser to browser, or at least enough different that an extension working on a browser does not work on another one.

Plug-ins add specific abilities into browsers using Application Programming Interfaces (APIs) allowing third parties to create plug-ins that interact with the browser. The original API was NPAPI, but subsequently Google introduced the PPAPI interface in Chrome. In addition, plug-ins allow browser extensions to perform tasks such as blocking ads, creating a secure online connection, and adding applications within a browser. Well-known browser plug-ins include the Adobe Flash Player, the QuickTime Player, and the Java plug-in, which can launch a user-activated Java applet on a web page to its execution a local Java virtual machine.

Sockets. A socket (a.k.a. 'network socket') is an endpoint of an IPC flow across a computer network. In the case the communications is based on IP (Internet Protocol), the network sockets are referred to as Internet sockets. A socket API is an application programming interface (API), usually provided by the operating system, that allows application programs to control and use network sockets. Internet socket APIs are usually based on the Berkeley sockets standard. A socket address is the combination of an IP address and a port number, similar to one end of a telephone connection in the combination of a phone number and a particular extension. Based on this address, internet sockets deliver incoming data packets to the appropriate application process or thread. Sockets are further described in a University of Toronto,

US 9,241,044 B2

37

Department of Computer Science presentation entitled: "*Tutorial on Socket Programming*" by Amin Tootoonchian, downloaded on August, 2014, and in the SAS Institute Inc. SHARE Session 5958 tutorial 'C Socket Programming Tutorial' entitled: "*Writing Client/Server Programs in C Using Sockets (A Tutorial) Part I*", by Greg Granger, dated February of 1998, which are both incorporated in their entirety for all purposes as if fully set forth herein.

An Internet socket is characterized by a unique combination of a Local socket address (Local IP address and port number), remote socket address (used for established TCP sockets), and the used Protocol, typically a transport protocol (e.g., TCP, UDP, raw IP, or others). Within the operating system and the application that created a socket, a socket is referred to by a unique integer value called a socket descriptor. The operating system forwards the payload of incoming IP packets to the corresponding application by extracting the socket address information from the IP and transport protocol headers and stripping the headers from the application data.

Several Internet socket types are available, such as Datagram sockets, also known as connectionless sockets, which use User Datagram Protocol (UDP), Stream sockets, also known as connection-oriented sockets, which use Transmission Control Protocol (TCP) or Stream Control Transmission Protocol (SCTP), and Raw sockets (or Raw IP sockets), typically available in routers and other network equipment. Here the transport layer is bypassed, and the packet headers are made accessible to the application. Other socket types are implemented over other transport protocols, such as Systems Network Architecture (SNA). Communicating local and remote sockets are called socket pairs. Each socket pair is described by a unique 4-tuple consisting of source and destination IP addresses and port numbers, i.e. of local and remote socket addresses. In the TCP case, each unique socket pair 4-tuple is assigned a socket number, while in the UDP case, each unique local socket address is assigned a socket number.

The socket is primarily a concept used in the Transport Layer of the Internet model. Networking equipment such as routers and switches do not require implementations of the Transport Layer, as they operate on the Link Layer level (switches) or at the Internet Layer (routers). However, stateful network firewalls, network address translators, and proxy servers keep track of active socket pairs. Also in fair queuing, layer 3 switching and quality of service (QoS) support in routers, packet flows may be identified by extracting information about the socket pairs. Raw sockets are typically available in network equipment and are used for routing protocols such as IGRP and OSPF, and in Internet Control Message Protocol (ICMP).

The amount of data transferred in a given period in commonly referred to as 'bandwidth' (BW) or 'bit-rate', which is the number of bits that are conveyed or processed per unit of time. The bit rate is quantified using the bits per second unit (symbol bit/s or b/s), often in conjunction with an SI prefix such as kilo- (1 kbit/s=1000 bit/s), mega- (1 Mbit/s=1000 kbit/s), giga- (1 Gbit/s=1000 Mbit/s) or tera- (1 Tbit/s=1000 Gbit/s). The non-standard abbreviation bps is often used to replace the standard symbol bit/s, so that, for example, "1 Mbps" (or 1 Mb/s) is used to mean one million bits per second. One byte per second (1 B/s) corresponds to 8 bit/s.

Latency is typically defined as a time interval between the stimulation and the response, or, from a more general point of view, as a time delay between the cause and the effect of some physical change in the system being observed. Network-related latency, such as in a packet-switched network, is measured either one-way (the time from the source sending a packet to the destination receiving it), or Round-Trip delay

38

Time (RTT), referring to the one-way latency from source to destination plus the one-way latency from the destination back to the source, plus any delays at the destination, such as processing or other delays. Round-trip latency can be measured from a single point. Latency limits total bandwidth in reliable two-way communication systems as described by the bandwidth-delay product, which refers to the product of a data link's capacity (in bits per second) and its end-to-end delay (in seconds). The result, an amount of data measured in bits (or bytes), is equivalent to the maximum amount of data on the network circuit at any given time, i.e., data that has been transmitted but not yet acknowledged. Sometimes it is calculated as the data link's capacity multiplied by its round trip time. A network with a large bandwidth-delay product is commonly known as a Long Fat Network (LFN). As defined in IETF RFC 1072, a network is considered an LFN if its bandwidth-delay product is significantly larger than 105 bits (12500 bytes).

The Round-trip Delay Time (RTD) or Round-Trip Time (RTT) is the length of time it takes for a signal to be sent and to be received and processed at the destination node, plus the length of time it takes for an acknowledgment of that signal to be received. This time delay therefore includes the propagation times between the two points of a signal. The signal is generally a data packet, and the RTT is also known as the ping time, and an internet user can determine the RTT by using the ping command. Network links with both a high bandwidth and a high RTT can have a very large amount of data (data bandwidth-delay product) "in flight" at any given time. Such "long fat pipes" require a special protocol design. One example is the TCP window scale option. The RTT was originally estimated in TCP by: $RTT = (\alpha \cdot Old\_RTT) + ((1-\alpha) \cdot New\_Round\_Trip\_Sample)$, where $\alpha$ is a constant weighting factor ($0 \leq \alpha < 1$). Choosing a value $\alpha$ close to 1 makes the weighted average immune to changes that last a short time (e.g., a single segment that encounters long delay). Choosing a value for $\alpha$ close to 0 makes the weighted average response to changes in delay very quickly. Once a new RTT is calculated, it is entered into the above equation to obtain an average RTT for that connection, and the procedure continues for every new calculation. The RTT may be measured as described in IETF 1323, and may be estimated by using a method described in IETF RFC 6323, which are both incorporated in their entirety for all purposes as if fully set forth herein.

An estimation of RTT for messages using TCP may use Karn's Algorithm, described by Karn, Phil and Craig Partridge in ACM SIGCOMM '87—Computer Communication Review publication, entitled: "*Improving Round-Trip Time Estimates in Reliable Transport Protocols*", which is incorporated in its entirety for all purposes as if fully set forth herein. The round trip time is estimated as the difference between the time that a segment was sent and the time that its acknowledgment was returned to the sender, but when packets are re-transmitted there is an ambiguity: the acknowledgment may be a response to the first transmission of the segment or to a subsequent re-transmission. Karn's Algorithm ignores re-transmitted segments when updating the round trip time estimate. Round trip time estimation is based only on unambiguous acknowledgments, which are acknowledgments for segments that were sent only once.

Many software platforms provide a service called 'ping' that can be used to measure round-trip latency. Ping performs no packet processing; it merely sends a response back when it receives a packet (i.e., performs a no-op), thus it is a first rough way of measuring latency. Ping operates by sending Internet Control Message Protocol (ICMP) echo requesting

US 9,241,044 B2

39

packets to the target host, and waiting for an ICMP response. During this process it measures the time from transmission to reception (round-trip time) and records any packet loss. The results of the test are printed in a form of a statistical summary of the response packets received, including the minimum, maximum, and the mean round-trip times, and sometimes the standard deviation of the mean.

The Transmission Control Protocol/Internet Protocol (TCP/IP) suite normally used on the Internet has included an Internet Message Control Protocol (ICMP) that is commonly used in echo testing or ping and trace route applications. In general, the Internet standard 'ping' or 'ICMP echo' has a request/response format, wherein one device sends an ICMP echo request and another device responds to a received ICMP echo request with a transmitted ICMP echo response. Normally, IP devices are expected to implement the ICMP as part of the support for IP, to be able to use ICMP for testing. Internet RFC 792, entitled "Internet Control Message Protocol: DARPA Internet Program Protocol Specification", which is incorporated in its entirety for all purposes as if fully set forth herein, at least partially describes the behavior of ICMP. The ICMP echo message has a type field, a code field, a checksum field, an identifier field, a sequence number field, and a data field. According to RFC 79: "The data received in the echo message must be returned in the echo reply message". Thus, an RFC compliant ping responders or an ICMP echo reply message responders are supposed to copy the received data field in an echo request message directly into the data field of the transmitted echo response message.

A newer version of ICMP known as ICMP version 6 or ICMPv6 is described at least partially in RFCs 1885 and 2463, which are both entitled "Internet Control Message Protocol (ICMPv6) for the Internet Protocol Version 6 (IPv6) Specification", which are both incorporated in their entirety for all purposes as if fully set forth herein. According to RFC 2463, "Every [IPv6] node MUST implement an ICMPv6 Echo responder function that receives Echo Requests and sends corresponding Echo Replies. An IPv6 node SHOULD also implement an application-layer interface for sending Echo Requests and receiving Echo Replies, for diagnostic purposes.". Thus, responding to ICMP echo requests normally is a necessary function in supporting IPv4 and/or IPv6 standards. The ICMPv6 RFCs 1885 and 2464 goes on to specify that the data field of an ICMP echo response contains the "data from the invoking Echo Request message." Therefore, both ICMP and ICMP v6 associated with IPv4 and IPv6, respectively, specify that the data field in an ICMP echo reply message is to essentially contain a copy of the data received in the corresponding ICMP echo request message.

Moreover, the ICMP echo protocol is basically a two-way echo in which one initiating device and/or process starts the communication by transmitting an echo request message, which may be then received by an echo responder process. The echo responder process, generally located on another device, receives the echo request message and responds with an echo reply back to the initiating process. Once the initiating device and/or process receives the response or times out waiting on the response, the two-way echo exchange of messages is complete. Although the echo request and echo response normally are performed between processes on two different devices, one skilled in the art will be aware that a device can ping its own IP address implying that the echo request and echo responder reply processes are on the same device. In addition, the loopback address of network 127.0.0.0 in IPv4 can be used to allow a device to the loopback outbound echo request messages back into the device's

40

own incoming echo responder processes. IPv6 has a loopback functionality as well.

This copying of data exactly in the ICMP echo response is somewhat wasteful because the responder generally does not convey that much (if any) information back to the ICMP echo request initiating device. Arguably the initiating device could compute bit error rate (BER) statistics on the transmitted versus the received data field in ICMP echo packets. However, such physical layer issues as BER statistics normally are not as relevant for network layer IP datagranis that already include various error control code mechanisms. Arguably the device running the responding process can communicate information to the device running the initiating process by having the device running the original responding process initiate its own echo request and wait for an echo response from the original initiating device. Such a solution results in four packets, with a first echo request from a local device responded to by a first echo response from a remote device, and with a second echo request from the remote device responded to by a second echo response from the local device.

An identifier and/or sequence number in ping packets generally has allowed the ping to be used by a device to determine the round-trip delay from the time an ICMP echo request packet is sent to the time corresponding to when an associated received ICMP echo request is received back at an initiating device. Furthermore, ping packets generally convey little or no information about the type of the device that initiated the ping. Moreover, although IPv4 has Type of Service (ToS) fields in the IP datagram, these fields have become more important as the services used over the Internet and networks using Internet technology have grown from basic computer data communication to also include real-time applications such as voice and/or video. Various Type of Service (ToS) in IPv4 and IPv6 have been used in implementing various (Quality of Service) QoS characteristics that are defined for different classes of service and/or Service Level Agreements (SLAs).

Timestamp. A timestamp is a sequence of characters or encoded information identifying when a certain event occurred, usually giving date and time of day, sometimes accurate to a small fraction of a second, and also refers to digital date and time information attached to the digital data. For example, computer files contain timestamps that tell when the file was last modified, and digital cameras add timestamps to the pictures they take, recording the date and time the picture was taken. A timestamp is typically the time at which an event is recorded by a computer, not the time of the event itself. In many cases, the difference may be inconsequential: the time at which an event is recorded by a timestamp (e.g., entered into a log file) should be close to the time of the event. Timestamps are typically used for logging events or in a Sequence of Events (SOE), in which case each event in the log or SOE is marked with a timestamp. In a file system such as a database, timestamp commonly mean the stored date/time of creation or modification of a file or a record. The ISO 8601 standard standardizes the representation of dates and times which are often used to construct timestamp values, and IETF RFC 3339 defines a date and time format for use in Internet protocols using the ISO 8601 standard representation.

Caching. A system and method for increasing cache size by performing the steps of: categorizing storage blocks within a storage device as within a first category of storage blocks if the storage blocks that are available to the system for storing data when needed; categorizing storage blocks within the storage device as within a second category of storage blocks if the storage blocks contain application data therein; and

US 9,241,044 B2

41

categorizing storage blocks within the storage device as within a third category of storage blocks if the storage blocks are storing cached data and are available for storing application data if no first category of storage blocks are available to the system, is described in U.S. Pat. No. 8,135,912 to Shribman et al. entitled: "System and Method of Increasing Cache Size", which is incorporated in its entirety for all purposes as if fully set forth herein. A system for resolving Domain Name System (DNS) queries that contains a communication device for resolving DNS queries, wherein the communication device further contains a memory and a processor that is configured by the memory, a cache storage for use by the communication device, and a network of authoritative domain name servers, where in a process of the communication device looking up a DNS request within the cache storage, if the communication device views an expired DNS entry within the cache storage, the communication device continues the process of looking up the DNS request in the cache storage while, in parallel, sending out a concurrent DNS request to an authoritative domain name server that the expired DNS entry belongs to, is described in U.S. Pat. No. 8,671,221 to the same inventors as this application, entitled: "Method and System for Increasing Speed of Domain Name System Resolution within a Computing Device", which is incorporated in its entirety for all purposes as if fully set forth herein.

Systems and methods of storing previously transmitted data and using it to reduce bandwidth usage and accelerate future communications, and using algorithms to identify long compression history matches. A network device that may improve compression efficiency and speed is described in U.S. Pat. No. 7,865,585 to Samuels et al., entitled: "Systems and Methods for Providing Dynamic Ad Hok Proxy-Cache Hierarchies", which is incorporated in its entirety for all purposes as if fully set forth herein. Further, a method and system for accelerating the receipt of data in a client-to-client network described in U.S. Pat. No. 7,203,741 to Marco et al., entitled: "Method and System for Accelerating Receipt of Data in a Client-to-Client Network", which is incorporated in its entirety for all purposes as if fully set forth herein.

Hearbeat. A heartbeat is a periodic signal generated by hardware or software to indicate normal operation or to synchronize other parts of a system. Usually a heartbeat is sent between machines at a regular interval of an order of seconds. If a heartbeat is not received for a time—usually a few heartbeat intervals—the machine that should have sent the heartbeat is assumed to have failed. As used herein, a heartbeat is a periodic message, such as a 'ping', generated by devices connected to the Internet to indicate being 'online' (connected to the Internet) and normal operation, and if a heartbeat is not received for a time, the device is assumed to be 'offline' (not connected to the Internet). A heartbeat protocol is generally used to negotiate and monitor the availability of a resource, such as a floating IP address. Typically, when a heartbeat starts on a machine, it will perform an election process with other machines on the network to determine which machine, if any, owns the resource. The IETF RFC 6520 describes Heartbeat operation for the Transport Layer Security (TLS), and is incorporated in its entirety for all purposes as if fully set forth herein.

Users in the Internet may desire anonymity in order not to be identified as a publisher (sender), or reader (receiver), of information. Common reasons include censorship at the local, organizational, or national level, personal privacy preferences such as preventing tracking or data mining activities, the material or its distribution is considered illegal or incriminating by possible eavesdroppers, the material may be legal

42

but socially deplored, embarrassing, or problematic in the individual's social world, and fear of retribution (against whistleblowers, unofficial leaks, and activists who do not believe in restrictions on information nor knowledge). Full anonymity on the Internet, however, is not guaranteed since IP addresses can be tracked, allowing to identify the computer from which a certain post was made, albeit not the actual user. Anonymizing services, such as I2P—"The Anonymous Network" or Tor, address the issue of IP tracking, as their distributed technology approach may grant a higher degree of security than centralized anonymizing services where a central point exists that could disclose one's identity. An anonymous web browsing refers to browsing the World Wide Web while hiding the user's IP address and any other personally identifiable information from the websites that one is visiting. There are many ways of accomplishing anonymous web browsing. Anonymous web browsing is generally useful to internet users who want to ensure that their sessions cannot be monitored. For instance, it is used to circumvent traffic monitoring by organizations that want to find out or control which web sites employees visit. Further, since some web-sites response differently when approached from mobile devices, anonymity may allow for accessing such a web-site from a non-mobile device, posing as a mobile device.

WiFi. A device herein (such as device 11) may consist of, be part of, or include, a Personal Computer (PC), a desktop computer, a mobile computer, a laptop computer, a notebook computer, a tablet computer, a server computer, a handheld computer, a handheld device, a Personal Digital Assistant (PDA) device, or a cellular handset. Alternatively or in addition, a device may consist of, be part of, or include, a handheld PDA device, an on-board device, an off-board device, a hybrid device, a vehicular device, a non-vehicular device, a mobile device, or a portable device. A network herein (such as LAN 14), may consist of, be part of, or include, a wired or wireless network, a Local Area Network (LAN), a Wireless LAN (WLAN), a Metropolitan Area Network (MAN), a Wireless MAN (WMAN), a Wide Area Network (WAN), a Wireless WAN (WWAN), a Personal Area Network (PAN), or a Wireless PAN (WPAN). Alternatively or in addition, a network herein may be operating substantially in accordance with existing IEEE 802.11, 802.11a, 802.11b, 802.11g, 802.11k, 802.11n, 802.11r, 802.16, 802.16d, 802.16e, 802.20, 802.21 standards and/or future versions and/or derivatives of the above standards. Further, a network element (or a device) herein may consist of, be part of, or include, a cellular radio-telephone communication system, a cellular telephone, a wireless telephone, a Personal Communication Systems (PCS) device, a PDA device which incorporates a wireless communication device, or a mobile/portable Global Positioning System (GPS) device. The communication interface 29 may consist of, be part of, or include, a transceiver or modem for communication with the network, such as LAN 14. In the case of wired networks, the communication interface 29 connects to the network via a port 28 that may include a connector, and in the case of wireless network, the communication interface 29 connects to the network via a port 28 that may include an antenna.

The LAN 14 may be a Wireless LAN (WLAN) such as according to, or base on, IEEE 802.11-2012, and the WLAN port may be a WLAN antenna and the WLAN transceiver may be a WLAN modem. The WLAN may be according to, or base on, IEEE 802.11a, IEEE 802.11b, IEEE 802.11g, IEEE 802.11n, or IEEE 802.11ac. Commonly referred to as Wireless Local Area Network (WLAN), such communication makes use of the Industrial, Scientific and Medical (ISM) frequency spectrum. In the US, three of the bands within the

US 9,241,044 B2

43

ISM spectrum are the A-Band, 902-928 MHz; the B-Band, 2.4-2.484 GHz (a.k.a. 2.4 GHz); and the C-Band, 5.725-5.875 GHz (a.k.a. 5 GHz). Overlapping and/or similar bands are used in different regions such as Europe and Japan. In order to allow interoperability between equipment manufactured by different vendors, few WLAN standards have evolved, as part of the IEEE 802.11 standard group, branded as WiFi (www.wi-fi.org). The IEEE 802.11b standard describes a communication using the 2.4 GHz frequency band and supporting a communication rate of 11 Mb/s, IEEE 802.11a uses the 5 GHz frequency band to carry 54 MB/s, and IEEE 802.11g uses the 2.4 GHz band to support 54 Mb/s. The WiFi technology is further described in a publication entitled: "*WiFi Technology*" by Telecom Regulatory Authority, published on July 2003, which is incorporated in its entirety for all purposes as if fully set forth herein. The IEEE 802 defines an ad-hoc connection between two or more devices without using a wireless access point: the devices communicate directly when in range. An ad hoc network offers peer-to-peer layout and is commonly used in situations such as a quick data exchange or a multiplayer LAN game, because the setup is easy and an access point is not required.

In order to support multiple devices and using a permanent solution, a Wireless Access Point (WAP) is typically used. A Wireless Access Point (WAP, or Access Point—AP) is a device that allows wireless devices to connect to a wired network using Wi-Fi, or related standards. The WAP usually connects to a router (via a wired network) as a standalone device, but it can also be an integral component of the router itself. Using Wireless Access Point (AP) allows users to add devices that access the network with little or no cables. A WAP normally connects directly to a wired Ethernet connection and the AP then provides wireless connections using radio frequency links for other devices to utilize that wired connection. Most APs support the connection of multiple wireless devices to one wired connection. An example of using WAPs in a system 20*a* shown in FIG. 2*b*, where a device 11*a* (corresponding to the device 11 above) may communicate, and for example, any access the Internet, via any one of a WAPs 26*a*, 26*b*, or 26*c*. Wireless access typically involves special security considerations, since any device within a range of the WAP can attach to the network. The most common solution is wireless traffic encryption. Modern access points come with built-in encryption such as Wired Equivalent Privacy (WEP) and Wi-Fi Protected Access (WPA), typically used with a password or a passphrase. A WAP may not be password protected, allowing free access (for example to the Internet via the WAP) to any device communicating with it, such as WAP 26*a* shown in system 20*a*. However, most WAPs, such as WAPs 26*b* and 26*c* shown in system 20*a* (denoted with the lock symbol), are password protected, allowing access only to specific users which can use the password.

Authentication in general, and a WAP authentication in particular, is used as the basis for authorization, which is the determination whether a privilege may be granted to a particular user or process, privacy, which keeps information from becoming known to non-participants, and non-repudiation, which is the inability to deny having done something that was authorized to be done based on the authentication. An authentication in general, and a WAP authentication in particular, may use an authentication server, that provides a network service that applications may use to authenticate the credentials, usually account names and passwords, of their users. When a client submits a valid set of credentials, it receives a cryptographic ticket that it can subsequently use to access

44

various services. Authentication algorithms include passwords, Kerberos, and public key encryption.

Compression. Data compression, also known as source coding and bit-rate reduction, involves encoding information using fewer bits than the original representation. Compression can be either lossy or lossless. Lossless compression reduces bits by identifying and eliminating statistical redundancy, so that no information is lost in lossless compression. Lossy compression reduces bits by identifying unnecessary information and removing it. The process of reducing the size of a data file is commonly referred to as a data compression. A compression is used to reduce resource usage, such as data storage space or transmission capacity. Data compression is further described in a Carnegie Mellon University chapter entitled: "*Introduction to Data Compression*" by Guy E. Blelloch, dated Jan. 31, 2013, which is incorporated in its entirety for all purposes as if fully set forth herein.

In a scheme involving lossy data compression, some loss of information is acceptable. For example, dropping of a nonessential detail from a data can save storage space. Lossy data compression schemes may be informed by research on how people perceive the data involved. For example, the human eye is more sensitive to subtle variations in luminance than it is to variations in color. JPEG image compression works in part by rounding off nonessential bits of information. There is a corresponding trade-off between preserving information and reducing size. A number of popular compression formats exploit these perceptual differences, including those used in music files, images, and video.

Lossy image compression is commonly used in digital cameras, to increase storage capacities with minimal degradation of picture quality. Similarly, DVDs use the lossy MPEG-2 Video codec for video compression. In lossy audio compression, methods of psychoacoustics are used to remove non-audible (or less audible) components of the audio signal. Compression of human speech is often performed with even more specialized techniques; speech coding, or voice coding, is sometimes distinguished as a separate discipline from audio compression. Different audio and speech compression standards are listed under audio codecs. Voice compression is used in Internet telephony, for example, and audio compression is used for CD ripping and is decoded by audio player.

Lossless data compression algorithms usually exploit statistical redundancy to represent data more concisely without losing information, so that the process is reversible. Lossless compression is possible because most real-world data has statistical redundancy. The Lempel-Ziv (LZ) compression methods are among the most popular algorithms for lossless storage. DEFLATE is a variation on LZ optimized for decompression speed and compression ratio, and is used in PKZIP, Gzip and PNG. The LZW (Lempel-Ziv-Welch) method is commonly used in GIF images, and is described in IETF RFC 1951. The LZ methods use a table-based compression model where table entries are substituted for repeated strings of data. For most LZ methods, this table is generated dynamically from earlier data in the input. The table itself is often Huffman encoded (e.g., SHRI, LZX). Typical modern lossless compressors use probabilistic models, such as prediction by partial matching.

Lempel-Ziv-Welch (LZW) is an example of lossless data compression algorithm created by Abraham Lempel, Jacob Ziv, and Terry Welch. The algorithm is simple to implement, and has the potential for very high throughput in hardware implementations. It was the algorithm of the widely used Unix file compression utility compress, and is used in the GIF image format. The LZW and similar algorithms are described in U.S. Pat. No. 4,464,650 to Eastman et al. entitled: "Appa-

US 9,241,044 B2

45

46

ratus and Method for Compressing Data Signals and Restoring the Compressed Data Signals", in U.S. Pat. No. 4,814,746 to Miller et al. entitled: "Data Compression Method", and in U.S. Pat. No. 4,558,302 to Welch entitled: "High Speed Data Compression and Decompression Apparatus and Method", which are all incorporated in their entirety for all purposes as if fully set forth herein.

A class of lossless data compression algorithms is based on using dictionaries, and operates by searching for matches between the text to be compressed and a set of strings contained in a data structure (called the 'dictionary') maintained by the encoder. When the encoder finds such a match, it substitutes a reference to the string's position in the data structure.

Some dictionary coders use a 'static dictionary', one whose full set of strings is determined before coding begins and does not change during the coding process. This approach is most often used when the message or set of messages to be encoded is fixed and large. A dictionary is often built from redundancy extracted from a data environment (various input streams) which dictionary is then used statically to compress a further input stream. For example, a dictionary may be built from old English texts then is used to compress a book. More common are methods where the dictionary starts in some predetermined state, but the contents change during the encoding process, based on the data that has already been encoded.

Both the LZ77 and LZ78 algorithms work on this principle, where in LZ77, a circular buffer called the "sliding window" holds the last N bytes of data processed, which serves as the dictionary, effectively storing every substring that has appeared in the past N bytes as dictionary entries. Instead of a single index identifying a dictionary entry, two values are needed: the length, indicating the length of the matched text, and the offset (also called the distance), indicating that the match is found in the sliding window starting offset bytes before the current text. LZ78 uses a more explicit dictionary structure: at the beginning of the encoding process, the dictionary only needs to contain entries for the symbols of the alphabet used in the text to be compressed, but the indexes are numbered in order to leave spaces for many more entries. At each step of the encoding process, the longest entry in the dictionary that matches the text is found, and its index is written to the output; the combination of that entry and the character that followed it in the text is then added to the dictionary as a new entry. An example of a dictionary-based compression is described in an University of Michigan paper entitled: *"Dictionary-Based Compression for Long Time-Series Similarity"* by Willis Lang, Michael Morse, and Jignesh M. Patel, downloaded from http://pages.cs.wisc.edu/on August 2014, which is incorporated in its entirety for all purposes as if fully set forth herein.

A one-way dictionary-based compression system is shown as a system 470 in FIG. 4. An encoding device 471 is shown to transmit data, such as DATA_1 to a decoding device 472 via a network 480, which may be the Internet 113. The encoding device 471 comprises an encoder 474 (also referred to as a coder, data coder, or data compressor), serving to compress DATA_1 received at an input port 475a into a DATA_2 (which is a lossless compression of DATA_1, preferably having a lower number of bits or lower data-rate that DATA_1) at an output port 475b, using the content in a shared dictionary 473a. The output DATA_2 is transmitted via the network 480, and is received at an input port 476a of a decoder 477 (also referred to as a data decoder or data decompressor) in the decoding device 472. Using a shared dictionary 473b in the decoding device 472, which preferably includes the same content as in the shared dictionary 473a of

the encoding device 471, the decoder 477 reconstructs the original data DATA_1 at an output port 476b.

A two-way dictionary-based compression system is shown as a system 470a in FIG. 4a. An encoding/decoding device 471c includes the functionalities of an encoding device 471a for transmitting, and of a decoding device 472a for receiving data. Similarly, an encoding/decoding device 472c includes the functionalities of the encoding device 471a for transmitting, and of the decoding device 472a for receiving data. In addition to the functionality of the decoding device 472a, the encoding/decoding device 472c is shown to also transmit data, such as DATA_3 to the encoding/decoding device 471c via the network 480, which may be the Internet 113. The encoding/decoding device 472c comprises an encoder 474b (also referred to as a coder, data coder, or data compressor), serving to compress DATA_3 received at an input port 475c into a DATA_4 (which is a lossless compression of DATA_3, preferably having a lower number of bits or lower data-rate that DATA_3) at an output port 475d, using the content in a shared dictionary 473d. The output DATA_4 is transmitted via the network 480, and is received at an input port 476d of a decoder 477b (also referred to as a data decoder or data decompressor) in the encoding/decoding device 471c. Using the shared dictionary 473c in the encoding/decoding device 471c, which preferably includes the same content as in the shared dictionary 473d of the encoding/decoding device 472c, the decoder 477b reconstructs the original data DATA_3 at an output port 476c.

Image/video. Any content herein may consist of, be part of, or include, an image or a video content. A video content may be in a digital video format that may be based on one out of: TIFF (Tagged Image File Format), RAW format, AVI, DV, MOV, WMV, MP4, DCF (Design Rule for Camera Format), ITU-T H.261, ITU-T H.263, ITU-T H.264, ITU-T CCIR 601, ASF, Exif (Exchangeable Image File Format), and DPOF (Digital Print Order Format) standards. A intraframe or interframe compression may be used, and the compression may a lossy or a non-lossy (lossless) compression, that may be based on a standard compression algorithm, which may be one or more out of JPEG (Joint Photographic Experts Group) and MPEG (Moving Picture Experts Group), ITU-T H.261, ITU-T H.263, ITU-T H.264 and ITU-T CCIR 601.

Web Analytics. Web analytics typically refers to the measurement, collection, analysis, and reporting of web data for purposes of understanding and optimizing web usage. Web analytics is commonly used for measuring web traffic, and may be used as a tool for business and market research, as well as to assess and improve the effectiveness of a web site. Web analytics applications can also help companies measure the results of traditional print or broadcast advertising campaigns. For example, it helps one to estimate how traffic to a website changes after the launch of a new advertising campaign. The web analytics provide information about the number of visitors to a website and the number of page views, and helps gauge traffic and popularity trends, which may be useful for market research. Web analytics related description and methods are described in a whitepaper by E-Nor, Inc. entitled: "A 7-*Step Analytics Reporting Framework—Marketing Optimization Whitepaper*" by Feras Alhlou, downloaded on August 2014, and in U.S. Pat. No. 8,234,370 to Hammer et al., entitled: "Determining Web Analytics Information", in U.A. Patent Application Publication No. 2008/0046562 to Butler entitled: "Visual Web Page Analytics", and in U.S. Pat. No. 7,941,525 to Yavilevich entitled: "Method and System for Monitoring an Activity of a User", which are all incorporated in their entirety for all purposes as if fully set forth herein.

US 9,241,044 B2

47

There are two categories of web analytics: off-site and on-site web analytics. Off-site web analytics refers to web measurement and analysis, and includes the measurement of a website's potential audience (opportunity), share of voice (visibility), and buzz (comments) that is happening on the Internet. On-site web analytics measure a visitor's behavior once on the website, and includes its drivers and conversions; for example, the degree to which different landing pages are associated with online purchases. On-site web analytics typically measures the performance of the website in a commercial context, and this data is typically compared against key performance indicators for performance, and used to improve a web site or marketing campaign's audience response. Google Analytics is a widely used on-site web analytics service; although new tools are emerging that provide additional layers of information, including heat maps and session replay.

Google Analytics is a service offered by Google that generates detailed statistics about a website's traffic and traffic sources and measures conversions and sales. The product is aimed at marketers as opposed to webmasters and technologists from which the industry of web analytics originally grew. Google Analytics can track visitors from all referrers, including search engines and social networks, direct visits and referring sites, and also tracks display advertising, pay-per-click networks, email marketing and digital collateral such as links within PDF documents. Integrated with AdWords, users can now review online campaigns by tracking landing page quality and conversions (goals). Goals might include sales, lead generation, viewing a specific page, or downloading a particular file.

Google Analytics is implemented with "page tags". A page tag, in this case called the Google Analytics Tracking Code is a snippet of JavaScript code that the website owner user adds to every page of the website. The tracking code runs in the client browser when the client browses the page (if JavaScript is enabled in the browser), and collects visitor data and sends it to a Google data collection server, as part of a request for a web beacon. The tracking code loads a larger JavaScript file from the Google webserver and then sets variables with the user's account number. The larger file (currently known as ga.js) is typically 18 KB. The file does not usually have to be loaded, though, because of browser caching. Assuming caching is enabled in the browser, it downloads ga.js only once at the start of the visit. Furthermore, as all websites that implement Google Analytics with the ga.js code use the same master file from Google, a browser that has previously visited any other website running Google Analytics will already have the file cached on their machine. In addition to transmitting information to a Google server, the tracking code sets first party cookies (If cookies are enabled in the browser) on each visitor's computer. These cookies store anonymous information, such as whether the visitor has been to the site before (new or returning visitor), the timestamp of the current visit, and the referrer site or campaign that directed the visitor to the page (e.g., search engine, keywords, banner, or email). Google Analytics is further described in an Koozai Ltd. guide entitled: "*The Practical Guide To Google Analytics For Business*", 2nd Edition, published 2013, by Anna Lewis, Graeme Benge, and Gemma Holloway, which is incorporated in its entirety for all purposes as if fully set forth herein.

DHCP. The Dynamic Host Configuration Protocol (DHCP) is a standardized networking protocol used on Internet Protocol (IP) networks for dynamically distributing network configuration parameters, such as IP addresses for interfaces and services. With DHCP, network elements request IP addresses and networking parameters automatically from a

48

DHCP server, reducing the need for a network administrator or a user to configure these settings manually.

DHCP is typically used by network elements for requesting Internet Protocol parameters, such as an IP address from a network server, and is based on the client-server model. When a network element connects to a network, its DHCP client software in the operating system sends a broadcast query requesting necessary information. Any DHCP server on the network may service the request. The DHCP server manages a pool of IP addresses and information about client configuration parameters such as default gateway, domain name, the name servers, and time servers. On receiving a request, the server may respond with specific information for each client, as previously configured by an administrator, or with a specific address and any other information valid for the entire network, and the time period for which the allocation (lease) is valid. A host typically queries for this information immediately after booting, and periodically thereafter before the expiration of the information. When an assignment is refreshed by the client computer, it initially requests the same parameter values, and may be assigned a new address from the server, based on the assignment policies set by administrators.

Depending on implementation, the DHCP server may have three methods of allocating IP-addresses: (a) Dynamic allocation, where a network administrator reserves a range of IP addresses for DHCP, and each client computer on the LAN is configured to request an IP address from the DHCP server during network initialization. The request-and-grant process uses a lease concept with a controllable time period, allowing the DHCP server to reclaim (and then reallocate) IP addresses that are not renewed. (b) Automatic allocation, where the DHCP server permanently assigns an IP address to a requesting client from the range defined by the administrator. This is similar to dynamic allocation, but the DHCP server keeps a table of past IP address assignments, so that it can preferentially assign to a client the same IP address that the client previously had. (c) Static allocation, where the DHCP server allocates an IP address based on a preconfigured mapping to each client's MAC address.

DHCP used for Internet Protocol version 4 (IPv4) is described in IETF RFC 2131, entitled "*Dynamic Host Configuration Protocol*", and DHCP for IPv6 is described IETF RFC 3315, entitled: "*Dynamic Host Configuration Protocol for IPv6* (DHCPv6)", both incorporated in their entirety for all purposes as if fully set forth herein. While both versions serve the same purpose, the details of the protocol for IPv4 and IPv6 are sufficiently different that they may be considered separate protocols. For IPv6 operation, devices may alternatively use stateless address autoconfiguration. IPv4 hosts may also use link-local addressing to achieve operation restricted to the local network link.

The DHCP protocol employs a connectionless service model, using the User Datagram Protocol (UDP). It is implemented with two UDP port numbers for its operations, which are the same as for the BOOTP protocol. The UDP port number 67 is the destination port of a server, and the UDP port number 68 is used by the client. DHCP operations fall into four phases: Server discovery, IP lease offer, IP request, and IP lease acknowledgment. These stages are often abbreviated as DORA for discovery, offer, request, and acknowledgment. The DHCP protocol operation begins with clients broadcasting a request. If the client and server are on different subnets, a DHCP Helper or DHCP Relay Agent may be used. Clients requesting renewal of an existing lease may communicate directly via an UDP unicast, since the client already has an established IP address at that point.

US 9,241,044 B2

49

Redundancy. A redundancy may be used in order to improve an accuracy, reliability, or availability. The redundancy may be implemented where two or more components may be used for the same functionality. The components may be similar, substantially or fully the same, identical, different, substantially different, or distinct from each other, or any combination thereof. The redundant components may be concurrently operated, allowing for improved robustness and allowing for overcoming a Single Point Of Failure (SPOF), or alternatively one or more of the components serves as a backup. The redundancy may be a standby redundancy, which may be 'Cold Standby' and 'Hot Standby'. In the case three redundant components are used, Triple Modular Redundancy (TMR) may be used, and Quadruple Modular Redundancy (QMR) may be used in the case of four components. A 1:N Redundancy logic may be used for three or more components. A communication system employing redundancy is described in U.S. Patent Application No. 2013/0201316 to Binder et al., entitled: "System and Method for Server Based Control", and redundancy for carrying audio over the Internet is described in IETF RFC 2198 entitled: "RTP Payload for Redundant Audio Data", both are incorporated in their entirety for all purposes as if fully set forth herein.

Parallel Redundancy Protocol (PRP) is a data communication network standardized by the International Electrotechnical Commission (IEC) as IEC 62439-3 Clause 4, which allows systems to overcome any single network failure without affecting the data transmission by using redundancy. Under PRP, each network node has two Ethernet ports attached to two different local area networks of arbitrary, but similar topology, and the two LANs are completely separated and are assumed to be fail-independent. A source node sends simultaneously two copies of a frame, one over each port. The two frames travel through their respective LANs until they reach a destination node, in the fault-free case, with a certain time skew. The destination node accepts the first frame of a pair and discards the second, taking advantage of a sequence number in each frame that is incremented for each frame sent. Therefore, as long as one LAN is operational, the destination always receives one frame. This protocol provides a zero-time recovery and allows checking the redundancy continuously to detect lurking failures. The PRP is described in an ABB Switzerland Ltd. 2012 presentation entitled "Highly Available Automation Networks Standard Redundancy Methods—Rationale behind the IEC 63429 standard suite", and in a Zurich University tutorial entitled: "Tutorial on Parallel redundancy Protocol (PRP)", by Prof. Hans Weibel, downloaded July 2014, both are incorporated in their entirety for all purposes as if fully set forth herein.

Gateway. The term 'gateway' is used herein to include, but not limited to, a network element (or node) that is equipped for interfacing between networks that uses different protocols. A gateway typically contains components such as protocol translators, impedance matching devices, rate converters, fault isolators, or signal translators, as necessary to provide networking interoperability. A gateway may be a router or a proxy server that routes between networks, and may operate at any network layer. In a network for an enterprise, a computer server acting as a gateway node is often also acting as a proxy server and a firewall server. A gateway is often associated with both a router, which knows where to direct a given packet of data that arrives at the gateway, and a switch, which furnishes the actual path in and out of the gateway for a given packet.

A subnet mask is a mask used to determine what subnet belongs to an IP address. An IP address has two components, the network address and the host address. For example, con-

50

sider the IP address 150.215.017.009. Assuming this is part of a Class B network, the first two numbers (150.215) represent the Class B network address, and the second two numbers (017.009) identify a particular host on this network. A subnetting enables the network administrator to further divide the host part of the address into two or more subnets. In this case, a part of the host address is reserved to identify the particular subnet. On an IP network, clients should automatically send IP packets with a destination outside a given subnet mask to a network gateway. A subnet mask defines the IP range of a private network. For example, if a private network has a base IP address of 192.168.0.0 and has a subnet mask of 255.255.255.0, then any data going to an IP address outside of 192.168.0.X will be sent to that network gateway. While forwarding an IP packet to another network, the gateway might or might not perform Network Address Translation (NAT).

Domain Name System (DNS) is hierarchical distributed naming system for computers, services, or any resource connected to the Internet or a private network. It associates various information with domain names assigned to each of the participating entities, and translates easily memorized domain names to the numerical IP addresses needed for the purpose of locating computer services and devices worldwide. The DNS is described, for example, in the IETF RFC 3467 entitled: "Role of the Domain Name System (DNS)", in the IETF RFC 6195 entitled: "Domain Name System (DNS) IANA Considerations", and in the IETF RFC 1591 entitled: "Domain Name System Structure and Delegation", which are incorporated in their entirety for all purposes as if fully set forth herein.

The '404' or 'Not Found' error message is a HTTP standard response code indicating that the client was able to communicate with a given gateway or server, but the server could not find what was requested. The web site hosting server will typically generate a "404 Not Found" web page when a user attempts to follow a broken or dead link; hence, the 404 error is one of the most recognizable errors users can find on the web. When communicating via HTTP, a server is required to respond to a request, such as a web browser request for a web page, with a numeric response code and an optional, mandatory, or disallowed (based upon the status code) message. In the code 404, the first digit indicates a client error, such as a mistyped Uniform Resource Locator (URL). The following two digits indicate the specific error encountered. At the HTTP level, a 404 response code is followed by a human-readable "reason phrase". The HTTP specification suggests the phrase "Not Found" and many web servers by default issue an HTML page that includes both the 404 code and the "Not Found" phrase.

Referring to FIG. 50 showing a system 500 using a gateway #1 505a as an intermediate device between a LAN 503 (which may be the LAN 14 in FIG. 1) and a WAN 502 (which may be the Internet 113). The gateway #1 505a allows an application 506 in the network element 504 to communicate with another network element such as a server 501 via the networks. The network element 504 typically includes a memory, such as the main memory 25a, the storage device 25c, or the ROM 25b, storing a software 508, which typically includes the application 506, which uses the Operating System (OS) 507, which may be associated with the WDM architecture 430 shown in FIG. 3, or with the Linux architecture 450 shown in FIG. 3a. As part of initializing of a communication session with the network element 501, the OS 507 typically identifies the gateway 505a in the LAN 503, and obtains therefrom the required information such as an IP address, a DNS server IP, a subnet mask, and other information to be used before and

US 9,241,044 B2

51

during the communication session. The gateway #1 505a may consist of, include, be part of, or integrated with, a network router or a WiFi router.

In consideration of the foregoing, it would be an advancement in the art to provide an improved functionality method and system that is simple, secure, anonymous, cost-effective, load balanced, redundant, reliable, provide lower CPU and/or memory usage, enable pipelining of requests and responses, reduce network congestion, easy to use, reduce latency, faster, has a minimum part count, minimum hardware, and/or uses existing and available components, protocols, programs and applications for providing better quality of service, overload avoidance, better or optimal resources allocation, better communication and additional functionalities, and provides a better user experience.

SUMMARY

A system may comprise multiple data servers and multiple client and tunnel devices, each data server may be storing a respective content that may be fetched by the client devices via the Internet. The tunnel devices may be used as intermediate devices (or nodes). Upon initializing of the client and tunnel devices (such as upon powering up or upon launching the applicable software application), they sign-in with an acceleration server, which stores an identification (such as IP address) of each of the client and tunnel devices. A client device, which may be requesting a content from a data server, first communicates with the acceleration server to receive a list of the available tunnel devices. The client device may then select one (or more) tunnel device, and then executes a pre-connection process with the selected tunnel device. Upon determining the need for a content to be fetched from the data server, the client device sends a request to the tunnel device, which in turn fetches the required content from the data server, and sends the fetched content to the client device. Each of the devices (client or tunnel) and each of the servers (acceleration or data) may be identified in the Internet using an IP address that may be in an IPv4 or IPv6 form. Alternatively or in addition to using an intermediary device such as the tunnel device (or multiple tunnel devices), the client device may directly access and fetch content from the data server, without using any intermediate device such as a tunnel device. A device may be both a client device and a tunnel device, and the roles may be assumed one at a time, or may be employed in parallel using multitasking or multiprocessing.

The required communication of requests and content between the client device and the selected tunnel device may be preceded by a pre-connection phase used for establishing a connection between the devices, which may be later used for the required request or content transfer. The devices may communicate using VPN or TCP, and a connection may be established by performing 'Active OPEN' or 'Passive OPEN'. The content may include files, text, numbers, audio, voice, multimedia, video, images, music, computer programs or any other sequence of instructions, as well as any other form of information represented as a string of bits or bytes. In one example, the content may include, be a part of, or a whole of, a website page.

One or a plurality of tunnel devices may be used. Further, a device may directly access the data server, hence acting as its own tunnel device. The selection of a tunnel or of multiple tunnels to be used by the client device may be based on pre-set criteria. The selection may use various attributes or characteristics of the tunnel devices, its operation environment, history, and any other characteristics. The attributes associated with each tunnel device may be stored in the acceleration

52

server, and sent to the client device as part of the available tunnel devices list, so that the client device may use these attributes for the selection process. The criteria herein may be used independently or in combination. In yet another alternative, the selection may be based on a timing, such as Time-Of-Day (TOD) or a day of the week.

The tunnel device (or devices) to be used may be randomly selected; using a random number generator may be based on a physical process, or may be software based using pseudo-random numbers. Alternatively or in addition, the tunnel device (or devices) to be used may be selected based on physical geographical location, such as based on the physical proximity to another device in the system, such as the data server. Alternatively or in addition, the tunnel device (or devices) to be used may be selected based on their IP address or addresses. Alternatively or in addition, the tunnel device (or devices) to be used may be selected based on their sign-in time, or the time of its last activity as a tunnel.

The content requested by the client device may be partitioned into multiple parts or 'slices'. Any number of slices may be used. The slicing may be in a bit, nibble (4-bits), byte (8-bits), word (multiple bytes), character, string, or a file level. The partition may be into equal length parts, or may use different length slicing. The content may be composed of inherent or identifiable parts or segments, and the partition may make use of these parts. The content may be a website content composed of multiple webpages, and each slice may include one (or few) webpages. Further, the partition may be sequential or non-sequential in the content. The partitioning may be non-overlapping or overlapping.

A method is disclosed for fetching over the Internet a first content, identified by a first content identification, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, by using a first device. The method may be comprising the steps of the second device sending the second identifier to the first server; in response to receiving the second identifier, the first server storing the second identifier; the first device sending a first request to the first server; in response to receiving the first request, the first server sending the second identifier to the first device; the first device sending a second request to the second device using the second identifier, the second request includes the first content identification and the third identifier; in response to receiving the second request, the second device sending the first content identification to the second server using the third identifier; in response to receiving the first content identification, the second server sending the first content to the second device; and in response to receiving the first content, the second device sending the first content to the first device.

The method may further comprise the following steps of the first device sending the first content identification to the second server using the third identifier; and in response to receiving the first content identification, the second server sending the first content to the first device. These steps may be performed before, after, or concurrently (using multitasking or multiprocessing) with any of the former steps.

The method may further be used with a third device identified in the Internet by a fourth identifier, and may further comprise the steps of the third device sending the fourth identifier to the first server; in response to receiving the fourth identifier, the first server storing the fourth identifier; in response to receiving the first request, the first server sending the fourth identifier to the first device; the first device sending a third request to the third device using the fourth identifier, the third request includes the first content identification and

US 9,241,044 B2

53

the third identifier; in response to receiving the third request, the third device sending the first content identification to the second server using the third identifier; in response to receiving the first content identification, the second server sending the first content to the third device; and in response to receiving the first content identification, the third device sending the first content to the first device. These steps may be performed before, after, or concurrently (using multitasking or multiprocessing) with any of the former steps.

The method may further be used with a group consisting of a plurality of devices, each associated with a respective identifier for being identified in the Internet, for each of the devices in the group the method further comprising the steps of the group device sending the associated identifier to the first server; and in response to receiving the associated identifier, the first server storing the associated identifier. Further, in response to receiving the first request, the first server may be sending the identifiers of all the devices in the group to the first device. The method may further comprise the steps of the first device sending a third request to the group device using the device associated identifier, the third request includes the first content identification and the third identifier; in response to receiving the third request, the group device sending the first content identification to the second server using the third identifier; in response to receiving the first content identification, the second server sending the first content to the group device; and in response to receiving the first content, the group device sending the first content to the first device.

The second device may be included as part of the group, and the method may further comprise a step of selecting the second device out of the devices in the group. The first server may select the second device out of the devices in the group, and in the first server may send the second identifier to the first device in response to the selection. Further, the first server may send the identifiers of all the devices in the group to the first device, followed by a step of the first device selecting the second device. Further, the method may include a step of selecting one or more devices, distinct from the second device, out of the devices in the group.

The second device may be randomly selected out of the devices in the group using one or more random numbers generated by a random number generator. The random number generator may be hardware based using thermal noise, shot noise, nuclear decaying radiation, photoelectric effect, or quantum phenomena. Alternatively or in addition, the random number generator may be software based, based on executing an algorithm for generating pseudo-random numbers. The second device may be selected based on attributes or characteristics of the device.

The second device may be selected based on the physical geographical location, and the method may comprise for each of the devices in the group the step of sending the device physical geographical location to the first server, followed by the step of the first server storing the received group device physical geographical location. The physical geographical location may include at least one out of a continent, a country, a state or province, a city, a street, a ZIP code, or a longitude and a latitude. The second device may be selected based on the physical geographical proximity to the second server.

The second device may be selected based on the second identifier, the second identifier may be an IP address, and the second device may be selected based on its IP address. Alternatively or in addition, the second device may be selected based on comparing the second identifier to the third identifier. Alternatively or in addition, the second device may be selected based on past activities, such as based on the timing of an event. The event may be a last or previous communica-

54

tion between the second device and the first device, the last communication between the second device and the first server, or the last communication between the second device and the second server. These steps may be performed before, after, or concurrently (using multitasking or multiprocessing) with any of the former steps.

Each of the identifiers herein may be a URL or an IP address in IPv4 or IPv6 form. Any one of the servers herein may be a web server using Hyper Text Transfer Protocol (HTTP) that responds to HTTP requests via the Internet, and any request herein may be an HTTP request. Any communication herein may be based on, or according to, TCP/IP protocol or connection, and may be preceded by the step of establishing a connection, such as an 'Active OPEN' or a 'Passive OPEN'. Alternatively or in addition, any communication herein may be based on, or use a VPN or a tunneling protocol. Any content herein may include, consist of, or comprise, part or whole of files, text, numbers, audio, voice, multimedia, video, images, music, or computer program, or may include, consists of, or comprise, a part of, or a whole of, a website page.

The method may be used for fetching over the Internet a second content, identified by a second content identification, by a third device identified in the Internet by a fourth identifier, from a third server identified in the Internet by a fifth identifier, via the first device, and may further comprising the steps of the third device sending a third request to the first server; in response to receiving the third request, the first server sending the first identifier to the third device; the third device sending a fourth request to the first device using the first identifier, the fourth request includes the second content identification and the fifth identifier; in response to receiving the fourth request, the first device sending the second content identification to the third server using the fifth identifier; in response to receiving the second content identification, the third server sending the second content to the first device; and in response to receiving the second content, the first device sending the second content to the third device. The third server may be distinct from, or the same device as, the second server. The third device may be distinct from, or the same device as, the second device. The second content may be distinct from, or the same content as, the first content.

A client device may be a first device identified in the Internet by a first identifier, executing a method for fetching over the Internet a first content, identified by a first content, from a second server identified in the Internet by a third identifier, via a second device identified in the Internet by a second identifier, using a first server. The method may include the steps of sending the first identifier to the first server; sending a first request to the first server; receiving the second identifier from the first server; sending a second request to the second device using the second identifier, the second request includes the first content identification and the third identifier; and receiving the first content from the second device. The method may further comprising of the step of sending the first content identification to the second server using the third identifier. These steps may be performed before, after, or concurrently (using multitasking or multiprocessing) with any of the former steps.

The method may further be used with a third device identified in the Internet by a fourth identifier, and may further comprise the steps of receiving the fourth identifier from the first server; sending a third request to the third device using the fourth identifier, the third request includes the first content identification and the third identifier; and receiving the first content from the third device. These steps may be performed

US 9,241,044 B2

55

before, after, or concurrently (using multitasking or multipro-cessing) with any of the former steps.

The method may further be used with a group consisting of a plurality of devices, each device in the group may be asso-ciated with a respective identifier for being identified in the Internet, and may further comprise the steps of receiving the identifiers of the group devices from the first server; sending a third request to the group devices using their associated identifiers, the third request includes the first content identi-fication and the third identifier; and receiving the first content from the group devices. The second device may be included in the group, and the method may further comprise a step of selecting the second device out of the devices in the group, or the step of selecting one or more devices, distinct from the second device, out of the devices in the group.

The method may further be used for fetching over the Internet a second content, identified by a second content identification, by a third device, identified in the Internet by a fourth identifier, from a third server identified in the Internet by a fifth identifier, via the first device. The method may further comprise steps of receiving a third request from the third device, the third request includes the second content identification and the fifth identifier; in response to receiving the third request, sending the second content identification to the third server using the fifth identifier; receiving the second content from the third server; and in response to receiving the second content, sending the second content to the third device using the fourth identifier. The third server may be distinct from the second server, or the third server and the second server are the same server. The second content may be distinct from the first content, or the second content and the first content may be the same content.

A tunnel device may be identified in the Internet by a second identifier execute a method for fetching over the Inter-net a first content, identified by a first content identification, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier using a first server. The method may comprise the steps of sending the second identifier to the first server; receiving a second request from the first device, the second request includes the first content identification and the third identifier; in response to receiving the second request, send-ing the first content identification to the second server using the third identifier; receiving the first content from the second server; and in response to receiving the first content, sending the first content to the first device using the first identification.

An acceleration server may execute a method for fetching over the Internet a first content, identified by a first content identification, by a first device identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier. The method may comprise steps of receiving the second identifier from the second device; in response to receiving the second identifier, storing the second identifier; receiving a first request from the first device; and in response to receiving a first request, sending the second identifier to the first device. The method may further be used with a third device identified in the Internet by a fourth identifier, and may comprise the steps of receiving the fourth identifier from the third device; in response to receiving the fourth identifier, storing the fourth identifier; and in response to receiving the first request, sending the fourth identifier to the first device.

The method may further be used with a group consisting of a plurality of devices; each device in the group may be asso-ciated with a respective identifier for being identified in the Internet, for each of the group devices in the group. The

56

method may comprise steps of receiving the associated iden-tifier from the group device; in response to receiving the associated identifier, storing the associated identifier; and in response to receiving the first request, sending the identifier of all group devices to the first device. The second device may be included as part of the group, and the method may further comprise the step of selecting the second device out of the devices in the group, and the sending the second identifier to the first device may be in response to the selection.

A method is disclosed for fetching a content over the Inter-net by a first device identified in the Internet by a first iden-tifier, from a first server identified in the Internet by a second identifier via a group of multiple devices each identified in the Internet by an associated group device identifier. The method may comprise a step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and identified using a content slice identifier. For each of the content slices, the method may comprise steps of selecting a device from the group; the first device sending a first request to the selected device using the selected device identifier, the first request including the content slice identi-fier and a second identifier; in response to receiving the first request, the selected device sending a second request to the first server using the second identifier; in response to receiving the second request, the first server sending the content slice to the selected device; and in response to receiving the content slice, the selected device sending the content slice to the first device.

The content may be composed of bits, nibbles, bytes, char-acters, words, or strings, and the partitioning may be based on bit, nibble, byte, multi-byte, number, character, word, or string level, or may be composed of files, or programs, and the partitioning may be based on file or program level. Alterna-tively or in addition, the content may be a website content comprising multiple webpages, and the partitioning may be based webpages level. All the parts of the content may be included in all of the content slices. All of the content slices may be having a same size. A part of the content may be included in two or more content slices. The partitioning may be sequential or non-sequential in the content. The number of content slices may be equal to, higher than, or lower than, the number of devices in the group. A distinct device may be selected for each content slice

A method to be executed by a device is disclosed for fetching a content over the Internet from a first server identi-fied in the Internet by a second identifier via a group of multiple devices each identified in the Internet by an associ-ated group device identifier, the method comprising a step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and iden-tified using a content slice identifier. For each of the content slices, the method may comprise steps of selecting a device from the group; sending a first request to the selected device using the selected device identifier, the first request including the content slice identifier and the second identifier; receiving the content slice from the selected device; and constructing the content from the received content slices.

A method is disclosed for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identi-fier, using a first server. The method may comprise the steps of the second device sending the second identifier to the first server; in response to receiving the second identifier, the first server storing the second identifier; the first device sending a

US 9,241,044 B2

57

first request to the first server; in response to receiving the first request, the first server sending the second identifier to the first device; the first device sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier; in response to receiving the second request, the second device sending the first content identifier to the second server using the third identifier; in response to receiving the first content identifier, the second server sending the first content to the second device; and in response to receiving the first content, the second device sending the first content to the first device. Alternatively or in addition, the method may comprise the additional steps of the first device sending the first content identifier to the second server using the third identifier; and in response to receiving the first content identifier, the second server sending the first content to the first device. These additional steps may precede any of the other steps, follow any of the other steps, or may be executed simultaneously with any one of the other steps using multitasking or multi-processing.

Alternatively or in addition, the method may be for use with a third device identified in the Internet by a fourth identifier, and may further comprising the steps of the third device sending the fourth identifier to the first server; in response to receiving the fourth identifier, the first server storing the fourth identifier; in response to receiving the first request, the first server sending the fourth identifier to the first device; the first device sending a third request to the third device using the fourth identifier, the third request includes the first content identifier and the third identifier; in response to receiving the third request, the third device sending the first content identifier to the second server using the third identifier; in response to receiving the first content identifier, the second server sending the first content to the third device; and in response to receiving the first content, the third device sending the first content to the first device.

Alternatively or in addition, the method may be for use with a group consisting of a plurality of devices, each associated with a respective identifier for being identified in the Internet, for each of the devices in the group, and the method may further comprise the steps of the group device sending the associated identifier to the first server; and in response to receiving the associated identifier, the first server storing the associated identifier. Alternatively or in addition, the method may comprise the step of in response to receiving the first request, the first server sending the identifiers of all the devices in the group to the first device. Alternatively or in addition, for each of the group devices in the group, the method may further comprise the steps of the first device sending a third request to the group device using the device associated identifier, the third request includes the first content identifier and the third identifier; in response to receiving the third request, the group device sending the first content identifier to the second server using the third identifier; in response to receiving the first content identifier, the second server sending the first content to the group device; and in response to receiving the first content, the group device sending the first content to the first device.

The second device may be included in the group, the method may further comprise the step of selecting the second device out of the devices in the group by the first server, and the first server may be sending the second identifier to the first device in response to the selection. Alternatively or in addition, the method may comprise the step of the first server may be sending the identifiers of all devices and the group to the first device, followed by a step of the first device selecting the second device. Alternatively or in addition, the method may

58

comprise the step of selecting 2, 3, 4, 5, 6, 7, 8, 9, 10, or more than 10 devices, distinct from the second device, out of the devices in the group. The second device may be randomly selected out of the devices in the group, such as being randomly selected using one or more random numbers generated by a random number generator. The random number generator may be software based, such as based on executing an algorithm for generating pseudo-random numbers. Alternatively or in addition, the second device may be selected based on attributes or characteristics of the device, or based on the device physical geographical location. Further, for each of the devices in the group, the method may comprise the steps of sending the device physical geographical location to the first server, followed by the step of the first server storing the received group device physical geographical location. The physical geographical location may include a continent, a country, a state or province, a city, a street, a ZIP code, or longitude and latitude, and the second device may be selected based on the physical geographical proximity to the second server. The second device may be selected based on the second identifier that may be an IP address, and the second device may be selected based on its IP address, or the second device may be selected based on comparing the second identifier to the third identifier. Alternatively or in addition, the second device may be selected based on past activities, or based on the timing of an event, wherein the event may be the last communication between the second device and the first device, may be the last communication between the second device and the first server, or may be the last communication between the second device and the second server.

The method may be used for fetching over the Internet a second content, identified by a second content identifier, by a third device, identified in the Internet by a fourth identifier, from a third server identified in the Internet by a fifth identifier, via the first device, the method further comprising the steps of the third device sending a third request to the first server; in response to receiving the third request, the first server sending the first identifier to the third device; the third device sending a fourth request to the first device using the first identifier, the fourth request includes the second content identifier and the fifth identifier; in response to receiving the fourth request, the first device sending the second content identifier to the third server using the fifth identifier; in response to receiving the second content identifier, the third server sending the second content to the first device; and in response to receiving the second content, the first device sending the second content to the third device. The third server may be distinct from, or the same as, the second server, the third device may be distinct from, or the same as, the second device, and the second content may be distinct from, or the same as, the first content. The method may further comprise the steps of the first device receiving the first content from the second device; and the first device storing the first content in a memory.

Further, a method is disclosed for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server. The method may comprise the steps of sending the first identifier to the first server; sending a first request to the first server; receiving the second identifier from the first server; sending a second request to the second device using the second identifier, the second request includes first content identifier and the third identifier; and receiving the first content from the second device. The method may be further for use with a third device identified in the Internet by

US 9,241,044 B2

59

a fourth identifier, and may further comprise the steps of receiving the fourth identifier from the first server; sending a third request to the third device using the fourth identifier, the third request includes the first content identifier and the third identifier; and receiving the first content from the third device.

The method may further for use with a group consisting of a plurality of devices, each device in the group may be associated with a respective identifier for being identified in the Internet, and may further comprise the steps of receiving the identifiers of the group devices from the first server; sending a third request to the group device using their associated identifiers, the third request includes the first content identifier and the third identifier; and receiving the first content from the group devices. The second device may be included in the group, and the method may further comprise the step of selecting the second device out of the devices in the group. Further, one or more devices, distinct from the second device, may be selected out of the devices in the group. The second device may be randomly selected out of the devices in the group, may be selected based on attributes or characteristics of the device. Alternatively or in addition, the selection may be based on a physical geographical location, such as on the physical geographical proximity to the second server. Further, the second device may be selected based on the second identifier, based on past activities, or based on the timing of an event.

Further, the method may be for fetching over the Internet a second content, identified by a second content identifier, by a third device, identified in the Internet by a fourth identifier, from a third server identified in the Internet by a fifth identifier, via the first device, the method may further comprise the steps of receiving a third request from the third device, where the third request includes the second content identifier and the fifth identifier; in response to receiving the third request, sending the second content identifier to the third server using the fifth identifier; receiving the second content from the third server; and in response to receiving the second content, sending the second content to the third device using the fourth identifier. The third server may be distinct from, or same as, the second content. The second content may be distinct from, or same as, the first content.

A method is disclosed for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server. The method may comprise the steps of sending the second identifier to the first server; receiving a second request from the first device, the second request includes the first content identifier and the third identifier; in response to receiving the second request, sending the first content identifier to the second server using the third identifier; receiving the first content from the second server; and in response to receiving the first content, sending the first content to the first device using the first identifier.

A method is disclosed for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method may comprise the steps of receiving the second identifier from the second device; in response to receiving the second identifier, storing the second identifier; in response to receiving a first request from the first device; and in response to receiving a first request, sending the second identifier to the first device. The method may for use with a third device identified in the Internet by a fourth identifier, and may

60

further comprise the steps of receiving the fourth identifier from the third device; in response to receiving the fourth identifier, storing the fourth identifier; and in response to receiving the first request, sending the fourth identifier to the first device. The method may be used with a group consisting of a plurality of devices; each device in the group may be associated with a respective identifier for being identified in the Internet. For each of the group devices in the group, the method further comprising the steps of receiving the associated identifier from the group device; in response to receiving the associated identifier, storing the associated identifier; and in response to receiving the first request, sending the first request sending the first identifier of all group devices to the first device.

A method is disclosed for fetching a content over the Internet by a first device identified in the Internet by a first identifier, from a first server identified in the Internet by a second identifier is a group of multiple devices, each identified in the Internet by an associated group device identifier, the method comprising the step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and identified using a content slice identifier, and for each of the content slices. The method may comprise the steps of selecting a device from the group; the first device sending a first request to the selected device using the selected device identifier, the first request including the content slice identifier and the second identifier; in response to receiving the first request, the selected device sending a second request to the first server using the second identifier, the second request including the content slice identifier; in response to receiving the second request, the first server sending the content slice to the selected device; and in response to receiving the content slice, the selected device sending the content slice to the first device.

A method is disclosed for fetching a content over the Internet from a first server identified in the Internet by a second identifier via a group of multiple devices, each identified in the Internet by an associated group device identifier, the method may comprise the step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and identified using a content slice identifier. For each of the content slices, the method may comprise the steps of selecting a device from the group; sending a first request to the selected device using the selected device identifier, the first request including the content slice identifier and the second identifier; receiving the content slice from the selected device; and constructing the content from the received content slices.

A content herein may be composed of bits, nibbles, bytes, characters, words, or strings, and the partitioning may be based on bit, nibble, byte, multi-byte, number, character, word, or string level. Alternatively or in addition, a content herein may be composed of files or programs, and the partitioning may be based on file or program level. Further, the content may be a website content comprising multiple webpages, and the partitioning may be based on webpages level. All parts of the content may be included in all of the content slices, and two or more, or all of the content slices, may be having the same size. Two or more of the content slices may include the same information. Further, the same part of the content may be included in two or more content slices. The partitioning may be sequential or non-sequential in the content, and the number of the content slices may be equal to, higher than, or lower than, the number of devices in the group. A distinct device may be selected for each content slice.

The first device may consist of, comprise, or be part of, any network element. In one example, the first device may consist

US 9,241,044 B2

61

of, comprise, or be part of, a client device, such as the client device #1. The first server may consist of, comprise, or be part of, any network element. In one example, the first server may consist of, comprise, or be part of, the acceleration server. The second server may consist of, comprise, or be part of, any network element. In one example, the second server may consist of, comprise, or be part of, a data server, such as the data server #1. The third server may consist of, comprise, or be part of, any network element. In one example, the third server may consist of, comprise, or be part of, a data server, such as the data server #2. The second device may consist of, comprise, or be part of, any network element. In one example, the second device may consist of, comprise, or be part of, a tunnel device, such as the tunnel device #1. The third device may consist of, comprise, or be part of, any network element. Alternatively or in addition, the third device may consist of, comprise, or be part of, a client device, such as the client device #2.

A method is disclosed for a first device fetching over the Internet a first content, identified by a first content identifier, stored in a first server that may be identified in the Internet by a first identifier, where the first content may be composed of multiple content parts, and each content part may be identified by a respective content part identifier. The method may be for use with a group of devices, each storing a copy of at least one content part and each group device may be identified in the internet by a respective group device identifier, and may be further for use with a second device identified in the Internet by a second identifier and storing the group device identifiers, and furthermore for use with a second server. The method may comprise the steps of the first device sending the first content identifier to the second server; in response to receiving the first content identifier, the second server sending the second identifier to the first device; the first device sending the first content identifier to the second device using the second identifier; and in response to receiving the first content identifier, the second device sending the group devices identifiers to the first device. Further, for each one out of the group devices identifiers, the method may comprise the steps of the first device sending a content part identifier to the group device using the group device identifier; and in response to receiving the content part identifier, the group device sending the content part identified by the content part identifier to the first device.

The first device may consist of, comprise, or be part of, any network element. In one example, the first device may consist of, comprise, or be part of, a client device, such as the client device #1. The first server may consist of, comprise, or be part of, any network element. In one example, the first server may consist of, comprise, or be part of, the acceleration server. The second server may consist of, comprise, or be part of, any network element. In one example, the second server may consist of, comprise, or be part of, a data server, such as the data server #1. The third server may consist of, comprise, or be part of, any network element. In one example, the third server may consist of, comprise, or be part of, a data server, such as the data server #2. The second device may consist of, comprise, or be part of, any network element. In one example, the second device may consist of, comprise, or be part of, a tunnel device, such as the tunnel device #1. Any device may consist of, comprise, or be part of, any network element. Alternatively or in addition, a group device may consist of, comprise, or be part of, a peer device, such as the peer device #2.

The first server may be a web server, and the first content may be a web-site, a web-page, or a URL, and the first content identifier may be an IP address, URL, or an HTTP header. The

62

first identifier may be the first server IP address, the second identifier may be the second IP address, and each of the group devices identifier may be an IP address or the respective group device. The first content may be composed of bits, nibbles, bytes, characters, words, or strings, and the content parts may be based on bit, nibble, byte, multi-byte, number, character, word, or string level partitioning of the first content, and the first content may include, consist of, or comprise, part or whole of files, text, numbers, audio, voice, multimedia, video, images, music, or computer program. Alternatively or in addition, the first content may include, be composed of, consist of, or comprise, a part of, or a whole of, files or programs, and the content parts may be based on file level or program level partitioning of the first content. Further, the first content may be a website content comprising multiple webpages, and the content parts may be based on webpages level partitioning of the first content. All the components of the first content may be included in all of the content parts. The method may further comprise the step of the first device reconstructing the first content from the received multiple content parts. Part of, or all of, the content parts may be having the same size, that may be 8 KB, 16 KB, 32 KB, or 64 KB. Two or more content parts may be identical and may contain the same data. A same portion of the first content may be included in two or more content parts. The content parts may be a result of a sequential, or a non-sequential, partitioning of the first content. The number of content parts may be equal to the number of group devices in the group. Each of the content part identifiers may be a hash value that may be the result of a hash function of the respective data in the content part, such as a checksum or CRC of the respective data in the content part. The CRC may be CRC-8, CRC-16, CRC-32, or CRC-64.

The method may further comprise the steps of the first device sending the first content identifier to the first server using the first identifier; and in response to receiving the first content identifier, the first server may be sending the part of, or the whole of, the first content to the first device. These steps may precede, follow, or be executed concurrently, with any one of the previously mentioned steps, using multitasking or multiprocessing.

The method may be for use with a second group consisting of a plurality of devices, each associated with a respective identifier for being identified in the Internet, the second group including the second device, wherein in response to receiving the first content identifier, the second server sending the identifiers of all devices in the second group to the first device, and may further comprise the step of selecting the second device from the second group. The second device may be randomly selected out of the devices in the group, using one or more random numbers generated by a random number generator. The random number generator may be hardware based, and may be using thermal noise, shot noise, nuclear decaying radiation, photoelectric effect, or quantum phenomena. Alternatively or in addition, the random number generator may be software based, and may be based on executing an algorithm for generating pseudo-random numbers. Alternatively or in addition, the second device may be selected based on attributes or characteristics of the device. Further, the second device may be selected based on the physical geographical location, and the method may further comprise for each of the devices in the second group, the steps of sending the device physical geographical location to the first device, followed by the step of the first device storing the received second group devices physical geographical location. The physical geographical location may include a continent, a country, a state or province, a city, a street, or a ZIP code, as well as longitude

US 9,241,044 B2

63

and latitude. Furthermore, the second device may be selected based on the physical geographical proximity to the first device.

Alternatively or in addition, the second device may be selected based on the second identifier, which may be an IP address, where the second device may be selected based on its IP address, or based on comparing the second identifier to a first device identifier. Further, the second device may be selected based on past activities, or based on the timing of an event, such as the last communication between the second device and the first device. Furthermore, the second device may be selected based on the ISP used to connect the second device to the Internet.

One or more of the group devices may be storing the first content. Alternatively or in addition, all of the group devices may be storing the first content. Alternatively or in addition, at least one of, or all of, the group devices may be storing only one content part. Each of the identifiers may be an IP address (such as in IPv4 or IPv6 form) or a URL. At least one of the servers may be a web server using HyperText Transfer Protocol (HTTP) that responds to HTTP requests (such as the first and second requests) the via the Internet. Further, the communication with the second server may be based on, or using, HTTP persistent connection. Furthermore, the communication with the first device, the second device, one of the group devices, the first server, or the second server, may be based on, or may be according to, TCP/IP protocol or connection.

The method may further comprise the step of establishing a connection between the first device and the second device in response to receiving the second identifier, and the first device may be communicating with the second device over the established connection. Further, the first device may be communicating with the second device using TCP, wherein the connection may be established by performing 'Active OPEN' or 'Passive OPEN'. Alternatively or in addition, the first device may be communicating with the second device using a VPN or a tunneling protocol, and the connection may be established using authentication. Further, the method may comprise the step of establishing a connection between the first device and at least one of the group devices in response to receiving the group devices identifiers. The first device may be communicating with at least one of, or all of, the group devices over established connections. The first device may be communicating with at least one of the group devices using TCP, and the connection may be established by performing 'Active OPEN' or 'Passive OPEN'. Alternatively or in addition, the first device may be communicating with at least one of the group devices using a VPN or using a tunneling protocol. Any of the connections may be using authentication.

The method according may further used with a fourth device fetching over the Internet a second content, identified by a second content identifier, stored in a second server that may be identified in the Internet by a fifth identifier, the second content may be composed of multiple second content parts, each second content part may be identified by a respective second content part identifier, and may be for use with a second group of devices each storing a copy of at least one second content part and each second group device may be identified in the internet by a respective second group device identifier, where the first device may be identified in the Internet by a third identifier. The method may further comprise the steps of the fourth device sending the second content identifier to the second server; in response to receiving the second content identifier, the second server sending the third identifier to the fourth device; the fourth device sending the second content identifier to the first device using the third

64

identifier; and in response to receiving the second content identifier, the first device sending the second group devices identifiers to the fourth device.

The method may further be used with a fourth device fetching over the Internet a second content, identified by a second content identifier, stored in a second server that may be identified in the Internet by a fifth identifier, the second content may be composed of multiple second content parts, each second content part may be identified by a respective second content part identifier, and may be further for use with a second group of devices each storing a copy of at least one second content part and each second group device is identified in the internet by a respective second group device identifier where the first device may be identified in the Internet by a third identifier and may be storing at least one of the second content parts, and may be for use with a fifth device fetching identified in the Internet by a fifth identifier and storing the third identifier. The method may further comprise the steps of the fourth device sending the second content identifier to the second server; in response to receiving the second content identifier, the second server sending the fifth identifier to the fourth device; the fourth device sending the second content identifier to the fifth device using the fifth identifier; in response to receiving the second content identifier, the fourth device sending the third identifier to the fourth device; the fourth device sending the identifier of the at least one second content part stored in the first device to the first device using the third identifier; and in response to receiving the identifier of the at least one second content part, the first device sending the at least one second content part to the fourth device.

The fourth device may consist of, comprise, or be part of, any network element. In one example, the first device may consist of, comprise, or be part of, a client device, such as the client device #1. In one example, the second server may consist of, comprise, or be part of, a data server, such as the data server #2. The fourth device and the second device may be the same device or distinct devices, and the fourth device may be the same as one of the group devices. The fifth device may consist of, comprise, or be part of, any network element. In one example, the fifth device may consist of, comprise, or be part of, an agent device, such as the agent device #2.

The fourth device and the second device may be the same device or distinct devices. The fourth device may be the same as one of the group devices. Further, the fifth device and the second device may be the same device. Alternatively or in addition, the fifth device and the one of the group devices may be the same device.

A method is disclosed for fetching over the Internet a first content, identified by a first content identifier, stored in a first server that may be identified in the Internet by a first identifier, the first content may be composed of multiple content parts, each content part may be identified by a respective content part identifier. The method may be used with a group of devices each storing a copy of at least one content part and each group device may be identified in the internet by a respective group device identifier, may be for use with a second device identified in the Internet by a second identifier and storing the group device identifiers, and may be used with a second server. The method may comprise the steps of sending the first content identifier to the second server; receiving the second identifier from the second server; sending the first content identifier to the second device using the second identifier; and receiving the group devices identifiers from the second device. For each one out of the group devices identifiers, the method may further comprise the steps of sending a content part identifier to the group device using the group device identifier; and receiving from the group device the

US 9,241,044 B2

65

content part identified by the content part identifier. The method may further comprise the steps of sending the first content identifier to the first server using the first identifier; and receiving the part of, or the whole of, the first content, from the first server.

A method is disclosed for a first device fetching over the Internet a first content, identified by a first content identifier, stored in a first server that may be identified in the Internet by a first identifier, the first content may be composed of multiple content parts, each content part may be identified by a respective content part identifier, for use with a group of devices each storing a copy of at least one content part and each group device may be identified in the internet by a respective group device identifier. The method may be used with a second device identified in the Internet by a second identifier and storing the group device identifiers, and may further be for use with a second server. The method may comprise the steps of receiving the group device identifier from the first device; and sending the group devices identifiers to the first device.

A method for a first device fetching over the Internet a first content, identified by a first content identifier, stored in a first server that may be identified in the Internet by a first identifier, the first content may be composed of multiple content parts, where each content part may be identified by a respective content part identifier, is disclosed. The method may comprise the steps of storing a content part identified by a content part identifier; receiving from the first device sending the content part identifier; and in response to receiving the content part identifier sending the content part identified by the content part identifier to the first device.

A method and system using an internet-connected device designated as a tunnel device is disclosed. A tunnel device may receive from a client device a request for content from a data server. Upon receiving such a request, the tunnel device fetches the requested content from the data server and sends the retrieved content to the client device. The request may specify a range of, or any portion of, the content, and then only the specified portion or range is retrieved from the data server and sent to the requesting client device. A tunnel device may open multiple connections when fetching the requested content from the data server. In a case where more connections may be opened for higher loading bandwidth, the client device may send a request to the tunnel device to open more connection with the data server.

The client device may use multiple tunnel devices, and may specify different or the same ranges or portions for each one of the tunnel devices. In a case where the requested content is locally stored in the tunnel device, such as in a local memory, such as a cache, the content is fetched from the local (internal) memory. Multiple tunnel devices, such as 5 tunnel devices, may be selected to be used by the client device, and the client device may request each of the tunnel devices to open more connections to the data server, up to the maximum allowable number of connections. The selection may be based on their proximity to the data server, such as selecting those tunnel devices that are the closest to the data server, based on their geolocation, IP distance, physical location, or the data communication characteristics.

A first network element may request content stored in a second network element over a communication link being part of a network. A time period for fetching the content may be estimated by the first network element by estimating the Bandwidth (BW) and the Round Trip Time (RTT) associated with the content fetching transaction. The estimation of the BW and RTT may use a database that contains information relating to previous interactions with the second network elements. Alternatively or in addition, the estimation of the

66

BW and RTT may use a database that contains information relating to previous interactions with a first group of network elements that are associated with an IP distance lower than, and with a second group of network elements that is associated with an IP distance higher than, the second network element, such as by calculating the average IP distance between the two groups.

A system may comprise a central server and network elements, each of the network elements may be in an 'online' or an 'offline' state. When in the online' state, each of the network elements periodically transmits a message (such as a 'ping') to the central server. In response to receiving the message, the central server determines that the network element from which a message was received in a defined past period is in an 'online' state, and further determines that network elements, from which a message was not received in the defined past period, are in an 'offline' state.

An operating system may send data from an application to network elements using sockets. A method may queue the data to be sent, and transfer the data to a socket that is available for immediate data transfer. The queue may be dynamic and may be part of an added layer to the OS. The added layer may further continuously check the sockets and queues, and upon detecting a queued data and a ready-to-send data socket, the data is un-queued from its dynamic queue and sent through the socket ready for sending. In a case where the application cancels the data sending, data is removed from the respective socket and the respective queue.

In a network element that is connected to a network and includes an operating system and applications, a method by which a program on the network element may provide the communication configuration to the operating system, instead of the operating system getting it from a gateway on the network. The program may communicate with the external gateway to get the configuration information so that it can communicate with other network elements, and provides separate configuration information to the operating system, thereby having the operating system communicate with the program, and the program communicating with the external network elements.

In a scenario where a communication of content between two network elements may use two or more data paths (routes), the content may be concurrently transmitted and received over multiple data paths. In one scenario, one or both of the network elements may connect only via a single data path. A reliability proxy server that is capable of concurrently communicating with one (or both) of the network elements over multiple data paths, may be used. The reliability proxy server serves as a proxy server, and communicate the content with one (or both) of the network elements over multiple data paths.

A timeout period (such as 5 ms, or any period substantially shorter than the defined typical) may be defined for completing a DHCP request. A DHCP request is repeatedly retransmitted to a DHCP server upon each timeout expiration, until a response is received, or until the typical timeout period expires.

A data may be transferred from a first network element to a second network element may involve transporting of a low priority, such as less time critical, meta data. Such meta data may be delayed by the first network element and be sent to the second network element only after higher priority, or more time sensitive, data was sent.

For use with devices such as WiFi access points that requires authentication such as being password protected, a user may try to connect a network element to a device that its password is unknown. The connection may automatically

US 9,241,044 B2

67

guess passwords for the connection, such as passwords that were used to connect to other devices, passwords that are common in the geographical location, or passwords that are common to similar devices from this same manufacturer. A central server (or servers) may store a list of known devices, such as WiFi access points, and their associated authentication methods, and may further store social connections between users. A user connecting to the devices may be prompted to update the central server the authentication information regarding the device and the device associated sharing level with others. A sharing-approved user may fetch the authentication information from the central server for connecting to a device.

A network element may use a hierarchical structure, whereby some of the graphical elements are sons or parents of other elements, for a user interface. If a user drags an object beyond the borders of a parent object, the dragging may be performed by carrying over (inheriting) the dragging to the parent object, and so recursively until reaching a parent that allows the dragging.

A method is disclosed for dictionary-based compression scheme, that may be used with a first device storing a first content in a first memory, and a second device storing a second content in a second memory, and for use with communicating a third content stored in the first device over a network. The method comprising the steps of the first device partitioning at least part of the first content into a plurality of first content slices according to a partitioning scheme; the first device associating a distinct slice identifier for each of the first content slices according to a rule; the second device partitioning at least part of the second content into a plurality of second content slices according to a partitioning scheme; the second device associating a distinct slice identifier for each of the second content slices according to the rule; the first device partitioning at least part of the third content into a plurality of third content slices according to a partitioning scheme. For each one of the third content slices, the method may further comprise the steps of the first device comparing the data in the third content slice to the data in the plurality of the first content slices; the first device sending to the second device over the network the slice identifier of the first content slice that includes the same data as the third content slice; the second device receiving the slice identifiers sent from the first device over the network; and the second device associating second content slices associated with the received slice identifiers. Two of, or all of, the slices may have the same the same size. Two of, or all of, the slices may be the same. The partitioning may be sequential in the respective content.

A method for attribute-based selecting devices by a first device located in a first geographical location, from a group of multiple Internet-connected devices is disclosed, where each of the group devices may be addressable in the Internet by a respective IP address. The method comprising the steps of: obtaining a list of the IP addresses of the devices of the group; determining the geographical location of each of the group devices based on the IP address; associating a value of the attribute for each of the geographical location of each of the group devices; associating a first value of the attribute for the first geographical location; and selecting one or more devices from the group based on comparing the values of the group devices to the first value. A single device or multiple devices may be selected, associated with the first value or having a value close to the first value. The geographical location may consist of, or comprise, a continent, a country, a region, a city, a street, a ZIP code, or a timezone. The determining of the

68

geographical location of each of the group devices may be based on a geolocation, such as based on W3C Geolocation API.

The method may be used with a database associating IP addresses to geographical locations, wherein the determining of the geographical location of each of the group devices based on the IP address may be using the database. The database may be stored in the first device or may be stored in a server accessible via the Internet, where the geographical location may be determined by the first device sending the IP addresses of the group devices to the server over the Internet; in response to receiving the IP addresses, the server sending the database associated physical locations to the first device; and the first device receiving the physical locations from the server. The attribute may relate to people or society, such as language, sport, demographics. or religion, or may be demographic based, such as culture, race, ethnicity, population, age structure, population growth rate, death rate, birth rate, migration rate, sex ratio, life expectancy, or health expenditures. The attribute may be economy related, such as Gross Domestic Product (GDP), GDP per capita (PPP), gross national saving, agriculture products, industry types, labor force, unemployment rate, household income or consumption by percentage share, Government budget, taxes and other revenues, inflation rate (consumer prices), export/import of goods and services, household consumption, government consumption, or investment in fixed capital. The attribute may relate to geography, such as climate, coastline, terrain, natural resources, and environment.

A method is disclosed for a first device fetching over the Internet a first content having a size X and identified by a first content identification, the first content may be stored in a second device that is identified in the Internet by a second identifier. The first device may be identified in the Internet by a first identifier, and the method may comprise the steps of the first device sending the first identifier and the first content identification to the second device; in response to receiving the first identifier and the first content identification, the second device sending the first content to the first device using the first identifier; the first device starting to receive the first content from the second device; the first device ending to receive the first content from the second device; the first device measuring an Round Trip Time (RTT) as a first time interval between the sending of the first identifier and the starting to receive the first content from the second device; the first device measuring a second time interval (T) between the starting and the ending of receiving the first content from the second device; and the first device calculating the bandwidth (BW) as X/T.

The method may further comprise the step of the first device storing in a memory the RTT and the BW, or the step of the first device sending the RTT and the BW to the second device. The method may be used with a second content having a size Y identified by a second content identification stored in the second device, and the method may further comprise the step of estimating a third time interval between a sending of the first identifier to the second device and an ending to receive the second content from the second device, where the third time interval may be estimated to be RTT+Y/ BW.

A method is disclosed for a first device fetching over the Internet a first content having a size X identified by a first content identification, for use with a group of group devices, each of the group devices storing the first content and each identified in the Internet by a respective group device identifier. Each of the group devices may be associated with a respective Round Trip Time (RTT) and a respective band-

US 9,241,044 B2

69

width (BW), and the method may comprise the steps of for each one of the group devices, estimating the time interval for fetching the first content from the group device using the RTT and BW; selecting the group device having the lowest estimated time interval; the first device sending the first identifier and the first content identification to the selected group device; and in response to receiving the first identifier and the first content identification, the selected group device sending the first content to the first device using the first identifier. The method may further comprise the steps of the first device starting to receive the first content from the selected group device; the first device ending to receive the first content from the selected group device; the first device measuring a Round Trip Time (RTT) as a first time interval between the sending of the first identifier and the starting to receive the first content from the selected group device; the first device measuring a second time interval (T) between the starting and the ending of receiving the first content from the selected group device; and the first device calculating the bandwidth (BW) as X/T. Further, the method may further comprise the step of associating the measured RTT and the calculated BW with the selected group device, and the step of the first device storing in a memory the measured RTT and the calculated BW. Alternatively or in addition, the method may further comprising the step of the first device sending the measured RTT and the calculated BW to the selected group device, wherein the time interval for each group device is estimated using the RTT and the BW associated with the group device, and is calculated as RTT+X/BW.

A method is disclosed for fetching to a first device a content having a size X from N multiple locations each storing a copy of a part of, or the entire of, the content. The method may comprise for each location designated as i ($1 \leq i \leq N$) the steps of obtaining the Round Trip Time (RTTi), wherein the RTTi is the time interval between a sending of a request to the i location and a starting to receive part of the first content from the i location; obtaining the Bandwidth (BWi), wherein the BWi is the rate of receiving data after the starting to receive from the i location; and designating Ti as Ti=RTTi+Xi/BWi, wherein Xi is the size of part of the content fetched from the i location. The method may further comprise the steps of non-overlapping partitioning of the content into N partitions, wherein the size of each partition is designated as Xi, so that for i=1 to N, $\Sigma Xi=X$; the first device fetching the partitions from the N locations; and the first device assembling the content from the received partitions. The content may be stored in a device in each location, and the first device and the location devices may be interconnected via a digital network, such as the Internet.

The partitioning may be based on the RTTi values, may be based on BWi, or may be based on both BWi and RTTi of all of the locations. The partitioning may be based on calculating the maximum or minimum value of Ti for all locations. Alternatively or in addition, the partitioning may be based on minimizing the maximum value of Ti for all locations, and may be calculated at the first device according to: Xi=BWi* [(X+$\Sigma$RTTi*BWi)/($\Sigma$BWi)−RTTi]. The RTTi and the BWi values may be stored in the first device, and may be based on previous communication with the locations. A non-transitory computer-readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform at least part of, or all of, the above steps.

The first device may consist of, comprise, or be part of, any network element. In one example, the first device may consist of, comprise, or be part of, a client device, such as the client device #1. The second device, or each of the group devices, may consist of, comprise, or be part of, any network element.

70

In one example, the second device, or each of the group devices, may consist of, comprise, or be part of, a tunnel device, such as the tunnel device #1 or the tunnel device #2.

A method for improving the fetching of a content from a first server over the Internet, for use with a second server distinct from the first server identified in the Internet by an identifier, is described. The method may comprise the steps of the application sending a first message to the second server; intercepting the first message to the second server; obtaining a second message based on the first message and on the identifier; returning the second message to the application; and in response to receiving the second message, the application sending a request for the content to the first server. The interception may be by hooking to the application, may be in a filter driver form, or may use an Inter-Process Communication (IPC). The IPC may use, or be based on, a file sharing, a signal, a socket, a pipe, a message queue, a shared memory, a semaphore, memory mapped file, a clipboard, a Component Object Model (COM), a data copy, a DDE protocol, or mailslots.

The application may be a web browser that consists of, comprises, or may be based on, Microsoft Internet Explorer, Google Chrome, Opera™, or Mozilla Firefox®. The web browser may be a mobile web browser, which consists of, comprises of, or may be based on, Safari, Opera Mini™, or Android web browser. The identifiers may be an IP address (in IPv4 or IPv6 form), or a URL.

The first message may be a web analytic related message, and the second server may be a web analytic server, such as Google Analytics server. The second message may be the same as, or based on, a response to the first message from the web analytic server. The method may use a database storing a list of typical responses from a web analytic server, and the second message may be obtained from the database. The method may comprise the step of blocking the sending of the first message to the second server, and the step of receiving a response from the second server. The method may use a database storing a list of typical responses from a web analytic server, and may further comprise the step of storing the response from the second server in the database.

A system is disclosed comprising multiple Internet-connected network elements, designated as peer devices, where each of the peer devices may store only a portion of a file (or other content) ('chunks') in its cache memory. Network elements, designated as client devices, may use the peer devices for fetching the portions of the file therefrom, and reconstructing the entire file. The system may consist, may include, may be based on, or may be part of, the system described in the '604 patent. A same portion of the file may be stored in two or more peer devices, each may be associated with a BW and RTT (where BW is the bandwidth of a peer device to the client device connection and RTT is the round trip time from a peer device to the client and back), and the peer device associated with the highest BW/RTT may be selected to provide the portion of the file. Alternatively or in addition, the number of portions allocated to be fetched from a peer device is based on, or pro-rata to, the respective peer device BW/RTT.

The system may further comprise multiple Internet-connected network elements, designated as agent devices, which store in their memory information regarding which peer devices are storing which portions of the file, and further store which client devices requested which files, so that client devices may serve as peer devices for providing the portions of file that they have fetched. After a client device completes

Case 2:18-cv-00483-JRG    Document 1-1    Filed 11/08/18    Page 174 of 227 PageID #:  202

US 9,241,044 B2

71

the fetching of a file, it may update network elements, such as the agent devices used, regarding the files availability in each of the used peer devices.

An agent device may provide a client device a list of peer devices that may be used for sourcing a part of, or an entire of, the file, and the client device may select five (5) or any other number of peer devices from the list, to fetch data therefrom. The agent device may store a first list of peer devices that may be available for use and storing a part of, or an entire of, the file, and may select from the first list a second list of peer devices to be sent to the client device. The second list may be selected based on the BW/RTT ratio associated with the communication of the respective peer device with the client device, such as selecting the peer devices having the highest ration of BW/RTT. Alternatively or in addition, the second list may be selected based on recent transaction between these peer devices and other client devices, such as selecting only peer devices that completed a successful data transfer. Alternatively or in addition, the second list may be selected based on the geographical distance to the client device.

The number of chunks allocated to the peer devices, to be fetched by a client device from the peer devices, may be set to a same number for all the peer devices. Alternatively or in addition, the number of chunks allocated to the peer devices may be determined by the latency in transporting the chunks to the client device, such as based on estimating the BW/RTT between the peer devices to the client device.

A client device may send out the request for a list of agent devices also to other network elements that the client device has communicated with in the past, so that if these elements have knowledge of any agent devices that may provide the information about the applicable peer devices, such an agent devices list will be sent to the client device. If these network elements themselves have knowledge of peer devices (including themselves) that might provide portions of the data required by the client device, they might provide themselves as an agent devices to the client device. Further, the client device may fetch information from a peer device regarding available agent devices, such as agent devices that were previously used with the data server. Alternatively or in addition, the client device may request a list of agent devices from an acceleration server.

A client device may request a list of peer devices from an agent device. If the requested data or file, in part or in whole, is stored in the agent device, the agent device may provide that data or file directly to the client device, instead of providing the meta data about the file to the client device. Alternatively or in addition, the agent device may provide that data or file directly to the client device only when the file is below a certain size, such as 16 KB. In a case where a client device fetches the required file from any other source, and that file is below that certain size, the client device may update and send the file to be stored in the agent devices, so that the data may be later provided to a client device.

A client device may receive and use a list of agent devices for a specific transaction, and when the network is idle, the client device may update the acceleration server regarding the used agent devices, allowing the acceleration server to later recommend or use these agent devices. The updating of the acceleration server may include the IP address of each of the agent devices, the communication session information such as RTT, BW and speed, the ports used in the communication sessions, the latency and speed for each of the connection phases, and whether the required file or data was stored in each of the agent devices. The acceleration server may use this information to decide which agent devices to recommend and include in a future agent devices list requested by client

72

devices. A client device may receive and use a list of peer devices for a specific transaction (such as from an agent device), and when the network is idle, the client device may update the acceleration server, agent devices, or both, regarding the used peer devices, allowing the acceleration server or the agent devices to later recommend or use these peer devices. The updating of the acceleration server or the agent devices may include the IP address of each of the peer devices, the communication session information such as RTT, BW and speed, the ports used in the communication sessions, the latency and speed for each of the connection phases, and whether the required file or data was stored in each of the peer devices. The acceleration server or the agent devices may use this information to decide which peer devices to recommend and include in future peer devices list requested, such as by client devices. In a case where an agent device does not store a required information, such as a peer devices list, the client device or the acceleration server may update the agent device with that information after it was obtained. Further, the client device or the acceleration server may update all of the agent devices that were used in a transaction. Such an update may be performed only when the communication is idling.

The acceleration server may periodically review the load of each of the network elements (such as agent devices), and if two network elements are used below a certain threshold of load, it merges the range responsibilities of these network elements. The responsibilities may be the peer devices that the agent device is responsible for serving, or may be the data servers that the agent device is responsible for serving. A network element may log network elements that are accessing it, or may only log a portion of the requests according to a certain algorithm, by which the list of accessing network elements may be representative of all of the requests. The algorithm may be based on logging only the past several requests (such as a last 1000 requests or the requests in the past 5 minutes), or may be based on logging a logarithmically reducing list of random requests.

Upon fetching requested chunks from various sources (such as peer devices) by a client device, some chunks may be larger than a pre-set minimum size. The client device may estimate that one of the sources will complete providing its last chunk much later than all other chunks from the other sources. In such a case, this chunk may be split into smaller sized chunks, such as into half of the original size, and re-distributed between the various sources. The splitting may be only performed if the last chunk is expected to delay the entire file loading by 10% or 50%. A back end module may be used that is based on applying criteria to a request received by a client device. Only requests that meet the criteria may be handled using a handling method associated with the criteria. The criteria may be based on the URL requested, the domain requested, the IP address of the request defined data server, the type of the requested file, the request timing, or the client device geographical location.

Two or more data path may be available for fetching a content. The selection of which data path to use may be based on estimating the time for completing the content fetching for each data path, and may be based on historical data regarding the performance and timing of each stage of part connections of each of the data paths. The times used for each stage may be the top percentile under which most samples fall (e.g., using a sample that is larger than 95% of the other samples). A watermark system may be used to determine a threshold used to prefer and select one scheme over the other. If both data paths estimated performance are below a threshold, both data paths may be simultaneously used.

US 9,241,044 B2

73

In a case where either a peers-using scheme (system or method) or a tunnels-using scheme may be used, the scheme to be used may be selected based on an evaluating the time to completely receive the information using the scheme. The evaluation may be based on data from previous interactions with peer devices and tunnel devices associated with, or in the vicinity of, the available peer devices and tunnel devices. Once the desired scheme is chosen, a timer is set for the expected time to complete the transaction, and if that time plus a margin has passed, both schemes may be selected to operate concurrently. In such a case of simultaneous activation of both schemes, upon receiving the first piece of data by one of the schemes, and if the other scheme is still active, that other scheme is terminated. Alternatively or in addition, upon receiving the last piece by one of the schemes, if the other scheme is still active, it is terminated. Further, upon fetching all requested data, information about all of the participating network elements, including response times for one or more of their functions, is stored for future use, and may further be sent to other network elements in the network for future use.

A method for managing congestion within a group of network elements is disclosed; where a central load-balancing server may identify that an element is congested. If over a certain amount of the network elements within the group are congested, a new network element is added to the group, and if over a certain amount of the network elements has not signaled being congested (such as by sending a message from the congested network elements), the server removes one or more of the network elements from the group. Alternatively or in addition, the signaling to the central load-balancing server may be performed by communication devices that are trying to connect or to use these network elements. The signaling to the central load-balancing server may be performed by the network elements whenever their own resources (such as storage capacity, I/O activity, CPU utilization, or available communication bandwidth) are used over a certain threshold. The central load-balancing server may send a request to the network elements and may mark them as congested, if they do not respond within a determined timeframe to a status request.

Each of the identifiers herein may be an IP address (in IPv4 or IPv6 form) or a URL. Each of the servers may be a web server using HyperText Transfer Protocol (HTTP) that responds to HTTP requests via the Internet, and the first and second requests may be HTTP requests. Each communication with a server may be based on, or using, HTTP persistent connection.

Any communication with a network element, such as with the first device, the second device, the first server, or the second server, may be based on, or be according to, TCP/IP protocol or connection, and may be preceded by the step of establishing a connection. Further, communication between any two network elements, such as between the first device and the second device, may be over the established connection. Any communication between any two network elements may use TCP, and wherein the connection may be established by performing 'Active OPEN' or 'Passive OPEN', may use a VPN, or may use a tunneling protocol. Any content herein, such as the first content, may include, consist of, or comprise, a part or whole of files, text, numbers, audio, voice, multimedia, video, images, music, web-site page, or computer program.

Each of the network elements herein, such as the first, second, and third servers, may store, operate, or use, a server operating system, that may be based on, comprise, or use, Microsoft Windows Server®, Linux, or UNIX, such as Microsoft Windows Server® 2003 R2, 2008, 2008 R2, 2012,

74

or 2012 R2 variant, Linux™ or GNU/Linux based Debian GNU/Linux, Debian GNU/kFreeBSD, Debian GNU/Hurd, Fedora™, Gentoo™, Linspire™, Mandriva, Red Hat® Linux, SuSE, and Ubuntu®; UNIX® variant Solaris™, AIX®, Mac™ OS X, FreeBSD®, OpenBSD, and NetBSD®. Each of the network elements herein, such as the first, second, and third devices, may store, operate, or use, a client operating system, that may consist or, comprise of, or may be based on, Microsoft Windows 7, Microsoft Windows XP, Microsoft Windows 8, Microsoft Windows 8.1, Linux, or Google Chrome OS. The client operating system may be a mobile operating system, such as Android version 2.2 (Froyo), Android version 2.3 (Gingerbread), Android version 4.0 (Ice Cream Sandwich), Android Version 4.2 (Jelly Bean), Android version 4.4 (KitKat)), Apple iOS version 3, Apple iOS version 4, Apple iOS version 5, Apple iOS version 6, Apple iOS version 7, Microsoft Windows® Phone version 7, Microsoft Windows® Phone version 8, Microsoft Windows® Phone version 9, or Blackberry® operating system.

Any method herein may further comprise the step of intercepting a request for a content by a network element, such as the intercepting of the request for the first content by the first device. The request may be initiated in an application (that may be a communications application such as a TCP/IP or HTTP handling application) in a network element such as the first device. The interception may be in the form of a plug-in or an extension of the application, may be by hooking to the application, may be in a filter driver form, or may be using Inter-Process Communication (IPC). The IPC may be using a file sharing, a signal, a socket, a pipe, a message queue, a shared memory, a semaphore, memory mapped file, a clipboard, a Component Object Model (COM), a data copy, a DDE protocol, or mailslots. The application may be a web browser that may be consisting of, comprising of, or may be based on, Microsoft Internet Explorer, Google Chrome, Opera™, or Mozilla Firefox®. Alternatively or in addition, the web browser may be a mobile web browser, that consist of, comprise of, or may be based on, Safari, Opera Mini™, or Android web browser.

Any system or method herein may implement redundancy, where the system or method may include one or more additional identical, similar, or different element, such as using two or more identical or similar slices or any other content parts, using two or more identical or similar network elements performing identical or similar functionalities, using two or more identical or similar hardware pieces performing identical or similar functionalities, or using two or more data-paths transporting identical or similar information. The redundancy may be based on Dual Modular Redundancy (DMR), Triple Modular Redundancy (TMR), Quadruple Modular Redundancy (QMR), 1:N Redundancy, 'Cold Standby', or 'Hot Standby'.

The steps described herein may be sequential, and performed in the described order. For example, in a case where a step is performed in response to another step, or upon completion of another step, the steps are executed one after the other. However, in case where two or more steps are not explicitly described as being sequentially executed, these steps may be executed in any order, or may be simultaneously performed. Two or more steps may be executed by two different network elements, or in the same network element, and may be executed in parallel using multiprocessing or multitasking.

A tangible machine-readable medium (such as a storage) may have a set of instructions detailing part (or all) of the methods and steps described herein stored thereon, so that when executed by one or more processors, may cause the one or more processors to perform part of, or all of, the methods

US 9,241,044 B2

75

and steps described herein. Any of the network elements may be a computing device that comprises a processor and a computer-readable memory (or any other tangible machine-readable medium), and the computer-readable memory may comprise computer-readable instructions such that, when read by the processor, the instructions causes the processor to perform the one or more of the methods or steps described herein.

Any communication or connection herein, such as the connection of peripherals in general, and memories in particular to a processor, and between any two network elements, may use a bus. A communication link (such as Ethernet, or any other LAN, PAN or WAN communication links) may also be regarded as buses herein. A bus may be an internal bus, an external bus or both. A bus may be a parallel or a bit-serial bus. A bus may be based on a single or on multiple serial links or lanes. A bus medium may be electrical conductors based such as wires or cables, or may be based on a fiber-optic cable. A bus topology may use point-to-point, multi-drop (electrical parallel) and daisy-chain, and may be based on hubs or switches. A point-to-point bus may be full-duplex, or half-duplex. Further, a bus may use proprietary specifications, or may be based on, similar to, substantially or fully compliant to an industry standard (or any variant thereof), and may be hot-pluggable. A bus may be defined to carry only digital data signals, or may also defined to carry a power signal (commonly DC voltages), either in separated and dedicated cables and connectors, or may carry the power and digital data together over the same cable. A bus may support master/slave configuration. A bus may carry a separated and dedicated timing signal or may use self-clocking line-code.

The networks or the data paths may be similar, identical or different geographical scale or coverage types and data rates, such as NFCs, PANs, LANs, MANs, or WANs, or any combination thereof. The networks or the data paths may be similar, identical or different types of modulation, such as Amplitude Modulation (AM), a Frequency Modulation (FM), or a Phase Modulation (PM), or any combination thereof. The networks or the data paths may be similar, identical or different types of duplexing such half- or full-duplex, or any combination thereof. The networks or the data paths may be based on similar, identical or different types of switching such as circuit-switched or packet-switched, or any combination thereof. The networks or the data paths may have similar, identical or different ownership or operation, such as private or public networks, or any combination thereof.

Any selection of devices herein, such as the selection of tunnel devices to be used either by a client device or by an acceleration sever, or the selection of agent devices either by a client device or by an acceleration sever, or the selection of peer devices, either by a client device or by an agent device, may be based on one or more of the following: Content URL, such as specific files on the Internet (e.g., "Wikipedia.org/contact.html"), domain name such as specific web sites (e.g., "Wikipedia.org"), data server IP such as specific servers (e.g., server having IP address of "208.80.152.201"), type of file such as specific file types (e.g., ".flv files"), time of day such as specific handling of all files or a group of files during certain hours of the day (e.g., "all files between 11 pm to 4 am"), or geography of the client such as specific handling according to a location of the client device (e.g., "for all Clients in Germany").

The above summary is not an exhaustive list of all aspects of the present invention. Indeed, it is contemplated that the invention includes all systems and methods that can be practiced from all suitable combinations and derivatives of the

76

various aspects summarized above, as well as those disclosed in the detailed description below and particularly pointed out in the claims filed with the application. Such combinations have particular advantages not specifically recited in the above summary.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention is herein described, by way of non-limiting examples only, with reference to the accompanying drawings, wherein like designations denote like elements. Understanding that these drawings only provide information concerning typical embodiments of the invention and are not therefore to be considered limiting in scope:

FIG. 1 illustrates schematically a block diagram of a computer connected to the Internet;

FIG. 2 depicts schematically the Internet and computers connected to the Internet;

FIG. 2a illustrates schematically a structure of an IP-based packet;

FIG. 2b depicts schematically a computerized device communicating with WAPs;

FIG. 3 illustrates schematically a simplified flowchart in a WDM architecture;

FIG. 3a illustrates schematically a simplified flowchart in a Linux architecture;

FIG. 4 illustrates schematically a block diagram of a one-way compression-based communication;

FIG. 4a illustrates schematically a block diagram of a two-way compression-based communication;

FIG. 5 depicts schematically client devices, tunnel devices, and servers connected to the Internet;

FIG. 5a illustrates schematically a table of data stored in a server;

FIG. 5b illustrates schematically a timing chart of messages and states associated with messages exchanged over the Internet in a system using tunnel devices;

FIG. 6 illustrates schematically a simplified flowchart of a method relating to a client device using a single tunnel device;

FIG. 7 illustrates schematically a simplified flowchart of a method relating to a tunnel device;

FIG. 7a illustrates schematically a simplified flowchart for increasing a number of connections to a server;

FIG. 7b illustrates schematically a simplified flowchart involving locally fetching of a content;

FIG. 8 illustrates schematically a simplified flowchart relating to an acceleration server in a tunnel-device based system;

FIG. 9 illustrates schematically a simplified flowchart relating to an acceleration server that also selects the tunnels to be used;

FIG. 10 illustrates schematically a simplified flowchart of a method relating to a client device using multiple tunnel devices;

FIG. 10a illustrates schematically a simplified flowchart of a method relating to a client device using multiple tunnel devices and direct access;

FIGS. 11, 11a, and 11b depict schematically messages exchanged over the Internet between a client device and a data server, using different tunnel devices;

FIG. 11c depicts schematically messages exchanged over the Internet between a client device and a data server using a direct access;

FIG. 12 depicts schematically client devices, tunnel devices, servers, and client/tunnel device connected to the Internet;

US 9,241,044 B2

77

FIG. 12a depicts schematically messages exchanged over the Internet between a client device and a data server using a client/tunnel device;

FIG. 13 depicts schematically client devices, tunnel devices, and servers connected to the Internet, where the client device is implemented using a proxy server;

FIG. 14 illustrates schematically a simplified flowchart of a method relating to a client device measuring and logging a communication with a tunnel device;

FIG. 15 illustrates schematically a table of a log of transactions of a client;

FIG. 15a illustrates schematically a table of a log of transactions of a client relating to content fetching from a single data server;

FIG. 16 illustrates schematically a simplified flowchart of managing a number of connections to a server by a client device;

FIG. 17 illustrates schematically a simplified flowchart of an accessing of an analytics server;

FIG. 17a illustrates schematically a simplified flowchart of an intercepting and simulating access to an analytics server;

FIG. 18 depicts schematically a computerized device accessing DHCP servers;

FIG. 18a illustrates schematically a simplified flowchart of accessing of a DHCP server;

FIG. 19 illustrates schematically a simplified flowchart of improving an accessing of a DHCP server;

FIG. 20 depicts schematically client devices, agent devices, peer devices, and server devices connected to the Internet;

FIG. 21 depicts schematically the relations of chunks relating to URLs and peer devices;

FIG. 21a depicts schematically the relations of content in peer devices to content in agent devices;

FIG. 21b depicts schematically the relations of content in peer devices to content of URLs;

FIG. 21c depicts schematically the relations of content in peer devices to content in agent devices;

FIG. 22 illustrates schematically a timing chart of messages and states associated with messages exchanged over the Internet in a system using peer and agent devices;

FIGS. 23, 23a, and 23b illustrate schematically a simplified flowchart relating to a client device using agent and peer devices;

FIG. 24 illustrates schematically a simplified flowchart relating to an agent device;

FIG. 24a illustrates schematically a simplified flowchart relating to a peer device;

FIG. 25 illustrates schematically a simplified flowchart relating to an acceleration server in a peer and agent devices system;

FIG. 25a illustrates schematically a table of data stored in an acceleration server;

FIG. 26 depicts schematically messages exchanged over the Internet between a client device and an acceleration server;

FIG. 26a depicts schematically messages exchanged over the Internet between a client device and an agent device;

FIGS. 26b, 26c, and 26d depict schematically messages exchanged over the Internet between a client device and a peer device;

FIG. 27 illustrates schematically a simplified flowchart relating to a client device measuring and logging a communication with a peer device;

FIG. 28 illustrates schematically a table representing a log of transactions of a client device;

78

FIG. 28a illustrates schematically a table representing a log of transactions of a client device relating to content fetching from a single data server;

FIG. 29 depicts schematically timing considerations involving a client device and peer devices;

FIG. 29a depicts schematically the calculations involving optimal timing considerations of a system involving a client device and peer devices;

FIG. 29b depicts schematically a chunks flow in a system involving a client device and peer devices;

FIG. 29c depicts schematically an improved chunks flow in a system involving a client device and peer devices;

FIG. 29d illustrates schematically a simplified flowchart for an improved flow of chunks in a system involving a client device and peer devices;

FIG. 29e depicts schematically a flow of chunks in a system involving a client device and peer devices;

FIG. 29f depicts schematically an improved chunks flow in a system involving a client device and peer devices;

FIG. 30 illustrates schematically a state diagram of a network element;

FIG. 31 illustrates schematically a simplified flowchart for determining a network element status;

FIG. 32 illustrates schematically a simplified flowchart for determining a network element status of a connected device;

FIG. 33 illustrates schematically a simplified flowchart for determining by a client the content fetching method;

FIG. 34 depicts schematically client devices, tunnel devices, agent devices, peer devices, and servers connected to the Internet;

FIG. 35 illustrates schematically a simplified flowchart relating to selecting devices based on an attribute relating to their geographical location;

FIG. 36 illustrates schematically a simplified flowchart relating to scaling an image;

FIG. 36a depicts schematically a part of a prior art image upscaling;

FIG. 36b depicts schematically a part of a prior art image downscaling;

FIG. 37 depicts schematically a prior art limited object movement on a screen;

FIG. 37a depicts schematically an unlimited movement of an object on a screen;

FIG. 38 illustrates schematically a simplified flowchart relating to unlimited moving object on a screen;

FIG. 39 depicts schematically a computerized device communicating with locked WAPs;

FIG. 40 illustrates schematically a simplified flowchart relating to guessing passwords in a WiFi environment;

FIG. 41 depicts schematically computerized devices communicating with locked WAPs;

FIG. 42 illustrates schematically a simplified flowchart relating to sharing passwords in a WiFi environment;

FIG. 43 illustrates schematically a simplified flowchart relating to the normalizing reference of a video content;

FIG. 44 illustrates schematically a block diagram relating to queueing schemes in a WDM architecture;

FIG. 45 illustrates schematically a block diagram relating to an improved dynamic queueing scheme in a WDM architecture;

FIG. 46 illustrates schematically a simplified flowchart relating to implementing an improved dynamic queueing scheme;

FIG. 47 illustrates schematically a block diagram relating to a one-way compression using a local dictionary;

US 9,241,044 B2

79

FIG. **48** illustrates schematically a simplified flowchart relating to implementing a one-way compression using a local dictionary;

FIG. **48a** illustrates schematically a simplified flowchart relating to implementing a compression using both dictionaries;

FIG. **49** illustrates schematically a block diagram relating to multiple copies of the same content;

FIG. **49a** illustrates schematically a simplified flowchart relating to comparing multiple copies of the same content;

FIG. **49b** illustrates schematically a simplified flowchart relating to validating a copy of a content;

FIG. **50** illustrates schematically a gateway connecting network elements over a WAN and a LAN;

FIG. **51** illustrates schematically using a VGS for communicating with a gateway connecting network elements over a WAN and a LAN;

FIG. **51a** illustrates schematically a simplified flowchart of a VGS;

FIG. **52** depicts schematically a prior art of a cache arrangement in a memory;

FIG. **53** depicts schematically a cache arrangement in a memory using overwrite reduction;

FIG. **54** illustrates schematically a simplified flowchart for cache overwrite reduction and cleanup;

FIG. **55** depicts schematically a cache arrangement in a memory using redundancy with overwrite reduction;

FIG. **56** illustrates schematically a simplified flowchart for cache overwrite reduction;

FIG. **57** depicts schematically a cache arrangement in a memory using overwrite reduction and having multiple chunk copies;

FIG. **58** depicts schematically a prior-art association of physical addresses to virtual addresses;

FIG. **59** illustrates schematically a simplified block diagram of a memory management unit for translating between physical addresses and virtual addresses;

FIG. **60** illustrates schematically a simplified block diagram of a prior-art memory management unit operation;

FIG. **61** illustrates schematically a simplified flowchart of a prior-art method of an exception handler;

FIG. **62** illustrates schematically a simplified flowchart of an NDCACHE operation;

FIG. **63** illustrates schematically a simplified block diagram of an NDCACHE API;

FIG. **64** illustrates schematically a simplified block diagram of mounting a filesystem;

FIG. **65** illustrates schematically a simplified block diagram of mounting a TMPFS filesystem;

FIG. **66** illustrates schematically a simplified flowchart of an NDCACHE operation using FS mounting;

FIG. **67** illustrates schematically a simplified flowchart of an NDCACHE operation using user and kernel mode;

FIG. **68** illustrates schematically a first part of a simplified block diagram of a high-level implementation of NDCACHE;

FIG. **69** depicts schematically an arrangement in a memory of NDCACHE pages and using a lock flag;

FIG. **70** illustrates schematically a second part of a simplified block diagram of a high-level implementation of NDCACHE;

FIG. **71** illustrates schematically a third part of a simplified block diagram of a high-level implementation of NDCACHE;

FIG. **72** depicts schematically an arrangement in a memory of NDCACHE pages using multiple segments in the cache;

80

FIG. **73** illustrates schematically a simplified flowchart of an improved NDCACHE operation;

FIG. **74** depicts schematically an arrangement in a memory of NDCACHE pages;

FIG. **75** illustrates schematically a first part of a simplified block diagram of a high-level implementation of an improved NDCACHE;

FIG. **76** illustrates schematically a second part of a simplified block diagram of a high-level implementation of an improved NDCACHE;

FIG. **77** illustrates schematically a simplified flowchart of an idle monitor;

FIG. **78** illustrates schematically a simplified block diagram of an idle monitor for reducing a storage read time;

FIG. **79** illustrates schematically a simplified flowchart of selecting WAP;

FIG. **80** illustrates schematically a simplified flowchart of an improved selection of a WAP;

FIG. **81** depicts schematically a network element selecting a WAP from two groups of WAPs;

FIG. **82** depicts schematically a network element selecting a WAP based on the WAP performance;

FIG. **83** illustrates schematically a simplified flowchart for selecting a WAP based on the WAP prior performance;

FIG. **84** illustrates schematically two network elements connected over an unreliable connection;

FIG. **85** illustrates schematically two network elements connected over multiple unreliable connections;

FIG. **86** illustrates schematically two network elements connected over multiple unreliable connections using a reliability proxy server;

FIG. **87** illustrates schematically two network elements connected over multiple unreliable connections using two reliability proxy servers;

FIG. **88** illustrates schematically a simplified flowchart for using a reliability proxy network server;

FIG. **89** illustrates schematically a simplified flowchart for carrying packets over multiple routes;

FIG. **90** illustrates schematically a simplified flowchart for minimizing disconnect times when using multiple routes;

FIG. **91** illustrates schematically a table containing IP related BW and RTT values;

FIG. **92** illustrates schematically a simplified flowchart for estimating BW and RTT values relating to network elements;

FIG. **93** illustrates schematically a simplified flowchart for reading or storing BW and RTT values relating to network elements; and

FIG. **94** illustrates schematically a simplified flowchart for estimating BW and RTT values relating to network elements.

## DETAILED DESCRIPTION

The principles and operation of an apparatus or a method according to the present invention may be understood with reference to the figures and the accompanying description wherein identical or similar components (either hardware or software) appearing in different figures are denoted by identical reference numerals. The drawings and descriptions are conceptual only. In actual practice, a single component can implement one or more functions; alternatively or in addition, each function can be implemented by a plurality of components and devices. In the figures and descriptions, identical reference numerals indicate those components that are common to different embodiments or configurations. Identical numerical references (in some cases, even in the case of using different suffix, such as **5**, **5a**, **5b** and **5c**) refer to functions or actual devices that are either identical, substantially similar,

US 9,241,044 B2

81

similar, or having similar functionality. It will be readily understood that the components of the present invention, as generally described and illustrated in the figures herein, could be arranged and designed in a wide variety of different configurations. Thus, the following more detailed description of the embodiments of the apparatus, system, and method of the present invention, as represented in the figures herein, is not intended to limit the scope of the invention, as claimed, but is merely representative of embodiments of the invention. It is to be understood that the singular forms "a," "an," and "the" herein include plural referents unless the context clearly dictates otherwise. Thus, for example, reference to "a component surface" includes reference to one or more of such surfaces. By the term "substantially" it is meant that the recited characteristic, parameter, or value need not be achieved exactly, but that deviations or variations, including, for example, tolerances, measurement error, measurement accuracy limitations and other factors known to those of skill in the art, may occur in amounts that do not preclude the effect the characteristic was intended to provide.

Each of devices herein may consist of, include, be part of, or be based on, a part of, or the whole of, the computer 11 or the system 100 shown in FIG. 1. Each of the servers herein may consist of, may include, or may be based on, a part or a whole of the functionalities or structure (such as software) of any server described in the '604 patent, such as the web server, the proxy server, or the acceleration server. Each of the clients or devices herein may consist of, may include, or may be based on, a part or a whole of the functionalities or structure (such as software) of any client or device described in the '604 patent, such as the peer, client, or agent devices.

In one example, an accessing to a data server is improved by using an intermediate device referred to as 'tunnel' device, that is executing a 'tunnel' flowchart. FIG. 5 shows a system 30 including two client devices, a client device #1 31a and a client device #2 31b, that may access the data servers 22a and 22b using one or more of a tunnel device #1 33a, a tunnel device #2 33b, and a tunnel device #3 33c, under the management and control of an acceleration server 32. These network elements communicates with each other using the Internet 113.

The method of using a tunnel device is described below, based on a database 40 shown in FIG. 5a describing a list stored in the acceleration server 32, a flowchart 60 shown in FIG. 6 describing a client device (such as the client device #1 31a) operation, a flow chart 70 shown in FIG. 7 describing a tunnel device (such as the tunnel device #1 33a) operation, and a messaging and states timing chart 50 shown in FIG. 5b. The chart 50 shows the messaging and related timing associated with the operation of the acceleration server 32 (corresponding to a dashed line 51a), a client device such as the client device #1 31a (corresponding to a dashed line 51b), a tunnel device such as the tunnel device #1 33a (corresponding to a dashed line 51c), and a data server such as the data server #1 22a (corresponding to a dashed line 51d). The flowchart 60 comprises a flowchart 64 relating to a pre-connection phase, and a flowchart 65 describing a content fetch phase, of the client device. Similarly, a flowchart 70 comprises a flowchart 72 relating to the pre-connection phase, and a flowchart 73 describing the content fetch phase, of the tunnel device. The database 40 shown in FIG. 5a is illustrated as a table, wherein a first column 41a (designated as 'TYPE') relates to a device functionality, such as tunnel or client, a second column 41b (designated as 'IP ADDRESS') relates to the respective device IP address, a third column 41c (designated as 'SIGN-IN DATE/TIME') relates to a timestamping including a date (in DD/MM format) and a time when a respective device

82

signed in with the acceleration server, and a fourth column 41d, relating to the device physical geographical location. A top row 42 in the table refers to the field designations. First 42a, second 42b, third 42c, fourth 42d, and fifth 42e rows in the table, respectively relate to first, second, third, fourth, and fifth devices that signed in with the acceleration server 32. For example, the second device shown in the row 42b has signed in as a tunnel device as shown in the column 41a, timestamped as January 23rd at 8:55 as shown in the third column 41c, and can be addressed over the Internet using the IP address 109.23.78.5 as shown in the second column 41b.

The process starts upon initializing a tunnel application in a tunnel device, schematically shown as a step 'START' 71a in the flowchart 70, corresponding to a state 54a 'Start' in the chart 50. Such initialization may be executed upon the device powering up process, or upon a user request. Then the tunnel device #1 33a sign in with the acceleration server 32 in a step 'Sign-in as Tunnel' 71b, which corresponds to a message 'Sign In' 56a in the chart 50. The message comprises the device functionality as 'tunnel', and the device 33a identification on the Internet 113, such as its IP address (for example 125.12.67.0). The message 'Sign In' is received as the acceleration server 32, which updates the database of the signed-in devices in a state 'Update List' 52a, as shown in a first row 42a in the table 40. The acceleration server 32 further log to the database the date and time of the signing in, such as 23/1 as the date and 7:32 as the time, as shown in the third column 41c of the table 40. The acceleration server 32 further adds rows to the table per each added tunnel device in a case of multiple tunnel devices, such as the addition of the tunnel device #2 33b, that its signing-in details are shown in the second row 42b, as addressed by the IP address 109.23.78.5 and having signed in at 23/1 at 8:55.

Similarly, the client device #1 31a starts and sign in with the acceleration server 32. The process starts upon initializing a client application in a client device, schematically shown as a step 'START' 61a in the flowchart 60, corresponding to a state 53a 'Start' in the chart 50. Such initialization may be executed upon the device powering up process, or upon a user request. Then the client device #1 31a sign in with the acceleration server 32 in a step 'Sign-in as Client' 61b, which corresponds to a message 'Sign In' 56b in the chart 50. The message comprises the device functionality as 'client', and the device 31a identification on the Internet 113, such as its IP address (for example 36.83.92.12). The message 'Sign In' is received as the acceleration server 32, which updates the database of the signed-in devices in a state 'Update List' 52b, as shown in the third row 42c in the table 40. The acceleration server 32 further logs to the database the date and time of the signing in, such as 23/1 as the date and 10:44 as the time, as shown in the third column 41c of the table 40. The acceleration server 32 further adds to the table an additional row per each newly signed client device in a case of multiple client devices, such as the addition of the client device #2 31b, that its signing-in details are shown in the second row 42d, as addressed by the IP address 125.66.69.73 and having signed in at 24/1 on 15:34.

In order to make the communication between a client device and a tunnel device faster and more efficient, a pre-connection phase is defined, where a preparation for communication such as a TCP connection is established, allowing for quick data transfer afterwards. The pre-connection phase starts at a 'Start Pre-Connection' state 53b in the chart 50, followed by the 'Request List' message 56c (corresponding to the 'Request Tunnels List' step 62 in the flowchart 60), being part of the Pre-connection client flowchart 64, where the client 31a requests the list of the available tunnels that may be

US 9,241,044 B2

83

used, from the acceleration server 32. The tunnel device #1 33a at this point is idling in an 'IDLE' step 72c shown in the flowchart 70, being part of the Pre-connection tunnel flowchart 72. In response to the client device 31a request, the acceleration server 32 prepares in a step 'Prepare List' 52b the list of current available tunnels, and sends the list as a 'Send List' message 56d to the client device 31a, which in turn receives the list as part of a 'Receive Tunnels List' step 62b.

Based on pre-set criteria, a tunnel device (or multiple tunnel devices) is selected by the client device #1 31a in a 'Tunnel Select' step 53c (corresponding to a 'Select Tunnel' step 62c in the flowchart 60). For example, the tunnel device #1 33a may be selected. Then, pre-connection is initiated in an 'Initiate Pre-Connection' step 62d, where an 'Initiate Pre-Connection' message 56e is sent to the tunnel device #1 33a, which starts the pre-connection in a 'Pre-Connection Start' state 54b, and replies the 'Pre-Connection' message 56f to the client device 31a, thus completing the pre-connection phase.

The pre-connection process involves establishing a connection (directly or via a server) between the client device #1 31a (executing the flowchart 64) and the tunnel device #1 33a (executing the flowchart 72). The handshaking between the two devices at this stage involves forming the connection by exchanging communication-related information. The formed connection may be used later for efficiently exchange data between the devices. In one example, the communication between the devices uses TCP, and the pre-connection is used for establishing a connection by forming 'passive open', involving exchanging SYN, SYN-ACK, and ACK messages. In one example, the message 'Initiate Pre-Connection' message 56e includes a SYN message, and the 'Pre-Connection' message 56f includes an ACK message.

In another example, a VPN is formed between the devices, and the tunneling or the VPN establishment is performed as part of the pre-connection phase. The tunnel endpoints at the client device #1 31a and the tunnel device #1 33a can be established. User-created remote-access VPNs may use passwords, biometrics, two-factor authentication, or any other cryptographic methods. Network-to-network tunnels often use passwords or digital certificates, and permanently stores the key in order to allow a tunnel to establish automatically, without intervention from a user.

As long as the client device #1 31a is not requiring any content from a data server as described in a 'Content Required?' step 63a, the device is idling in an 'IDLE' step 62e. Once the client device #1 31a determines that external content from a data server is required, as shown in a 'Content Required' state 53d, a 'Content Request' message 56g (shown in the messaging chart 50) is sent (corresponding to a 'Send Content Request' step 63b in the flowchart 60) to the selected tunnel device #1 33a. The request is received at the tunnel device #1 33a at a 'Request Received' state 54c, corresponding to a 'Receive Content Request' 73b in the flowchart 70). In response, the tunnel device 33a sends a 'Content Request' message 56h to the data server #1 22a (corresponding to a 'Send Request To Server' step 73c), requesting the content that was requested by the client device #1 31a. The data server #1 22a receives the request and prepares the requested content in a 'Content Prepared' state 55a, and sends the requested content back to the tunnel device #1 33a in a 'Send Content' message 56i, received by the tunnel device #1 33a in a 'Receive Content from Server' step 73d. The received content is prepared in a 'Content Prepared' state 54d, and then sent, in a 'Send Content' message 56f (corresponding to a 'Send Content To Client' step 73e), to the client device #1 31a. The tunnel device 33a may then revert to idling in the 'IDLE' step 73a, until a new request is received. The requested content is

84

received in a 'Content Received' state 53e in the timing chart 50, corresponding to a 'Receive Content' step 63c shown in the flowchart 60. The client device 31a may then revert to idling in the 'IDLE' step 62e, until a new content is required. When such new content is required as determined as part of the 'Content Required ?' step 63a, the process repeats by sending a 'Content Request' message 56k, corresponding to the 'Send Content Request' step 63b. In one example, the 'Content Fetch' flowchart 73 executed by the tunnel device #1 33a may be a typical HTTP session for accessing a content from a web-server.

The content herein may consist of, or comprise, data such as files, text, numbers, audio, voice, multimedia, video, images, music, computer programs or any other sequence of instructions, as well as any other form of information represented as a string of bits, bytes, or characters. In one example, the content may include, be a part of, or a whole of, a URL or a website page.

The acceleration server 32 generally executes a flowchart 80 shown in FIG. 8. The server 32 is idling in an 'IDLE' step 81a until a request is received from one of the devices in the network. The request may be a sign-in request, as checked in a 'Sign-In Request ?' step 81b, which may be the result of a signing in of the client device #1 31a as part of the 'Sign-in as Client' step 61b in the client flowchart 60, or may be the result of a signing in of the tunnel device #1 33a as part of the 'Sign-in as Tunnel' step 71b in the tunnel flowchart 70. In the case of signing in, the server 32 update the database such as the table 40 shown in FIG. 5a in an 'Update Table' step 81c, corresponding to an 'Update List' state 52a for tunnel signing-in and an 'Update List' state 52b for the client signing-in in the timing chart 50. In a 'List Request ?' step 81d the acceleration server 32 checks for receiving a request from the client device #1 31a as part of a 'Request Tunnels List' step 62a, corresponding to the message 'Request List' 56c in the timing chart 50. In response to such request, the server 32 compiles a list of tunnels that can be used by the client device #1 31a to serve the received request, as part of a 'Prepare List' step 81e (corresponding to a 'Prepare List' state 52c in the timing chart 50). The compiled list is sent to the client device 31a as part of a 'Send List' step 81f, corresponding to a 'Send List' message 56d in the timing chart 50. After completing the signing-in or sending list processes, the server 32 reverts to idling in the 'IDLE' step 81a.

Data servers (such as the data server #1 22a) typically limit the number of concurrent active connections with connected devices (hosts). In many cases, a web page content may include multiple URLs, and it is beneficial to open many concurrent connections, each for one or more of the URLs, to accelerate the fetching of the web site content. In one example, the maximum number of connections permitted by the data server from which the content is to be fetched is sent to a tunnel device, such as the tunnel device #1 33a, as part of the 'Pre-connection Tunnel #1' step 64a or the 'Content Fetch Tunnel #1' step 65a, shown as part of the flowchart 100 in FIG. 10. In response, the tunnel device #1 33a as part of the 'Send Request To Server' step 73c, opens the requested number of connections with the respective data server. For example, the client may request, based on stored information in the client device (such as based on former interaction with the respective data server received from a tunnel device as part of a 'Notify Client' step 74c), sends the tunnel device a request to open 8 connections, which is known to be the maximum available (or allowable) number of connections relating to the specific data server. The client device may request all the tunnel devices used to use the maximum number of connections. For example, assuming 3 tunnel devices

US 9,241,044 B2

85

are used, and the maximum connections per host (device) is limited (by the data server) to 10 connections per host, each tunnel device may open the maximum 10 connections available. Hence, such scenario results in total open connections (for fetching the requested content) to be 10*3=30, which is 3 times better than using a single tunnel device, or when compared to a direct content fetching by the single client device from the data server. In another example, assuming the limitation of the data server is 8 connections, and wherein the client device sets the optimal number of total of 15 connections, the client device may request one tunnel device to use 8 connection and another tunnel device to use 7 connections, thus obtaining the optimal 8+7=15 connections.

Alternatively or in addition, a tunnel device may try to open as many connections as available, as described in a flowchart 74 shown in FIG. 7a. The flowchart 74 corresponds to the flowchart 73 shown in FIG. 7. In parallel to starting the content fetching from the data server in the 'Send Request To Server' step 73c and starting the reception of content from the data server in the 'Receive Content From Server' step 73d, the tunnel device tries to open an additional connection (or multiple additional connections) to those already in use in a 'Open Connection(s)' step 74a. In the case the additional connection was properly established, as is checked in a 'Successful ?' step 74b, the tunnel device reverts to try to open an additional connection in the 'Open Connection(s)' step 74a. In the case no additional connection can be established, typically because the limit set by the data server was reached, the tunnel device notifies the client device in the 'Notify Client' step 74c of the maximum number of connections available for this data server. This notification allows the client device to use such information for use with other tunnel devices communicating with this data server or for future use with the data server.

Alternatively or in addition, a tunnel device may be used to store a content to be provided to a client device, as described in a flowchart 75 shown in FIG. 7b, which corresponds to the flowchart 73 shown in FIG. 7. Upon receiving a request for content from a client device, a tunnel device (such as the tunnel device #1 33a) first checks if the requested content is stored locally (in the tunnel device itself), such as in its cache memory, in a 'Locally Available ?' step 75a. The requested content may be stored in the tunnel device as a result of a former accessing the respective data server, for example by a web browser (or any other application) that is part of the tunnel device. Alternatively or in addition, the content may be stored as part of a 'Store Content From Server' step 75b in a past fetching of content, for this client device or for another client device. If the content is available locally in the tunnel device, the overhead, time, and resources, of accessing the respective data server are obviated, and the locally stored requested content is sent to the client device in the 'Send Content To Client' step 73e. In the case the requested content is not locally available, the tunnel device continues as described in the flowchart 73 to fetch the content from the data server. Alternatively or in addition, upon receiving the requested content from the data server in the 'Receive Content From Server' step 73d, the receive content may be stored locally in the tunnel device for future use, in the 'Store Content From Server' step 75b. Storing of the received content may be executed before, after, or in parallel to sending the content to the requesting client device in the 'Send Content To Client' step 73e.

Since the data server #1 22a is accessed by, and sends information only to, tunnel devices (such as the tunnel device #1 33a), and is not aware of the final content destination being the client device #1 31a, the identity (such as the IP address)

86

of the client device #1 31a is concealed from the data server #1 22a, thus providing anonymity and untraceability. Further, in a case where the data server #1 22a is a web server, the method and system described may provide for an anonymous web browsing. Further, the system and method provide an Internet traffic route for the content delivery that is distinct from the typical approach where the client device #1 31a access the data server #1 22a directly over the Internet, hence may alleviates bottlenecks and conserve bandwidth. Furthermore, since multiple parts of the content stored in a data server (such as the data server #1 22a) are loaded in parallel to a client device (such as the client device #1 31a) using multiple distinct paths, the content is fetched faster and using more effectively the network resources.

A schematic messaging flow diagram 110 describing the client device #1 31a related 'content fetch' flowchart 65 and the tunnel device #1 33a related flowchart 73 is shown in FIG. 11. A 'Content Request' message 111a (corresponding to the 'Content Request' message 56g in the timing chart 50) is first sent from the client device #1 31a to the selected tunnel device #1 33a, which responds by forwarding the request to the data server #1 22a using a 'Content Request' message 111b (corresponding to the 'Content Request' message 56h in the timing chart 50). In turn the data server #1 replies and sends the content in a 'Send Content' message 111c (corresponding to the 'Send Content' message 56i in the timing chart 50) to the requesting tunnel device #1 33a, which in turn forward the fetched content to the asking client device #1 31a using a 'Send Content' message 111d (corresponding to the 'Send Content' message 56j in the timing chart 50).

While accessing the data server #1 22a was exampled above using the tunnel device #1 33a as an intermediary device, the system and the client #1 31a may use multiple tunnel devices in order to fetch the content from the same data server #1 22a. Two, three, four, or any other number of tunnel devices, serving as intermediary devices having the same or similar role as the tunnel device #1 33a, may be equally used. In one example, three tunnel devices may be used, such as adding the tunnel device #2 33b and the tunnel device #3 33c, shown in system 30 in FIG. 5. Each of the tunnel devices may execute the flow chart 70 shown in FIG. 7.

A flowchart 100 relating to the client device #1 31a when employing three tunnel devices is shown in FIG. 10, based on the flowchart 60 described above. Upon receiving a list of available tunnel in a 'Receive Tunnels List' step 62b from the Acceleration server 32, the client device #1 31a selects multiple tunnels from the received list, rather than selecting a single tunnel as described in the 'Select Tunnel' step 62c described above. In the described example, three distinct tunnel devices are selected from the list, such as the tunnel device #1 33a (as before), the tunnel device #2 33b, and the tunnel device #3 33c. The client device 31a executes three pre-connection processes in a 'Pre-Connection Tunnel #1' step 64a, a 'Pre-Connection Tunnel #2' step 64b, and a 'Pre-Connection Tunnel #3' step 64c (each corresponding to the 'Pre-connection' flow chart 64 above), followed by a 'Content Fetch Tunnel #1' step 65a, a 'Content Fetch Tunnel #2' step 65b, and a 'Content Fetch Tunnel #3' step 65c, respectively (each corresponding to the 'Content Fetch' flow chart 65 above).

In such a configuration, three distinct data paths are involved in the content fetching. In addition to the messaging data path 110, a messaging flow 110a shown in FIG. 11a describes the usage of the tunnel device #2 33b as an intermediary device, relating to the client device #1 31a 'content fetch' related flowchart 65b and the tunnel device #2 33b related flowchart 73. A 'Content Request' message 112a (cor-

US 9,241,044 B2

87

responding to the 'Content Request' message 56g in the timing chart 50) is first sent from the client device #1 31a to the selected tunnel device #2 33b, which responds by forwarding the request to the data server #1 22a using a 'Content Request' message 112b (corresponding to the 'Content Request' message 56h in the timing chart 50). In turn the data server #1 replies and sends the content in a 'Send Content' message 112c (corresponding to the 'Send Content' 56i in the timing chart 50) to the requesting tunnel device #2 33b, which in turn forward the fetched content to the asking client device #1 31a using a 'Send Content' message 112d (corresponding to the 'Send Content' message 56j in the timing chart 50). Similarly, a messaging flow 110b shown in FIG. 11b describes the usage of the tunnel device #3 33c as an intermediary device, relating to the client device #1 31a associated with 'content fetch' in the flowchart 65c and with the tunnel device #2 33b in the flowchart 73. The 'Content Request' message 115a (corresponding to the 'Content Request' message 56g in the timing chart 50) is first sent from the client device #1 31a to the selected tunnel device #3 33c, which responds by forwarding the request to the data server #1 22a using the 'Content Request' message 115b (corresponding to 'Content Request' message 56h in the timing chart 50). In turn the data server #1 22a replies and sends the content in the 'Send Content' message 115c (corresponding to the 'Send Content' message 56i in the timing chart 50) to the requesting tunnel device #3 33c, which in turn forward the fetched content to the asking client device #1 31a using the 'Send Content' message 115d (corresponding to the 'Send Content' message 56j in the timing chart 50).

Alternatively or in addition to accessing the data server #1 22a via intermediary devices such as one or more tunnel devices as described herein, the client device #1 31a may also directly access the data server #1 22a for fetching the content therefrom. Such a flowchart 100a is shown in FIG. 10a, where a 'Content Fetch Direct' step 65d is added. In this step 65d, the client device #1 31a directly accesses the data server #1 22a, as typically known, and in the same way, or in a similar way, the tunnel devices are accessing the data server #1 22a for fetching content therefrom. Such direct access is shown in messaging flow 110c shown in FIG. 11c, where no intermediary device is used. The 'Content Request' message 114a (which may be corresponding to the 'Content Request' message 56g in the timing chart 50) is first sent from the client device #1 31a to the data server #1 22a. In turn the data server #1 22a replies and sends the content in the 'Send Content' message 114b (which may be corresponding to the 'Send Content' message 56i in the timing chart 50) to the client device #1 31a. As used herein, a direct access by a client device, such as the client device #1 31a, is considered as if the client device itself serves as a tunnel device for itself.

In one example, the same content (from the same data server #1 22a) is requested by the client device #1 31a, from all the selected tunnel devices. In such a case, the same content is requested and fetched in the 'Content Fetch' flowcharts. In the example of three tunnel devices shown in a flowchart 100, the same content may be defined to be requested (and later fetched) in the 'Content Fetch Tunnel #1' step 65a, the 'Content Fetch Tunnel #2' step 65b, and the 'Content Fetch Tunnel #3' step 65c. Such configuration may be advantageous, for example, in the case where one or multiple data paths are unstable or unreliable, or provide intermittent connection. In the case wherein multiple redundant tunnels and data paths are used, there is a higher probability to fetch the required content, even if one or more of the data paths are problematic or non-functioning. For example, in the case where the tunnel device #1 33a and the tunnel device #3

88

33c are not fully functioning or having a momentary (or continuous) problem fetching the requested content, still the tunnel device #2 33b may provide the content. Further, such redundant operation may allow for quicker and faster content fetching, since the client device #1 31a may use the content first to be received, hence using the faster content fetching route. For example, in case of the tunnel device #1 33a replying and providing the content after 12 milliseconds, the tunnel device #2 33b replying and providing the content after 23 milliseconds, and the tunnel device #3 33c replying and providing the content after 5 milliseconds, the content is available at the client device #1 31a after 5 milliseconds, and there is no need to wait for the other tunnels to reply. Similarly, in case of a direct access, the client device #1 31a direct access is added as a redundant content fetching path to the tunnels-associated data paths.

The tasks relating to the different data paths, such as shown in a flowchart 100a, relating to communicating with the multiple tunnel devices and/or direct access, may be executed sequentially or in parallel. Further, each of the messages transferred shown in the messaging charts and data paths, such as in the diagrams 110, 110a, 110b, and 110c, may be executed, or may occur, sequentially or in parallel. For example, in case of multiple pre-connection processes, the client device #1 31a may execute the processes sequentially, meaning initiating a new pre-connection only after a former pre-connection is completed (or only upon being successfully completed). For example, relating to the flowchart 100a, the client device first executes the 'Pre-connection Tunnel #1' step 64a, and only upon completion of this step initiates the 'Pre-connection Tunnel #2' step 64b, and only upon completion of the latter step initiates the 'Pre-connection Tunnel #3' step 64c. Alternatively or in addition, the processes may be executed in parallel, using a multitasking.

Similarly, in case of multiple connect fetching processes, the client device #1 31a may execute the processes sequentially, meaning initiating a new content fetching only after a former content fetching is completed (or only upon being successfully completed). For example, relating to the flowchart 100a, the client device first executes the 'Content Fetch Direct' step 65d, and only upon completion of this step initiates the 'Content Fetch Tunnel #1' step 65a, and only upon completion of the latter step initiates the 'Content Fetch Tunnel #2' step 65b. Alternatively or in addition, the processes may be executed in parallel, using a multitasking.

The client device 31a may select a single tunnel device to be used as an intermediary device as described above relating to the 'Select Tunnel' step 62c. Alternatively or addition, the client device 31a may select a plurality of tunnel devices (including itself as described in the 'Content Fetch Direct' step 65d) to be used as an intermediary device as described above relating to the 'Select Tunnels' step 101a. The selection of a tunnel or of multiple tunnels may be based on pre-set criteria. The selection may use various attributes or characteristics of the tunnel devices, its operation environment, history, and any other characteristics. The attributes associated with each tunnel device may be stored in the acceleration server 23, and sent to the client device #1 31a as part of the available tunnel devices list, so that the client device #1 31a may use these attributes for the selection process. The criteria herein may be used independently or in combination. In yet another alternative, the selection is based on timing measurement, such as Time-of-Day (TOD). For example, one selection scheme may be used on a daily basis from 2.00 AM to 3.00 AM, a different selection from 3.00 AM to 4.00 AM and so on, cycling in a 24-hour day. Similarly, each day of the week may use different selection. Any combination of the

US 9,241,044 B2

89

schemes described herein may be equally used. Any number of tunnel devices may be selected. The number of tunnel devices that are selected in the 'Select Tunnels' step 101a may be 1 (one) (corresponding to the 'Select Tunnel' step 62c). Alternatively, a small number of tunnel devices may be selected, such as 2 or 3. Alternatively, 4, 5, 6, 7, 8, 9, or 10 tunnel devices may be selected. Further, more than 10 tunnel devices may be selected, such as 10, 20, 30, 40, or 50.

The client device 31a may select a single tunnel device to be used as an intermediary device as described above relating to the 'Select Tunnel' step 62c. Alternatively or addition, the client device #1 31a may select a plurality of tunnel devices (including itself as described in the 'Content Fetch Direct' step 65d) to be used as an intermediary device as described above relating to the 'Select Tunnels' step 101a. Alternatively or in addition, the tunnel devices to be used may be selected by the acceleration server 32, and the tunnel list sent to the client device #1 31a (in the 'Send List' step 81f and received by the client device #1 31a in the 'Receive Tunnels List' step 62b) may include only the identification (e.g., IP address) of the tunnel devices to be used as intermediary devices to the client device #1 31a. Such a flowchart 90 to be executed by the acceleration server 32 is shown in FIG. 9. After preparing a list of available or potential tunnel devices that may be used in the 'Prepare List' step 81e, the acceleration server 32 itself selects in a 'Select Tunnels' step 101a the tunnel devices that are to be used by the client device #1 31a, and sends only these tunnel devices list to the client device #1 31a in a 'Send Selected List' step 91a.

Alternatively or in addition, the tunnel devices to be used may be selected by both the client device #1 31a and the acceleration server 32 working in cooperation. In one example, the acceleration server 32 (for example, as part of the 'Select Tunnels' step 101a in the flow chart 90) may select a subgroup of suggested, offered, or recommended tunnel devices that can be used, while the client device #1 31a (for example, as part of the 'Select Tunnels' step 101a in the flow chart 100) further selects and uses a subset of the tunnel devices from the list of offered suggested tunnel devices. Alternatively or in addition, the tunnel devices to be used may be selected by the acceleration server 32, based on rules or criteria set by, or requested from, the client device #1 31a. For example, as part of the requesting of tunnel devices list in the 'Request Tunnels List' step 62a, the client device #1 31a may send to the acceleration server 32 a set or rules or criteria, relating to the tunnel devices that are to be used by this client, which may relate to various attributes or characteristics of the available tunnel devices. In one example, the criteria may be the geographical location of the tunnel devices. The client device #1 31a may ask for tunnel devices only in a specific location, such as a specific country, and in response the acceleration server 32 may select tunnel devices only in the specified country (for example, in the 'Select Tunnel' step 101a in the flowchart 90) and send only this list (for example in the 'Send Selected List' step 91a) to the client device #1 31a. For example, relating to the example of the table 40 shown in FIG. 5a, in the case the client device #1 31a asks for tunnels only in Germany (or Europe), only the second listed tunnel device in the row 42b may be included in the list, being the only one located in Germany.

The selection of the tunnel device (or devices) to be used, or the priorities assigned to them, may be based on the available communication attributes or their history. For example, based on the costs associated with the usage of a network, the higher cost network may have lower priority and less used than lower cost or free network. In another example, a high quality network, such as having a higher available bandwidth

90

or throughput, lower communication errors or packet loss, lower hops to destination, or lower transfer delay time, is having higher priority that a lower quality network. The system may use Bit Error Rate (BER), Received Signal Strength Indicator (RSSI), Packet Loss Ratio (PLR), Cyclic Redundancy Check (CRC) and other indicators or measures associated with the communication channel associated with a network interface, and may be based on, use, or include the methodology and schemes described in RFC 2544 entitled: "*Benchmarking Methodology for Network Interconnect Devices*", and ITU-TY.1564 entitled: "*Ethernet Service Activation Test Methodology*", which are both incorporated in their entirety for all purposes as if fully set forth herein. The network quality grade may be affected by the history of using such a network, for example during a pre-set period before the process of selection of a network interface. In one example, the network interface where the last proper packet was received from may be selected as the interface to be used for the next packet to be transmitted. The system may further use, or be based on, the schemes and technologies described in U.S. Pat. No. 7,027,418 to Gan et al. entitled: "Approach for Selecting Communications Channels Based on Performance", which is incorporated in its entirety for all purposes as if fully set forth herein.

Random:

In one example, the tunnel device (or devices) to be used are randomly selected. Randomness is commonly implemented by using random numbers, defined as a sequence of numbers or symbols that lack any pattern and thus appear random, are often generated by a random number generator. Randomness is described, for example, in IETF RFC 1750 "*Randomness Recommendations for Security*" (December 1994), which is incorporated in its entirety for all purposes as if fully set forth herein. A random number generator (having either analog or digital output) can be hardware based, using a physical process such as thermal noise, shot noise, nuclear decaying radiation, photoelectric effect or other quantum phenomena. Alternatively, or in addition, the generation of the random numbers can be software based, using a processor executing an algorithm for generating pseudo-random numbers which approximates the properties of random numbers.

Physical Location:

In one example, the selection criterion is based on physical geographical location of a tunnel device. For example, a tunnel device, which is geographically the closest to the data server #1 22a from which a content is to be requested, will be the first to be selected. The second nearest tunnel device will be the second to be selected, and so on. In this scheme, tunnel devices which are in the same city as the data server #1 22a, will have highest priority than other tunnel devices in the same country, then in the same continent and so forth. Alternatively or in addition, the criterion may be based on the physical distance between a tunnel device and the acceleration server 32 location, or on the physical distance between a tunnel device and the client device #1 31a. In one example, the tunnel devices may be selected based on being in a location, which is the most distant from the data server #1 22a, the acceleration server 32, or the client device #1 31a. The information about the tunnel device locations may be obtained, for example, from the tunnel devices themselves during the signing-up process. In such a scheme, the tunnel device sends its physical geographical location (which may include country, state or province, city, street address, or ZIP code) as part of the sign-in process, and the location is stored in the acceleration server as part of the tunnels related database. The table 40 in FIG. 5a shows various devices in the system listed with associated cities and countries in the fourth column 41d. In

US 9,241,044 B2

91

the example shown, the first row 42a relates to a tunnel device located in Boston, Mass., in the United States, the second row 42b relates to a tunnel device located in Munich in Germany, the third row 42c relates to a client device located in Sidney in Australia, the fourth row 42d relates to a client device located at Tel-Aviv in Israel, and the fifth row 42e relates to a device located at Cairo in Egypt. In the case wherein the criterion involved relates to the node closest to the data server #1 22a, which for example is located in London in the United-Kingdom, the first (or only) tunnel device to be selected may be the second tunnel device associated with the second row 42b, being in Europe and thus the geographically closest device. In one example, the device location may be obtained using its built-in Global Positioning System (GPS), and may include the latitude, longitude, and timezone of the device location.

IP Address:

In one example, the IP address is used as a measure to determine 'closeness'. For example, an IP address that is numerically close to another IP, may be considered as 'geographically' close. In this context, 192.166.3.103 is closer to 192.166.3.212 than to 192.167.3.104. Alternatively or in addition, devices that share the same ISP are considered as 'close', since it is likely that better and faster communication is provided, since the need to communicate via the Internet is obviated.

Timing:

In one example, the timing of an event or activity of a tunnel device affects its selection. The timing of a tunnel device signing up with the acceleration server 32 may be used for the selection criterion. The first available tunnel device that signed in may be first selected, then the second in line. In the example of the table 40 shown in FIG. 5a, the tunnel device associated with the first row 42a will be first to be selected, having the earliest sign-in time (23/1, 7:32), while the following tunnel device to sign in (shown in the row 42b) will be selected next. Alternatively or in addition, the latest signed-in tunnel device will be the first to be selected.

Alternatively or in addition, the time of the last usage as the tunnel device may be used as a criterion. For example, a tunnel device that was most recently used will have the highest priority to be reselected. Alternatively, a 'fairness' rule will be applied in order to uniformly use all available channels, where a tunnel device will be selected if it was not used the most time.

The content requested by the client device #1 31a may be partitioned into multiple parts or 'slices'. Any number of slices may be used. The slicing may be in a bit, nibble (4-bits), byte (8-bits), word (multiple bytes), character, string, or file level. For example, in a case wherein the content includes 240 bytes designated byte #1 to byte #240, using a byte level partitioning into two slices results in a first slice (slice #1) including byte #1 to byte #120, and a second slice (slice #2) including byte #121 to byte #240. In the case of byte-level partitioning into three slices (referred as slice #1, slice #2, and slice #3), a first slice (slice #1) may be including byte #1 to byte #80, a second slice (slice #2) may be including byte #81 to byte #160, and a third slice (slice #3) may be including byte #161 to byte #240. Similarly, in a case wherein the content include 3 bytes designated byte #1 to byte #3 representing 24 bits, using a bit-level partitioning into four slices results in a slice #1 including the first 6 bits, slice #2 including the next 6 bits, slice #3 including the next 6 bits, and slice #4 including the last 6 bits. The partition may be into equal length parts. Alternatively or in addition, a different length slicing may be applied. For example, in the case of a 240 bytes content and using byte-level partitioning into three slices (referred as slice #1, slice #2, and slice #3), a first slice (slice #1) may be

92

including byte #1 to byte #20 (20-byte length), a second slice (slice #2) may be including byte #21 to byte #100 (80-byte length), and a third slice (slice #3) may be including byte #101 to byte #240 (140-byte length). In one example, the content itself is made of inherent or identifiable parts or segments, and the partition may make use of these parts. In one example, the content may be a website content composed of multiple webpages, and thus the partition may be such that each slice includes one (or few) webpages. Further, the partitioning may be sequential or non-sequential in the content.

The partitioning may be non-overlapping, wherein each slice includes a distinct part of the content, as is exampled above in a case wherein the content includes 240 bytes designated byte #1 to byte #240, where using a byte level partitioning into three slices (referred as slice #1, slice #2, and slice #3), results in a first slice (slice #1) including byte #1 to byte #80, a second slice (slice #2) including byte #81 to byte #160, and a third slice (slice #3) including byte #161 to byte #240. Alternatively or in addition, an overlapping partitioning may be applied, where the same part of the content is included in multiple slices. For example, in a case above where the content includes 240 bytes designated byte #1 to byte #240, and using a byte level partitioning into three slices (referred as slice #1, slice #2, and slice #3), a first slice (slice #1) may include byte #1 to byte #160, a second slice (slice #2) may include byte #81 to byte #240, and a third slice (slice #3) may include byte #1 to byte #80 in addition to byte #161 to byte #240. In such a case, byte #1 to byte #80 are part of both slice #1 and slice #3, byte #81 to byte #160 are part of both slice #1 and slice #2, and byte #161 to byte #240 are part of both slice #2 and slice #3. It is noted that in such a partition, the content may be fully reconstructed from any two of the slices, hence providing a degree of redundancy. For example, in case of carrying the three slices over the Internet and a failure to receive one of the slices, the remaining two slices may be used to fully reconstruct the whole content.

The same content may be requested and fetched using multiple tunnel devices as exampled above. Alternatively or in addition, the content may be partitioned into multiple slices (overlapping or non-overlapping), where each slice is requested and fetched using a distinct tunnel device (or via the client device serving as its own tunnel). The content is partitioned into slices in a 'Content Partition' step 101b shown in the flowchart 100. In one example, each of the slices is allocated to a different tunnel device, and fetched via that tunnel device as explained herein. For example, in the case of partitioning into 3 slices, where slice #1 may be fetched via the tunnel device #1 33a in a 'Content Fetch Tunnel #1' step 65a, slice #2 may be fetched via the tunnel device #2 33b in a 'Content Fetch Tunnel #2' step 65b, and slice #2 may be fetched via the tunnel device #3 33c in a 'Content Fetch Tunnel #3' step 65c. Alternatively or in addition, a slice (or multiple slices) may be requested and fetched via two or more tunnel devices. Such scheme provides redundancy and may further accelerate the content fetch. For example, in the case of partitioning into 2 slices, where slice #1 may be fetched via the tunnel device #1 33a in the 'Content Fetch Tunnel #1' step 65a and in parallel slice #1 may also be fetched via the tunnel device #2 33b in the 'Content Fetch Tunnel #2' step 65b, while slice #2 may be fetched via the tunnel device #3 33c in the 'Content Fetch Tunnel #3' step 65c.

The system was exampled above where a device may be a client device (such as the client device #1 31a) executing, for example, the flowchart 60, the flowchart 100, or the flowchart 100a. Similarly, a device may be a tunnel device (such as the tunnel device #1 33a) executing, for example, the flowchart 70. It is appreciated that a device may serve as both a client

US 9,241,044 B2

93

device and as a tunnel device, executing both a client device flowchart (such as the flowchart 100a) and a tunnel device flowchart (such as the flowchart 70). The two roles may be performed sequentially, where one role is assumed at a time, or may be used in parallel using multitasking or multiprocessing. For example, the client device #1 31a may also serve as a tunnel device, referred to as Client/Tunnel device #1 ala as shown in system 120 in FIG. 12. For example, the table 40 shown in FIG. 5a shows in the fifth row 42e such a client/tunnel device after signing in. A system may include client-only devices using tunnel-only devices. Alternatively or in addition, a part of, or all the devices in a system may be client/tunnel devices, capable of assuming both roles of client and tunnel devices.

In one example shown as a messaging flow 120a in FIG. 12a, the client/tunnel #1 device 121a is serving as a tunnel device (in addition to being the client device #1 31a as described above) serving as an intermediary device for the client device #2 31b for fetching content from the data server #2 22b. The 'Content Request' message 122a (corresponding to the 'Content Request' message 56g in the timing chart 50) is first sent from the client device #2 31b to the client/tunnel device #1 121a, which responds by forwarding the request to the data server #2 22b using the 'Content Request' message 122b (corresponding to the 'Content Request' message 56h in the timing chart 50). In turn the data server #2 22b replies and sends the content in 'Send Content' message 122c (corresponding to the 'Send Content' message 56i in the timing chart 50) to the requesting client/tunnel device #1 121a now serving as a tunnel device, which in turn forward the fetched content to the asking client device #2 31b using the 'Send Content' message 122d (corresponding to the 'Send Content' message 56j in the timing chart 50).

Any device referred to herein as a 'tunnel device', such as the tunnel device #1 33a, the tunnel device #2 33b, or the tunnel device #3 33c, may be implemented as a computer serving as a client device in the server/client sense, and may execute client applications or software. In particular, such a tunnel device may execute a web browser application. Similarly, any tunnel device may be implemented as a computer serving as a server device in the server/client sense. Similarly, any device referred to herein as a 'client device', such as client device #1 31a, client device #2 31b, and client device #3 31c, may be implemented as a computer serving as a client device in the server/client sense, and may be executing client applications or software. In particular, such a client device may execute a web browser application. Similarly, any client device may be implemented as a computer serving as a server device in the server/client sense.

Further, the functionality of any device herein may be implemented using multiple physical devices. In one example shown as a system 130 in FIG. 13, the client device #1 31a functionality is implemented in as client device #1 system 133, comprising a computer 132 (may be used for GUI or as a client), is communicating with a proxy server 131. The client device #1 31a functionality may be split between the computer 132 and the proxy server 131.

In one example, the acceleration server 32 (together with the tunnel devices) forms a system that may be used to provide a service to a client device. The service allows the client device (such as client device #1 31a) to quickly and anonymously fetch content from the data server #1 22a. The service level may be measured, or the service may be billed for, if applicable, for example, using the following parameters (individually or combined):

Content amount. In this example, the amount of data relating to the content fetched from a data server (such as the data

94

server #1 22a) is measured and logged. In such a scheme, the tunnel devices may send to the acceleration server the amount of data flowing through from the data server to the client device. Alternatively or in addition, the client device may log or send the amount of content fetched to the acceleration server 32.

Number of tunnels. The number of tunnels that were available to a client device, or the number of tunnel devices that were actually used, may be used as an indication to the service level.

Location. The service level may be measured or billed based the country the data server, from which the content is fetched, is located. Similarly, the service level may be measured or billed based the country the client device, to which the content is fetched, is located.

While the pre-connection process was described above regarding the communication between a client device (such as the client device #1 31a) and a tunnel device (such as the tunnel device #1 33a), described as the client device pre-connection flowchart 64 and the tunnel device pre-connection flowchart 72, a pre-connection may be established between any two devices in the system 30, such as between a client device and the acceleration server 32, between two client devices, or between a client device and a data server (such as the data server #1 22a). Similarly, a pre-connection may be established between a tunnel device and the acceleration server 32, between two tunnel devices, or between a tunnel device and a data server (such as the data server #1 22a).

The performance of the method and system described herein may be based on the latency involved in fetching a required content. The flowchart 65 in FIG. 6 describes the steps involved in fetching content from a tunnel device, and a flowchart 140 in FIG. 14 provides further detailed operation of a client device, such as the client device #1 31a. The 'receive Content' step 63c may be partitioned into two or more steps, as shown in the flowchart 270 in FIG. 27, such as a 'Receive Start' step 141a, relating to the starting of receiving data from a tunnel device, upon starting or completing the reception of the first byte of the data, for example, and a 'Receive End' step 141b, relating to the ending of receiving data from a tunnel device, for example upon starting or completing the reception of the end byte of the data.

As part of the 'Send Content Request' step 63b, a timer #1 is started in 'Timer #1 Start' step 142a, and the timer #1 is stopped in a 'Timer #1 Stop' step 142b at the beginning of the receiving the data from the tunnel device in the 'Receive Start' step 141a. Hence, the timer #1 is used to measure the Round Trip Time (RTT), relating to the time interval measured from sending the request to a tunnel device until the requested data is starting to be received. Similarly, as part of the 'Receive Start' step 143a a timer #2 is started, and the timer #2 is stopped in a 'Timer #2 Stop' step 143b at the end of the receiving the data from the tunnel device in a 'Receive End' step 141b. Hence, the timer #2 is used to measure the time interval required to receive the content itself from the tunnel. For example, in case the time interval is 50 milliseconds (ms), this is the time interval measured from starting to ending of the data reception from the tunnel device. In the case the content size is X bits, the BW can be calculated as the X bits divided by the timer #2 measured time interval. For example, in case the received content from the tunnel device is about the size of 50,000 bits (50 Kbits) received during 100 milliseconds (ms), the effective (or average) BW is BW=50,000/0.1=500,000 bits/second=500 Kb/s=62.5 Kbytes/s=62.5 KB/s. The total latency affecting the performance is the combination of both the time interval measured by timer #1 and the time interval measured by timer #2. Using

US 9,241,044 B2

95

the above examples where the timer #1 measured an RTT of 50 ms and the timer #2 measured 100 ms, the total latency, measured from sending the request to the tunnel in the 'Send Content Request' step 63b to the end of the content reception in the 'Receive End' step 141b, is 150 ms (50+100=150).

After a transaction involving fetching a content from a tunnel is completed, it is beneficial to store the fetched content for future use, as shown in a 'Store Content' step 145 in the flowchart 140. The fetched content may be stored in the client device in any volatile or non-volatile memory, or may be stored in a local cache as described in U.S. Pat. No. 8,135,912 to the same inventors as this application, entitled: "System and Method of Increasing Cache Size", which is incorporated in its entirety for all purposes as if fully set forth herein. The content is stored with its related metadata or any other identifiers, so it can be easily detected and fetched when later required. For example, the stored content may be used when the same content is required at any later stage by the same client, or may be used when the client device also serves as a peer device, such as the peer device #1 102a as shown in system 260. In the latter case, the fetched content (such as a URL content) may be arranged and stored as chunks, as described herein.

After a transaction involving fetching a content from a tunnel is completed, it is beneficial to store the transaction related information for future use, such as for future analysis. An example of a table relating to transactions log, that may be part of a database, is shown as table 150 in FIG. 15. The table is updated in the 'Update Transactions Log' step 144 as part of the flowchart 140 shown in FIG. 14. A top row 152 provides the titles of the various columns, where each of the rows provides information regarding a specific transaction, where a first transaction information is shown in a first row 152a, the second transaction information is shown in a second row 152b, the third transaction information is shown in a third row 152c, and so forth. The first column 151a shows the date and time (in DD/MM HH/MM format) when the transaction occurred, such as the start or end of the transaction. For example, the first transaction related information is in the first row 152a shows that the transaction was completed (or started) at March 13th, on 9:23. Similarly, the second transaction information is in the second row 152b shows that the transaction was completed (or started) on March 13th, at 9:46, and the third transaction information is in the third row 152b shows that the transaction was completed (or started) at April 16th, on 11:22. The second column 151b includes an identifier such as the IP address of the tunnel device that was used in the transaction to fetch the content from the data server, which identifier (such as its IP address) is included in the third column 151c. In the example of the first transaction shown in the first row 152a, the IP address of the tunnel device used is 229.155.81.168, and it was used to fetch content stored in a data server having an IP address of 128.164.35.35.142. Similarly, in the example of the second transaction shown in the second row 152b, the IP address of the tunnel device used is 248.107.109.10, and it was used to fetch content stored in a data server having an IP address of 49.154.2.5, and in the example of the third transaction shown in the third row 152c, the IP address of the tunnel device used is 158.217.19.195, and it was used to fetch content stored in a data server having an IP address of 72.251.238.51. The fourth column 151d describes the identifier of the content that was fetched during this transaction, such as IP address, URL, web-site or web-page, where the first transaction content (in the first row 152a) relates to the URL www.111.com/22.mpg, the second transaction content (in the second row 152b) relates to the URL

96

www.xxx.com/hy.avi, the third transaction content (in the third row 152c) relates to the URL www.vyy.com/t6.php, and so forth.

A fifth column 151e logs the BW calculated in a respective transaction, based on timer #2 time interval measurement as described above. In the first transaction (in the first row 152a) the calculated BW is logged as 1000 Kb/s (=1 Mb/s=125 KB/s), in the second transaction (in the second row 152b) the calculated BW is logged as 350 Kb/s (=0.35 Mb/s), and in the third transaction (in the third row 152c) the calculated BW is logged as 2500 Kb/s (=2.5 Mb/s). A sixth column 151f logs the RTT measured in the transaction, based on timer #1 time interval measurement as described above. In the first transaction (in the first row 152a) the measured RTT is logged as 30 ms (=0.03 seconds=0.03 s), in the second transaction (in the second row 152b) the measured RTT is logged as 70 ms, and in the third transaction (in the third row 152c) the measured RTT is logged as 540 ms (=0.54 second).

The transaction log, such as table 150, may be prepared by a client device, such as client device #1 31a, and stored in the client device for future use. Alternatively or in addition, the transaction log may be sent, after each transaction or after multiple transactions, such as per a time period (e.g., hourly, daily, weekly, monthly), to other entities in the system, to be stored in the entities for future use by them or by other entities in the network. In one example, the transaction log is sent to the acceleration server 32. Alternatively or in addition, the transactions log may be sent to the tunnel devices, such as the tunnel device #1 33a, the tunnel device #2 33b, or the tunnel device #3 33c, that were involved in the content fetching transaction.

Similar to table 150 shown in FIG. 15, a table 150a shown in FIG. 15a shows a table relating to four tunnel devices used for fetching different content from the same data server (such as the data server #1 22a), thus the same server IP address is shown in the third column 153c. The IP addresses the tunnel devices are shown in the second column 153b, the URL fetched is shown in the fourth column 153d, the date and time of the transaction are logged in the first column 153a, the BW is shown in the fifth column 153e, and the measured RTT is shown in the sixth column 153f. The first transaction (logged in a first row 154a) is using a first tunnel device having IP address of 139.230.154.213, the second transaction (logged in a second row 154b) is using a second tunnel device having IP address of 132.171.60.197, the third transaction (logged in a third row 154c) is using a third tunnel device having IP address of 248.46.80.36, and the fourth transaction (logged in a fourth row 154d) is using a fourth tunnel device having IP address of 31.16.208.171.

The tunnel devices to be used when content is to be fetched from a data server (such as the data server 22a) may be selected by a client device (such as the client device #1 31a) in the 'Select Tunnel' step 62c in the flowchart 60, or in the 'Select Tunnels' step 101b in the flowchart 100. Alternatively or in addition, the tunnel devices may be selected by the acceleration server 32, as part of the 'Select Tunnels' step 101a in the flowchart 90. The selection may be based on a past performance of the tunnel devices, such as information relating to former transactions involving these tunnel devices. In one example, the transactions log may be used to evaluate and select which tunnel devices to use in a specific transaction to be executed, or in multiple transactions.

In the example of the transaction log table 150a shown in FIG. 15a related to a client device, the client device may need to fetch content from the same data server shown in the table 150a (having an IP address of 49.154.2.5), and thus may use the table content as an indication of the performance of

US 9,241,044 B2

97

the various tunnel devices. In one example, the criterion to select a single tunnel device to be used for fetching content from the data server may be based on having higher BW, assuming that the higher BW has not changed and thus will result in faster content fetching, and hence the tunnel device used in the third logged transaction (having an IP address of 248.46.80.36) will be selected for this transaction, having the highest recorded BW of 2500 Kb/s. In the case two tunnel devices are to be selected, the second tunnel device to be selected is the tunnel device used in the fourth logged transaction (having an IP address of 31.16.208.171) will be selected for this transaction, being associated with the second highest BW in the table. Similarly, the tunnel device associated with the first logged transaction will be the next to be selected.

Alternatively or in addition, the criterion to select a single tunnel to be used for fetching content from the data server may be based on having lower RTT, assuming that the lower RTT has not changed and this will result in faster content fetching, and hence the tunnel device used in the first logged transaction (having an IP address of 139.230.154.213) will be selected for this transaction, having the lowest recorded RTT of 30 ms. In the case two tunnel devices are to be selected, the second tunnel device to be selected is the tunnel device used in the second logged transaction (having an IP address of 132.171.60.197) will be selected for this transaction, being associated with the second lowest RTT in the table (70 ms). Similarly, the tunnel device associated with the fourth logged transaction will be the next to be selected.

Alternatively or in addition, both the RTT and the BW are used as criteria for selecting tunnel devices. In one example, the expected total latency is calculated, based on both the former BW and the former RTT, and the tunnel device offering the lowest estimated total latency will be selected. In one example, assuming the content to be fetched is estimated (or known to be) having the size of 100 Kb (100 kilobits), the tunnel device used in the first logged transaction (in the first row 154a) is associated with past performance (with the same data server) of BW=1000 Kb/s and RTT=30 ms. In such a case, the total latency is calculated and estimated as 30+100/1000=130 ms. The tunnel device used in the second logged transaction (in the second row 154b) is associated with past performance (with the same data server) of BW=350 Kb/s and RTT=70 ms, and thus the total latency is calculated and estimated as 70+100/350=355.7 ms. Similarly, the estimated total latency of using the tunnel device used in the third logged transaction (in the third row 154c) is 580 ms, and the estimated total latency of using the tunnel device used in the fourth logged transaction (in the fourth row 154d) is 241.4 ms. Having the lowest estimated total latency, the tunnel device used in the first logged transaction (in the first row 154a) will be selected first as having the lowest expected total latency, the tunnel device used in the fourth logged transaction (in the fourth row 154d) will be selected second, the tunnel device used in the second logged transaction (in the second row 154b) will be selected third, and the tunnel device used in the third logged transaction (in the third row 154c) will be selected last.

However, assuming the content to be fetched is estimated (or known to be) having the size of 1000 Kb (1000 kilobits=1 Mb). The tunnel device used in the first logged transaction (in the first row 154a) is associated with past performance (with the same data server) of BW=1000 Kb/s and RTT=30 ms. In such a case, the total latency is calculated and estimated as 30+1000/1000=1030 ms (1.03 s). The tunnel device used in the second logged transaction (in the second row 154b) is associated with past performance (with the same data server)

98

of BW=350 Kb/s and RTT=70 ms, and thus the total latency is calculated and estimated as 70+1000/350=2927.1 ms. Similarly, the estimated total latency of using the tunnel device used in the third logged transaction (in the third row 154c) is 940 ms, and the estimated total latency of using the tunnel device used in the fourth logged transaction (in the fourth row 154d) is 884.2 ms. Having the lowest estimated total latency, the tunnel device used in the fourth logged transaction (in the fourth row 154d) will be selected first as having the lowest expected total latency, the tunnel device used in the third logged transaction (in the third row 154c) will be selected second, the tunnel device used in the first logged transaction (in the first row 154a) will be selected third, and the tunnel device used in the second logged transaction (in the second row 154b) will be selected last.

The flowchart 74 in FIG. 7a describes a method to be executed by a tunnel device, such as the tunnel device #1 33a (or any other network element), for independently increasing the number of connections to a data server (such as the data server #1 22a), in order to allow faster fetching of content from the data server. Alternatively or in addition, the client device may manage the number of connections used per tunnel device, as described in a flowchart 160 shown in FIG. 16, which describes a method that may be executed by a client device, such as the client device #1 31a (or any other network), in element order to set more connection to the data server. The maximum number of connections available to the data server is determined in a 'Determine Maximum Connections Number' step 161a. This maximum value may be obtained from previous interactions with this data server, received from a tunnel device in a 'Notify Client' step 74c in the flowchart 74, or using a known default number. The actual number of connections that are in use at a specific time is determined in a 'Determine Number of Connections Used' step 161b. The actual connections used for each tunnel device may be obtained, for example, from the tunnel devices. In one example, more connection may be used, as checked in a 'More Connections Available?' step 161c. For example, the data server may provide up to 8 connections per tunnel device, while one of tunnel devices only uses 5 connections. In such a case, the client device may send a request to this tunnel device to increase the number of connections, for example by adding a single connection, as part of a 'Request More Connections' step 161d. In the case where the request for adding one or more connections is successful, as checked in a 'Rejected ?' step 161e, the device may repeat the request for additional connections. However, in one example, no additional connections may be opened, since the tunnel device has reached the maximum number of allowable connections with the data server. If no additional connections are to be opened, the client device may increase the effective bandwidth of content fetching from the data server by requesting the usage of more tunnel devices from an acceleration server (such as the acceleration server 32) as part of a 'Request More Tunnels' step 161f, corresponding to the 'Request Tunnels List' step 62a in the flowchart 60, followed by activating selected tunnel devices from the received tunnel devices list received from the acceleration server 32, as part of an 'Activate More Tunnels' step 161g, corresponding to the 'Content Fetch' flowchart 65. The client device may further repeat the process for maximizing the number of connections for the newly activated tunnel devices.

Web analysis is used by many web sites in order to measure the usage statistics, such as counting of web pages views, checking an average time between various web pages, and other usage statistics ('usage stats'). In many cases, the web analysis is based on embedding a code in the web-browser,

US 9,241,044 B2

99                                                                                 100

which sends an update or request to an analytics server, such as Google Analytics Server, which is used to measure and log the required web analysis. A flowchart 170 shown in FIG. 17 describes the scheme of interacting with the analytics server. An application, such as a web browser, may identify a content (such as by a URL) to be fetched via the Internet in a 'URL Identified' step 171a. Alternatively or in addition, the content may be identified by the IP of the data server, or using any other identification. Before accessing the URL-associated data server for fetching the required content, the application first sends information to the analytics server for logging and gathering statistics, in an 'Update Analytics Server' step 171b. The applications then waits until the update is completed, as acknowledged by receiving the analytics server response in an 'Analytics Server Response' step 171c. Only upon receiving the analytics server response, the application requests the content from the respective data server in a 'Request to Data Server' step 171d. The access to the analytics server, as described in the 'Update Analytics Server' step 171b and waiting for the server to respond in the 'Analytics Server Response' step 171c, consumes time and resources, and makes the process of fetching the required content slower.

Each of the analytic servers that are commonly used typically uses a unified response to an update request in the 'Analytics Server Response' step 171c. In one example, a database is built, including typical responses of analytic servers. Such information regarding typical responses may be obtained from previous interactions with analytic servers, either by the device executing the requesting application, or from other network elements.

The database containing the typical responses may be used to accelerate the flow of the requesting application, as described in a flowchart 170a shown in FIG. 17a, which corresponds to a flowchart 170 shown in FIG. 17. The Upon detecting a communication request targeting the analytics server as part of the 'Update Analytics Server' step 171b, the request is intercepted in an 'Intercept Update' step 172b. Such interception may be in the form of a filter driver (or any other intermediate driver), enabling the interception as part of an OS kernel. Alternatively or in addition, the interception may be in the form of an extension or a plug-in of the requesting application, such as a browser plug-in or a browser extension in the case where the application is a web browser. Alternatively or in addition, the interception of the request may use hooking of the requesting application or of the communication-related application. Alternatively or in addition, the application and the steps described herein may communicate using an Inter-Process Communication (IPC), such as a file sharing, a signal, a socket, a pipe, a message queue, a shared memory, a semaphore, or memory mapped file. In Windows environment, the IPC may be based on a clipboard, a Component Object Model (COM), a data copy, a DDE protocol, or mailslots.

The typical response database is used as a look-up table, associating to the update request intercepted a simulated artificial typical response, that is expected to be the same or similar to the response expected from the analytics server, as part of an 'Obtain Typical Response' step 172b. The artificial response is then returned to the requesting application, in a 'Return Typical Response' step 172c, so the requesting application may continue its operation in the 'Request to Data Server' step 171d, without the need to wait first for the actual response from the analytics server as part of the 'Analytics Server Response' step 171c. In such a scheme, the latency involved with waiting to the analytics server response is obviated.

The actual response received from the analytics server as part of the 'Analytics Server Response' step 171c may be ignored in general, and in particular by the requesting application, as it was substituted by the simulated response in the 'Return Typical Response' step 172c. Alternatively or in addition, the response is stored as part of the typical response database, to be used for forming simulated responses in future interactions with the same analytics server. Further, in order to save resources such as bandwidth and processing power, the update request to the analytics server may not be actually transmitted, and replaced only with the simulated response. Alternatively or in addition, such update request may be stored and transmitted at a later stage, for example, when the network element is idle.

The elements involved in a DHCP process are illustrated in a system 180 shown in FIG. 18. A device 181 (which may be any network element) may connect to a DHCP server #1 182a via a LAN 183, or may use a DHCP server #2 182b connected via a WAN 184. Typically, a DHCP process is completed in less than 5 milliseconds (ms) when communicating over the LAN 183, such as LAN 183, and is completed in less than 20 ms when communicating with the DHCP server #2 182b over the WAN 184. The DHCP process performed by the device 181 is described as a flowchart 180a in FIG. 18a. Upon sending to the DHCP server (such as DHCP server #1 182a or DHCP server #2 182b) a DHCP request in a 'Send DHCP Request' step 185a, the device 181 starts a timer #1 in a 'Start Timer #1) step 185b. Commonly, such a countdown timer is set to 5 seconds, notifying a timeout period after the 5 seconds expire. In a 'Response Received ?' step 185c, it is checked if a response was received, and the DHCP has been completed, so that the device may continue other activities, as part of a 'Return Response' step 185d. The device 181 checks continuously and waits for a response from a DHCP server for completing the DHCP process as long as the timer #1 has not expired in a 'Timer #1 Expired ?' step 185e. In the case where the timer 1 has expired, and no connection was made with the DHCP server or the DHCP has not been completed, then a failure of the DHCP process is declared in a "Return 'No Response'" step 185f.

While the common DHCP resolving period is under 5 ms in a LAN environment, and under 20 ms in a WAN environment, the timer #1 typical setting is of 5 seconds (or any other number of seconds), which is many orders of magnitude longer than required. Further, in some case a short or an intermittent communication problem, may cause a transiently drop of a packet, causing the DHCP process to fail and not be completed. Such failure will be detected only after the full 5 seconds has been expired, leading to a long delay in responding to, and fixing the problem (e.g, by repeating the DHCP process).

An improved DHCP timing scheme is shown as a flowchart 190 in FIG. 19, which may be executed by the device 181, and is based on the flowchart 180a in FIG. 18a. In addition to the prior-art timer #1 that is commonly set for a few seconds, an additional timer #2 is added, which is set to a much lower period, such as 100 or 200 ms, which allows for faster reconnection in case of a failure. The timer #2 starts with a 'Start Timer #2' step 191a. In the case the timer #2 expires before a successful DHCP process is completed, as checked in a 'Timer #2 Expired ?' step 191b, and as long as the timer #1 has not expired, the timer #2 is restarted in the 'Start Timer #2' step 191a, and the DHCP process is re-initialized in the 'Send DHCP Request' step 185a. Hence, in the case of a brief communication problem, the DHCP process initialization will be repeated, and as such will be recovered and completed in one of the cycles. In the case of a dysfunctional DHCP

US 9,241,044 B2

**101**

server, the problem will still be determined after timer #1 expiration, as in the prior-art scheme.

In one example, accessing a data server is improved by using an intermediate device referred to as 'peer' and 'agent' devices, respectfully executing a 'peer' and 'agent' flowchart. FIG. **20** shows a system **200** including a client device **201***a*, which may be the same device as the client device #1 **31***a* described above or a distinct device, that may access the data servers **22***a* and **22***b* using one or more of the peer device #1 **102***a*, the peer device #2 **102***b*, and the peer device #3 **102***c*, under the management and control of the acceleration server **202**, and using agent devices such as the agent device #1 **103***a* and the agent device #2 **103***b*. The acceleration server **202** may be the same server as the acceleration server **32** in the system **30** described above, or may be a distinct or a dedicated server. Similarly, a data server, such as the data server #1 **22***a* or data server #2 **22***b*, may be the same as the same servers described above in system **30**, or may be distinct or dedicated servers. While two agent devices are shown, any number of agent devices may be used. Similarly, while three peer devices are shown, any number of peer devices may be used.

The content stored in a data server, such as the data server #1 **22***a*, which may be requested by a client device such as the client device #1 **201***a*, may be partitioned into multiple parts or 'slices'. Any number of slices may be used. The slicing may be in a bit, nibble (4-bits), byte (8-bits), word (multiple bytes), character, string, or file level. For example, in a case wherein the content includes 240 bytes designated byte #1 to byte #240, using a byte level partitioning into two slices results in a first slice (slice #1) including byte #1 to byte #120, and a second slice (slice #2) including byte #121 to byte #240. In the case of byte-level partitioning into three slices (referred as slice #1, slice #2, and slice #3), a first slice (slice #1) may be including byte #1 to byte #80, a second slice (slice #2) may be including byte #81 to byte #160, and a third slice (slice #3) may be including byte #161 to byte #240. Similarly, in a case wherein the content include 3 bytes designated byte #1 to byte #3 representing 24 bits, using a bit-level partitioning into four slices results in a slice #1 including the first 6 bits, slice #2 including the next 6 bits, slice #3 including the next 6 bits, and slice #4 including the last 6 bits. The partition may be into equal length parts. Alternatively or in addition, a different length slicing may be applied. For example, in the case of a 240 bytes content and using byte-level partitioning into three slices (referred as slice #1, slice #2, and slice #3), a first slice (slice #1) may be including byte #1 to byte #20 (20-byte length), a second slice (slice #2) may be including byte #21 to byte #100 (80-byte length), and a third slice (slice #3) may be including byte #101 to byte #240 (140-byte length). In one example, the content itself is made of inherent or identifiable parts or segments, and the partition may make use of these parts. In one example, the content may be a website content composed of multiple webpages, and thus the partition may be such that each slice includes one (or few) webpages. Further, the partitioning may be sequential or non-sequential in the content.

The partitioning may be non-overlapping, wherein each slice includes a distinct part of the content, as exampled above in the case wherein the content includes 240 bytes designated byte #1 to byte #240, where using a byte level partitioning into three slices (referred as slice #1, slice #2, and slice #3), results in a first slice (slice #1) including byte #1 to byte #80, a second slice (slice #2) including byte #81 to byte #160, and a third slice (slice #3) including byte #161 to byte #240. Alternatively or in addition, an overlapping partitioning may be applied, where the same part of the content is included in multiple slices. For example, in a case above where the con-

**102**

tent includes 240 bytes designated byte #1 to byte #240, and using a byte level partitioning into three slices (referred as slice #1, slice #2, and slice #3), a first slice (slice #1) may include byte #1 to byte #160, a second slice (slice #2) may include byte #81 to byte #240, and a third slice (slice #3) may include byte #1 to byte #80 in addition to byte #161 to byte #240. In such a case, byte #1 to byte #80 are part of both slice #1 and slice #3, byte #81 to byte #160 are part of both slice #1 and slice #2, and byte #161 to byte #240 are part of both slice #2 and slice #3. It is noted that in such a partition, the content may be fully reconstructed from any two of the slices, hence providing a degree of redundancy. For example, in case of carrying the three slices over the Internet and a failure to receive one of the slices, the remaining two slices may be used to fully reconstruct the whole content.

In one example, the content is a website or a webpage, or may be identified as a URL, and consists of, or comprises, non-overlapping and equally-sized parts, referred to as chunks. For example, multiple chunks may be combined to reconstruct the original content, such as website or content. A chunk size may be 16 KB (Kilo-Bytes), and in the case the content to be partitioned is not exact multiple of 16 KB, the 'last' chunk will padded and filled with 'space' characters (or any other no content data).

For example, multiple chunks may be combined to reconstruct the original content, such as website or content, as schematically shown in an arrangement **210** shown in FIG. **21**. The data servers may include content addressed by various IP addresses or URLs, such as URL #1 **211***a*, URL #2 **211***b*, URL #3 **211***c*, and URL #N **211***d*. While examped using URLs, any other type of content may equally apply. Each URL may be associated with the URL associated HTTP headers. A content of the URL #1 **211***a* consists of multiple chunks stack **214***a* consisting of m chunks, designated chunk #1a **212***a*, chunk #1b **212***b*, chunk #1c **212***c*, up to chunk #1m **212***d*. Similarly, a content of the URL #2 **211***b* consists of multiple chunks stack **214***b* consisting of n chunks (n=m or n≠m), designated chunk #2a **212***e*, chunk #2b **212***f*, chunk #2c **212***g*, up to chunk #2n **212***h*, and a content of the URL #N **211***d* consists of multiple chunks stack **214***c* consisting of n chunks (p=m, p=n, p≠n or p≠m), designated chunk #3a **212***i*, chunk #3b **212***j*, chunk #3c **212***k*, up to chunk #3p **212***l*. Similarly, the URL #3 **211***c* may be partitioned into chunks (not shown).

Each of the content in the chunks is identified by a chunk identifier, where each chunk identifier is associated with one, and only one, chunk. In one example, preferably used in sequential partitioning scheme, a chunk is identified by the identifier of the content and the location of the chunk in the sequence of the partitioning. For example, a chunk may be identified by the content (e.g., URL, web-site, or web-page), and a number such as the number '23', meaning that this chunk is the 23rd slice in sequential partitioning of the content. Alternatively or in addition, the CRC of the content of the chunk is calculated, and used as the chunk identifier. For example, CRC-32 may be used, allowing each chunk (such as 16 KB size) to be identified by 33-bit identifier. Alternatively or in addition, a chunk identifier is based on a hash function of the chunk content.

A peer device may include a part of, or the entire stack of a single URL. Alternatively or in addition, a peer device may include a part of, or the entire stack of multiple URLs. In one example, a peer device may store all of the chunks included in a URL (or any other content). As shown in the arrangement **210**, the peer device #1 **213***a* stores the stack **214***a* of the entire chunks relating to the single URL #1 **211***a*, the peer device #2 **213***b* stores the stacks of 2 URLs: The stack **214***a* of

US 9,241,044 B2

103

the URL #1 211a and the stack 214b of the URL #2 211b. Similarly, the peer device #3 213c stores the stacks of 3 URLs: The stack 214a of the URL #1 211a, the stack 214b of the URL #2 211b, and the stack 214c of the URL #N 211d. Similar to peer device #1 213a, the peer device #d 213q stores the stack 214c of the entire chunks relating to the single URL #N 211d. The agent devices serve as pointers to the peer devices, based on the requested content. As shown in an arrangement 210a in FIG. 21a, an agent device #1 215a stores information regarding the location of content relating to URL #1 211a, and thus stores the identifiers of the peer device #1 213a, the peer device #2 213b, and the peer device #3 213c, since all these peer devices store the content of URL #1 211a. An agent device #2 215b stores information regarding the location of content relating to URL #2 211b, and thus stores the identifiers of the peer device #2 213b and the peer device #3 213c, since these peer devices store the content of URL #2 211b. Similarly, an agent device #N 215d stores information regarding the location of content relating to URL #N 211d, and thus stores the identifiers of the peer device #q 213d and the peer device #3 213c, since these peer devices store the content of URL #N 211d. While exampled where each agent device stores information about a single URL, an agent device may equally store information regarding the location of multiple URLs.

A peer device, such as the peer device #1 102a, the peer device #2 102b, and the peer device #3 102c, may store one or more chunks (or any part of the entire content), as a copy of the chunk content as part of the whole content, stored as in a data server. The availability of such content or chunks may be the result of a past loading of the content in the chunk from the appropriate data server. Each of the chunk content is stored in a memory of the associated peer device, and the memory may be referred to herein as a cache memory. As shown in scheme 210b in FIG. 21b, the peer device #1 213a (corresponding for example to the peer device #1 102a) stores in its cache memory the chunk #1a 212a, the chunk #1b 212b, the chunk #2a 212e, and the chunk #2c 212g. Similarly, the peer device #2 213b (corresponding for example to the peer device #2 102b) stores in its cache memory the chunk #1b 212b, the chunk #1m 212d, the chunk #2b 212f, and the chunk #3a 212i; the peer device #3 213c (corresponding for example to the peer device #3 102c) stores in its cache memory the chunk #2b 212f, the chunk #2c 212g, and the chunk #2n 212h; and the peer device #q 213d stores in its cache memory the chunk #1m 212d, the chunk #2b 212h, the chunk #3b 212j, and the chunk #3p 212l. A chunk may not be associated with any peer device, such as the chunk #3c 212k, which is shown in scheme 210 as not being stored in any of the peer devices. Alternatively or in addition, a chunk may be stored in multiple peer devices, such as the chunk #1b 212b which is shown to be stored in both the peer device #1 213a and the peer device #2 213b. Further, a peer device may store chunks which are part of multiple URLs, such as peer #q 213d shown to store the chunk #1m 212d which is part of URL #1 211a, the chunk #2n 212h which is part of URL #2 211b, and the chunk #3b 212j which is part of URL #N 211d.

An agent device, such as the agent device #1 103a or the agent device #2 103b, may include a list of peers, for example peers that store chunks relating to, or retrieve from, the same data server or URL. In the example shown as a scheme 210c in FIG. 21c, the agent device #1 215a (corresponding for example to the agent device #1 103a) stores a list of chunks location of URL #1 211a, including the peer device #1 213a (storing Chunk #1a 212a and Chunk #1b 212b), the peer #2 213b (storing Chunk #1b 212b and Chunk #1m 212d), and the peer #3 213c (storing Chunk #1m 212d). Similarly, the agent

104

device #2 215b (corresponding for example to the agent device #2 103b) stores a list of chunks location of URL #2 211b, including the peer device #1 213a (storing Chunk #2b 212f and Chunk #2c 212g), the peer device #2 213b (storing Chunk #2b 212f), the peer device #3 213c (storing Chunk #2b 212f, Chunk #2c 212g, and Chunk #2n 212h), and the peer #q 213d (storing Chunk #2n 212h); and the agent devices #r 215c and Agent #N 215d, both storing a list of chunks location of URL #N 211d, both stores a list including the peer #2 213b (storing Chunk #3a 212i) and the peer device #q 213d (storing Chunk #3b 212j and Chunk #3p 212l). An agent may store an empty list having no peers. Further, a peer may not be stored in any agent. The peer and agent devices may be identified by their respective IP address, or by any other mechanism allowing addressing over the Internet.

In one example, accessing a data server may be obviated by accessing copies of the data server content stored as chunks in 'peer' devices, each executing a 'peer' flowchart. The peer devices for a content (such as a URL, web-page, web-site, or IP address) are identified by 'agent' devices, each executing an 'agent' flowchart.

The method of retrieving chunks from peer devices is described below, based on the database 250a shown in FIG. 25 describing the list stored in the acceleration server 202, a flowcharts 230, 230a, and 230b respectively shown in FIGS. 23, 23a, and 23b describing a client device (such as the client device #1 201a) operation, a flow chart 240 shown in FIG. 24 describing an agent device (such as the agent device #1 103a) operation, a flow chart 240a shown in FIG. 24a describing a peer device (such as the peer device #1 102a) operation, and a messaging and states timing chart 220 shown in FIG. 20. The chart 220 shows the messaging and related timing associated with the operation of the acceleration server 202 (corresponding to a dashed line 221a), a client device such as the client device #1 201a (corresponding to a dashed line 221b), an agent device such as the agent device #1 103a (corresponding to a dashed line 221c), and a peer device such as the peer device #1 102a (corresponding to a dashed line 221d). The flowchart 230a comprises a flowchart 239 relating to the chunks retrieving from peer devices. The database 250a shown in FIG. 25a is illustrated as a table, wherein a first column 252a (designated as 'TYPE') relates to a device functionality, such as a agent, peer, or client, a second column 252b (designated as 'IP ADDRESS') relates to the device IP address, a third column 252c (designated as 'SIGN-IN DATE/TIME') relates to the date (in DD/MM format) and the time (in HH:MM—Hour:Minute format) when the device signed in with the acceleration server, and a fourth column 252d, relating to the physical geographical location of the device. The top row 253 in the table refers to the field designations. The first 253a, second 253b, third 253c, fourth 253d, and fifth 253e rows in the table 250a respectively relate to first, second, third, fourth, and fifth devices that signed in with the acceleration server 202. For example, the device shown in the first row 253a has signed in as an agent device as shown in the first column 252a, on March 24th at 8:35 as shown in the third column 252c, and can be addressed over the Internet using the IP address 73.0.82.8 as shown in the second column 252b. Similarly, the device shown in the third row 253c has signed in as a peer device as shown in the column 252a, on March 28th at 11:49 as shown in the third column 252c, and can be addressed over the Internet using the IP address 111.13.69.78 as shown in the second column 252b.

As shown in the messaging and timing chart 220, the process starts upon initializing an agent application in an agent device, schematically shown as a 'START' step 224a in the chart 220, corresponding to the state 241a 'START' in chart

US 9,241,044 B2

105

**240**. Such initialization may be executed upon the device powering up process, or upon a user request. Then the agent device #1 **103**a (as an example of an agent device) signs in with the acceleration server **202** in the 'Sign-in as Agent' step **241**b, which corresponds to a message 'Sign In' **226**a in the chart **220**. The message comprises the device functionality as 'agent', and the agent device **103**a identification on the Internet **113**, such as its IP address (for example 73.0.82.8). The acceleration server **202** is in an 'IDLE' step **251**a, until the message 'Sign In' **226**a is received at the acceleration server **202** at a 'Sign-In Request' step **251**b, which initiate an update of the database of the signed-in devices in a state 'Update Table' **251**c (corresponding to an 'Update List' state **222**a in the chart **220**), as shown, for example, in the first row **253**a in table **250**a. The acceleration server **202** further logs into the database the date and time of the signing in, such as 24/3 as a date and 8:35 as the time, as shown in the first column **252**a of the table **250**a. The acceleration server **202** further adds rows to the table per each agent device, in the case of multiple agent devices, such as the addition of the agent device #2 **103**b, that its signing-in details are shown in the second row **253**b, as addressed by IP address 68.78.78.3 and having signed in at 25/3 at 10:59.

Similarly, the peer device #1 **102**a starts and sign in with the acceleration server **202**. The process starts upon initializing a peer application in a peer device, schematically shown as a 'START' step **225**a in the chart **220**, corresponding to the state 'Start' **242**a in chart **240**a, followed by the 'Sign In' message (shown as dashed-line) **226**b in the chart **220**, corresponding to the 'Sign-in As Peer' step **242**b in the flowchart **240**a. The acceleration server **202** adds the agent device #2 **103**b and the signing-in details to the table **250**a in the 'Update Table' step **251**, as shown in the third row **253**c, as addressed by IP address 111.13.69.78 and having signed in at 28/3 on 11:49. Such initialization may be executed upon the device powering up process, or upon a user request. Alternatively or in addition, the peer device #1 **102**a may sign-in with the associated agent device, such as the agent device #1 **103**a, shown as a 'Sign In' message (shown as dashed-line) **226**c in the chart **220**. In the latter case, the agent device #1 **103**a updates its list of peer devices by adding the newly signed-in peer device #1 **102**a, as shown in an 'Update List' state **224**b in the chart **220**.

Similarly, the client device #1 **201**a starts and sign in with the acceleration server **202**. The process starts upon initializing a client application in a client device, schematically shown as a 'START' step **231**a 'Start' in the chart **220**. Such initialization may be executed upon the device powering up process, or upon a user request. Then the client device #1 **201**a sign in with the acceleration server **202** in the 'Sign-in as Client' step **231**b, which corresponds to the message 'Sign In' **226**d in the chart **220**. The message comprises the device functionality as 'client', and the client device #1 **201**a identification on the Internet **113**, such as its IP address (for example 125.90.25.92). The message 'Sign In' is received at the acceleration server **202**, which update the database of the signed-in devices in state 'Update Table' **251**c (corresponding to a state 'Update List' **222**b in the chart **220**), as shown in the fourth row **253**d in table **250**a. The acceleration server **202** further logs to the database the date and time of the signing in, such as 29/3 as a date and 14:23 as the sign-in time, as shown in the fourth column **253**d of the table **250**a. The acceleration server **202** further add to the table rows per each client devices. In one example, a device may be assigned to have multiple roles, such as functioning as both a client and an agent, as both an agent and a peer, as both

106

a client and a peer, or as an agent, a client, and a peer. Multiple roles may be implemented at different times, or simultaneously using multiprocessing or multitasking. For example, a device may sign-in as both an agent and a peer, as shown in the fifth row **253**e of the table **250**a, addressed by its IP address 95.33.37.80 and signing in at 16/3 on 21:53.

While the pre-connection process was described above regarding the communication between a client device (such as the client device #1 **31**a) and a tunnel device (such as the tunnel device #1 **33**a), described as the client device pre-connection flowchart **64** and the tunnel device pre-connection flowchart **72**, a pre-connection may be equally established between any two devices in the system **200**, such as between a client device (such as the client device #1 **201**a) and the acceleration server **202**, between two client devices, between a client device (such as the client device #1 **201**a) and an agent device (such as the agent device #1 **103**a), between a client device (such as the client device #1 **201**a) and a peer device (such as the peer device #1 **102**a), or between a client device and a data server (such as the data server #1 **22**a). Similarly, a pre-connection may be established between an agent device (such as the agent device #1 **103**a) and the acceleration server **202**, between two agent devices, between an agent device (such as the agent device #1 **103**a) and a peer device (such as the peer device #1 **102**a), or between an agent device and a data server (such as the data server #1 **22**a). Further, a pre-connection may be established between a peer device (such as the peer device #1 **102**a) and the acceleration server **202**, between two peer devices, or between a peer device and a data server (such as the data server #1 **22**a).

A content, such as an URL (or a web-page, or a web-site) which is typically stored in a data server, such as the data server #1 **22**a, may be requested by the client device, such as the client device **201**a, as shown in a state 'Content Needed' **223**b in the chart **220**. The client device sends a 'Request List' message **226**e to the acceleration server **202**, corresponding to a 'Request Agents List' step **231**c in the flowchart **230**. This request includes the URL or any other identifier of the requested content. The request is received at the acceleration server **202** in the 'Agent List Request ?' step **251**d in the flowchart **250**, which corresponds to the request by preparing a list of the agent devices which are associated with the required content, in the 'Prepare List' state **222**c in the chart **220**, corresponding to the 'Prepare List' step **251**e in the flowchart **250**. For example, the list may include identifiers of all agent devices that are related to the data server #1 **22**a, or the identifiers of all the agent devices, which may have information about the location of the chunks relating to the requested content. The list of agents (including the identifiers of the agent devices) is then sent, in a 'Send List' step **251**f in the flowchart **250** (corresponding to a message 'Send List' **226** in the chart **220**), to the requesting client device #1 **201**a, that receives the list in a 'Receive Agents List' step **231**d in the flowchart **230**. In the case no appropriate agent devices were found, the client device #1 may choose other schemes for fetching the required content, such as using tunnels as described above, or direct access to the data server #1 **22**a in a 'Content Fetch Direct' step **233** shown as part of the flowchart **230**a in FIG. 23a. In the case the list received at the client device #1 **201**a include multiple agents, the client device #1 **201**a may select one, two, three, or any other number of agent devices from the list, in a 'Select Agents' step **231**f in the flowcharts **230** and **230**a, corresponding to a 'Select Agent' state **223**c in the chart **220** illustrating selection of a single agent. Alternatively, all of the agent devices in the list may be selected.

US 9,241,044 B2

107

After receiving the agent devices list in the 'Receive Agents List' step 231d, the client device #1 201a may store the list in its storage, such as a cache memory. In a 'Store Agents List' step 231g. Further, a list of agent devices may be obtained from other elements in the system. Preferably, the list may include information about each agent device and transaction history relating to each agent device, such as the connection parameters (e.g., RTT and BW), the results quality, the resolved Domain Name System (DNS), and any other relevant information that may be used in the future. Alternatively or in addition to accessing the acceleration server 202 for obtaining a list of the available agent devices in the 'Request Agents List' step 231c, the client device #1 201a may obtain a list of relevant agent devices locally from a storage or cache memory. For example, the client device #1 201a may use a list of agent devices that were previously stored as part of the 'Store Agents List' step 231g.

Any number of agent devices may be selected. The number of agent devices that are selected in the 'Select Agents' step 231f may be 1 (one). Alternatively, a small number of agent devices may be selected, such as two (2) or three (3). Further, 4, 5, 6, 7, 8, 9, or 10 agent devices may be selected. Further, more than 10 agent devices may be selected, such as 10, 20, 30, 40, or 50.

A schematic messaging flow diagram 260 describing the client device #1 31a related steps of fetching the agent devices list from the acceleration server 202 is shown in FIG. 26. The 'Request Agent' message 261a (corresponding to the 'Request Agents List' step 231c in the flowchart 230) is first sent from the client device #1 31a to the acceleration server 202, which responds by sending the agents list using the 'Send Agent' message 261b (corresponding to the 'Receive Agents List' step 231d in the flowchart 230).

A flowchart 230a in FIG. 23a shows an example where three agents are selected by the client device, designated as an agent device #1 (such as the agent device #1 103a), an agent device #2 (such as the agent device #2 103b), and an agent device #3, while the timing and messaging chart 220 illustrates the usage of a single agent device. In a 'Request List Agent #1' step 234a in the flowchart 230a, the client device #1 201a send to the agent device #1 103a (using its identifier from the list received from the acceleration server 202) a request for a list of peers associated the requested content identifier (such as a URL), such as these peer devices that are known or expected to store chunks of the requested content (or any part of it), corresponding to the 'Request List' message 226g in the chart 220. The agent device #1 103a, which may be idling in an 'IDLE' step 241c, receives the request from the client device #1 201a in a 'Receive List Request' step 241d. In response to the request, in a 'Prepare Peers List' step 241e (corresponding to a state 'Prepare List' 224c in the chart 220), the agent device #1 103a prepares a list of the peer devices that it believes store chunks of the requested content, and in a 'Send List To Client' step 241f, corresponding to a 'Send List' message 226h in the chart 220, sends the list of identifiers of the relevant peer devices back to the requesting client device #1 201a. For each of the selected agent devices, the client device #1 201a selects one, two, or all of the peers in the list, and then retrieves the relevant chunks from each of the selected peer devices as shown in a 'Chunks Fetch' flowchart 239, shown in FIG. 23b. The peers list is requested from agent device #1 in a 'Request List Agent #1' step 234a, and the chunks are fetched from the peer devices in the list in a 'Chunks Fetch Agent #1' step 239a. Similarly, the peers list is requested from agent device #2 in a 'Request List Agent #2' step 234b, and the chunks are fetched from the peer devices in the list in a 'Chunks Fetch Agent #2' step 239b, which follows

108

the same 'Chunks Fetch' flow in the flowchart 239, and the peers list is requested from agent #3 in a 'Request List Agent #3' step 234c, and the chunks are fetched from the peer devices in the list in a 'Chunks Fetch Agent #3' step 239c, which also follows the same 'Chunks Fetch' flowchart 239.

A schematic visual messaging flow diagram 260a describing the client device #1 31a related steps of fetching the peer devices list from the agent device #1 103a is shown in FIG. 26a. The 'Request Peer List' message 262a (corresponding to the 'Request List Agent #1' step 234a in the flowchart 230b) is first sent from the client device #1 31a to the agent device #1 103a, which responds by sending the peer list using a 'Send Peer List' message 262b (corresponding to a 'Receive Peers List' step 238 in the flowchart 230b).

The flowchart 239 in FIG. 23b is an example of a handling of the list received from the agent device #1 103a. The list of the peer devices identifiers is received at the client device in a 'Receive Peers List' step 238, followed by a 'Select Peers' step 238a (corresponding to a 'Select Peers' state 223d shown in the chart 220), where the client device #1 201a selects which peer devices out of the list are to be used. The client device may select one, two, three, or any other number out of the listed peer identifiers, or may use all the peer devices in the list. In the example shown in the flowchart 239, three peer devices are used, designated as peer #1, peer #2, and peer #3. For each selected peer device, such as the peer device #1 102a, the client device #1 201a in the 'Request Chunk Peer #1' step 237a which corresponds to a 'Chunk Request' message 226i in the chart 220, send a request to the selected peer device asking for a chunk (or multiple chunks) that is stored (or expected to be stored) thereof. The peer device, such as the peer device #1 102a is in general idling in an 'IDLE' step 242c in the flowchart 240a. Upon receiving the request from the client device #1 201a in a 'Receive Chunk Request' step 242d in the flowchart 240a, the peer device #1 102a fetches the requested chunk (or chunks) as denoted in 'Fetch Chunk' state 225b in the chart 220, and send it to the requesting client device #1 201a, in a 'Send Chunk To Client' step 242e in the flowchart 240a, which corresponds to a 'Send Chunk' message 226j shown in the chart 220. The sent chunk is received at the client device #1 201a in the 'Receive Chunk Peer #1' step 236a. A schematic visual messaging flow diagram 260b describing the client device #1 31a related steps of fetching chunks from the peer device #1 102a is shown in FIG. 26b. The 'Request Chunk' message 263a (corresponding to the 'Request Chunk Peer #1' step 237a in the flowchart 230b) is first sent from the client device #1 31a to the peer device #1 102a, which responds by sending the requested chunks in the 'Send Chunk' message 263b (corresponding to the 'Receive Chunk Peer #1' step 236a in the flowchart 230b).

Similarly, the chunks from peer #2 are requested (in parallel or sequentially to peer#1 chunks fetching 239a operation) in a 'Request Chunk Peer #2' step 237b, and are received in a 'Receive Chunk Peer #2' step 236b, and the chunks from the peer device #3 102c are requested (in parallel or sequentially to peer device #1 chunks fetching 239a operation) in a 'Request Chunk Peer #3' step 237b, and are received in a 'Receive Chunk Peer #3' step 236c. A schematic visual messaging flow diagram 260c describing the client device #1 31a related steps of fetching chunks from the peer device #2 102b is shown in FIG. 26c. A 'Request Chunk' message 263c (corresponding to the 'Request Chunk Peer #2' step 237b in the flowchart 230b) is first sent from the client device #1 31a to the peer device #2 102b, which responds by sending the requested chunks in the 'Send Chunk' message 263d (corresponding to the 'Receive Chunk Peer #2' step 236b in the flowchart 230b). Similarly, a schematic visual messaging

US 9,241,044 B2

109

flow diagram 260d describing the client device #1 31a related steps of fetching chunks from the peer device #3 102c is shown in FIG. 26d. The 'Request Chunk' message 263e (corresponding to the 'Request Chunk Peer #3' step 237c in the flowchart 230b) is first sent from the client device #1 31a to the peer device #3 102c, which responds by sending the requested chunks in the 'Send Chunk' message 263f (corresponding to the 'Receive Chunk Peer #3' step 236c in the flowchart 230b).

Upon receiving part of, or all of, the requested chunks, the client device #1 201a assembles the chunks to render a reconstructed content (in part or in full), such as the requested URL, in an 'Assemble URL' step 235, corresponding to a 'Whole Content Received' state 223e in the chart 220. In the case part of the content is still missing, the client device #1 201a may directly approach the data server #1 22a in a 'Content Fetch Direct' step 233, or use other schemes, such as using tunnel devices as described above to fetch the remaining part of the content.

Any number of peer devices may be selected. The number of peer devices that are selected in the 'Select Peers' step 238a may be 1. Alternatively, a small number of peer devices may be selected, such as 2 or 3. Further, 4, 5, 6, 7, 8, 9, or 10 peer devices may be selected. Further, more than 10 peer devices may be selected, such as 10, 20, 30, 40, or 50.

After a transaction involving fetching a content from all peer devices is completed, it is beneficial to store the fetched content for future use, as shown in a 'Store Content' step 235a in the flowchart 230a. The fetched content may be stored in the client device in any volatile or non-volatile memory, or may be stored in a local cache as described in U.S. Pat. No. 8,135,912 to the Shribman et al., entitled: "System and Method of Increasing Cache Size", which is incorporated in its entirety for all purposes as if fully set forth herein. The content is stored with its related metadata or any other identifiers, so it can be easily detected and fetched when later required. For example, the stored content may be used when the same content is required at any later stage by the same client, or may be used when the client device also serves as a peer device, such as the peer device #1 102a as shown in system 260. In the latter case, the fetched content (such as a URL content) may be arranged and stored as chunks, as described herein.

The selection of the agent devices to be used in the 'Select Agents' step 231/may use any of the selection rules or criteria described above regarding to selecting tunnel devices in the 'Select Tunnel' step 62c or the 'Select Tunnels' step 101a described above. Further, the selection of peer devices to be used in the 'Select Peers' step 238a may use any of the selection rules or criteria described above regarding to selecting tunnel devices in the 'Select Tunnel' step 62c or the 'Select Tunnels' step 101a described above.

The performance of the method and system described herein may be based on the latency involved in fetching a required content. The flowchart 230a in FIG. 23a describes the steps involved in fetching content from a peer device, and a flowchart 239 in FIG. 23b provides further detailed operation of a client device, such as the client device #1 201a. The 'Receive Chunk Peer #1' step 236a (as an example for all equivalent steps such as the 'Receive Chunk #2' step 236b and the 'Receive Chunk #3' step 236c) may be partitioned into two or more steps, as shown in a flowchart 270 in FIG. 27, such as a 'Receive Start' step 271a, relating to the starting of receiving data from a peer device, upon starting or completing the reception of the first byte of the data, for example, and a 'Receive End' step 271b, relating to the ending of receiving

110

data from a tunnel, for example upon starting or completing the reception of the end byte of the data.

As part of the 'Request Chunk Peer #1' step 237a, a timer #1 is started in a 'Timer #1 Start' step 272a, and the timer #1 is stopped in a 'Timer #1 Stop' step 272b at the beginning of the receiving the data from the peer device in a 'Receive Start' step 271a. Hence, timer #1 is used to measure the Round Trip Time (RTT), relating to the time interval measured from sending the request to a peer device until the requested data is starting to be received. Similarly, as part of a 'Receive Start' step 273a a timer #2 is started, and the timer #2 is stopped in a 'Timer #2 Stop' step 273b at the end of the receiving the data from the peer device in a 'Receive End' step 271b. Hence, timer #2 is used to measure the time interval measured to receive the content itself from the peer device. For example, in case the time interval is 50 milliseconds (ms), this is the time interval measured from starting to end of the data reception from the peer device. In the case the content size is X bits, the BW can be calculated as the X bits divided by the timer #2 measured time interval. For example, in the case the received content from the peer device is about the size of 50,000 bits (50 Kbits) received during 100 milliseconds (ms), the effective (or average) BW is BW=50,000/0.1=500,000 bits/second=500 Kb/s=62.5 Kbytes/s=62.5 KB/s. The total latency affecting the performance is the combination of both the time interval measured by timer #1 and the time interval measured by timer #2. Using the above examples where the timer #1 measured an RTT of 50 ms and the timer #2 measured 100 ms, the total latency, measured from sending the request to the peer device in the 'Request Chunk Peer #1' step 237a to the end of the content reception in the 'Receive End' step 271b, is 150 ms (50+100=150).

After a transaction involving fetching a content from a peer is completed, it is beneficial to store the transaction related information for future use, such as for future analysis. An example of a table relating to transactions log, that may be part of a database, is shown as a table 280 in FIG. 28. The table is updated in the 'Update Transactions Log' step 274 as part of the flowchart 270 shown in FIG. 27. A top row 282 provides the titles of the various columns, where each of the rows provides information regarding a specific transaction, where a first transaction information is shown in a first row 282a, the second transaction information is shown in a second row 282b, the third transaction information is shown in a third row 282c, and so forth. A first column 281a shows the date and time (in DD/MM HH/MM format) when the transaction occurred, such as the start or end of the transaction. For example, the first transaction related information is in the first row 282a shows that the transaction was completed (or started) at March 13, at 9:23. Similarly, the second transaction information is in the second row 282b shows that the transaction was completed (or started) at March 13th, at 9:46, and the third transaction information is in the third row 282b shows that the transaction was completed (or started) at April 16th, on 11:22. A second column 281b includes an identifier such as the IP address of the peer device that was used in the transaction to fetch the content from the data server, which identifier (such as its IP address) is included in a third column 281c. In the example of the first transaction shown in first row 282a, the IP address of the peer device used is 229.155.81.168, and it was used to fetch content stored in a data server having an IP address of 128.164.35.35,142. Similarly, in the example of the second transaction shown in second row 282b, the IP address of the peer device used is 248.107.109.10, and it was used to fetch content stored in a data server having an IP address of 49.154.2.5, and in the example of the third transaction shown in third row 282c, the

US 9,241,044 B2

111

IP address of the peer device used is 158.217.19.195, and it was used to fetch content stored in a data server having an IP address of 72.251.238.51. A fourth column 281d describes the identifier of the content that was fetched during this transaction, such as IP address, URL, web-site or web-page, where the first transaction content (in the first row 282a) relates to the URL www.111.com/22.mpg, the second transaction content (in the second row 282b) relates to the URL www.xxx.com/hy.avi, the third transaction content (in the third row 282c) relates to the URL www.yyy.com/16.php, and so forth.

A fifth column 281e logs the BW calculated in a respective transaction, based on timer #2 time interval measurement as described above. In the first transaction (in the first row 282a) the calculated BW is logged as 1000 Kb/s (=1 Mb/s=125 KB/s), in the second transaction (in the second row 282b) the calculated BW is logged as 350 Kb/s (=0.35 Mb/s), and in the third transaction (in the third row 282c) the calculated BW is logged as 2500 Kb/s (=2.5 Mb/s). A sixth column 281f logs the RTT measured in the transaction, based on timer #1 time interval measurement as described above. In the first transaction (in the first row 282a) the measured RTT is logged as 30 ms (=0.03 seconds=0.03 s), in the second transaction (in the second row 282b) the measured RTT is logged as 70 ms, and in the third transaction (in the third row 282c) the measured RTT is logged as 540 ms (=0.54 second).

The transaction log, such as table 150, may be prepared by a client device, such as client device #1 201a, and stored in the client device for future use. Alternatively or in addition, the transaction log may be sent, after each transaction or after multiple transactions, such as per a time period (e.g, hourly, daily, weekly, monthly), to other entities in the system, to be stored in the entities for future use by them or by other entities in the network. In one example, the transaction log is sent to the acceleration server 202. Alternatively or in addition, the transactions log may be sent to the relevant agent devices, such as the agent device #1 103a or the agent device #2 103b, or any other agent device associated with the relevant peer device or devices involved in the transaction.

Similar to table 280 shown in FIG. 28, a table 280a shown in FIG. 28a shows a table relating to four peer devices used for fetching different content from the same data server (such as the data server #1 22a), thus the same server IP address is shown in the third column 283c. The IP addresses of the peer devices are shown in the second column 283b, the URL fetched is shown in the fourth column 283d, the date and time of the transaction are logged in the first column 283a, the BW is shown in the fifth column 283e, and the measured RTT is shown in the sixth column 283f. The first transaction (logged in a first row 284a) is using a first peer device having IP address of 139.230.154.213, the second transaction (logged in a second row 284b) is using a second peer device having IP address of 132.171.60.197, the third transaction (logged in a third row 282c) is using a third peer device having IP address of 248.46.80.36, and the fourth transaction (logged in a fourth row 154d) is using a fourth peer device having IP address of 31.16.208.171.

The peer devices to be used when content is to be fetched from a data server (such as the data server 22a) may be selected by a client device (such as the client device #1 201a) in the 'Select Peers' step 238a in the flowchart 230b or by the agent devices in the 'Prepare Peers List' step 241e in the flowchart 240. Alternatively or in addition, the peer devices may be selected by the acceleration server 202. Similarly, the agent devices to be used may be selected by a client device (such as the client device #1 201a) in the 'Select Agents' step 231f in the flowchart 230, or may be selected by the acceleration server 202 in the 'Prepare List' 251e in the flowchart 250.

112

The selection may be based on a past performance of the peer devices, such as on any information relating to former transactions involving these peers. In one example, the transactions log may be used to evaluate and select which peer devices to use in a specific transaction to be executed, or in multiple transactions.

In the example of the transaction log table 280a shown in FIG. 28a and relating to a client device, the client device may need to fetch content from the same data server shown in table 280a (having an IP address of 49.154.2.5), and thus may use the table content as an indication of the performance of the various peer devices. In one example, the criterion to select a single peer (or agent) device to be used for fetching content from the data server may be based on having higher BW, assuming that the higher BW has not changed and thus will result in faster content fetching, and hence the peer device used in the third logged transaction (having an IP address of 248.46.80.36) will be selected for this transaction, having the highest recorded BW of 2500 Kb/s. In the case two peer devices are to be selected, the second peer device to be selected is the peer device used in the fourth logged transaction (having an IP address of 31.16.208.171) will be selected for this transaction, being associated with the second highest BW in the table. Similarly, the peer device associated with the first logged transaction will be the next to be selected.

Alternatively or in addition, the criterion to select a single peer (or agent) device to be used for fetching content from the data server may be based on having lower RTT, assuming that the lower RTT has not changed and thus will result in faster content fetching. Hence the peer device used in the first logged transaction (having an IP address of 139.230.154.213) will be selected for this transaction, having the lowest recorded RTT of 30 ms. In the case two peer devices are to be selected, the second peer device to be selected is the peer device used in the second logged transaction (having an IP address of 132.171.60.197) will be selected for this transaction, being associated with the second lowest RTT in the table (70 ms). Similarly, the peer device associated with the fourth logged transaction will be the next to be selected.

Alternatively or in addition, both the RTT and the BW are used as criteria for selecting peer (or agent) devices. In one example, the expected total latency is calculated, based on both the former BW and the former RTT, and the peer device offering the lowest estimated total latency will be selected. In one example, assuming the content to be fetched is estimated (or known to be) having the size of 100 Kb (100 kilobits), the peer device used in the first logged transaction (in the first row 284a) is associated with past performance (with the same data server) of BW=1000 Kb/s and RTT=30 ms. In such a case, the total latency is calculated and estimated as 30+100/1000=130 ms. The peer device used in the second logged transaction (in the second row 284b) is associated with past performance (with the same data server) of BW=350 Kb/s and RTT=70 ms, and thus the total latency is calculated and estimated as 70+100/350=355.7 ms. Similarly, the estimated total latency of using the peer device used in the third logged transaction (in the third row 284c) is 580 ms, and the estimated total latency of using the peer device used in the fourth logged transaction (in the fourth row 284d) is 241.4 ms. Having the lowest estimated total latency, the peer device used in the first logged transaction (in the first row 284a) will be selected first as having the lowest expected total latency, the peer device used in the fourth logged transaction (in the fourth row 284d) will be selected second, the peer device used in the second logged transaction (in the second row 284b) will be selected third, and the peer device used in the third logged transaction (in the third row 284c) will be selected last.

US 9,241,044 B2

113

However, assuming the content to be fetched is estimated (or known to be) having the size of 1000 Kb (1000 kilobits=1 Mb). The peer device used in the first logged transaction (the first row **284***a*) is associated with past performance (with the same data server) of BW=1000 Kb/s and RTT=30 ms. In such a case, the total latency is calculated and estimated as 30+1000/1000=1030 ms (1.03 s). The peer device used in the second logged transaction (in the second row **284***b*) is associated with past performance (with the same data server) of BW=350 Kb/s and RTT=70 ms, and thus the total latency is calculated and estimated as 70+1000/350=2927.1 ms. Similarly, the estimated total latency of using the peer device used in the third logged transaction (in the third row **284***c*) is 940 ms, and the estimated total latency of using the peer device used in the fourth logged transaction (in the fourth row **284***d*) is 884.2 ms. Having the lowest estimated total latency, the peer device used in the fourth logged transaction (in the fourth row **284***d*) will be selected first as having the lowest expected total latency, the peer device used in the third logged transaction (in the third row **284***c*) will be selected second, the peer device used in the first logged transaction (in the first row **284***a*) will be selected third, and the peer device used in the second logged transaction (in the second row **284***b*) will be selected last.

In the general case, there may be N peer devices that may be used, designated i=1, 2, ... N, and that the total content size is X. Assuming non-overlapping partition, each of the peer devices (i) will be assigned part of the total content Xi, where X=ΣXi. The latency (Ti) in each path (i) relating to a peer device (i) is calculated as Ti=RTTi+Xi/BWi, where RTTi is the RTT associated with peer device (i) and BWi is the BW associated with the peer device (i). Since typically the latency relating to complete the fetching of the whole of the content (T) is determined by the longest latency of the individual latency Ti, then T=max(Ti), hence it is beneficial to minimize the maximum Ti, designated as min(max(Ti))=min(max (RTTi+Xi/BWi)). Such a minimum is obtained when all Ti's are equal to each other, so that $T=Ti=T_1=T_2=T_3=...=T_N$, which is resulted when the partition Xi is: $Xi=BWi^*[(X+ \Sigma RTTi^*BWi)/(\Sigma BWi)-RTTi]$, and the latency in such a case is $T=(X+\Sigma(RTTi^*BWi))/(\Sigma BWi)$. In the example of using two peer devices (N=2), then $X_1=BW_1^*[X+BW_2^*(RTT_2-RTT_1)]/(BW_1+BW_2)$ and $X_2=BW2^*[X+BW_1^*(RTT_1-RTT_2)]/(BW_1+BW_2)$, while the resulting latency is $T=T_1=T_2=(RTT_1^*BW_1+RTT_2^*BW_2+X)/(BW_1+BW_2)$.

Referring now to a system **290** shown in FIG. 29, schematically showing a general peer device #i **102***i*, which stores in a database **291***i* the entire content required (or a part of it), or at least part $X_i$ (which may be chunks-based) of the content that is required by the client device #1 **201***a*. The peer device #i **102***i* communicates with the client device #1 **201***a* over a data path **297***i*, characterized by an RTT_i and BW_i, so that the latency can be estimated to be $T_i=RTT_i+X_i/BW_i$. Similarly, a peer device #1 **102***a*, which stores in a database **291***a* the entire content required, or at least part $X_1$ (which may be chunks-based) of the content that is required by the client device #1 **201***a*. The peer device #1 **102***a* communicates with the client device #1 **201***a* over a data path **297***a*, characterized by an RTT_1 and BW_1, so that the latency can be estimated to be $T_1=RTT_1+X_1/BW_1$. Assuming that there are N peer devices, a peer device #N **102***N* is shown, which stores in a database **291***N* the entire content required, or at least part $X_N$ (which may be chunks-based) of the content that is required by the client device #1 **201***a*. The peer device #N **102***N* communicates with the client device #1 **201***a* over a data path **297***N*, characterized by an RTT_N and BW_N, so that the latency over this data path can be estimated to be $T_N=RTT_N+X_N/BW_N$.

114

An analysis of the system **290** is shown as a view **290***a* in FIG. 29*a*. The total latency expression is based on the arrival of the last piece (or last chunk) of a requested content to the client device #1 **201***a*, and hence T=Max (T_i) as shown in an expression (1) **292***a*, and in order to obtain fastest load time, the target is to minimize the total latency T, based on a partition $X_i$ of the total content X, as shown in an expression (2) **292***b*. Such minimum is obtained where the latency is the same (T) in all the data paths, as shown in an expression (3) **292***c*. An expression (4) **292***d* provides the optimal partition $X_i$ for minimum latency, and an expression (5) **292***e* provides the obtained latency. It is apparent that in the case wherein a fixed-fixed chunks are used in the system, the calculation of Xi may result in a non-integer number of chunks. In such a case, a chunk may be further partitioned into smaller chunks. Alternatively or in addition, the resulting sizes may be round to the nearest integer value, allowing for keeping the scheme of only using fixed-size chunks.

The allocation of the parts of the requested content to the available peer devices to be fetched therefrom, may be part of the 'Select Peers' step **238***a*. While exampled above regarding the allocation of content and the partitioning in a peer/agent based system, the method and the analysis are equally applicable for any system or arrangement where multiple data paths are used, each relating to the allocated parts of the content. For example, such a method may be used when the content is fetched using agents, such as in the 'Content Partition' step **101***b* in the flowchart **100** (or the flowchart **100***a*) above, where the partition may be based on the expression (4) **292***d* shown in the view **290***a*.

FIG. 29 further shows an example of a content **293**, composed of 6 (six) non-overlapping fixed-sized chunks designated as 'A' **293***a*, 'B' **293***b*, 'C' **293***c*, 'D' **293***d*, 'E' **293***e*, and 'F' **293***f*. In one example, assuming three (3) peer devices are used (N=3 in the system **290**), the allocation determined is shown in view **295***a* in FIG. 29*b*, where three chunks including the chunks 'A' **293***a*, 'B' **293***b*, and 'C' **293***c*, are allocated to be fetched from a first peer device (such as the peer device #1 **102***a*), a single chunk 'D' **293***d* is allocated to be fetched from a second peer device (such as the peer device #i **102***i*), and the two chunks 'E' **293***e* and 'F' **293***f*, are allocated to be fetched from a third peer device (such as the peer device #N **102**N). At time t=0, the content fetching from the three peer devices is started. A client device (such as the client device #1 **201***a*) prepares a memory **294** for storing the requested content **293** upon obtaining it.

The allocations of the content chunks into the available peer devices may be based on estimation RTT, BW, as well as other parameters relating to each of the peer devices, as well as on the communication characteristics associated with each peer device, and known to the client device. Such an estimation may be found to be inaccurate or not updated. The client device may measure and update the BW, RTT, and other relevant information as part of the actual content fetching. For example, an actual RTT and BW may be measured per each of the peer devices as described in the flowchart **140** in FIG. 14, added to other updated information gathered throughout the content fetching process. Further, the allocation of chunks to peer devices may be re-evaluated according to the updated parameters, and changed during the content fetching process. The re-evaluating of the allocation may be executed continuously and simultaneously with the content fetching, or preferably at specified time intervals.

In one example shown as view **295***b* in FIG. 29*b*, at a time t=t1 after the content fetching activity has initiated, the client device checks the status of the fetching, to find that the chunks 'A' **193***a*, 'B' **293***b*, and 'D' **293***d* have been completely

US 9,241,044 B2

| 115 | 116 |

fetched and loaded into the client device memory **294**. Further, the chunk 'C' **293***c* is about to start to be fetched from the first peer device, and a chunk 'E' **293***e* is in the process of being fetched. It is noted that the chunk 'F' **293***f* has not yet been fetched, and is expected to be the last chunk to be fully fetched, and hence determines and affects the total time required for the fetching of the entire requested content **293**. In one example, shown as a view **295***d* in FIG. 29*c*, the client device may decide, in order to reduce the total fetching time, to recalculate the content fetching time, and for example to reallocate the fetching of the chunk 'F' **293***f* (being the 'bottleneck' chunk) to another peer device, such as the second peer device. Alternatively or in addition, in order to improve efficiency and reduce the content fetching latency, the last to receive the chunk 'F' **293***f* is split into two equal-sized chunks 'F1' **293/1** and 'F2' **293/2**. It is apparent that splitting into non-equally sized chunks, or splitting into more than two chunks, may be equally applicable. Each of the newly formed chunks may now be allocated to a peer device, using any allocation scheme or criteria. In one example shown in view **295***e* in FIG. 29*e*, one of the new chunks 'F1' **293/1** is allocated to the third peer device, while the other chunk 'F2' **293/2** is allocated now to the second peer device.

The flowchart **296** shown in FIG. 29*d*, corresponds to the flowchart **239** shown in FIG. 23*b*, describes an example of a method involving real-time re-allocation of chunks to peer devices. The initial allocation of chunks to peer devices, based on criteria and scheme known before the content fetch initiation, is part of the 'Select Peers' step **238***a*. The fetching of the peer device #1 allocated chunks starts in a 'Start Receive Chunk Peer #1' step **298***a*, being part of the 'Receive Chunk Peer #1' step **236***a* shown in the flowchart **239** in FIG. 23*b*. Similarly, the fetching of the peer device #2 allocated chunks starts in a 'Start Receive Chunk Peer #2' step **298***b*, being part of the 'Receive Chunk Peer #2' step **236***b* in the flowchart **239** in FIG. 23*b*, and the fetching of the peer device #3 allocated chunks starts in a 'Start Receive Chunk Peer #3' step **298***c*, being part of the 'Receive Chunk Peer #3' step **236***c* in the flowchart **239** in FIG. 23*b*. In parallel to the process of fetching the various chunks from the allocated peer devices, the client device, continuously or periodically, measures the various communication related characteristics for each communication with a peer device, such as BW and RTT, as part of a 'Measure BW, RTT' step **299***a*. The new measured parameters are used for recalculation of the allocation, for example according to the expression (4) **292***i* in FIG. 29*a*. In a 'Re-Allocate ?' step **299***b*, the need for changing the former allocation is determined. In some cases, there may be no need to change the initial or former allocation. If there a need for re-allocation, the 'Select Peers' step **238***a* is resumed, and new allocation is affected.

In one example shown as arrangement **290***a* in FIG. 29*e*, each of the peer devices stored all of the chunks composing the entire content **293**. The peer device #1 **102***a* is shown to store the entire content in its memory as content **291***a*. Similarly, the peer device #i **102***i* stores the entire content in its memory as content **291***i*, and the peer device #N **102**N stores the entire content in its memory as content **291**N. In such a case, the client device **201***a* may choose any peer device for any chunk of the content **293**, or may even choose a single peer device (such as the peer device #1 **102***a*) to fetch the entire content therefrom. Alternatively or in addition, each of the peer devices may store only part of the chunks composing the content **293**, as shown in an arrangement **290***b* in FIG. 29*f*. The peer device #1 **102***a* is shown to store only chunks 'A' **293***a*, 'B' **293***b*, 'C' **293***c*, and 'E' **293***e*, in its memory as content **291***a*, while the peer device #i **102***i* stores only chunks

'A' **293***a*, 'C' **293***c*, 'D' **293***d*, and 'F' **293***f*, in its memory as content **291***i*, and the peer device #N **102**N stores only chunks 'A' **293***a*, 'D' **293***d*, 'E' **293***e*, and 'F' **293***f*, in its memory as content **291**N. It is noted that such storing of portions of the content **293** may not affect the system operation described in views **295***a*, **295***b*, **295***c*, and **295***d*, since the chunks required from each of the peer devices are indeed stored in these peer devices. In such a configuration, the agent devices and the client device should consider the actual content portion in each of the peer device, in addition to the size of the content portion that is optimal to be fetched from them.

Each of the devices denoted herein as servers, such as the acceleration server **32**, the data server #1 **22***a*, the data server #2 **22***b*, and the acceleration server **202**, may typically function as a server in the meaning of client/server architecture, providing services, functionalities, and resources, to other devices (clients), commonly in response to the clients' request. Each of the server devices may further employ, store, integrate, or operate a server-oriented operating system, such as the Microsoft Windows Server® (2003 R2, 2008, 2008 R2, 2012, or 2012 R2 variant), Linux™ (or GNU/Linux) variants (such as Debian based: Debian GNU/Linux, Debian GNU/kFreeBSD, or Debian GNU/Hurd, Fedora™, Gentoo™, Linspire™, Mandriva, Red Hat® Linux available from Red Hat, Inc. headquartered in Raleigh, N.C., U.S.A., Slackware®, SuSE, or Ubuntu®), or UNIX®, including commercial UNIX® variants such as Solaris™ (available from Oracle Corporation headquartered in Redwood City, Calif., U.S.A.), AIX® (available from IBM Corporation headquartered in Armonk, N.Y., U.S.A.), or Mac™ OS X (available from Apple Inc. headquartered in Cupertino, Calif., U.S.A.), or free variants such as FreeBSD®, OpenBSD, and NetBSD®. Alternatively or in addition, each of the devices denoted herein as servers, may equally function as a client in the meaning of client/server architecture.

Devices that are not denoted herein as servers, such as client devices (such as the client device #1 **31***a*, the client device #2 **31***b*, or the client device #1 **201***a*), tunnel devices (such as the tunnel device #1 **33***a* or the tunnel device #2 **33***b*), agent devices (such as the agent device #1 **103***a* or the agent device #2 **103***b*), or peer devices (such as the peer device #1 **102***a* or the peer device #2 **102***b*), may typically function as a client in the meaning of client/server architecture, commonly initiating requests for receiving services, functionalities, and resources, from other devices (servers or clients). Each of the these devices may further employ, store, integrate, or operate a client-oriented (or end-point dedicated) operating system, such as Microsoft Windows® (including the variants: Windows 7, Windows XP, Windows 8, and Windows 8.1, available from Microsoft Corporation, headquartered in Redmond, Wash., U.S.A.), Linux, and Google Chrome OS available from Google Inc. headquartered in Mountain View, Calif., U.S.A. Further, each of the these devices may further employ, store, integrate, or operate a mobile operating system such as Android (available from Google Inc. and includes variants such as version 2.2 (Froyo), version 2.3 (Gingerbread), version 4.0 (Ice Cream Sandwich), Version 4.2 (Jelly Bean), and version 4.4 (KitKat)), iOS (available from Apple Inc., and includes variants such as versions 3-7), Windows® Phone (available from Microsoft Corporation and includes variants such as version 7, version 8, or version 9), or Blackberry® operating system (available from BlackBerry Ltd., headquartered in Waterloo, Ontario, Canada). Alternatively or in addition, each of the devices that are not denoted herein as servers, may equally function as a server in the meaning of client/server architecture.

US 9,241,044 B2

117

The method and system described herein allows for a client device (such as Client device #1 31a in FIG. 5 or the client device #1 201a in FIG. 20) to effectively fetch content from a data server (such as the data server #1 22a). The method and system may be used by the client device for supporting an application, such as a web browser application, when the application is requesting a content from the Internet in general, and from a data server in particular. The request for Internet-related content may be intercepted by the 'client' application and process, initiating the client flowchart 60 shown in FIG. 6, the flowchart 100 shown in FIG. 10, or the flowchart 230 shown in FIG. 23. In one example, the client device uses a communication-related application to be used by the application when no 'client' application is present, such as HTTP stack handling application. The request from the requesting application to the communication-related application is intercepted and routed to be handled as part of the 'client' application or process. Such interception may be in the form of a filter driver (or any other intermediate driver), enabling the interception as part of the OS kernel. Alternatively or in addition, the interception may be in the form of extension or a plug-in of the requesting application, such as a browser plug-in or a browser extension in the case where the application is a web browser. Alternatively or in addition, the interception of the request may use hooking of the requesting application or of the communication-related application. Alternatively or in addition, the application and the steps described herein may communicate using an Inter-Process Communication (IPC), such as a file sharing, a signal, a socket, a pipe, a message queue, a shared memory, a semaphore, or memory mapped file. In Windows environment, the IPC may be based on a clipboard, a Component Object Model (COM), a data copy, a DDE protocol, or mailslots.

Examples of web browsers include Microsoft Internet Explorer (available from Microsoft Corporation, headquartered in Redmond, Wash., U.S.A.), Google Chrome which is a freeware web browser (developed by Google, headquartered in Googleplex, Mountain View, Calif., U.S.A.), Opera™ (developed by Opera Software ASA, headquartered in Oslo, Norway), and Mozilla Firefox® (developed by Mozilla Corporation headquartered in Mountain View, Calif., U.S.A.). The web-browser may be a mobile browser, such as Safari (developed by Apple Inc. headquartered in Apple Campus, Cupertino, Calif., U.S.A.), Opera Mini™ (developed by Opera Software ASA, headquartered in Oslo, Norway), and Android web browser.

Any network element, or any device that is herein that is connectable to the Internet, may be in one of the states in a state diagram 300 shown in FIG. 30. A device may be in an 'OFFLINE' state 301, where the device cannot access, and cannot be accessed via, the Internet. For example, the device may be not powered, or may not be connected to the Internet due to a faulty or non-operative communication interface, or due to the lack of Internet connectivity in the vicinity of the device. In normal operation, the device is in an 'ONLINE' state 302, where the device is connected to the Internet, and may receive messages from, and send messages to, the Internet. Further, a resource (or few resources) in the device may in time become congested in a 'CONGESTED' state 303. The device monitors its resources and performance, and upon detecting a resource utilization that is above a set threshold, declares itself as congested. The congestion detection scheme serves as a mechanism to measure the device performance and quality of service, and may be used to alert other devices in the system that the device may not be capable to handle additional tasks or services. The detection of congestion may be further used for load balancing, such as for distributing

118

workloads across multiple computing resources, such as computers, a computer cluster, network links, central processing units, or disk drives, for optimizing resource use, maximizing throughput, minimizing response time, and avoiding overload of any one of the resources. Further, using multiple components in a device with load balancing instead of a single component may increase reliability through redundancy. Similarly, using multiple devices in a system or network with load balancing instead of a single (or few) device may increase reliability through redundancy.

Upon power up and being operative, the device shifts from the 'OFFLINE' state 301 to the 'ONLINE' state 302 as depicted by an arrow 304b in the states chart 300. If for any reason the device is not capable to access the Internet or to be operative as required, such as upon powering the device power off or a faulty Internet connection, the device is considered to shift to the 'OFFLINE' state 301 as depicted by an arrow 304a. In the case a congestion is detected, the device shifts to the 'CONGESTED' state 303, as depicted by an arrow 304e. Upon detecting that the detected congestion has elapsed, the device may resume to normal operation in the 'ONLINE' state 302, as depicted by an arrow 304d. The device may also shift from the 'CONGESTED' state 303 to the 'OFFLINE' state 301, as depicted by an arrow 304c.

In one example, the congestion decision may be based on a CPU utilization, where CPU time or CPU usage is reported either for each thread, for each process, or for the entire system. The CPU utilization relates to the relative time that the CPU is not idling (for example, the amount of time it not executing a system idle process). In the case the CPU utilization is above a predetermined threshold, such as 80%, the device declares itself as congested. Alternatively or in addition, a congestion state may be based on memory utilization. In the case wherein the memory locations that are in use are above a predetermined threshold, for example, when additional memory requirements may not be satisfied, the device may declare itself as congested. Alternatively or in addition, a congestion state may be the result of detecting of low availability of communication bandwidth (for example, for accessing the Internet), or input/output resources limitations. The congestion in Internet related communication is described in IETF RFC 2914 entitled: "Congestion Control Principles", which is incorporated in its entirety for all purposes as if fully set forth herein.

A heartbeat mechanism may be used in order to allow devices to sense the status of other devices in the system. A 'ONLINE HEARTBEAT' flow chart 305 is shown in FIG. 31 as part of the flowchart 310, may be executed by any device herein. The device may be in an 'OFFLINE' step 301, corresponding to the 'OFFLINE' state in the state diagram 300. When in the 'ONLINE' state 302 and the 'CONGESTED' state 303, the device executes the flow chart 'ONLINE HEARTBEAT' 305, which starts at a 'Send Heartbeat' step 305a, where the device sends a 'ping' or any other message, thus notifying its availability over the Internet, and being in normal operation, and capable of providing services to other devices if required. The message sent in this step may be a dedicated heartbeat related message. Alternatively or in addition, any message which is sent as part of the device functionality, may as well be used as a 'heartbeat' message, corresponding to the 'Send Heartbeat' step 305a. For example, the 'Sign-in as Client' step 61b in the client device flowchart 60, the 'Request Tunnel List' step 62a, the 'Request Agents List' step 231c in the client flowchart 230, and the 'Send Chunk to Client' step 242d in the peer flowchart 240a, may serve also as a heartbeat message, corresponding to the 'Send Hearbeat' step 305a. A timer set to a predetermined time

US 9,241,044 B2

119

120

interval is started in a 'Start Timer' step 305b. The time period set by the timer is used to determine the frequency of the heartbeat 'pulse', where high frequency resulting short time periods allows for frequent updating of the device status. The time period between 'heartbeat pulses' may be in the order of milliseconds, such as every 10, 20, 30, 50, or 100 milliseconds, may be in the order of tens of seconds, such as every 10, 20, 30, 50, or 100 seconds, or may be in the order of minutes, such as every 1, 2, 3, 5, or 10 minutes. The device remains as long as the timer has not lapsed in a 'Timer Elapsed ?' step 305c. Upon an expiration of the timer, the device reverts to the 'Send Heartbeat' step 305a, and the process is resumed.

The congestion related activities of a device is shown in a flowchart 310a in FIG. 31, showing the flowchart 308, including the 'ONLINE' flowchart 308, describing to the device activity while in the 'ONLINE' state 302, and the 'CONGESTED' flowchart 307 describing the device activity while in the 'CONGESTED' state 303. The congestion related mechanism may also use heartbeat scheme, where the congestion state is periodically checked and reported. Upon entering the 'ONLINE' step 302 (corresponding to the 'ONLINE' state 302 in the state diagram 300), the device sends a message regarding its availability in a 'Send Non-Congested' step 308a. The device remains in a 'Congested ?' step 308b, as long as no congestion is detected. Upon detecting a congestion state, the device shifts to 'CONGESTED' state 303 and executes a 'CONGESTED' flowchart 307, starting with notifying its status as congested, in a 'Send Congested' step 307a. As long as the congestion condition is detected, the device stays in a 'Congested ?' step 307b. When the congestion criterion is not met anymore, the device reverts to normal operation in the 'ONLINE' state 302 and executes the 'Send Non-Congested' step 308a.

A device that monitors or tracks the status a tracked device (that executes the flowchart 310 and the flowchart 310a) may execute the tracking device 320 shown in FIG. 32. In a 'Message Received?' step 321f the tracking device checks for receiving any message from the tracked device, which may be following the flowchart 310 and the flowchart 310a in FIG. 31. In a 'Congested Message ?' step 321a, the received message type is checked. The received message may indicate that the tracked device is congested, for example, send the 'congested' message in the 'Send Congested' step 307a in the flowchart 307. In such a case, the tracked device status is marked as 'congested' in a 'Mark as Congested' step 321c, and the system or the tracking device may hold any further workload, or request for any service, relating to the tracked device. The received message may indicate that the tracked device is online, for example initiated as part of a 'Send Heartbeat' step 305a, as part of the 'Send Non-Congested' step 308a, or any other message indicating proper operation of the tracked device. In such a case, the tracked device status is marked as 'online' in a 'Mark as Online' step 321b, and the tracked device is assumed available to provide services, receive messages, or response to requests. In a 'Start Timer' step 321e, a timer configured to respond after a time interval has elapsed is triggered, similar to the timer described in the flowchart 305 in FIG. 31. In one example, the time interval measured by the timer starting at the 'Start Timer' step 321e may be the same as the time interval measured by the timer operated in the flowchart 305. Alternatively, the tracking device timer may be used to measure longer time interval, such as 5%, 10%, or 120% longer than the tracked device timer, allowing for an error margin. In the case a message is received in the 'Message Received ?' step 321f, the message is checked and the tracked device status is validated as described above. In the case no message is received from the tracked device, as noted in the 'Timer Elapsed ?' step 321g, it is assumed that the heartbeat mechanism of the tracked device shows as the flowchart 305 is inoperative, hence in a 'Mark as Offline' step 321b the tracked device is assumed to be inoperative, and thus not available for any services or requests.

In one example, all the devices herein (including server devices) in the system are tracked and are executing the tracked device flowchart 310 and the flowchart 310a in FIG. 31. Alternatively or in addition, all the devices in a system (including server devices) are tracking other devices and execute the tracking device flowcharts 320 in FIG. 32. In one example, the client devices, such as client device #1 31a and the client device #2 31b are the tracked devices, and thus execute the tracked device flowchart 310 and the flowchart 310a in FIG. 31, and the tracking devices are the tunnel devices (such as the tunnel device #1 33a, the tunnel device #2 33b, and the tunnel device #3 33c) and the acceleration server 32, each executing the tracking device flowcharts 320 in FIG. 32. Alternatively or in addition, the tunnel devices (such as the tunnel device #1 33a, the tunnel device #2 33b, and the tunnel device #3 33c) are the tracked devices, and thus execute the tracked device flowchart 310 and the flowchart 310a in FIG. 31, and the tracking devices are the client devices (such as client device #1 31a and the client device #2 31b) and the acceleration server 32, each executing the tracking device flowcharts 320 in FIG. 32. An example of the acceleration server 32 keeping a status of client devices and tunnel devices is shown as a column 'status' 41e in the table 40 in FIG. 5a, where the first row 42a entry shows that the associated tunnel is in an 'online' state, the second row 42b entry shows that the associated tunnel is in a 'congested' state, the third row 42c entry shows that the associated client is in an 'online' state, the fourth row 42d entry shows that the associated client is in an 'offline' state, and the fifth row 42e entry shows that the associated client/tunnel is in a 'congested' state. When the acceleration server 32 prepares a list of tunnel devices to be used as part of the 'Prepare List' step 81e in the flowchart 80, tunnel devices that are 'offline' and tunnel devices that are congested (such as the tunnel device associated with the entry of the second row 42b in the table 40) are not used, and are not included is the tunnel devices list sent to the requesting client device as part of the 'Send List' step 81f in the flowchart 80.

In one example, the client devices, such as client device #1 201a is the tracked devices, and thus execute the tracked device flowchart 310 and the flowchart 310a in FIG. 31, and the tracking devices are the agent devices (such as the agent device #1 103a, the agent device #2 103b, and the agent device #3 103c), the peer devices (such as the peer device #1 102a, the peer device #2 102b, and the peer device #3 102c), and the acceleration server 202, each executing the tracking device flowcharts 320 in FIG. 32. Alternatively or in addition, the agent devices (such as the agent device #1 103a, the agent device #2 103b, and the agent device #3 103c) are the tracked devices, and thus execute the tracked device flowchart 310 and the flowchart 310a in FIG. 31, and the tracking devices are the client devices (such as client device #1 201a), the peer devices (such as the peer device #1 102a, the peer device #2 102b, and the peer device #3 102c), and the acceleration server 202, each executing the tracking device flowchart 320 in FIG. 32. Alternatively or in addition, the peer devices (such as the peer device #1 102a, the peer device #2 102b, and the peer device #3 102c) are the tracked devices, and thus execute the tracked device flowchart 310 and the flowchart 310a in FIG. 31, and the tracking devices are the client devices (such as client device #1 201a), the agent devices (such as the agent

US 9,241,044 B2

121

device #1 103$a$, the agent device #2 103$b$, and the agent device #3 103$c$), and the acceleration server 202, each executing the tracking device flowchart 320 in FIG. 32. In such a system, an agent device or a peer device, that is either congested or offline, is not selected to provide a service to a client device. For example non-online agent devices are not selected as part of the 'Select Agents' step 231$f$ in the flowchart 230, and non-online peer devices are not selected as part of the 'Select Peers' step 238$a$ in the flowchart 230.

A device may be selected to provide a service, such as a tunnel device that may be selected (alone or as part of a group) by a client device as part of the 'Select Tunnels' step 101$a$ in the flowchart 100. The selected tunnel device may shift to the 'offline' state 301 or to the 'congested' state 303, and thus respectively becomes unavailable or less effective to use. In such a case, a new tunnel device, that was not formerly selected, may be now selected as a substitute for the 'offline' or 'congested' tunnel device as part of a 'Replace Device' step 321$d$. Similarly, an agent device may be selected (alone or as part of a group) by a client device as part of the 'Select Agents' step 231$f$ in the flowchart 230. The selected agent device may shift to the 'offline' state 301 or to the 'congested' state 303, and thus respectively becomes unavailable or less effective to use. In such a case, a new agent device, that was not formerly selected, may be now selected as a substitute for the 'offline' or 'congested' agent device as part of a 'Replace Device' step 321$d$. Alternatively or in addition, a peer device may be selected (alone or as part of a group) by a client device as part of the 'Select Peers' step 238$a$ in the flowchart 230$b$. The selected peer device may shift to the 'offline' state 301 or to the 'congested' state 303, and thus respectively becomes unavailable or less effective to use. In such a case, a new peer device, that was not formerly selected, may be now selected as a substitute for the 'offline' or 'congested' peer device as part of a 'Replace Device' step 321$d$.

Alternatively or in addition, in the case where multiple devices are selected to provide a service, such as a group of multiple tunnel devices, a group of multiple agent devices, or a group of multiple peer devices, the unavailability of a single device or multiple devices in the group (due to shifting to 'offline' state 301 or to 'congested' state 303), may not be handled or corrected, as long as a performance criterion or a threshold is not crossed. For example, assume 5 tunnel devices are assigned to a client device in the 'Select Tunnels' step 101$a$, where the system set a criterion of a minimum of 3 operative tunnel devices. Hence, as long as at least 3 tunnel devices are available and operational, no corrective action will be taken, and no devices will be replaced as part of the 'Replace Device' step 321$d$. Hence, even in the case of two tunnel devices becoming unavailable or congested, no new tunnel devices will be provided to fetch content for the applicable client device. However, in such a case, if 3 tunnel devices become unavailable rendering only 2 in operational (online) state, at least one new tunnel device will be selected (according to any criterion described herein) and will be used as a replacement as part of the 'Replace Device' step 321$d$.

The system 30 shown in FIG. 5 above describes the components involved in fetching content using tunnel devices. The system 30 comprises the acceleration server 32, which may execute a part of, or the whole of, the acceleration server tunnel-related flowcharts, such as the flowchart 80 shown in FIG. 8 or the flowchart 90 shown in FIG. 9. Further, the system 30 comprises client devices such as the client device #1 31$a$ and the client device #2 31$b$, each of which may execute a part of, or the whole of, the client device related flowcharts, such as the flowchart 60 shown in FIG. 6, the flowchart 100 shown in FIG. 10, or the flowchart 100$a$ shown

122

in FIG. 10$a$. In addition, the system 30 comprises tunnel devices such as the tunnel device #1 33$a$, the tunnel device #2 33$b$, and the tunnel device #3 33$c$, each of which may execute a part of, or the whole of, the tunnel device related flowcharts, such as the flowchart 70 shown in FIG. 7.

Similarly, the system 200 shown in FIG. 20 above describes the components involved in fetching content using agent and peer devices. The system 200 comprises the acceleration server 202, which may execute a part of, or the whole of, the acceleration server agent/peer related flowcharts, such as the flowchart 250 shown in FIG. 25. Further, the system 200 comprises client devices such as the client device #1 201$a$, which may execute a part of, or the whole of, the client device related flowcharts, such as the flowchart 230 shown in FIG. 23, the flowchart 230$a$ shown in FIG. 23$a$, or the flowchart 230$b$ shown in FIG. 23$b$. In addition, the system 200 comprises agent devices such as the agent device #1 103$a$ and the agent device #2 103$b$, each of which may execute a part of, or the whole of, the agent device related flowcharts, such as the flowchart 240 shown in FIG. 24. Furthermore, the system 200 comprises peer devices such as the peer device #1 102$a$, the peer device #2 103$b$, and the peer device #3 103$c$, each of which may execute a part of, or the whole of, the agent device related flowcharts, such as the flowchart 240$a$ shown in FIG. 24$a$.

Any network element in the system may be a dedicated device that assumes only a single role, and thus being only a client (using tunnels), a tunnel, a client (using agents/peers), an agent, or a peer device. Alternatively or in addition, a network element may be capable of assuming two or more roles, either at different times or simultaneously, from the list of roles including a client (using tunnels), a tunnel, a client (using agents/peers), an agent, or a peer device. Alternatively or in addition, a device may be capable of assuming all of the above roles. Further, the same server may be both the tunnels-related acceleration server 32 and the peer/agent related acceleration server 202, either simultaneously or at different times. Alternately, two (or more) distinct servers may be used.

Referring to a system 340 shown in FIG. 34, integrating both the system 30 shown in FIG. 5 and the system 200 shown in FIG. 20. Using such a system, content may be fetched using either tunnel devices, as described, for example, in the timing and messaging chart 50 shown in FIG. 5$b$, or using agent and peer devices as described, for example, in the timing and messaging chart 220 shown in FIG. 22, or both methods together. A client device such as a client device #1 341 may assume the role of the tunnel-using client device #1 31$a$, the role of the agent/peers-using client device #1 201$a$, or both. Such a dual-function client device may execute the flowchart 330 shown in FIG. 33, which is based on using one of the methods described herein, or both.

The client device 341 in the system 340 may use tunnel devices and assume the role of the client device #1 31$a$, may use peer/agent devices and assume the role of the client device #1 201$a$, or may use both methods, as shown in a flow chart 330 shown in FIG. 33. Upon a content request, the method starts in a 'START' step 331$a$. First, it is checked in a 'Locally Cached ?' step 331$c$ if the requested content is available in the client device #1 341 itself, for example in its cache or any available storage. In one example, the content may be available in the cache memory, since the content was fetched in a past transaction and stored in the device, such as in 'Store Content' step 145 as a part of the flowchart 140 in FIG. 14, or in a 'Store Content' step 235$a$ as a part of the flowchart 230$a$. In the case of locally available content, the content is fetched from the cache (or any other storage) as part of a 'Fetch from Local cache' step 331$b$. In the case the requested content is

US 9,241,044 B2

123

not locally available at the device, the client device #1 341 may check in a 'Direct Fetch ?' step 331d the possibility of directly accessing a data server (such as the data server #1 22a) storing the content. In one example, such directly approaching the data server without using any intermediate devices such as using tunnel devices, or fetching the content from peer devices, may result in less overhead and handling, and sometimes may be faster. In the case of direct fetching, the client device #1 341 accesses and fetch the requested content directly from the data server in a 'Fetch from Server' step 331e.

If the direct fetching is not selected, then in a 'Method Select' step 331f, the device selects which content fetching method to use. The selection of which method to use may be based on estimation of the latency associated with each method until the content is fully fetched. In one example, a method may be selected when the estimated latency using the other method is substantially longer. The client device #1 341 may select to only use tunnel devices ('Tunnels Only'), and in this scenario, it will execute the tunnels-using client device flowchart (such as the flowchart 60 in FIG. 6) as part of a 'Tunnel Flowchart' step 331i. In one example, the estimated latency using the tunnel-based method may not apply in reality, and may be much longer than estimated. In such a case, it may be beneficial to revert to the other method, which may be faster. Hence, a timer may be used in order to assess in real-time the latency associated with a method, in order to reconsider which method to use. Such a Timer#3 is set to the estimated latency expected in the tunnels-using method, preferably with an additional margin to allow for estimation errors or inaccuracies. The Timer #3 starts in a 'Timer #3 Start' step 331g, before or in parallel the starting of the tunnel-using method in the 'Tunnel Flowchart' step 331i. In case the content fetching in the 'Tunnel Flowchart' step 331i is completed before the timer #3 expiration, the selected method has succeeded to fetch the content in full and the process is completed. In the case where the Timer #3 expires in a 'Timer #3 Expired' step 331j before content fetching completion, the tunnel-based method in the 'Tunnel Flowchart' step 331i may be stopped in 'Stop Tunnel' step 331j in order to save resources (such as processing power), and the 'Peer Flowchart' step 331h is initiated, executing the alternate method for fetching the content.

Alternatively, the client device #1 341 may select to only use peer/agent devices ('Peers Only'), and in this scenario, it will execute the peers/agents-using client device flowchart (such as the flowchart 230 in FIG. 23 and the flowchart 230a in FIG. 23a) as part of a 'Peer Flowchart' step 331h. In one example, the estimated latency using the tunnel-based method may not apply in reality, and may be much longer than estimated. In such a case, it may be beneficial to revert to the other method, which may be faster. Hence, a timer may be used in order to assess in real-time the latency associated with a method, in order to reconsider which method to use. Such a Timer#4 is set to the estimated latency expected in the peers/agents-using method, preferably with an additional margin to allow for estimation errors or inaccuracies. The Timer #4 starts in a 'Timer #4 Start' step 331n, before or in parallel to the starting of the peers/agents-using the method in the 'Peers Flowchart' step 331h. In the case the content fetching in the 'Peer Flowchart' step 331h is completed before the timer #4 expiration, the selected method has succeeded to fetch the content in full and the process is completed. In the case where the Timer #4 expires in a 'Timer #4 Expired' step 331m before content fetching completion, the peers/agents-based method in the 'Peer Flowchart' step 331h may be stopped in a 'Stop Peer' step 331k in order to save resources (such as processing

124

power), and the 'Tunnel Flowchart' step 331i is initiated, executing the alternate method for fetching the content.

Alternatively or in addition, the client device #1 341 may select to use both methods (Both), and such to simultaneously execute both the tunnels-using client device flowchart (such as the flowchart 60 in FIG. 6) as part of the 'Tunnel Flowchart' step 331i, and the peers/agents-using client device flowchart (such as the flowchart 230 in FIG. 23 and the flowchart 230a in FIG. 23a) as part of the 'Peer Flowchart' step 331h. The two methods are executed in parallel, and one of them is completed before the other. In the case using of tunnels is faster than using peer/agent devices, the content will be fetched in full using this method, and the 'Tunnel Flowchart' step 331i will be completed first. In such a case, in a 'Stop Peer' step 331k the peer/agent using method executed as part of the 'Peer Flowchart' step 331h is not needed anymore (since the content was fetched in full) and is stopped, in order to save processing power and bandwidth. Similarly, in the case the using peers/agents is faster than using tunnel devices, the content will be fetched in full using this method, and the 'Peer Flowchart' step 331h will be completed first. In such a case, in a 'Stop Tunnel' step 331j the tunnels-using method executed as part of the 'Tunnel Flowchart' step 331i is not needed anymore (since the content was fetched in full) and is stopped, in order to save processing power and bandwidth.

A content fetched or sent by a network element may consist of, or include, video data. Video data fetched via the Internet are typically identified by a set of characters, including three fields, relating to a URL domain name, a specific video identifier, and offset, relating to the viewing point in the video data itself. For example, in a video identifier such as https://www.youtube.com/watch?v=9 mSh3P7cZIE? ST=1:48, the field 'https://www.youtube.com' is the URL domain, which identify the server from which the video can be fetched, the part '9 mSh3P7cZIE' identifies the video data (such as a movie) as a whole, and the offset '1:48' part in the video starting point, in this example after 1 minute and 48 seconds after the video start point. The offset may be presented (as part of the video identifier) in time using another format such as #T=3M54S (denoting starting point after 3 minutes and 54 seconds) is bytes (such as B=10344, denoting a starting point after 10344 bytes), relative offset (such as in %, such as R=54.3, denoting that the starting point is after 54.3% of the total video length, such as byte 543 out of 100 bytes sized video content)), and various other methods. In the case the content to be fetched is a video data, while the video content may be located in other network elements, it may be identified differently than the requested URL or content identifier, and as such may not be easily fetched. In one example, in order to form a common method for identification of a video-related URL, the offset is detected (e.g., by the '/' symbol, or by the identifying the offset format, or both), and the URL is stored (such as in a cache) identified as the domain name and the video data identifier only, where the offset is stored as additional separate attribute. In one example, where the offset is stored as additional separate attribute. In one example, the offset presentation is normalized to a common format, which is understood by all of the network elements.

A flowchart 410 shown in FIG. 43 describes a method for forming a unified identifying scheme for video content. The video-related content is received (or requested) by a network element in a 'URL Received' step 411a. In a 'Remove Offset' step 411b, the offset part of the URL is detected and removed, such as by detecting the '/' symbol, or by the identifying the offset format, or both. A direct request for the video content is sent to a respective data server (such as the data server #1 22a) in a 'Send Request To Server' step 411c. Typically, the initial part of the data server response includes meta-data informa-

US 9,241,044 B2

125

tion, including the content length, in a form of time (such as hours, minutes, and seconds) or size (such as in bytes). Once the content size or length information is received, there is no need for any communication with the data server, and the communication session is terminated in a 'Terminate Server' step 411e. The content size or length information is used for unifying the form of the video identifier in a 'Normalize Offset' step 411f. For example, a unified scheme may include relating offset, so a video file that start at byte 345 out of 1000 total bytes will be identified as 34.5% (345/1000), and a video file that starts after 1 minute 30 second (1:30) out of a total of 10 minutes will be identified as 15%. Similarly, files that do not end at the video end may also be accordingly identified. For example, a video file that starts after 2 minutes and ends after 7 minutes, will be identified as 20-70%. In such a unified scheme, a network element may store (such as in a cache), or request, parts of a video file by using the common identification scheme. For example, a network element that stores the range from 1 minute to 22 minutes out of a video file, may respond to a request asking for the range of minute 15 to minute 17.

IP-based geolocation (commonly known as geolocation) is a mapping of an IP address (or MAC address) to the real-world geographic location of a computing device or a mobile device connected to the Internet. The IP address based location data may include information such as country, region, city, postal/zip code, latitude, longitude, or Timezone. Deeper data sets can determine other parameters such as domain name, connection speed, ISP, language, proxies, company name, US DMA/MSA, NAICS codes, and home/business classification. The geolocation is further described in the publication entitled: "*Towards Street-Level Client-Independent IP Geolocation*" by Yong Wang et al., downloaded from the Internet on July 2014, and in an Information Systems Audit and Control Association (ISACA) 2011 white-paper entitled: "*Geolocation: Risk, Issues and Strategies*", which are both incorporated in their entirety for all purposes as if fully set forth herein. There are a number of commercially available geolocation databases, such as a web-site http://www.ip2location.com operated by Ip2location.com head-quartered in Penang, Malaysia, offering IP geolocation software applications, and geolocation databases may be obtained from IpInfoDB operating web-site http://ipinfodb.com, and by Max Mind, Inc., based in Waltham, Mass., U.S.A, operating the web-site https://www.maxmind.com/en/home.

Further, the W3C Geolocation API is an effort by the World Wide Web Consortium (W3C) to standardize an interface to retrieve the geographical location information for a client-side device. It defines a set of objects, ECMA Script standard compliant, that executing in the client application give the client's device location through the consulting of Location Information Servers, which are transparent for the Application Programming Interface (API). The most common sources of location information are IP address, Wi-Fi and Bluetooth MAC address, radio-frequency identification (RFID), Wi-Fi connection location, or device Global Positioning System (GPS) and GSM/CDMA cell IDs. The location is returned with a given accuracy depending on the best location information source available. The W3C Recommendation for the geolocation API specifications draft dated Oct. 24, 2013, is available from the web-site http://www.w3.org/TR/2013/REC-geolocation-API-20131024. Geolocation-based addressing is described in U.S. Pat. No. 7,929,535 to Chen et al., entitled: "Geolocation-based Addressing Method for IPv6 Addresses", and in U.S. Pat. No. 6,236,652 to Preston et al., entitled: "Geo-spacial Internet Protocol Address-

126

ing", and in U.S. Patent Application Publication No. 2005/0018645 to Mustonen et al., entitled: "Utilization of Geographic Location Information in IP Addressing", which are all incorporated in their entirety for all purposes as if fully set forth herein.

Geolocation may be used by any network element. The peer devices described above as storing a content (chunks) that is required by a client device, and thus the client device fetches the content from the peer devices rather than directly from the web server (or in addition to it). In some cases, multiple devices are available storing unknown content which may be the content required by a client device. The geolocation may be used to determine which available devices may be, or are expected to be, storing the content that is requested. In this context, two Internet-connected devices, each identified by a respective IP address, for example, are considered as being 'close' if there is a likelihood that the same content is stored in both, or that both devices fetched the same content from a data server. Similarly, two devices are considered closer than the other two devices if there is a higher likelihood that they store the same content (from the same data server).

Referring now to FIG. 35 showing a flowchart 350, which may be executed by any network element, describing a method for selecting devices based on a geolocation and on location-specific attributes, for use by a requesting device, interested in obtaining a content from a data server. In a 'Receive IP List' step 351a list of devices available to select from is obtained. In one example, the devices may be identified by their respective IP addresses. In an 'Associate Location' step 352, the IP address of each of the devices is used to obtain the physical geographical location of the device using any geolocation schemes, such as looking up a local database stored in the requesting device, or using a remote database via the Internet. The physical geographical location may include a country, region (such as state or county), city, postal/zip code, latitude, longitude, or timezone. In a 'Select Devices' step 354, one or more devices are selected from the list.

In one example, the selection is based only on the obtained the geographical location. In one example, such selection may be based on the physical geographical location of the requesting device (obtained locally at the requesting device or by using a geolocation), a physical geographical location of the data server storing a content that is requested (obtained locally or by using geolocation), or relating to physical geographical location of IP addressable, Internet connected device. In one example, the devices may be selected based on being in the same location, such as in the same continent, country, region, city, street, or timezone. The devices may be selected from the list based on the physical geographical distance, where 'closeness' is defined as based on actual geographical distance between devices, where shorter distance indicates closer devices. For example, is the case where the latitude and the longitude are obtained, the physical distance between each device in the list and the requesting device (or the data server or another device) may be calculated, and the nearest device will be first selected, then the second nearest device, and so on. Alternatively or in addition, devices in the same city (or street) as the requesting device are considered as the closest and may be first selected, then the devices that are in the same region or country may be considered as close and may be selected next.

In one example, an attribute is used as a basis for defining 'closeness' in the 'Select Devices' step 354, and each device is associated with an attribute value based on its geographical physical location, in an 'Associate Attribute' step 353. The information relating to the various attributes can be obtained

US 9,241,044 B2

**127**

from a database that is local to the requesting device, or may be publicly available via the Internet, using city, region, or country based databases. In one example, country based information may be obtained via the Internet, such as 'The World Factbook' website by the U.S. Central Intelligence Agency (CIA) having a URL: "https://www.cia.gov/library/publications/the-world-factbook/docs/notesanddefs.html? fieldkey=2113&alphaletter=G&term=Geography-note", and the United Nations Statistics Division website: https://data.un.org.

One example of such an attribute is the language that is widely known (or is the formal language) in a geographical location, such as in a country. In this aspect, while Portugal is geographically closer to Germany than to Brazil, using the language as the selection attribute suggest that Portugal is 'closer' to Brazil, since the Portuguese language is popular in both these countries, and Portuguese-speaking Portugal is language-wise distant from German-speaking Germany. Similarly, Arabic-spoken countries are close to each other, regardless of the actual geographical distance. Such 'closeness' definition is supported, since a web-site or URL having a content (such as text, audio or video) in Portuguese language, is likely to be accessed by users from Brazil and Portugal, and less likely to be accessed by users located in Germany.

Another example of an attribute is the popular sport type in the geographical location. For example, soccer is most popular in Brazil and in Germany, while American football is popular in the U.S. Regarding this aspect, Brazil is considered to be closer to Germany than to the U.S., as it is expected that web-sites associated with soccer will be more popular with users in Germany and Brazil rather than with user in North-America. Another example of an attribute is the religion popular in a region or a country. In this aspect, Turkey and Egypt, both being Islamic countries, are religion-wise closer than Turkey and Greece, having different dominant religion, in spite of their geographical proximity. For example, website offering Islamic-related content are likely to be more popular in Turkey and Egypt, rather than in Greece.

Other attributes relating to people and society may include race and ethnic groups, and demographic or social characteristics, such as population, age structure, population growth rate, death rate, birth rate, migration rate, sex ratio, life expectancy, and health expenditures. Other attributes may include economical-related characteristics (of a location or a country) such as Gross Domestic Product (GDP), GDP per capita (PPP), gross national saving, agriculture products, industry types, labor force, unemployment rate, household income or consumption by percentage share, Government budget, taxes and other revenues, inflation rate (consumer prices), export/import of goods and services, household consumption, government consumption, and investment in fixed capital.

Another example of an attribute is the weather in a location or a country. Countries or locations associated with cold weather are being considered weather-wise closer than locations having distinct and different weather. For example, web-sites relating to ski resorts or snow related equipment are likely to be more popular in cold weather countries than countries having a desert climate. Similarly, web-sites relating to cooling equipment (such as air conditioners) are likely to be more popular in warm weather locations and countries. In addition to climate, other geographical related characteristics include having a coastline, terrain, natural resources, and environment.

In one example, the following demographic attributes or categories can be used: Gender, such as male or female; age,

**128**

such as the age groups 0-11, 12-17, 18-20, 21-24, 25-34, 35-49, 50-54, 55-64, and 65-99; income (in US $, for example) such as 0-24,999, 25,000-49,999, 50,000-74,999, 75,000-99,999, 100,000-149,000, and 150,000 and up; education such as some High School, High School Graduate, Home College, Associates Degree, Bachelor's Degree, and Post Graduate; occupation such as administrative or Clerical, Craftsman, Educators, Executive, Laborer, Homemaker, Military, Professional, Sales, Service, Student, Technical, Self-employed, and Retired; race such as Hispanic, Non-Hispanic, African American, Caucasian, Asian, and Native American. Alternatively or in addition, the following psychographic categories may be used: Travel, such as Air, Car Rental, Lodging, Reservations; and Maps; Finance/Investments such as Banking Brokers, Quotes, Insurance, and Mortgage; sports, such as Auto Racing, Baseball, Basketball, Fantasy Sports, Football, Hockey, Soccer, Golf, and Tennis; recreation & hobbies such as Cycling, Golf, Hiking, Sailing, Snow, Sports, Surfing, Tennis, Home & Garden, Pets, Genealogy, Photography, Games, and Toys; entertainment such as Movies/Film, Music, Theater, TV/Video, Sci-Fi, Humor, Games, and Toys; auto such as Trucks, SUV, and Sports car; news and information such as Magazines and Weather; politics such as Democrat and Republican; E-shopping such as Groceries, Furniture, Auctions, Cards/Gifts, Apparel, Books, Music, TV/Video; Software such as E-purchasing and Computers; Science; Employment; health & fitness; Medical; Pharmacy; Dating/Single; Advice; Beauty; Weddings; Maternity; or Spirituality/Religion such as Astrology. An example of profiling web users is described in U.S. Pat. No. 8,108,245 to Hosea et al., entitled: "Method and System for Web User Profiling and Selective Content Delivery", which is incorporated in its entirety for all purposes as if fully set forth herein.

A bitmap (a.k.a. bit array or bitmap index) is a mapping from some domain (for example, a range of integers) to bits (values that are zero or one). In computer graphics, when the domain is a rectangle (indexed by two coordinates) a bitmap gives a way to store a binary image, that is, an image in which each pixel is either black or white (or any two colors). More generally, the term 'bitmap' is used herein to include, but not limited to, a pixmap, which refers to a map of pixels, where each one may store more than two colors, thus using more than one bit per pixel. A bitmap is a type of memory organization or image file format used to store digital images.

In typical uncompressed bitmaps, image pixels are generally stored with a color depth of 1, 4, 8, 16, 24, 32, 48, or 64 bits per pixel. Pixels of 8 bits and fewer can represent either grayscale or indexed color. An alpha channel (for transparency) may be stored in a separate bitmap, where it is similar to a grayscale bitmap, or in a fourth channel that, for example, converts 24-bit images to 32 bits per pixel. The bits representing the bitmap pixels may be packed or unpacked (spaced out to byte or word boundaries), depending on the format or device requirements. Depending on the color depth, a pixel in the picture will occupy at least n/8 bytes, where n is the bit depth. For an uncompressed, packed within rows, bitmap, such as is stored in Microsoft DIB or BMP file format, or in uncompressed TIFF format, a lower bound on storage size for a n-bit-per-pixel (2n colors) bitmap, in bytes, can be calculated as: size=width·height·n/8, where height and width are given in pixels. In the formula above, header size and color palette size, if any, are not included.

The BMP file format, also known as bitmap image file or Device Independent Bitmap (DIB) file format or simply a bitmap, is a raster graphics image file format used to store bitmap digital images, independently of the display device (such as a graphics adapter), especially on Microsoft Win-

US 9,241,044 B2

129

dows and OS/2 operating systems. The BMP file format is capable of storing 2D digital images of arbitrary width, height, and resolution, both monochrome and color, in various color depths, and optionally with data compression, alpha channels, and color profiles. The Windows Metafile (WMF) specification covers the BMP file format.

An image scaling is the process of resizing a digital image. Scaling is a non-trivial process that involves a trade-off between efficiency, smoothness and sharpness. With bitmap graphics, as the size of an image is reduced or enlarged, the pixels that form the image become increasingly visible, making the image appear "soft" if pixels are averaged, or jagged if not. With vector graphics, the trade-off may be in processing power for re-rendering the image, which may be noticeable as slow re-rendering with still graphics, or slower frame rate and frame skipping in computer animation.

Apart from fitting a smaller display area, image size is most commonly decreased (or subsampled or downsampled) in order to produce thumbnails. Enlarging an image (upsampling or interpolating) is generally common for making a smaller imagery fit a bigger screen in fullscreen mode, for example. In "zooming" a bitmap image, it is not possible to discover any more information in the image than already exists, and image quality inevitably suffers. However, there are several methods of increasing the number of pixels that an image contains, which evens out the appearance of the original pixels. Typically scaling of an image, such as enlarging or reducing the image, involves manipulation of one or more pixels of the original image into one or more pixels in the target image. In many applications, image scaling is required to be executed in real-time, requiring processing power. Scaling or resizing of an image is typically measured as the ratio (in %, for example) of the number of pixels of the resulting image relative to the number of pixels in the original image. Some image scaling schemes are simple and may be quickly and efficiently processed, such as the examples shown in FIG. 36a. An original image is shown in grid 362a, including an exemplary bitmap 363, and the image after image scaling of 400% is shown as grid 362b, where the single pixel 363 is manipulated into pixels 363a, 363b, 363c, and 363d arranged as a 2×2 square matrix. Similarly, each of the pixels in the original image is converted into 4 pixels arranged as a square, where all the newly generated pixels have the same bit value ('0' or '1') in a bitmap, or the color value in case of multiple bits per pixel. Similarly, an original image is shown in grid 365a, including an exemplary pixel 364, and the image after image scaling of 900% is shown as grid 365b, where the single pixel 364 is manipulated into nine pixels 364a, 364b, 364c, 364d, 364e, 364f, 364g, 364h, and 364i arranged as a 3×3 square. Similarly, each of the pixels in the original image is converted into 9 pixels arranged as a square, where all the newly generated pixels have the same bit value ('0' or '1') in a bitmap, or the color value in case of multiple bits per pixel.

Some image reduction schemes are simple and may be quickly and efficiently processed, such as the examples shown in FIG. 36b. An original image is shown in grid 366b, including an exemplary 4 pixels 368a, 368b, 368c, and 369d arranged as a 2×2 square, and the image after image downscaling of 25% is shown as grid 366a, where a single pixel 368 is represents the four pixels. Similarly, each group of 2×2 pixels in the original image is converted into a single pixel, where all the newly generated pixels have the average of the original 4 pixels value ('0' or '1' in a bitmap, or the color value in case of multiple bits per pixel). Similarly, an original image is shown in a grid 367b, including an exemplary 9 pixels 369a, 369b, 369c, 369d, 369e, 369f, 369g, 369h, and 369i, arranged as a 3×3 square, and the image after image down-

130

scaling of 1/9 (11.11%) is shown as a single pixel 369 in the grid 367a, where the single pixel 369 represents the 9 pixels. Similarly, each 3×3 pixels matrix in the original image is converted into a single pixel, where all the newly generated pixel is an average of the original 9 pixel value ('0' or '1') in a bitmap, or the color value in case of multiple bits per pixel).

Referring now to a flowchart 360 in FIG. 36, which may be executed by any network element, describing a method for combining quick scaling schemes with another scaling scheme, for achieving quicker and more efficient downscaling scheme. The original image, designated as IMG(0) and the scaling requested (in %) is obtained in a 'Receive IMG(0), Scaling (%)' step 361a. The parameter N is zeroed in an 'N←0' step 361b, denoting the flowchart initial state. If the scaling required is above 50% as is checked in a 'Scaling>50%?' step 361c, then the current image in the N-th cycle designated as IMG(N), is scaled using any scaling or resizing method in a 'Scale IMG(N)' step 361d, and the method ends in an 'END' step 361e. In the case the scaling required is below 50%, a 50% scaling is executed using a quick and simple scaling scheme as described above, in a 'Scale 50%' step 361f. The cycle counter N is raised by 1 in a 'N←N+1' step 361g, and then the image is scaled 200% and the requested scaling (received in the initial 'Receive IMG(0), Scaling (%)' step 361a) is doubled, in a 'Resize 200%, Scale←Scale*2' step 361h, and the process is repeated until the scaling is above 50%. In such a scheme, in case a scaling of 30% is required, a scaling of 50% will be followed by another scaling of 60% (30%*2), resulting a total of scaling of 30% as originally required.

When using a graphics-based human interface, when an element is dragged from a location to another location on a screen, the dragging is typically limited by the outer limits of the parent object, as schematically shown in views 370a and 370b in FIG. 37. In the view 370a, a box-shaped object (1) 373 is located within the area of a parent object (2) 372, which in turn is within the area of its parent object (3) 371. A user may attempt to drag the object (1) 373 to a left bottom corner of the screen, as illustrated by the hand 375 and the dashed line 374, to a location which is external to the object (3) 371 defined area. In many cases, the dragging of the object (1) 373 may not exceed its parent object (2) 372 periphery, and thus the dragging is limited to the left bottom limit of the object (2) 372 as shown in view 370b. It may be beneficial to allow the object (1) 373 to be dragged as requested by the user along the dragging line 374 to the left bottom corner as shown by view 370c in FIG. 37a. In one example, such dragging external to a limited low-level object area may be executed by transferring (or 'inheriting') the dragging request to higher level objects (such as object (2) 372 and object (3) 371, where such dragging is allowed.

Referring now to a flowchart 380 shown in FIG. 38, which may be executed by any network element, and is schematically describing the transfer of a dragging request to higher levels until such dragging is allowed. The element to be dragged is identified as an object (1) in a 'Receive Object (1)' step 381a, located in a current location designated as (current_X, current_Y), denoting the (x,y) coordinated on the screen. For example, object (1) 373 (shown in views 370a and 370b) and its associated current coordinates are identified. The new location coordinates, designated as (new_X, new_Y) to which the object (1) is to be dragged (such as the drag line 374), is received in a 'Receive New Location' step 381b, hence a requested movement can be calculated as (new_X−current_X, new_Y−current_+Y). The cycles of the flowchart 380 are monitored by a cycle counter N, which is set to 1 at a 'N←1' step 381c.

US 9,241,044 B2

131                                    132

In a 'Location Beyond Object (N+1) Limits?' step 381*d* the requested new location (new_X, new_Y) is checked to be within the limits of the parent (object (N+1)) of the current object (N). For example, the object (1) 373 new location is checked to be within the limits of object (2) 372. In the case where the requested new location exceeds the limits of the parent (object (N+1)), the counter N in raised by 1 in a 'N←N+1' step 381*e*, and the check is repeated with the new object in a 'Location Beyond Object (N+1) Limits?' step 381*d*. In the example shown in view 370*a*, the required new location is outside the area of an object (2) 372, hence the counter will be increased, and the new location will now be checked versus the object (3) 371. In a case where the new location (new_X, new_Y) is found to be within the limits of the parent (object (N+1)), then in a 'Move Objects (1, 2, ... N) to New Location' step 381*f* the object (1), as well as all its parent objects, such as object (2), object (3), ... object (N), are shifted according to dragging requested (new_X−current_X, new_Y−current+Y), so that the object (1) reaches the required new location (new_X, new_Y). Such movement is exampled in a view 370*c*, where the object (1) 373 is shown in its new location, and where the object (2) 372 is shown also after being moved as required in order to allow for the object (1) 373 movement.

Any device herein may be connected to the Internet using a wireless access, such as via a WLAN, such as the device 11*a* shown in an arrangement 20*a* in FIG. 2*b*. In one example shown in an arrangement 390 in FIG. 39, a device 391 (which may correspond to any device or network element herein) may be in the range of 3 WAPs 26*b*, 26*c* and 26*d*, which are all password protected, and each of the WAPs is allowing connection to the Internet. In a case where the user of the device 391 is not aware of the password, no connection to the Internet is easily available. In an emergency, where no other communication means are available, there may be an urgent need to communicate via one of the WAPs, such as to the Internet, for example in order to call for help. In such a case, it may be beneficial to guess a password used by one (or more) of the WAPs, in order to be able to communicate over the Internet (or any other network backbone). The device 391 may include locally (such as in storage memory 25*c*), or be connected to, a database 392, which may comprise a list of passwords that may be suitable for use with the WAPs. The database 392 may be periodically updated by the device 391, or may be updated by accessing and fetching passwords from other databases over the Internet.

A flowchart 400 in FIG. 40, which may be executed by any network element, describes a method for guessing passwords, for example to be used for communicating via WAPs, based on a geographical location, a user history, or a WAP vendor. Starting in a 'Select WAP' step 401*a*, one of the WAPs is selected. In the case of a presence of a single WAP, it is the one to select. If few WAPs are available, such as in the system 390 shown in FIG. 39, one of the WAPs is selected, such as WAP 26*b*, randomly or according to set criteria. The selected WAP is then checked to be password protected in a 'Password Protected ?' step 401*b*. Upon detecting that the WAP is not 'locked' and no password is thus not required, a connection with the selected WAP is established in a 'Connect' step 401*c*, and the device (such as the device 391) may then communicate via the selected WAP (such as the WAP 26*b*) over the Internet.

Commonly users or devices in a certain geographical location (such as city or country) are more likely to use certain passwords, due to the tendency of the local population (having similar demographics, for example), to choose similar or same words. Hence, in a case wherein the selected WAP is password-protected, the device 391 fetches from the database 392 and tries various passwords associated with the local geographical location in a 'Location Based' step 401*d*. If one of the tried guessed password is indeed successful, and a connectivity is achieved with the selected WAP, as checked in an 'Access?' step 401*e*, then a connection to the selected WAP is established in a 'Connect' step 401*c*, and the device (such as device 391) may then communicate via the selected WAP (such as WAP 26*b*) over the Internet. In order to simplify remembering and handling multiple passwords, users commonly use the same password or a minimal set of correlated passwords for many purposes. Hence, in the case none of the location based guessed passwords was found suitable, the device 391 fetches from database 392 a list of passwords that were previously used, even if used for another WAP. If one of the tried guessed password is indeed successful, and connectivity is achieved with the selected WAP, as checked in an 'Access?' step 401*g*, a connection with the selected WAP is established in a 'Connect' step 401*c*, and the device (such as device 391) may then communicate via the selected WAP (such as WAP 26*b*) over the Internet. Typically WAPs are manufactured and shipped having a default (vendor set) password. In many cases, the user of a WAP does not change the default password, and the database 392 may store a list of such default passwords, associated with various manufacturers and WAP types. Typically, as part of communicating with a WAP, the WAP type (e.g., model number) or the WAP manufacturer identifier or name (or both), are exchanged as part of the handshaking process. In a 'Vendor Based' step 401*h*, the device 391 tries a list of passwords based on the WAP type or vendor, or based on a list of all known manufacturers default values. If one of the tried guessed password is indeed successful, and connectivity is achieved with the selected WAP, as checked in an 'Access?' step 401*i*, a connection with the selected WAP is established in a 'Connect' step 401*c*, and the device (such as the device 391) may then communicate via the selected WAP (such as the WAP 26*b*) over the Internet. If none of the former password guessing techniques is successful, and in case other WAPs are available, the device 391 may select another WAP, such as WAP 26*c* in system 390, in a 'Select Another WAP' step 401*j*, and repeat the passwords guessing with the newly selected WAP.

Referring to FIG. 41 showing a system 400*a*, which is based on the system 390 shown in FIG. 39, comprising also a locked WAP 26*e* and a locked WAP 26*f*. The system is shown to include two devices, a device #1 391*a* (which may correspond to device 391 in the system 390) having a password database 392*a* in the memory, and a device #2 391*b* (which may also correspond to device 391 in the system 390) having a password database 392*b* in the memory. The device #1 391*a* is located in the range of the WAP 26*d*, and may communicate with this WAP over a WiFi communication link 404*d*, is located in the range of the WAP 26*b*, and may communicate with this WAP over a WiFi communication link 404*b*, is located in the range of WAP 26*c*, and may communicate with this WAP over a WiFi communication link 404*c*. Similarly, the device #2 391*b* is located in the range of the WAP 26*b*, and may communicate with this WAP over a WiFi communication link 404*a*, is located in the range of the WAP 26*c*, and may communicate with this WAP over a WiFi communication link 404*g*, is located in the range of the WAP 26*e*, and may communicate with this WAP over a WiFi communication link 404*e*, and is located in the range of the WAP 26*f*, and may communicate with this WAP over a WiFi communication link 404*f*. Hence, both two devices 391*a* and 391*b* may communicate with the WAPs 26*b* and 26*c*. The two devices may share information about the authentication with these WAPs. Fur-

US 9,241,044 B2

133

thermore, an authentication server 403 may include a database 392c storing passwords (and other authentication means), and may share the database 392c with the two devices 391a and 391b.

For each of the communication links, a device may assign a level of sharing, associated with the intention of a user of the device to share the passwords, stored in the local database or stored in the database 392c of the authentication server 403, with other users or devices. For example, the device #1 391a may assign a level of 'Private' to the communication link 404d with the WAP 26d, denoting that the password (or other credentials) associated with this connection is not to be shared with others, for example, since the WAP 26d is the user private network at home. Similarly, the user of the device #2 391b may assign a level of 'Private' to the communication links 404e and 404f. Alternatively or in addition, a device (such as the device #1 391a or the device #2 391b) may assign a level of 'Friends' to a password, associated with an intention to share the available password with a limited number of devices or users (friends), as shown regarding to communication links 404c and 404g in the system 400a. Further, a device (such as the device #1 391a or the device #2 391b) may assign a level of 'All' to a password, associated with an intention to share the available password with any device or user, as shown regarding to communication links 404a and 404b in the system 400a. The user and authentication database 392c keeps the connection levels between the users of the system (i.e., who is friends with who). The clients update this central database 392c when new authentication information about a WAP is acquired, such as when the authentication information no longer works, or when updated or new authentication information is known. Once deployed in large numbers, the size of the authentication database 392c becomes significant and large. Thus the update from the central database 392c to the clients can be done in parts, such as loading only the information that a device is most likely to require, for example, to limit the size of the database to local geography, and/or by getting all access points located in close proximity to all (or popular) points of entries in various countries. For example, a device may periodically connect to the central database 392c, and may fetch therefrom an update of list of relevant passwords, and store these passwords in the local database, such as the database 392a or 392b. Further, the device may also update the central database 392c of any new information it has acquired regarding authentication methods (such as passwords) regarding to various WAPs. The size of the information that is loaded into the device may be limited, and the device may get an update on authentication information only regarding to WAPs that may be of interest to that device.

A flowchart 400b shown in FIG. 42 describes an example of the system 400a operation. In a 'WAP connection' step 402a, a request from a device (such as the device #1 391a or the device #2 391b) to connect to a WAP (such as the WAP 26d or the WAP 26f) is intercepted, typically in order to access the Internet. First, using a protocol handshake or any other scheme, the device checks if authentication is required by the specific WAP, as part of an 'Authentication Required ?' step 402b. If no authentication is required, the device may connect to the WAP in a 'Connect' step 402c. In the case the WAP required authentication for connecting to, the device checks the local authentication database (such as the database 391a or the database 391b), as part of a 'Locally Stored ?' step 402d. If the relevant authentication information is locally available, the device may connect using this information in a 'Connect Using Local Data' step 402e. In the case of successful connection to the WAP, as checked in a 'Successful ?' step

134

402i, the device may send an update to the central database 392c in the authentication server 403, notifying or updating it regarding the validity and regarding the authentication information associated with the WAP.

In the case there is no locally available password regarding the respective WAP, the device may connect to the authentication server 403 for fetching authentication information from the central database 392c. The server 403 checks the availability of the requested password in a 'Server Stored ?' step 402g. If no authentication information is found to be stored in the central database 392c, the authentication server 403 accordingly replies to the requesting device. Upon receiving of the server 403 response, the device may be prompted that no authentication information is available for the WAP, in a 'No Success' step 402k. The user then may select another WAP (if available), and repeat the process (with the newly selected WAP) as part of the 'WAP Connection' step 402a.

Alternatively or in addition, the device may try the password of the WAP in a 'Guess Password' step 402i, and such guessing scheme may consist of, include, or be based on, the guessing method described in the flowchart 400 in FIG. 40. If the password guessing in the 'Guess Password' step 402i is successful, as checked in a 'Successful ?' step 402j, the device may send the successfully guessed password to the server 403 to be stored in the database 392c, as part of an 'Update Database' step 402m, so this password may be used by other devices (if allowed) when connecting to this WAP. In the case wherein a password is stored in the central database 392c for this WAP, the authentication server 403 fetches the stored password, and sends it to the requesting device, which then uses this password for connecting to the WAP, in a 'Receive from Server & Connect' step 402h. If the connection is successful, as checked in a 'Successful ?' step 402l, the device may send a message to the server 403, notifying it that the password fetched is indeed valid. However, if the connection is not successful, for example, since the password was changed or is otherwise not valid, the device may send this information to the server 403, allowing it to delete the non-valid password from the central database 392c, in a 'Delete from database' step 402n.

As part of sending the authentication server 403 a new password, such as in 'Update Database' step 402m, the sending device may associate a level of sharing with such password, such as 'Private' (i.e., don't share with anyone), 'Friends' (i.e., only share with friends), 'Family' (i.e. only share with family), or 'All'. When fetching a password from the central database 392c, such as in 'Request from Server' step 402f, the server 403 returns the stored password only if the requesting device is authorized to receive this information. For example, if the password is marked as 'Friends', only devices (or users) that are identified as 'friends' may fetch the stored password.

Referring to an architecture 440 shown in FIG. 44, which is based on the architecture 430 shown in FIG. 3, describing an example of a software and hardware interface in a WDM-based operating system, which may be part of any device (or server) described herein. In the arrangement 440, the device may assume the role of a tunnels-using client device (such as the client device #1 31a or the client device #2 31b) and thus executes a 'Client (Tunnel) Flowchart' 441a, which may be a part of, or the whole of, the client device related flowcharts, such as the flowchart 60 shown in FIG. 6, the flowchart 100 shown in FIG. 10, or the flowchart 100a shown in FIG. 10a. Alternatively or in addition, the device may assume the role of a Peers/Agents-using client device (such as the client device #1 201a) and thus executes a 'Client (Peers) Flowchart' 441a,

US 9,241,044 B2

135

which may be a part of, or the whole of, the client device related flowcharts, such as the flowcharts 230, 230a, and 230b, respectively shown in FIGS. 23, 23a, and 23b. Alternatively or in addition, the device may assume the role of a tunnel device (such as the tunnel device #1 33a, the tunnel device #2 33b, or the tunnel device #3 33c), and thus executes a 'Tunnel Flowchart' 441c, which may be a part of, or the whole of, the tunnel device related flowcharts, such as the flowchart 70 shown in FIG. 7. Alternatively or in addition, the device may assume the role of an agent device (such as the agent device #1 103a, the agent device #2 103b, or the agent device #3 103c), and thus executes an 'Agent Flowchart' 441d, which may be a part of, or the whole of, the agent device related flowcharts, such as the flowchart 240 shown in FIG. 24. Alternatively or in addition, the device may assume the role of a peer device (such as the peer device #1 102a, the peer device #2 102b, or the peer device #3 102c), and thus executes a 'Peer Flowchart' 441e, which may be a part of, or the whole of, the agent device related flowcharts, such as the flowchart 240a shown in FIG. 24a. Similarly, the device may execute a web browser application 441f, that may use the acceleration applications above for faster operation.

While the arrangement 10 shown in FIG. 1 includes a single communication interface 29 connecting to a LAN 14, currently many computerized devices and systems include multiple communication interfaces, such as Communication Interface #1 443a, Communication Interface #2 443b, and Communication Interface #3 443c, shown as part of the architecture 440 (corresponding to the peripherals #1 439a, #2 439b, and #3 439c, shown as part of the architecture 430 in FIG. 3). While three (3) interfaces are shown, any number of such interfaces may be equally used. Typically, each communication interface enables communication over a distinct network type, so that the multiple communication interfaces allow for concurrent communication over multiple networks. Each network may be a wired network, which is based on conductive medium, such as a coaxial cable, twisted-pair, powerlines, or telephone lines, or may be a wireless network which is based on a non-conductive medium, and is using RF, light, or sound guided, or any other over-the-air propagation. Further, a network may be NFC, PAN, LAN, MAN, WAN, WPAN, WLAN (such as WiFi), WMAN, or WWAN. Further, the communication may be based on a cellular communication. A network may be half-duplex, full-duplex, or unidirectional, and may use modulation such as AM, FM, or PM. Furthermore, a network may be packet-based or circuit-switched. The various communication interfaces and the respective protocols are serviced by the kernel space 430b Communications Drivers Stack 442 (corresponding to the drivers stack 436 shown in the architecture 430). The data to be sent or received via the communication interfaces is transferred via applicable queues serving to buffer the transferred data, such as an OS Queue #1 443a, an OS Queue #2 443b, and an OS Queue #3 443c, using underlying sockets such as a Socket #1 444a serving OS Queue #1 443a, a Socket #2 444b serving OS Queue #2 443b, and a Socket #3 444c serving OS Queue #3 443c. A queue (such as queue #1 443a) may be loaded with data, such as data to be sent, and next data that may use the same queue may need to wait until the former data in that queue is vacated, and only then the newly introduced data will be handled. In one example, the allocation of data to the queues may be static, and not changing in time. Alternatively or in addition, the allocation to the various OS queues may be adaptive. For example, at the same time the first data is handled, another queue (such as queue #2 443b) may be empty, and this may be used for faster handling of the new data. An adaptive queue mechanism is described, for

136

example, in U.S. Patent Application No. 2006/0187830 to Nam, entitled: "Adaptive Queue Mechanism for Efficient Realtime Packet Transfer and Adaptive Queue Establishment System thereof", and improved technique for handling events in a multipathing system employing event queueing is described in U.S. Pat. No. 8,452,901 to Sandstrom et al., entitled: "Ordered Kernel Queue for Multipathing Events", which are all incorporated in their entirety for all purposes as if fully set forth herein.

An adaptive structure involving real-time moving data between sockets and queues upon their availability is shown as an architecture 457 in FIG. 45, which may be part of any network element. Dynamic queues are added to the transmit data path, from an application (in the User Space) and the communication interfaces, allowing better usage of the system resources, in particular the various sockets and OS queues. A Dynamic Queue #1 459a is added to cooperated with the OS queue #1 443a and the socket #1 444a, a Dynamic Queue #2 459b is added to cooperated with the OS queue #2 443b and the socket #2 444b, and a Dynamic Queue #3 459c is added to cooperated with the OS queue #3 443c and the socket #3 444c. The dynamic queues are data allocated, managed, and supervised by a Dynamic Queues Manager 458 added software module, which may execute a flowchart 460 shown in FIG. 46. The dynamic queues manager 458 checks the status of the queues and sockets in the system, and shifts the data to be transmitted between the various queues and sockets to obtain higher system efficiency. For example, in a case one queue is loaded while another queue is empty, the manager 458 may remove data from a loaded queue and shifts the data to the empty one.

The flowchart 460, which may be executed by any network element, starts at a 'Data to Send' step 461a, where data to be sent from the device is intercepted from an application. In a 'Obtain Sockets Status' step 461b, the status of all sockets (and related queues) is checked. For example, if the data was already loaded into one of the queues relating to a socket, the waiting time for the socket to transmit all loaded data is estimated. Further, the characteristics of the socket and its underlying communication interface, such as BW and RTT (based on previous transactions), is also fetched. Based on the obtained information in the 'Obtain Sockets Status' step 461b, one of the sockets is selected as the optimal one, in a 'Select Optimal Socket' step 461c. The optimal socket (and related queues) may be selected based on the time it is estimated that the data will be fully transmitted from the device and the applicable queues will be rendered empty. The selected optimal socket route queues are then checked in an 'Empty?' step 461d to be empty. In the case the optimal socket is empty, the data is routed to the selected socket, such as to the OS queue #1 443a, to be queued for being sent via the socket #1 444a and a respective communication interface, in an 'Add to Queue' step 461e. In the case the selected route via the socket (e.g., socket #1 444a) is not empty, the manager 458 checks in a 'Cancelled ?' step 461f whether the data that is currently stored in that route has been cancelled by the application that requested this data transfer, or whether it was previously cancelled by the manager 458. In the case the data transmitting was indeed cancelled, the respective cancelled operation is cancelled and the data is removed from the queues in a 'Remove Data' step 461g, and the new data to be sent is loaded to be transmitted via this route, in the 'Add to Queue' step 461e. In the case the data transmitting process has not been cancelled, the socket (and its respective queues) is declared as unavailable in a 'Socket Unavailable' step 461h, and another optimal socket (different from the last selected one) is selected in the 'Select Optimal Socket' step 461c.

US 9,241,044 B2

137

Any transfer of data between any two network elements, may use, or be based on, a compression scheme (which may be any compression scheme), such as the communication between a client device (such as the client device #1 31a) and the acceleration server 32, that is a part of the illustrated messaging chart 50, such as the 'Sign in' 56b, 'Request List' 56c, 'Send List' 56d, or any other communications between these elements. Alternatively or in addition, the same or other compression scheme may be used in the communication between a tunnel device (such as the tunnel device #1 33a) and the acceleration server 32, that is a part of the illustrated messaging chart 50, such as the 'Sign in' 56a or any other communications between these elements. Alternatively or in addition, the same or other compression scheme may be used in the communication between a client device (such as the client device #1 31a) and a tunnel device (such as the tunnel device #1 33a), that is a part of the illustrated messaging in the timing chart 50, such as the 'Initiate Pre-Connection' 56e, 'Pre-Connection' 56f, 'Content Request' 56g, 'Send Content' 56i, or any other communications between these elements. Alternatively or in addition, the same or other compression scheme may be used in the communication between a tunnel device (such as the tunnel device #1 33a) and a data server (such as the data server #1 22a), that is a part of the illustrated messaging chart 50, such as the 'Content Request' 56h, 'Send Content' 56i, or any other communications between these elements.

Alternatively or in addition, the same or other compression scheme may be used in the communication between an agent device (such as the agent device #1 103a) and the acceleration server 202, that is a part of the illustrated messaging chart 220, such as the 'Sign In' 226a, or any other communications between these elements. Alternatively or in addition, the same or other compression scheme may be used in the communication between a client device (such as the client device #1 210a) and the acceleration server 202, that is a part of the illustrated messaging chart 220, such as the 'Sign In' 226d, 'Request List' 226e, 'Send List' 226f, or any other communications between these elements. Alternatively or in addition, the same or other compression scheme may be used in the communication between a client device (such as the client device #1 210a) and an agent device (such as the agent device #1 103a), that is a part of the illustrated messaging chart 220, such as the 'Request List' 226g, 'Send List' 226h, or any other communications between these elements. Alternatively or in addition, the same or other compression scheme may be used in the communication between a client device (such as the client device #1 210a) and a peer device (such as the peer device #1 102a), that is a part of the illustrated messaging chart 220, such as the 'Chunk Request' 226i, 'Send Chunk' 226j, or any other communications between these elements.

The same compression scheme may be used in all of the above communications. Alternatively or in addition, no compression or different compression scheme may be used in each of the above communication. A compression scheme used may be lossy or lossless (non-lossy). Further, a compression scheme may be a dictionary-based scheme. Furthermore, the compression may be according to, or based on, a standard compression algorithm which may be JPEG (Joint Photographic Experts Group) and MPEG (Moving Picture Experts Group), ITU-T H.261, ITU-T H.263, ITU-T H.264, or ITU-T CCIR 601. Further, the compression scheme may be according to, or based on, Lempel-Ziv (LZ) or Huffman coding (or both) compression methods, such as LZ, DEFLATE, SHRI, LZX, or LZW. Further, a dictionary-based compression scheme may be used that is according to, or based on, a local dictionary as described herein. In the case wherein the

138

data transferred consists of, or include, m video data, the compression scheme may be an intraframe or interframe compression.

Devices communicating over a network, such as over the Internet 113, may include the same software components or applications, such as the same operating system or the same web browser, and may further retrieve and store the same or similar content from the Internet 113. Such stored content similarities may be used in order to build a dictionary to use in a lossless compression scheme.

Referring now to a lossless dictionary-based system 470b shown in FIG. 4, which is based on the system 470 shown in FIG. 4. In addition to the shared dictionary 473a, the encoder 474a (corresponding to the encoder 474) shown as part of the encoding device 471a (corresponding to the encoding device 471) which may be part of any network element, is using also a local dictionary 478a. The compression may use only the shared dictionary 473a, only the local dictionary 478a, or both. Similarly, the decoder 477a (corresponding to the encoding device 471a) shown as part of the decoding device 472a (corresponding to the decoding device 472) which may be part of any network element, is using also a local dictionary 478b. Further, the decoding device 472a which is the receiving device, may transmit feedback over connection 479b of the decoding device 472a, communicating over the network 480 to the connection 479a of the encoding device 471a.

The building of the local dictionaries 478a and 478b in the respective encoding device 471a and the decoding device 472a is shown as a 'Local Dictionary Building' flowchart 481 in FIG. 48, which may be executed by any network element. In the first step (such as upon a device power-up or upon launching the respective application), the device allocates a storage space in its memory (such as in its storage device 25c) for the local dictionary in an 'Allocate Memory' step 481a. For example, a buffer of the size of 1 GB may be allocated for serving as a dictionary. Alternatively or in addition, a portion of an available hard-disk storage area may be allocated. Next, a local dictionary (such as dictionaries 478a and 478b) is built in each of the devices in a 'Build Local Dictionary' step 481b. The device (such as the encoding device 471a or the decoding device 472a) scans the content stored in all its storage devices, such as the storage device 25c, the main memory 25a, and the ROM 25b, and partition it into chunks. The partition into chunks may involve the chunks being non-overlapping, equally-sized parts. In one example, a chunk size may be 2 KB (Kilo-Bytes), and in the case the content to be partitioned is not an exact multiple of 2 KB, the 'last' chunk will be padded and filled with 'space' characters (or any other no content data). Each of the content in the chunks is identified by a chunk identifier, where each chunk identifier is associated with one, and only one, chunk, and the local dictionary stores the identifiers for the chunks. The identifiers of the chunks may be their calculated checksum, or the CRC of the content of the chunk is calculated, and used as the chunk identifier. For example, CRC-32 may be used, allowing each chunk (such as 16 KB size) to be identified by 33-bit identifier. Alternatively or in addition, a chunk identifier is based on a hash function of the chunk content. Since the same rules regarding partitioning into chunks and identifying the chunks are used by both the encoding device 471a and the decoding device 472a, and since it is assumed that some identical content is stored in both devices, the resulting local dictionaries 478a and 478b will have many common entries, that can be used for dictionary-based lossless compression.

Since the storage area allocated in the 'Allocate Memory' step 481a may be limited and may not store all the chunks' identifiers, priorities may be assigned to parts of the parti-

US 9,241,044 B2

139

tioned content, and only identifiers of chunks associated with a high priority content will be stored as part of the local dictionary. Such probabilities are allocated as part of an 'Allocate Probabilities' step $481c$, and may involve assigning higher probability, leading to higher priority for being included in the local dictionary, to files and data that are likely to be stored in both devices. For example, files of the operating system may be assigned higher probability since they are likely to be stored in both devices, while locally generated data may be associated with a lower probability.

The encoding device $471a$ may execute a 'Sending Data' flowchart $482$ shown in FIG. 48, which may be executed by any network element. Upon receiving data to send in a 'Data to Send' step $482a$, such as receiving DATA__1 in input port $475a$ of the encoder $474a$, the encoder $474a$ compresses the received data in a 'Compress Using Both Dictionaries' step $482b$. The compression scheme may use either the local dictionary $478a$, or the shared dictionary $473a$, or both, where chunks to be transmitted are replaced with their identifiers as stored in one of these dictionaries. In one example, the local dictionary $478a$ is first fetched for a chunk identifier, and only if such identifier do not exist in that dictionary, the shared dictionary is used according to any compression scheme. The compressed data DATA__2 at encoder $474a$ output port $475b$ is then sent via the network $480$ to the decoding device $472a$.

Upon receiving data, such as the DATA__2 from the network $480$, the decoding device executes a 'Receiving Data' flowchart $483$, shown in FIG. 48, which may be executed by any network element. The data is received at the decoder (or decompressor) $477a$ input port $476a$, in a 'Data Received' step $483a$. The decoder $477a$ decompress the received data in a 'Decompress' step $483b$, such as by replacing the received identifiers with the actual chunks for reconstructing the original data DATA__1, and outputting it at the port $476b$. However, a received chunk identifier (or multiple identifiers) may not be found in the local dictionary $478b$, as checked in a 'Successful ?' step $483c$. In the case an identifier is not located, the decoder $477a$ sends via the Feedback connection $479b$, a retransmit request over the network $480$, in a 'Send Retransmit Request' step $483d$. In the case the decompression was successful, or after sending the retransmit request, the decoder $477a$ handles the next received chunk (if exists) by reverting to the 'Data Received' step $483a$.

The retransmit request is received at the connection $479a$ of the encoder $474a$, and is handled as part of a 'Retransmit Request' step $482d$. The encoder $474a$ retransmits the chunk for which an identifier was not found in the decoding device $472a$. The encoder $474a$ may send the chunk in an uncompressed form. Alternatively or in addition, if the unidentifiable chunk was compressed using the local dictionary $478a$, the encoder may now retransmit the chunk using the shared dictionary $473a$. The shared dictionaries $473a$ and $473b$ may be built and used using any known dictionary-based compression scheme. Alternatively or in addition, the shared dictionaries $473a$ and $473b$ may be based on content and dictionaries received from other network elements.

Using a compression scheme allows for reducing the time interval required in order to transfer a content from an encoding device (such as the encoding device $471a$) to a decoding device (such as the encoding device $472a$), by reducing the number of bits that are actually transferred, while allowing to fully reconstruct the entire content. For example, in a case where the content to be transferred is about the size of 100 Kb, using lossless compression may allow for transmitting and receiving only 80 Kb, while allowing the reconstruction of the whole 100 Kb size content, hence saving 20% of the total content size. Assuming the content is transferred over a com-

140

munication medium (such as the network $480$) that is associated with $RTT_1$ and $BW_1$, the time saved due to the compression can be calculated to be BITS_REDUCED/$BW_1$, where BITS_REDUCED denotes the size of the saved content that is not transmitted over the network due to the compression, such as 20 Kb (100 Kb–80 Kb) in the above example. In one example, assuming the saved part of the content is transmitted separately and hence the $RTT_1$ is associated with its transmission, the time saved may be calculated to be $RTT_1$+BITS_REDUCED/$BW_1$. It is noted that in a case wherein the processing time due to the compression and decompression is not negligible (denoted COMPRESS_TIME), the added time associated with these activities may be reduced from the calculated saved time above, to be SAVED_TIME=$RTT_1$+BITS_REDUCED/$BW_1$–COMPRESS_TIME.

In the case wherein a retransmission is required, there is time-consuming overhead added to the total transfer time, relating to the retransmission request from the decoding device to the encoding device, such as the 'Send Retransmit Request' step $483d$, the 'Retransmit Received' step $482d$, and the 'Retransmit Using Shared Dictionary' step $482b$, and the associated overhead of handling these steps, and the actual retransmission process. Assuming the communication medium (such as the network $480$) used to send the retransmitted message from the decoding device to the encoding device is associated with $RTT_2$ and $BW_2$, the added time period for the sending of the retransmitted message (the 'penalty') can be calculated to be $RTT_2$+MESSAGE_SIZE/$BW_2$, where the MESSAGE_SIZE relates to the size of the retransmitted message. Further, the retransmission itself of the content part that was not successfully compressed when first transmitted, causes a delay of $RTT_1$+RETRANSMIT_SIZE/$BW_1$, hence the total delay associated with retransmission may be calculated to be $RTT_2$+MESSAGE_SIZE/$BW_2$+$RTT_1$+RETRANSMIT_SIZE/$BW_1$. It is noted that in a case wherein the processing time due to the retransmission, the re-compression and the re-decompression (assuming another compression scheme is used) is not negligible (denoted RECOMPRESS_TIME), the added time associated with these activities may be added to the calculated added time above, so that the retransmission total added time ('penalty') may be PENALTY=RECOMPRESS_TIME+$RTT_2$+RETRANSMIT_SIZE/$BW_2$+$RTT_1$+MESSAGE_SIZE/$BW_1$.

Hence, while the net time saved as part of a compression scheme may be calculated to be the saved time period, deducting the total retransmission related time period, and thus the actual time saving, denoted as an ACTUAL_SAVE and equal to SAVED_TIME−PENALTY, may be calculated as ACTUAL_SAVE=($RTT_1$+BITS_REDUCED/$BW_1$–COMPRESS_TIME)−(RECOMPRESS_TIME+$RTT_2$+MESSAGE_SIZE/$BW_2$+$RTT_1$+RETRANSMIT_SIZE/$BW_1$). In the case the ACTUAL_SAVE is negative (ACTUAL_SAVE<0), the using of the compression scheme is not efficient, as there is no actual saving of any latency in the effective total content transmission time.

The need for retransmission may be estimated, and thus the time saving in using a compression scheme may be estimated, and used for deciding to use a compression scheme, or what compression scheme to use. In one example, a probability of retransmission is allocated to each content (or a part thereof). The probability may be estimated based on the probability that a random device may store such content, based on former communication sessions, based on a receiving device characteristics (such as being a laptop, a desktop, a smartphone, or a mobile device), based on the receiving device operating system (such as Windows or Android), or based on the receiving device IP address. Based on the assigned retransmission

US 9,241,044 B2

141

probability, the estimated time savings using various compression schemes may be estimated, and the estimation may be used in order to select between compression schemes. Assuming a probability P for a successful compression, the probability for a retransmission is 1-P, and hence the estimated time saving (EST_ACTUAL_SAVE) can be calculated as EST_ACTUAL_SAVE=SAVED_TIME-(1-P)*PENALTY, hence in the case of P=1 (successful compression, no retransmission), the saved time will be the SAVED_TIME, and in case of P=0 (retransmission guaranteed), the estimated saved time is SAVED_TIME-PENALTY. In the case the EST_ACTUAL_SAVE is negative (or zero), whereby no actual time saving is expected to be achieved, an alternative (or none) compression scheme should be used.

Referring now to a flowchart 484 shown in FIG. 48a, which may be part of the 'Compress Using Both Dictionaries' step 482b of the flowchart 482. The content or data to be compressed before transmission is checked, and a probability of successful compression using a local dictionary (such as the dictionary 478a), defined as a compression where no retransmission is required, is allocated as part of an 'Allocate Probability' step 484a. Using the allocated probability, the saved time is estimated in an 'Estimate Saved Time' step 484b, for example based on the expression EST_ACTUAL_SAVE=SAVED_TIME-(1-P)*PENALTY described above. The actual estimated time saving (such as EST_ACTUAL_SAVE) is checked in a 'Saved Time>0 ?' step 484c. In a case where the estimated time is positive, suggesting that there is a latency reduction by using a compression based on the local dictionary 478a method, a compression based on the local dictionary 478a follows in a 'Compress Using Local Dictionary' step 484d. In a case where the estimated saved time is negative, suggesting that no time is saved using a local dictionary based compression scheme, a compression based on the shared dictionary 478a (or sending the data uncompressed) follows in a 'Compress Using Shared Dictionary' step 484e.

Referring to a system 490 shown in FIG. 49, showing a device #1 491a, which may consist of, comprise of, or is included in, a tunnel-based client device (such as the client device #1 31a), a peer-based client device (such as the client device #1 31a), or any other network element, a device #2 491b, which may consist of, comprise of, or is included in, a tunnel device (such as the tunnel device #1 33a), a peer device (such as the peer device #1 102a), or any other network element, and the data server #1 22a, connected for exchanging information over the Internet 113. The data server #1 22a may store a content that is identified by a URL (or by any other identifier type). Further copies of the content may be stored in a memory 493a being part of the device #1 491a, and in a memory 493b being part of the device #2 491b. The copies of the content stored in the devices may be the result of fetching it from the data server #1 22a as part of previous interactions. In one example, an application in the device #1 491a requests the same content. As described in the 'Locally cached?' step 331c in the flowchart 330, it is more efficient to retrieve the requested content from the local memory (such as the memory 493a) as described in the 'Fetch from Local cache' step 331b in the flowchart 330, than to spend resources in order to again fetch the same content from the data server #1 22a.

However, while identified by the same identifier (such as a URL), the content in the data server #1 22a may have been changed or updated since it was fetched by the device #1 493a or by the device #2 491b, thus the copies stored in these devices may not anymore be valid or updated. In such a scenario, the locally stored non-valid stored copy should be

142

ignored and discarded, and not used anymore, and hence a fresh content relating to the URL needs to be fetched from the data server #1 22a, or from another location. Further, a validity period may be associated with a content or its copy, where the content is ensured to be valid until the validity period expires. In one example, the validity of a copy of a content is verified by comparing a part of a validated (or original) content, to the respective part of the checked copy. In the case the two parts are the same, the copy is declared as valid, assuming the rest of the copy of the content is the same as the updated content.

Referring to a flowchart 490a shown in FIG. 49a, describing a method for validating a copy of a content. The request for the content (such as by using a URL or any other content identifier) is obtained in an 'Obtain Content Request' 494a. In a 'Local Copy Valid' step 494b (which may be part of the 'Locally Cached' step 331c) the validity of the content, if known (such as by checking that the associated period has not yet expired), is checked. In the case the locally stored copy (such as in the memory 493a of the device #1 491a) is determined to be valid, the locally stored content is used in a 'Use Local Copy' step 494c, which corresponds to the 'Fetch from Local Cache' step 331b in the flowchart 330. In the case the validity of the locally stored copy is suspected, a part of the content (preferably a small part) is fetched from the data server #1 22a in a 'Fetch Slice From Server' step 494d. The requested and fetched part of the content may be a slice or chunk, as described herein. Alternatively or in addition, a fixed number of bytes may be used. Further, the size of the fetched part may be 5% or 10% of the total size of the content. The part of the content may be the first part, the last part, or any other part of the content.

In a 'Same as Local Copy?' step 494e, the fetched part of the content is compared with the respective part of the locally stored copy of the content. In the case the two checked parts are found to consist of the same information, the locally cached content is determined to be valid, and is used as a response to the content request in the 'Content Request' step 494a as part of the 'Use Local Copy' step 494c. In the case where the two checked parts are different, the locally cached content is determined to be non-valid. Next, a slice of a copy of the content is requested and fetched from another network element, such as from the device #2 491b in a 'Fetch Slice From Device' step 494f, and the fetched slice is checked in a 'same as Server Slice?' step 494g, and compared versus the slice that was fetched from the data server #1 22a in the 'Fetch Slice From Server' step 494d. In the case where the two checked parts are found to consist of the same information, the cached content in the network element (such as in the memory 493b of the device #2 491b) is determined to be valid, and the device #1 491a may fetch the content therefrom in a 'Fetch Content From Device' step 494h. In one example, such fetching may use any of the methods described herein, for example, the device #2 491b may be used as a peer device. Alternatively or in addition, the device #1 491a may fetch the updated content from the data server #1 22a itself, corresponding to the 'Fetch from Server' step 331e in the flowchart 330. In the case where the two checked parts are different, the cached content in the network element (such as in the memory 493b of the device #2 491b) is determined to be non-valid, and thus the device #1 491a can only fetch the updated content from the data server #1 22a, as part of a 'Fetch Content From Server' step 494i, corresponding to the 'Fetch from Server' step 331e in the flowchart 330.

The steps involved in the actual validating of the local content copy are considered part of a 'Content Validation' flowchart 496, that is part of the flowchart 490a in FIG. 49a.

US 9,241,044 B2

143 | 144

In a 'Same as Local Copy' step 494e and a 'Same as Server Slice' step 494f, two parts of the content are compared. The actual information in the compared parts may be compared in a bit-by-bit (or byte-by-byte) level. Alternatively or in addition, the checksums, the CRCs (or any other hash function), HTTP headers, or any other information representative of the parts information may be used for determining of the parts are the same.

In one example, a network element (device) periodically checks and validates the content stored in it. Hence, when the content is required, local copy may be used for either local use or as a peer device, allowing for faster response to a request for the locally stored content. A network element may thus execute a flowchart 490b shown in FIG. 49b. The validation process is considered as a low-priority task, so in an 'Idle?' step 495a, the activity of the network element is checked, such as checking the CPU utilization, the available storage size, or the available communication bandwidth. In the case the activity is above a set threshold, the higher-priority activities are given precedence, and the validation activity is not activated, and the element remains in the 'Idle?' step 495a. Upon availability of enough resources and determination that no other more important tasks are to be activated, the device scans the local memory (or cache) in a 'Scan Cache' step 495b, and the entries of the various content copies are checked for validity. In the case where all the content parts are found to be valid in a 'Non-Valid Content?' step 495c, the device resumes to the idling of the validation process in the 'Idle?' step 495a, since no validation activity is required. For each of all content entries that are found to be non-valid, the time left until its validity expiration is checked, and is associated with the respective content entry, in an 'Associate Expiration Time' step 495d. It is noted that some content entries may be determined to be not important, and thus will not be part of the validation process. Out of the content entries that are considered as important, the device selects the content entry that is the first to expire, in a 'Select Non-Valid Content' step 495e. The selected content is then validated in a 'Content Validation' step 495f, which corresponds to the 'Content Validation' flowchart 496 shown as part of the flow-chart 490a in FIG. 49a. After validating the selected content, the memory is re-scanned for non-valid content in the 'Scan Cache' step 495b, and the validating process is until all important and non-valid content entries are validated.

As shown in the system 500 in FIG. 50, a network element 504 may connect to another network element 501 via the gateway #1 505a. Due to many reasons, the network element 504 may disconnect for a short time from the gateway #1 505a, and then may re-connect to the same gateway 505a or to another gateway. In such a case, the application 506 detects the connection disruption with the gateway 505a, and lose the connectivity during the time there is no connection to any gateway. In a case where the application is a web browser, such short loss of connectivity may cause service disruption, such as the "404 page not found" message to a user. Further, recovering from such loss of connection may be time consuming and employs valuable resources.

A Virtual Gateway Service 512 (VGS) may be used to reduce the period of re-connection, and to reduce the harmful impact on the network element 504 operations, as shown in a system 510 in FIG. 51. The network element 504 may use either the gateway #1 505a or a gateway #2 505b for connecting to the network element 501. The VGS 512 is a software stored in the network element 504 memory 508, and operating as an intermediate level between the OS 507 and the physical layer connecting to the LAN 503. The VGS 512 intercepts requests from the operating system 507 to the network for receiving configuration information, and receives on the configuration information from the gateway #1 505a. This information is fed back to the OS 507, hence serving as a proxy (or an agent) for a configuration information between the OS 507 and the gateway #1 505a. Alternatively or in addition, an intercepted request from the OS 507 may be responding directly by the VGS 512. For example, in a case of an intercepted IP request, the VGS may locally provide an IP address.

In one example, the network element 504 may disconnect from the gateway #1 505a, and may connect to the gateway #2 505b shortly after. The VGS 512 may simulate to the operating system 507 a gateway response, so that the OS 507 may not detect the disconnection from gateway #1 505a, and as such may not report an error or a change of a status. When the re-connection to the new gateway #2 505b has been done, the VGS 512 may request new configuration information, while not notifying or changing the operating system 507 status. Thus, from the perspective of the operating system 507, it is continuously connected to a gateway and a network, and the actual disconnection is not sensed by the OS 507. However, in a case of a long disconnection (from a network or a gateway), the VGS 512 senses such a disconnection (such as longer than pre-defined time period), and accordingly notifies the operating system 507, thus providing the operating system 507 and the application 506 the ability to correctly respond correctly to the situation, such as to notify the user.

The VGS 512 may execute a flowchart 510a shown in FIG. 51a. Upon connecting to a network such as the LAN 503, the OS 507 (via the VGS 512) sends an IP request to the gateway 505a identified on the network 503. During such initialization process, the VGS 512 is transparent, and allows the OS 507 to complete the regular process of initializing of a communication session. Afterwards, any request for IP address, for any configuration information, or any other initialization access, to the gateway 505a is intercepted as part of an 'Intercept Gateway Access' step 511a. In a case where the intercepted (or trapped) request is an IP request, as detected in an 'IP Request?' step 511b, the VGS 512 serves effectively as a NAT, and provides an IP address for the OS 507 to use, as part of a 'Return Valid IP Address' step 511e. The VGS 512 continues to serve (from the OS 507 point of view) as an external proxy/NAT or simulates a connection with a gateway as part of an 'Activate Virtual Gateway' step 511d. In a 'Gateway Disconnected?' step 511e, the VGS 512 checks the status of the actual connection to the gateway, such as the gateway #1 505a. If no actual disconnection is detected, the VGS 512 idles until a new IP request is intercepted as part of the 'IP Request?' step 511b. If the actual connection to the gateway #1 505a is not available, the VGS 512 tries to get an actual externally-sourced IP address, such as from the gateway #1 505a, in a 'Get External IP Address' step 511f. If no network connection is available, the VGS 512 may skip this step. In parallel, a timer set to a time period (such as X milliseconds) is started in a 'Start Timer' step 511g, for measuring the disconnection related time. As long as the timer has not expired, the VGS 512 checks if an external IP address was obtained in an 'External IP Received?' step 511h, as a response to the request sent in the 'Get External IP Address' step 511f. If an actual IP address was received before the timer expiration, as checked in a 'Timer Expired?' step 511i, such as from an alternative gateway that may be the gateway #2 505b, the received IP address is returned for the use of the OS 507, allowing for a quick switchover between the gateways, and for normal NAT/proxy service to the OS 507. However, if the timer has expired and no IP address was obtained, the VGS 512 notifies the OS 507 that the connection was lost,

US 9,241,044 B2

145

allowing for the operating system **507** to react to the disconnect state in the way it was programmed to.

A concept of writing cache data to the free portion of the memory is introduced in U.S. Pat. No. 8,135,912 to Shribman et al., entitled: "System and Method of Increasing Cache Size". The stored information is transparent to the operating system, and thus more cache size is available without degrading the amount of memory that is available for the user to use. The memory arrangement in such a prior art system is shown in FIG. **52**, where the file system first writes the OS data **62002**, after which the cache data **62004** is written, followed by a not-used (free) space **62006**. The problem with this memory management approach is that when the file system overwrites the cache data when adding data to the OS data **62002**. In such a system where the free space **62006** is still available, it would be beneficial to have a system where such further OS writes would not overwrite the cached data while free space is available. Such a memory arrangement is shown in FIG. **53**. The OS data **62012** is first stored, whereas the cache data **62016** is stored on the other side of the memory, starting at the furthest position from the start of the writing of the OS data **62012**, so that the OS data **62012** overwrites the cache data only when a free space **62014** is completely used. It may also be desirable to have a system that cleans up the cache data, so that data that is no longer needed is removed, to maintain the cache data and avoid the cache data being overwritten.

FIG. **54** is a flowchart of a system for writing cached data in this modified method, as well as for cleaning up the cache periodically to allow for a free space in the system and thus less data overwrites. In a step **62202** the cache_pointer is set to the point on the storage location that is furthest from the starting point of where the OS data is written to when the storage device is empty. In a step **62204**, it is checked whether cache data (cache_data) need to be written to the storage device. If not, then in a step **62206** it is checked whether system resources are idle enough to warrant a cache cleanup to be performed. If there is more cache to write, then in a step **62208** the cache_pointer is moved back (i.e., 'towards' the OS data) by the size of cache_data, and then in a step **62210** the cache_data is written to the storage device as the referenced patent instructs how to do (i.e., without notifying the operating system so that this space is still viewed as empty by the OS). This moving back of the pointer is novel, since it creates a situation where the data is written in a 'forward' direction (in the same direction to which the OS data is written to), which is typically the faster writing direction for storage devices, as they are optimized for writing OS data.

When the cleanup is performed, then in a step **62214** it is checked whether the free space is close to running out (e.g., is it under x % of the total available storage size, where x can be 10%, or under y Bytes free where Y is 1 GB for example). If this threshold has been reached, then in a step **62216** the least relevant cache is searched for to be removed. The criteria for less relevant could be in that it has expired, or that it is accessed the least, or any of other prior art cache purge methods. This cache item is removed.

A cache system such as that described in U.S. Pat. No. 8,135,912 to Shribman et al. entitled: "System and Method of Increasing Cache Size", creates a very large cache size (cache_size) but at the expense of the reliability of reading the cache back after writing it, where the probability for a cache miss (i.e., to try to read back the cached element and to fail) at a certain point in time would be P, where P<1.

In some cases, the cache_size is significantly bigger than required for the system operation. In such a case, FIG. **55** is a diagram of how P can be increased (i.e., reliability can be

146

increased) at the cost of the cache_size. FIG. **55** offers to create two zones of writing the cache data in the storage device, where each element in the cache is written once to each zone. This way, the cache_size is reduced by half (since each element is written twice), and P would be reduced to P^2, since the probability of not reading back P would be to miss it in both of the zones. Thus, while the size of the cache is reduced linearly (cut in half), the probability of getting a cache miss is reduced exponentially (P^2).

FIG. **56** is a flowchart for how this could be implemented. In a step **63202**, a 'cache read' or a 'cache write' command is received by the module, and in a step **63204**, it checks if it is a read command or a write command. If it is a read command, then in a step **63206** the module looks up in the cache index to find the two locations to which the cache was written, and in a step **63208** attempts to read the cache entry from the first location. A step **63210** checks if the cache entry was found in that read. If it was, then return a step **63212** the data that was read. If it was not found, then in a step **63220** read the cache entry from the second location and return it if found in the step **63212** or return data_not_found if not found in the second location as well. In the case of a write command, two different free locations are identified in a step **63214** and the cache data is written to those two locations in a step **63216**. The cache index is updated with these two locations so that the cache entry can be found in future writes. FIG. **57** shows that in a similar manner, the amount of times that a cache element is written to the storage device can be increased from 2 as shown in FIGS. **55** and **56**, to any number N, where in such a case the available cache size is reduced from (cache_size) to (cache_size/N), and the probability of a cache miss is reduced from (P) to (PAN).

(NDCACHE—Non-Deterministic volatile memory CACHE). In a computing device, the Random Access Memory (RAM) is a limited resource. When the operating system uses the RAM, it typically increases the speed of the application. However, excessive use of the RAM for an application limits the use of the RAM by other applications and thus limits their speed. One such use of the RAM is for caching information in order to speed up the speed of the program's operation. Such cached data may be data retrieved from the network, or be the result of a complicated operation, etc. Operating systems make use of the RAM for caching purposes, and typically leave some of the RAM free to be used later. If this free RAM, memory could be used to store additional cache without significantly affecting system performance in other ways that would be beneficial.

FIG. **58** is a diagram of the state of the art implementation of address space mapping. A physical address **64004** is a memory address that is represented in the form of a binary number on the address bus circuitry in order to enable the data bus to access a particular storage cell of main memory, or a register of memory mapped I/O device. In a computer with a virtual memory **64002**, the term physical address is used mostly to differentiate from a virtual address. In particular, in computers utilizing Memory Management Unit (MMU) to translate memory addresses, the virtual and physical addresses refer to an address before and after MMU translation respectively.

FIG. **59** is a diagram of a prior art MMU and TLB, in which the CPU **64002** requires a translation of a logical address into a physical address **64008** in order to read or write to it. For the translation, it sends the logical address to the MMU **64004**, which uses a cache called a Translation Lookaside Buffer (TLB) **64006** to map the virtual address to a physical address **64008**. Modern MMUs **64004** typically divide the virtual address space into pages, each having a size which is a power

US 9,241,044 B2

147

148

of 2, usually a few kilobytes, but they may be much larger. The bottom n bits of the address (the offset within a page) are left unchanged. The upper address bits are the (virtual) page number. The MMU **64004** normally translates virtual page numbers to physical page numbers via an associative cache called TLB **64006**. When the TLB **64006** lacks a translation, a slower mechanism involving hardware-specific data structures or software assistance is used. The data found in such data structures are typically called page table entries (PTEs), and the data structure itself is typically called a page table. The physical page number is combined with the page offset to give the complete physical address.

Sometimes, a TLB **64006** entry or PTE prohibits access to a virtual page, perhaps because no physical random access memory has been allocated to that virtual page. In this case, the MMU **64004** signals a page fault to the CPU **64002**. The operating system (OS) then handles the situation, perhaps by trying to find a spare frame of RAM and set up a new PTE to map it to the requested virtual address. If no RAM is free, it may be necessary to choose an existing page (known as a victim), using some replacement algorithm or 'eviction algorithm', and save it to another form of storage (e.g., hard disk)—typically known as "paging".

FIG. **60** is a diagram of prior art on how an MMU works. The TLB **64402** receives a virtual address from the CPU. If it finds the associated physical memory within the TLB **64402**, then it returns the Physical address associated with this virtual memory, to the CPU. If it does not find the address in the TLB **64402**, then it looks it up in the Page Table **64404**. If there is an association there, then the physical address associated with the virtual address is returned. If there is no such association, then the Page Table Exception Handler **64406** is activated. It uses a database and a set of drivers to figure out how to map the virtual memory to physical memory (often by allocating new memory, loading information on to that memory from disk, and mapping it to a virtual memory). The data is then loaded into the physical page in **64408**, and the physical address is returned to the CPU.

FIG. **61** is a diagram of prior art on how the MMU's page table exception handler works. When a page table exception occurs, the page table exception handler is invoked, as per FIG. **59**. The page table exception handler **64802** first identifies in a step **64804** the driver responsible for this data segment. This is typically stored in the page table. For example, the driver for a specific virtual memory segment may determine that this part of the virtual memory should be mapped to real physical memory, or it may determine that it is mapped to an IO device such as a camera and the contents should be read from the camera's sensors. Then, the driver assigned determines whether a new physical memory segment needs to be assigned to this virtual address space or not. If more physical memory is required, then in a step **64808** the OS determines whether there is such physical memory available to the system. If there isn't free physical memory, then in the step **64808** the OS determines which physical page to 'purge' out of memory based on any number of 'eviction algorithms' (e.g., least recently used is discarded). The driver assigned to this memory space determines in which manner this information is purged—i.e., is it simply discarded, or saved to disk, etc. The MMU then evicts in a step **64810** the physical page by either swapping it to disk, erasing it, or whatever method the driver associated with it determined. If in a step **64806** it is determined that there is enough free physical memory to create the new page, then the driver determines in a step **64814** the method by which to load the data into the physical memory or to otherwise map the virtual address to an IO device, etc., and then loads in a step **64816** the data into the

physical memory or maps it as required. The virtual memory map to the physical address is then sent to the TLB **64818**, and the request is resolved for the CPU.

The prior art memory management can be described as deterministic, because information that is stored in the physical memory by the application is always retrievable, even in case that physical memory is purged, since the driver for that memory segment that is purged typically saves the data before discarding it. There is a 'cost' to this determinism, in that there is a load and purge time to the physical memory, since when purging this physical memory it needs to be written to a different medium, and then loaded back from the medium before it can be read. In cases where an application wishes to store cache data in the volatile memory in order to save time in re-calculating an algorithm, or in order to not load it again from the web, or in other cases, it does not need the determinism offered by the state of the art memory management systems, but it does need high access speeds, since if the speeds are not high, then it may be more beneficial to the system to recalculate the algorithm or to re-fetch the information from the web, and not to do a page fault which is costly in time. In addition, the more physical memory available for the cache, the faster that the applications can run. However, the more physical memory allocated to cache of one application, the less is available for other uses, and thus the system performance may be degraded. Therefore, it is beneficial to design a system that can gain from higher speeds associated with non-determinism in the memory management, and that can use the maximum possible physical memory without deteriorating the performance of other applications.

FIG. **62** is a flowchart of how a non-deterministic physical memory caching system may be implemented. In a step **65002** an application requests from the operating system a non-deterministic physical memory cache (NDCACHE). The OS allocates in a step **65004** the physical memory for the cache, and maps it to virtual memory, and marks these pages with an 'NDCACHE' flag. If the eviction algorithm of the OS decides to swap out in a step **65006** a physical page which is marked with an 'NDCACHE' flag, then that page is discarded in a step **65010** without being stored back to non volatile memory—it is simply removed from the page table, and will be allocated to a new page and the new data will overwrite the old. If the OS is running out in a step **65008** of physical memory (this may be determined via a variety of ways that will be described later on in the document), then the OS discards one or more NDCACHE pages from memory to clear up memory for the OS. For example, it may clear up four pages, check if that is enough for the OS, and clear more if needed. When the application wishes to read in a step **65014** a virtual memory that was requested as an NDCACHE memory, and is now a regular memory (since the NDCACHE memory was swapped out and thus discarded), it receives back a 'DOES NOT EXIST' message to indicate that this memory was lost and thus the cache data requested no longer exists. During a read or write transaction to or from an NDCACHE page in a step **65016**, that page is locked so that the eviction algorithm does not purge it during that action.

FIG. **63** is a suggested Application Programming Interface (API) for an NDCACHE implementation. This suggested API is similar to the file system API (http://en.wikipedia.org/wiki/File_system_API) in POSIX (http://en.wikipedia.org/wiki/POSIX). To start a new NDCACHE type cache, an application first will call the function NDCACHE_OPEN **6504**, which returns a handle to the NDCACHE (FILEDS) that is referenced by NAME. The NAME that is passed to the function is a unique name for that cache that is used between different processes accessing this page, similar to how a file-

US 9,241,044 B2

149                                                                    150

name is used in the file system POSIX API. If the NDCACHE specified by NAME exists, then the function simply returns a handle to the existing cache. If it does not exist, then NULL is returned by the function. However, if the CREATE_FLAG passed to the function is turned on, then upon opening an NDCACHE specified by NAME that does not yet exist, such an NDCACHE is created and the function returns the handle to that NDCACHE. If such a cache already exists and the TRUNCATE_FLAG is set, then that cache is erased, and a handle to this empty cache is returned by the function.

NDCACHE_READ and NDCACHE_WRITE **65404** are the functions used to read from the NDCACHE and write to the NDCACHE (respectively) that is referenced by the FILEDS that was initially received from the NDCACHE_OPEN function. The BUFFER is an allocated memory that the application can use to read the information to (in case of NDCACHE_READ) or to write from (in case of NDCACHE_WRITE). The OFFSET is the offset (in bytes, for example) within the NDCACHE referenced, to start the read, or to write from. SIZE is the number of bytes to read or to write. NDCACHE_CLOSE **65406** is called to close the handle to the NDCACHE referenced by FILEDS. After all handles to an NDCACHE are closed, the OS may decide to swap it out based on its eviction algorithms. NDCACHE_UNLINK **6508** is called to remove the NDCACHE entry referenced by FILEDS from the operating system's page table, thus effectively deleting this NDCACHE.

A file system is a means to organize data by providing procedures to store, retrieve and update data, as well as manage the available space on the device(s) which contain it. A file system is tuned to the specific characteristics of the device. There is usually a tight coupling between the operating system and the file system. Some filesystems provide mechanisms to control access to the data and metadata. Ensuring reliability is a major responsibility of a filesystem. Some filesystems provide a means for multiple programs to update data in the same file at nearly the same time.

File systems are used on data storage devices such as hard disk drives, floppy disks, optical discs, memory storage devices, remote servers, etc. File systems may provide access to data on a file server by acting as clients for a network protocol (e.g. NFS or SMB clients), or they may be virtual and exist only as an access method for virtual data (e.g. procfs). This is distinguished from a directory service and registry. A File system is implemented in a file system driver which implements a standard file system API for using it, and is coupled to a storage device or other storage strategy (like mapping to existing memory).

FIG. **64** shows the prior art method of mounting a file system. A computer **66202** has a file system directory structure **66204**, which in various directories represent space on various storage devices. The block device **66208** is such a storage device on which data may be stored. The file system driver **66206** links between the block device **66208** and a certain directory in the file system **66204**. The file system driver is configured to be called by the OS on a specific point in the OS directory structure (in this example in "/tmp"). Every file call to that directory initiates a call to the File System Driver **66206**, which may use a memory device such as the block device **66208** to store & retrieve information. This linking of a storage device to a directory is called 'mounting a file system'.

FIG. **65** is a prior art diagram of the TMPFS file system. TMPFS is a common name for a temporary file storage facility on many Unix-like operating systems. It is intended to appear as a mounted file system, but stored in volatile memory instead of a persistent storage device. A similar construction is a RAM disk, which appears as a virtual disk drive and hosts a disk file system. The computer **66402** has a directory structure **66404** in which the TMP directory is mapped to the TMPFS file system driver **66406**, such that when file system calls are made on files within the TMP directory, they are performed on data that is stored in a volatile memory **66408**.

A secondary implementation of an NDCACHE may use simple file system mounting. This implementation is simple in that it does not require kernel mode modifications, or some minimal modifications to the TMPFS file storage facility is available on many unix-like operating systems.

FIG. **66** is a flowchart of a possible implementation of an NDCACHE by using a TMPFS file system. In a step **66602** a TMPFS is created and mounted, with an initial size of X bytes, where X can be 1 GB for example, to be used for the NDCACHE. In a step **66604**, the system checks whether the operating system would benefit from having additional volatile memory. This can be done in various methods known to those in the art. For example, this can be done by checking every Y ms (for example every 20 ms) if less than a certain amount of free memory exists in the system (could be less than 200 MB for example), or if above a certain amount of memory swaps occurred recently (could be more than 2 swaps per second for example), or if the kernel cache space is reduced to under a certain size (could be under 2 GB for example). This can also be done by listening to 'stress' operating system calls such as "low memory" type calls—if these are called then the operating system probably would benefit from having additional volatile memory. This could also be checked by attaching a callback on the swapping out of memory of the TMPFS file and deleting it instead of swapping it out.

If any of the above events in a step **66606** occurred, then the OS would benefit from having more volatile memory. This is checked in a step **66608**. If the OS would not benefit from more memory, then continue to the step **66604**. If it would, then in a step **66610** the NDCACHE is reduced by deleting a number of elements from it, so that its size is reduced by Z bytes (for example by 200 MB). In a step **66612** shows various strategies by which elements may be reduced from the NDCACHE: delete the least recently used (LRU), the least frequently used (LFU), the largest elements by bytes, or the smallest elements by size. This TMPFS size reduction thus frees space for the operating system. This system described in FIG. **66** thus describes an implementation of an NDCACHE, since the application gains a physical memory cache, that is swapped out (partially or completely) as the operating system requires more physical memory for its operation.

Hence, a method of increasing the size of the memory (which is a physical memory) available to applications by which an application may request memory which is specially marked, is disclosed, where the application is able to read and write to this physical memory, and where if the operating system needs more memory then this specially marked memory is discarded. If the specially marked memory space is swapped by the operating system, then it is simply discarded. If the operating system would benefit by having more memory available to it, it reduces the size of the memory allocated to the specially marked cache. The method may be implemented by a TMPFS system that allocates physical memory to this special cache, where if the operating system would benefit by having more memory available to it, it reduces the size of the TMPFS allocated to this specially marked cache

US 9,241,044 B2

151                                                                    152

The second implementation of the NDCACHE—the calls to TMPFS are from user mode to kernel mode, and thus may take thousands of CPU cycles to complete. It is thus desirable to avoid calls between user mode and kernel mode if possible, to improve a performance of the system to get minimum cycles per an NDCACHE call.

A system with higher performance can be achieved by implementing the NDCACHE as a user mode module that communicates with an NDCACHE kernel module, as described in FIG. 67. Block 67202 is the user mode space of the computing device, and block 67208 is the kernel space. The application 67204 is running in the user mode 67202 and using an API (NDCACHE calls) that is implemented in an NDCACHE user mode implementation 67206. It uses system calls to communicate with the NDCACHE kernel mode implementation 67210.

FIG. 68 is a description of the API relating to a third implementation method of the NDCACHE. The block 67402 is pseudo code that describes how an NDCACHE would be allocated and written to. First, a FILEDS handle is created by opening a file that is handled by the NDCACHE_DRIVER, which is the kernel module for NDCACHE events, along with the NDCACHE_NAME, which is the specific name of the NDCACHE that is being accessed. Then, a pointer directly to the NDCACHE memory is received by doing an NDCACHE_LOOKUP on the NDCACHE_NAME. This lookup returns a pointer to the memory of the specific NDCACHE, and if such a cache does not exist, P is assigned NULL. If indeed no such NDCACHE exists, then it needs to be created. In such a case, the pointer P is assigned a memory map of a certain size (in this specific implementation it is 1 MB, but this could be other sizes), where this memory is declared as shared memory so that it may be used by multiple processes.

Then the first memory position in P (P[0]) is increased (so that if this was a new assignment of memory, then P is now 1), to indicate that there is content in this NDCACHE. Then the program continues by writing the data to P, starting at P[1]. If the cache exists (i.e. was not allocated by this call), then do the NDCACHE_WRITE( ) function.

FIG. 69 shows how such an allocation would look like—the first byte of the allocation is the lock flag (P[0] in the above code), which indicates that there is content within this NDCACHE of 1 MB that was allocated, and the 1 MB is comprised of a series of 4 KB allocations. FIG. 70 is an implementation of the NDCACHE_READ( ) and NDCACHE_WRITE( ). First, it is checked whether the cache still exists, by checking the first byte of the NDCACHE range. If it is zero, then that NDCACHE was swapped out, and thus the program returns to the application MEM_NOT_FOUND. Then the program increments the first byte of the NDCACHE range. If it equals '1', then it was zero when incremented—i.e., the NDCACHE range was swapped out and cannot be used. The program then returns the first byte to zero, and returns MEM_NOT_FOUND to the application. Now the NDCACHE range is locked (because the first byte is non-zero), and the range is read in to buffer or written from the buffer to the range, as the case may be for NDCACHE_READ or NDCACHE_WRITE respectively. After finishing the read or write, the program then decrements the lock flag to release the lock on the range by indicating it has completed the read/write and returns.

FIG. 71 is the implementation of the eviction algorithm of the NDCACHE kernel module (the NDCACHE_DRIVER). In prior art operating systems, the eviction algorithm is called when the OS needs more physical memory—it then calls the eviction calls of the various drivers handling memory for them to clear out selected portions of the memory. Some of these drivers are programmed to copy segments of the memory in to other storage devices (such as a hard drive) and then to clear the physical memory for other uses, while other drivers may choose other forms of action. The eviction algorithm for the NDCACHE_DRIVER is described in block 67802. Upon being called, it removes all associated memory ranges associated with LOCK_FLAG that is 0 (which means that the memory range is not in use). If more memory needs to be freed, then it can also remove the ranges who's LOCK_FLAG is 1, since they are in use but not locked. It does not remove memory ranges who's LOCK_FLAG is greater than 1, since they are currently locked by a read or write operation. As an example, there may be several NDCACHES in use, each of them of various sizes. When the eviction algorithm is called, it removes those NDCACHES associated with a lock flag that is 0 or 1, but not greater than one. Further implementations of this may choose to not remove all the NDCACHEs possible, but only enough NDCACHEs so that the OS has enough free memory (e.g. 50 MB) to continue normal operation.

Block 67804 describes how the swapping out of memory ranges by an NDCACHE_DRIVER is done: Once the eviction algorithm of the NDCACHE_DRIVER decided to free a range, it maps the virtual memory pointers to an "all zero" range in 'read only' mode (for example by mapping to devzero). This quickly sets the memory and the LOCK_FLAG to zero, thus freeing the physical memory for the OS to use, and marking it as empty towards the applications using the NDCACHE.

FIG. 72 is a diagram that shows the system for the fourth method of implementation for the NDCACHE, which allows for parts of the NDCACHE to be removed while keeping other parts in the memory. For example, where not all the memory ranges handled by the NDCACHE driver are attempted to be freed, but only a certain amount that will enable the OS to have more free space to operate (e.g., freeing ranges until 200 MB are free).

In the previous implementation methods, an NDCACHE element in the previous implementations is assigned in one block. The problem is that this whole block is swapped out even if only a certain part needs to be swapped out by the OS (all or nothing type of approach). It is desirable to have an implementation where only portions of the allocation may be swapped out (for example, the NDCACHE element could be a whole file, and it may be useful if parts of it are swapped out). In block 68002 there are a group of pages in the physical memory of a computer (page #1, Page #2, . . . Page #N), in this example each of the pages is a range of 4 KB. In block 68004, there is a group of flags in an area of the physical memory allocated to be the management area of the NDCACHE, where there is one such flag for every page in the memory, that is allocated to the NDCACHE. Each flag in the management area in block 68004 is actually a 'lock flag' from the previous implementation of the NDCACHE and is used in the same way, but is done per page, so that each lock flag correlates with one page in the memory. Thus, the NDCACHE may allocate a large file from Page #1 to Page #N, and when the OS needs more free memory then the NDCACHE's eviction algorithm may choose to free a certain memory size for the OS (e.g. 4 MB), and only remove the first 1,000 pages from this NDCACHE, instead of removing the whole cache.

Hence, an NDCACHE system is disclosed, where each NDCACHE is mapped to a multitude of physical memory pages, and where there is one lock_flag associated with each such physical memory page, so that when the operating sys-

US 9,241,044 B2

153

tem of the computing device needs more physical memory, it can release only some of the physical pages associated with this NDCACHE.

FIG. 73 is a flowchart for implementing the fourth implementation of an NDCACHE. When an NDCACHE is requested by an application, the application calls the initialization function and specifies the size of the requested NDCACHE. In a step 68202, physical memory is allocated for the NDCACHE as was requested by the calling application (e.g. 20 MB). The prior art OS responds by allocating such a memory segment (if available), where this memory segment is provided as series of blocks of physical pages, of a certain size as determined by the OS (e.g. 4 MB per page). In a step 68204, a management area is allocated, where in this area there is one LOCK_FLAG for every physical page that is allocated in the step 68202. Thus this memory size is equal to [MEM_ALLOCATED]/[SIZEOF(MEMORY_PAGE)]* [SIZEOF(INT)]. For example, on an OS where a page size is 4 KB, the memory allocated for the NDCACHE is 20 MB, and an integer is 4 Bytes, the size for allocating a management area is =20 MB/4 KB*4 B=5 k*4 B=20 kB (for storing 5,000 flags of 4 bytes each).

The normal operation (read/write) of the NDCACHE in the fourth implementation is similar to the earlier implementations, but where the memory for the NDCACHE is the series of memory pages allocated to the NDCACHE, and the LOCK_FLAG is not for the whole memory range allocated to the NDCACHE, but for each of the pages in that memory range, and when the eviction algorithm needs to free memory for the OS, it can evict a portion of the memory ranges, freeing up the memory range and its corresponding LOCK_FLAG from the management area.

FIG. 74 describes an improvement in the fourth method of implementation of an NDCACHE. The following are three problems with the fourth method of implementation that may be improved:

1. When an NDCACHE that is smaller than the OS's memory page size (typically 4 kB) is requested, a full page (e.g. 4 kB) is allocated and thus there is waste in allocating more than is needed.

2. When an NDCACHE that is larger than the page size is requested, the allocation needs to be done in multiple parts (once for each page), thus degrading performance and degrading the ease of use of the API.

3. The fourth implementation does not conform to the 'malloc'/'free' paradigm, which makes it more difficult to integrate in to existing and new solutions

In this improvement, when a new NDCACHE is allocated, when allocating the pages in memory 69002 for the NDCACHE, a secondary management area 69004 is allocated at the first page, such that it includes a pointer to the first LOCK_FLAG in the management area 69006, and a counter of how many pages are allocated to this NDCACHE ("N") is maintained. Thus, when allocating multiple pages for an NDCACHE, the secondary management area 69004 includes all the information needed to use all pages and lock flags.

FIG. 75 is a flowchart of the initialization process for the improvement on the fourth method. In a step 69202 when the NDCACHE is requested by the application, a memory range (P) is allocated for the NDCACHE. Its size is the size of the memory requested+sizeof(T) where T is the area required for the secondary management area. Then in a step 69204 space is allocated for the management area to hold the LOCK_ FLAGs for each of the memory pages required by the new NDCACHE. Then, a secondary management area (T) is defined in a step 69206, and into it is inserted a pointer (T→PTR) to the management area and an integer (T→N) that

154

represents the number of pages in this NDCACHE's memory range. In a step 69208 the pointer P is changed such that P=P+SIZEOF(T). This is so that P now points to the start of the main memory range (right after the secondary management area). Lastly, in a step 69210 the program returns the pointer (P+SIZEOF(T)) to the calling application, which is a pointer to the place in the memory where the NDCACHE memory itself starts (right after the secondary management section).

Note that the allocations for these memory ranges can use any of the existing malloc/free implementation algorithms to allocate memory from the main NDCACHE pool to this allocation. The malloc and free can be done over mmap with the implementation of NDCACHE shown in the fourth implementation, which makes this a non-deterministic cache. Also note that if the allocation is less than one page, T→N could still span more than one page, if for example this page already contains part of a previous allocation and this new allocation causes the allocation to overrun to the next page.

FIG. 76 is a flowchart of the actions of reading from or writing to the NDCACHE for the improvement on the fourth method of implementation. In a step 69602, the read/write is described. The read/write is done in the same way as in the fourth implementation with two exceptions: Lock(P)/unlock (P): First evaluates that T→N is not zero. If it is zero, then the NDCACHE was swapped and needs to return mem_not_found. If T→N is not zero, lock all pages that this NDCACHE element spans by locking the N LOCK_FLAGS starting at the T→PTR LOCK_FLAG. When reading/writing from/to the NDCACHE, not limited to one page of memory (can use the complete allocated size). In a step 69606 the deleting of the allocation—NDCACHE_CLOSE(P)—is described. The NDCACHE is freed by calling the OS free( ) function and providing to it the pointer of (P-SIZEOF(T)) where P is the pointer to the main memory range, and T is the secondary management area, so that the memory freed is both the secondary management area as well as the main memory area.

A further note about NDCACHE: There is an advantage to being able to use named objects for NDCACHE—i.e., for the NDCACHE objects to be named so that they can be used by multiple processes, and also lets the virtual memory related to these named objects to be freed on swap. This can be implemented over the systems described previously by adding a hash table where in the open/create of the object, this name is looked up in the hash table, and if found provides back a pointer to an existing object.

There are applications that may benefit from understanding when the computer's resources are idle. For example, a screensaver monitors the mouse and keyboard movements for idleness, and after a preset amount of idle time, it activates its display program. Further, the idling period may be utilized for performing non-time sensitive activities, such as updating and maintenance. For example, idling is detected as part of the 'Idle?' step 495a in the flowchart 490b. Other cases are for a web site to monitor inactivity of a keyboard or mouse input, and to log out as a consequence.

FIG. 77 is a flowchart of an idle monitor that uses new inputs to define idleness of a computing device or its operator. Such a flowchart may be executed by any network element herein. In a step 70002, an application wishes to be notified of when idleness has occurred, and so notifies the idle monitor program, provides a CallBack function (CB)—a function to call when the idleness occurs—and defines the type of idleness on which to call this function (PARAMS) and the duration of time they should be idle for the CB to be called. The program then scans in a step 70004 'idleness' resources and tracks for how long each has been idle. These resources

US 9,241,044 B2

155

include the following: Bits being sent or received to/from communication device—i.e. idleness of communication. Storage device read or write—i.e. idleness of the IO with storage devices. Temperature changes in any of the device's temperature gauges—i.e., idleness of the environment. Non-idleness of the environment could signal that there is movement in the environment of this computing device, or that the temperature around is shifting. CPU busy over certain threshold (could be 5% for example)—i.e. idleness to a degree of the computing resources. Camera senses motion—i.e. idleness of the physical surrounding of the computing device (movement of persons for example can trigger this to not be idle)

Light sensor senses changes in light intensity or structure—i.e., idleness of the physical surrounding of the computing device (movement of persons, for example, can trigger this to not be idle):

Accelerometer that senses movement or orientation change

HD accelerometer that senses movement

GPS sensor that senses movement

If any of the above sensors is idle in a step 70006, then check in a step 70008 whether all sensors included in PARAMS are idle and have been idle for the amount of time as described in T. If they have all been idle for this time, call the CB.

Hence, in a system monitoring the idleness of a computing device, the following sensors may be included in a list of devices to be monitored for idleness: Bits being sent or received to/from communication device, storage device read or write, temperature changes in any of the device's temperature gauges, CPU busy over certain threshold, camera senses motion, light sensor senses changes in light intensity or structure, Accelerometer that senses movement or orientation change, HD accelerometer that senses movement, GPS sensor that senses movement in location or height

In storage devices with moving media, physical seek times are typically long relative to the read or write times because of the read/write head movement, and thus should be avoided where possible. Also in storage devices, writing to the storage device is typically less urgent as reading from it, since the writing is typically to archive existing information, whereas reading data is used for actionable results (such as displaying data on the screen) and thus may be blocking.

In prior art systems, reading and writing occur randomly, and thus when the typically higher priority reading is occurring, it could possibly be after a write had occurred, and thus the reading head is typically not close to the place where the information should be read from. Delaying the writing of data until storage device read/write is idle can speed up the read time, since there's then no need to wait for write to end before reading and also eliminates many seek cycles.

FIG. 78 is a diagram of a system to reduce the read times from a storage device 71008. It includes the OS 71002, which calls the storage read time reduction module 71004 when accessing the disk. This module uses the storage device idle monitor 71006 to determine when the storage device is idle. When the storage read time reduction module 71004 wishes to write to disk, it first ensures that the disk has been idle for a pre-determined amount of time (eg. 30 ms) before writing to the storage device. If the storage device is busy, it increases the chance that while the OS is writing data to the disk, a disk read will occur, which will be slowed down by the read time and seek time back to the place to read from. Thus, with the system described by the diagram in FIG. 78, such conflicts (of having a read while a write is in action) are reduced. Thus, when the storage device idle monitor reports non-idleness, then the data to be written to the disk is written to the write queue 71010 instead of to the disk.

156

This concept may be broadened by looking not only at the idleness of the storage device 71008 by the storage device idle monitor 71006, but by incorporating an idleness monitor that checks for a much broader set of idleness parameters such as keyboard inputs, mouse inputs, network communication, etc., since any kind of non-idleness on the computing device typically correlates to reads from the storage device, and thus storage writes should be avoided during such periods of non-idleness.

Hence, in a computing system comprised of a storage device and a processor, a method for reducing the average time to read data from such storage device is disclosed, by which storage writes are only performed when the storage device has been idle for a certain amount of time (eg. 30 ms). Other parameters may be checked for idleness, such as the keyboard input, the mouse input, the network communication, etc.

FIG. 79 is a flowchart of an implementation of a storage read time reduction module SRTRM. If the SRTRM received a write command in a step 71202 then it checks in a step 71204 whether the write queue has enough free space for queuing this request. If it does, then the request is queued in a step 71206 until the storage device is idle at which time it will be written to it. If the write queue does not have enough space to queue the new write data, then the program writes in a step 71205 the new request data to the storage device. If the SRTRM has not received a write command, then it checks in a step 71208 whether the disk been idle from read commands for x milliseconds (x could be 30 for example). Alternatively or in addition, can use other parameters for idleness to determine idleness for the purpose of writing, such as mouse movement, etc.). If idleness for x milliseconds is determined, then a segment of the write queue (e.g., 500 KB) is written from the queue to the storage device.

When a network element is connected to a WAP, it sometimes shortly disconnects and then reconnects. This short disconnection (sometimes referred to as 'cutoff') may occur due to an 'explicit user disconnect' reason, where the user explicitly requests to disconnect from the WAP, such as due to poor service from the WAP, or because other reasons, such as turning off the network element, and disconnecting from the network (for example by turning off the WiFi switch). When the network element tries to re-connect to the WAP, it is typically preferred to first try to connect to 'favorite' WAPs, which are commonly WAPs that the network element has already successfully previously connected to. In one example, a WAP is determined as a 'favorite' WAP when providing high signal strength. FIG. 81 shows a prior art diagram of a network element 41002 that is trying to connect to WAPs defined as part of a 'favorite' group 42006. The network element 41002 may disconnect explicitly from one of these 'favorite' devices 42006, for example due to poor connection or otherwise poor service, and afterwards, when the network element 41002 software tries to re-connect to a WAP, it may try to re-connect again to that problematic WAP, resulting in again a poor service. It is therefore beneficial to distinguish between 'explicit user disconnect' reasons and 'other' reasons associated with each WAP in the favorite group 42006, and to first try to connect to the WAPs associated with disconnection due to 'other' reasons.

FIG. 82 shows such a system, where the favorites group 41206 is subdivided to two sub-groups: an "explicit user disconnect" group 41220, which is the group of WAPs which the user chose to disconnect from, and an "other" group 41210, which is a group of the favorite WAPs (shown to include only a single WAP) that were disconnected due to

US 9,241,044 B2

157

'other' reasons, and a WAP will preferably and firstly be selected from the latter group.

FIG. **83** shows a flowchart relating to implementing such a system. In a step **41402**, it is checked if the client has just disconnected from a WAP, and then in a step **41404** a variable designated as last_dv is set to the recently disconnected WAP. A proactive disconnection by the user, such as by user pressing 'disconnect', is checked in a step **41406**. A poor performance disconnection is checked in a step **41408**, and as part of this step the WAP is checked to be not responding, or responding slowly. In a case the WAP was found to be disconnected not because of poor performance, then the last_dv is set as "other" in a step **41410**, and thus this WAP is highly prioritized, and will be first to be selected, followed by the rest of the "Other" WAPs, and the "explicit user disconnect" related WAPs are the last to be selected. If the WAP was found to be disconnected due to poor performance, then the last_dv is marked as "explicit user disconnect" in a step **41412**. FIG. **80** shows a flowchart of an algorithm that describes how network elements may attempt to connect to multiple WAPs, allowing for a quick connection to a selected one of the WAPs. While exampled herein regarding connection to a WAP, any other communication device, such as a switch, router, or a gateway, using a wireless or wired connection, may be equally applied.

Typical connections (including data paths and communication links) via a network, and in particular via a packet-based network such as the Internet **113**, are associated with a reliability that is less than 100%. The reliability is typically measured as the number of packets that do not reach their destination intact, but can also be measured by their latency, bandwidth, and other factors. FIG. **84** is a diagram of a common arrangement, where a Network Element 1 (NE1) **25** communicates with another Network Element 2 (NE2) **26**, where there are only multiple unreliable connections available between the two elements. Typically, a connection for fetching by the NE1 **25** of a part of, or all of, a content from the NE2 **26**, is established using only a single connection **24004**, out of these available unreliable connections. For example, in a case where Voice over IP (VoIP) call is carried between the NE1 **25** and the NE2 **26** over one of these unreliable connections, that drops, for example, 1% of the packets, then 1 out of every 100 packets of the call will be lost, resulting in a low quality call. The other available unreliable connections between the two network elements may be used to increase the reliability, as shown schematically in FIGS. **85**, **86**, and **87**, illustrating the utilizing of additional connections for increased connection reliability.

FIG. **85** shows a using of the multiple unreliable connections **24204** for communication between the NE1 **25** and the NE2 **26**, implemented by a special program that is installed on both the NE1 **25** and the NE2 **26**. This program transmits each packet from the NE1 **25** to the NE2 **26**, or vice versa, over two or more data routes. Thus, the resulted unreliability is decreased by a factor received by multiplying the unreliability of the routes, and the used bandwidth is increased by a factor corresponding to the number of routes used. In one example, 3 (three) data routes are used, and assuming each data route reliability 99% (i.e., 99 out of 100 packets typically reach their destination intact) whereby the unreliability of a single connection is 1%, then the resulted unreliability of the new scheme is 1% (unreliability) ^3 (number of routes)= 0.0001%, and the available bandwidth is triple the bandwidth available when using a single data path. Multiple routes may be implemented by using a program that uses available multiple network interfaces of the network elements, where packets are sent the packet over two or more of the available

158

interfaces, or alternatively by using peer devices (such as the peer device #1 **102a** and the peer device #2 **102b**) as described herein or in the '604 patent.

In one example, the program may be installed on only one of the network elements. In such a scheme, a network element designated as a reliability proxy may be used, on which the program is installed. Preferably, the reliability proxy may use multiple connections to the other network element. A scheme using a reliability proxy is shown in FIG. **86**, used for communication between the NE1 **25** and the NE2 **26**, and the program is installed on the NE1 **25** but not on the NE2 **26**. The NE1 **25** queries a reliability proxy network server **24301** and provides the server the identifier (e.g., IP address) of the NE2 **26**. The server **24301** responds by providing the NE1 **25** the identifier (e.g., IP address) of a Reliability Proxy (RP) **24308** to be used. The RP **24308** is a network element on which the program is installed, and which has a connection **24310** to NE2 **26**, which is preferably more reliable than the direct connection between the NE1 **25** and the NE2 **26**. The NE1 **25** then communicates with the RP **24308** via multiple routes **24306**, and the RP **24308** communicates with NE2 **26** through the reliable connection **24310**. Thus, the information is reliably carried over the routes **24306**, providing a more reliable connection than the single route that may be used, since the original route **24004** is included in **24306**, and using additional routes improves the reliability, and since route **24310** is more reliable by selection, the total obtained reliability is higher than a single direct connection between the two devices.

It is also possible to use this method in a configuration where neither the NE1 **25** nor the NE2 **26** includes the program installed, as shown in FIG. **87**. In this scheme, the NE1 **25** is manually configured to use the reliability proxy **24404** as a reliability proxy, and that reliability proxy then uses a reliability proxy network server **24401** to find a reliability proxy **24406** that can be used to communicate with the NE2 **26**.

A flowchart of the program is shown in FIG. **88**. The program is activated in a step **24602** when the NE1 **25** requests to communicate with the NE2 **26**. The program then checks in a step **24604** whether the existing direct connection between the two network elements is good enough, such as by using the RTT and BW of the direct connection route. If the existing route is good enough, then a direct communication is initiated in the step **24606**, as known in the art. However, if the existing route is not good enough, then in a step **24622** the program checks whether the NE2 **26** has the program installed. The network elements on which the program is installed report to the server upon being online, and the server logs this information in a reliability database This can be done by sending a query to the NE2 **26**, so that if the program exists, the device to acknowledges, or by requesting such information from the reliability proxy network server by using the server reliability database. If the NE2 **26** does have the program installed, then a direct communication is used between the NE1 **25** and NE2 **26**, using multiple routes (as in FIG. **85**), as described in FIG. **89**. If the NE2 **26** does not have the program installed, then a request is sent in a step **24608** to the Reliability Proxy Network Server (RPNS) for a proxy to use for the communication. The response received in a step **25610** from the RPNS provides an identifier of a Reliability Proxy Device (RPD) that may use a data path to the NE2 **26** that is more reliable than a direct connection from the NE1 **25** to the NE2 **26**, if such a path exists. The NE1 **25** then sends in a step **24612** the information to the RPD via the multiple routes

US 9,241,044 B2

159

between them as described in FIG. **89**. If there is no such data path, then a direct communication is established, such as in the step **24606**.

A method of transmitting packets in parallel over multiple routes, between the NE1 **25** and the NE2 **26**, is described in FIG. **89**. In a step **24702** NE1 **25** receives from a routing unit the number of routes available to the NE2 **26**, and the reliability associated with each one of the routes. In a step **24704**, the routes to be uses are selected as follows: A Desired Reliability (DR) is first set, and the available routes are ranked based on their reliability, where the highest reliability is listed first as Route #1, assuming to be associated with a reliability of R1, the second reliable route is listed second as Route #2, assuming to be associated with a reliability of R2, and so on, until the less reliable route is Route #N with an associated reliability of the RN. The routes to use are determined by multiplying $(1-R1)*(1-R2)*(1-R3)\dots$, until the product is lower than DR. Note that $(1-Rn)$ is the "unreliability" of a route n whose reliability is Rn, and thus the product of the 'unreliability' of the routes is the un-reliability of the parallel use of the multiple routes, assuming that the routes R1, R2, . . . Rx are used for this particular communication between the NE1 **25** and the NE2 **26**. During the communication session between the NE1 **25** and the NE2 **26**, each packet to be transmitted is carried in a step **24706** over all the selected routes. On the receiving side, each unique packet received is passed in a step **24708** to the application, and other similar packets received from the other routes are discarded. In the case of a missing packet over the fastest connection, that packet is expected to be received via the second fastest connection.

In addition to packet loss, unreliable connections typically frequently disconnect. In such a case, the communicating devices try to reconnect, and often succeed. However, such a disconnection may create discontinuity that may be detected by the communicating applications, and may impact their performance, such as a producing a "404 page not found" message in a web browser. However, if the disconnection is not detected by the applications until the re-connection is established, the discontinuity could be avoided. Thus, it is desirable to delay for a short time the signaling to the applications, until the connection is re-established, as described in a flowchart in FIG. **90**.

In a step **24802** the NE 1 **25** initiates a communication with other network element, such as the NE2 **26**. The connection from the NE1 **25** to the NE2 **26** is established in a step **24804** through a Reliability Proxy program (RP) in each of the NE1 **25** and the NE2 **26** (if such an RP exists). If the RP does not exist in the NE1 **25**, then it can be configured to use an external device as a Reliability Proxy (RP). If the RP does not exist in the NE2 **26**, then the NE1 **25** requests an RP from the reliability proxy network server, and communicates with it, instead of communicating directly with the NE2 **26**, where the RP will proxy the messages to the NE2 **26** so that effectively the NE1 **25** is communicating with the NE2 **26**.

The connection between the RPs may be disconnected as determined in a step **24810** (whether the RPs are within the NE1 **25** and the NE2 **26**, or external to them). If the connection was disconnected, then in a step **24812** the reliability proxies hold the connection between them and the operating system that they are acting as a proxy for, for a set short amount of time that it would take to re-connect the broken connection in a reasonable scenario (e.g., 200 ms). Holding the connection may be performed in a way similar to the virtual application gateway described in FIG. **51**. During the period that the connection to the operating system is held, the RPs try to reconnect with each other in a step **24814**. If the

160

re-connection succeeds within the set time, then communication resumes without a break from the operating system perspective. However, if the re-connection did not succeed in the set amount of time, then the OS is notified of the disconnection.

The systems and methods herein may use redundant communication routes (or data paths), that may be based on standby redundancy, (a.k.a. Backup Redundancy), where one of the data paths or the associated hardware is considered as a primary unit, and the other data path (or the associated hardware) is considered as the secondary unit, serving as back up to the primary unit. The secondary unit typically does not monitor the system, but is there just as a spare. The standby unit is not usually kept in sync with the primary unit, so it must reconcile its input and output signals on the takeover of the communication. This approach does lend itself to give a "bump" on transfer, meaning the secondary operation may not be coordinated with the last system state of the primary unit. Such mechanism may require a watchdog, which monitors the system to decide when a switchover condition is met, and command the system to switch control to the standby unit. Standby redundancy configurations commonly employ two basic types, namely 'Cold Standby' and 'Hot Standby'.

In a cold standby scheme, the secondary unit is either powered off or otherwise non-active in the system operation, thus preserving the reliability of the unit. The drawback of this design is that the downtime is greater than in hot standby, because the standby unit needs to be powered up or activated, and brought online into a known state.

In a hot standby scheme, the secondary unit is powered up or otherwise kept operational, and can optionally monitor the system. The secondary unit may serve as the watchdog and/or voter to decide when to switch over, thus eliminating the need for an additional hardware for this job. This design does not preserve the reliability of the standby unit as well as the cold standby design. However, it shortens the downtime, which in turn increases the availability of the system. Some flavors of Hot Standby are similar to Dual Modular Redundancy (DMR) or Parallel Redundancy. The main difference between Hot Standby and DMR is how tightly the primary and the secondary are synchronized. DMR completely synchronizes the primary and secondary units.

While a redundancy of two was exampled above, where two data paths and two hardware devices were used, a redundancy involving three or more data paths or systems may be equally used. The term 'N' Modular Redundancy, (a.k.a. Parallel Redundancy) refers to the approach of having multiply units or data paths running in parallel. All units are highly synchronized and receive the same input information at the same time. Their output values are then compared and a voter decides which output values should be used. This model easily provides bumpless switchovers. This model typically has faster switchover times than Hot Standby models, thus the system availability is very high, but because all the units are powered up and actively engaged with the system operation, the system is at more risk of encountering a common mode failure across all the units.

Deciding which unit is correct can be challenging if only two units are used. If more than two units are used, the problem is simpler, usually the majority wins or the two that agree win. In N Modular Redundancy, there are three main typologies: Dual Modular Redundancy, Triple Modular Redundancy, and Quadruple Redundancy. The Quadruple Modular Redundancy (QMR) is fundamentally similar to the TMR but using four units instead of three to increase the reliability. The obvious drawback is the 4× increase in system cost.

US 9,241,044 B2

161

Dual Modular Redundancy (DMR) uses two functional equivalent units, thus either can control or support the system operation. The most challenging aspect of DMR is determining when to switch over to the secondary unit. Because both units are monitoring the application, a mechanism is needed to decide what to do if they disagree. Either a tiebreaker wins or simply the secondary unit may be designated as the default winner, assuming it is more trustworthy than the primary unit. Triple Modular Redundancy (TMR) uses three functionally equivalent units to provide a redundant backup. This approach is very common in aerospace applications where the cost of failure is extremely high. TMR is more reliable than DMR due to two main aspects. The most obvious reason is that two "standby" units are used instead of just one. The other reason is that in a technique called diversity platforms or diversity programming may be applied. In this technique, different software or hardware platforms are used on the redundant systems to prevent common mode failure. The voter decides which unit will actively control the application. With TMR, the decision of which system to trust is made democratically and the majority rules. If three different answers are obtained, the voter must decide which system to trust or shut down the entire system, thus the switchover decision is straightforward and fast.

Another redundancy topology is 1:N Redundancy, where a single backup is used for multiple systems, and this backup is able to function in the place of any single one of the active systems. This technique offers redundancy at a much lower cost than the other models by using one standby unit for several primary units. This approach only works well when the primary units all have very similar functions, thus allowing the standby to back up any of the primary units if one of them fails. While the redundant data paths have been exampled with regard to the added reliability and availability, redundant data paths may as well be used in order to provide higher aggregated data rate, allowing for faster response and faster transfer of data over the multiple data paths.

A client device may connect to one of multiple sources for fetching data therefrom. The client device may estimate in advance the Bandwidth (BW) and Round Trip Time (RTT) relating to a connection to each of the sources, in order to estimate the best source to use. Further, a client device may use several available peer devices for loading chunks therefrom. A chunk may, include, for example, 16 KB of data. Assuming that there are two peers devices, designated as P1 and P2, respectively associated with the following BW/RTT times: P1_BW=2,000 Kb/s P1_RTT=30 ms and P2_BW=4, 000 Kb/s P2_RTT=70 ms, then the estimated time for a transaction using P1 would be 30 ms+16,000*8/2,000,000=30 ms+64 ms, whereas a transaction using P2 would be 60 ms+16,000*8/4,000,000=70 ms+32 ms=102 ms. In such a case, it would be beneficial for the client device to select and use P1. Other examples of such networks include an HTTP client that may access two different web servers for obtaining a certain URL, such as the original web server, and a CDN storing the URL content. However, the client device may not have previously (or lately) communicated with a source, and thus may not possess the BW and the RTT data needed for the evaluation. In such a case, it would be beneficial to have an algorithm for estimating BT/RTT with the source.

FIG. **91** shows a network that includes a client device 2 and four available sources **20802**, **20804**, **20806**, and **20808**, as well as a database **20810** in the client device 2 that keeps track of the IPs, BW and RTTs of the various sources that were previously communicated with. This database **20810** may also include the time of the last connection, as well as other data. The database **20810** may sort the sources according to

162

their respective IPs, such that if a source_1 is shown in the table (representing the database **20810**) in a column that is left to a source_2 related column, then necessarily the IP of source_1 is smaller than the IP of source_2.

In the example shown in FIG. **91**, the Client 2 has previously connected with the source_1 **20802** and with the source_4 **20808**, and hence stores in the database **20810** the BW and RTT for these two sources. The Client 2 may require evaluating the BW and RTT to source_2 **20804**, in order to determine whether to use it, or to seek for an alternative source (or not to communicate at all).

In such a case, the client needs to assess the BW and RTT of the source_2. A good estimation (or a guess) may assume that the values of the BW and RTT of the source_2 are between the values of BW and RTT of source_1 and source_4, which are the sources of either side of the source_2 (in terms of IP address), based on the information stored in the database **20810**. The estimated values of the source_2 related BW and RTT might be derived in various ways. For example, using proportional estimation, so that when the BW and RTT of source 1 are respectively BW1 and RTT1, for source_4 they are respectively BW4 and RTT4, and for source_2 they are respectively BW2 and RTT2, then BW2 and RTT2 can be calculated by their relative IP distance from BW1 and BW4 and between RTT1 and RTT4. Other ways to calculate can be a regular average, such as BW2=(BW1+BW4)/2.

Alternatively or in addition, the database **20810** may reside on a server on the network, and thus a client device may request and fetch therefrom information about connecting to various sources, even those that it has not previously or lately connected with, based on connections with other client devices that have communicated with it and logged their results to this networked database.

FIG. **92** shows a flowchart for estimating a source related BW and RTT. In a step **21002**, the client device is maintaining a database **20810** of network elements that it has communicated with, where for each of these network elements the associated BW and RTT of the connection, and optionally the time of a connection for each, is stored. In the database **20810**, the network elements are sorted by their IP distance from the client device, where the IP distance is the difference between the IP of the source and the IP of the client. The client device is requesting in a step **21004** to communicate with a source (source_x), and thus first assesses the BW and RTT that relates to the source_x. In a step **21012**, it is checked whether relevant information about the BW and RTT to source_x already exists in the database **20810**. It is noted that this database may be local—in the client device, or available via a network and thus accessible by multiple clients. If the source_x entry exists in the database, then these stored values of the BW and the RTT are assumed for the source_x. If not, then the client gets information from the database about the BW and RTT for the two sources that are associated with IP addresses on either side, such as a lower one and a higher one, of the source_x (in terms of IP distance). The client device uses these two data points to assess the BW and RTT, using any of a variety of methods, such as using a regular average or a weighted average.

A large database may be used to store data relating to the connections characteristics (such as BW and RTT) to various network elements. Over time this data accumulates, and may be reduced by storing only valuable information, as shown in a flowchart FIG. **93**, describing a method for storing only the data pertaining to certain network elements, which are indicative of other network elements in their vicinity.

The system initializes in a step **21202**, when the system starts for the first time, before the database is initialized. As

Appx273

Case 2:18-cv-00483-JRG   Document 1-1   Filed 11/08/18   Page 220 of 227 PageID #:  248

US 9,241,044 B2

163

part of an initialization process, a database is created, with entries that signify logarithmic IP distances from the local network element. Thus, a first entry will be for an IP_dist=1, a second for an IP_dist=2, a third for an IP_dist=4, a fourth for an IP_dist=8, etc., until the farthest IP distance possible in the network that the local network element is operating in (for an IPv4 network example, the smallest IP address is 0.0.0.0 and the largest address is 255.255.255.255, the largest IP distance is half of the difference between these two addresses).

In a step 21204, it is checked whether the database is accessed for reading or writing. The database is accessed for reading when a program requests the estimated BW & RTT between the local network element (associated with IP that is designated as a HOST_IP), and a certain network element to which this local network element is considering to communicate with (associated with IP that is designated as IP_NEW). The database is accessed for writing when the local network element has completed a communication session to another network element, or otherwise found out information about the BW & RTT to that network element in other ways, and requests to write the newly learned data (NEW_BW, NEW_RTT) to the database so that the system can make later better assessments of the BW & RTT.

Next, the IP distance (IP_DISTANCE) is calculated in a step 21206 between the HOST_IP to the IP_NEW by finding the number of IPs that are between the HOST_IP and the IP_NEW. Note that in the case of using IP distance, this method considers that the first address is 'connected at the edges', meaning that the first address (0.0.0.0 in IPv4) is 1 IP address away from the last address (255.255.255.255 in IPv4), and thus there are two different IP distances between each 2 points. The IP_DISTANCE is calculated as the minimum between these two distances. In a step 21208, the logarithmic distance (DIST) from HOST_IP to the NEW_IP is calculated. The DIST is calculated as the Round_down (log_b2(IP_DISTANCE))—where the rounding down the log (in base 2) of the IP_DISTANCE between HOST_IP and IP_NEW. If the database action was for a READ action, then in a step 21212 the BW & RTT are read from the entry [DIST] of the database. If the database action was for a WRITE action, then in a step 21214 the NEW_BW & NEW_RTT are written to the entry [DIST]. Note that the NEW_BW & NEW_RTT may also be written to the database in other methods, in order to keep track also of historical data. For example, the NEW_BW & NEW_RTT may be averaged in with the other data samples (by keeping the latest average and the number of samples in the database), or in any other similar methods.

When network elements use BW & RTT values from the tables, they could benefit from 'teaching' each other about the information they already have about BW & RTT between them and other network elements. FIG. 94 is a flowchart showing a method where network elements can share BW & RTT information so that a network element that wishes to communicate with a network element that it has not recently communicate with, may assess the BW & RTT to it by learning from the experience of other network elements that have recently communicated with that network element. The method starts with scheduling an update of other network elements in a step 21404. The scheduling can be set to either happen at constant time intervals, when the local host is idle, when both the local host and other network element to be updated are idle, or when finished communicating with other network element. If the scheduled event of updating other network elements with the table from the local network element, then a list is created in a step 21408 of which of the network elements to update. This can be all the network

164

elements that have been recently communicated with, or a central server that will be updated and update other network elements, or by getting a list from such a central server. The BW & RTT of this local host are then communicated to the elements in this list.

In a step 21410 the local host receives a BW & RTT table (UPDATE_DB) from a different network element associated with an IP that is IP_ELEMENT. Then, for each non-empty entry in the UPDATE_DB (entry marked as 'E'), the following set of actions is performed: First, in a step 21414 the IP of the network element that provided the UPDATE_DB (IP_ELEMENT) is looked up in the local network element database, and the resulting BW and RTT are stored in memory as BW_ELEMENT and RTT_ELEMENT (these are the BW and RTT between the local network element and the network element that is providing the UPDATE_DB). Then, in a step 21416, the BW & RTT in entry 'E' are stored in memory as BW_E and RTT_E. In a step 21418, the IP distance from the network element to the 'E' associated IP is calculated and stored in the data base as IP_DIST_E. In a step 21420, the local database entry for the IP distance of (IP_ELEMENT_DIST+IP_DIST_E) is updated where the BW value receives the value of BW_HOST+BW_E and the RTT value receives the value of RTT_HOST+RTT_E.

The term 'network element' (or 'element') is used herein to include, but not limited to, a tunnel-based client device (such as the client device #1 31a), a tunnel-based acceleration server (such as the acceleration server 32), a tunnel device (such as the tunnel device #1 33a), a peer-based client device (such as the client device #1 31a), an agent device (such as the agent device #1 103a), a peer device (such as the peer device #1 102a), a peer-based acceleration server (such as the acceleration server 202), or a data server (such as the data server #1 22a). The terms 'chunk' and 'slice' are interchangeably used herein to include, but not limited to, a part of, or the entire of, a content. Any memory, storage, database, or cache mentioned herein may consist of, comprise, use, or be included in, the local cache as described in U.S. Pat. No. 8,135,912 to the Shribman et al., entitled: "System and Method of Increasing Cache Size".

The steps described herein may be sequential, and performed in the described order. For example, in a case where a step is performed in response to another step, or upon completion of another step, the steps are executed one after the other. However, in case where two or more steps are not explicitly described as being sequentially executed, these steps may be executed in any order, or may be simultaneously performed. Two or more steps may be executed by two different network elements, or in the same network element, and may be executed in parallel using multiprocessing or multitasking.

A tangible machine-readable medium (such as a storage) may have a set of instructions detailing part (or all) of the methods and steps described herein stored thereon, so that when executed by one or more processors, may cause the one or more processors to perform part of, or all of, the methods and steps described herein. Any of the network elements may be a computing device that comprises a processor and a computer-readable memory (or any other tangible machine-readable medium), and the computer-readable memory may comprise computer-readable instructions such that, when read by the processor, the instructions causes the processor to perform the one or more of the methods or steps described herein.

Any device or network element herein may comprise, consists of, or include a Personal Computer (PC), a desktop computer, a mobile computer, a laptop computer, a notebook computer, a tablet computer, a server computer, a handheld

US 9,241,044 B2

165

computer, a handheld device, a Personal Digital Assistant (PDA) device, a cellular handset, a handheld PDA device, an on-board device, an off-board device, a hybrid device, a vehicular device, a non-vehicular device, a mobile or portable device, a non-mobile or a non-portable device. Further, any device or network element herein may comprise, consist of, or include a major appliance (white goods) and may be an air conditioner, dishwasher, clothes dryer, drying cabinet, freezer, refrigerator, kitchen stove, water heater, washing machine, trash compactor, microwave oven and induction cooker. The appliance may similarly be a 'small' appliance such as TV set, CD or DVD player, camcorder, still camera, clock, alarm clock, video game console, HiFi or home cinema, telephone or answering machine.

The term 'host' or 'network host' is used herein to include, but not limited to, a computer or other device connected to a computer network, such as the Internet. A network host may offer information resources, services, and applications to users or other nodes on the network, and is typically assigned a network layer host address. Computers participating in networks that use the Internet Protocol Suite may also be called IP hosts, and computers participating in the Internet are called Internet hosts, or Internet nodes. Internet hosts and other IP hosts have one or more IP addresses assigned to their network interfaces. The addresses are configured either manually by an administrator, automatically at start-up by means of the Dynamic Host Configuration Protocol (DHCP), or by stateless address autoconfiguration methods. Network hosts that participate in applications that use the client-server model of computing, are classified as server or client systems. Network hosts may also function as nodes in peer-to-peer applications, in which all nodes share and consume resources in an equipotent manner.

The arrangements and methods described herein may be implemented using hardware, software or a combination of both. The term "software integration" or any other reference to the integration of two programs or processes herein, is used herein to include, but not limited to, software components (e.g., programs, modules, functions, processes, etc.) that are (directly or via another component) combined, working or functioning together or form a whole, commonly for sharing a common purpose or set of objectives. Such software integration can take the form of sharing the same program code, exchanging data, being managed by the same manager program, executed by the same processor, stored on the same medium, sharing the same GUI or other user interface, sharing peripheral hardware (such as a monitor, printer, keyboard and memory), sharing data or a database, or being part of a single package. The term "hardware integration" or integration of hardware components is used herein to include, but not limited to, hardware components that are (directly or via another component) combined, working or functioning together or form a whole, commonly for sharing a common purpose or set of objectives. Such hardware integration can take the form of sharing the same power source (or power supply) or sharing other resources, exchanging data or control (e.g., by communicating), being managed by the same manager, physically connected or attached, sharing peripheral hardware connection (such as a monitor, printer, keyboard and memory), being part of a single package or mounted in a single enclosure (or any other physical collocating), sharing a communication port, or used or controlled with the same software or hardware. The term "integration" herein is used herein to include as applicable, but not limited to, a software integration, a hardware integration, or any combination thereof.

166

Any networking protocol may be utilized for exchanging information between the network elements (e.g., clients, tunnels, peers, servers) within the network (such as the Internet). For example, it is contemplated that communications can be performed using TCP/IP. Generally, HTTP and HTTPS are utilized on top of TCP/IP as the message transport envelope. These two protocols are able to deal with firewall technology better than other message management techniques. However, partners may choose to use a message-queuing system instead of HTTP and HTTPS if greater communications reliability is needed. A non-limiting example of a message queuing system is IBM's MQ-Series or the Microsoft Message Queue (MSMQ). The system described hereinafter is suited for both HTTP/HTTPS, message-queuing systems, and other communications transport protocol technologies. Furthermore, depending on the differing business and technical requirements of the various partners within the network, the physical network may embrace and utilize multiple communication protocol technologies.

The term "port" refers to a place of access to a device, electrical circuit or network, where energy or signal may be supplied or withdrawn. The term "interface" of a networked device refers to a physical interface, a logical interface (e.g., a portion of a physical interface or sometimes referred to in the industry as a sub-interface—for example, such as, but not limited to a particular VLAN associated with a network interface), and/or a virtual interface (e.g., traffic grouped together based on some characteristic—for example, such as, but not limited to, a tunnel interface). As used herein, the term "independent" relating to two (or more) elements, processes, or functionalities, refers to a scenario where one does not affect nor preclude the other. For example, independent communication such as over a pair of independent data routes means that communication over one data route does not affect nor preclude the communication over the other data routes.

Some embodiments may be used in conjunction with various devices, network elements, and systems, for example, a Personal Computer (PC), a desktop computer, a mobile computer, a laptop computer, a notebook computer, a tablet computer, a server computer, a handheld computer, a handheld device, a Personal Digital Assistant (PDA) device, a cellular handset, a handheld PDA device, an on-board device, an off-board device, a hybrid device, a vehicular device, a non-vehicular device, a mobile or portable device, a non-portable device, a wireless communication station, a wireless communication device, a wireless Access Point (AP), a wired or wireless router, a wired or wireless modem, a wired or wireless network, a Local Area Network (LAN), a Wireless LAN (WLAN), a Metropolitan Area Network (MAN), a Wireless MAN (WMAN), a Wide Area Network (WAN), a Wireless WAN (WWAN), a Personal Area Network (PAN), a Wireless PAN (WPAN), devices and/or networks operating substantially in accordance with existing IEEE 802.11, 802.11a, 802.11b, 802.11g, 802.11k, 802.11n, 802.11r, 802.16, 802.16d, 802.16e, 802.20, 802.21 standards and/or future versions and/or derivatives of the above standards, units and/or devices which are part of the above networks, one way and/or two-way radio communication systems, cellular radio-telephone communication systems, a cellular telephone, a wireless telephone, a Personal Communication Systems (PCS) device, a PDA device which incorporates a wireless communication device, a mobile or portable Global Positioning System (GPS) device, a device which incorporates a GPS receiver or transceiver or chip, a device which incorporates an RFID element or chip, a Multiple Input Multiple Output (MIMO) transceiver or device, a Single Input Multiple Output (SIMO) transceiver or device, a

US 9,241,044 B2

167

Multiple Input Single Output (MISO) transceiver or device, a device having one or more internal antennas and/or external antennas, Digital Video Broadcast (DVB) devices or systems, multi-standard radio devices or systems, a wired or wireless handheld device (e.g., BlackBerry, Palm Treo), a Wireless Application Protocol (WAP) device, or the like.

As used herein, the terms "program", "programmable", and "computer program" are meant to include any sequence or human or machine cognizable steps which perform a function. Such programs are not inherently related to any particular computer or other apparatus, and may be rendered in virtually any programming language or environment including, for example, C/C++, Fortran, COBOL, PASCAL, assembly language, markup languages (e.g., HTML, SGML, XML, VoXML), and the likes, as well as object-oriented environments such as the Common Object Request Broker Architecture (CORBA), Java™ (including J2ME, Java Beans, etc.) and the likes, as well as in firmware or other implementations. Generally, program modules include routines, programs, objects, components, data structures, etc., that performs particular tasks or implement particular abstract data types. The term "application program" (also referred to as 'application', 'software application', or 'application software') is used herein to include, but not limited to, a computer program designed to perform a specific function directly for a user, or for another application program. Application software is typically a set of one or more programs designed to carry out operations for a specific application. Commonly, an application software is dependent on system software that manages and integrates computer capabilities, but does not directly perform tasks that benefit the user, such as an operating system, to execute. Examples of types of application software may include accounting software, media players, and office suites. Applications may be bundled with the computer and its system software, or may be published separately, and further may be developed and coded as a proprietary, or as an open-source, software. Most applications are designed to help people perform an activity.

The terms "task" and "process" are used generically herein to describe any type of running programs, including, but not limited to a computer process, task, thread, executing application, operating system, user process, device driver, native code, machine or other language, etc., and can be interactive and/or non-interactive, executing locally and/or remotely, executing in foreground and/or background, executing in the user and/or operating system address spaces, a routine of a library and/or standalone application, and is not limited to any particular memory partitioning technique. The steps, connections, and processing of signals and information illustrated in the figures, including, but not limited to any block and flow diagrams and message sequence charts, may typically be performed in the same or in a different serial or parallel ordering and/or by different components and/or processes, threads, etc., and/or over different connections and be combined with other functions in other embodiments, unless this disables the embodiment or a sequence is explicitly or implicitly required (e.g., for a sequence of reading the value, processing the value—the value must be obtained prior to processing it, although some of the associated processing may be performed prior to, concurrently with, and/or after the read operation). Where certain process steps are described in a particular order or where alphabetic and/or alphanumeric labels are used to identify certain steps, the embodiments are not limited to any particular order of carrying out such steps. In particular, the labels are used merely for convenient identification of steps, and are not intended to imply, specify or require a particular order for carrying out such steps. Further-

168

more, other embodiments may use more or less steps than those discussed herein. They may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote memory storage devices.

The corresponding structures, materials, acts, and equivalents of all means plus function elements in the claims below are intended to include any structure, or material, for performing the function in combination with other claimed elements as specifically claimed. The description of the present invention has been presented for purposes of illustration and description, but is not intended to be exhaustive or limited to the invention in the form disclosed. The present invention should not be considered limited to the particular embodiments described above, but rather should be understood to cover all aspects of the invention as fairly set out in the attached claims. Various modifications, equivalent processes, as well as numerous structures to which the present invention may be applicable, will be readily apparent to those skilled in the art to which the present invention is directed upon review of the present disclosure.

All publications, standards, patents, and patent applications cited in this specification are incorporated herein by reference as if each individual publication, patent, or patent application were specifically and individually indicated to be incorporated by reference and set forth in its entirety herein.

The invention claimed is:

1. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:

  (a) the second device sending the second identifier to the first server;

  (b) in response to receiving the second identifier, the first server storing the second identifier;

  (c) the first device sending a first request to the first server;

  (d) in response to receiving the first request, the first server sending the second identifier to the first device;

  (e) the first device sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier;

  (f) in response to receiving the second request, the second device sending the first content identifier to the second server using the third identifier;

  (g) in response to receiving the first content identifier, the second server sending the first content to the second device; and

  (h) in response to receiving the first content, the second device sending the first content to the first device.

2. The method according to claim 1 further comprising the steps of:

  (i) the first device sending the first content identifier to the second server using the third identifier; and

  (j) in response to receiving the first content identifier, the second server sending the first content to the first device.

3. The method according to claim 2 wherein steps (i) and (j) are preceding step (e).

4. The method according to claim 2 wherein steps (i) and (j) are following step (h).

5. The method according to claim 2 wherein steps (i) and (j) are simultaneously with one of the steps (e)-(h) using multitasking or multiprocessing.

US 9,241,044 B2

| 169 | 170 |

**6.** The method according to claim **1** for use with a fourth device identified in the Internet by a fourth identifier, further comprising the steps of:

(i) the third device sending the fourth identifier to the first server;

(j) in response to receiving the fourth identifier, the first server storing the fourth identifier;

(k) in response to receiving the first request, the first server sending the fourth identifier to the first device;

(l) the first device sending a third request to the third device using the fourth identifier, the third request includes the first content identifier and the third identifier;

(m) in response to receiving the third request, the third device sending the first content identifier to the second server using the third identifier;

(n) in response to receiving the first content identifier, the second server sending the first content to the third device;

(o) in response to receiving the first content, the third device sending the first content to the first device.

**7.** The method according to claim **6** wherein steps (i) to (o) are simultaneously with steps (e)-(h) using multitasking or multiprocessing.

**8.** The method according to claim **1** for use with a group consisting of a plurality of devices, each associated with a respective identifier for being identified in the Internet, for each of the devices in the group the method further comprising the steps of:

(i) the group device sending the associated identifier to the first server; and

(j) in response to receiving the associated identifier, the first server storing the associated identifier.

**9.** The method according to claim **8** further comprising the step of:

(a) in response to receiving the first request, the first server sending the identifiers of all the devices in the group to the first device.

**10.** The method according to claim **8** for each of the group devices in the group further comprising the steps of:

(p) the first device sending a third request to the group device using the device associated identifier, the third request includes the first content identifier and the third identifier;

(q) in response to receiving the third request, the group device sending the first content identifier to the second server using the third identifier;

(r) in response to receiving the first content identifier, the second server sending the first content to the group device; and

(s) in response to receiving the first content, the group device sending the first content to the first device.

**11.** The method according to claim **8** wherein the second device is included in the group, the method further comprising the step of selecting the second device out of the devices in the group.

**12.** The method according to claim **11** wherein the first server is selecting the second device out of the devices in the group, and in step (d) the first server is sending the second identifier to the first device in response to the selection.

**13.** The method according to claim **11** wherein in step (d) the first server sending the identifiers of all devices and the group to the first device, followed by a step of the first device selecting the second device.

**14.** The method according to claim **11** further comprising the step of selecting one or more devices, distinct from the second device, out of the devices in the group.

**15.** The method according to claim **14** further comprising the step of selecting 2, 3, 4, 5 or 6 devices, each distinct from the second device, out of the devices in the group.

**16.** The method according to claim **14** further comprising the step of selecting 7, 8, 9, or 9 devices, each distinct from the second device, out of the devices in the group.

**17.** The method according to claim **14** further comprising the step of selecting 10 or more devices, each distinct from the second device, out of the devices in the group.

**18.** The method according to claim **8** wherein the second device is randomly selected out of the devices in the group.

**19.** The method according to claim **18** wherein the second device is randomly selected using one or more random numbers generated by a random number generator.

**20.** The method according to claim **19** wherein the random number generator is software based.

**21.** The method according to claim **19** wherein the random number generator is based on executing an algorithm for generating pseudo-random numbers.

**22.** The method according to claim **8** wherein the second device is selected based on attributes or characteristics of the device.

**23.** The method according to claim **8** wherein the second device is selected based on the physical geographical location.

**24.** The method according to claim **23** further comprising for each of the devices in the group the steps of sending the device physical geographical location to the first server, followed by the step of the first server storing the received group device physical geographical location.

**25.** The method according to claim **23** wherein the physical geographical location includes at least one out of a continent, a country, a state or province, a city, a street, a ZIP code, or longitude and latitude.

**26.** The method according to claim **8** wherein the second device is selected based on the physical geographical proximity to the second server.

**27.** The method according to claim **8** wherein the second device is selected based on the second identifier.

**28.** The method according to claim **27** wherein the second identifier in an IP address, and the second device is selected based on its IP address.

**29.** The method according to claim **28** wherein the second device is selected based on comparing the second identifier to the third identifier.

**30.** The method according to claim **8** wherein the second device is selected based on past activities.

**31.** The method according to claim **8** wherein the second device is selected based on the timing of an event.

**32.** The method according to claim **31** wherein the event is the last communication between the second device and the first device.

**33.** The method according to claim **31** wherein the event is the last communication between the second device and the first server.

**34.** The method according to claim **31** wherein the event is the last communication between the second device and the second server.

**35.** The method according to claim **1** for fetching over the Internet a second content, identified by a second content identifier, by a third device, identified in the Internet by a fourth identifier, from a third server identified in the Internet by a fifth identifier, via the first device, the method further comprising the steps of:

(i) the third device sending a third request to the first server;

(k) in response to receiving the third request, the first server sending the first identifier to the third device;

US 9,241,044 B2

171

(l) the third device sending a fourth request to the first device using the first identifier, the fourth request includes the second content identifier and the fifth identifier;

(m) in response to receiving the fourth request, the first device sending the second content identifier to the third server using the fifth identifier;

(n) in response to receiving the second content identifier, the third server sending the second content to the first device; and

(o) in response to receiving the second content, the first device sending the second content to the third device.

36. The method according to claim 35 wherein the third server is distinct from the second server.

37. The method according to claim 35 wherein the third server and the second server are the same server.

38. The method according to claim 35 wherein the third device is distinct from the second device.

39. The method according to claim 35 wherein the third device and the second device are the same.

40. The method according to claim 35 wherein the second content is distinct from the first content.

41. The method according to claim 35 wherein the second content and the first content are the same content.

42. The method according to claim 35 wherein the steps (i)-(o) are executed concurrently with steps (c)-(h) using multitasking or multiprocessing.

43. The method according to claim 1 wherein the steps are sequentially executed.

44. The method according to claim 1 wherein each of the identifiers is an IP address or a URL.

45. The method according to claim 44 wherein each of the IP addresses is in IPv4 or IPv6 form.

46. The method according to claim 1 wherein at least one of the servers is a web server using HyperText Transfer Protocol (HTTP) that responds to HTTP requests via the Internet.

47. The method according to claim 46 wherein the first and second requests are HTTP requests.

48. The method according to claim 46 wherein the communication with the second server is based on, or using, HTTP persistent connection.

49. The method according to claim 1 wherein the communication with the first device, the second device, the first server, or the second server, is based on, or according to, TCP/IP protocol or connection.

50. The method according to claim 1 wherein the step (e) is preceded by the step of establishing a connection between the first device and the second device in response to receiving the second identifier.

51. The method according to claim 50 wherein the first device is communicating with the second device over the established connection.

52. The method according to claim 50 wherein the step (e) is the first device is sending the second request over the established connection.

53. The method according to claim 50 wherein the first device is communicating with the second device using TCP, and wherein the connection is established by performing 'Active OPEN' or 'Passive OPEN'.

54. The method according to claim 50 wherein the first device is communicating with the second device using a VPN.

55. The method according to claim 50 wherein the established connection is using a tunneling protocol.

56. The method according to claim 50 wherein the connection is established using authentication.

172

57. The method according to claim 1 further followed by the steps of the first device receiving the first content from the second device; and the first device storing the first content in a memory.

58. The method according to claim 1 wherein the first content includes, consists of, or comprises, a part or whole of files, text, numbers, audio, voice, multimedia, video, images, music, or computer program.

59. The method according to claim 58 wherein the first content includes, consists of, or comprises, a part of, or a whole of, a web-site page.

60. The method according to claim 1 wherein at least the first server or the second server is storing, operating, or using, a server operating system.

61. The method according to claim 60 wherein the server operating system consists or, comprises of, or based on, one out of Microsoft Windows Server®, Linux, or UNIX.

62. The method according to claim 60 wherein the server operating system consists or, comprises of, or based on, one out of Microsoft Windows Server® 2003 R2, 2008, 2008 R2, 2012, or 2012 R2 variant, Linux™ or GNU/Linux based Debian GNU/Linux, Debian GNU/kFreeBSD, Debian GNU/Hurd, Fedora™, Gentoo™, Linspire™, Mandriva, Red Hat® Linux, SuSE, and Ubuntu®, UNIX® variant Solaris™, AIX®, Mac™ OS X, FreeBSD®, OpenBSD, and NetBSD®.

63. The method according to claim 1 wherein the first device or the second device is storing, operating, or using, a client operating system.

64. The method according to claim 63 wherein the client operating system consists or, comprises of, or is based on, one out of Microsoft Windows 7, Microsoft Windows XP, Microsoft Windows 8, Microsoft Windows 8.1, Linux, and Google Chrome OS.

65. The method according to claim 63 wherein the client operating system is a mobile operating system.

66. The method according to claim 65 wherein the mobile operating system is one out of Android version 2.2 (Froyo), Android version 2.3 (Gingerbread), Android version 4.0 (Ice Cream Sandwich), Android Version 4.2 (Jelly Bean), Android version 4.4 (KitKat)), Apple iOS version 3, Apple iOS version 4, Apple iOS version 5, Apple iOS version 6, Apple iOS version 7, Microsoft Windows® Phone version 7, Microsoft Windows® Phone version 8, Microsoft Windows® Phone version 9, and Blackberry® operating system.

67. The method according to claim 1 further preceded by the step of intercepting a request for the first content in the first device.

68. The method according to claim 67 wherein the request is initiated in an application in the first device.

69. The method according to claim 68 wherein the interception is in the form of a plug-in or an extension of the application.

70. The method according to claim 68 wherein the application is a communication application.

71. The method according to claim 70 wherein the communication application is a TCP/IP or HTTP handling application.

72. The method according to claim 68 wherein the interception is by hooking to the application.

73. The method according to claim 68 wherein the interception is in a filter driver form.

74. The method according to claim 68 wherein the application and the steps are communicating using an Inter-Process Communication (IPC).

US 9,241,044 B2

173

**75**. The method according to claim **74** wherein the IPC is using a file sharing, a signal, a socket, a pipe, a message queue, a shared memory, a semaphore, or memory mapped file.

**76**. The method according to claim **74** wherein the IPC is using a clipboard, a Component Object Model (COM), a data copy, a DDE protocol, or mailslots.

**77**. The method according to claim **68** wherein the application is a web browser.

**78**. The method according to claim **77** wherein the web browser consists of, comprises of, or based on, Microsoft Internet Explorer, Google Chrome, Opera™, or Mozilla Firefox®.

**79**. The method according to claim **68** wherein the web browser is a mobile web browser.

**80**. The method according to claim **79** wherein the mobile web browser consists of, comprises of, or based on, Safari, Opera Mini™, or Android web browser.

**81**. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:
  (a) sending the first identifier to the first server;
  (b) sending a first request to the first server;
  (c) receiving the second identifier from the first server;
  (d) sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier; and
  (e) receiving the first content from the second device.

**82**. The method according to claim **81** further comprising the step of:
  (f) sending the first content identifier to the second server using the third identifier.

**83**. The method according to claim **82** wherein step (f) is preceding step (d).

**84**. The method according to claim **82** wherein step (f) is following step (e).

**85**. The method according to claim **82** wherein step (f) is simultaneous with steps (d)-(e).

**86**. The method according to claim **85** wherein step (f) is simultaneous with steps (d)-(e) using multitasking or multiprocessing.

**87**. The method according to claim **81** for use with a third device identified in the Internet by a fourth identifier, further comprising the steps of:
  (f) receiving the fourth identifier from the first server;
  (g) sending a third request to the third device using the fourth identifier, the third request includes the first content identifier and the third identifier; and
  (h) receiving the first content from the third device.

**88**. The method according to claim **87** wherein steps (f) to (h) are executed concurrently with steps (d)-(e) using multitasking or multiprocessing.

**89**. The method according to claim **81** for use with a group consisting of a plurality of devices, each device in the group is associated with a respective identifier for being identified in the Internet, further comprising the steps of:
  (f) receiving the identifiers of the group devices from the first server;
  (g) sending a third request to the group device using their associated identifiers, the third request includes the first content identifier and the third identifier; and
  (h) receiving the first content from the group devices.

**90**. The method according to claim **89** wherein steps (f) to (h) are executed concurrently with steps (d)-(e).

174

**91**. The method according to claim **89** wherein steps (f) to (h) are executed concurrently with steps (d)-(e) using multitasking or multiprocessing.

**92**. The method according to claim **89** wherein the second device is included in the group, the method further comprising the step of selecting the second device out of the devices in the group.

**93**. The method according to claim **89** further comprising the step of selecting one or more devices, distinct from the second device, out of the devices in the group.

**94**. The method according to claim **89** wherein the second device is randomly selected out of the devices in the group.

**95**. The method according to claim **89** wherein the second device is selected based on attributes or characteristics of the device.

**96**. The method according to claim **89** wherein the second device is selected based on the physical geographical location.

**97**. The method according to claim **89** wherein the second device is selected based on the physical geographical proximity to the second server.

**98**. The method according to claim **89** wherein the second device is selected based on the second identifier.

**99**. The method according to claim **89** wherein the second device is selected based on past activities.

**100**. The method according to claim **89** wherein the second device is selected based on the timing of an event.

**101**. The method according to claim **81** for fetching over the Internet a second content, identified by a second content identifier, by a third device, identified in the Internet by a fourth identifier, from a third server identified in the Internet by a fifth identifier, via the first device, the method further comprising the steps of:
  (f) receiving a third request from the third device, the third request includes the second content identifier and the fifth identifier;
  (g) in response to receiving the third request, sending the second content identifier to the third server using the fifth identifier;
  (h) receiving the second content from the third server; and
  (i) in response to receiving the second content, sending the second content to the third device using the fourth identifier.

**102**. The method according to claim **101** wherein the third server is distinct from the second server.

**103**. The method according to claim **101** wherein the third server and the second server are the same server.

**104**. The method according to claim **101** wherein the second content is distinct from the first content.

**105**. The method according to claim **101** wherein the second content and the first content are the same content.

**106**. The method according to claim **101** wherein the steps (f)-(i) are executed after steps (a)-(e).

**107**. The method according to claim **101** wherein the steps (f)-(i) are executed concurrently with steps (a)-(e) using multitasking or multiprocessing.

**108**. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:
  (a) sending the second identifier to the first server;
  (b) receiving a second request from the first device, the second request includes the first content identifier and the third identifier;

US 9,241,044 B2

175

176

(c) in response to receiving the second request, sending the
first content identifier to the second server using the third
identifier;

(d) receiving the first content from the second server; and

(e) in response to receiving the first content, sending the
first content to the first device using the first identifier.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 9,241,044 B2                                                          Page 1 of 1
APPLICATION NO.     : 14/468836
DATED               : January 19, 2016
INVENTOR(S)         : Shribman et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Claims

In Column 170, Line 5, Claim 16, instead of "selecting 7, 8, 9 or 9 devices"; should be -- selecting 7, 8 or 9 devices --;

In Column 172, Line 41, Claim 66, instead of "4.4 (KitKat))"; should be -- 4.4 (KitKat) --.

Signed and Sealed this
Seventh Day of June, 2016

Michelle K. Lee

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

**Appx281**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

LUMINATI NETWORKS LTD.

        Plaintiff,

    v.

BI SCIENCE INC.,

        Defendant.

Case No.

JURY TRIAL DEMANDED

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Luminati Networks Ltd. ("Luminati") brings this action under the patent laws of the United States, Title 35 of the United States Code, and makes the following allegations against BI Science Inc. ("BI Science" or "Defendant"):

### THE PARTIES

1. Plaintiff Luminati is an Israeli company having a principal place of business at 3 Hamahshev St., Netanya 42507, ISRAEL.

2. Upon information and belief, Defendant BI Science is an Israeli corporation headquartered at 6 Hanechoshet St., Tel Aviv, 6971070, ISRAEL.

### JURISDICTION AND VENUE

3. This is an action for patent infringement under the patent laws of the United States of America, 35 U.S.C. § 1, *et seq*.

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over BI Science because it, directly or through its subsidiaries, divisions, groups, or distributors, has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2).  On information and belief, BI Science transacts substantial business in the State of Texas, directly or through agents, including: (i) at least some of the infringement alleged herein in the United States occurring in Texas, and (ii) regularly does or solicits business in Texas, engages in other persistent courses of conduct, maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas.  For example, on information and belief, BI Science utilizes software, which is, *inter alia*, the subject of the infringement alleged herein, that routes internet communications through user devices having IP addresses serving as residential proxies located in the State of Texas, as well as this Judicial District, permitting BI Science to include user devices in this Judicial District as part of BI Science's residential proxy service.

6.     Following *Brunette Machine Works v. Kockum Industries, Inc.*, 406 U.S. 706 1972), venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) at least because, upon information and belief, BI Science is a foreign entity.

## FACTUAL ALLEGATIONS

7.     Derry Shribman and Ofer Vilenski are the named inventors of a number of patents, including U.S. Patent Nos. 9,241,044 ("'044 Patent") and divisional 9,742,866 ("'866 Patent") (collectively the "Asserted Patents").

8.     The Asserted Patents are directed toward methods for fetching content over the Internet through the use of intermediary tunneling devices. Luminati identifies its patents on its

website   at   https://luminati.io/patent-marking#system-and-method-for-streaming-content-from-multiple-servers.

9.      The Asserted Patents were assigned to Hola Networks Ltd. ("Hola"). Hola has subsequently changed its name to Luminati Ltd., before changing its name to Luminati Networks Ltd., the Plaintiff in this action.

10.     Luminati, formerly known as Hola, provides a cloud service connecting tens of millions of devices over the Internet through a proxy-based network.  Each participating device allows the network to utilize a small fraction of that device's idle time for the network.  Luminati utilizes this network to provide proxy-based services to businesses.

11.     Since 2014, Luminati has offered proxy-based services relying on its "Residential Proxy Network" that practice one or more claims of the Asserted Patents.  Luminati permits its business customers to utilize its residential proxy network to access data over the Internet using residential IP addresses from various localities as required by the customers.  These residential IP addresses provide businesses with a number of advantages.  For example, Luminati's customers may use this network to anonymously compare prices leading to more transparency and lower prices for consumers.  Luminati's customer's may also use residential proxy addresses to test their web sites from any city in the world.  Prior to and separate from the technology at issue in this case, Hola provided a Virtual Private Network ("VPN") service called HolaVPN.

12.     Luminati, formerly known as Hola, has a number of investor shareholders.  One of these investors, iAngels Crowd Ltd. In Trust ("iAngels"), executed an Agreement to be Bound by an April 15, 2015 Amended and Restated shareholders Rights Agreement on July 14, 2015.  This Agreement to be Bound was signed by Shelly Hod Moyal, founding partner of iAngels.  As the representative for the shareholder iAngels, Ms. Moyal had access to Luminati confidential

information and know-how.  Upon information and belief, Ms. Moyal was aware of Luminati's intellectual property (including trade secrets and know-how), including the pending patent applications that resulted in the Asserted Patents.

13.     Upon information and belief, as a condition for iAngels to invest in Luminati, Ms. Moyal's husband, Kfir Moyal, conducted technical due diligence at Hola on behalf of iAngels in May 2015.  Upon information and belief, in this role Mr. Moyal also had access to Luminati's confidential information as well as Luminati's intellectual property (including trade secrets and know-how), including the then pending patent applications that resulted in the Asserted Patents and financial records regarding Luminati's residential proxy service.  Upon information and belief, Mr. and Ms. Moyal knew of the pending patent applications that resulted in the Asserted Patents and were aware of Luminati's commercial success resulting from its residential proxy network services.  Upon information and belief, Mr. Moyal did not disclose that BI Science had a residential proxy service or intended to offer a residential proxy service prior to or during the performance of due diligence on behalf of iAngels.

14.     Upon information and belief, Kfir Moyal and Assaf Toval, founded BI Science in 2009.  Upon information and belief, as early as October 14, 2014 Mr. Moyal approached Luminati as a purported customer seeking information regarding Luminati's residential proxy service.  Upon information and belief, BI Science subsequently tested Luminati's residential proxy service as part of a free trial.  Upon information and belief, at some time after Mr. Moyal became aware of the patent applications that resulted in the Asserted Patents and Luminati's commercial success with its residential proxy network services, BI Science decided to provide a residential proxy service. Upon information and belief, BI Science had decided to provide this service as early as May 2017 having estimated that switching to a residential proxy service from a server-based service could

dramatically reduce BI Science's ongoing server costs and provide BI Science with new revenue streams from this capability.   Upon information and belief, BI Science introduced its own residential proxy service under the "GeoSurf" brand by July 2017.

15.    Alon Ghelber, Samuel Levy, and Vadim Feldman each entered into a Personal Employment Agreement ("Employment Agreement") with Hola Networks Ltd., now known as Luminati, on December 18, 2014, March 1, 2015, and March 3, 2015 respectively.   The terms of the Employment Agreement include a confidentiality provision obligating the employee to keep in confidence Luminati's proprietary information.   The Employment Agreement also includes a non-compete clause prohibiting the employee from accepting employment with a company offering competing services within twelve months of the termination of employment with Luminati.

16.    Luminati terminated employment of Mr. Ghelber and Mr. Feldman on February 2, 2017 and February 20, 2017 respectively.   Mr. Levy terminated his employment with Luminati on February 8, 2017.   These employees had access to Luminati confidential know-how and trade secrets, including client lists, client records, client data usage, accounts receivable documents, business plans, marketing research, technical documents related to the architecture of Luminati's residential proxy network, and related work product.   Luminati's residential proxy service is intended for use in interstate or foreign commerce.   Upon information and belief, BI Science subsequently hired these three individuals in 2017 within months of their termination by Luminati. Upon information and belief, BI Science hired Mr. Levy in May 2017 followed by Mr. Feldman in June 2017, which was approximately on or after BI Science decided to offer the residential proxy service.   Upon information and belief, BI Science also hired Mr. Ghelber in 2017.   Upon information and belief, BI Science hired these former Luminati employees despite the non-

compete clause of the Employment Agreements or was willfully blind to these former Luminati employees being subject to such a provision. Upon information and belief, BI Science hired these former Luminati employees knowing them to be former Luminati employees with knowledge of Luminati's trade secrets including confidential information related to Luminati's residential proxy service. Upon information and belief, BI Science hired these former Luminati salespeople for the purposes of selling BI Science's competing "Geosurf" residential proxy service. Upon information and belief, the former Luminati employees have touted their experience with Luminati as part of their approach to Luminati clients offering the "GeoSurf" service as an alternative in competition with Luminati's residential proxy service. Upon information and belief, Luminati's former employees employed Luminati's confidential trade secrets on behalf of BI Science in furtherance of the competing "Geosurf" residential proxy service. Upon information and belief, Luminati lost customers for its residential proxy service to BI Science's competing Geosurf service.

17.    By July 2017, Luminati learned that BI Science had hired its three former employees and started offering a residential proxy service through Geosurf. On July 12, 2017, Mr. Vilenski sent an email to Ms. Moyal requesting that Ms. Moyal collect and provide information about Mr. Moyal's competing business, including its employment of Luminati's three former sales people. Mr. Vilenski specifically noted that Mr. Moyal gained detailed information from Mr. Vilenski as an advisor to Ms. Moyal, without Ms. Moyal disclosing that Mr. Moyal is involved in or is running a competing business. On August 14, 2017, Mr. Vilenski sent a follow-up email to Ms. Moyal demanding that Mr. Moyal stop providing residential proxy services through GeoSurf.

18.    On February 8, 2018, Or Lenchner, then VP of Luminati and currently Luminati CEO, sent a letter to Mr. Moyal informing Mr. Moyal that Luminati had become aware that BI Science was developing, using, offering for sale or selling products and services in the field of

VPN services based on residential IP peers, such as the GeoSurf service.  Mr. Lenchner notified

BI Science that Luminati owns intellectual property within this field including specifically the

'866 Patent attached to that letter in addition to other related patents and patent applications.  Mr.

Lenchner invited BI Science to enter into licensing discussions to cover past and future use of this

intellectual property by BI Science.  BI Science responded on March 8, 2018 in a letter from BI

Science's outside counsel Asaf Biger.

19.     On April 16, 2018, Mr. Toval sent an email to Mr. Lenchner requesting a meeting

to discuss potential licensing of Luminati's software patents, that resulted in a meeting on April

30, 2018.   On May 13, 2018, Mr. Lenchner sent a follow-up email with an attached request for

information to promote licensing discussions.   Mr. Toval sent a response on May 31, 2018

indicating that BI Science was unable to provide such information.  Following additional efforts

by Mr. Lenchner to propose a framework for a licensing agreement, Mr. Toval sent an email

response on June 18, 2018 agreeing to review the framework and provide feedback, but BI Science

has not done so.

20.     Upon information and belief, BI Science offers large-scale data harvesting products

and services under the GeoSurf brand. https://www.GeoSurf.com/products/residential-ips/. Upon

information and belief, this includes a residential proxy network with millions of residential IP

addresses from more than 192 countries.  *id*.  Upon information and belief, the IP addresses of

these residential proxies are assigned by a standard Internet Service Provider (ISP) to a homeowner

or other residential or mobile user.  *id*.  Upon information and belief, this residential proxy network

is used to access content over the Internet, wherein that content may be divided into portions, each

of which includes part of the content and its own content identifier.



## USING MILLIONS OF RESIDENTIAL IPS WILL NEVER GET YOU BLOCKED

The World's most advanced solution for data harvesting, now offers residential IPs! Our Residential IPs are based on a P2P Network, which enables our clients the freedom to harvest the web by harnessing a pool of over 2 Million unblocked IPs.

Our inbuilt IP rotation API is tailor made for high scope & high-performance Enterprise level activities. This unique approach enables you to send unlimited parallel requests through millions of 100% verified working IPs; this means that you will never get blocked again.

https://www.GeoSurf.com/products/residential-ips/



**UNLIMITED CLEAN RESIDENTIAL IPS**

Over 2Million clean residential IPs. Our IPs are never detected as proxies. This combination of proxy masking & residential IPs gives us the ability to stay undetectable.

https://www.GeoSurf.com/products/residential-ips/

**✚  ❷  What is GeoSurf™?**

GeoSurf™ is a straight-forward a premium proxy service which enables users to send requests via 3 networks:

• GeoSurf™ Residential IPs proxy network with more than 2 Million Residential IPs in every country and every city in the world.
• GeoSurf™ Premium Static proxy network with servers in 130+ global locations and 30+ DMA's.
• GeoSurf™ Static proxy network with more than 10K static IPs in 20+ global locations

GeoSurf™ products enable users to surf and view geo-targeted local content from other areas. It also emulates many mobile devices. The service is available as a browser toolbar, VPN client, Direct Connect API, Residential IPs API, and smart phone connection.

https://www.GeoSurf.com/resources/faq/#ac_15174_collapse1

## State Gateway Overview

This Residential IP Gateway that allows you to choose State's IPs. This service is available for all 50 US states and Washington DC.

**How it works?**
- Authentication – The authentication is done in the same way as all other gateways, so, if your IP is white-listed in our system you can start using the State gateway immediately
- State selection – The State gateway allows you to choose from all states using "loc" proxy header.
- Session persistence – The state gateway allows you to maintain session persistence and open multiple session using the "X-Session" proxy header.
- Limits – Like all other GSR services you have unlimited number of requests/sessions or connections and unlimited concurrent connections.
- Gateway domain – state.geosurf.io

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse4

## Can I select an IP per city?

Yes, you can select an IP from all major US cities by using the City gateway. Check out GeoSurf Residential IPs Integration Guide for more information and request example. City IP is a premium feature, the city gateway's usage comes with a different pricing compared with your existing plan. Contact your customer success representative for additional information.

https://www.GeoSurf.com/resources/faq/#ac_15216_collapse4

## City Gateway overview

This service is currently available for all major US cities and we will continue to add more and more cities in the near future.

**How it works?**
- Authentication – The authentication is done the same way as all other gateways, If your IP is whitelisted in our system you can start using the City gateway immediately.
- City selection – The city gateway allows you to choose from 100 US cities, each city has its own port range.
- Limits – Like all other GSR services you are unlimited with number of requests/sessions or connections, concurrent connections are limited to 20 per machine IP.
- Gateway domain – us-city1.geosurf.io

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse1

**Appx290**

Upon information and belief, some of these user devices serving as residential proxies (and associated with respective IP addresses) are located in the Eastern District of Texas.

21.     Upon information and belief, the residential proxy network used as part of the GeoSurf service is based upon numerous user devices, each of which is a client device identifiable over the Internet by an IP address.   Upon information and belief, a server ("First Server") is operated by BI Science and/or a third party having a contractual obligation to BI Science to implement residential proxy network requests sent by BI Science.  BI Science touts itself as owning all the servers in the GeoSurf network.  However, upon information and belief, BI Science may contract with a third-party, such as Jetstar Media and/or Microleaves Ltd., to implement its GeoSurf residential proxy network.  Upon information and belief, whether BI Science owns the First Server or contracts with a third-party to operate the First Server, BI Science directs and controls the First Server to implement the GeoSurf residential proxy service.

| − ❓ How secure and private is GeoSurf? |
|---|
| Our network boasts the highest levels of reliability, availability, and security. Because we own all of the servers on our network and host them in Tier 1 backbone data centers around the world, all of our users experience a totally secure browsing experience. We sign legally binding agreements with our customers to ensure their privacy. |

https://www.GeoSurf.com/resources/faq/#ac_15174_collapse5

22.     Upon information and belief, software ("Server Software") is executed that implements the GeoSurf service.  Upon information and belief, BI Science directs and controls the operation of the Server Software to the extent that the Server Software implements the GeoSurf service. For example, upon information and belief, BI Science can direct and control the GeoSurf service to select residential proxy devices located within a specific state or city and can determine

how long a given proxy device will be utilized for a given session, which is referred to as sticky residential IPs and session persistence.

**State Gateway Overview**

This Residential IP Gateway that allows you to choose State's IPs. This service is available for all 50 US states and Washington DC.

**How it works?**
- Authentication – The authentication is done in the same way as all other gateways, so, if your IP is white-listed in our system you can start using the State gateway immediately
- State selection – The State gateway allows you to choose from all states using "loc" proxy header.
- Session persistence – The state gateway allows you to maintain session persistence and open multiple session using the "X-Session" proxy header.
- Limits – Like all other GSR services you have unlimited number of requests/sessions or connections and unlimited concurrent connections.
- Gateway domain – state.geosurf.io

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse4

**Can I select an IP per city?**

Yes, you can select an IP from all major US cities by using the City gateway. Check out GeoSurf Residential IPs Integration Guide for more information and request example. City IP is a premium feature, the city gateway's usage comes with a different pricing compared with your existing plan. Contact your customer success representative for additional information.

https://www.GeoSurf.com/resources/faq/#ac_15216_collapse4



The requests are made by {key:value} pairs. The key represents the GateWay and the value represents the actual IP.

In our dashboard you will see all the different configurations for high rotation, 1 minute, 10 minutes and 30 minutes persistent sessions.

The Sticky country gateways can be found in your dashboard.

**Port ranges (value) are defined based on the following locig:**

10 minutes sticky port values: +0 – + 2000

30 minutes sticky port values: +4001 – + 6000

1 minutes sticky port values: +2001 – + 4000

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15062_collapse1

  23. Upon information and belief, each user device in the residential proxy network sends its respective identifier to the First Server, which stores these identifiers. Upon information and belief, to the extent that BI Science has contractual relationship(s) with one or more third parties that provide server services, BI Science directs and/or controls these third-party servers to implement its residential proxy network for the GeoSurf service through the third-party servers and user devices included in the residential proxy network. Upon information and belief, as part of the GeoSurf service, BI Science provides a device designated as a 'Gateway', which

authenticates the user devices of BI Science customers and controls the access and operation of requests and responses through the one or more third-party proxy residential networks directed and controlled by BI Science, and is in continuous communication with the Server Software.

**BROWSER & OS CONFIGURATION**



1. Open Windows Explorer.
2. Type in "Internet Properties"
3. Click on "connections" tab.
4. Navigate to "LAN settings"
5. Check the first checkbox under "Proxy server"
6. Click "Advanced"
7. Fill in your proxy address (ex: gw1.geosurf.io) and port (ex: 8020) under HTTP.
8. The "use the same proxy server" checkbox should be checked.
9. Click OK and Apply to save your proxy settings.
10. Go to ipinfo.io and verify the IP you got is from the desired country

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15054_collapse1

**— ◉ Do you support authentication by IP?**

Yes, IP address of every device / Machine which uses Geosurf should be authorized. The IP can be easily managed from our dashboard, click here to login to your dashboard.

https://www.GeoSurf.com/resources/faq/#ac_15217_collapse4



https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15173_collapse6

**—  ⓘ  Are you getting 408 timeouts?**

If a significant portion of your requests is timing out ( 408 response code), there are a few reasons this could happen:

1. The network connection between you and our gateway or between the gateway and the IP is not stable.
    1. Try using another gateway (ex. gw2.geosurf.io) and see if it fixes the issue.
    2. Try switching an IP, simply end the session and make another request through our gateway (IP will rotate automatically)
2. The request you are making takes a long time to load.
    1. Increase the request timeout using a within the request header.
    2. Switch an IP.
3. The residential IPs has been blocked by the remote site.
    1. Although this rarely happens, switching an IP will resolve the issue.

If only a small percentage of your requests are getting a 408 response code, the optimal solution is to resend your requests with a short delay of at least 3 seconds in-between each request.

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15173_collapse3

     24.    Upon information and belief, BI Science has developed or is developing the software to be used in the user devices as part of the GeoSurf service by integration with different third-party software applications, including at least GSA search engine ranker, Foxy Proxy, AIO

Sneakers Bot, EasyCopy sneakers bot, NikeSlayer, BretterNikeBot (BNB), Supreme Bot, Another Nike Bot, Sneaker Bot 2.0, and StubTabs.

**3RD PARTY SOFTWARE INTEGRATION**

➕ ⚙ Using Geosurf Residential IP proxy with GSA search engine ranker

➕ ⚙ Using Geosurf Geosurf Residential IP proxy with Foxy Proxy

➕ ⚙ Using Geosurf Residential IP proxy with AIO Sneakers Bot

➕ ⚙ Using Geosurf Residential IP proxy with EasyCop sneakers bot

➕ ⚙ Using Geosurf Residential IP proxy with NikeSlayer

➕ ⚙ Using Geosurf Residential IP proxy with BetterNikeBot (BNB)

➕ ⚙ Using Geosurf Residential IP proxy with Supreme Bot

➕ ⚙ Using Geosurf Residential IP proxy with Another Nike Bot

➕ ⚙ Using Geosurf Residential IP proxy with Sneaker Bot 2.0

➕ ⚙ Using Geosurf Residential Proxy Network with StubTabs & ProxyTabs

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse4

25.    Upon information and belief, a GeoSurf customer may utilize the GeoSurf residential proxy network by sending a request ("First Request") from the GeoSurf customer's device through the GeoSurf Gateway, either of which could serve as the first device ("First Device"), to the above First Server, which responds by sending the IP address ("Second Identifier") corresponding to one of a group of client devices in the proxy network, any one of which may serve as a proxy device ("Second Device"), back to the First Device.

> **▬  ⚙  US Residential 1 minute session persistence CURL example**
>
> To use the USA residential session persistence, simply make a request to the USA sticky ips gateway (us-s1).
> The port range is 10231 – 12231, each port will assign you with a new Sticky IP which can be accessed for 1 minutes.
> **Example requests for a sticky residential IP in the United States:**
> Curl -v –proxy us-s1.geosurf.io:10231"http://www.ipinfo.io"
> Curl -v –proxy us-s1.geosurf.io:10232"http://www.ipinfo.io"
> Curl -v –proxy us-s1.geosurf.io:10233"http://www.ipinfo.io"
> …
> Curl -v –proxy us-s1.geosurf.io:12230"http://www.ipinfo.io"
> The process reloads every 30 min and assigns new IPs, even though the reload is very fast (less than 2 seconds) it is recommended to ping the gateway every 5 minutes for availability. Don't forget to whitelist your machine IP, see instruction.

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15062_collapse2

26.     Upon information and belief, having received the Second Identifier, the First Device may then send a request ("Second Request") to the Second Device for specific Internet data ("First Content") identified by an identifier ("Content Identifier") from a target server ("Second Server") identified by its own identifier ("Third Identifier"), which is forwarded by the Second Device to the Second Server.  Upon information and belief, the target Second Server responds to the forwarded Second Request by sending the First Content to the Second Device, which is then forwarded back to the First Device.  Upon information and belief, to the extent that the requested content may be divided into portions or slices, the GeoSurf customer's device, which is a First Device, can construct the content from the plurality of Content Slices.

**Appx297**



https://vimeo.com/250282014 (**Time: 00:47 sec to 01:20 sec**)



https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15173_collapse6



You should use Sticky IPs when you must run sequential requests to the target domain or website in a single session.

Examples: Running requests to several web pages from the same website, Navigating through several web pages using the same session etc.

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15172_collapse1

27.    The use of the residential proxy network permits anonymity to GeoSurf customers, for example for engaging in activities such as web crawling without disclosing the customer's identity to the targeted web sites.

**COUNT I**
(Infringement of the '044 Patent)

28.    Luminati repeats and re-alleges the allegations contained in paragraphs 1-26 of this Complaint as if fully set forth herein.

29.    The '044 Patent entitled "System and Method for Improving Internet Communication by Using Intermediate Nodes" was duly and legally issued by the U.S. Patent and Trademark Office on January 19, 2016, from Application No. 14/468,836 filed on August 26,

2014, claiming priority to provisional applications 61/870,815 filed on August 28, 2013. A true

and accurate copy of the '044 Patent is attached hereto as Exhibit A.

30.     Each and every claim of the '044 Patent is valid and enforceable, and each enjoys

a statutory presumption of validity under 35 U.S.C. § 282.

31.     Luminati exclusively owns all rights, title, and interest in and to the '044 Patent and

possesses the exclusive right of recovery, including the exclusive right to recover for past

infringement.

32.     Claim 81 of the '044 Patent recites:

Claim 81. A method for fetching over the Internet a first content, identified by a
        first content identifier, by a first device, identified in the Internet by a first
        identifier, from a second server identified in the Internet by a third identifier
        via a second device identified in the Internet by a second identifier, using a
        first server, the method comprising the steps of:
        (a) sending the first identifier to the first server;
        (b) sending a first request to the first server;
        (c) receiving the second identifier from the first server;
        (d) sending a second request to the second device using the second
        identifier, the second request includes the first content identifier and the
        third identifier; and
        (e) receiving the first content from the second device.

33.     As described above in paragraphs 19 to 22, upon information and belief, BI

Science's proxy residential network used for the GeoSurf service comprises numerous devices

each of which is identifiable by its own IP address ("identifier"), which are stored on servers

through the execution of Server Software under the control and/or direction of BI Science.

Consequently, BI Science's GeoSurf proxy residential network would comprise at least a First

Device and a Second Device with their corresponding First Identifier and Second Identifier and a

First Server.

34.     As described above in paragraphs 19-25, upon information and belief, this network

would permit a user to access Internet content ("First Content"), identifiable by a content identifier

such as a URL ("First Content Identifier") from a target server ("Second Server"), identifiable by

its own corresponding IP address ("Third Identifier").

35.    As described above in paragraphs 19-25, upon information and belief, the GeoSurf

customer sends a request with its corresponding IP address to the GeoSurf Gateway which

forwards the request to the "First Server."  At least the GeoSurf Gateway can serve as a "First

Device" with the First Server storing the corresponding IP address ("First Identifier") of that "First

Device."

36.    As described above in paragraphs 19-25, upon information and belief, a GeoSurf

customer can utilize its device to send a request ("First Request") through the GeoSurf Gateway,

with at least the Gateway serving as the first device ("First Device"), to the First Server, causing

the First Server to respond by sending the Second Identifier back to the First Device.  Upon

information and belief, a second request ("Second Request"), comprising a First Content Identifier

and a Third Identifier to the Second Device, is then sent from the First Device to the Second Server

using the Second Identifier.  Upon information and belief, the Second Server responds by sending

the requested First Content to the Second Device, which is forwarded back to the First Device.

37.    Upon information and belief, BI Science has had actual notice of the '044 Patent

since at least January 8, 2018, and has known, including by way of communications on and since

that date and this lawsuit, that implementation of its GeoSurf residential proxy service would

infringe at least claim 81 of the '044 Patent.

38.    BI Science has been and is now directly infringing, literally and/or under the

doctrine of equivalents, one or more claims, including at least claim 81 of the '044 Patent, by

implementing its residential proxy service in the United States without authority and/or license

from Luminati and is liable to Luminati under 35 U.S.C. § 271(a).

39.     BI Science has been and is now indirectly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 81 of the '044 Patent, by providing this residential proxy service to its customers knowing that the use of such service infringes these claims in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(b).

40.     As a result of BI Science's infringement of the '044 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from BI Science the damages Luminati sustained as a result of BI Science's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court under 35 U.S.C. § 284.

41.     Luminati has suffered damage because of the infringing activities of BI Science, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless BI Science's infringing activities are preliminarily and permanently enjoined by this Court.

42.     BI Science's infringement of the '044 Patent was, is, and continues to be deliberate and willful because BI Science was and is on notice of the '044 Patent at least as early as January 8, 2018, yet it continued and continues to infringe the '044 Patent.

### COUNT II
(Infringement of the '866 Patent)

43.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-41 of this Complaint as if fully set forth herein.

44.     The '866 Patent entitled "System and Method for Improving Internet Communication by Using Intermediate Nodes" was duly and legally issued by the U.S. Patent and

Trademark Office on August 22, 2017 from Application No. 14/930,894 filed on August 22, 2017,

a divisional of Application No. 14/468,836 that issued as the '044 Patent, both of which claim

priority to provisional applications 61/870,815 filed on August 28, 2013. A true and accurate copy

of the '866 Patent is attached hereto as Exhibit B.

45.    Each and every claim of the '866 Patent is valid and enforceable, and each enjoys

a statutory presumption of validity under 35 U.S.C. § 282.

46.    Luminati exclusively owns all rights, title, and interest in and to the '866 Patent and

possesses the exclusive right of recovery, including the exclusive right to recover for past

infringement.

47.    Claim 15 of the '866 Patent recites:

Claim 15. A method for fetching a content over the Internet from a first server
identified in the Internet by a second identifier via a group of multiple
devices, each identified in the Internet by an associated group device
identifier, the method comprising the step of partitioning the content into a
plurality of content slices, each content slice containing at least part of the
content, and identified using a content slice identifier, and for each of the
content slices, comprising the steps of:
(a) selecting a device from the group;
(b) sending over the Internet a first request to the selected device using the
group device identifier of the selected device, the first request including the
content slice identifier and the second identifier;
(c) in response to receiving the sent first request by the selected device,
receiving over the Internet the content slice from the selected device; and
wherein the method further comprising the step of constructing the content
from the received plurality of content slices, and
wherein each of the devices in the group is a client device.

48.    As described above in paragraphs 19 to 22, upon information and belief, BI

Science's GeoSurf proxy residential network comprises numerous devices, each of which is a

client device identifiable by its own identifier.  Upon information and belief, BI Science's GeoSurf

proxy residential network permits BI Science's customers to request content from the customer's

device through the GeoSurf Gateway, which forwards such requests through a server and proxy

residential user device ("Selected Device") to a target server ("First Server"), which is identifiable by its own IP address ("Second Identifier"). The Selected Device is selected from a group of client devices ("Group"), each of which has its own IP address ("Group Device Identifier".  As further described above, this content may be divided into portions ("Content Slices") identifiable by their own identifiers ("Content Slice Identifier").

49.    As described above in paragraphs 19-25, upon information and belief, the GeoSurf service permits the GeoSurf customer to select a proxy user device from the Group and send a request ("First Request") over the Internet to the Selected Device using the selected device IP address ("Group Device Identifier of the Selected Device").  This First Request includes the Content Slice Identifier and Second Identifier.

50.    As described above in paragraphs 19-25, upon information and belief, the above Selected Device responds to the First Request by sending the request to the First Server with the Content Slice Identifier.  The First Server responds by sending the requested Content Slice to the Selected Device, which forwards the Content Slice through the GeoSurf Gateway to the device of the GeoSurf customer, which is a client device.  The client device of the GeoSurf customer then constructs the content from the plurality of Content Slices.

51.    BI Science has had actual notice of the '866 Patent since at least January 8, 2018, and has known, including by way of communications on and since that date and this lawsuit, that implementation of its GeoSurf residential proxy service would infringe at least claim 15 of the '866 Patent.

52.    BI Science has been and is now directly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 15 of the '866 Patent, by

implementing its residential proxy service in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(a).

53.     BI Science has been and is now indirectly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 15 of the '866 Patent, by providing this residential proxy service to its customers knowing that the use of such service infringes these claims in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(b).

54.     As a result of BI Science's infringement of the '866 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from BI Science the damages Luminati sustained as a result of BI Science's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court under 35 U.S.C. § 284.

55.     Luminati has suffered damage because of the infringing activities of BI Science, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless BI Science's infringing activities are preliminarily and permanently enjoined by this Court.

56.     BI Science's infringement of the '866 Patent was, is, and continues to be deliberate and willful because BI Science was and is on notice of the '866 Patent at least as early as January 8, 2018, yet it continued and continues to infringe the '866 Patent.

### COUNT III
(Tortious Interference with Luminati's Employment Agreements)

57.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-56 of this Complaint as if fully set forth herein.

**Appx305**

58.    Hola Networks Ltd., now known as Luminati, had entered into Employment Agreements with each of three former Luminati employees Alon Ghelber, Samuel Levy, and Vadim Feldman ("Former Luminati Employees"), which include confidentiality and non-compete clauses prohibiting each of the these employees from disclosing information confidential to Luminati and from accepting employment with a company offering competing services within twelve months of the termination of employment with Luminati.

59.    BI Science intentionally and willfully interfered with the Employment Agreements having hired the Former Luminati Employees shortly after termination of their employment by Luminati knowing that they had been employed by Luminati as salesmen for the Luminati residential proxy service.  BI Science knew or should have known that the hiring of the Former Luminati Employees to sell BI Science's competing Geosurf service caused the Former Luminati Employees to violate at least the non-compete clause of their Employment Agreements.

60.    Luminati has suffered damages and BI Science has been unjustly enriched as Luminati lost business to BI Science's competing GeoSurf service.  BI Science's interference with the Employment Agreements and hiring of the Former Luminati Employees was the proximate cause of this lost business.

### COUNT IV
(Misappropriation of Trade Secret Under Federal Defense of Trade Secret Act)

61.    Luminati repeats and re-alleges the allegations contained in paragraphs 1-61 of this Complaint as if fully set forth herein.

62.    Luminati takes reasonable measures to protect the confidentiality of valuable trade secrets related to its residential proxy service, including the requirement that its employees protect the confidentiality of Luminati trade secrets.  This non-public information has actual independent economic value derived from Luminati's experience in the residential proxy service field.

63.    Luminati's residential proxy service is intended for use in interstate or foreign commerce.

64.    Upon information and belief, BI Science misappropriated Luminati's trade secrets by hiring Luminati's former employees, knowing that each of them had access to Luminati's trade secrets related to Luminati's residential proxy service as well as a duty to preserve the confidentiality of Luminati's trade secrets, for the purpose of competing with Luminati's residential proxy service.

65.    Luminati has suffered damages and BI Science has been unjustly enriched as Luminati lost business to BI Science's competing GeoSurf service as a result of BI Science's misappropriation of Luminati's trade secrets.

66.    BI Science's misappropriation of Luminati trade secrets was willful and malicious.

67.    Luminati is entitled to recover the actual loss suffered by Luminati, any additional damages to account for BI Science's unjust enrichment, and exemplary damages as a result of BI Science's misappropriation of its trade secrets under 18 U.S.C. § 1836(b)(3)(B) and (C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Luminati respectfully requests that this Court enter:

A.  A judgment that each of the Asserted Patents is valid and enforceable.

B.  A judgment in favor of Luminati that the Defendant has and is infringing the Asserted Patents;

C.  A judgment declaring Defendant's infringement to be willful.

26

D.  A judgment in favor of Luminati that the Defendant tortiously interfered with Luminati's Employment Agreements;

E.  A judgment in favor of Luminati that the Defendant misappropriated Luminati's trade secrets under 18 U.S.C. § 1836(b);

F.  A judgment and order for damages under 18 U.S.C. § 1836(b)(3)(B);

G.  A judgment and order for exemplary damages under 18 U.S.C. § 1836(b)(3)(C);

H.  A judgment declaring that this case is exceptional within the meaning of 35 U.S.C. § 285;

I.  A permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, associates, partners, customers, server owners and / or operators, and other persons who are in active concert or participation with BI Science, from infringing the Asserted Patents and/or such other equitable relief the Court determines is warranted in this case;

J.  A judgment and order requiring the Defendant to pay to Luminati its damages, enhanced damages, costs, expenses, prejudgment and post-judgment interest, and attorneys' fees, if applicable, for the Defendants' infringement of the Asserted Patents as provided under 35 U.S.C. §284 and/or §285, and an accounting of ongoing post-judgment infringement;

K.  Disgorgement of the amount by which BI Science has been unjustly enriched; and

L.  Any and all other relief, at law or in equity that this Court deems just or proper.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Luminati hereby demands a trial by jury of all issues so triable.

Dated:  November 08, 2018                              Respectfully submitted,


By: */s/ Korula T. Cherian*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Capshaw DeRieux, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: 903-845-5770
ccapshaw@capshawlaw.com
ederieux@capshawlaw.com

Korula T. Cherian
RuyakCherian LLP
1936 University Ave, Ste. 350
Berkeley, CA  94702
Email: sunnyc@ruyakcherian.com

Attorneys for Plaintiff

**Appx309**

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS LTD.** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 2:18-cv-483-JRG** |
| | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **BISCIENCE INC.** | § | **FILED UNDER SEAL** |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE,**
**MOTION TO TRANSFER VENUE**

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Defendant BIScience Inc.[1] ("BIScience") respectfully submits this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction or, in the alternative, to transfer venue to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).  In addition, this motion identifies defects in certain claims of Plaintiff Luminati Networks Ltd.'s ("Luminati") complaint that warrant dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

## I.     **INTRODUCTION**

On November 8, 2018, Luminati, an Israeli company, filed suit against BIScience, also an Israeli company, alleging patent infringement, tortious interference with Luminati's employment agreements, and misappropriation of trade secrets under the Federal Defense of Trade Secrets Act. Dkt. 1. Indisputably, all of the non-patent claims involve facts and witnesses in Israel—for Luminati and for BIScience.  Luminati contends that this Court has personal jurisdiction over BIScience because it has "sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2)."  Dkt. 1 ¶ 5. Luminati alleges that "some" of the alleged infringement occurred in Texas and that BIScience "maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas."  *Id.*  As discussed in more detail below, this is not true.  BIScience has insufficient contacts with Texas such that the exercise of personal jurisdiction over BIScience would offend traditional notions of fair play and substantial justice.  BIScience has none of the indicia of personal jurisdiction recognized by the law, such as having an office or other real estate in Texas. Nor does it have employees, a registered agent, or a bank account in Texas, make

---

[1] BIScience Inc. is not a legal entity.  BI Science (2009) Ltd. is an Israeli corporation and the proper party.  Regardless of the corporate entity, however, this motion should be granted.  In the interest of judicial and party efficiency, this motion addresses BI Science (2009) Ltd. as "BIScience".

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

business trips to Texas, attend trade show attendance in Texas, or engage in specific marketing to Texas customers.  BIScience has also never invoked the legal system in Texas.

BIScience  is an Israeli corporation with its headquarters in Tel Aviv, Israel.  Contrary to Luminati's assertions, BIScience conducts its U.S. activities out of an office in New York.  It conducts sales activity from this New York office, attends trade shows in New York, and regularly visits its New York office as part of its regular business operations.  For these and other reasons set forth below, there is no personal jurisdiction over BIScience in Texas and venue would be inconvenient for all parties and witnesses in this forum.  Both personal jurisdiction and venue are instead proper in the Southern District of New York.  Putting aside the parties' disputes on the merits, this case could have and should have been filed in that judicial district.

## II.    **THIS CASE SHOULD BE DISMISSED FOR LACK OF JURISDICTION**

### A.    **Requirements for Personal Jurisdiction**

Personal jurisdiction is governed by Federal Circuit law in patent infringement actions. *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009); *see also Blue Spike, LLC v. Texas Instruments, Inc.*, No. 6:12-cv-499, 2014 WL 11829323 at *1 (E.D. Tex. Mar. 31, 2014).  The burden is on the plaintiff to establish that the defendant is subject to personal jurisdiction.  *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015).

A court can exercise personal jurisdiction over an out-of-state defendant only if the forum state's long-arm statute permits jurisdiction without violating federal due process as delineated in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  *HTI IP LLC v. DriveOk, Inc.*, No. 6:09-cv-370, 2010 WL 3075200, at *4 (E.D. Tex. Aug. 4, 2010) (*citing LSI Indus. Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1371 (Fed. Cir. 2000)).  The Texas long-arm statute is coextensive with due process such that the analysis collapses into a single inquiry.  *WorldVentures Hldgs., LLC v. Mavie*,

2

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

No. 4:18-cv-393, 2018 WL 6523306, at *4 (E.D. Tex. Dec. 12, 2018).  To establish whether a court has personal jurisdiction over a defendant, a plaintiff must show: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice.  *Int'l Shoe*, 326 U.S. at 316-20 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-77 (1985).  The type of contacts with the forum state determine whether specific or general jurisdiction may be invoked. *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014); *WorldVentures*, 2018 WL 6523306, at *4.

General jurisdiction exists for a corporate defendant only when its "corporate operations within a state [are] so substantial and of such a nature" to justify suit based on activity entirely distinct from the alleged activities.  *Daimler*, 571 U.S. at 127 (citing *Int'l Shoe*, 326 U.S. at 318). The operations must be so continuous and systematic that the corporate defendant is "essentially at home in the forum State."  *Id.* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, n. 9 (1984)).  Only a limited set of contacts support general jurisdiction of a corporate defendant, including the defendant being incorporated or having a principal place of business in the forum state.  *Id.* at 137; *see also Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).

To exercise specific jurisdiction, a court must determine "(1) whether the defendant purposefully directs activities at the forum's residents; (2) whether the claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair." *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1361 (Fed. Cir. 2012) (*citing Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010)).  The focus of

3

**Appx543**

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

the specific jurisdiction inquiry is on the "relationship between the defendant, the forum, and the litigation." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 343 (1985) (*quoting Burger King*, 471 U.S. at 474). However, the primary concern is the burden on the defendant. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Random, fortuitous, or attenuated contacts are insufficient to establish purposeful availment. *Burger King*, 471 U.S. at 476.

**B.      There is No General Jurisdiction Over BIScience**

BIScience is not subject to general personal jurisdiction in Texas.[2] BIScience is not incorporated in nor does it operate a principal place of business in Texas. Ex. A ¶ 2, 7. BIScience is not registered to do business in Texas, does not have a registered agent in Texas, does not have a bank account in Texas, does not have an office or any property in Texas, does not employ personnel in Texas, does not conduct visits to Texas for business (or otherwise), does not attend trade shows or conferences in Texas, and does not specifically advertise to Texas residents as opposed to other locations. *Id.* ¶¶ 3-6. BIScience's corporate activities are therefore not so continuous and systematic such that it would be "at home" in Texas sufficient to exercise general jurisdiction in this forum. *Daimler*, 571 U.S. at 126. Luminati alleges no activities that establish otherwise. *See, e.g.*, *Internet Machines LLC v. Alienware Corp.*, No. 6:10-cv-023, 2011 WL 2292961, at *4 (E.D. Tex. June 7, 2011).

---

[2] For completeness, Fed. R. Civ. P. 4(k)(2) also fails to provide personal jurisdiction over BIScience. Because BIScience would be subject to general personal jurisdiction in the Southern District of New York as discussed herein, the rule does not apply. *See* Fed. R. Civ. P. 4(k)(2)(A) (limited to situations where "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction").

4

**Appx544**

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

### C.    There is No Specific Jurisdiction Over BIScience

BIScience is not subject to specific personal jurisdiction in this forum because Luminati fails to establish that BIScience purposefully directs activities toward Texas or that Luminati's claims arise out of any contact BIScience has with Texas.

Luminati generally alleges that BIScience "has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2)." *See* Dkt. 1 ¶ 5. The only non-general allegations made are that "BI Science utilizes software, which is, *inter alia*, the subject of the infringement alleged herein, that routes internet communications through user devices having IP addresses ***serving as residential proxies*** located in the State of Texas, as well as this Judicial District, permitting BI Science to include user devices in this Judicial District as ***part of BI Science's residential proxy service***." *Id.* (emphasis added). However, the location and use of residential proxy software is not the focus of Luminati's alleged theory of infringement, as made clear by the complaint.

The asserted claims of the '044 and '866 patents are each method claims. Dkt. 1 ¶¶ 32, 47. Luminati alleges that the claimed methods are performed by a "user" or "customer" of the accused GeoSurf service. *Id.* at ¶¶ 34-36, 48-49. However, the existence or operation of residential proxy software in Texas—activity unrelated to any BIScience customer or user—fails to demonstrate BIScience purposefully availed itself of the benefits of doing business in Texas as Luminati alleges. Ex. A ¶ 9; *Blue Spike*, 2014 WL 11829323, at *3 ("Plaintiff further suggests that because [defendant] incorporated its software into the products of Texas-based corporations, [defendant] must necessarily be charged with independently establishing contacts with Texas. But Plaintiff has not demonstrated that [defendant] purposefully availed itself of the benefits of doing business in Texas."). Luminati's complaint thus fails to establish a *prima facie* case that BIScience

5

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

purposefully directs activities at residents of this forum relating to or arising out of the allegedly infringing activity.

The customer activity alleged by Luminati is also minimal when compared to BIScience's overall business.  As of January 22, 2019, there are only six GeoSurf residential active customers and only thirty-four former GeoSurf residential customers in Texas.  Ex. A ¶ 9.  The total sales of the six active customers is $5,500 per month.  *Id.*  The total revenue among the six active Texas customers and the thirty-four former Texas customers, combined, is only $37,191.  *Id.*  To put those numbers in perspective, BIScience had total worldwide revenue across all of its products of $8.3 million in 2018.  *Id.*  The total sales among all current and former GeoSurf residential customers in Texas is thus only 0.44% of BIScience's overall 2018 revenue.  As courts have recognized, minimal sales in a forum state, absent any purposeful activity focused on the state, are insufficient to confer personal jurisdiction.  *See, e.g., Roberts v. Paulin*, No. 07-cv-13207, 2007 WL 3203969 (E.D. Mich. Oct. 31, 2007) (finding lack of personal jurisdiction where defendant had less than $500 of sales in forum state); *Tuna Processors, Inc. v. Anova Food, Inc*., No. 07-6192, 2007 WL 3232609, at *4 (D. Or. Nov. 1, 2007) (finding lack of personal jurisdiction despite sales of two allegedly infringing sales in forum state).  Accordingly, while there are a small number of BIScience customers in Texas, representing minimal sales, BIScience has never purposefully directed any aspect of its business operations to Texas.

For these reasons, the allegations in Luminati's complaint are insufficient to confer specific personal jurisdiction.

**D.     There is No Pendent Jurisdiction over the Tortious Interference Claims**

In addition to alleging patent infringement, Luminati asserts purports to claim tortious interference with its employment agreements and misappropriation of trade secrets under the

6

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Federal Defense of Trade Secrets Act.  As discussed below, the trade secret claim should be dismissed under Fed. R. Civ. P. 12(b)(6).  With the trade secret claim dismissed, the Court should also dismiss the tortious interference claim—a state law claim—as a matter of declining to assert pendent personal jurisdiction.

Luminati's tortious interference claim involves three former Luminati employees—Mr. Ghelber, Mr. Feldman, and Mr. Levy.  *See* Dkt. 1 ¶¶ 15-17, 58, 64.  These individuals allegedly worked for Hola Networks Ltd., now known as Luminati, in Israel.  *Id*.  The employment agreements complained of were executed in Israel.[3]  These former Luminati employees were allegedly hired by BIScience in Israel to work in Israel.  None of Luminati's allegations involve any activities outside of Israel.

If the Court dismisses Luminati's trade secret claim for the reasons below, the Court should decline to exercise pendent personal jurisdiction over BIScience for the tortious interference claim.  Pendent personal jurisdiction exists when the court has "personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim."  *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008); *Pinnacle Label, Inc. v. Spinnaker Coating, LLC*, No. 3:09-cv-0950, 2009 WL 3805798 (N.D. Tex. Nov. 12, 2009) (court granted motion to dismiss the state law claims for lack of personal jurisdiction because the state law claims and the Lanham act claims did not arise from a common nucleus of operative fact.).  Here, in order

---

[3] The agreements are not exhibits to Luminati's complaint, nor does Luminati address whether they contain choice of venue clauses, arbitration clauses, or other potentially material provisions.

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

### 2.     The Other Public Interest Factors

Familiarity with the governing law is neutral.  Both districts are familiar with patent law and the asserted tort claims, suggesting that this factor is neutral.  The avoidance of unnecessary problems of conflict of laws or in the application of foreign law does not appear to apply here, therefore, this factor would also be neutral.

The administrative difficulties flowing from court congestion lean slightly in favor of the Eastern District of Texas as opposed to the Southern District of New York.  According to recent statistics, the average time to trial in a civil case in the Eastern District of Texas is 19.1 months, as compared to 29.4 months in the Southern District of New York.  Administrative Office of the United States Courts, Caseload Statistics Data Tables,     https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2018.pdf.  The average time to trial difference between the two districts is only approximately 10 months.  When compared to the complete lack of contacts to the Eastern District of Texas combined with the convenience of transfer to the Southern District of New York, this factor should only be given minimal weight, if any.

### IV.     <u>THIS CASE SHOULD ALSO BE DISMISSED DUE TO DEFECTS IN THE COMPLAINT</u>

The Court should also dismiss Luminati's trade secret and indirect infringement claims for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

### A.     The Defense of Trade Secrets Act Does Not Cover Conduct Abroad

Luminati's trade secret allegations must fail because the Defense of Trade Secrets Act ("DTSA") has explicit extraterritorial limits. 18 U.S.C. § 1837.  First, an "offender" must be either a U.S. citizen or "an organization organized under the laws of the United States or a State or political subdivision thereof."  18 U.S.C. § 1837(1).  Failing this, the statute requires "an act in

13

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

furtherance of the offense [be] committed in the United States." 18 U.S.C. § 1837(2).  Neither of these situations apply here and Luminati's claim should be dismissed.

Under the first prong, Luminati's complaint fails to state a claim because BIScience is an Israeli corporation not covered under the statute.  BIScience's U.S.-based office is not a separate entity, and notwithstanding, did not engage in any of the purported activity in Luminati's complaint—i.e., the alleged hiring of three former Luminati employees in Israel and the activities of those former Luminati employees in Israel.  *See* Dkt. 1 at ¶¶ 15-17.  Under the second prong of the statute, Luminati fails to allege any conduct occurring in the U.S. relating to the alleged misappropriation.  The complaint merely alleges that Luminati employees based in Israel were terminated and then hired by BIScience in Israel.  Along with failing to even identify the subject of any purported trade secret in its complaint, Luminati fails to allege any conduct related to the misappropriation occurring outside of Israel.  *See Vendavo, Inc. v. Price f(x) AG,* 3:17-cv-06930, slip op. at 6-7 (N.D. Cal. Mar. 23, 2018) (Ex. C) ("Given the territorial and temporal limits of the DTSA, such facts are foundational to the existence of a viable claim").  For these reasons, Luminati's trade secret claims should be dismissed.

### B.    Luminati's Complaint Lacks Any Facts Regarding Indirect Infringement

Luminati's complaint fails to allege even the basics of indirect infringement.  Nowhere does Luminati allege any facts of "inducement" of infringement under 35 U.S.C. § 271(b) or "contributing" to infringement under § 271(c).  Instead, Luminati offers only an incomplete reference to unspecified "indirect" infringement for both the '044 and '866 patents.  Dkt. 1 ¶ 39, 53.

With respect to inducement, for example, Luminati does not allege any alleged direct infringer being allegedly induced by BIScience, or how such alleged inducement occurs.  With

14

**Appx554**

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

respect to contributory infringement, Luminati does not address any particular patented "component" being a "material part of the invention" in its complaint, nor does Luminati address how such a component is "especially made or especially adapted for use in an infringement of such patent" or "not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c). Because Luminati does not allege facts supporting any theory of indirect infringement—or even specifically allege inducement or contributory infringement—Luminati's claims of indirect infringement should be dismissed under Fed. R. Civ. P. 12(b)(6). *See NobelBiz, Inc. v. InsideSales.com, Inc.*, No. 6:13-cv-360, 2014 WL 12378804, at *3-*4 (E.D. Tex. Oct. 14, 2014) (granting motion to dismiss for allegations of inducement of infringement and contributory infringement for failure to plead supporting facts); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (complaints lacking "sufficient factual matter" to support a claim should be dismissed).

## V.     **CONCLUSION**

For the above reasons, the Court should dismiss this case for lack of personal jurisdiction or, in the alternative, transfer the case to the Southern District of New York. Luminati's trade secret claim should also be dismissed as an improper extraterritorial application of law, and Luminati's indirect infringement claims should be dismissed for failure to plead any supporting facts.

Dated:  January 28, 2019

By:  */s/ Eric H. Findlay*
Eric H. Findlay (TX Bar No. 00789886)
FINDLAY CRAFT, P.C.
102 North College Avenue, Suite 900
Tyler, Texas 75702
Tel: (903) 534-1100
Fax: (903) 534-1137
Email: efindlay@findlaycraft.com

*ATTORNEY FOR DEFENDANT*
*BI SCIENCE INC.*

15

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

LUMINATI NETWORKS LTD.

        Plaintiff,

        v.

BI SCIENCE INC.,

        Defendants.

Case No.  2:18-CV-00483-JRG

FILED UNDER SEAL

JURY TRIAL DEMANDED

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND**
**IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**
**AND MOTION FOR EARLY VENUE DISCOVERY**

## I.    INTRODUCTION

Plaintiff Luminati Networks Ltd. ("Plaintiff" or "Luminati") filed a complaint ("Complaint", Dkt. 1) asserting various patent and non-patent claims directed toward Defendant BI Science Inc.'s1 ("Defendant" or "BI Science") competing and infringing residential proxy service, including the "Geosurf" brand, and the hiring of Luminati's former salespeople and misappropriation of Luminati trade secrets to sell this infringing service. Defendant filed a Motion to Dismiss, and in the Alternative, Motion to Transfer Venue ("Motion", Dkt. 15).

As addressed below, Defendant's motion to dismiss under 12(b)(6) should be denied because (a) Luminati pled sufficient facts to support its indirect patent infringement claims; and (b) BI Science misappropriated Luminati's trade secrets to harm Luminati in the United States and Texas by using this information to sell BI Science's competing "Geosurf" service in the United States. Similarly, this Court has personal jurisdiction over the asserted patent claims, because BI Science directed its Geosurf service toward Texas by selling the service in Texas and advertising the use of proxy devices belonging to Texas Residents in ten Texas cities as part of its "Geosurf" service.  This Court also has at least pendant personal jurisdiction over the non-patent claims as they share the same nucleus of facts involving the sale of the same competing and infringing "Geosurf" service.

Defendant also has no basis to seek transfer to the Southern District of New York as the building identified in Mr. Ofal's sworn declaration as the location for BI Science's purported office

---

[1] While Defendant asserts that BI Science Inc. is not a legal entity, Defendant does not assert this as a basis for the Motion.  Regardless, Defendant's website identifies BI Science Inc. as the copyright holder of the website and Defendant's counsel has identified itself to Plaintiff as representing BI Science Inc. Ex. 1; Ex. 2.  Plaintiff intends to seek discovery clarifying the relationship between Defendant BI Science Inc. and BI Science (2009) Ltd.

1

is under construction and has been vacant for years.  In addition, this motion should be denied because there are no relevant sources of discovery in New York, judicial efficiencies favor retaining the case in Texas with the related Tesonet case, and the Courts in the proposed transferee district are far more congested.

Consequently, the motions to dismiss and transfer should be denied.  However, to the extent that the Court entertains either motion, Plaintiff requests limited discovery regarding Defendant's purported presence in New York and activities in Texas.

## II.    DEFENDANT'S ACCUSED GEOSURF SERVICE IS DIRECTED TOWARD TEXAS

In general, the asserted claims of the Asserted Patents (U.S. Patent Nos. 9,241,044 ("'044 Patent") and 9,742,866 ("'866 Patent")) are directed toward proxy services that permit a user to request content from a target server over the Internet via a proxy device, such as different individual's mobile device. By routing requests through a proxy device, these inventions permit a user to conceal its identity while the target server perceives the user to be a resident from a specific geographic location indicated by the residential proxy IP address.  The claims necessarily require (1) a first device such as a user or client device, (2) one or more proxy devices, and (3) a target server.

Plaintiff asserts that Defendant's residential proxy service known under the brand name "Geosurf" infringes Asserted Patent claims by providing a service that performs all the steps of the claims. Complaint at ¶¶ 20-56. BI Science's customers also infringe the Asserted Patents by implementing the service. Complaint at ¶ 25. As shown in the Complaint, "Geosurf" is touted as a residential proxy service enabling users to send requests to a target server over the internet via a pool of millions of proxy devices. Complaint at ¶ 20. This service involves both Texas customers,

2

# EXHIBIT 4

## Residential IPs Integration Guide

Here you can find detailed information about GeoSurf™ Residential IPs integration. GeoSurf™ has an inbuilt IP rotation solution designed for easy integration. If you don't find the right documentation for your needs, please fill in the contact us form and one of our representatives will be in touch.

**BROWSER & OS CONFIGURATION**

+ ☐ Internet Explorer, Chrome & Edge Browser

+ ☐ Mozilla Firefox

+ ☐ Android Proxy configuration

**API & EXAMPLES**

+ ⅄ PHP file_get_contents proxy example

+ ⅄ PHP cURL proxy example

+ ⅄ Python version 2.x proxy example

+ ⅄ Python version 3.x proxy example

+ ⅄ Ruby proxy example

+ ⅄ Java global proxy example

+ ⅄ Java apache HttpClient proxy example

+ ⅄ Most simple CURL example

+ ⅄ Node.js CURL proxy example - Random country selection

**STICKY RESIDENTIAL IPS AND SESSION PERSISTENCE**

+ ⚙ Session persistence overview

+ ⚙ US Residential 1 minute session persistence CURL example

+ ⚙ US Residential 10 minutes session persistence CURL example

+ ⚙ US Residential 30 minutes session persistence CURL example

+ ⚙ Germany (DE) Residential 1 minute session persistence CURL example

+ ⚙ Germany (DE) Residential 10 minute session persistence CURL example

+ ⚙ Germany (DE) Residential 30 minute session persistence CURL example

+ ⚙ France (FR) Residential 1 minute session persistence CURL example

+ ⚙ France (FR) Residential 10 minute session persistence CURL example

+ ⚙ France (FR) Residential 30 minute session persistence CURL example

+ ⚙ Great Britain (GB) Residential 1 minute session persistence CURL example

+ ⚙ Great Britain (GB) Residential 10 minute session persistence CURL example

Appx633

+ ⚙️ Great Britain (GB) Residential 30 minute session persistence CURL example

+ ⚙️ India (IN) Residential 1 minute session persistence CURL example

+ ⚙️ India (IN) Residential 10 minute session persistence CURL example

+ ⚙️ India (IN) Residential 30 minute session persistence CURL example

+ ⚙️ Thailand (TH) Residential 1 minute session persistence CURL example

+ ⚙️ Thailand (TH) Residential 10 minute session persistence CURL example

+ ⚙️ Thailand (TH) Residential 30 minute session persistence CURL example

CITY & STATE GATEWAY

+ 🏛️ City Gateway overview

− 🏛️ Available Cities & Ports

Below is a list of all available cities, and their ports:

| CITY | STATE | STATE_ABBREVIATION | START_PORT | END_PORT |
|---|---|---|---|---|
| Albuquerque | New Mexico | NM | 8000 | 8019 |
| Arlington | Texax | TX | 8020 | 8039 |
| Athens | Georgia | GA | 8040 | 8059 |
| Atlanta | Georgia | GA | 8060 | 8079 |
| Auburn | Alabama | AL | 8080 | 8099 |
| Aurora | Colorado | CO | 8100 | 8119 |
| Austin | Texas | TX | 8120 | 8139 |
| Bakersfield | California | CA | 8140 | 8159 |
| Baltimore | Maryland | MD | 8160 | 8179 |
| Baton Rouge | Louisiana | LA | 8180 | 8199 |
| Beaverton | Oregon | OR | 8200 | 8219 |
| Bellevue | Washington | WA | 8220 | 8239 |
| Birmingham | Alabama | AL | 8240 | 8259 |
| Booneville | Mississippi | MS | 8260 | 8279 |
| Boston | Massachusetts | MA | 8280 | 8299 |
| Brooklyn | New York | NY | 8300 | 8319 |
| Buffalo | New York | NY | 8320 | 8339 |
| Charlotte | North Carolina | NC | 8340 | 8359 |
| Chicago | Illinois | IL | 8360 | 8379 |
| Cleveland | Ohio | OH | 8380 | 8399 |
| Colorado Springs | Colorado | CO | 8400 | 8419 |
| Columbia | South Carolina | SC | 8420 | 8439 |
| Columbus | Ohio | OH | 8440 | 8459 |
| Crowley | Texax | TX | 8460 | 8479 |
| Dallas | Texas | TX | 8480 | 8499 |
| Dayton | Ohio | OH | 8500 | 8519 |
| Decatur | Georgia | GA | 8520 | 8539 |
| Denver | Colorado | CO | 8540 | 8559 |
| Detroit | Michigan | MI | 8560 | 8579 |
| El Paso | Texas | TX | 8580 | 8599 |
| Fayetteville | North Carolina | NC | 8600 | 8619 |
| Fort Lauderdale | Florida | FL | 8620 | 8639 |
| Fort Worth | Texas | TX | 8640 | 8659 |
| Fremont | California | CA | 8660 | 8679 |
| Fresno | California | CA | 8680 | 8699 |
| Garwood | New Jersey | NJ | 8700 | 8719 |
| Glendale | California | CA | 8720 | 8739 |
| Harrisburg | Pennsylvania | PA | 8740 | 8759 |
| Henderson | Nevada | NV | 8760 | 8779 |
| Hollywood | California | CA | 8780 | 8799 |
| Honolulu | Hawaii | HI | 8800 | 8819 |
| Houston | Texas | TX | 8820 | 8839 |
| Indianapolis | Indiana | IN | 8840 | 8859 |
| Jackson | Mississippi | MS | 8860 | 8879 |
| Jacksonville | Florida | FL | 8880 | 8899 |
| Kansas City | Missouri | MO | 8900 | 8919 |

| CITY | STATE | STATE_ABBREVIATION | START_PORT | END_PORT |
|------|-------|--------------------|-----------|---------|
| Katy | Texas | TX | 8920 | 8939 |
| Lansing | Michigan | MI | 8940 | 8959 |
| Lapel | Indiana | IN | 8960 | 8979 |
| Las Vegas | Nevada | NV | 8980 | 8999 |
| Lexington | Kentucky | KY | 9000 | 9019 |
| Los Angeles | California | CA | 9020 | 9039 |
| Louisville | Kentucky | KY | 9040 | 9059 |
| Macon | Georgia | GA | 9060 | 9079 |
| Madison | Wisconsin | WI | 9080 | 9099 |
| Memphis | Tennessee | TN | 9100 | 9119 |
| Miami | Florida | FL | 9120 | 9139 |
| Milwaukee | Wisconsin | WI | 9140 | 9159 |
| Minneapolis | Minnesota | MN | 9160 | 9179 |
| Nashville | Tennessee | TN | 9180 | 9199 |
| New Orleans | Louisiana | LA | 9200 | 9219 |
| New York | New York | NY | 9220 | 9239 |
| Newark | New Jersey | NJ | 9240 | 9259 |
| Oakland | California | CA | 9260 | 9279 |
| Oklahoma City | Oklahoma | OK | 9280 | 9299 |
| Omaha | Nebraska | NE | 9300 | 9319 |
| Orlando | Florida | FL | 9320 | 9339 |
| Philadelphia | Pennsylvania | PA | 9340 | 9359 |
| Phoenix | Arizona | AZ | 9360 | 9379 |
| Pittsburgh | Pennsylvania | PA | 9380 | 9399 |
| Pompano Beach | Florida | FL | 9400 | 9419 |
| Portland | Oregon | OR | 9420 | 9439 |
| Prescott Valley | Arizona | AZ | 9440 | 9459 |
| Princeton | New Jersey | NJ | 9460 | 9479 |
| Raleigh | North Carolina | NC | 9480 | 9499 |
| Richmond | Virginia | VA | 9500 | 9519 |
| Rochester | New York | NY | 9520 | 9539 |
| Rockvale | Colorado | CO | 9540 | 9559 |
| Sacramento | California | CA | 9560 | 9579 |
| Saint James | Missouri | MO | 9580 | 9599 |
| Saint Paul | Minnesota | MN | 9600 | 9619 |
| Salem | Massachusetts | MA | 9620 | 9639 |
| Salt Lake City | Utah | UT | 9640 | 9659 |
| San Antonio | Texas | TX | 9660 | 9679 |
| San Diego | California | CA | 9680 | 9699 |
| San Francisco | California | CA | 9700 | 9719 |
| San Jose | California | CA | 9720 | 9739 |
| Seattle | Washington | WA | 9740 | 9759 |
| Shreveport | Louisiana | LA | 9760 | 9779 |
| Spokane | Washington | WA | 9780 | 9799 |
| Spring | Texas | TX | 9800 | 9819 |
| St Louis | Missouri | MO | 9820 | 9839 |
| Stockton | California | CA | 9840 | 9859 |
| Tacoma | Washington | WA | 9860 | 9879 |
| Tampa | Florida | FL | 9880 | 9899 |
| The Bronx | New York | NY | 9900 | 9919 |
| Tucson | Arizona | AZ | 9920 | 9939 |
| Wallingford | Connecticut | CT | 9940 | 9959 |
| Washington | District of Columbia | DC | 9960 | 9979 |
| Wichita | Kansas | KS | 9980 | 9999 |

+ 🔀 Simple CURL example

+ 🔀 State Gateway Overview

+ 🔀 What is the benefit of using Proxy headers?

+ 🔀 Simple CURL example

BEST PRACTICES – RESIDENTIAL IPS API

+ ☑ When and Where Should I use Sticky IPs?

☑ Choosing the correct sticky IPs time

☑ When and Where should I use the High Rotation gateway?

**3RD PARTY SOFTWARE INTEGRATION**

⚙ Using Geosurf Residential IP proxy with GSA search engine ranker

⚙ Using Geosurf Geosurf Residential IP proxy with Foxy Proxy

⚙ Using Geosurf Residential IP proxy with AIO Sneakers Bot

⚙ Using Geosurf Residential IP proxy with EasyCop sneakers bot

⚙ Using Geosurf Residential IP proxy with NikeSlayer

⚙ Using Geosurf Residential IP proxy with BetterNikeBot (BNB)

⚙ Using Geosurf Residential IP proxy with Supreme Bot

⚙ Using Geosurf Residential IP proxy with Another Nike Bot

⚙ Using Geosurf Residential IP proxy with Sneaker Bot 2.0

⚙ Using Geosurf Residential Proxy Network with StubTabs & ProxyTabs

⚙ Using Geosurf Residential Proxies With Insomniac Browser

**CONNECTION PROBLEMS**

ⓘ Are you behind a firewall?

ⓘ Are you getting Connection Refused from AWS/EC?

ⓘ Are you getting 408 timeouts?

ⓘ Are you getting error code(-7) or (-3) when making an API request?

ⓘ Are you getting denied access errors?

ⓘ Do you have DNS leak issues?

## SIGN UP NOW

Start your experience with our GeoSurf Premium Proxy!

GET STARTED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

LUMINATI NETWORKS LTD.

           Plaintiff,

      v.

BI SCIENCE INC.

           Defendant.

Case No.  2:18-CV-483-JRG

JURY TRIAL DEMANDED

### AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Pursuant to Fed. R. Civ. Pro. 15(a)(1)(B), Plaintiff, Luminati Networks Ltd. ("Luminati")

amends the Complaint bringing this action under the patent laws of the United States, Title 35 of

the United States Code, and makes the following allegations against BI Science (2009) Ltd., also

known as BI Science Inc. ("BI Science" or "Defendant"):

### THE PARTIES

1.      Plaintiff Luminati is an Israeli company having a principal place of business at 3

Hamahshev St., Netanya 42507, ISRAEL.

2.      Upon information and belief, Defendant BI Science is an Israeli corporation

headquartered at 6 Hanechoshet St., Tel Aviv, 6971070, ISRAEL.

### JURISDICTION AND VENUE

3.      This is an action for patent infringement under the patent laws of the United States

of America, 35 U.S.C. § 1, *et seq.*

**Appx656**

4.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over BI Science because it, directly or through its subsidiaries, divisions, groups, or distributors, has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2).  On information and belief, BI Science transacts substantial business in the State of Texas, directly or through agents, including: (i) at least some of the infringement alleged herein in the United States occurring in Texas, and (ii) regularly does or solicits business in Texas, engages in other persistent courses of conduct, maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas.  For example, on information and belief, BI Science utilizes software, which is, *inter alia*, the subject of the infringement alleged herein, that routes internet communications through user devices having IP addresses serving as residential proxies located in the State of Texas, as well as this Judicial District, permitting BI Science to include user devices in this Judicial District as part of BI Science's residential proxy service.  In addition, on information and belief, by selling the same accused infringing service in competition with Plaintiff's residential proxy service in the State of Texas and the United States to Plaintiff's customers using Plaintiff's former salespeople and Plaintiff's trade secrets, BI Science has committed acts in the State of Texas and the United States that have harmed Plaintiff in furtherance of Plaintiff's non-patent claims.  This Court has at least specific personal jurisdiction and/or pendent personal jurisdiction over BI Science for all asserted claims.

6.      Following *Brunette Machine Works v. Kockum Industries, Inc.*, 406 U.S. 706 1972), venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) at least because, upon information and belief, BI Science is a foreign entity.

### FACTUAL ALLEGATIONS

7.      Derry Shribman and Ofer Vilenski are the named inventors of a number of patents, including U.S. Patent Nos. 9,241,044 ("'044 Patent") and divisional 9,742,866 ("'866 Patent") (collectively the "Asserted Patents").

8.      The Asserted Patents are directed toward methods for fetching content over the Internet through the use of intermediary tunneling devices. Luminati identifies its patents on its website at https://luminati.io/patent-marking#system-and-method-for-streaming-content-from-multiple-servers.

9.      The Asserted Patents were assigned to Hola Networks Ltd. ("Hola"). Hola has subsequently changed its name to Luminati Ltd., before changing its name to Luminati Networks Ltd., the Plaintiff in this action.

10.     Luminati, formerly known as Hola, provides a cloud service connecting tens of millions of devices over the Internet through a proxy-based network.  Each participating device allows the network to utilize a small fraction of that device's idle time for the network.  Luminati utilizes this network to provide proxy-based services to businesses.

11.     Since 2014, Luminati has offered proxy-based services relying on its "Residential Proxy Network" that practice one or more claims of the Asserted Patents.  Luminati permits its business customers to utilize its residential proxy network to access data over the Internet using residential IP addresses from various localities as required by the customers.  These residential IP addresses provide businesses with a number of advantages.  For example, Luminati's customers

3

**Appx658**

may use this network to anonymously compare prices leading to more transparency and lower prices for consumers.  Luminati's customer's may also use residential proxy addresses to test their web sites from any city in the world.  Prior to and separate from the technology at issue in this case, Hola provided a Virtual Private Network ("VPN") service called HolaVPN.

12.     Luminati, formerly known as Hola, has a number of investor shareholders.  One of these investors, iAngels Crowd Ltd. In Trust ("iAngels"), executed an Agreement to be Bound by an April 15, 2015 Amended and Restated shareholders Rights Agreement on July 14, 2015.  This Agreement to be Bound was signed by Shelly Hod Moyal, founding partner of iAngels.  As the representative for the shareholder iAngels, Ms. Moyal had access to Luminati confidential information and know-how.  Upon information and belief, Ms. Moyal was aware of Luminati's intellectual property (including trade secrets and know-how), including the pending patent applications that resulted in the Asserted Patents.

13.     Upon information and belief, as a condition for iAngels to invest in Luminati, Ms. Moyal's husband, Kfir Moyal, conducted technical due diligence at Hola on behalf of iAngels in May 2015.  Upon information and belief, in this role Mr. Moyal also had access to Luminati's confidential information as well as Luminati's intellectual property (including trade secrets and know-how), including the then pending patent applications that resulted in the Asserted Patents and financial records regarding Luminati's residential proxy service.  Upon information and belief, Mr. and Ms. Moyal knew of the pending patent applications that resulted in the Asserted Patents and were aware of Luminati's commercial success resulting from its residential proxy network services.  Upon information and belief, Mr. Moyal did not disclose that BI Science had a residential proxy service or intended to offer a residential proxy service prior to or during the performance of due diligence on behalf of iAngels.

14.     Upon information and belief, Kfir Moyal and Assaf Toval, founded BI Science in 2009.  Upon information and belief, as early as October 14, 2014 Mr. Moyal approached Luminati as a purported customer seeking information regarding Luminati's residential proxy service.  Upon information and belief, BI Science subsequently tested Luminati's residential proxy service as part of a free trial.  Upon information and belief, at some time after Mr. Moyal became aware of the patent applications that resulted in the Asserted Patents and Luminati's commercial success with its residential proxy network services, BI Science decided to provide a residential proxy service. Upon information and belief, BI Science had decided to provide this service as early as May 2017 having estimated that switching to a residential proxy service from a server-based service could dramatically reduce BI Science's ongoing server costs and provide BI Science with new revenue streams from this capability.  Upon information and belief, BI Science introduced its own residential proxy service under the "GeoSurf" brand by July 2017.

15.     Alon Ghelber, Samuel Levy, and Vadim Feldman each entered into a Personal Employment Agreement ("Employment Agreement") with Hola Networks Ltd., now known as Luminati, on December 18, 2014, March 1, 2015, and March 3, 2015 respectively.  The terms of the Employment Agreement include a confidentiality provision obligating the employee to keep in confidence Luminati's proprietary information.  The Employment Agreement also includes a non-compete clause prohibiting the employee from accepting employment with a company offering competing services within twelve months of the termination of employment with Luminati.

16.     Luminati terminated employment of Mr. Ghelber and Mr. Feldman on February 2, 2017 and February 20, 2017 respectively.  Mr. Levy terminated his employment with Luminati on February 8, 2017.  These employees had access to Luminati confidential know-how and trade

secrets, including client lists, client records, client data usage, accounts receivable documents, business plans, marketing research, technical documents related to the architecture of Luminati's residential proxy network, and related work product. Luminati's residential proxy service is intended for use in interstate or foreign commerce. Upon information and belief, BI Science subsequently hired these three individuals in 2017 within months of their termination by Luminati. Upon information and belief, BI Science hired Mr. Levy in May 2017 followed by Mr. Feldman in June 2017, which was approximately on or after BI Science decided to offer the residential proxy service. Upon information and belief, BI Science also hired Mr. Ghelber in 2017. Upon information and belief, BI Science hired these former Luminati employees despite the non-compete clause of the Employment Agreements or was willfully blind to these former Luminati employees being subject to such a provision. Upon information and belief, BI Science hired these former Luminati employees knowing them to be former Luminati employees with knowledge of Luminati's trade secrets including confidential information related to Luminati's residential proxy service. Upon information and belief, BI Science hired these former Luminati salespeople for the purposes of selling BI Science's competing "Geosurf" residential proxy service, including in Texas and the United States. Upon information and belief, the former Luminati employees have touted their experience with Luminati as part of their approach to Luminati clients offering the "GeoSurf" service as an alternative in competition with Luminati's residential proxy service. Upon information and belief, Luminati's former employees employed Luminati's confidential trade secrets on behalf of BI Science in furtherance of the competing "Geosurf" residential proxy service. Upon information and belief, Luminati lost Texas and United States customers for its residential proxy service and associated revenues to BI Science's competing Geosurf service.

17.    By July 2017, Luminati learned that BI Science had hired its three former employees and started offering a residential proxy service through Geosurf.  On July 12, 2017, Mr. Vilenski sent an email to Ms. Moyal requesting that Ms. Moyal collect and provide information about Mr. Moyal's competing business, including its employment of Luminati's three former sales people.  Mr. Vilenski specifically noted that Mr. Moyal gained detailed information from Mr. Vilenski as an advisor to Ms. Moyal, without Ms. Moyal disclosing that Mr. Moyal is involved in or is running a competing business.  On August 14, 2017, Mr. Vilenski sent a follow-up email to Ms. Moyal demanding that Mr. Moyal stop providing residential proxy services through GeoSurf.

18.    On February 8, 2018, Or Lenchner, then VP of Luminati and currently Luminati CEO, sent a letter to Mr. Moyal informing Mr. Moyal that Luminati had become aware that BI Science was developing, using, offering for sale or selling products and services in the field of VPN services based on residential IP peers, such as the GeoSurf service.  Mr. Lenchner notified BI Science that Luminati owns intellectual property within this field including specifically the '866 Patent attached to that letter in addition to other related patents and patent applications.  Mr. Lenchner invited BI Science to enter into licensing discussions to cover past and future use of this intellectual property by BI Science.  BI Science responded on March 8, 2018 in a letter from BI Science's outside counsel Asaf Biger.

19.    On April 16, 2018, Mr. Toval sent an email to Mr. Lenchner requesting a meeting to discuss potential licensing of Luminati's software patents, that resulted in a meeting on April 30, 2018.   On May 13, 2018, Mr. Lenchner sent a follow-up email with an attached request for information to promote licensing discussions.  Mr. Toval sent a response on May 31, 2018 indicating that BI Science was unable to provide such information.  Following additional efforts by Mr. Lenchner to propose a framework for a licensing agreement, Mr. Toval sent an email

response on June 18, 2018 agreeing to review the framework and provide feedback, but BI Science has not done so.

20.    Since at least the filing of the original Complaint on November 8, 2018, BI Science has made false and/or misleading statements regarding Luminati and Luminati's residential proxy service in advertising directed toward Luminati's customers.  For example, on November 19, 2018, BI Science published a blog post on its website titled "Six Mistakes to Avoid When You Buy a Proxy" by Mr. Ghelber, Luminati's former employee, located on BI Science's website at https://www.geosurf.com/blog/six-mistakes-to-avoid-when-you-buy-a-proxy/.  Exhibit C.  The blog post states that "[s]ome proxy providers look great and fancy until you try to integrate them. Some-such as Luminati-are very difficult to integrate, as they require you to install complex proxy managers and to ultimately modify your entire solution."  *id*. at 3.  This statement is false.  Use of Luminati's residential proxy service does not require installation of Luminati's proxy manager. Upon information and belief, Mr. Ghelber made this statement despite knowing it to be false.  This false statement has been repeated in other blog posts including the December 2, 2018 blog post titled "Your Ultimate Guide to Data Mining and Scraping Using a Proxy" by Pavel Gomon at https://www.geosurf.com/blog/ultimate-guide-data-mining-scraping-with-proxy/.  Exhibit D at 7. Upon information and belief, BI Science has specifically targeted customers searching for Luminati in its advertising campaign for Geosurf, which directs prospective customers of residential proxy services to BI Science's website.

# *"Is the proxy going to be difficult to integrate?"*

Well, that depends on which proxy service you purchase.

Some proxy providers look great and fancy until you try to integrate them. Some—such as Luminati—are very difficult to integrate, as they require you to install complex proxy managers and to ultimately modify your entire solution. Other proxy services require you to whitelist your IP addresses; but if you are using shared servers like Amazon Web Services (AWS) or any Software as a Service (SaaS) solution, you cannot whitelist the IPs, because they're probably in somebody else's whitelist.

In short, stay away from these proxies.

Instead, go for easy-integration proxies that support whatever your needs may be. GeoSurf, for instance, takes less than 5 minutes to integrate and supports the IP:port method with IP whitelist, the username-Password solution, and session persistence with an API.

https://www.geosurf.com/blog/ultimate-guide-data-mining-scraping-with-proxy/



21.     Upon information and belief, BI Science offers large-scale data harvesting products and services under the GeoSurf brand. https://www.GeoSurf.com/products/residential-ips/. Upon information and belief, this includes a residential proxy network with millions of residential IP

addresses from more than 192 countries.  *id.*  Upon information and belief, the IP addresses of

these residential proxies are assigned by a standard Internet Service Provider (ISP) to a homeowner

or other residential or mobile user.  *id.*  Upon information and belief, this residential proxy network

is used to access content over the Internet, wherein that content may be divided into portions, each

of which includes part of the content and its own content identifier.  BI Science touts this service

as permitting its customers to harvest data over the web via millions of "clean residential IPs."  BI

Science also advertises this service as permitting its customers to select the proxy devices based

on their location in specific states and cities.  BI Science also specifically touts the ability to select

proxies located within 10 specific cities in Texas.  Exhibit E at 2-3.



## USING MILLIONS OF RESIDENTIAL IPS WILL NEVER GET YOU BLOCKED

The World's most advanced solution for data harvesting, now offers
residential IPs! Our Residential IPs are based on a P2P Network, which
enables our clients the freedom to harvest the web by harnessing a pool of
over 2 Million unblocked IPs.
Our inbuilt IP rotation API is tailor made for high scope & high-performance
Enterprise level activities. This unique approach enables you to send
unlimited parallel requests through millions of 100% verified working IPs; this
means that you will never get blocked again.

https://www.GeoSurf.com/products/residential-ips/



### UNLIMITED CLEAN RESIDENTIAL IPS

Over 2Million clean residential IPs. Our IPs are never detected as
proxies. This combination of proxy masking & residential IPs gives us
the ability to stay undetectable.

https://www.GeoSurf.com/products/residential-ips/

### ✚ ❓ What is GeoSurf™?

GeoSurf™ is a straight-forward a premium proxy service which enables users to send requests via 3 networks:

- GeoSurf™ Residential IPs proxy network with more than 2 Million Residential IPs in every country and every city in the world.
- GeoSurf™ Premium Static proxy network with servers in 130+ global locations and 30+ DMA's.
- GeoSurf™ Static proxy network with more than 10K static IPs in 20+ global locations

GeoSurf™ products enable users to surf and view geo-targeted local content from other areas. It also emulates many mobile devices. The service is available as a browser toolbar, VPN client, Direct Connect API, Residential IPs API, and smart phone connection.

https://www.GeoSurf.com/resources/faq/#ac_15174_collapse1

### ➖ 🅰 State Gateway Overview

This Residential IP Gateway that allows you to choose State's IPs. This service is available for all 50 US states and Washington DC.

**How it works?**

- Authentication – The authentication is done in the same way as all other gateways, so, if your IP is white-listed in our system you can start using the State gateway immediately
- State selection – The State gateway allows you to choose from all states using "loc" proxy header.
- Session persistence – The state gateway allows you to maintain session persistence and open multiple session using the "X-Session" proxy header.
- Limits – Like all other GSR services you have unlimited number of requests/sessions or connections and unlimited concurrent connections.
- Gateway domain – state.geosurf.io

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse4

### ➖ 🔍 Can I select an IP per city?

Yes, you can select an IP from all major US cities by using the City gateway. Check out GeoSurf Residential IPs Integration Guide for more information and request example. City IP is a premium feature, the city gateway's usage comes with a different pricing compared with your existing plan. Contact your customer success representative for additional information.

https://www.GeoSurf.com/resources/faq/#ac_15216_collapse4

**Appx666**

**— ⚑ City Gateway overview**

This service is currently available for all major US cities and we will continue to add more and more cities in the near future.

**How it works?**

- Authentication – The authentication is done the same way as all other gateways, If your IP is whitelisted in our system you can start using the City gateway immediately.
- City selection – The city gateway allows you to choose from 100 US cities, each city has its own port range.
- Limits – Like all other GSR services you are unlimited with number of requests/sessions or connections, concurrent connections are limited to 20 per machine IP.
- Gateway domain – us-city1.geosurf.io

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse1

Upon information and belief, some of these user devices serving as residential proxies (and associated with respective IP addresses) are located in the Eastern District of Texas.  Upon information and belief, on a given day a hundred or more user devices belong to residents in the Eastern District of Texas are available for use as proxy devices for the Geosurf service.  In addition to the residential proxies, upon information and belief, BI Science has customers in Texas who use its Geosurf residential service.

22.     Upon information and belief, the residential proxy network used as part of the GeoSurf service is based upon numerous user devices, each of which is a client device identifiable over the Internet by an IP address.  Upon information and belief, a server ("First Server") is operated by BI Science and/or a third party having a contractual obligation to BI Science to implement residential proxy network requests sent by BI Science.  BI Science touts itself as owning all the servers in the GeoSurf network.  However, upon information and belief, BI Science may contract with a third-party, such as Jetstar Media and/or Microleaves Ltd., to implement its GeoSurf residential proxy network.  Upon information and belief, whether BI Science owns the

First Server or contracts with a third-party to operate the First Server, BI Science directs and controls the First Server to implement the GeoSurf residential proxy service.



**How secure and private is GeoSurf?**

Our network boasts the highest levels of reliability, availability, and security. Because we own all of the servers on our network and host them in Tier 1 backbone data centers around the world, all of our users experience a totally secure browsing experience. We sign legally binding agreements with our customers to ensure their privacy.

https://www.GeoSurf.com/resources/faq/#ac_15174_collapse5

23.    Upon information and belief, software ("Server Software") is executed that implements the GeoSurf service.  Upon information and belief, BI Science directs and controls the operation of the Server Software to the extent that the Server Software implements the GeoSurf service. For example, upon information and belief, BI Science can direct and control the GeoSurf service to select residential proxy devices located within a specific state or city and can determine how long a given proxy device will be utilized for a given session, which is referred to as sticky residential IPs and session persistence.



**State Gateway Overview**

This Residential IP Gateway that allows you to choose State's IPs. This service is available for all 50 US states and Washington DC.

**How it works?**

• Authentication – The authentication is done in the same way as all other gateways, so, if your IP is white-listed in our system you can start using the State gateway immediately

• State selection – The State gateway allows you to choose from all states using "loc" proxy header.

• Session persistence – The state gateway allows you to maintain session persistence and open multiple session using the "X-Session" proxy header.

• Limits – Like all other GSR services you have unlimited number of requests/sessions or connections and unlimited concurrent connections.

• Gateway domain – state.geosurf.io

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15171_collapse4

**Appx668**

**— ⊕  Can I select an IP per city?**

Yes, you can select an IP from all major US cities by using the City gateway. Check out GeoSurf Residential IPs Integration Guide for more information and request example. City IP is a premium feature, the city gateway's usage comes with a different pricing compared with your existing plan. Contact your customer success representative for additional information.

https://www.GeoSurf.com/resources/faq/#ac_15216_collapse4

**— ⚙  Session persistence overview**



The requests are made by {key:value} pairs. The key represents the GateWay and the value represents the actual IP.

In our dashboard you will see all the different configurations for high rotation, 1 minute, 10 minutes and 30 minutes persistent sessions.

The Sticky country  gateways can be found in your dashboard.

**Port ranges (value) are defined based on the following locig:**

10 minutes sticky port values: +0 – + 2000

30 minutes sticky port values: +4001 – + 6000

1 minutes sticky port values: +2001 – + 4000

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15062_collapse1

24.    Upon information and belief, each user device in the residential proxy network sends its respective identifier to the First Server, which stores these identifiers.  Upon information

and belief, to the extent that BI Science has contractual relationship(s) with one or more third parties that provide server services, BI Science directs and/or controls these third-party servers to implement its residential proxy network for the GeoSurf service through the third-party servers and user devices included in the residential proxy network.  Upon information and belief, as part of the GeoSurf service, BI Science provides a device designated as a 'Gateway', which authenticates the user devices of BI Science customers and controls the access and operation of requests and responses through the one or more third-party proxy residential networks directed and controlled by BI Science, and is in continuous communication with the Server Software. Upon information and belief, BI Science's GeoSurf customers directly practice at least claim 81 of the '044 Patent and claim 15 of the '866 Patent by utilizing the BI Science's residential proxy service through their client devices.  BI Science also directly practice these claims by implementing customer requests through its Server Software as part of its Geosurf service.  In addition, upon information and belief, as BI Science knew of the Asserted Patents and had notice that its residential proxy service infringed these patents, but continued to advertise Geosurf's infringing features and enter into contracts with its customers to provide this service, BI Science intended its customers to implement this infringing service.

## BROWSER & OS CONFIGURATION





1. Open Windows Explorer.
2. Type in "Internet Properties"
3. Click on "connections" tab.
4. Navigate to "LAN settings"
5. Check the first checkbox under "Proxy server"
6. Click "Advanced"
7. Fill in your proxy address (ex: gw1.geosurf.io) and port (ex: 8020) under HTTP.
8. The "use the same proxy server" checkbox should be checked.
9. Click OK and Apply to save your proxy settings.
10. Go to ipinfo.io and verify the IP you got is from the desired country

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15054_collapse1

### — ⊙ Do you support authentication by IP?

Yes, IP address of every device / Machine which uses Geosurf should be authorized. The IP can be easily managed from our dashboard, click here to login to your dashboard.

https://www.GeoSurf.com/resources/faq/#ac_15217_collapse4

is a First Device, can construct the content from the plurality of Content Slices.  Upon information and belief, BI Science advertises the infringing Geosurf service, including the specific use of proxy devices or proxy IPs with the intent that its customers will implement the Geosurf service to operate as advertised.



https://vimeo.com/250282014 (**Time: 00:47 sec to 01:20 sec**)



https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15173_collapse6



You should use Sticky IPs when you must run sequential requests to the target domain or website in a single session.

Examples: Running requests to several web pages from the same website, Navigating through several web pages using the same session etc.

https://www.GeoSurf.com/resources/residential-ips-integration-guide/#ac_15172_collapse1

28.     The use of the residential proxy network permits anonymity to GeoSurf customers, for example for engaging in activities such as web crawling without disclosing the customer's identity to the targeted web sites.

## COUNT I
### (Infringement of the '044 Patent)

29.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-28 of this Complaint as if fully set forth herein.

30.     The '044 Patent entitled "System and Method for Improving Internet Communication by Using Intermediate Nodes" was duly and legally issued by the U.S. Patent and Trademark Office on January 19, 2016, from Application No. 14/468,836 filed on August 26,

2014, claiming priority to provisional applications 61/870,815 filed on August 28, 2013. A true and accurate copy of the '044 Patent is attached hereto as Exhibit A.

31.     Each and every claim of the '044 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

32.     Luminati exclusively owns all rights, title, and interest in and to the '044 Patent and possesses the exclusive right of recovery, including the exclusive right to recover for past infringement.

33.     Claim 81 of the '044 Patent recites:

Claim 81. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:
(a) sending the first identifier to the first server;
(b) sending a first request to the first server;
(c) receiving the second identifier from the first server;
(d) sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier; and
(e) receiving the first content from the second device.

34.     As described above, upon information and belief, BI Science's proxy residential network used for the GeoSurf service comprises numerous devices each of which is identifiable by its own IP address ("identifier"), which are stored on servers through the execution of Server Software under the control and/or direction of BI Science.  Consequently, BI Science's GeoSurf proxy residential network would comprise at least a First Device and a Second Device with their corresponding First Identifier and Second Identifier and a First Server.

35.     As described, upon information and belief, this network would permit a user to access Internet content ("First Content"), identifiable by a content identifier such as a URL ("First

Content Identifier") from a target server ("Second Server"), identifiable by its own corresponding IP address ("Third Identifier").

36.     As described, upon information and belief, the GeoSurf customer sends a request with its corresponding IP address to the GeoSurf Gateway which forwards the request to the "First Server."  At least the GeoSurf Gateway can serve as a "First Device" with the First Server storing the corresponding IP address ("First Identifier") of that "First Device."

37.     As described above, upon information and belief, a GeoSurf customer can utilize its device to send a request ("First Request") through the GeoSurf Gateway, with at least the Gateway serving as the first device ("First Device"), to the First Server, causing the First Server to respond by sending the Second Identifier back to the First Device.  Upon information and belief, a second request ("Second Request"), comprising a First Content Identifier and a Third Identifier to the Second Device, is then sent from the First Device to the Second Server using the Second Identifier.  Upon information and belief, the Second Server responds by sending the requested First Content to the Second Device, which is forwarded back to the First Device.

38.     Upon information and belief, BI Science has had actual notice of the '044 Patent since at least January 8, 2018, and has known, including by way of communications on and since that date and this lawsuit, that implementation of its GeoSurf residential proxy service would infringe at least claim 81 of the '044 Patent.  Despite this knowledge, BI Science has advertised these features of its GeoSurf residential proxy service and entered into service agreements with its customers with the intent that the customers would implement this service as described above.

39.     BI Science has been and is now directly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 81 of the '044 Patent, by

implementing its residential proxy service in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(a).

40.     BI Science has been and is now indirectly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 81 of the '044 Patent, by providing this residential proxy service to its customers knowing that the use of such service infringes these claims in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(b).

41.     As a result of BI Science's infringement of the '044 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from BI Science the damages Luminati sustained as a result of BI Science's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court under 35 U.S.C. § 284.

42.     Luminati has suffered damage because of the infringing activities of BI Science, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless BI Science's infringing activities are preliminarily and permanently enjoined by this Court.

43.     BI Science's infringement of the '044 Patent was, is, and continues to be deliberate and willful because BI Science was and is on notice of the '044 Patent at least as early as January 8, 2018, yet it continued and continues to infringe the '044 Patent.

**COUNT II**
(Infringement of the '866 Patent)

44.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-43 of this Complaint as if fully set forth herein.

45.     The '866 Patent entitled "System and Method for Improving Internet Communication by Using Intermediate Nodes" was duly and legally issued by the U.S. Patent and Trademark Office on August 22, 2017 from Application No. 14/930,894 filed on August 22, 2017, a divisional of Application No. 14/468,836 that issued as the '044 Patent, both of which claim priority to provisional applications 61/870,815 filed on August 28, 2013. A true and accurate copy of the '866 Patent is attached hereto as Exhibit B.

46.     Each and every claim of the '866 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

47.     Luminati exclusively owns all rights, title, and interest in and to the '866 Patent and possesses the exclusive right of recovery, including the exclusive right to recover for past infringement.

48.     Claim 15 of the '866 Patent recites:

Claim 15. A method for fetching a content over the Internet from a first server identified in the Internet by a second identifier via a group of multiple devices, each identified in the Internet by an associated group device identifier, the method comprising the step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and identified using a content slice identifier, and for each of the content slices, comprising the steps of:
(a) selecting a device from the group;
(b) sending over the Internet a first request to the selected device using the group device identifier of the selected device, the first request including the content slice identifier and the second identifier;
(c) in response to receiving the sent first request by the selected device, receiving over the Internet the content slice from the selected device; and wherein the method further comprising the step of constructing the content from the received plurality of content slices, and
wherein each of the devices in the group is a client device.

49.     As described above, upon information and belief, BI Science's GeoSurf proxy residential network comprises numerous devices, each of which is a client device identifiable by its own identifier.  Upon information and belief, BI Science's GeoSurf proxy residential network

permits BI Science's customers to request content from the customer's device through the GeoSurf Gateway, which forwards such requests through a server and proxy residential user device ("Selected Device") to a target server ("First Server"), which is identifiable by its own IP address ("Second Identifier"). The Selected Device is selected from a group of client devices ("Group"), each of which has its own IP address ("Group Device Identifier".  As further described above, this content may be divided into portions ("Content Slices") identifiable by their own identifiers ("Content Slice Identifier").

50.    As described, upon information and belief, the GeoSurf service permits the GeoSurf customer to select a proxy user device from the Group and send a request ("First Request") over the Internet to the Selected Device using the selected device IP address ("Group Device Identifier of the Selected Device").  This First Request includes the Content Slice Identifier and Second Identifier.

51.    As described, upon information and belief, the above Selected Device responds to the First Request by sending the request to the First Server with the Content Slice Identifier.  The First Server responds by sending the requested Content Slice to the Selected Device, which forwards the Content Slice through the GeoSurf Gateway to the device of the GeoSurf customer, which is a client device.  The client device of the GeoSurf customer then constructs the content from the plurality of Content Slices.

52.    BI Science has had actual notice of the '866 Patent since at least January 8, 2018, and has known, including by way of communications on and since that date and this lawsuit, that implementation of its GeoSurf residential proxy service would infringe at least claim 15 of the '866 Patent.  Despite this knowledge, BI Science has advertised these features of its GeoSurf

residential proxy service and entered into service agreements with its customers with the intent that the customers would implement this service as described above.

53.    BI Science has been and is now directly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 15 of the '866 Patent, by implementing its residential proxy service in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(a).

54.    BI Science has been and is now indirectly infringing, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 15 of the '866 Patent, by providing this residential proxy service to its customers knowing that the use of such service infringes these claims in the United States without authority and/or license from Luminati and is liable to Luminati under 35 U.S.C. § 271(b).

55.    As a result of BI Science's infringement of the '866 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from BI Science the damages Luminati sustained as a result of BI Science's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court under 35 U.S.C. § 284.

56.    Luminati has suffered damage because of the infringing activities of BI Science, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless BI Science's infringing activities are preliminarily and permanently enjoined by this Court.

57.    BI Science's infringement of the '866 Patent was, is, and continues to be deliberate and wilfull because BI Science was and is on notice of the '866 Patent at least as early as January 8, 2018, yet it continued and continues to infringe the '866 Patent.

## COUNT III
### (Tortious Interference with Luminati's Employment Agreements)

58.    Luminati repeats and re-alleges the allegations contained in paragraphs 1-57 of this Complaint as if fully set forth herein.

59.    Hola Networks Ltd., now known as Luminati, had entered into Employment Agreements with each of three former Luminati employees Alon Ghelber, Samuel Levy, and Vadim Feldman ("Former Luminati Employees"), which include confidentiality and non-compete clauses prohibiting each of these employees from disclosing information confidential to Luminati and from accepting employment with a company offering competing services within twelve months of the termination of employment with Luminati.

60.    BI Science intentionally and willfully interfered with the Employment Agreements having hired the Former Luminati Employees shortly after termination of their employment by Luminati knowing that they had been employed by Luminati as salesmen for the Luminati residential proxy service.  BI Science knew or should have known that the hiring of the Former Luminati Employees to sell BI Science's competing Geosurf service caused the Former Luminati Employees to violate at least the non-compete clause of their Employment Agreements.

61.    Luminati has suffered damages in Texas and the United States and BI Science has been unjustly enriched as Luminati lost business to BI Science's competing GeoSurf service. Upon information and belief, BI Science's interference with the Employment Agreements and hiring of the Former Luminati Employees was the proximate cause of this lost business.

## COUNT IV

**Appx683**

# EXHIBIT C

Case 2:18-cv-00483-JRG   Document 28-3   Filed 02/19/19   Page 2 of 7 PageID #:  1360



## 19 NOV SIX MISTAKES TO AVOID WHEN YOU BUY A PROXY

Posted at 08:37h in Proxy 101 by Alon Ghelber  •  0 Comments  •  Share 08:37

Say you're considering to buy a proxy server for your data harvesting operations. Whether you plan to use a proxy for **web scraping, price monitoring, ad verification**, or other types of online operations, you want to be careful about picking the right service. To help you navigate the vast spread of options available out there, we've compiled a list of **common mistakes** people and companies often make when they select a proxy server.

## (1) BUYING THE WRONG TYPE OF PROXY.

If you think that any proxy will do the job, consider that there are several types of proxies out there, and if you don't use the right one, not only it will be useless, but it might even be counterproductive.

Case: 20-2118     Document: 90-1     Page: 360     Filed: 05/31/2022

Six Mistakes to Avoid When You Buy a Proxy | GeoSurf                                        Page 2 of 6
Case 2:18-cv-00483-JRG   Document 28-3   Filed 02/19/19   Page 3 of 7 PageID #:  1361

Most importantly, there are two categories of proxies: Data Centers (or Sever) and Residential IPs. When you browse the internet to harvest data or verify where your ads are being published, you often get different results depending whether you are using a Data Center or a Residential IP.

Data Centers are easily detectable. Residential IPs, instead, are spread around the world and will help you pass as a real user. If you want to keep a low profile and harvest data in total anonymity, use Residential IPs: No one will block you or feed you with falsified information.

## (2) NEGLECTING THE LOCATION OF THE PROXY.

Some cheap proxy servers don't allow you to select the location of the proxy. That can easily defeat your purpose. Other proxies, instead, allow you to select the country of navigation, but not the city. If you want to access local results in your operation, we advise to use a proxy that allows you to pick the specific city of navigation.

Location is key. One of the reasons to use a proxy, is to appear as if you were surfing from a different place. Say you're in Qatar, and you want to access a website blocked in your region: you must ensure the proxy is located far away! Or if you are in Europe and want to read an American news site unavailable in your country—you have to use an American IP.

## (3) NOT USING STICKY IPS WHEN IT'S REQUIRED.

Most proxy providers use high rotation IPs, which means that you get a new IP address every time you make a new request. However, this can affect the success of your operation. If you need to send multiple requests or go through several web pages, it's recommended to send all the requests through the same IP address in order to successfully complete the process.

Using high rotation IPs to complete a task that requires to go through several web pages is a mistake you should avoid!

**Sticky IP by GeoSurf** allows you to stick to the same IP address throughout the duration of a task. You just need to select the desired location and the rotation time corresponding to the time you need to complete your task (1 minute, 10 minutes, 30 minutes) until your IP address will change. This process will maximize the success rate and get the job done much faster.

## (4) BUYING A PROXY THAT IS DIFFICULT TO INTEGRATE

Some proxy providers look great and fancy until you try to integrate them. Some—such as Luminati—are very difficult to integrate, as they require you to install complex proxy managers and to ultimately modify your entire solution.

Other proxy services require you to whitelist your IP addresses; but if you are using shared servers like Amazon Web Services (AWS) or any Software as a Service (SaaS) solution, you cannot whitelist the IPs, because they're probably in somebody else's whitelist.

In short, stay away from these proxies.

Instead, go for easy-integration proxies that support whatever your needs may be. **GeoSurf**, for instance, takes less than 5 minutes to integrate and supports the IP:port method with IP whitelist, the username-Password solution, *and* session persistence with an API.

## (5) USING THE WRONG TOOLS

You've probably noticed there are many off-the-shelf solutions for web scraping, multilogin applications, tickets, and so on. Some—usually those that come as SaaS solutions and continuously offer updates—are good. But there are also many cheap solutions, usually with a one-time fee, that quickly become obsolete. Just consider that any website should update almost on a daily basis!

The ideal proxy solution integrates with all software providers.

Case: 20-2118     Document: 90-1     Page: 362     Filed: 05/31/2022

Six Mistakes to Avoid When You Buy a Proxy | GeoSurf                                    Page 4 of 6
Case 2:18-cv-00483-JRG   Document 28-3   Filed 02/19/19   Page 5 of 7 PageID #:  1363

**GeoSurf**'s proxy solution comes already integrated with 4 tools: StubTabs, Multiloginapp, Ghost Browser, and Insomniac Browser.

## (6) GOING WITH A PROXY THAT DOESN'T OFFER CUSTOMER SUPPORT

Why would you spend money on a proxy server, find it hard to set it up or integrate it, and then pay more money to receive technical support?

Avoid the hassle: Use a proxy plan that includes free support at all times.

### GEOSURF HELPS YOU AVOID ALL THESE MISTAKES

GeoSurf's Residential IP proxy solution allows you to avoid all of the aforementioned mistakes:

| | |
|---|---|
| **Type of proxy** | GeoSurf gives you access to a pool of over 2 million Residential IPs. Scrape the web in total anonymity: no website will ever block you or show you falsified data. |
| **Location of proxy** | GeoSurf's Residential IPs are located in more than 130 countries and 1700 cities around the world. |
| **Sticky IPs** | With Sticky IPs by GeoSurf, select your desired location and timeframe and surf the web in total freedom while keeping the same IP until you've completed your operation. |
| **Easy integration** | GeoSurf's integration takes less than 5 minutes and supports both the IP:port method with IP whitelist, the username-Password solution, and session persistence with an API. |
| **Right tools** | Our solution integrates with all software providers and comes already integrated with 4 tools: StubTabs, Multiloginapp, Ghost Browser, and Insomniac Browser. |
| **Customer support** | Need help? GeoSurf's enterprise users get a designated customer success manager, who is available for support on the phone at every hour, every day, all year long. |

Case 2:18-cv-00483-JRG   Document 28-3   Filed 02/19/19   Page 6 of 7 PageID #:  1364

Access GeoSurf's pool of over 2 million residential IPs for your large-scale operations. Scrape the web in total anonymity: no website will ever block you or show you falsified data.

**Get your GeoSurf's Residential IP Proxy Network account today!**

## NO COMMENTS

## POST A COMMENT

Write your comment here...

Your full name

E-mail address

Website

SUBMIT

< All posts

## RECENT POSTS

What is Ad Verification And Why Do We Need It?

**Appx695**

Case: 20-2118    Document: 90-1    Page: 364    Filed: 05/31/2022

Six Mistakes to Avoid When You Buy a Proxy | GeoSurf                    Page 6 of 6
Case 2:18-cv-00483-JRG   Document 28-3   Filed 02/19/19   Page 7 of 7 PageID #:  1365

GeoSurf's Highlights 2018

Familiarizing Yourself With GeoSurf: Learn how to add and manage IPs Video Tutorial

Familiarizing Yourself With GeoSurf: Insomniac Browser Integration Video Tutorial

Your Ultimate Guide To Data Mining and Scraping Using A Proxy

## RELATED POSTS

# EXHIBIT D

Case: 20-2118     Document: 90-1     Page: 366     Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 4 of 15
Case 2:18-cv-00483-JRG   Document 28-4   Filed 02/19/19   Page 5 of 16 PageID #: 1370



## THE RISK OF SCRAPING FALSIFIED DATA (AND HOW TO AVOID IT BY USING A RESIDENTIAL PROXY NETWORK)

Now, you might be thinking: "Awesome, I got it! Let's start scraping!" However, if you do that without protecting yourself, your scraping might lead to nothing or, even worse, to a financial loss. Yes, you read that right. Let us explain.

The internet can be dangerous jungle, don't we all agree? Many of your target sites (in other words, the websites you're trying to gather information from) will try to detect you. If they recognize that you're trying to scrape their data, their server will block you. In some cases, it might not block you, but show you **falsified information**, instead. Let's say you're mining data and you're basing your business decisions on the results you get from your search. If you're basing your decisions on falsified results, you're likely to make a very poor decision.

Another example: If you're scraping the internet for price comparison, and you visit certain sites extensively while using the same IP address, you will appear as suspicious to the target websites, which will block you.

So, how can you avoid being detected? It's simple: you can use a **proxy server** that allows you to use—and even rotate between—**Residential IPs**. These IPs

Case: 20-2118     Document: 90-1     Page: 367     Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 5 of 15
Case 2:18-cv-00483-JRG   Document 28-4   Filed 02/19/19   Page 6 of 16 PageID #:  1371

look unsuspicious and allow you to gather your data in total anonymity. Beware that if you're using a proxy server but the IP you're using is not residential, you might still be detected.

# WHAT ARE THE BENEFITS OF USING A WEB SCRAPING PROXY?

### STABLE CONNECTION

ELKI, GATE, KNIME, MEPX… No matter which data mining software you use, you know it's a process that takes a considerable amount of time. Just imagine that you're about to complete the process when your connection suddenly breaks and you lose all the progress you've made, wasting precious work and time. This can happen if you use your own server, whose connection can be unreliable. A good proxy will ensure you have a stable connection.

### HIDING YOUR OWN IP ADDRESS

As we explained earlier in this article, if you pursue several web scraping operations over an extended period of time in the target site, you are likely to get banned. In other cases, you might be blocked because of your location. A good proxy like GeoSurf can solve these problems in the blink of an eye. It will hide your IP address and replace it with a large pool of rotating residential proxies, making you virtually invisible to the server of your target site. A proxy will also give you access to a set of proxy servers located worldwide, which will help you solve the location obstacle easily: Just select your preferred location, whether it's the United States or Madagascar, and surf in total anonymity and freedom.

### SECURITY

Your own server might not be secure enough to handle all the malicious entities it may encounter while you're scraping information; do you really want to put yourself in a vulnerable position while you're in the middle of a mining operation? Getting a backconnect proxy is the best solution to this problem.

Data mining is a complex process in and of itself; regardless of the software you're planning to use and how great of an expert you are, a proxy can easily help you with some crucial and basic necessities such as hiding your IP address

Case: 20-2118    Document: 90-1    Page: 368    Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 6 of 15
Case 2:18-cv-00483-JRG    Document 28-4    Filed 02/19/19    Page 7 of 16 PageID #:  1372

and using a secure and stable connection to carry your operation smoothly and successfully.

## COMMON QUESTIONS ABOUT MINING WITH A PROXY

## *"It's such an expensive service!"*

While it's not true that proxy servers are particularly expensive, it's important to put things in perspective and realize that if you are detected by your target site and fed with falsified information, this may lead to a much greater financial burden; at that point, paying for a Starter Plan with a good Residential IP Proxy service ends up being more convenient.

Using Residential IPs will lower your fail rate; and if you get better results from your data mining activities, you can say that by paying for a good proxy you get a bigger **return on investment (ROI).**

## *"But how can I control the rotation of the Residential IPs?"*

Many proxy providers out there use high rotation IPs, which means that you get a new IP address every time you send a new request. This can obviously affect the success of your operation. If you need to send multiple requests or go through several web pages, it's recommended to send all the requests through the same IP address in order to successfully complete the process. Using high rotation IPs to complete a task that requires to go through several web pages is a mistake you should avoid!

**Sticky IP by GeoSurf** allows you to stick to the same IP address throughout the duration of a task. You just need to select the desired location and the rotation

Case: 20-2118     Document: 90-1     Page: 369     Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 8 of 15
Case 2:18-cv-00483-JRG   Document 28-4   Filed 02/19/19   Page 9 of 16 PageID #: 1374

the entire proxy eco-system architecture and have a language-agnostic API
which is mandatory since developers normally deal with multiple coding
languages and will always prefer an API that has no language restrictions.

## UNDERSTANDING THE DIFFERENT TECHNIQUES OF DATA MINING

Now that we explained why it is crucial to use Residential IPs to carry your
mining operations, we can discuss the actual operations in detail. As we
mentioned earlier, data mining means finding large sets of data and analyzing
them in order to discover patterns in them. It's a computing process that
enables a user to extract the information and transform it into a clear structure
for future use.



First of all, define the problem you want to solve. Are you looking into finding
the prices of the competition and analyzing them? Or are you looking into
learning about people's opinions on a certain topic or issue? At this point, you
can start with the data mining.

The entire process can be divided into three stages:

Case: 20-2118     Document: 90-1     Page: 370     Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 9 of 15
Case 2:18-cv-00483-JRG   Document 28-4   Filed 02/19/19   Page 10 of 16 PageID #:  1375

## DATA EXPLORATION

At this initial stage, you gather the data you're looking for. You need to find it, access it (here you'll need a proxy), sampling it and if necessary transforming it.

## MODEL BUILDING

After considering various data models and patterns, you build one that will work best for your goal. After creating your model, you might want to test it.

## MODEL APPLICATION

Apply the gathered data to your model and analyze it. This might lead to writing an in-depth report of your findings and ultimately might help you make a business decision based on the results.

There are numerous data mining techniques you can pick from. Some of them will only leave you speculating what the pattern actually is and how to use it. Below, we will list some excellent techniques:

## CLASSIFICATION ANALYSIS

This technique is a good fit for you if you want to categorize the data in different classes. You can apply algorithms that already exist or invent your own to determine how to classify the new data.

## ANOMALY DETECTION

If you encounter a data item that does not really match an expected pattern, the most logical thing you can do is to take a closer look at it, right? Anomalies are also referred to as outliers, deviations, noise, exceptions and novelties—therefore you might read the phrase "outlier detection" or other synonyms online. Anomalies can provide extremely useful information and help you detect the real cause behind them. If your job is to monitor a network, you can easily detect a flaw in the system by detecting and analyzing the anomaly.

## CLUSTERING ANALYSIS

If you are an expert at customer profiling, then you know how important this method is! Clustering analysis allows you to group similar items, objects or people in the same category. As a result, you will have categories containing

items with a high level of association, while items in different categories will bear very little similarity.

As you can imagine, there are many more data mining examples, but we chose these three because they are some of the most efficient ones.

So far, we've talked about all the good things that come with data mining. The truth is, that just like with anything also, also data mining can have its advantages and disadvantages.

## HERE ARE THE MAIN **PROS** OF WEB SCRAPING:

### AUTOMATION

Can you imagine how much time you would waste if you had to manually copy and paste each piece of information you need from a website? It would take hours—if not days—and drain all of your energy. Scraping softwares automate this type of operation, gathering the data in just a fraction of the time it take a human to execute the same instructions.

### ACCURACY

Not only is scraping fast, but it is also very accurate. This characteristic prevents you from making major mistakes that can easily occur when you carry these operations manually. It takes just a minor mistake to mess up a larger result: don't risk it!

### DATA MANAGEMENT

In order to manage figures and numbers on your computer, you can use spreadsheets and databases. However, you cannot really do this on a website configured in HTML. Using a web scraping tool, this is possible.

Case: 20-2118     Document: 90-1     Page: 372     Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 12 of 15
Case 2:18-cv-00483-JRG   Document 28-4   Filed 02/19/19   Page 13 of 16 PageID #: 1378

## HONEYPOTS

A honeypot is a system used by websites to catch hackers; they are created to deceive hackers / data scraping. A common example is what map businesses have started doing to prevent competitors to scrape their maps: They started inserting "new," inexistent places in their maps so that they could prove that their competitors were stealing their maps and infringing the copyright.

## INFINITE LOOPS

Some websites deploy infinite loops as a means of security in order to mislead a data scraping bot when it hits a honeypot. This easily can be avoided by limiting the number of redirects allowed for your data scraping framework. For example, if you set the limit to 5 than the infinite loop will stop after visiting 5 URLs.

## WEBSITE POLICIES

Website policies typically contain some text about limiting access to their service for bots or other means of non-human engagement in relation to their content. Having said that, a *federal judge on Monday ordered LinkedIn Corp. to allow a startup company to scrape data publicly posted by LinkedIn users* (wsj.com, Aug. 14, 2017 by Jacob Gershman). We learn from this case that retrieval of data by human or machine

Now that you're prepared and you know what obstacles to expect, it's time to discuss the best tools for data mining.

# BEST WEB SCRAPING TOOLS OUT THERE RIGHT NOW

There are a few web scraping tools that no mining expert can go without! Take a look below at some of our favorites:

## SELENIUM

Selenium is a suite of tools designed for automating web browsers. It can perform several tasks on autopilot. You can use it to mimic a human visiting a web page, emulate ajax calls, test websites and automate any other time-

Case: 20-2118    Document: 90-1    Page: 373    Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf          Page 13 of 15
Case 2:18-cv-00483-JRG    Document 28-4    Filed 02/19/19    Page 14 of 16 PageID #:  1379

consuming activities. It runs in many browsers and operating systems and can be controlled by many programming languages and testing frameworks.

## NUTCH

Many say that Nutch is the ultimate tool when it comes to web scraping. It's very useful for crawling, extracting and storing data at the speed of light.

## BOILERPIPE

Boilerpipe is the tool you want to use to extract clean text along with associated titles. It is a Java library that extracts both structured and unstructured web pages. This tool intelligently removes HTML tags and other noise; in other words, it "provides algorithms to detect and remove the surplus clutter around the main textual content of a web page." And it does it very fast and with minimal input!

## WATIR

Watir is a flexible and user-friendly tool used for web browser automation. It can automatically click on links, fill forms, press buttons and navigate a website the way a human would. It's "an open source Ruby library for automating tests."

## CELERITY

This tool was created around HTMLUnit, which is a headless Java browser with support for JavaScript. Its API is easy to use if you want to navigate through web applications. In addition to that, the speed of Celerity (just as the name suggests!) is fantastic, because it doesn't spend time on GUI rendering or unnecessary downloads.

After you've selected your preferred scraping tool, you can pair it with a proxy to ensure anonymity and security for your data mining operation.

**GeoSurf** gives you access to a premium proxy network of over 2 million Residential IP addresses located in over 130 countries. With GeoSurf, you can select how often you want to rotate between different IP addresses. Scrape in total anonymity and with no fear of being blocked or fed with falsified information.

Case: 20-2118     Document: 90-1     Page: 374     Filed: 05/31/2022

Data Mining and Scraping Using A Proxy - Ultimate Guide | GeoSurf                    Page 14 of 15
Case 2:18-cv-00483-JRG   Document 28-4   Filed 02/19/19   Page 15 of 16 PageID #:  1380

## NO COMMENTS

## POST A COMMENT

Write your comment here...

Your full name

E-mail address

Website

SUBMIT

< All posts

## RECENT POSTS

What is Ad Verification And Why Do We Need It?

GeoSurf's Highlights 2018

Familiarizing Yourself With GeoSurf: Learn how to add and manage IPs Video
Tutorial

Familiarizing Yourself With GeoSurf: Insomniac Browser Integration Video
Tutorial

Your Ultimate Guide To Data Mining and Scraping Using A Proxy

# EXHIBIT E

## Residential IPs Integration Guide

Here you can find detailed information about GeoSurf™ Residential IPs integration. GeoSurf™ has an inbuilt IP rotation solution designed for easy integration. If you don't find the right documentation for your needs, please fill in the contact us form and one of our representatives will be in touch.

### BROWSER & OS CONFIGURATION

+ 🖥 Internet Explorer, Chrome & Edge Browser

+ 🖥 Mozilla Firefox

+ 📱 Android Proxy configuration

### API & EXAMPLES

+ ⊬ PHP file_get_contents proxy example

+ ⊬ PHP cURL proxy example

+ ⊬ Python version 2.x proxy example

+ ⊬ Python version 3.x proxy example

+ ⊬ Ruby proxy example

+ ⊬ Java global proxy example

+ ⊬ Java apache HttpClient proxy example

+ ⊬ Most simple CURL example

+ ⊬ Node.js CURL proxy example - Random country selection

### STICKY RESIDENTIAL IPS AND SESSION PERSISTENCE

+ ⚙ Session persistence overview

+ ⚙ US Residential 1 minute session persistence CURL example

+ ⚙ US Residential 10 minutes session persistence CURL example

+ ⚙ US Residential 30 minutes session persistence CURL example

+ ⚙ Germany (DE) Residential 1 minute session persistence CURL example

+ ⚙ Germany (DE) Residential 10 minute session persistence CURL example

+ ⚙ Germany (DE) Residential 30 minute session persistence CURL example

+ ⚙ France (FR) Residential 1 minute session persistence CURL example

+ ⚙ France (FR) Residential 10 minute session persistence CURL example

+ ⚙ France (FR) Residential 30 minute session persistence CURL example

+ ⚙ Great Britain (GB) Residential 1 minute session persistence CURL example

+ ⚙ Great Britain (GB) Residential 10 minute session persistence CURL example

Case: 20-2118    Document: 90-1    Page: 377    Filed: 05/31/2022

Residential IPs Integration Guide | GeoSurf                          Page 2 of 4
Case 2:18-cv-00483-JRG   Document 28-5   Filed 02/19/19   Page 3 of 5 PageID #:  1384

✛  ⚙  Great Britain (GB) Residential 30 minute session persistence CURL example

✛  ⚙  India (IN) Residential 1 minute session persistence CURL example

✛  ⚙  India (IN) Residential 10 minute session persistence CURL example

✛  ⚙  India (IN) Residential 30 minute session persistence CURL example

✛  ⚙  Thailand (TH) Residential 1 minute session persistence CURL example

✛  ⚙  Thailand (TH) Residential 10 minute session persistence CURL example

✛  ⚙  Thailand (TH) Residential 30 minute session persistence CURL example


## CITY & STATE GATEWAY

✛  🅰  City Gateway overview

—  🅰  Available Cities & Ports

Below is a list of all available cities, and their ports:

| CITY | STATE | STATE_ABBREVIATION | START_PORT | END_PORT |
|---|---|---|---|---|
| Albuquerque | New Mexico | NM | 8000 | 8019 |
| Arlington | Texax | TX | 8020 | 8039 |
| Athens | Georgia | GA | 8040 | 8059 |
| Atlanta | Georgia | GA | 8060 | 8079 |
| Auburn | Alabma | AL | 8080 | 8099 |
| Aurora | Colorado | CO | 8100 | 8119 |
| Austin | Texas | TX | 8120 | 8139 |
| Bakersfield | California | CA | 8140 | 8159 |
| Baltimore | Maryland | MD | 8160 | 8179 |
| Baton Rouge | Louisiana | LA | 8180 | 8199 |
| Beaverton | Oregon | OR | 8200 | 8219 |
| Bellevue | Washington | WA | 8220 | 8239 |
| Birmingham | Alabama | AL | 8240 | 8259 |
| Booneville | Mississippi | MS | 8260 | 8279 |
| Boston | Massachusetts | MA | 8280 | 8299 |
| Brooklyn | New York | NY | 8300 | 8319 |
| Buffalo | New York | NY | 8320 | 8339 |
| Charlotte | North Carolina | NC | 8340 | 8359 |
| Chicago | Illinois | IL | 8360 | 8379 |
| Cleveland | Ohio | OH | 8380 | 8399 |
| Colorado Springs | Colorado | CO | 8400 | 8419 |
| Columbia | South Carolina | SC | 8420 | 8439 |
| Columbus | Ohio | OH | 8440 | 8459 |
| Crowley | Texax | TX | 8460 | 8479 |
| Dallas | Texas | TX | 8480 | 8499 |
| Dayton | Ohio | OH | 8500 | 8519 |
| Decatur | Georgia | GA | 8520 | 8539 |
| Denver | Colorado | CO | 8540 | 8559 |
| Detroit | Michigan | MI | 8560 | 8579 |
| El Paso | Texas | TX | 8580 | 8599 |
| Fayetteville | North Carolina | NC | 8600 | 8619 |
| Fort Lauderdale | Florida | FL | 8620 | 8639 |
| Fort Worth | Texas | TX | 8640 | 8659 |
| Fremont | California | CA | 8660 | 8679 |
| Fresno | California | CA | 8680 | 8699 |
| Garwood | New Jersey | NJ | 8700 | 8719 |
| Glendale | California | CA | 8720 | 8739 |
| Harrisburg | Pennsylvania | PA | 8740 | 8759 |
| Henderson | Nevada | NV | 8760 | 8779 |
| Hollywood | California | CA | 8780 | 8799 |
| Honolulu | Hawaii | HI | 8800 | 8819 |
| Houston | Texas | TX | 8820 | 8839 |
| Indianapolis | Indiana | IN | 8840 | 8859 |
| Jackson | Mississippi | MS | 8860 | 8879 |
| Jacksonville | Florida | FL | 8880 | 8899 |
| Kansas City | Missouri | MO | 8900 | 8919 |

| CITY | STATE | STATE_ABBREVIATION | START_PORT | END_PORT |
|---|---|---|---|---|
| Katy | Texas | TX | 8920 | 8939 |
| Lansing | Michigan | MI | 8940 | 8959 |
| Lapel | Indiana | IN | 8960 | 8979 |
| Las Vegas | Nevada | NV | 8980 | 8999 |
| Lexington | Kentucky | KY | 9000 | 9019 |
| Los Angeles | California | CA | 9020 | 9039 |
| Louisville | Kentucky | KY | 9040 | 9059 |
| Macon | Georgia | GA | 9060 | 9079 |
| Madison | Wisconsin | WI | 9080 | 9099 |
| Memphis | Tennessee | TN | 9100 | 9119 |
| Miami | Florida | FL | 9120 | 9139 |
| Milwaukee | Wisconsin | WI | 9140 | 9159 |
| Minneapolis | Minnesota | MN | 9160 | 9179 |
| Nashville | Tennessee | TN | 9180 | 9199 |
| New Orleans | Louisiana | LA | 9200 | 9219 |
| New York | New York | NY | 9220 | 9239 |
| Newark | New Jersey | NJ | 9240 | 9259 |
| Oakland | California | CA | 9260 | 9279 |
| Oklahoma City | Oklahoma | OK | 9280 | 9299 |
| Omaha | Nebraska | NE | 9300 | 9319 |
| Orlando | Florida | FL | 9320 | 9339 |
| Philadelphia | Pennsylvania | PA | 9340 | 9359 |
| Phoenix | Arizona | AZ | 9360 | 9379 |
| Pittsburgh | Pennsylvania | PA | 9380 | 9399 |
| Pompano Beach | Florida | FL | 9400 | 9419 |
| Portland | Oregon | OR | 9420 | 9439 |
| Prescott Valley | Arizona | AZ | 9440 | 9459 |
| Princeton | New Jersey | NJ | 9460 | 9479 |
| Raleigh | North Carolina | NC | 9480 | 9499 |
| Richmond | Virginia | VA | 9500 | 9519 |
| Rochester | New York | NY | 9520 | 9539 |
| Rockvale | Colorado | CO | 9540 | 9559 |
| Sacramento | California | CA | 9560 | 9579 |
| Saint James | Missouri | MO | 9580 | 9599 |
| Saint Paul | Minnesota | MN | 9600 | 9619 |
| Salem | Massachusetts | MA | 9620 | 9639 |
| Salt Lake City | Utah | UT | 9640 | 9659 |
| San Antonio | Texas | TX | 9660 | 9679 |
| San Diego | California | CA | 9680 | 9699 |
| San Francisco | California | CA | 9700 | 9719 |
| San Jose | California | CA | 9720 | 9739 |
| Seattle | Washington | WA | 9740 | 9759 |
| Shreveport | Louisiana | LA | 9760 | 9779 |
| Spokane | Washington | WA | 9780 | 9799 |
| Spring | Texas | TX | 9800 | 9819 |
| St Louis | Missouri | MO | 9820 | 9839 |
| Stockton | California | CA | 9840 | 9859 |
| Tacoma | Washington | WA | 9860 | 9879 |
| Tampa | Florida | FL | 9880 | 9899 |
| The Bronx | New York | NY | 9900 | 9919 |
| Tucson | Arizona | AZ | 9920 | 9939 |
| Wallingford | Connecticut | CT | 9940 | 9959 |
| Washington | District of Columbia | DC | 9960 | 9979 |
| Wichita | Kansas | KS | 9980 | 9999 |

+  ⚑  Simple CURL example

+  ⚑  State Gateway Overview

+  ⚑  What is the benefit of using Proxy headers?

+  ⚑  Simple CURL example

BEST PRACTICES – RESIDENTIAL IPS API

+  ☑  When and Where Should I use Sticky IPs?

Case: 20-2118     Document: 90-1     Page: 379     Filed: 05/31/2022

Residential IPs Integration Guide | GeoSurf                                           Page 4 of 4
Case 2:18-cv-00483-JRG   Document 28-5   Filed 02/19/19   Page 5 of 5 PageID #:  1386

☑ Choosing the correct sticky IPs time

☑ When and Where should I use the High Rotation gateway?

**3RD PARTY SOFTWARE INTEGRATION**

Using Geosurf Residential IP proxy with GSA search engine ranker

Using Geosurf Geosurf Residential IP proxy with Foxy Proxy

Using Geosurf Residential IP proxy with AIO Sneakers Bot

Using Geosurf Residential IP proxy with EasyCop sneakers bot

Using Geosurf Residential IP proxy with NikeSlayer

Using Geosurf Residential IP proxy with BetterNikeBot (BNB)

Using Geosurf Residential IP proxy with Supreme Bot

Using Geosurf Residential IP proxy with Another Nike Bot

Using Geosurf Residential IP proxy with Sneaker Bot 2.0

Using Geosurf Residential Proxy Network with StubTabs & ProxyTabs

Using Geosurf Residential Proxies With Insomniac Browser

**CONNECTION PROBLEMS**

Are you behind a firewall?

Are you getting Connection Refused from AWS/EC?

Are you getting 408 timeouts?

Are you getting error code(-7) or (-3) when making an API request?

Are you getting denied access errors?

Do you have DNS leak issues?

## SIGN UP NOW
Start your experience with our GeoSurf Premium Proxy!

GET STARTED

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS LTD.** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 2:18-cv-483-JRG** |
| | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **BISCIENCE INC.** | § | **FILED UNDER SEAL** |
| | § | |
| **Defendant.** | § | |

<u>**DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE,**</u>
<u>**MOTION TO TRANSFER VENUE**</u>

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

<u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION ................................................................................. 2

II.     THIS CASE SHOULD BE DISMISSED FOR LACK OF JURISDICTION ..................... 3

        A.      Requirements for Personal Jurisdiction ................................... 3

        B.      There is No General Jurisdiction Over BIScience in Texas ................................. 5

        C.      There is No Specific Jurisdiction Over BIScience in Texas ................................. 6

        D.      There is No Pendent Jurisdiction over the Tortious Interference Claims .............. 8

III.    ALTERNATIVELY, THIS CASE SHOULD BE TRANSFERRED TO THE
        SOUTHERN DISTRICT OF NEW YORK ....................................................... 10

        A.      This Case Could Have Been Brought in the Southern District of New York ....... 10

        B.      The Private Factors Strongly Favor Transfer ......................................... 11

                1.      Relevant Sources of Proof Are in the Southern District of New
                        York and Israel ................................................................ 11

                2.      The Cost and Convenience for Witnesses Favors Transfer ..................... 12

                3.      Other Practical Considerations Are Neutral ............................. 13

        C.      The Public Factors Favor Transfer ...................................... 14

                1.      The Local Interest Factor Supports Transfer ............................ 14

                2.      The Other Public Interest Factors ....................................... 15

IV.     THIS CASE SHOULD ALSO BE DISMISSED DUE TO DEFECTS IN THE
        COMPLAINT .................................................................................. 15

        A.      The Defense of Trade Secrets Act Does Not Cover Conduct Abroad .................. 15

        B.      Luminati's Amended Complaint Fails to Assert a Plausible Claim for False
                Advertising ................................................................... 15

V.      CONCLUSION .................................................................................. 18

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

## TABLE OF AUTHORITIES

**CASES**

*AFTG-TG, LLC v. Nuvoton Tech. Corp.*,
689 F.3d 1358 (Fed. Cir. 2012).......................................................................5

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
566 F.3d 1012 (Fed. Cir. 2009).......................................................................3

*In re BigCommerce, Inc.*,
890 F.3d 978 (Fed. Cir. 2018).......................................................................11

*Blue Spike, LLC v. Texas Instruments, Inc.*,
No. 6:12-cv-499, 2014 WL 11829323 (E.D. Tex. Mar. 31, 2014)..................3, 7

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*,
137 S. Ct. 1773 (2017).......................................................................5

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).......................................................................4, 5

*Celgard, LLC v. SK Innovation Co., Ltd.*,
792 F.3d 1373 (Fed. Cir. 2015).......................................................................3

*Daimler AG v. Bauman*,
571 U.S. 117 (2014).......................................................................4, 6

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
No. 6:13-cv-919, 2014 WL 6847569 (E.D. Tex. Nov. 17, 2014)....................13

*Freudensprung v. Offshore Technical Servs., Inc.*,
379 F.3d 327 (1985).......................................................................5

*In re Genentech, Inc.*,
566 F.3d 1388 (Fed. Cir. 2009).......................................................................10, 12

*Gonzalez v. Autotrader.com*,
2:14-cv-650, 2015 WL 1387858 (E.D. Tex. Mar. 25, 2015)............................12

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011).......................................................................4

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984).......................................................................4

*Hoffman v. Blaski*,
363 U.S. 335 (1960).......................................................................14

ii

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

*In re Hoffman-La Roche Inc.*,
    587 F.3d 1333 (Fed. Cir. 2008)...........................................................................14

*In re HTC Corp.*,
    889 F.3d 1349 (Fed. Cir. 2018)...........................................................................11

*HTI IP LLC v. DriveOk, Inc.*,
    No. 6:09-cv-370, 2010 WL 3075200 (E.D. Tex. Aug. 4, 2010).........................4

*Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.*,
    321 F.2d 53 (5th Cir. 1963) .................................................................................11

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945).............................................................................................4

*Internet Machines LLC v. Alienware Corp.*,
    No. 6:10-cv-023, 2011 WL 2292961 (E.D. Tex. June 7, 2011) ...........................6

*Logan v. Burgers Ozark Cty. Cured Hams, Inc.*,
    263 F.3d 447 (5th Cir. 2001) ...............................................................................17

*LSI Indus. Inc. v. Hubbell Lighting, Inc.*,
    232 F.3d 1369 (Fed. Cir. 2000)............................................................................4

*In re Nintendo Co.*,
    589 F.3d 1194 (Fed. Cir. 2009)......................................................................10, 11

*Nuance Commc'ns, Inc. v. Abbyy Software House*,
    626 F.3d 1222 (Fed. Cir. 2010)............................................................................5

*Pinnacle Label, Inc. v. Spinnaker Coating, LLC*,
    No. 3:09-cv-0950-D, 2009 WL 3805798 (N.D. Tex. Nov. 12, 2009) .................9

*In re Radmax, Ltd.*,
    720 F.3d 285 (5th Cir. 2013) ...............................................................................12

*Roberts v. Paulin*,
    No. 07-cv-13207, 2007 WL 3203969 (E.D. Mich. Oct. 31, 2007)......................7

*Rolls-Royce Corp. v. Heros, Inc.*,
    576 F. Supp. 2d 765 (N.D. Tex. 2008) ................................................................9

*In re Toa Techs., Inc.*,
    543 F. App'x 1006 (Fed. Cir. 2013) .....................................................................12

*Tuna Processors, Inc. v. Anova Food, Inc.*,
    No. 07-6192, 2007 WL 3232609, at *4 (D. Or. Nov. 1, 2007)...........................7

**Appx721**

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

*Uniloc USA, Inc. v. Apple Inc.*,
    2:17-cv-00258 (E.D. Tex. Dec. 22, 2017) ........................................................12

*Vendavo, Inc. v. Price f(x) AG*,
    3:17-cv-06930 (N.D. Cal. Mar. 23, 2018) ........................................................16

*In re Volkswagen AG*,
    371 F.3d 201 (5th Cir. 2004) .............................................................10, 11, 14

*In re Volkswagen of Am., Inc.*,
    545 F.3d 304 (5th Cir. 2008) ......................................................................14

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)..................................................................................4, 5

*WorldVentures Hldgs., LLC v. Mavie*,
    No. 4:18-cv-393, 2018 WL 6523306 (E.D. Tex. Dec. 12, 2018) ........................4

## STATUTES / RULES

28 U.S.C. § 1404(a) ....................................................................1, 10, 12

18 U.S.C. § 1837...........................................................................15, 16

Fed. R. Civ. P. 4(k)(2)....................................................................2, 5, 6

Fed. R. Civ. P. 12(b)(2)........................................................................1

Fed. R. Civ. P. 12(b)(6)..............................................................1, 8, 15, 18

**Appx722**

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Defendant BIScience (2009) Ltd. (which Plaintiff alleges is also known as BIScience Inc.) (hereinafter referred to as "BIScience") respectfully submits this motion to dismiss Plaintiff's Amended Complaint (Dkt. No. 28) pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction or, in the alternative, to transfer venue to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). In addition, this motion identifies defects in certain claims of Plaintiff Luminati Networks Ltd.'s ("Luminati") complaint that warrant dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

BIScience first addresses Luminati's repeated unwarranted criticisms and characterizations of BIScience's declaration submitted in response to Plaintiff's Original Complaint. In Kfir Moyal's previous declaration attached in support of Defendant's Motion to Dismiss (Dkt. No. 15), Mr. Moyal mistakenly transposed a number on BIScience's New York office address which resulted in 345 Madison Ave., rather than the correct address of 335 Madison Ave. Plaintiff went to great lengths hiring an investigator to take pictures in New York to prove there was no 345 Madison Ave. and even went so far to claim that the undersigned was "grossly negligent" or "asserted blatant falsehood" to the Court. Dkt. No. 21, p.11. And most recently in its latest filing, Plaintiff launched the same attack. Dkt. No. 33, pp.1-2. This mistake was the result of a clerical typographical error, not "gross negligence" or "blatant falsehood" and, importantly, an issue which could have been quickly corrected with a simple phone call to the undersigned. These parties are business competitors and keenly aware of each other's business operations and office locations. To suggest otherwise is not credible. And further, BIScience lists another New York address on its website which is not an office location (it is a mailing address), but certainly even following that information would lead to at least some indication of a presence in New York rather than a

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

claim that BIScience intentionally made the office address up in New York to support a response

to a motion, which clearly it did not do.

## I.    **INTRODUCTION**

On November 8, 2018, Luminati, an Israeli company, filed suit against BIScience, also an

Israeli company, alleging patent infringement, tortious interference with Luminati's employment

agreements, and misappropriation of trade secrets under the Federal Defense of Trade Secrets Act.

Dkt. No. 1.  In response, BIScience filed its Motion to Dismiss and in the alternative, Motion to

Transfer Venue.  Dkt. No. 15.  Luminati then filed its Opposition to Defendant's Motion to

Dismiss, and in the alternative, Motion to Transfer Venue and Motion For Early Venue Discovery

Dkt. Nos. 21 and 22.  On February 19, 2019, Plaintiff filed an Amended Complaint for Patent

Infringement against BIScience.  Dkt. No. 28.  In its Amended Complaint, Plaintiff added

additional causes of action for false advertising and tortious interference with current and

prospective business relationships.  Dkt. No. 28, pp. 29-31.  Additionally, Plaintiff added

allegations related to activities in Texas and the United States sporadically throughout in an

attempt to address issues raised in BIScience's previous motion to dismiss.  However, those

allegations are still not sufficient to establish jurisdiction or even venue in this Court.

Indisputably, all of the non-patent claims involve facts and witnesses in Israel—for

Luminati and for BIScience.  Luminati contends that this Court has personal jurisdiction over

BIScience because it has "sufficient minimum contacts with this forum as a result of business

conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2)."  Dkt. No. 28 ¶ 5.

Luminati alleges that "some" of the alleged infringement occurred in Texas and that BIScience

"maintains continuous and systematic contacts within this Judicial District, purposefully avails

itself of the privilege of doing business in Texas, and/or derives substantial revenue from services

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

provided in Texas." *Id*. As discussed in more detail below, this is not true. BIScience has insufficient contacts with Texas such that the exercise of personal jurisdiction over BIScience would offend traditional notions of fair play and substantial justice. BIScience has none of the indicia of personal jurisdiction recognized by the law, such as having an office or other real estate in Texas. Nor does it have employees, a registered agent, or a bank account in Texas, make business trips to Texas, attend trade show attendance in Texas, or engage in specific marketing to Texas customers. BIScience has also never invoked the legal system in Texas. Nothing in Luminati's Amended Complaint alleges otherwise.

BIScience is an Israeli corporation with its headquarters in Tel Aviv, Israel. Contrary to Luminati's assertions, BIScience conducts its U.S. activities out of an office in New York. It conducts sales activity from this New York office, attends trade shows in New York, and regularly visits its New York office as part of its regular business operations. For these and other reasons set forth below, there is no personal jurisdiction over BIScience in Texas and venue would be inconvenient for all parties and witnesses in this forum. Both personal jurisdiction and venue are instead proper in the Southern District of New York. Putting aside the parties' disputes on the merits, this case could have and should have been filed in that judicial district.

## II.     <u>THIS CASE SHOULD BE DISMISSED FOR LACK OF JURISDICTION</u>

### A.     Requirements for Personal Jurisdiction

Personal jurisdiction is governed by Federal Circuit law in patent infringement actions. *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009); *see also Blue Spike, LLC v. Texas Instruments, Inc.*, No. 6:12-cv-499, 2014 WL 11829323 at *1 (E.D. Tex. Mar. 31, 2014). The burden is on the plaintiff to establish that the defendant is subject to personal jurisdiction. *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015).

3

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

A court can exercise personal jurisdiction over an out-of-state defendant only if the forum state's long-arm statute permits jurisdiction without violating federal due process as delineated in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). *HTI IP LLC v. DriveOk, Inc.*, No. 6:09-cv-370, 2010 WL 3075200, at *4 (E.D. Tex. Aug. 4, 2010) (*citing LSI Indus. Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1371 (Fed. Cir. 2000)). The Texas long-arm statute is coextensive with due process such that the analysis collapses into a single inquiry. *WorldVentures Hldgs., LLC v. Mavie*, No. 4:18-cv-393, 2018 WL 6523306, at *4 (E.D. Tex. Dec. 12, 2018). To establish whether a court has personal jurisdiction over a defendant, a plaintiff must show: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe*, 326 U.S. at 316-20 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-77 (1985). The type of contacts with the forum state determine whether specific or general jurisdiction may be invoked. *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014); *WorldVentures*, 2018 WL 6523306, at *4.

General jurisdiction exists for a corporate defendant only when its "corporate operations within a state [are] so substantial and of such a nature" to justify suit based on activity entirely distinct from the alleged activities. *Daimler*, 571 U.S. at 127 (citing *Int'l Shoe*, 326 U.S. at 318). The operations must be so continuous and systematic that the corporate defendant is "essentially at home in the forum State." *Id.* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, n. 9 (1984)). Only a limited set of contacts support general jurisdiction of a corporate defendant, including the defendant being incorporated or having a principal place of business in the forum

4

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

state. *Id.* at 137; *see also Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).

To exercise specific jurisdiction, a court must determine "(1) whether the defendant purposefully directs activities at the forum's residents; (2) whether the claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair." *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1361 (Fed. Cir. 2012) (*citing Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010)). The focus of the specific jurisdiction inquiry is on the "relationship between the defendant, the forum, and the litigation." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 343 (1985) (*quoting Burger King*, 471 U.S. at 474). However, the primary concern is the burden on the defendant. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Random, fortuitous, or attenuated contacts are insufficient to establish purposeful availment. *Burger King*, 471 U.S. at 476.

### B.    There is No General Jurisdiction Over BIScience in Texas

BIScience is not subject to general personal jurisdiction in Texas.[1] BIScience is not incorporated in nor does it operate a principal place of business in Texas. Ex. 1 ¶¶ 7, 8. BIScience is not registered to do business in Texas, does not have a registered agent in Texas, does not have a bank account in Texas, does not have an office or any property in Texas, does not employ personnel in Texas, does not conduct visits to Texas for business (or otherwise), does not attend trade shows or conferences in Texas, and does not specifically advertise to Texas residents as

---

[1] For completeness, Fed. R. Civ. P. 4(k)(2) also fails to provide personal jurisdiction over BIScience. Since BIScience is subject to general personal jurisdiction in the Southern District of New York as discussed herein, the rule does not apply. *See* Fed. R. Civ. P. 4(k)(2)(A) (limited to situations where "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction").

5

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

opposed to other locations. *Id.* ¶ 8. BIScience's corporate activities are therefore not so continuous and systematic such that it would be "at home" in Texas sufficient to exercise general jurisdiction in this forum. *Daimler*, 571 U.S. at 126. Luminati, including in its Amended Complaint, alleges no activities that establish otherwise. *See, e.g.*, *Internet Machines LLC v. Alienware Corp.*, No. 6:10-cv-023, 2011 WL 2292961, at *4 (E.D. Tex. June 7, 2011).

### C.    There is No Specific Jurisdiction Over BIScience in Texas

BIScience is not subject to specific personal jurisdiction in this forum because Luminati fails to establish that BIScience purposefully directs activities toward Texas or that Luminati's claims arise out of any contact BIScience has with Texas.

Luminati generally alleges that BIScience "has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2)." *See* Dkt. No. 28 ¶ 5. The only non-general allegations made are that "BI Science utilizes software, which is, *inter alia*, the subject of the infringement alleged herein, that routes internet communications through user devices having IP addresses *serving as residential proxies* located in the State of Texas, as well as this Judicial District, permitting BI Science to include user devices in this Judicial District as *part of BI Science's residential proxy service*." *Id.* (emphasis added). However, the location and use of residential proxy software is not the focus of Luminati's alleged theory of infringement, as made clear by the complaint.

The asserted claims of the '044 and '866 patents are each method claims. Dkt. No. 28 ¶¶ 33, 48. Luminati alleges that the claimed methods are performed by a "user" or "customer" of the accused GeoSurf service. *Id.* at ¶¶ 34-37, 49-51. This is Luminati's infringement theory in its Amended Complaint (Dkt. No. 28 ¶¶ 34-37, 49-51), just as it was in its original Complaint (Dkt. No. 1 ¶¶ 33-36, 48-50). However, the existence or operation of residential proxy software in

6

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Texas—activity distinct from the actions of any BIScience customer or user—fails to demonstrate BIScience purposefully availed itself of the benefits of doing business in Texas as Luminati alleges. *Blue Spike*, 2014 WL 11829323, at *3 ("Plaintiff further suggests that because [defendant] incorporated its software into the products of Texas-based corporations, [defendant] must necessarily be charged with independently establishing contacts with Texas. But Plaintiff has not demonstrated that [defendant] purposefully availed itself of the benefits of doing business in Texas."). Luminati's Amended Complaint thus fails to establish a *prima facie* case that BIScience purposefully directs activities at residents of this forum relating to or arising out of the allegedly infringing activity.

The customer activity alleged by Luminati is also minimal when compared to BIScience's overall business. As of February 28, 2019, there were only six GeoSurf residential active customers and only forty-six former GeoSurf customers in Texas. Ex. 1 ¶ 11. The total revenue of the six active customers in February 2019 is $4,128 per month. *Id.* The total revenue among the six active Texas customers and the forty-six former Texas customers, combined, is only $52,079. *Id.* To put those numbers in perspective, BIScience had total worldwide revenue across all of its products of $8.3 million in 2018. *Id.* The total sales among all current and former GeoSurf residential customers in Texas is thus only 0.44% of BIScience's overall 2018 revenue. As courts have recognized, minimal sales in a forum state, absent any purposeful activity focused on the state, are insufficient to confer personal jurisdiction. *See, e.g., Roberts v. Paulin*, No. 07-cv-13207, 2007 WL 3203969 (E.D. Mich. Oct. 31, 2007) (finding lack of personal jurisdiction where defendant had less than $500 of sales in forum state); *Tuna Processors, Inc. v. Anova Food, Inc.*, No. 07-6192, 2007 WL 3232609, at *4 (D. Or. Nov. 1, 2007) (finding lack of personal jurisdiction despite sales of two allegedly infringing sales in forum state). Accordingly, while there are a small

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

number of BIScience customers in Texas, representing minimal sales, BIScience has never purposefully directed any aspect of its business operations to Texas.

For these reasons, the allegations in Luminati's Amended Complaint are insufficient to confer specific personal jurisdiction.

### D.    There is No Pendent Jurisdiction over the Tortious Interference Claims

In addition to alleging patent infringement, Luminati asserts claims for tortious interference with Luminati's employment agreements, tortious interference with Luminati's current and prospective business relationships, misappropriation of trade secret under the Federal Defense of Trade Secret Act, and false advertising.  As discussed below, the trade secret and false advertising claims should be dismissed under Fed. R. Civ. P. 12(b)(6).  With the trade secret and false advertising claims dismissed, the Court should also dismiss the tortious interference claims—state law claims—as a matter of declining to assert pendent personal jurisdiction.

Luminati's tortious interference claims involve three former Luminati employees— Mr. Ghelber, Mr. Feldman, and Mr. Levy.  *See* Dkt. 28 ¶¶ 59-61.  These individuals allegedly worked for Hola Networks Ltd., now known as Luminati, in Israel.  *Id.*  The employment agreements complained of were executed in Israel.[2]  These former Luminati employees were allegedly hired by BIScience in Israel to work in Israel.

If the Court dismisses Luminati's trade secret and false advertising claims for the reasons below, the Court should decline to exercise pendent personal jurisdiction over BIScience for the tortious interference claims.  Pendent personal jurisdiction exists when the Court has "personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction

---

[2] The agreements are not exhibits to Luminati's original Complaint or Amended Complaint, nor does Luminati address whether they contain choice of venue clauses, arbitration clauses, or other potentially material provisions.

8

**Appx730**

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim." *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008); *Pinnacle Label, Inc. v. Spinnaker Coating, LLC*, No. 3:09-cv-0950, 2009 WL 3805798 (N.D. Tex. Nov. 12, 2009) (court granted motion to dismiss the state law claims for lack of personal jurisdiction because the state law claims and the Lanham act claims did not arise from a common nucleus of operative fact.).  Here, in order for there to be pendent jurisdiction, Luminati's patent claims would need to arise from the same facts as its tortious interference claim.  They do not.

The patent infringement claims involve allegations that BIScience infringed Luminati's patents by implementing and providing the GeoSurf service to customers.  Dkt. 28 ¶¶ 29-57.  The non-patent claims are entirely distinct, sharing none of the same elements of a cause of action. One of the tortious interference claims involves allegations relating to three specific Israeli individuals, their alleged employment agreements with Luminati, and their alleged hiring in Israel. *Id*. at ¶¶ 58-61.  The other tortious interference claim involves Luminati's business relationships with customers.  *Id*. at ¶¶ 75-78.  This claim includes allegations that BIScience has "contacted current and prospective Luminati customers to sell its competing Geosurf service…" Dkt. No. 28 ¶77.  Luminati's patent claims and tortious interference claims do not involve the same facts or even a common nucleus of operative facts.  The Israeli employees at issue in the tortious interference claim were business salespeople.  Luminati admits this in its Amended Complaint. *Id*. at ¶ 60.  They were not involved in any research or development of GeoSurf.  The other tortious interference claim involves alleged interference with Luminati's current and prospective business relationships, essentially its customers.  *Id*. at ¶¶ 76-77.

9

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

There are no allegations in Luminati's Amended Complaint to support a theory that both sets of claims (the patent claims and tortious interference claims) arise out of the same nucleus of operative facts. The only overlapping fact is essentially the parties—Luminati and BIScience. This is not sufficient to establish pendent jurisdiction. Accordingly, the Court should decline to exercise pendent jurisdiction over the two asserted tortious interference claims.

## III.   ALTERNATIVELY, THIS CASE SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF NEW YORK

### A.     This Case Could Have Been Brought in the Southern District of New York

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." However, a motion to transfer venue should only be granted upon a showing that the transferee venue is "clearly more convenient" than the venue chosen by the plaintiff. *In re Nintendo Co.*, 589 F.3d 1194, 1197 (Fed. Cir. 2009); *In re Genentech, Inc.*, 566 F.3d 1388, 1342 (Fed. Cir. 2009).

The first step is to determine "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). This case could have been brought in the Southern District of New York. BIScience has one office in the U.S., which is located in shared office space at 335 Madison Ave, Floor 16, New York, New York, 10017.[3] Ex. 1 ¶ 5. BIScience conducts business out of its New York office, employs personnel in New York, references a New York

---

[3] In Kfir Moyal's previous declaration attached in support of Defendant's Motion to Dismiss (Dkt. No. 15), Mr. Moyal mistakenly transposed a number on the office address which resulted in 345 Madison Ave., rather than the correct address of 335 Madison Ave.. Plaintiff went to great lengths hiring an investigator to take pictures in New York to prove there was no 345 Madison Ave. and even went so far to claim that the undersigned was grossly negligent or asserted blatant falsehood to the Court. Dkt. No.21, p.11. Certainly, that is not true and this typo could have been quickly corrected with a simple phone call to the undersigned.

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

office on its website www.biscience.com, visits New York regularly, and attends trade shows and conferences in New York. Ex. 1 ¶¶ 6, 10, 16. In BIScience's contracts with customers, purchase agreements, non-disclosure agreements, and terms of use for GeoSurf, BIScience consistently and specifically invokes New York law and the venue of New York courts. BIScience's contacts with New York are so systematic and continuous that it is essentially at home there such that the Southern District of New York could exercise general jurisdiction over it. Venue is also proper because BIScience is a foreign corporation amenable to venue in the Southern District of New York. *In re BigCommerce, Inc.*, 890 F.3d 978, 981 (Fed. Cir. 2018); *In re HTC Corp.*, 889 F.3d 1349, 1361 (Fed. Cir. 2018).

**B.      The Private Factors Strongly Favor Transfer**

Once the threshold first step is met, courts then analyze both public and private factors relating to the convenience of parties and witnesses, as well as the interests of particular venues in hearing the case. *See Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963); *Nintendo*, 589 F.3d at 1198.

The private factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Volkswagen I*, 371 F.3d at 203.

**1.      Relevant Sources of Proof Are in the Southern District of New York and Israel**

As stated, BIScience has two office locations outside of Israel, one in Ukraine and the other being located at 335 Madison Ave, Floor 16, New York, New York, 10017, which is within the Southern District of New York. Ex. 1 ¶ 4. This New York office has access to relevant documentation, such as documents regarding sales and marketing activity. *Id.* ¶¶ 10. In contrast,

11

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

there are no sources of proof or even access to the same located in Texas.  *Id*. ¶¶ 17.  To the extent

documents are available electronically, they can be securely accessed remotely and maintained in

the New York office.  The critical inquiry "is relative ease of access, not absolute ease of access."

*In re Toa Techs., Inc.*, 543 F. App'x 1006, 1009 (Fed. Cir. 2013) (citing *In re Radmax, Ltd.*, 720

F.3d 285, 288 (5th Cir. 2013)).  Here, the relative ease of access to relevant sources of proof weighs

in favor of transfer.

### 2.      The Cost and Convenience for Witnesses Favors Transfer

"The convenience of the witnesses is probably the single most important factor in a transfer

analysis." *Uniloc USA, Inc. v. Apple Inc.*, 2:17-cv-00258, slip op. at 15 (E.D. Tex. Dec. 22, 2017)

(Ex. B) (quoting *Genentech, Inc.*, 566 F.3d at 1342). "[T]he convenience of non-party witnesses

[] is the more important factor and is accorded greater weight in a transfer of venue analysis."

*Gonzalez v. Autotrader.com*, 2:14-cv-650, 2015 WL 1387858 at *2 (E.D. Tex. Mar. 25, 2015).

"When the distance between an existing venue for trial of a matter and a proposed venue under §

1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct

relationship to the additional distance to be travelled."  *Uniloc*, slip op. at 15 (quoting *Genentech*,

566 F.3d at 1343).

Here, the travel for *every* witness to the Southern District of New York will be far more

convenient than to the Eastern District of Texas.  There are no nonstop flight options to Dallas

from Israel, where most if not all witnesses from both Luminati and BIScience are located.

Ex. 1 ¶ 14.  The air travel between Dallas and Israel would range from 15 to 33 hours depending

on the number of flight connections.  In contrast, there are several nonstop flight options between

Israel and New York area airports, with flight times of approximately 10-11 hours.  *Id*.  The

individuals referenced and identified in Plaintiff's Complaint *all* live and work in Israel, including

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Kfir Moyal, Assaf Toval, Alon Ghelber, Samuel Levy, and Vadim Feldman, along with Luminati's own employees and witnesses. *See id.* ¶ 15. Further, the two named inventors of the asserted patents—Derry Shribman and Ofer Vilenski—are both believed to be based in Israel.

Accordingly, the cost and convenience of traveling to New York versus Marshall, Texas for ***all*** witnesses and for ***both*** parties weighs in favor of transfer.

### 3.    Other Practical Considerations Are Neutral

The last private interest factor addresses practical considerations related to the ease, expense, and time to trial. These considerations include "judicial economy." *DSS Tech. Mgmt., Inc. v. Apple Inc.*, No. 6:13-cv-919, 2014 WL 6847569, at *4 (E.D. Tex. Nov. 17, 2014). This case is at its early stage in the proceedings, so a transfer would not cause any significant delay. It is anticipated that Luminati will raise the pending case—*Luminati Networks Ltd. v. UAB Tesonet*, Cause No. 2:18-cv-299-JRG, to support its position that the case should not be transferred. However, the *Tesonet* case does not heavily impact the transfer analysis. The parties in the *Tesonet* case have separate deadlines for discovery disclosures, claim construction briefing, a claim construction hearing, dispositive motions, and trial. Additionally, the issues in the *Tesonet* case are specific to the facts and the parties in that case, not to BIScience or GeoSurf. Thus, regardless of whether this case is kept in the Eastern District of Texas or transferred to the Southern District of New York, BIScience and Luminati will have to engage in discovery specific to them, claim construction briefing and argument specific to their case, dispositive motions unique to the facts in their case, and trial as to them alone. here are no practical difficulties that would weigh heavily in favor or against transfer, this factor is neutral.

13

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

## C.    The Public Factors Favor Transfer

In addition to the private factors, the public factors also weigh in favor of transfer.  The public factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law.  *Volkswagen I*, 371 F.3d at 203.  These factors are to be decided based on "the situation which existed when suit was instituted."  *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960).  Though the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314-15 (5th Cir. 2008).

### 1.    The Local Interest Factor Supports Transfer

The Southern District of New York has an interest in this dispute because BIScience operates its U.S. business out of an office in that district.  As alleged by Luminati, this suit calls into question the work and reputation of BIScience employees conducting business in the Southern District of New York.  *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2008) (transferee district's local interest is strong because the case "calls into question the work and reputation of several individuals residing in or near that district and who presumably conduct business in that community.").  In contrast, the Eastern District of Texas has no local interest in this dispute.  Neither party has any ties to the Eastern District of Texas.  Neither company has any offices or employees located in the Eastern District of Texas.  Therefore, this factor weighs in favor of transfer.

14

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

### 2.    The Other Public Interest Factors

Familiarity with the governing law is neutral.  Both districts are familiar with patent law and the asserted tort claims, suggesting that this factor is neutral.  The avoidance of unnecessary problems of conflict of laws or in the application of foreign law does not appear to apply here, therefore, this factor is also neutral.

The administrative difficulties flowing from court congestion lean slightly in favor of the Eastern District of Texas as opposed to the Southern District of New York.  According to recent statistics, the average time to trial in a civil case in the Eastern District of Texas is 19.1 months, as compared to 29.4 months in the Southern District of New York. Administrative Office of the United States Courts, Caseload Statistics Data Tables, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2018.pdf.  The average time to trial difference between the two districts is only approximately 10 months.  When compared to the complete lack of contacts to the Eastern District of Texas combined with the convenience of transfer to the Southern District of New York, this factor should only be given minimal weight, if any.

## IV.    THIS CASE SHOULD ALSO BE DISMISSED DUE TO DEFECTS IN THE COMPLAINT

The Court should also dismiss Luminati's trade secret, indirect infringement, and false advertising claims for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

### A.    The Defense of Trade Secrets Act Does Not Cover Conduct Abroad

Luminati's trade secret allegations must fail because the Defense of Trade Secrets Act ("DTSA") has explicit extraterritorial limits. 18 U.S.C. § 1837.  First, an "offender" must be either a U.S. citizen or "an organization organized under the laws of the United States or a State or political subdivision thereof."  18 U.S.C. § 1837(1).  Failing this, the statute requires "an act in

15

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

furtherance of the offense [be] committed in the United States." 18 U.S.C. § 1837(2).  Neither of these situations apply here and Luminati's claim should be dismissed.

Under the first prong, Luminati's Amended Complaint fails to state a claim because BIScience is an Israeli corporation not covered under the statute.  BIScience's U.S.-based office is not a separate legal entity and, notwithstanding this, did not engage in any of the purported activity in Luminati's complaint—i.e., the alleged hiring of three former Luminati employees in Israel and the activities of those former Luminati employees in Israel.  *See* Dkt. 28 at ¶¶ 62-68.  Under the second prong of the statute, Luminati fails to allege any conduct occurring in the U.S. relating to the alleged misappropriation.  The Amended Complaint merely alleges that Luminati employees based in Israel were terminated and then hired by BIScience in Israel.  Along with failing to even identify the subject of any purported trade secret in its Amended Complaint, Luminati fails to allege any conduct related to the misappropriation occurring outside of Israel.  *See Vendavo, Inc. v. Price f(x) AG,* 3:17-cv-06930, slip op. at 6-7 (N.D. Cal. Mar. 23, 2018) (Ex. C) ("Given the territorial and temporal limits of the DTSA, such facts are foundational to the existence of a viable claim").  While Luminati's Amended Complaint attempted to cure this deficiency by pleading that "Luminati has suffered damages in Texas," this is inapposite—the statute is plain in requiring "an act in furtherance of the offense" be committed in the United States, not merely alleged damages being projected in the United States. 18 U.S.C. § 1837(2).  For these reasons, Luminati's trade secret claims should be dismissed.

**B.     Luminati's Amended Complaint Fails to Assert a Plausible Claim for False Advertising**

In Plaintiff's Amended Complaint, it asserts for the first time a claim for false advertising under the Lanham Act.  Dkt. 28 ¶ 69-74.  This allegation is devoid of substance.

16

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

In order to establish a claim of false advertising under the Lanham Act, plaintiff is required to show the following: (1) that the defendant made a false statement of fact about its product in a commercial advertisement; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result. *Logan v. Burgers Ozark Cty. Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir. 2001) (citation and brackets omitted). Luminati's Amended Complaint does not come close to plausibly alleging a cause of action for false advertising. The insufficient allegations are as follows:

> 70. Upon information and belief, since the filing of the original complaint and in retaliation thereto, BI Science has engaged in false advertising against Luminati under 15 U.S.C. § 1125(a) by making false advertisements to the public at large, including Luminati's customers. Through these false advertisements, Luminati believes and thus avers that BI Science has materially represented at least the nature and characteristics of Luminati's own residential proxy service.

> 71. BI Science caused its false advertising to enter interstate commerce, including upon information and belief in the Eastern District of Texas. BI Science's false advertising has at been distributed through at least Internet advertisements including, but not limited to, advertisements placed with Google responsive to queries regarding Luminati and BI Science's publicly accessible website.

> 72. BI Science's actions have deceived, or are likely to deceive, a substantial segment of Luminati's customers who have purchased or would otherwise purchase Luminati's residential proxy service.

Dkt. No. 28, p.30. Luminati does not identify what the false statement was, what product the false statement was in reference to, what "advertisements" are being referred to placed with Google, or what "advertisements placed with Google responsive to queries regarding Luminati and BIScience's publicly accessible website" even means. In paragraph 73 of its Amended Complaint, Luminati alleges that its "commercial injuries are a direct result of BIScience's false statements

17

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

directed to Luminati's customers regarding at least Luminati's residential proxy service." Dkt. No. 28, p.30. However, Luminati does not identify these "false statements" nor allege how they are related to a claim for false advertising. In a previous paragraph, paragraph 20, Luminati alleges that BIScience published two blog posts on its website containing a "false" statement regarding installation of Luminati's proxy manager. Dkt. No. 28, p.8. Again, to the extent these allegations are part of the false advertising claim, it is unclear how a competitor's blog post on its website regarding difficulties in integrating some proxy services constitutes false advertising. Further, in the same paragraph 20, Luminati alleges that "BIScience has specifically targeted customers searching for Luminati in its advertising campaign for Geosurf, which directs prospective customers of residential proxy services to BIScience's website." *Id.* This allegation is not clear and does not even put BIScience on notice of the claim being made against it.

Luminati's vague allegations are not sufficient, plausible allegations to support a claim for false advertising. For these reasons, Luminati's claim for false advertising should be dismissed.

## V.    **CONCLUSION**

For the above reasons, the Court should dismiss this case for lack of personal jurisdiction or, in the alternative, transfer the case to the Southern District of New York. Luminati's trade secret claim should also be dismissed as an improper extraterritorial application of law. Luminati's false advertising claim does meet the plausibility standard for pleading and should be dismissed under Fed. R. Civ. P. 12(b)(6).

Dated:  March 4, 2019          By:      */s/ Eric H. Findlay*
                                        Eric H. Findlay (TX Bar No. 00789886)
                                        FINDLAY CRAFT, P.C.
                                        102 North College Avenue, Suite 900
                                        Tyler, Texas 75702
                                        Tel: (903) 534-1100

18

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Fax: (903) 534-1137
Email: efindlay@findlaycraft.com

*ATTORNEY FOR DEFENDANT
BI SCIENCE INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2019 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Eric H. Findlay*
Eric H. Findlay

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Unopposed Motion for Leave to File Under Seal (D.I. 35) entered in this case.

*/s/ Eric H. Findlay*
Eric H. Findlay

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| LUMINATI NETWORKS LTD. | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 2:18-cv-483-JRG** |
| | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **BISCIENCE INC.** | § | **FILED UNDER SEAL** |
| | § | |
| **Defendant.** | § | |

**DECLARATION OF KFIR MOYAL IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TRANSFER VENUE PURSUANT TO 28 USC § 1404(A)**

I, Kfir Moyal, hereby declare as follows:

1.    I am the Co-Founder and CEO of BI Science (2009) Ltd. ("BIScience") and have held this position for 5 years.  I live in Tel-Aviv, Israel and work in Tel-Aviv, Israel.  I have personal knowledge of the facts contained in this declaration and am competent to testify as to the truth thereof if called upon to do so.

2.    BIScience was founded in Tel Aviv, Israel and continues to operate from its global headquarters in Tel Aviv, Israel.  BIScience employs approximately 60 people, all but 35 of whom are located and work in Israel.

3.    All of the research and development, engineering, finance, accounting, and management activities at BIScience occur in Israel with some R&D taking place in Ukraine.

4.    BIScience has two office locations outside of Israel.  One is in the Ukraine, and the other is located at 335 Madison Ave., Floor 16, New York, New York 10017.  In my previous declaration attached in support of Defendant's Motion to Dismiss, or in the Alternative, Transfer

1

**Appx742**

RESTRICTED—ATTORNEYS' EYES ONLY
FILED UNDER SEAL

Venue Pursuant to 28 USC § 1404(A) (Dkt. No. 15), I mistakenly transposed a number on the address and listed an incorrect address for the New York office: 345 Madison Avenue rather than 335 Madison Avenue.

5.    This New York office has 2 employees (through consulting agreements), both of whom are focused on sales activities rather than research and development, engineering, finance, accounting, or management. BIScience has conducted business out of this New York office since the first quarter of 2018. The New York office is part of shared office space, and BIScience sublets its office space there. Photos of the office are attached as well. Ex. A-C.

6.    I personally travel to New York and conduct business out of the New York office. My most recent such visit to the New York office was in August 2018. To the extent it is relevant, BIScience is currently in the process of leasing a different office location in New York City. At this time, final arrangements have not been made and a lease has not been signed, but we expect to have plans solidified in the next 30 days. The new office will still be in New York City.

7.    BIScience does not have any office in Texas, and has never had any office in Texas.

8.    In addition, BIScience:

- Has no property of any kind, either owned or leased, in Texas;

- Has no employees in Texas;

- Has no servers supporting the GeoSurf residential proxy product at issue in this case in Texas;

- Leases servers in Texas, but none of the servers support the accused GeoSurf residential proxy product at issue in this case;

- Is not registered to do business in Texas;

- Has never held a bank account in Texas;

2

**Appx743**

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

- Has never directed any advertising specifically to Texas;

- Has no registered agent in Texas;

- Has never attended a trade show or convention in Texas;

- To the best of my knowledge, no BIScience employees have ever visited Texas for any business or even personal purpose.  I have never been to Texas.

9.    It is my understanding from the Plaintiff's Complaint in this case, that BIScience's residential proxy product GeoSurf is accused of infringement.  GeoSurf is a premium proxy platform for enterprise clients launched in 2010.  The GeoSurf product was conceived of, designed, and developed in Israel.  Customers of GeoSurf are located around the world.

10.    All of the individuals at BIScience that had a role in the development of GeoSurf are located in Israel.  The source code for GeoSurf and all technical documents pertaining to GeoSurf are located in Israel.  Some sales and marketing documents are located in BIScience's New York office.  BIScience personnel from the Israel office regularly travel to the New York office for business.

11.    After a thorough search of our records, it appears that as of February 28, 2019, BIScience has six GeoSurf residential active customers in Texas and 46 former GeoSurf customers in Texas.  The total revenue for these active customers in February 2019 is monthly recurring revenue of $4,128, and the total revenue among the active Texas customers as well as the 46 former Texas customers is $52,079.  BIScience had total worldwide revenue across all of its products of $8.3 million in 2018.

12.    The functionality of GeoSurf can involve several different components, such as servers, gateways, and residential proxy software.  Paragraph 5 of Plaintiff's complaint appears to refer to this residential proxy software through its reference to "residential proxies."

3

**Appx744**

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

13.    It is my understanding from reading Plaintiff's Amended Complaint that Plaintiff has asserted two non-patent claims, one claim for tortious interference with a Luminati employment agreement and a second claim for misappropriation of trade secrets. While BIScience denies these allegations, from a review of the complaint, it is clear that all the alleged facts, allegations, and occurrences set forth in these causes of action took place between people in Israel. None of the allegations or alleged facts took place in Texas or anywhere in the United States.

14.    As between New York and Texas, it would be significantly more convenient for BIScience to litigate this case in New York. I am aware of no non-stop flights between Dallas and Israel, and flight times range from 15 to 33 hours. There are several nonstop flight options between Israel and New York area airports, with a flight time of approximately 10-11 hours.

15.    In addition, upon information and belief, all the individuals referenced and identified in Plaintiff's Complaint live and work in Israel, including Ofer Vilenski, Derry Shribman, Kfir Moyal, Assaf Toval, Alon Ghelber, Samuel Levy, and Vadim Feldman, along with a number of Luminati employees and potential witnesses.

16.    BIScience employees typically travel to New York approximately 6-8 times per year. The total number of such visits were 7 in 2016, 8 in 2017, and 6 in 2018. These visits sometimes involved more than one person from BIScience visiting New York. As indicated above, no BIScience employee, including myself, has ever been to Texas for business purposes at BIScience.

17.    BIScience does not maintain or store any documents, relevant to this case or otherwise, in Texas. All relevant documents are located outside of Texas.

4

**Appx745**

**RESTRICTED—ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL**

I declare under penalty of perjury under the laws of the United States of America that the

foregoing facts are true and correct based on my own personal knowledge.

Date:    March 4, 2019

Kfir Moyal

5

**Appx746**

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  2:18-CV-00483-JRG** |
| | § | |
| **BISCIENCE INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant BIScience Inc.'s ("BIScience") Motion to Dismiss, and in the Alternative, Motion to Transfer Venue (the "First Motion to Dismiss"). (Dkt. No. 15.) Additionally, before the Court is BIScience's Second Motion to Dismiss, and in the Alternative, Motion to Transfer Venue (the "Second Motion to Dismiss") (Dkt. No. 36), as well as Plaintiff Luminati Networks Ltd.'s ("Luminati") Motion to Strike Portions of Defendant's Second Motion to Dismiss (the "Motion to Strike") (Dkt. No. 40). Finally, before the Court is Luminati's Motion for Early Venue Discovery. (Dkt. No. 22.)

Having considered these motions and for the reasons set forth herein, the Court finds that Luminati's Motion to Strike should be and hereby is **DENIED**. The Court further finds that BIScience's First Motion to Dismiss should be and hereby is **DENIED AS MOOT**. BIScience's Second Motion to Dismiss should be and hereby is **GRANTED-IN-PART** and **DENIED-IN-PART**. BIScience's Second Motion to Dismiss is **GRANTED** as to Luminati's claim for tortious interference with employment agreements, but is otherwise **DENIED**.  Also, Luminati's Motion for Early Venue Discovery is **DENIED AS MOOT**.

**Appx853**

## **Background**

Luminati filed its first Complaint (the "Original Complaint") against BIScience alleging direct and indirect infringement of U.S. Patent Nos. 9,241,044 (the "'044 Patent") and 9,742,866 (the "'866 Patent") (collectively, the "Asserted Patents"), as well as tortious interference with Luminati's employment agreements and misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"). (Dkt. No. 1.) BIScience then filed its First Motion to Dismiss directed at the Original Complaint arguing that this Court lacked personal jurisdiction over BIScience; that, if the Court did have jurisdiction, the case should nonetheless be transferred; and that the Original Complaint failed to state claims for violation of the DTSA or indirect infringement of the Asserted Patents. (Dkt. No. 15.) Luminati opposed the First Motion to Dismiss and moved for early venue discovery. (Dkt. No. 22.)

While briefing on the First Motion to Dismiss was ongoing, Luminati filed its First Amended Complaint.[1] (Dkt. No. 28.) The First Amended Complaint adds additional claims for false advertising under the Lanham Act and tortious interference with current and prospective business relationships. (*Id.* ¶¶ 69–78.) The First Amended Complaint also alleges new facts relevant to this Court's personal jurisdiction over BIScience. (*E.g. id.* ¶ 5.) These facts also bear on whether a transfer of venue is appropriate. BIScience took the position that the First Amended Complaint mooted the First Motion to Dismiss and filed its Second Motion to Dismiss. (Dkt. No. 36.) Luminati took the position that the First Motion to Dismiss was not moot in its entirety and

---

[1] The Court notes that the First Amended Complaint was filed 22 days after the First Motion to Dismiss (*compare* Dkt. No. 15 (filed Jan. 28, 2019), *with* Dkt. No. 28 (filed Feb. 19, 2019)), and thus outside of the window in which Luminati could amend as a matter of course. Fed. R. Civ. P. 15(a)(1)(B). The Court is not aware of any written consent given by BIScience for this amendment. *Id.* 15(a)(2). However, in the interest of justice, and to the extent not cured by the subsequent Docket Control Order (Dkt. No. 59), the Court *sua sponte* and *ex post* grants leave for this amendment. *Id.*

moved to strike the portions of the Second Motion to Dismiss that Luminati argued were

duplicative of the First Motion to Dismiss. (Dkt. No. 40.) The Second Motion to Dismiss asserts

the same bases for dismissal or transfer as the First Motion to Dismiss, except BIScience drops its

Rule 12(b)(6) defense as to Luminati's claim for indirect infringement and adds a Rule 12(b)(6)

defense as to Luminati's Lanham Act claim. (*Compare* Dkt. No. 15, *with* Dkt. No. 36.)

### **Luminati's Motion to Strike**

The Court finds that the First Amended Complaint mooted the First Motion to Dismiss

directed at the Original Complaint. BIScience properly directed its Second Motion to Dismiss at

the First Amended Complaint. Accordingly, BIScience's First Motion to Dismiss is **DENIED AS**

**MOOT** and Luminati's Motion to Strike is **DENIED**.

### I.     **Legal Standard**

"Generally, an amended pleading supersedes the original for all purposes." *Nolen v. Lufkin*

*Indus., Inc.*, 466 F. App'x 895, 898 (Fed. Cir. 2012); *see also King v. Dogan*, 31 F.3d 344, 346

(5th Cir. 1994) ("An amended complaint supersedes the original complaint and renders it of no

legal effect . . . ."). "A motion to dismiss that attacks the superseded complaint may be denied as

moot." *New World Int'l, Inc. v. Ford Global Techs., LLC*, No. 3:16-CV-1112-M, 2017 WL

1078525, at *5 (N.D. Tex. Mar. 22, 2017); *see also WorldVentures Holdings, LLC v. Mavie*, No.

4:18-CV-393, 2018 WL 6523306, at *16 (E.D. Tex. Dec. 12, 2018). However, where a motion to

dismiss attacks the original complaint for deficiencies that persist in the amended complaint, the

court has discretion to apply the original motion to dismiss to the amended complaint rather than

deny the motion as moot. *New World*, 2017 WL 1078525, at *5; *see also* 6 Charles A. Wright &

Arthur R. Miller, *Federal Practice and Procedure* § 1476 (3d ed. 2019) ("[D]efendants should not

be required to file a new motion to dismiss simply because an amended pleading was introduced

while their motion was pending. If some of the defects raised in the original motion remain in the

new pleading, the court simply may consider the motion as being addressed to the amended pleading.").

## II.    Discussion

The Court finds that the proper course is to deny the First Motion to Dismiss as mooted by the First Amended Complaint.

Luminati argues that its First Amended Complaint did not necessarily moot the First Motion to Dismiss and, as a result, the Second Motion to Dismiss is a duplicative motion that represents an abusive litigation tactic. (Dkt. No. 40, at 5–6.) While Luminati is correct that other courts have found motions to dismiss and motions to transfer not mooted by amended complaints, these courts recognized that it was an act of their "discretion" to consider such motions to the extent "such a motion remains applicable." *WowWee Grp. Ltd. v. Wallace*, CV-12-2298-MWF(VBKx), 2012 WL 13013022, at *2 (C.D. Cal. June 27, 2012). Indeed, it is within the Court's discretion to consider a motion directed to a superseded pleading where the motion remains applicable to the amended pleading—that is, where the amended pleading has not addressed the defects raised in the motion. However, it is equally within the discretion of the Court to deny such motion where it is not applicable. The Court finds that the latter situation is present here. This decision is largely facilitated by BIScience's filing of its Second Motion to Dismiss.

The purpose of interpreting a motion directed at a superseded complaint as one directed at the amended complaint is to save time and resources in situations where the motion is fairly applicable to amended complaint, not to unfairly tie the hands of the movant in situations where it is not. The plaintiff should not be allowed to amend its complaint in response to a motion and then require the movant to rest on its outdated briefing.

Luminati argues that Rule 12(b)(2) motions are distinguishable from Rule 12(b)(6) motions or other motions on the pleadings and thus cases finding such motions moot are inapposite. (Dkt.

No. 57, at 2–3.) Luminati provides no basis for this supposed distinction. *See, e.g.*, *New World*, 2017 WL 1078525, at *5 (denying as moot a motion to dismiss for lack of personal jurisdiction and improper venue directed towards a superseded complaint). Though discovery is available in determining a Rule 12(b)(2) motion, the Court also relies on the facts pled in the complaint, just as it does in a Rule 12(b)(6) motion. *See Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) ("[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true . . . ."). The First Amended Complaint, in addition to adding new causes of action, alleges new facts, including new facts alleged in support of this Court's jurisdiction. (*See* Dkt. No. 28 ¶ 5.) The plaintiff cannot shift the playing field during the course of briefing on a motion and reasonably expect that the defendant will not be given an opportunity to respond with a new and properly directed motion.

Luminati also argues that the Second Motion to Dismiss is barred by Rule 12(g). (Dkt. No. 40, at 7–8.) It is true that Rule 12(g) would prevent BIScience from raising an argument in its Second Motion to Dismiss that was available to it but not asserted in its First Motion to Dismiss. Fed. R. Civ. P. 12(g)(2). However, Luminati identifies no such arguments. On the contrary, Luminati affirmatively states that "BIScience's Second Motion to Dismiss is based on the same grounds as the First Motion to Dismiss." (Dkt. No. 40, at 9; *see also id.* at 1–2.)

Finally, Luminati's argument that the Second Motion to Dismiss effectively circumvents this Court's local rules regarding briefing schedules and page limits is unfounded. (*Id.* at 8–9.) BIScience timely responded to Luminati's First Amended Complaint with a new motion directed at the First Amended Complaint. Fed. R. Civ. P. 12(a)–(b), 15(a). BIScience briefed this motion within the prescribed page limits and without seeking to incorporate by reference arguments made in its First Motion to Dismiss.

Luminati's First Amended Complaint superseded the Original Complaint and added allegations to address defects asserted by the First Motion to Dismiss. Accordingly, the Court denies the First Motion to Dismiss as moot and considers instead the Second Motion to Dismiss. Luminati's Motion to Strike is denied.

### BIScience's Second Motion to Dismiss

Turning to the Second Motion to Dismiss, the Court finds that it has specific personal jurisdiction or supplemental personal jurisdiction over all of Luminati's claims. However, the Court declines to exercise supplemental jurisdiction over the claim for tortious interference with employment agreements. Accordingly, the tortious interference with employment agreements claim is **DISMISSED WITHOUT PREJUDICE**. The Court further finds that transfer of venue is not warranted and that Luminati has stated claims for violations of the DTSA and the Lanham Act. Therefore, the remainder of BIScience's Second Motion to Dismiss is **DENIED**.

### I.      Motion to Dismiss for Lack of Jurisdiction

The Court finds that it has specific personal jurisdiction over Luminati's claims for patent infringement and false advertising. Additionally, the Court has supplemental jurisdiction over the remainder of Luminati's claims. However, the Court declines to exercise supplemental jurisdiction over Luminati's claim for tortious interference with employment agreements, as determination of that claim is best left to the judicial authority of the State of Israel.

#### A.  Legal Standard

Federal Circuit law governs personal jurisdiction where "a patent question exists." *See Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1377 (Fed. Cir. 2015). "[W]hether a defendant is subject to specific personal jurisdiction in the forum state involves two inquiries: first, whether the forum state's long-arm statute permits service of process and, second, whether the assertion of jurisdiction is consistent with due process." *Id.* "Because the Texas long-arm statute extends to

the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008); *accord Grober v. Mako Prod., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012) ("California and federal due process limitations are coextensive, and thus the inquiry collapses into whether jurisdiction comports with due process.") (internal quotation marks omitted).

For due process to be satisfied, the defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted). "A court must inquire whether the defendant has 'purposefully directed his activities' at the forum state and, if so, whether 'the litigation results from alleged injuries that arise out of or relate to those activities.'" *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361–62 (Fed. Cir. 2006) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Upon a showing of purposeful minimum contacts, the defendant bears the burden to prove unreasonableness. *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1350 (Fed. Cir. 2003). In rare circumstances, a defendant may defeat the exercise of personal jurisdiction by "present[ing] a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Where a court has personal jurisdiction over the patent claims asserted, the court also has supplemental personal jurisdiction over "non-patent claims to the extent they form part of the 'same case or controversy' as the patent claims." *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1339 (Fed. Cir. 2008). 28 U.S.C. § 1367 "confers supplemental jurisdiction with respect to both subject matter and personal jurisdiction where the 'same case or controversy' requirement is satisfied." *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1206 (Fed. Cir. 2003).

**B. Discussion**

The Court finds that it has personal jurisdiction over BIScience as to Luminati's claims of patent infringement. BIScience has sold its allegedly infringing GeoSurf service to at least 52 customers in Texas. (Dkt. No. 36-1 ¶ 11.) Additionally, BIScience's service allows customers all over the world to utilize residential proxy devices in ten Texas cities—Arlington, Austin, Crowley, Dallas, El Paso, Fort Worth, Houston, Katy, San Antonio, and Spring—and BIScience advertises as such. (Dkt. No. 28-5, at 2–3.) Those proxy service activities are "purposefully directed" at Texas, and Luminati's claims for patent infringement allege "injuries that arise out of or relate to those activities." *Burger King Corp.*, 471 U.S. at 472. Accordingly, specific personal jurisdiction is proper over these claims.

*Blue Spike, LLC v. Texas Instruments, Inc.*, upon which BIScience relies (Dkt. No. 53, at 3–4), is distinguishable. No. 6:12-cv-499, 2014 WL 11829323 (E.D. Tex. Mar. 31, 2014). In *Blue Spike*, the plaintiff attempted to establish jurisdiction by arguing that "[defendant's] partners—and therefore [defendant] itself operates pervasively throughout Texas." *Id.* at *3. The plaintiff also argued that the defendant's website included a "partner locator" that directed customers to partners in Texas. *Id.* at *2. The court found these arguments unpersuasive, noting that "[t]he Court's focus is on [defendant's] actions, not third-party customers." The court held that the plaintiff had not established that the defendant's partner's contacts with Texas related to the claims in that case. *Id.* at *3.

By contrast, in the instant case, BIScience itself, not a third-party, has purposefully directed activities toward Texas. These contacts relate directly to the claims at issue. BIScience is accused, *inter alia*, of directly and indirectly infringing method claims in the Asserted Patents. (Dkt. No. 28 ¶¶ 39–40, 53–54.)  BIScience allegedly does this by allowing its customers to request content via selected residential proxy devices, including many located in Texas. (*See id.* ¶ 49.) BIScience is

8

**Appx860**

also accused of implementing these residential proxies. (*Id.* ¶ 24, 39, 53.) The ability to direct internet traffic through proxies situated in various locations, including Texas, is a key advertised feature of BIScience's service:

> A proxy will also give you access to a set of proxy servers located worldwide, which will help you solve the location obstacle easily: Just select your preferred location, whether it's the United States or Madagascar, and surf in total anonymity and freedom.

(Dkt. No. 28-4, at 5; *see also* Dkt. No. 28-3, at 2 ("Location is key. One of the reasons to use a proxy, is to appear as if you were surfing from a different place.").) Far from being unrelated, BIScience's encouragement of customers to use proxies, including those located in Texas, is foundational to Luminati's claims of patent infringement. Specific personal jurisdiction over these claims is therefore appropriate.

BIScience allegedly relied upon false advertising to sell these same proxy services. (Dkt. No. 28 ¶ 20.) Therefore, the Court has personal jurisdiction over BIScience with regard to Luminati's Lanham Act claim as well.

The Court likewise finds that it may exercise supplemental personal jurisdiction over Luminati's claims for tortious interference with employment agreements, misappropriation of trade secrets, and tortious interference with current and prospective business relationships. The factual underpinnings of whether BIScience misappropriated trade secrets by interfering with Luminati employment and confidentiality agreements bear directly on Luminati's claim for patent infringement—particularly whether such infringement was willful. *Droplets, Inc. v. Adobe Sys., Inc.*, No. 2:06-CV-307, 2008 WL 11446843, at *4 (E.D. Tex. Aug. 29, 2008); *see also Performance Pulsation Control, Inc. v. Sigma Drilling Techs.*, LLC, No. 4:17-CV-00450, 2017 WL 5569897, at *4 (E.D. Tex. Nov. 20, 2017) (finding that claims for copyright infringement and trade secret misappropriation arose from the same operative facts). Moreover, Luminati's claims

for patent infringement may be a necessary predicate to a claim for tortious interference with business relations under Texas law, which requires that "the defendant's conduct [be] independently tortious or unlawful." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). These claims "arise out of 'a common nucleus of operative fact'" and thus form the "same case or controversy" for purposes of § 1367. *Silent Drive*, 326 F.3d at 1206 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

    Although the Court has supplemental jurisdiction over these claims, its exercise of this jurisdiction is discretionary. 28 U.S.C. § 1367(c). The Court declines to exercise jurisdiction over Plaintiff's claim for tortious interference with employment agreements. As to this claim, Luminati alleges that BIScience hired former employees of Luminati for the purpose of obtaining Luminati's trade secrets, in violation of those former employees' employment agreements, which contained both non-compete and confidentiality provisions. (Dkt. No. 28 ¶¶ 15–17, 59–60.) While Luminati does not allege where these events took place, BIScience CEO Kfir Moyal declared, and Luminati did not dispute, that they occurred exclusively in Israel. (Dkt. No. 36-1 ¶ 13; *see, e.g.,* Dkt. No. 44, at 5–7.) Accordingly, the Court is persuaded that Israeli law would apply to Luminati's claim for tortious interference with employment agreements, and that any evidence of such is likely centered in the State of Israel.

    A federal court exercising supplemental jurisdiction must apply the choice-of-law rules of the state in which it sits. *Janvey v. Brown*, 767 F.3d 430, 435 (5th Cir. 2014). Texas has adopted the Restatement (Second) of Conflict of Laws' "most significant relationship" test to decide choice of law issues. *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000). Section 145 of the Restatement sets out the following factors for determining which forum's laws should apply to tort claims:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the . . . place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971). Most if not all of these factors counsel in favor of this dispute—between two Israeli companies, regarding contracts executed in Israel, and involving employees based in Israel—being decided under Israeli law. (*See, e.g.*, Dkt. No. 36-1 ¶ 13.)

Having determined that Israeli law would likely apply to this action, the underlying conduct of which occurred entirely in Israel, the Court finds that resolution of this dispute is properly left to the court system in Israel. "[C]omity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictate in this case that the district court decline the exercise [of] supplemental jurisdiction under § 1367(c)." *Voda v. Cordis Corp.*, 476 F.3d 887, 903 (Fed. Cir. 2007). The Court therefore declines to exercise supplemental jurisdiction over Luminati's claim for tortious interference with employment agreements.

## II.     Motion to Transfer Venue

Turning to BIScience's alternative motion to transfer venue pursuant to § 1404(a), the Court concludes BIScience has failed to demonstrate that the Southern District of New York is clearly more convenient than Luminati's chosen venue in the Eastern District of Texas.

### A.  Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). However, a motion to transfer venue should only be granted upon a showing by the movant "that the transferee venue 'is clearly more convenient' than the venue chosen by the plaintiff." *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009) (quoting *In re Volkswagen*

*of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008)). In making this determination the court considers

certain public and private interest factors. *Id.*

The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the

availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance

for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious

and inexpensive." *Id.*; *Volkswagen*, 545 F.3d at 315. The public interest factors are: "(1) the

administrative difficulties flowing from court congestion; (2) the local interest in having localized

interests decided at home; (3) the familiarity of the forum with the law that will govern the case;

and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign

law." *Genentech*, 566 F.3d at 1342; *Volkswagen*, 545 F.3d at 315. Motions to transfer venue are

to be decided based on the situation that existed when the suit was filed. *In re EMC Corp.*, 501 F.

App'x 973, 976 (Fed. Cir. 2013) (quoting *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)).

**B. Discussion**

BIScience, as a foreign corporation, is subject to suit in any judicial district for venue

purposes. 28 U.S.C. § 1391(c)(3); *In re HTC Corp.*, 889 F.3d 1349, 1361 (Fed. Cir. 2018).

Accordingly, while venue is proper before this Court, this action also could have been brought in

the Southern District of New York. However, BIScience has failed to show that the Southern

District of New York is a clearly more convenient forum.

As a preliminary matter, the Court addresses Luminati's allegations that the multiple

declarations of Mr. Moyal, are deceptive and improper attempts to bolster BIScience's venue

arguments.[2] (*E.g.*, Dkt. No. 73, at 1.) The Court disagrees with Luminati on both points. The Court

_____

[2] Mr. Moyal submitted three declarations in support of BIScience's motions to dismiss. The first
was submitted in support of the First Motion to Dismiss. (Dkt. No. 15-2.) The second was
submitted in support of the Second Motion to Dismiss, and repeated much of the same information
as the first declaration. (Dkt. No. 36-1.) The third declaration, filed along with BIScience's reply

accepts Mr. Moyal's explanation that BIScience's New York office address as stated in his first declaration contained a typographical error. (Dkt. No. 36-1 ¶ 4.) Nor does the Court fault BIScience for properly responding to Luminati's First Amended Complaint, which bolstered Luminati's venue arguments, by filing a Second Motion to Dismiss addressed to the new complaint that bolstered BIScience's own arguments in favor of venue in New York.[3]

However, the Court disagrees with BIScience that its presence in Manhattan is significant enough to tip the venue scales in its favor. BIScience has provided little information about the office it maintained at the time this action was filed, but what little information is available—including the membership agreement BIScience submitted as to its subsequently acquired space—indicates that this "office" was simply a single desk in a shared office space. (Dkt. No. 36-1 ¶ 4–6; 53-2.)  The Court now turns to a specific analysis of the private and public interest factors.

### 1.  Private Interest Factors

Access to Sources of Proof.  BIScience argues that New York is a more convenient forum because its "New York office has *access* to relevant documentation." (Dkt. No. 36, at 11 (emphasis added).)  Specifically, BIScience argues that relevant documents "can be securely accessed remotely and maintained in the New York office." (*Id.*) BIScience does not explain why this would be relatively easier than accessing documents remotely from anywhere else in the world, such as its home office in Israel or its counsel's offices in Tyler, Texas. Indeed, both of these locations

---

in support of the Second Motion to Dismiss, alerted the Court that BIScience had moved offices in New York (Dkt. No. 53-1), a possibility Mr. Moyal had already raised in his second declaration (Dkt. No. 36-1 ¶ 6).

[3] BIScience's Second Motion to Dismiss elaborated upon the arguments already made in its First Motion to Dismiss. As discussed above, the Court finds that BIScience did not improperly advance new arguments in violation of Rule 12(g).

**Appx865**

would be a more convenient place to "securely access" documents than a desk in a shared office in Manhattan. The Court finds this factor is neutral.

Availability of Compulsory Process. Most of the relevant witnesses appear to be within the control of the parties, and those that are not reside in Israel. Neither party has identified potentially relevant witnesses that would be susceptible to compulsory process in one venue but not the other. This factor is neutral.

Cost of Attendance of Willing Witnesses. All of the relevant witnesses identified by the parties reside in Israel. While the Court recognizes the inconvenience of overseas travel, these "witnesses will be inconvenienced with international travel regardless whether this case is transferred." *Accuhale LLC v. AstraZeneca LP*, No. 6:11-cv-707-LED, 2013 WL 12322594, at *4 (E.D. Tex. Mar. 27, 2013). Thus, "these witnesses are discounted for the purpose of transfer analysis." *Id.*; *accord Bionx Implants, Inc. v. Biomet, Inc.*, No. 99 Civ. 740(WHP), 1999 WL 342306, at *3 (S.D.N.Y. May 27, 1999) (stating that witnesses traveling from Finland were no more inconvenienced by having to travel to Indiana than they would be traveling to New York); *Cento Grp., S.p.A. v. OroAmerica, Inc.*, 822 F. Supp. 1058, 1061–62 (S.D.N.Y. 1993) (European plaintiff was no more inconvenienced by litigating in California than in New York); *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 484 (D.N.J. 1993) (plaintiff's witnesses from Japan were no more inconvenienced by testifying in Minnesota than in New York). This factor is also neutral.

Other Practical Problems. "Where multiple and parallel lawsuits in two different jurisdictions are contemplated, judicial economy weighs heavily in the Court's transfer analysis." *ComCam Int'l, Inc. v. Mobotix Corp.*, No. 2:13-cv-798-JRG, 2014 WL 4229711, at *4. A related case currently pending before this Court, *Luminati Networks Ltd. v. UAB Tesonet*, No. 2:18-cv-299-JRG, also alleges infringement of the Asserted Patents. These cases "will present common

issues of law and fact, and judicial economy favors the avoidance of parallel litigation in multiple courts." *ComCam*, 2014 WL 4229711, at *4. This factor weighs against transfer.

### 2.  Public Interest Factors

Administrative Difficulties Flowing from Court Congestion. The parties agree that that the average time to trial in the Southern District of New York is 29.4 months,10 months longer than the average time to trial in the Eastern District of Texas, which is 19.1 months. (Dkt. No. 36, at 15; Dkt. No. 44, at 23.) The congestion faced by the Southern District of New York, resulting in trial times more than 50% longer than in the Eastern District of Texas, weighs against transfer.

Local Interest. BISciences argues that this suit "calls into question the work and reputation of BIScience employees conducting business in the Southern District of New York," but BIScience has not identified these employees. (Dkt. No. 36, at 14.) There is no indication, either from the First Amended Complaint or BIScience's Second Motion to Dismiss, that the conduct of any consultant or employee in New York has been implicated by this case. Moreover, evidence that an Israeli company rents what appears to be a single desk in a shared office space in Manhattan does not create a local interest in this case being resolved in New York. Accordingly, the Court finds that this factor is neutral.

Remaining Factors. The Southern District of New York and Eastern District of Texas are both familiar with the federal law that will govern most of the claims in this case. The parties have not alerted the Court to any applications of state or foreign law that would bear upon either courts' relative familiarity with the governing law or any conflict of law issues. The Court finds that these factors are also neutral.

In summary, the Court finds that two of the relevant factors weigh against transfer, six are neutral, and none weigh in favor of transfer. The Court concludes that BIScience has failed to demonstrate that the Southern District of New York is a clearly more convenient forum.

Accordingly, the motion to transfer is denied. Consequently, Luminati's motion for venue discovery is denied as moot.

### III.   Motion to Dismiss for Failure to State a Claim

Having determined that the Court has personal jurisdiction over BIScience and that venue is proper in this district, the Court turns to BIScience's motion to dismiss for failure to state a claim. The Court finds that Luminati has stated a claim for trade secret misappropriation under the DTSA and a claim for false advertising under the Lanham Act.

#### A.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is "plausible on its face" where the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).  However, the Court need not accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.  To be legally sufficient, the complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.  *Id*.  The complaint must contain enough factual allegations to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.  *Lormand*, 565 F.3d at 255–57.  "In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). If it is apparent from the face of the complaint that an

insurmountable bar to relief exists, the court must dismiss the claim.  *Jones v. Bock*, 549 U.S. 199,

215 (2007).

### B.  Discussion

#### 1.  Trade Secret Misappropriation

BIScience argues that Luminati has failed to state a claim for misappropriation that is

actionable under the DTSA because "Luminati fails to allege any conduct occurring in the U.S.

relating to the alleged misappropriation," as required under the statute. (Dkt. No. 36, at 16.)

Luminati responds that "the sale of [BIScience's] competing 'Geosurf' residential proxy service

using [Luminati's] trade secrets causing harm to Luminati in the United States was clearly in

furtherance of its misappropriation of Luminati's trade secrets," and thus such a claim is actionable

under the DTSA. (Dkt. No. 44, at 6.)

The DTSA "applies to conduct occurring outside the United States if . . . an act in

furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(2).[4] The statute

does not define what constitutes "an act in furtherance of the offense." The parties have not

identified any case law interpreting this language in the context of the DTSA, nor has the Court

found any such case law. However, this language is not foreign to the common law but is regularly

used in the area of federal conspiracy law. *See, e.g.*, *Yates v. United States*, 354 U.S. 298, 334

(1957) ("[T]he overt act must be found . . . to have been in furtherance of a conspiracy . . . .");

*Findlay v. McAllister*, 113 U.S. 104, 114 (1885) ("[T]o sustain the action it must be shown not

only that there was a conspiracy, but that there were tortious acts in furtherance of it . . . .").

---

[4] The DTSA also applies to extraterritorial conduct if the offender is a U.S. Citizen, permanent
resident, or an entity incorporated in the United States. 18 U.S.C. § 1837(1). It is undisputed that
BIScience is an Israeli corporation, and therefore not subject to the DTSA via this provision. (*See*
Dkt. No. 28 ¶ 2.)

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts . . . the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952). As a result, the Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA. 18 U.S.C. § 1837(2).

In *Yates*, the Supreme Court explained what it means for an overt act to be "in furtherance of" a conspiracy:

> It is not necessary that an overt act be the substantive crime charged in the indictment as the object of the conspiracy. Nor, indeed, need such an act, taken by itself, even be criminal in character. The function of the overt act in a conspiracy prosecution is simply to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence.

354 U.S. at 334. Applied to the DTSA, *Yates* makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must "manifest that the [offense] is at work" and is not simply "a project in the minds of the offenders or a "fully completed operation." *Id.* Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act "in furtherance of" the offense.

A civil claim for misappropriation of trade secrets under the DTSA requires: "(1) a trade secret; (2) misappropriation; and (3) use in interstate commerce." *N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, No. 4:17-CV-00062, 2017 WL 2120015, at *6 (E.D. Tex. May 16, 2017); *see also* 18 U.S.C. § 1836(b)(1). As relevant here, misappropriation is satisfied if disclosure or use of the secret is made without express or implied consent by a person who (1) used improper means to obtain the secret, or (2) at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was improperly obtained or acquired under circumstances giving rise to a duty to maintain its secrecy. 18 U.S.C. § 1839(5)(B).

Both sides have submitted evidence in support of their respective positions that acts "in furtherance of" misappropriation did or did not happen in the United States. BIScience's Second Motion to Dismiss includes a declaration from Mr. Moyal that all of the alleged occurrences supporting Luminati's misappropriation claim "took place between people in Israel. None of the allegations or alleged facts took place in Texas or anywhere in the United States." (Dkt. No. 36-1 ¶ 13.) Luminati responds with exhibits demonstrating that the former Luminati employees who possessed the alleged trade secrets attended conferences in Las Vegas. (Dkt. No. 44-4; Dkt. No. 44-5.) The Court disregards this evidence for purposes of resolving a motion to dismiss under Rule 12(b)(6) and considers only the allegations in the complaint, the documents attached or incorporated therein, and facts subject to judicial notice. *Willard*, 336 F.3d at 379.

The First Amended Complaint alleges that "Luminati's former employees employed Luminati's confidential trade secrets on behalf of [BIScience] in furtherance of the competing 'Geosurf' residential proxy service." (Dkt. No. 28 ¶ 16.) Luminati further alleges that "Luminati lost Texas and United States customers for its residential proxy service and associated revenues to [BIScience's] competing Geosurf service." However, "causing harm to Luminati in the United States" via lost customers is not enough to state a claim actionable under the DTSA. (Dkt. No. 44, at 6.)

Though damages caused as a result of misappropriation are relevant to a plaintiff's remedy, they do not constitute part of the offense itself. *Id.* § 1836(b)(3)(B); *see also id.* §§ 1836(b)(1), 1839(5). Accordingly, damages that occurred in the United States, standing alone, would not be acts "in furtherance of" misappropriation but rather would be the consequence of a "fully completed operation." *Yates*, 354 U.S. at 334.

However, Luminati also alleges that, by "using . . . [Luminati's] trade secrets, [BIScience] has committed acts in the State of Texas and the United States." (*Id.* ¶ 5.) The Court finds that this allegation is sufficient to draw a reasonable inference that BIScience used Luminati's trade secrets in the United States to sell its GeoSurf service, or at least committed acts in furtherance of such sales in the United States. Accordingly, Luminati has plausibly stated a claim actionable under the DTSA.

### 2. False Advertising

BIScience also argues that Luminati has failed to state a claim for false advertising under the Lanham Act because Luminati has not identified any false statements made by BIScience in commercial advertising. (Dkt. No. 36, at 17–18.) Section 43(a)(1)(B) of the Lanham Act provides in relevant part:

> Any person who . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

The Fifth Circuit has held that the elements for a false advertising claim under the Lanham Act are:

(1) a false or misleading statement of fact about a product;

(2) such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers;

(3) the deception is material, in that it is likely to influence the consumer's purchasing decision;

(4) the product is in interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the statement at issue.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

BIScience argues that Luminati's allegations fail to clearly identify any false statements made by BIScience. (Dkt. No. 36, at 17–18.) To the contrary, Luminati attached two blog posts published on BIScience's website that each state, "Some proxy providers look great and fancy until you try to integrate them. Some—such as Luminati—are very difficult to integrate, as they require you to install complex proxy managers and to ultimately modify your entire solution." (Dkt. No. 28-3, at 3; Dkt. No. 28-4, at 7.) Luminati has alleged that these statements are false because "Luminati's residential proxy service does not require installation of Luminati's proxy manager." (Dkt. No. 28 ¶ 20.) Thus, Luminati has sufficiently alleged a false statement of fact about its products.

Additionally, BIScience disputes whether a "blog post on its website . . . constitutes false advertising." (Dkt. No. 36, at 18.) The Fifth Circuit has held that in order for representations to constitute "commercial advertising or promotion" under § 43(a)(1)(B) of the Lanham Act, they must be:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996). BIScience's blog posts meet these criteria.

The blog posts are commercial speech by a company that is in commercial competition with Luminati. They are also made for the purpose of influencing customers to use BIScience's GeoSurf service. Shortly after the allegedly false statements at issue, the blog posts continue: "In short, stay away from these proxies. Instead, go for easy-integration proxies that support whatever

21

**Appx873**

your needs may be. **GeoSurf**, for instance, takes less than 5 minutes to integrate . . . ." (Dkt. No. 28-3, at 3 (emphasis in original); *see also* Dkt. No. 28-4, at 7.)

Finally, while company blog posts may not be traditional ads, they are a quintessential type of informal promotion. Luminati has alleged that BIScience has purchased advertisements on platforms such as Google that direct potential customers to BIScience's website—where these blog posts appear—when they search for terms like "luminati." (Dkt. No. 28 ¶ 20.) Thus, Luminati has alleged that these blog posts are disseminated sufficiently to the relevant purchasing public.

In sum, the Court finds that these allegedly false statements constitute advertising for purposes of the Lanham Act. Accordingly, Luminati has stated a claim for false advertising.

## <u>Conclusion</u>

For the reasons set forth herein, Luminati's Motion to Strike (Dkt. No. 40) is **DENIED**, and BIScience's First Motion to Dismiss (Dkt. No. 15) is **DENIED-AS-MOOT**. BIScience's Second Motion to Dismiss (Dkt. No. 36) is **DENIED-IN-PART** and **GRANTED-IN-PART**, as follows: BIScience's Second Motion to Dismiss is **GRANTED** in so far as it seeks dismissal of Luminati's claim for tortious interference with employment agreements; however, the remainder of BIScience's Second Motion to Dismiss, including the motion to transfer venue, is **DENIED**. Resultingly, Luminati's Motion for Early Venue Discovery (Dkt. No. 22) is **DENIED-AS-MOOT**.

**So ORDERED and SIGNED this 13th day of May, 2019.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS LTD.** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 2:18-cv-483-JRG** |
| | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **BISCIENCE INC.** | § | |
| | § | |
| **Defendant,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **HOLA NETWORKS LTD.,** | § | |
| | § | |
| **Additional Defendant on** | § | |
| **Counterclaim.** | § | |

**DEFENDANT BISCIENCE'S ANSWER, AFFIRMATIVE DEFENSES AND**
**COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant BIScience (2009) Ltd. (also known as BIScience Inc.) (hereinafter referred to

as "BIScience") files its Answer, Affirmative Defenses, and Counterclaims to Plaintiff Luminati

Networks Ltd.'s ("Luminati" or "Plaintiff") Amended Complaint for Patent Infringement as

follows:

**I.**

**ANSWER**

**THE PARTIES**

1.     On information and belief, BIScience admits the allegations in paragraph 1 of the

Amended Complaint.

2.     BIScience admits the allegations in paragraph 2 of the Amended Complaint.

1

**Appx876**

## JURISDICTION AND VENUE

3.        BIScience admits that Plaintiff's action purports to arise under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*.

4.        BIScience admits that this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.        BIScience denies that this Court has personal jurisdiction over BIScience for the reasons articulated in its Motion to Dismiss (Dkt. No. 36) and denies the remainder of the allegations in paragraph 5.

6.        BIScience denies that venue is proper in this Court.

## FACTUAL ALLEGATIONS

7.        BIScience admits that Shribman and Valenski are named as purported inventors in the Asserted Patents.

8.        BIScience denies Plaintiff's characterization of the Asserted Patents as set forth in paragraph 8 of the Amended Complaint, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein, and therefore denies them.

9.        BIScience is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Amended Complaint, and therefore denies them.

10.        On information and belief, Luminati and/or Hola have been providing managed, intermediated proxy services for many years.  However, BIScience is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10 of the Amended Complaint, and therefore denies them.

11.        BIScience is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Amended Complaint, and therefore denies them,

2

**Appx877**

other than to allege on information and belief that the activities of Luminati and/or Hola described in par. 11 predated 2014.

12.    BIScience denies that anyone acting on its behalf ever had access to any confidential information or knowhow of Hola or Plaintiff. The allegations of paragraph 12 are further false in that the application for the '044 and '866 patents (as well as earlier applications with the same disclosures) was already published and thus fully public knowledge prior to the dates of the alleged misappropriation. BIScience is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 12 of the Amended Complaint, and therefore denies them.

13.    Denied. Neither Kfir Moyal nor BIScience conducted due diligence on Hola, which, on information and belief, was already completed (and iAngels had already made its investment decision) by the time Mr. Moyal was introduced to Mr. Vilenski in 2015.  The introduction was so that Hola and BIScience could explore a potential business relationship.  Mr. Vilenski only provided high-level information to Mr. Moyal.  There was no non-disclosure agreement or request for one, nor was there any understanding that confidential information was being provided.  At no time during this process did Mr. Moyal have access to any of Luminati's or Hola's confidential information.

14.    Admit that Kfir Moyal and Assaf Toval founded BIScience in 2009.  Since that time—and long before Luminati or Hola—BIScience was in the business and had developed and provided web proxy services through a server-based proxy solution.  This included GeoSurf Direct Connect, which, well before the applications for the '044 and '866 Patents, allowed customers to use an API to select the proxy/geolocation they wanted to exit from, and to use that proxy to fetch content over the Internet.  This was offered to the public through the "Geosurf Toolbar."  Luminati

## FIFTH COUNTERCLAIM

### False Advertising

127.    BIScience repeats and realleges paragraphs 79-126 as if fully set forth herein.

128.    This counterclaim is proper and arises under the Lanham Act, 15 U.S.C. § 1125(a).

129.    Based on Plaintiff's assertions against BIScience in its Complaint concerning the '044 patent and the '866 patent, a justiciable, actual, substantial and continuing case and controversy with immediacy exists between BIScience and Plaintiff, warranting an affirmative judgment and an award of damages by this Court.

130.    BIScience asserts that Plaintiff has engaged in false advertising against BIScience, under 15 U.S.C. § 1125(a) by making false advertisements to BIScience's customers and the public.  As one, non-limiting, example upon information and belief on or about March 12, 2018, Luminati communicated with members of the media in Israel and caused an article to appear in the Israeli publication "TheMarker," which contained numerous falsehoods and damaging statements about BIScience and its representatives.  *See* Exhibit A.

131.    Based on the above facts and conduct, BIScience is informed and believes, and thus avers, that Plaintiff has made and continues to make allegations of patent infringement in bad faith because Plaintiff knows, or should know, after a reasonable inquiry and due diligence that these allegations are unfounded, not supported, and wholly improper.

132.    Plaintiff's false advertising and material misrepresentations have deceived, or are likely to deceive, a substantial segment of BIScience's customers who have purchased or would otherwise purchase the Geosurf products, and diverted sales to Luminati.

133.    Plaintiff's actions have caused BIScience injury to a commercial interest in both its business reputation and its sales.

134.    BIScience is entitled to a judgment that Plaintiff has engaged in false advertising against BIScience, which is the direct cause of BIScience's injuries to its commercial interests in its reputation and sales under 15 U.S.C. § 1125(a), and damages pursuant to 15 U.S.C. § 1117.

135.    This case is exceptional, because, *inter alia*, Plaintiff's advertisement of its false claims of infringement of the '044 patent and the '866 patent are meritless and made in bad faith, and BIScience is entitled to an award of attorneys' fees under 15 U.S.C. § 1117(a).

### SIXTH COUNTERCLAIM

### Monopolization/Attempt to Monopolize

136.    BIScience repeats and realleges paragraphs 79-135 as if fully set forth herein.

137.    At the times relevant hereto a market has existed in the U.S. and internationally for the service of providing residential proxies (the service of commercially providing a communications facility that operates through a plurality of intermediary devices having IP addresses dynamically assigned to those devices by Internet Service Providers (ISPs) ("Relevant Market").

138.    Luminati, as well as BIScience, UAB Tesonet LT (a Lithuanian company) ("Teso"), IP Ninja Ltd. (another Israeli company) ("IP Ninja"), and others, compete in the Relevant Market.

139.    The commercial activities of said competitors in the Relevant Market are carried out as part of trade or commerce among the several States, or with foreign nations.

140.    On information and belief, Luminati currently possesses a dominant position in the Relevant Market.  Luminati describes itself on its web site as "World's Largest Proxy Service."

141.    Luminati has achieved its dominant position not through superior products, innovation, or business acumen, but as a result of having monopolized, or attempted to monopolize

18

the Relevant Market in interstate and/or foreign commerce in violation of 15 U.S.C. § 2.  It has

done so, in combination with Hola, by engaging in predatory and anticompetitive conduct with

specific intent to monopolize.  It has thereby achieved monopoly power in the Relevant Market or

at a minimum reached a dangerous probability of achieving such monopoly power. Its predatory

and anticompetitive acts so aimed includes without limitation the conduct alleged below.

142.    Luminati has built its market share by engaging in a pattern of deceptive and

unlawful activities, including using its Hola affiliate to offer "free" VPN (Virtual Private Network)

services to consumers, and, without proper disclosure, fraudulently using the consumers' devices

as exit nodes for Luminati's "residential proxies," for which the consumers pay for the bandwidth

but Luminati charges hundreds of dollars per month, per user. Luminati resells these services

indiscriminately to persons widely known to be using the service to conduct massive frauds and

cybercrime, including click fraud, illegal computer intrusion, illegal acquisition of personal

information, distributed denial of service attacks, botnets, and other unlawful activities. Luminati

uses the proceeds of this illicit business to fund its rapid growth. Its activities are notorious, and

its services have been banned by Google and documented by reputable market observers, including

Trend Micro.

143.    In an effort to fence off its lucrative market and deter lawful competitors, Luminati

has sought and obtained U.S. and foreign patents for subject matter it knows is unpatentable over

its own prior published patent applications and voluminous third-party prior art with which it is

fully familiar, and asserted those patents in demands, publicity, and lawsuits in a manner intended

to intimidate competitors and eliminate lawful competition in the Relevant Market.

144.    One of Luminati's published patents, U.S. Pat. Pub. US 2011/0087733 A1, was for

an "Internet Accelerator" that was a business failure, but also included unclaimed disclosure of

Case 2:18-cv-00483-JRG   Document 109-5   Filed 10/15/19   Page 1 of 14 PageID #:  3291

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

LUMINATI NETWORKS LTD.

      Plaintiff,

     v.

BISCIENCE INC.,

      Defendant.

Case No.  2:18-CV-483-JRG

Judge Rodney Gilstrap

**DECLARATION OF DR. VERNON THOMAS RHYNE JR. IN SUPPORT OF**
**PLAINTIFF LUMINATI NETWORK LTD.'S CLAIM CONSTRUCTIONS**

I, Dr. Thomas Rhyne, declare as follows:

1.     My full name is Vernon Thomas Rhyne, III.  I am a former professor of Electrical Engineering at Texas A&M University and an Adjunct Faculty Member at the Department of Electrical and Computer Engineering at Carnegie-Mellon University and at the University of Texas at Austin.  I am currently active as a part-time engineering consultant.

2.     I hold degrees from Mississippi State University (B.S.E.E., Special Honors, 1962), the University of Virginia (M.E.E., 1964), and the Georgia Institute of Technology (Ph.D., Electrical Engineering, 1967).  I have been a registered Professional Engineer in the State of Texas since 1969 and a Registered Patent Agent since 1999.  A copy of my CV is attached as Exhibit 1.

3.     If called upon to do so, I could and would testify truthfully as follows:

4.     Based on my experience in the art and my study of the Internet communication systems disclosed in the Asserted Patents (U.S. Patents Nos. 9,241,044 and 9,742,866, which, as divisionals, share a common specification), in my opinion a person of ordinary skill in the art a (a

**Appx1045**

"POSA" hereafter) would be an individual who, as of August 28, 2013, the filing date of the Provisional Application, had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet communications.

5.      I understand that a patent claim is invalid if it is indefinite.  I further understand that in order to satisfy the definiteness requirement, a claim must inform a POSA of the claimed invention's scope with reasonable certainty when the claim is read in view of the patent's specification and prosecution history.

6.      I also understand that the defendant in the instant litigation contends that the following claim terms as used in claims 81 (and its dependent claims 83-86) and claim 108 of the '044 patent are indefinite: (i) "first device," (ii) "second device," (iii) "first server," and (iv) "second server."  For reference, claim 81 of the '044 patent reads as:

*81. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of: (a) sending the first identifier to the first server; (b) sending a first request to the first server; (c) receiving the second identifier from the first server; (d) sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier; and (e) receiving the first content from the second device.*

7.      Further, claim 108 of the '044 patent has the same preamble and reads as:

*108. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of: (a) sending the second identifier to the first server; (b) receiving a second request from the first device, the second request includes the first content identifier and the third identifier; (c) in response to receiving the second request, sending the first content identifier to the second server using the third identifier; (d) receiving the first content from the second server; and (e) in response to receiving the first content, sending the first content to the first device using the first identifier.*

8.      Based upon Defendant's invalidity contentions, I understand that Defendant contends that terms (i) through (iv) are indefinite because Defendant asserts that a POSA would have to speculate as to whether or how the first device, the first server, the second device, and the second server interrelate in accordance with the steps set forth in the above-listed claims.  As I explain below, however, I disagree.  Rather, in my opinion the Asserted Claims identified above are not indefinite because they clearly inform a POSA of their scope – including the terms identified above – with reasonable certainty when those claims are read in view of the common specification, the prosecution history of the '044 patent, the language of the claims that include these terms themselves, and the knowledge of a POSA, those intrinsic sources providing clear notice of the boundaries of those claims.

9.      As I noted above, the preamble of claim 81 and that of claim 108 of the '044 patent each recites "[a] method for fetching over the Internet a first content, identified by a first content

identifier, <u>by a first device</u>, identified in the Internet by a first identifier, <u>from a second server</u> identified in the Internet by a third identifier <u>via a second device</u> identified in the Internet by a second identifier, <u>using a first server.</u>"  Thus, in claim 81 the claim language informs a POSA how the claimed first device relates to the other elements of that claim as the claimed method is performed, and in claim 108 the claim language informs a POSA how the second device relates to the other elements of that claim as the claimed method is performed.  The claim language clearly distinguishes between the claimed "first device," the "second device," the "first server," and the "second server," and sets forth the steps of the claimed method of each claim in a manner that unambiguously identifies the elements that are the called out in each of those steps.

10.    In addition to the claim language itself, in my opinion a POSA would be informed by Figs. 5-16 and the associated text from the common specification including, but not limited to, 81:32-83:18, 83:43-65, 84:12-18, 86:15-42, 88:46-89:49, and 106:32-40 (using the column and line numbers of the '044 specification) in order to understand the relationship between the cited first device and other elements of claims 81 and 108 and the claims which depend from them.

11.    As one example, Fig. 11a shows transmission of information in an overall exemplary system:



**FIG. 11a**

12.     Given this exemplary embodiment, in my opinion a POSA would follow the steps of claim 81 from the perspective of the "first device" which in Fig. 11a is "Client #1" (No. 31a), those steps being:

(a) The first device (*e.g.*, "Client #1" 31a) sends the first identifier (*e.g.*, its own identity) to the first server (*e.g.*, "Acceleration Server" 32);

(b) The first device (*e.g.*, "Client #1" 31a) sends a first request to the first server (*e.g.*, "Acceleration Server" 32);

(c) The first device (*e.g.*, "Client #1" 31a) receives the second identifier (*e.g.*, identifying the second device) from the first server (*e.g.*, "Acceleration Server" 32);

(d) The first device (*e.g.*, Client #1 - 31a) sends a second request (*e.g.*, "Content Request") to the second device (*e.g.*, "Tunnel #1" 33b) using the second identifier

5

**Appx1049**

where the second request includes the first content identifier (*e.g.*, what content is sought) and the third identifier (*e.g.*, the IP address or other identifier of Data Server #1 or the target server 22a); and,

(e) The first device (*e.g.*, "Client #1" 31a) receives the first content (*e.g.*, the sought content shown as "Send Content" to 31a) from the second device (*e.g.*, "Tunnel #1" 33b).

13.    Claim 108 focuses on a different part of the fetching in the same system, specifically fetching "via a second device" which in Fig. 11a is "Tunnel #2" (No. 33b):



**FIG. 11a**

14.    Given the above exemplary embodiment, in my opinion a POSA would understand claim 108 to disclose fetching via a second device where each claim steps can be performed by the second device labeled "Tunnel #2" as follows:

(a) The second device (*e.g.*, "Tunnel #2" 33b) sends an identifier to identify itself to the first server (*e.g.*, "Acceleration Server" 32) (*e.g.*, second device registers with the first server);

(b) The second device receives a second request received from the first device (*e.g.*, "Client #1" 31a) (identified in this claim to clarify the overall process and where in that process this method occurs), and that request includes two identifiers: (i) the first content identifier (what content is sought, such as the web page), and (ii) the "third identifier" that identifies the second server, or target server (the server that holds the content) (*e.g.*, "Data Server #1" 22a);

(c)  In response to the request for content, the tunnel devices use the information about where the target (second) server is and asks the target server for the content;

(d) The second device receives the content from the target server; and

(e)  The second device sends the content back to the first device.

15.    As another example, Fig. 5b of the common specification is shown below.  In this embodiment, the ACCELERATION SERVER is the "first server," the DATA SERVER is the "second server," the CLIENT DEVICE can serve as the "first device," and the TUNNEL DEVICE can serve as the "second device."  Given this exemplary embodiment, I believe that a POSA would readily align all the steps of claim 81 as being performed by the CLIENT DEVICE and all the steps of claim 108 as being performed by the TUNNEL DEVICE.

7

**Appx1051**



**FIG. 5b**

16.    Specifically, it is my opinion that a POSA would readily understand that the lettered steps in claim 81 align with the numbers of the actions related to the CLIENT DEVICE in Fig. 5b as follows: Claim 81 step (a) occurs at 53a; Claim 81 step (b) occurs at 53b; Claim 81 step (c) occurs at 53c; Claim 81 step (d) occurs at 56g; and Claim 81 step (e) occurs at 53e.

17.    In my further opinion, a POSA would also understand that the lettered steps in claim 108 align with the numbers of actions related to the TUNNEL DEVICE in Fig. 5b as follows: Claim 108 step (a) occurs at 54a; Claim 108 step (b) occurs at 54c; Claim 108 step (c) occurs at 56h; Claim 108 step (d) occurs at 56i; and Claim 108 step (e) occurs at 56j.

18.    Further, in my opinion the additional indefiniteness arguments submitted by Defendant in its P.R. 3-3 disclosures regarding "first device" are not clear in and of themselves.  I

understand that in those disclosures Defendant has provided alternative constructions for the terms "first device," "second device," "first server," and "second server", thereby clearly indicating that Defendant believes these terms have meaning and hence are not indefinite. Even so, in my opinion these four terms do not require construction and therefore should simply receive their plain and ordinary meaning.  These terms would be commonly known to a POSA, and, given the claims and the supporting specification, in my opinion a POSA would not have to speculate as to the nature of the "first device" or how it relates to the claimed steps.

19.     With regard to the term "from a second server," the plain language of the preamble of the two claims identified above makes clear that the first content is "fetched … from a second server … via a second device."  Consistent with my previous references to the preamble, figures, and specification of the '044 patent, in my opinion a POSA would understand that the claims having this term do not require a specific method for the fetching of the first content from the second server.  Rather, in my opinion a POSA would understand that the second device requests and receives the first content from the second server.  Consequently, in my opinion a POSA would not have to speculate about the terms "from a second server" or "via a second device."

20.     Based upon Defendant's invalidity contentions, in addition to the claims of the '044 patent, Defendant has also asserted indefiniteness of claim 15 of the '866 patent related to the term: "partitioning the content into a plurality of content slices."  I understand that Defendant contends that this term as used in the '866 patent allegedly is indefinite because the common specification allegedly does not describe how the "partitioning" is done with respect to the claimed methods or what device does the partitioning, and that Defendant also asserts that the common specification does not describe how to construct variable-content slices which may or may not contain

Case 2:18-cv-00483-JRG   Document 110-1   Filed 10/16/19   Page 1 of 21 PageID #: 3336

# Luminati Networks Ltd. Technology Tutorial

**U.S. Patent No. 9,241,044; 9,742,866**

October 15, 2019

Luminati Networks Ltd. v. BI SCIENCE INC.
Case 2:18-cv-00483-JRG-RSP

1

Appx1089

## Solution: The Requestor Can Use a Proxy to Conceal Its Identity.

- To solve this problem, the requestor can send the request to a proxy device (tunnel), which can then send the request to the target server.

- The target server only identifies the request as coming from the proxy device, such as a cell phone owned by a real person.

- The target server does not know that the request originated with a competitor providing the requestor with anonymity.

- Consequently, the content which otherwise would have been blocked is sent to the requestor via the proxy device.



FIG. 11a

10

Case: 20-2118     Document: 90-1     Page: 456     Filed: 05/31/2022

**Appx1099**

## Solution: The Requestor Can Use a Proxy to Conceal Its Identity.

- In the example to the right, a client at www.sears.com is requesting content from a server at www.target.com, using a proxy device owned by a real person (Ms. X) at IP address XX.XX.XX.XX located in Washington, DC.

- Because, the Target server identifies Ms. X as a potential customer, the requested content is sent Ms. X's device, which is then sent from Ms.X's device to client Sears.



FIG. 11a

11

## How can a Client Identify an available proxy (tunnel) device?

A system may comprise multiple data servers and multiple client and tunnel devices, each data server may be storing a respective content that may be fetched by the client devices via the Internet. The tunnel devices may be used as intermediate devices (or nodes). Upon initializing of the client and tunnel devices (such as upon powering up or upon launching the applicable software application), they sign-in with an acceleration server, which stores an identification (such as IP address) of each of the client and tunnel devices. A client device, which may be requesting a content from a data server, first communicates with the acceleration server to receive a list of the available tunnel devices. The client device may then select one (or more) tunnel device, and then executes a pre-connection process with the selected tunnel device. Upon determining the need for a content to be fetched from the data server, the client device sends a request to the tunnel device, which in turn fetches the required content from the data server, and sends the fetched content to the client device. Each of the devices (client or tunnel) and each of the servers (acceleration or data) may be identified in the Internet using an IP address that may be in an IPv4 or IPv6 form. Alternatively or in addition to using an intermediary device such as the tunnel device (or multiple tunnel devices), the client device may directly access and fetch content from the data server, without using any intermediate device such as a tunnel device. A device may be both a client device and a tunnel device, and the roles may be assumed one at a time, or may be employed in parallel using multitasking or multiprocessing.

- A client device can identify an available and suitable proxy (tunnel) device by first logging onto an acceleration server.

- The acceleration server "stores an identification (such as IP address) of each of the client and tunnel devices."



'044 Patent at 51:19-46

'866 Patent at 52:33-61

**FIG. 5**

Appx1100

12

## Problem #2 - A Data server may block a request based on other criteria

- In addition to blocking a request based on the identity of the requestor, a target data server may also block requests based upon other criteria.

- Such criteria may include the geographic location or geographic proximity of the requestor.

- A data server designed to receive requests from within a geographic area, may block requests that are deemed to fall outside that area.

- For example, www.craigslist.com, has a plurality of pages designed to service to distinct cities.

- The following slides show a second example demonstrating the use of intermediate proxy residential devices to overcome geographic restrictions using a map of the United States as a real-world example of Figures 11a and 11c above.

13

Case 2:18-cv-00483-JRG    Document 110-1    Filed 10/16/19    Page 14 of 21 PageID #: 3349



**Example #2: User in Seattle, WA requests content from Craigslist server in Texas**

Appx1102

## Example #2: Craigslist server blocks user, because user is outside of Texas



**Client #1**
Seattle, WA

craigslist
Texas server

Case: 20-2118   Document: 90-1   Page: 460   Filed: 05/31/2022

Appx1103

15

Case 2:18-cv-00483-JRG    Document 110-1    Filed 10/16/19    Page 16 of 21 PageID #: 3351

**Example #2: User sends the request via proxy device 2, located in Marshall, Texas and Craigslist server sends response to proxy device 2 as both are located in Texas.**



**Client #1**
Seattle, WA
**1**

**Tunnel #1**
Marshall, TX
**2**

craigslist
Texas server
**3**

**Appx1104**

16

Case 2:18-cv-00483-JRG   Document 110-1   Filed 10/16/19   Page 17 of 21 PageID #: 3352



Example #2: Proxy device 2 sends the requested content back to the user in Seattle, WA. Geographic restrictions are circumvented by the use of local proxy devices.

Appx1105

## The '866 Patent – Content Partitioning

Case: 20-2118    Document: 90-1    Page: 463    Filed: 05/31/2022

Appx1106

Case 2:18-cv-00299   Document 1-1   Filed 07/19/18   Page 164 of 227 PageID #:  180

US 9,241,044 B2

52:19-30

- Content can also be partitioned into multiple content slices.

The content requested by the client device may be partitioned into multiple parts or 'slices'. Any number of slices may be used. The slicing may be in a bit, nibble (4-bits), byte (8-bits), word (multiple bytes), character, string, or a file level. The partition may be into equal length parts, or may use different length slicing. The content may be composed of inherent or identifiable parts or segments, and the partition may make use of these parts. The content may be a website content composed of multiple webpages, and each slice may include one (or few) webpages. Further, the partition may be sequential or non-sequential in the content. The partitioning may be non-overlapping or overlapping.

18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| LUMINATI NETWORKS LTD.<br>*Plaintiff*,<br><br>v.<br><br>BISCIENCE INC.,<br>*Defendant.* | Case No. 2:18-cv-00483-JRG |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of Luminati Networks Ltd. ("Plaintiff") (Dkt. No. 109, filed on October 15, 2019),[1] the response of BIScience (2009) Ltd. ("Defendant") (Dkt. No. 115, filed under seal on November 4, 2019; a redacted version was submitted as Dkt. No. 115), and Plaintiff's reply (Dkt. No. 119, filed on November 14, 2019). The Court held a hearing on the issues of claim construction and claim definiteness on November 26, 2019. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

## Table of Contents

I.     **BACKGROUND** ........................................................................................... **4**

II.    **LEGAL PRINCIPLES** ................................................................................. **6**

     A.     Claim Construction ............................................................................ 6

     B.     Departing from the Ordinary Meaning of a Claim Term ....................... 8

     C.     Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ............... 10

III.   **CONSTRUCTION OF DISPUTED TERMS** ............................................ **11**

     A.     Preambles of Claims 81 and 108 of the '044 Patent ............................. 11

     B.     Definiteness of Claims 81 and 108 of the '044 Patent .......................... 17

     C.     "first device," "first server," "second device," "second server" ........... 20

     D.     "first content identifier" .................................................................... 23

     E.     "identified in the Internet by a first identifier," "identified in the Internet by a second identifier," and "identified in the Internet by a third identifier" ....... 25

     F.     "receiving the second identifier from the first server," "sending the second identifier to the first server," "sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier," "receiving a second request from the first device, the second request includes the first content identifier and the third identifier," and "in response to receiving the first content, sending the first content to the first device using the first identifier" ................................................................................... 28

     G.     "multitasking or multiprocessing" and "proximity to the second server" ........... 32

     H.     "past activities" ............................................................................... 33

     I.      Preamble of Claim 15 of the '866 Patent ........................................... 34

     J.      Definiteness of Claim 15 of the '866 Patent ...................................... 37

     K.     "first server" and "a group of multiple devices" ................................. 38

     L.     "identified in the Internet by a second identifier" ............................... 40

     M.    "partitioning the content into a plurality of content slices" .................. 41

     N.     "each content slice containing at least part of the content" and "each content slice … identified using a content slice identifier" ................................. 44

     O.     "a plurality of content slices … and for each of the content slices" ...... 47

     P.     "selecting a device from the group" and "sending over the Internet a first request to the selected device using the group device identifier of the selected device" ................................................................................... 49

     Q.     "the first request including the content slice identifier and the second identifier" ...................................................................................... 51

**Appx1356**

R.      "the partitioning is based webpages level" ........................................................... 52

S.      "all of the parts of the content are included in all of the content slices" .............. 53

T.      "part of the content is included in two or more content slices" ........................... 55

**IV.    CONCLUSION ........................................................................................................ 56**

**Appx1357**

## I.    BACKGROUND

Plaintiff alleges infringement of two U.S. Patents: No. 9,241,044 (the "'044 Patent") and No. 9,742,866 (the "'866 Patent") (collectively, the "Asserted Patents"). Each of the Asserted Patents is entitled System and Method for Improving Internet Communication by Using Intermediate Nodes. The patents are related: the '866 Patent issued from a divisional application of the '044 Patent's application and both claim priority to a provisional application filed on August 28, 2013.

In general, the Asserted Patents are directed to technology for fetching content over the Internet.

The abstracts of the Asserted Patents are identical and provide:

> A method for fetching a content from a web server to a client device is disclosed, using tunnel devices serving as intermediate devices. The client device access an acceleration server to receive a list of available tunnel devices. The requested content is partitioned into slices, and the client device sends a request for the slices to the available tunnel devices. The tunnel devices in turn fetch the slices from the data server, and send the slices to the client device, where the content is reconstructed from the received slices. A client device may also serve as a tunnel device, serving as an intermediate device to other client devices. Similarly, a tunnel device may also serve as a client device for fetching content from a data server. The selection of tunnel devices to be used by a client device may be in the acceleration server, in the client device, or in both. The partition into slices may be overlapping or non-overlapping, and the same slice (or the whole content) may be fetched via multiple tunnel devices.

Plaintiff asserts three independent claims: Claims 81 and 108 of the '044 Patent and Claim 15 of the '866 Patent. These claims recite as follows:

> 81. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:
>   (a) sending the first identifier to the first server;
>   (b) sending a first request to the first server;
>   (c) receiving the second identifier from the first server;
>   (d) sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier; and

4

**Appx1358**

(e) receiving the first content from the second device.

108. A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:
   (a) sending the second identifier to the first server;
   (b) receiving a second request from the first device, the second request includes the first content identifier and the third identifier;
   (c) in response to receiving the second request, sending the first content identifier to the second server using the third identifier;
   (d) receiving the first content from the second server; and
   (e) in response to receiving the first content, sending the first content to the first device using the first identifier.

15. A method for fetching a content over the Internet from a first server identified in the Internet by a second identifier via a group of multiple devices, each identified in the Internet by an associated group device identifier, the method comprising the step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and identified using a content slice identifier, and for each of the content slices, comprising the steps of:
   (a) selecting a device from the group;
   (b) sending over the Internet a first request to the selected device using the group device identifier of the selected device, the first request including the content slice identifier and the second identifier;
   (c) in response to receiving the sent first request by the selected device, receiving over the Internet the content slice from the selected device; and
   wherein the method further comprising the step of constructing the content from the received plurality of content slices, and
   wherein each of the devices in the group is a client device.

The Court previously construed the Asserted Patents in *Luminati Networks Ltd. v. UAB Tesonet et al.*, No. 2:18-cv-00299-JRG, Claim Construction Memorandum and Order, 2019 U.S. Dist. LEXIS 141513 (E.D. Tex. Aug. 20, 2019), Dkt. No. 121 ("*Tesonet*"). Many of the disputes before the Court here are identical or substantially similar to the disputes addressed in *Tesonet*.

5

**Appx1359**

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because

6

claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

7

**Appx1361**

specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

### B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own

8

lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

### C.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112(b). A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112(b) and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

10

**Appx1364**

### III.    CONSTRUCTION OF DISPUTED TERMS

#### A.    Preambles of Claims 81 and 108 of the '044 Patent

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:"<br><br>• '044 Patent Claim 81 | The preamble is limiting to the extent the terms set out network structure used by the claimed methods. | The preamble is limiting. |
| "A method for fetching over the Internet a first content, identified by a first content identifier, by a first device, identified in the Internet by a first identifier, from a second server identified in the Internet by a third identifier via a second device identified in the Internet by a second identifier, using a first server, the method comprising the steps of:"<br><br>• '044 Patent Claim 108 | The preamble is limiting to the extent the terms set out network structure used by the claimed methods. | The preamble is limiting. |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

---

[3] The term charts in this order list the claims in which the term is found but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Patent Rule 4-5(d) Joint Claim Construction Chart (Dkt. No. 122) are listed.

11

**Appx1365**

**The Parties' Positions**

Plaintiff submits: It does not dispute applying the *Tesonet* holding that the preambles of Claims 81 and 108 are limiting, but only "to the extent the terms set out the network structure used by the claimed methods." Dkt. No. 109 at 13.

Defendant responds: The preambles of Claims 81 and 108 each set forth important aspects of the invention that are not separately recited in the body of the claims; namely, that the devices and servers of the claims that fetch content across the Internet are separated across the Internet. The preambles are limiting, as set forth in *Tesonet*, and include the limitations "that the content must be fetched across the Internet, and that the components identified within the preambles be separated across the Internet." Dkt. No. 115 at 5–7.

Plaintiff replies: There is no dispute with respect to the preambles being limiting "to the extent that terms in the claimed methods are part of a network structure set forth in the preambles." The preamble of Claim 108 does not, however, require the "first device" to perform the steps of the claimed method. Dkt. No. 119 at 4.

**Analysis**

The issue in dispute is whether the preambles of Claims 81 and 108 of the '044 Patent are limiting in their entirety. They are.

The Court reiterates and adopts the ruling and reasoning on this issue that it set forth in *Tesonet*. 2019 U.S. Dist. LEXIS 141513, at *12–21, *83–86.

The disputed preambles are limiting in their entirety. Under Federal Circuit precedent "[a] preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018) (quotation marks and

citations omitted). A preamble is limiting, however, when it "necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quotation marks and citations omitted). For example, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Id.* "Likewise, when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." *Id.* "Further, when reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation." *Id.* Here, the preambles provide more than simply a statement of intended use, they reflect important aspects of the described invention and they are essential to properly understanding limitations in the claim bodies.

A preamble is limiting when it tethers the claim body to the described invention. For example, in *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, the Federal Circuit noted that the "specification makes clear that the inventors were working on the particular problem of an effective optical communication system not on general improvements in conventional optical fibers" and held the "optical waveguide" language in the preamble was limiting when the claim body was ostensibly directed to optical fibers irrespective of any waveguide properties. 868 F.2d 1251, 1257 (Fed. Cir. 1989). In other words, the claim body was properly understood only with reference to the preamble and the preamble was thus limiting. *Id.* Similarly, in *Gen. Elec. Co. v. Nintendo Co.,* the Federal Circuit noted that "the '125 specification makes clear that the inventors were working on the particular problem of displaying binary data on a raster scan display device and not general improvements to all display systems" and held "system for displaying a pattern on a raster scanned display device" in the preamble as limiting when the claim body was ostensibly directed to all types of display systems. 179 F.3d 1350, 1361–62 (Fed. Cir. 1999). The Federal

13

Circuit addressed a similar issue in *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563 (Fed. Cir. 1996). There, it noted that the "specification also states that the purpose of the invention" was to address a problem in a "cold purge process" and held "[i]n a cold purge process" in the preamble as limiting. *Id.* at 1571–73. *See also*, *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309–10 (Fed. Cir. 2004) (reading the preamble as limiting because the patent document "shows that the inventor considered that the . . . preamble language represented an important characteristic of the claimed invention"); *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343–44 (Fed. Cir. 2006) (reading the preamble as limiting because "it states the framework of the invention . . . [that] is fundamental to the [] invention" as described in the patent and therefore "embraces the totality of [the recited] limitations, and limits the claim to the subject matter of the preamble"); *MEMS Tech. Berhad v. Int'l Trade Comm'n,* 447 F. App'x 142, 153–54 (Fed. Cir. 2011) (reading the preamble as limiting because it states "the essence of the invention" and "standing alone, the bodies of [the claims] do not require" the important characteristic of the invention recited in the preamble). Common to these cases is that the preamble is limiting when the preamble tethers the claim to the focus of the described invention—when it provides an important aspect of the invention when that aspect is not understood solely from body of the claim.

As explained in *Tesonet*, the preambles of Claims 81 and 108 provide antecedent basis for numerous terms in bodies of the claims and define important attributes of those terms and their relationships in the invention that are not expressed in the bodies of the claims. *Tesonet,* 2019 U.S. Dist. LEXIS 141513, at *15–21, *84–86. For example, each of the preambles (which are identical) sets forth important attributes of the "first identifier," "second identifier," and "third identifier" that are not expressed in the bodies of the claims; namely, that they "identif[y] in the Internet" a

"first device," "second device," and "second server," respectively. Similarly, the preamble sets forth an important attribute of the "content" that is not expressed in the bodies; namely, that it is "fetch[ed] over the Internet." And the preambles set forth an important attribute of the relationship among the components that is not expressed in the bodies; namely, the "fetching" is "by a first device . . . from a second server . . . via a second device . . . using a first server."

The aspects of the invention set forth in the preambles are essential to properly understanding the claims. For example, the '044 Patent is clear that the focus of the invention is "improving communication over the Internet by using intermediate nodes." '044 Patent col.1 ll.13–17; *see also*, col.51 ll.19–22 ("A system may comprise multiple data servers and multiple client and tunnel devices, each data server may be storing a respective content that may be fetched by the client devices via the Internet."); col.52 ll.31–36 ("A method is disclosed for fetching over the Internet a first content . . . by a first device . . . from a second server . . . via a second device . . . by using a first server."). Both the Internet and the intermediate-node aspects of the invention are not apparent from the body of the claims alone. For example, the role of the second device as an intermediary in Claim 81 is apparent only when read in light of the preamble's definition of the content being fetched "by a first device . . . from a second server . . . via a second device." For example, divorced from the preamble, the claim body ostensibly covers a situation in which the second device is the original source of the content rather than an intermediary. Similarly, without reference to the preamble, the body ostensibly covers local fetching rather than fetching over the Internet. Claim 108 suffers similar issues. Without each preamble in its entirety limiting the claims, the claims fail to capture important aspects of the invention. The preambles are essential to a proper understanding of the claims and are therefore limiting.

15

The Court rejects Plaintiff's position that the preambles are limiting only "to the extent the terms set out network structure used by the claimed methods." First, it is not entirely clear what Plaintiff means by its caveat. Second, Plaintiff's argument appears to be based on an improper application of *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). Dkt. No. 109 at 15 n.2; *Tesonet*, 2019 U.S. Dist. LEXIS 141513, at *17 n.3. *Uniloc* addressed an issue of divided-infringement of a system claim rather than the effect of a preamble on the scope of a method claim. *Uniloc*, 632 F.3d at 1309 ("That other parties are necessary to complete the environment in which the claimed element functions does not necessarily divide the infringement between the necessary parties."). *Uniloc* was further explained in *Advanced Software Design Corp. v. Fiserv, Inc.* 641 F.3d 1368, 1374 (Fed. Cir. 2011) ("Like the claim in *Uniloc*, the claims at issue in this case contain preambles that define the environment in which an accused infringer must act or describe capabilities that an accused device must have."). The issue addressed in *Uniloc* and *Advanced Software* was not whether particular claim language was limiting but rather was to "distinguish between those limitations that describe the environment in which a claim operates from the limitations that must be performed by an accused infringer." *Advanced Software*, 641 F.3d at 1375. Indeed, the environmental language in *Uniloc* and *Advanced Software* was limiting. This distinction is explained succinctly in *Advanced Software*. There, the Federal Circuit held that claims directed to validating a financial instrument having encrypted information in which the method of encryption is defined in the preamble may be infringed without performing the encryption method. But the claims will not be infringed if the instrument that is validated has not been "encrypted . . . in accordance with steps described in the preamble." *Id*. at 1373–75. Thus, the environment in *Advanced Software*, namely, the encrypted information specified in the

16

**Appx1370**

preamble, was a limitation of the claim. Here, the issue is whether the preambles are limiting, not

whether the claims invoke a divided-infringement issue.

Accordingly, the Court holds that the preambles of Claims 81 and 108 of the '044 Patent are

limiting in their entirety.

### B.    Definiteness of Claims 81 and 108 of the '044 Patent

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • '044 Patent Claim 81 | not indefinite | indefinite |
| • '044 Patent Claim 108 | not indefinite | indefinite |

Because the parties' arguments and proposed constructions with respect to these issues are

related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Defendant has not provided information under the Local Patent Rules that

is sufficient to "overcome the presumption of definiteness and validity to which Luminati is

entitled." The scope of each of Claims 81 and 104 of the '044 Patent is reasonably certain: Claim

81 sets forth how the "first device" relates to other elements of the claim as the method is

performed. Claim 108 sets forth how the "second device" relates to other elements of the claim as

the method is performed. The method of Claim 81 "can be performed by the 'first device.'" The

method of Claim 108 "can be performed by the 'second device.'" "[T]he claimed methods do not

require steps to be performed [by] each of [these] components." The preamble of Claim 108, which

refers to fetching by the first device, does not require the steps in the body to be performed by the

first device. Rather, while this preamble sets forth the network in which the steps recited in the

body of the claim are to be performed, the actions recited in the preamble are not claim limitations.

Dkt. No. 109 at 13–17 & n.2.

**Appx1371**

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '044 Patent figs.5–16, col.81 l.32 – col.83 l.18, col.83 ll.43–65, col.84 ll.12–18, col.86 ll.15–42, col.88 l.46 – col.89 l.49, col.106 ll.32–40. **Extrinsic evidence**: Rhyne Decl.[4] ¶¶ 6–19 (Plaintiff's Ex. D, Dkt. No. 109-5).

Defendant responds: It is not reasonably certain whether Claims 81 and 108 encompass methods for fetching local content or are restricted to fetching content over the Internet, as recited in the preambles. It is not reasonably certain which of the recited devices must perform the steps of the methods. If the preamble of Claim 81 is limiting, it indicates that the "first device" performs the steps recited in the body of the claim. But the steps in Claim 108, which has the identical preamble, are not performed by the "first device." Thus, the scopes of the claims are not reasonably certain. Further, the Court has already held Claim 108 indefinite in *Tesonet* and the reasons expressed there also apply here. Dkt. No. 115 at 7–9.

In addition to the claims themselves, Defendant cites the following **extrinsic evidence** to support its position: Rhyne Decl. ¶¶ 9, 12, 14 (Plaintiff's Ex. D, Dkt. No. 109-5).

Plaintiff replies: Defendant did not explain its indefiniteness position as required under Local Patent Rule 4-2 and did not provide expert testimony on the issue and thus cannot meet the clear-and-convincing standard of proving either Claim 81 or Claim 108 invalid as indefinite. The common preamble of the two claims "sets out all the major components and their roles, even though two different devices perform different steps set forth in the different claims." Dkt. No. 119 at 4–6.

---

[4] Declaration of Dr. Vernon Thomas Rhyne Jr. in Support of Plaintiff Luminati Network Ltd.'s Claim Constructions.

**Analysis**

The issues in dispute distill to: (1) whether it is reasonably certain that Claims 81 and 108 of the '044 Patent are restricted to fetching content over the Internet and (2) whether it is reasonably certain which of the devices listed in the claims performs the steps recited in the claims. As set forth above, the claims require "fetching over the Internet a first content." Further, the role of the various recited components in performing the claimed steps, and thus claim scope, is reasonably certain in Claim 81 but not in Claim 108.

The Court reiterates and adopts the reasoning and ruling expressed in *Tesonet* regarding the role of the various components in performing the steps of Claim 81. *Tesonet*, 2019 U.S. Dist. LEXIS 141513, at *76– 83. Specifically, "[a] fair reading of the claim as a whole is that the lettered method steps are performed 'by a first device,' which is set forth in the preamble. The claim scope is 'reasonabl[y] certain[]' in this respect." *Id*. at *80 (citing *Nautilus*, 572 U.S. at 910).

The Court also reiterates and adopts the reasoning and ruling expressed in *Tesonet* regarding the role of the various components in performing the steps of Claim 108. *Id.* at *86–88. Specifically, "the analysis set forth above as to Claim 81 does not apply to Claim 108 because the preamble recites that the method is performed 'by a first device,' not by the second device. The recital of 'via a second device' in Claim 108 fails to find any reasonably clear meaning in the context of the remainder of the claim, in particular as to the steps recited in the body of the claim. The scope of the claim therefore lacks 'reasonable certainty.'" *Id*. at *88 (citing *Nautilus*, 572 U.S. at 910). The Court is not persuaded otherwise by Plaintiff's expert's testimony. While the Court does not take issue with Dr. Rhyne's explanation of the exemplary embodiments of Figures 5b and 11a of the '044 Patent or his explanation of how Claim 108 may encompass those embodiments, the Court finds his ultimate opinion—that "each claim step[] ***can be*** performed by the second

device," Rhyne Decl. ¶ 14 (emphasis added)—unhelpful. Plaintiff's argument is similarly

unhelpful, stating that "each of the claimed steps *can be* performed by the second device." Dkt.

No. 109 at 16–17 (emphasis added). It is not reasonably certain from the language of the claim

whether any or all the steps *must be* performed by the second device to effect fetching of content

"via a second device." Plaintiff and its expert have provided little, if any, certainty regarding this

issue. Ultimately, Claim 108 as written, and even in light of Plaintiff's argument and evidence,

leaves a "zone of uncertainty which enterprise and experimentation may enter only at the risk of

infringement claims." *Nautilus*, 572 U.S. at 909–10. Therefore, Claim 108 is indefinite.

Accordingly, the Court holds that Defendant has not met its burden to prove Claim 81 of the

'044 Patent is indefinite. Conversely, the Court holds Claim 108 of the '044 Patent as indefinite.

**C.    "first device," "first server," "second device," "second server"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "first device"<br><br>• '044 Patent Claims 81, 108 | not indefinite / preamble not limiting / plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• a device, separate from the second device, the first server, and the second server, that receives the Internet content from the second device |
| "first server"<br><br>• '044 Patent Claims 81, 108 | not indefinite / preamble not limiting / plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• a server, separate from the second device, the first device, and the second server, that receives the Internet content from the second device |

**Appx1374**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "second device"<br><br>• '044 Patent Claims 81, 108 | not indefinite / preamble not limiting / plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• a device, separate from the first device, the first server, and the second server, that is communicatively positioned between the first device and the second server |
| "second server"<br><br>• '044 Patent Claims 81, 108 | not indefinite / preamble not limiting / plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• a server, separate from the first device, the second device, and the first server, from which the Internet content is fetched |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The Court should construe these terms as it did in *Tesonet*; namely, that these terms have their plain and ordinary meanings. Further, Defendant's proposed constructions are unhelpful and potentially confusing. For example, it is not clear how "separate" is being used in Defendant's proposals and the claims do not require geographic separation. Dkt. No. 109 at 18.

Defendant responds: These terms should be construed to clarify that: (1) the four components are arranged as provided in the preambles of Claims 81 and 108 of the '044 Patent, (2) the communication amongst the components is as provided in the preambles, (3) the content of the claims is content that is fetched over the Internet as provided in the preambles (i.e., it is "Internet content"), and (4) the "first device," "second device," "first server," and "second server" of the

21

**Appx1375**

claims are separate components in that a single component cannot satisfy more than one of these limitations. Dkt. No. 115 at 10–11.

Plaintiff replies: Defendant's proposed "separate" limitation does not resolve any dispute or clarify claim scope as Defendant has not explained what "separate" here means or asserted that Plaintiff is accusing a single device or server as satisfying more than one of these terms. Dkt. No. 119 at 6–7.

**<u>Analysis</u>**

The issues here largely overlap with the issues regarding the limiting effect of the preambles of Claims 81 and 108 of the '044 Patent. In addition, there appears to be a dispute as to whether the "first device," "second device," "first server," and "second server" are necessarily distinct components. As set forth above, the preambles are limiting in their entirety. Therefore, the Court declines to separately inject the preamble's limitations into these device and server terms. With respect to whether the devices and servers are necessarily separate (i.e., distinct) components, the Court understands the plain import of separately reciting these claim elements is that they are distinct components.

To the extent Defendant's proposed constructions simply restate the limitations explicit in the preambles, the Court rejects the constructions as unnecessary and potentially confusing. The Court also rejects as improper Defendant's limitations that are not explicit in the preambles or elsewhere in the claims. For example, to the extent Defendant proposes that "Internet content" is anything other than content that is fetched over the Internet, as provided in the preamble's "fetching over the Internet a first content," the Court rejects the limitation as improper.

With respect to whether the devices and servers of the claims are "separate," the Court holds that they are distinct, though not necessarily geographically separate. Indeed, this is the plain

**Appx1376**

meaning of the claim language, which lists these as separate components. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." (quotation and modification marks omitted)). Plaintiff has not established, or even suggested, that this clearly implied distinct nature does not apply.

Finally, the Court understands Defendant's primary position of indefiniteness to be that addressed above.

Accordingly, the Court determines that these terms have their plain and ordinary meanings, under which the separately recited claim elements correspond to distinct components, without the need for further construction.

###    D.    "first content identifier"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "first content identifier"<br><br>• '044 Patent Claims 81, 108 | plain and ordinary meaning | identification of the Internet content that is to be fetched |

**The Parties' Positions**

Plaintiff submits: The plain and ordinary meaning of "identifier" is easily understood, so there is no need to construe "first content identifier." Further, "content" should not be rewritten as "Internet content" as it is not clear what "Internet content" means and there is no support that "content" in the '044 Patent has a meaning other than its ordinary, broad, meaning. Dkt. No. 109 at 18–20.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '044 Patent fig.15, col.5 ll.2–47, col.8 ll.12–29, col.12 ll.28–49, col.19 l.49 – col.20 l.36, col.46 ll.30–43, col.47 ll.37–44, col.51 l.19 – col.56

**Appx1377**

l.19, col.56 ll.30–36, col.56 l.59 – col.57 l.36, col.58 ll.20–30, col.61 l.65 – col.62 l.63, col.63

ll.43–56, col.73 ll.41–47, col.95 ll.16–17, col.95 l.25 – col.96 l.3, col.102 ll.45–59, col.107 ll.34–

47, col.110 l.33 – col.111 l.10, col.124 ll.26–57, col.141 ll.47–49. **Extrinsic evidence**:

International Telecommunications Union (ITU) definitions of "content" (Plaintiff's Ex. E,[5] Dkt.

No. 109-6; Plaintiff's Ex. F,[6] Dkt. No. 109-7) and "identifier" (Plaintiff's Ex. G,[7] Dkt. No. 109-8;

Plaintiff's Ex. H,[8] Dkt. No. 109-10).

Defendant responds: The term "first content identifier" should be construed to clarify that the

"content" of the claims is the content that is fetched over the Internet (i.e., it is "Internet content").

This does not encompass content that is not fetched over the Internet, such as locally stored content.

This is mandated by the preambles of Claims 81 and 108, which each recite "fetching over the

Internet a first content." Dkt. No. 115 at 12–13.

Plaintiff replies: "Whether content is fetched over the Internet or not has nothing to do with

the content itself." Further, "content" was construed in *Tesonet* as "digital data." Finally, Plaintiff

does not contend that the claims encompass "fetching local content from local storage devices."

Rather, the "preamble clearly requires 'fetching … a first content … from a second server

identified in the Internet" (ellipses in original). Dkt. No. 119 at 7 & n.3.

---

[5]   https://www.itu.int/net/ITU-R/asp/terminology-definition.asp?lang=en&rlink=%7b46309866-F797-45BC-81E9-2B6B2DAC1F32%7d

[6]   https://www.itu.int/net/ITU-R/asp/terminology-definition.asp?lang=en&rlink=%7b0A3C5266-56D4-4ED8-9076-A4345192D7EB%7d

[7]   https://www.itu.int/net/ITU-R/asp/terminology-definition.asp?lang=en&rlink=%7b5C58FBE6-BE32-4E31-81CE-676FCB191E2B%7d

[8]   https://www.itu.int/net/ITU-R/asp/terminology-definition.asp?lang=en&rlink=%7bA842D85F-D255-4218-98D1-D8AD272C9067%7d

**Analysis**

The issue in dispute entirely overlaps with the issues regarding the limiting effect of the preambles of Claims 81 and 108 of the '044 Patent. As set forth above, the preambles are limiting in their entirety. Therefore, the Court declines to inject the preamble's "Internet" limitation into the "first content identifier" as Defendant proposes. The Court rejects the remainder of Defendant's proposed construction, "identification of the [] content that is to be fetched" as merely redundant of other express claim language and therefore unnecessary.

Accordingly, the Court determines the "first content identifier" has its plain and ordinary meaning without the need for further construction.

**E.    "identified in the Internet by a first identifier," "identified in the Internet by a second identifier," and "identified in the Internet by a third identifier"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "identified in the Internet by a first identifier"<br><br>• '044 Patent Claims 81, 108 | preamble not limiting / plain and ordinary meaning | identified by a first identifier that is different than the third identifier, although there may be some overlap |
| "identified in the Internet by a second identifier"<br><br>• '044 Patent Claims 81, 108 | preamble not limiting / plain and ordinary meaning | identified by information that includes an address of the second device |
| "identified in the Internet by a third identifier"<br><br>• '044 Patent Claims 81, 108 | preamble not limiting / plain and ordinary meaning[9] | identified by a third identifier that is different than the first identifier, although there may be some overlap |

---

[9] Plaintiff did not state a position in the P.R. 4-5(d) chart for the "third identifier" term. Dkt. No. 122-1 at 15–16. The position set forth in the briefing is "plain and ordinary meaning." Dkt. No. 109 at 21. As the briefing positions on the "first identifier" and "second identifier" terms were also "plain and ordinary meaning," the Court understands that Plaintiff's position on all three terms are as expressed in the P.R. 4-5(d) chart for the "first identifier" and "second identifier" terms.

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The first, second, and third identifiers simply identify without comparison to other identifiers. This does not need to be clarified and the plain and ordinary meaning of "identifier" is easily understood. Further, while the '044 Patent describes that an identifier may include an address, these are exemplary embodiments and do not mandate an address. Claim 44 of the '044 Patent, for example, recites that "each of the identifiers is an IP address or a URL" and a URL is not an address. Dkt. No. 109 at 21–22.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '044 Patent col.20 ll.3–4, col.39 ll.23–24, col.40 l.21, col.54 ll.7–22, col.58 ll.20–30, col.61 l.64 – col.62 l.33, col.63 ll.4–13, col.73 ll.41–47, col.95 ll.16–17, col.95 l.25 – col.96 l.3, col.102 ll.45–59, col.110 l.33 – col.111 l.10, col.124 ll.26–38; '866 Patent col.55 ll.31–32, col.83 ll.54–59.

Defendant responds: These terms should be construed to clarify that a single identifier may not satisfy more than one of the first, second, and third identifier limitations. According to the patent examiner, the separate identifiers are what distinguish the claims over the prior art. Further, including the "address" in the second identifier clarifies that the claims require Internet traffic. Dkt. No. 115 at 13–15.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '044 Patent File Wrapper September 11, 2015 Notice of Allowability at 2 (Defendant's Ex. A, Dkt. No. 115-1 at 31).

Plaintiff replies: The term "identifier" is used according to its broad plain and ordinary meaning and was not narrowed during prosecution. Dkt. No. 119 at 7–9.

**<u>Analysis</u>**

There are two issues in dispute. First, whether "address" should be injected into the construction of "second identifier." It should not. Second, whether the first, second, and third identifiers are necessarily distinct from each other. According to a plain reading of the claims, under which separately recited elements correspond to distinct components, the identifiers are different from each other (i.e., they are distinct).

The Court rejects Defendant's proposed "address" limitation. The Court addressed a substantially similar issue in *Tesonet* and the Court here reiterates and adopts the reasoning and ruling expressed there. *Tesonet*, 2019 U.S. Dist. LEXIS 141513, at *22–28. Specifically, it is not necessary to inject "address" into a limitation to affect an "Internet" limitation that is already explicit in the claim. Further, the Court refuses to equate an "identifier" with an "address" simply because the identifier "identifie[s] in the Internet." Rather, the Asserted Patents provide that an address is simply an exemplary Internet identifier and therefore allows for identifiers other than addresses. *See, e.g.*, '044 Patent col.54 ll.7–8 ("Each of the identifiers herein ***may be*** a URL or an IP address in IPv4 or IPv6 form." (emphasis added)); *see also*, *id*. at col.50 ll.18–31 (describing the "Domain Name System (DNS)" which "translates easily memorized domain names to the numerical IP addresses needed for the purpose of locating computer services and devices worldwide").

With respect to whether the first, second, and third identifiers of the claims are "separate," the Court holds that they are distinct. Indeed, this is the plain meaning of the claim language, which

lists these as separate components. *See Becton, Dickinson & Co.*, 616 F.3d at 1254. Plaintiff has not established, or even suggested, that this clearly implied distinct nature does not apply.

Accordingly, the Court rejects Defendant's proposed "address" limitation in "second identifier" and determines that these terms have their plain and ordinary meanings, under which the separately recited claim elements correspond to distinct components, without the need for further construction.

> F.     **"receiving the second identifier from the first server," "sending the second identifier to the first server," "sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier," "receiving a second request from the first device, the second request includes the first content identifier and the third identifier," and "in response to receiving the first content, sending the first content to the first device using the first identifier"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "receiving the second identifier from the first server"<br><br>• '044 Patent Claim 81 | plain and ordinary meaning | receiving, by the first device from the first server, identification of the second device that includes an address of the second device |
| "sending the second identifier to the first server"<br><br>• '044 Patent Claim 108 | plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• sending, by the second device to the first server, identification of the second device that includes an address of the second device |
| "sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier"<br><br>• '044 Patent Claims 81 | plain and ordinary meaning | sending, by the first device to the second device, using the address of the second device that was received from the first server, a request for the Internet content which is to be fetched that includes both (1) identification of the Internet content that is to be fetched and also (2) the address of the second server |

28

**Appx1382**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "receiving a second request from the first device, the second request includes the first content identifier and the third identifier"<br><br>• '044 Patent Claim 108 | plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• receiving, by the second device from the first device, a request for the Internet content that includes both (1) identification of the Internet content that is to be fetched and also (2) the address of the second server |
| "in response to receiving the first content, sending the first content to the first device using the first identifier"<br><br>• '044 Patent Claim 108 | plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• after the second device receives the Internet content, the second device forwards the Internet content to the first device using an address of the first device |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: Defendant's proposals are improper for a variety of reasons: First, the "second identifier" does not necessarily include an address so sending or receiving the "second identifier" does not necessarily require sending or receiving an address. Second, the "content" is not necessarily "Internet content." Third, the "first device" of the claims does not necessarily perform the sending or receiving steps, which may instead be performed by another device on behalf of the first device. Finally, sending "in response to receiving" is not simply sending after receiving but rather indicates a causal relationship between the sending and receiving. Dkt. No. 109 at 23–26.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '044 Patent fig.15, col.5 ll.2–47, col.8 ll.12–29, col.12 ll.28–49, col.19 l.49 – col.20 l.36, col.46 ll.30–43, col.47 ll.37–44, col.51 l.19 – col.56 l.29, col.56 l.59 – col.57 l.36, col.58 ll.20–30, col.61 l.65 – col.62 l.63, col.63 ll.43–56, col.64 l.48 – col.65 l.5, col.73 ll.41–47, col.95 l.25 – col.96 l.3, col.102 ll.45–49, col.107 ll.34–47, col.110 l.33 – col.111 l.10, col.124 ll.26–57. **Extrinsic evidence**: International Electrotechnical Commission (IEC) definition of "server" (Plaintiff's Ex. I,[10] Dkt. No. 109-10).

Defendant responds: These proposed constructions are largely based on Defendant's proposed constructions and positions on other terms: The sending and receiving steps in Claim 81 of the '044 Patent are performed by the "first device," as set forth in the preamble and as held in *Tesonet*. The "address of the second device" is included in the "second identifier." The "content" that is requested is necessarily Internet content. And the first, second, and third identifiers are separate. Further, the sending that is "in response to receiving" should be clarified to denote the temporal relationship between the sending and receiving: that the sending is "after" the receiving. Finally, Defendant "proposes [Claim 108's] contingent constructions only in the alternative should the Court find [Claim 108] is not indefinite." Dkt. No. 115 at 15–18.

In addition to the claims themselves, Defendant cites the following **extrinsic evidence** to support its position: Rhyne Decl. ¶ 14 (Plaintiff's Ex. D, Dkt. No. 109-5).

Plaintiff replies: Defendant's proposals here are improper for the same reasons that its proposals for the "first identifier," "second identifier" and "third identifier" terms are improper. Dkt. No. 119 at 9–10.

---

[10] http://www.electropedia.org/iev/iev.nsf/display?openform&ievref=732-01-12

Plaintiff cites further **intrinsic evidence** to support its position: '044 Patent col.50 ll.18–31, col.72 ll.52–55, col.75 ll.48–63.

**<u>Analysis</u>**

Other than whether "in response to" in Claim 108 of the '044 Patent should be rewritten as "after," the issues in dispute here have been addressed with respect to other terms. The Court reiterates that: (1) "receiving . . ." and "sending . . ." steps of Claim 81 of the '044 Patent are performed by the "first device"; (2) none of the "first identifier," "second identifier," or "third identifier" are necessarily an address; (3) it is unnecessary and potentially confusing to include the "Internet" limitation of the preamble into a construction of "first content" or "first content identifier"; and (4) Claim 108 is indefinite. The Court rejects that "in response to" should be rewritten as "after." Doing so is not necessary to clarify any temporal relationship and threatens to change the scope of the claim. Further, since Claim 108 is indefinite, there is no need to address the propriety of Defendant's alternative constructions for the "sending . . .," "receiving . . . ," and "in response to receiving . . ." or "sending . . ." limitations of Claim 108.

Finally, subject to the foregoing and the constructions of their constituent terms, the Court construes the "sending . . ." and "receiving . . ." limitations of Claim 81 as follows:

- "receiving the second identifier from the first server" means "receiving, by the first device, the second identifier from the first server" and

- "sending a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier" means "sending, by the first device, a second request to the second device using the second identifier, the second request includes the first content identifier and the third identifier."

**Appx1385**

### G.    "multitasking or multiprocessing" and "proximity to the second server"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "multitasking or multiprocessing"<br><br>• '044 Patent Claims 86, 88, 91, 107 | multiple tasks being performed in overlapping time periods using common processing resources | BIScience does not challenge Luminati's proposed construction |
| "proximity to the second server"<br><br>• '044 Patent Claim 97 | distance from second server | BIScience does not challenge Luminati's proposed construction[11] |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Its proposed constructions for these terms are that which was agreed to by the parties and adopted by the Court in *Tesonet*. Dkt. No. 109 at 24–25.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '044 Patent col.24 l.60 – col.25 l.4, col.53 ll.55–59, col.90 l.43 – col.91 l.15. **Extrinsic evidence**: International Electrotechnical Commission (IEC) definition of "multitasking" (Plaintiff's Ex. J,[12] Dkt. No. 109-11); Merriam-Webster online definition of "multitasking" (Plaintiff's Ex. K,[13] Dkt. No. 109-12); Dictionary.com definition of "proximity" (Plaintiff's Ex. L,[14] Dkt. No. 109-13).

---

[11] Defendant did not state a position in the P.R. 4-5(d) chart for the "proximity" term, Dkt. No. 122-1 at 24–25, but based on the briefing, the Court understands Defendant's position to be the same as that expressed for the "multitasking" term.

[12] http://www.electropedia.org/iev/iev.nsf/display?openform&ievref=171-05-69

[13] https://www.merriam-webster.com/dictionary/multitasking

[14] https://www.dictionary.com/browse/proximity?s=t

**Appx1386**

Defendant responds: "To ease the burden on the Court, BIScience is not challenging Luminati's proposed constructions. However, BIScience does not concede that Luminati's proposed constructions are proper." Dkt. No. 115 at 18.

Plaintiff replies: Since Defendant is not challenging Plaintiff's proposed constructions of these terms, the Court should adopt them. Dkt. No. 119 at 10.

### Analysis

There appears to be no dispute to resolve. Accordingly, the Court adopts Plaintiff's proposed constructions:

- "multitasking or multiprocessing" means "multiple tasks being performed in overlapping time periods using common processing resources"; and

- "proximity to the second server" means "distance from second server."

### H.    "past activities"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "past activities"<br><br>• '040 Patent Claim 99 | past actions or performance | indefinite<br><br>alternatively:<br><br>• plain and ordinary meaning |

### The Parties' Positions

The parties did not submit any argument or evidence on the meaning of "past activities" but listed their positions in the P.R. 4-5(d) chart. Dkt. No. 122-1 at 25.

### Analysis

Given that the parties provided no argument or evidence on this dispute and that the proposed constructions are identical to that considered in *Tesonet*, the Court reiterates and adopts the ruling and reasoning on this term that it set forth in *Tesonet*. 2019 U.S. Dist. LEXIS 141513, at *46–49.

Accordingly, the Court determines that "past activities" has its plain and ordinary meaning without the need for further construction.

### I.    Preamble of Claim 15 of the '866 Patent

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "A method for fetching a content over the Internet from a first server identified in the Internet by a second identifier via a group of multiple devices, each identified in the Internet by an associated group device identifier, the method comprising the step of partitioning the content into a plurality of content slices, each content slice containing at least part of the content, and identified using a content slice identifier, and for each of the content slices, comprising the steps of:"<br><br>• '866 Patent Claim 15 | Preamble is limiting to the extent it sets forth the components of the residential proxy network. | The preamble is limiting. |

**The Parties' Positions**

Plaintiff submits: "[T]he preamble [of Claim 15 of the '866 Patent] may be limiting to the extent it sets forth the components of the residential proxy network and particularly to the extent those components introduced in the preamble act as antecedent bases for the terms in the body of the claim." Dkt. No. 109 at 26–27.

Defendant responds: The preamble of Claim 15 of the '866 Patent is fully limiting for reasons similar to those for Claim 81 of the '044 Patent. Further, the preamble is:

> A method for fetching a content over the Internet from a first server identified in the Internet by a second identifier via a group of multiple devices, each identified in the Internet by an associated group device identifier, the method comprising,

'866 Patent col.173 ll.41–45, rather than:

> A method for fetching a content over the Internet from a first server identified in
> the Internet by a second identifier via a group of multiple devices, each identified
> in the Internet by an associated group device identifier, the method comprising the
> step of partitioning the content into a plurality of content slices, each content slice
> containing at least part of the content, and identified using a content slice identifier,
> and for each of the content slices, comprising the steps of,

*id*. col.173 ll.41–49. Plaintiff's infringement contentions indicate that Plaintiff improperly includes

"partitioning the content into a plurality of content slices, each content slice containing at least part

of the content, and identified using a content slice identifier, and for each of the content slices,

comprising the steps of" in the preamble. Dkt. No. 115 at 18–21.

In addition to the claims themselves, Defendant cites the following **extrinsic evidence** to

support its position: Rhyne Decl. ¶ 23 (Plaintiff's Ex. D, Dkt. No. 109-5).

Plaintiff replies: "There appears to be no real dispute here. To the extent there is any

confusion, Luminati agrees the preamble is limiting." Dkt. No. 119 at 10.

### Analysis

There appear to be two issues in dispute. First, whether the preamble of Claim 15 of the '866

is entirely or only partially limiting. It is entirely limiting. Second, whether the preamble ends at

"the method comprising" or at "comprising the steps of." It ends at "the method comprising."

To begin, under a plain reading of Claim 15 of the '866 Patent, the preamble ends at the phrase

"the method comprising." Plaintiff has not provided any reason to deviate from this plain reading,

or even indicated a position on this issue. In any event, and as set forth below, the Court holds the

preamble is limiting in its entirety.

The preamble of Claim 15 of the '866 Patent is limiting in its entirety for reasons similar to

that provided above with respect to the preambles of Claims 81 and 108 of the '044 Patent.

Specifically, the preamble of Claim 15 of the '866 Patent provides antecedent basis for numerous

**Appx1389**

terms in body of the claims and defines important attributes of those terms and their relationships

in the invention that are not expressed in the body of the claims. Claim 15, with emphasis added,

provides:

> 15. A method for fetching *a content* over the Internet from a first server identified in the Internet by *a second identifier* via *a group of multiple devices*, each identified in the Internet by *an associated group device identifier*, the **method comprising** the step of partitioning the content into *a plurality of content slices*, each content slice containing at least part of the content, and identified using *a content slice identifier*, and for each of the content slices, **comprising** the steps of:
>   (a) selecting a device from *the group*;
>   (b) sending over the Internet a first request to the selected device using *the group device identifier* of the selected device, the first request including *the content slice identifier* and *the second identifier*;
>   (c) in response to receiving the sent first request by the selected device, receiving over the Internet *the content slice* from the selected device; and
>   wherein the method further comprising the step of constructing *the content* from the received plurality of content slices, and
>   wherein each of *the devices in the group* is a client device.

Specifically, "the group," "the group device identifier," "the second identifier," "the content,"

and "the devices in the group" recited in the body of the claim each have their antecedent basis in

the preamble, considering the preamble terminates at "the method comprising the step of." The

preamble also defines important attributes of these components and how they relate to one another.

For example, the "content" is defined as being "fetch[ed] over the Internet from a first server . . .

via a group of multiple devices," the "second identifier" identifies the first server "in the Internet,"

and each device of the group is "identified in the Internet by an associated group identifier." As

explained above, the use of a preamble to provide antecedent basis and define important aspects

of the invention that are essential to a proper understanding of the claim body renders the preamble

entirely limiting. *See, e.g., Catalina Mktg. Int'l*, 289 F.3d 801, 808.

Even were the preamble to include the "step of partitioning … for each of the content slices

comprising the steps of," the entire preamble would be limiting. The step-of-partitioning clause

provides the antecedent basis for "the content slice identifier" and "the content slice" and defines that the "each content slice contain[s] at least part of the content" and that "each content slice … [is] identified using a content slice identifier."

Accordingly, the Court holds that the preamble of Claim 15 of the '866 Patent is limiting in its entirety and ends at "the method comprising" transition.

### J.    Definiteness of Claim 15 of the '866 Patent

**The Parties' Positions**

Defendant submits: It is not reasonably certain which devices or components perform the steps of Claim 15 of the '866 Patent and thus the claim is indefinite. Dkt. No. 115 at 21–22.

Plaintiff replies: There is nothing indefinite about Claim 15: "the method is performed by the device that performs the method, and it performs all the steps of the method." Dkt. No. 119 at 10–11.

Plaintiff cites further **extrinsic evidence** to support its position: Rhyne Decl. ¶¶ 20–25 (Plaintiff's Ex. D, Dkt. No. 109-5).

**Analysis**

The issue in dispute here is twofold: whether it is reasonably certain what device or devices perform the steps of the method of Claim 15 of the '866 Patent and, if not, whether that uncertainty renders the claim indefinite. The Court determines that specifying a device or devices that perform the steps of the claim is not important to understanding the claim and that the claim otherwise sets forth with reasonable certainty the relationship of the various claim elements.

The scope of Claim 15 is reasonably certain. The claim is directed to a method for fetching content over the Internet from a first server via a group of multiple devices that includes partitioning the content into slices and receiving the various slices from the devices of the group. The only hardware components mentioned in the claim are the devices of the group and the server.

The role of these two components in the method is reasonably certain: the content is fetched in slices from the server via the devices of the group with each content slice received from a selected device of the group. While the claim is silent on which specific device must perform many of the steps, the Court understands this to mean that what performs the steps is not important. The claim otherwise defines the role of the server and group of devices, and specifically how the fetching is accomplished "via" the group, with reasonable certainty, and the claim is not limited as to what device performs the other steps.

Accordingly, the Court holds that Defendant has not proven Claim 15 of the '866 Patent is indefinite for failing to specify which device or devices perform the steps of the claim.

### K. "first server" and "a group of multiple devices"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "first server"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | a server, separate from the first device, the second device, and the group of multiple devices, from which the Internet content is fetched |
| "a group of multiple devices"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | a plurality of devices that are able to fetch the Internet content from the first server and which does not include the first device and the second server |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Defendant's proposed constructions for these terms include many of the same errors found in previous terms: For example, the proposed constructions improperly limit the "content" from the "first server" to "Internet content" and they unnecessarily and confusingly

38

inject "separate." Further, Defendant's proposed constructions include "second device" and "second server" which do not appear in the claim. Dkt. No. 109 at 27–29.

Defendant responds: Its proposed constructions clarify that the "first server," the "first device," and the "second server" are each distinct from the "group of multiple devices." Dkt. No. 115 at 22–23.

Plaintiff replies: Defendant's proposed constructions confuse rather than clarify claim scope. Dkt. No. 119 at 10.

**Analysis**

The mains issues in dispute here distill to: (1) whether the Internet aspect of the preamble should be expressed in constructions of these terms and (2) whether the "first server" and the devices of the "group of multiple devices" are necessarily separate (i.e., distinct) components. As set forth above, the preambles are limiting in their entirety and express that the content is fetched over the Internet. Therefore, the Court declines to inject an "Internet content" limitation into these terms as Defendant proposes. With respect to whether the devices and servers are necessarily separate (i.e., distinct) components, the Court understands the plain import of separately reciting these claim elements is that they are distinct components. *See Becton, Dickinson & Co.*, 616 F.3d at 1254.

The Court rejects the other limitations proposed by Defendant. With respect to "a group of multiple devices," the Court rejects Defendant's proposed "able to fetch the internet content from the first server" and "which does not include . . . the second server" limitations and refuses to rewrite "multiple devices" as "a plurality of devices." Defendant did not provide argument or evidence to support the "able to fetch the . . . content from the first server" limitation. Similarly, Defendant did not provide any argument or evidence regarding "the second server" and there is no

mention of any "second server" in the claim. And rewriting "multiple devices" as "a plurality of devices," as Defendant proposes, does not clarify claim scope or address any dispute. With respect to "first server," Defendant did not provide any argument or evidence regarding "the second device" and there is no mention of any "second device" in the claim. The Court therefore rejects Defendant's proposed constructions.

Accordingly, the Court determines that these terms have their plain and ordinary meanings, under which the separately recited claim elements correspond to distinct components, without the need for further construction.

### L.    "identified in the Internet by a second identifier"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "identified in the Internet by a second identifier"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | identified by information that includes an address of the first server |

#### The Parties' Positions

Plaintiff submits: Defendant's proposed construction for this term in Claim 15 of '866 Patent is improper for same reasons its proposed construction for this term in Claims 81 and 108 of the '044 Patent is improper. Dkt. No. 109 at 27–28.

Defendant responds: This term has the same meaning as it does in Claims 81 and 108 of the '044 Patent. Dkt. No. 115 at 23.

Plaintiff replies: Plaintiff "agrees the claim term and scope are the same in both patents." Dkt. No. 119 at 7 n.4.

#### Analysis

The issues in dispute here are the same as for the identical term in Claims 81 and 108 of the '044 Patent and the Court holds that "identified in the Internet by a second identifier" in the '866

**Appx1394**

Patent has the same meaning as that term in the '044 Patent. Accordingly, the Court rejects

Defendant's proposed "address" limitation in "second identifier" and determines that this term has

its plain and ordinary meaning without the need for further construction.

### M.    "partitioning the content into a plurality of content slices"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "partitioning the content into a plurality of content slices"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | indefinite under 35 U.S.C. § 112<br><br>Alternatively:<br><br>• dividing, by a group of multiple devices that is fetching Internet content, the Internet content to be fetched into a plurality (more than just one) of portions, although the portions can have overlapping content |

**The Parties' Positions**

Plaintiff submits: In *Tesonet*, the Court held this term has definite meaning. And the meaning

of this term is plain without construction: the content is partitioned into content slices. As described

in the '866 Patent, the slices may be of entirely distinct content, partially overlapping content, or

entirely overlapping (identical) content. Dkt. No. 109 at 29–30.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic

evidence to support its position: **Intrinsic evidence**: '866 Patent col.53 ll.43–48, col.62 ll.26–29,

col.63 ll.62–63, col.168 ll.48–50. **Extrinsic evidence**: Rhyne Decl. ¶¶ 20–25 (Plaintiff's Ex. D,

Dkt. No. 109-5).

Defendant responds: It is not certain from the claim language what device or devices perform

the partitioning step and thus Claim 15 of the '866 Patent is indefinite. Defendant's proposed

alternative construction sets forth the only partitioning scheme described in the '866 Patent, in which the client device defines the partitioning and the partitioning is "carried out by the group of devices acting as proxies to actually fetch the content." It is important to clarify this partitioning scheme in the construction to avoid a potential "unreasonable broadening of the claims by rendering significant limitations into admitted prior art" such as the packetizing scheme set forth in Figure 2a of the patent. Dkt. No. 115 at 23–27.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '866 Patent figs.2a, 10, 23, 23a, col.4 l.6, col.94 ll.63–67, col.109 l.39–44, col.114 ll.48–54. **Extrinsic evidence**: Rhyne Decl. ¶ 22[15] (Plaintiff's Ex. D, Dkt. No. 109-5).

Plaintiff replies: The device that performs the partitioning is the device the performs all the steps of Claim 15. Thus, a person of ordinary skill in the art "would clearly understand that a device that performs those steps practices the patent claim." And the "partitioning" of the claim includes "requesting partitioned content in content slices, which can be done by a single device." Further, the patent expressly teaches that "[t]wo or more content parts may be identical and may contain the same data" (quoting '866 Patent col.63 ll.62–63). Dkt. No. 119 at 10–12.

Plaintiff cites further **intrinsic evidence** to support its position: '866 Patent col.53 ll.36–47, col.94 ll.23–26, col.104 ll.19–22.

<u>**Analysis**</u>

There are two main issues in dispute. First, whether Claim 15 of the '866 Patent is indefinite for not specifying the device that performs the partitioning step. As set forth above, it is not.

---

[15] Defendant cites paragraph 15 but quotes material from paragraph 22.

Second, whether the "partitioning" limitation should be limited to partitioning "by a group of multiple devices that is fetching Internet content." It should not.

To begin, for reasons set forth in other terms, the Court rejects Defendant's proposal to rewrite "content" as "Internet content to be fetched."

The Court also rejects Defendant's proposal that partitioning is necessarily "by a group of multiple devices that is fetching Internet content." To begin, Defendant suggests that because the only partitioning described in the '866 Patent is performed by a group of multiple devices that is fetching Internet content the claimed partitioning must be limited to the described embodiment. Defendant's position is contrary to law. *Phillips*, 415 F.3d at 1323 ("In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."); *see also*, *Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."). Further, Defendant mischaracterizes the '866 Patent. For example, the patent teaches allocating slices of partitioned content to multiple devices without any suggestion that the devices must form the slices. '866 Patent col.117 ll.23–57, col.168 ll.48–50. Simply put, the record does not support limiting partitioning as Defendant proposes.

The Court addressed the concept of partitioning into slices in *Tesonet* and the Court here reiterates and adopts the reasoning and ruling there expressed. *Tesonet*, 2019 U.S. Dist. LEXIS 141513, at *63–67. Specifically, *Tesonet* construed "partitioning the content" as "splitting the content into content slices (the resulting content slices may be overlapping or non-overlapping)." *Id*. at *67. Other than improperly limiting the partitioning function to a group of multiple devices, Defendant's proposal strays from the *Tesonet* construction primarily by replacing "splitting" with

43

"dividing" and by replacing "slices" with "portions." Although "splitting" and "dividing" convey similar concepts, the Court prefers "splitting" as that language is found in the patent, '866 Patent at col.32 ll.9–14, and it better captures "partitioning" in that "dividing" could improperly imply making the whole smaller instead of simply splitting it into parts. With respect to "slices" or "portions," the Court in *Tesonet* construed "content slices" as "some or all of the content, created by partitioning the content and useable with other content slices to reconstruct the content" to give effect to the patent's teaching that a "content slice" may include all of the content. *Tesonet*, 2019 U.S. Dist. LEXIS 141513, at *56–62 (citing '866 Patent col.168 ll.48–50). Defendant's proposed "portion" may improperly imply that a content slice is necessarily less than all of the content. The remaining differences between the Tesonet construction and Defendant's proposed construction relate to the "into a plurality of content slices" clause. The Court declines to rewrite "plurality" as "plurality (more than just one)" as it is an unwieldly and unnecessary clarification.

Accordingly, the Court construes "partitioning the content into a plurality of content slices" as follows:

- "partitioning the content into a plurality of content slices" means "splitting the content into multiple content slices that each include some or all of the content (the resulting content slices may be overlapping or non-overlapping)."

**N.    "each content slice containing at least part of the content" and "each content slice … identified using a content slice identifier"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "each content slice containing at least part of the content"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | each portion contains at least part of the Internet content |

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "each content slice . . . identified using a content slice identifier" <br><br> • '866 Patent Claim 15 | plain and ordinary meaning | each portion is identified uniquely relative to the other portions |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The plain meanings of these terms are easily understood. Rewriting "content slice" as "portion" and "content" as "Internet content" does not clarify scope but rather confuses and threatens to improperly limit the scope of these terms. Further, there is no reason that content slices, which may be identical, must have unique identifiers relative to each other. Dkt. No. 109 at 30–31.

Defendant responds: The terms should be construed as proposed by Defendant to clarify that the "content" is the content that is fetched over the Internet and that the goal of Claim 15 of the '866 Patent is "constructing the content from the received plurality of content slices." Dkt. No. 115 at 27.

Plaintiff replies: Whether the "content" is sent over the Internet is independent of the meaning of "content," so it would be improper to change "content" to "Internet content." And Defendant does not provide any reason to change "content slice" to "portion." Finally, the content identifiers need not be unique since contents slices can be identical. Dkt. No. 119 at 12.

Plaintiff cites further **intrinsic evidence** to support its position: '866 Patent col.63 ll.62–63.

**Appx1399**

**Analysis**

There are two main issues in dispute. First, whether "content" should be changed to clarify

that it is the content that is fetched over the Internet (i.e., "Internet content"). For the reasons set

forth above, it should not as doing so would introduce a potentially confusing redundancy of a

limitation expressed in the preamble. Second, whether the identification of the content slice is

necessarily unique. It is not.

On the record before it, the Court refuses to limit "identified" to "identified uniquely" as

Defendant proposes. Defendant does not support this limitation with any argument or evidence.

And the patent teaches that two or more content slices may be identical. '866 Patent col.62 ll.28–

29, col.63 ll.62–63. The Court discerns no reason that two identical content slices must be uniquely

identified relative to each other. Indeed, the embodiment of Figure 29e (reproduced here) depicts

three devices, each associated with the same six content slices, and each identical content slice

identified with the same identifier (e.g., "A" or "B"). *Id.* at col.118 l.47 – col.119 l.8. This suggests

that the identifiers of identical slices allocated to different devices may not be unique.



**FIG. 29e**

**Appx1400**

Finally, and for the reasons stated above, the Court refuses to rewrite "content slice" as "portion."

Accordingly, the Court determines that these terms have their plain and ordinary meanings without the need for further construction.

### O.    "a plurality of content slices … and for each of the content slices"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "a plurality of content slices . . . and for each of the content slices"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | performing the following steps for each of the plurality of content slices (portions), rather than just a single time for the entirety of the fetched Internet content |

**The Parties' Positions**

Plaintiff submits: Again, "content" should not be rewritten as "Internet content." Further, performance of the steps of Claim 15 does not need to be repeated for each content slice but rather a single performance of a step may apply to each slice. Dkt. No. 109 at 31–32.

Defendant responds: The plain meaning of the claim is that the steps of the claim are repeated for each of the plurality of content slices. For example, if there are three slices then three devices are selected. Dkt. No. 115 at 27–29.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '866 Patent fig.23a.

Plaintiff replies: Defendant "fails to dispute … that the method can be performed once but applied to each of the content slices." Dkt. No. 119 at 12.

**Analysis**

There issue in dispute here appears to be whether each step in the claim has to be performed anew for each content slice. It does not.

The Court is not persuaded by Defendant's interpretation requiring that each step of Claim 15 must be separately performed for each content slice. Rather, a plain reading of the claim and the teaching of the '866 Patent suggests that the steps may be accomplished for each slice by performing the step for more than one slice at a time. While the claim states that "for each of the content slices" certain steps are taken, it does not specify that each step must be performed for each slice separately from the performance of that step for every other slice. And the patent suggests otherwise. For example, in the six-slice embodiment described with reference to Figure 29a, three slices are allocated to a first device, one to a second, and two to a third. '866 Patent col.117 ll.23–39. Similarly, for the embodiment described with reference to Figure 29e, the patent teaches that the slices may be allocated to any of multiple devices, or even to only one of the devices. *Id*. at col.118 ll.48–58. These teachings establish that although a device is selected for each slice, one device may be selected for multiple slices. And in the content-fetch flow described with reference to Figure 23a, the client selects one or more devices and then "retrieves the relevant chunks from each of the selected . . . devices." *Id*. at col.110 ll.12–52. This indicates that a single device selection may apply to each of multiple slices (chunks) allocated to that device.

Accordingly, the Court rejects Defendant's proposal to require each step in the claim to be performed separately for each content slice and construes "and for each of the content slices, comprising the steps of:" as follows:

- "and for each of the content slices, comprising the steps of:" means "and for each of the content slices, independently or in any combinations, the method further comprising the steps of:"

48

**Appx1402**

### P.    "selecting a device from the group" and "sending over the Internet a first request to the selected device using the group device identifier of the selected device"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "selecting a device from the group"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | selecting, by some node other than the first server and one of the group of multiple devices, a device within the group of multiple devices |
| "sending over the Internet a first request to the selected device using the group device identifier of the selected device"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | sending, by some node other than the first server and one of the group of multiple devices, to the selected device, a request to fetch the Internet content device within the group of multiple devices and that uses the selected device's unique identification |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Contrary to Defendant's proposed construction, under the plain meaning of the terms the device that performs the "selecting a device from the group" or the "sending over the Internet" may itself be one of the devices of the group. Further, it would be improper to replace "content" with "Internet content" or to require a "unique identification" when the claims do not recite such limitations. Dkt. No. 109 at 32–33.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '866 Patent col.71 ll.45–47.

**Appx1403**

Defendant responds: The '866 Patent teaches only that the client device selects a device from the group. "No other operation, apart from the client device performing the selection, is disclosed or enabled by the specification." Dkt. No. 115 at 29–30.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '866 Patent fig.23a, col.109 ll.33–44. **Extrinsic evidence**: Rhyne Decl. ¶ 22 (Plaintiff's Ex. D, Dkt. No. 109-5).

Plaintiff replies: While the embodiment of Figure 23a may inform the meaning of Claim 15, the exemplary embodiment does not limit the claim as Defendant suggests. Dkt. No. 119 at 13.

### Analysis

Other than Defendant's proposed "Internet content" and "unique identification" limitations, which are addressed above, the issue in dispute appears to be whether the device that performs the selecting or sending steps is necessarily other than the "first server" and any device in the group of multiple devices. The Court rejects such a negative limitation.

Defendant's proposed construction would improperly supplant the claims, which express no limitation on what device may perform the "selecting . . ." or "sending . . ." steps, with an exemplary embodiment. This is contrary to law. *Phillips*, 415 F.3d at 1323; *see also*, *Thorner*, 669 F.3d at 1366.

Accordingly, the Court rejects Defendant's proposed construction and determines that these terms have their plain and ordinary meanings without the need for further construction.

50

Q.    **"the first request including the content slice identifier and the second identifier"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the first request including the content slice identifier and the second identifier"<br><br>• '866 Patent Claim 15 | plain and ordinary meaning | the request for fetching the Internet content, that is sent to the selected device, includes (1) the content slice identifier and (2) information that includes the address of the first server |

**The Parties' Positions**

Plaintiff submits: As explained with reference to other terms, it would be improper to change "content" to "Internet content" or to require an "address" in the "identifier." Dkt. No. 109 at 33.

Defendant responds: Its proposed constructions clarify that the "content" is fetched from across the Internet and the second identifier includes an address, as explained with respect to other terms. Dkt. No. 115 at 30.

Plaintiff replies: For the reasons expressed with respect to other terms, Defendant's proposed construction is improper. Dkt. No. 119 at 13.

**Analysis**

The dispute here distills to two issues. First, whether the "fetching a content over the Internet" from Claim 15's limiting preamble should be incorporated into the construction of another term. Second, whether the "second identifier" necessarily includes an address. For the reasons set forth above, the Court declines to incorporate an Internet limitation that is expressed in the limiting preamble and rejects that the "second identifier" necessarily includes an address.

Accordingly, the Court determines that this term has its plain and ordinary meaning without the need for further construction.

### R.    "the partitioning is based webpages level"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the partitioning is based webpages level"<br><br>• '866 Patent Claim 18 | plain and ordinary meaning | each of the plurality (more than just one) of portions of the fetched Internet content corresponds to one or more webpages |

#### The Parties' Positions

Plaintiff submits: As explained in the '866 Patent, the partitioning may be based on a web pages level where each slice may include one or a few webpages. That is the plain and ordinary meaning of this term. The "plurality," "portions," and "Internet content" limitations proposed by Defendant are improper. Dkt. No. 109 at 33–34.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '866 Patent col.53 ll.44–48, col.57 ll.65–67.

Defendant responds: Its "proposed construction clarifies that there is plurality of partitions and that the content is fetched from across the Internet," as argued with respect to other terms. Dkt. No. 115 at 30–31.

Plaintiff replies: For the reasons expressed with respect to other terms, Defendant's proposed construction is improper. Dkt. No. 119 at 13.

#### Analysis

The issues in dispute here are whether the "Internet" and "plurality of content slices" limitations expressed in Claim 15, from which Claim 18 depends, should be restated in the construction of this term. They should not. Including these limitations in the construction would not clarify claim scope but rather threatens to confuse. The Court, however, determines that this term would benefit from some construction to clarify what it means to partition on a webpages-

level basis. And the parties appear to fundamentally agree that webpages-level-based partitioning means the slices include one or more webpages. *See* '866 Patent col.53 ll.36–46 ("The content requested by the client device may be partitioned into multiple parts or 'slices'. . . . The content may be a website content composed of multiple webpages, and each slice may include one (or few) webpages.").

Accordingly, the Court declines to include the "fetched Internet content" and the "plurality (more than just one) of the portions" limitations into the claim and construes "the partitioning is based webpages level" as follows:

- "the partitioning is based webpages level" means "each of the content slices resulting from the partitioning includes one or more webpages."

**S.      "all of the parts of the content are included in all of the content slices"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "all of the parts of the content are included in all of the content slices"<br><br>• '866 Patent Claim 19 | plain and ordinary meaning | indefinite under 35 U.S.C. § 112 |

**The Parties' Positions**

Plaintiff submits: The plain meaning of this term is reasonably certain, the totality of the content slices include the totality of the content. Dkt. No. 109 at 34.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '866 Patent col.168 ll.48–50. **Extrinsic evidence**: Rhyne Decl. ¶ 26 (Plaintiff's Ex. D, Dkt. No. 109-5).

Defendant responds: It is not clear whether this term refers to an identification of the parts of the content in, e.g., an index, or the content itself. Thus, Claim 19 of the '866 Patent is indefinite. Dkt. No. 115 at 31.

Plaintiff replies: The only expert testimony of record on this issue is that the term refers to content rather than an index. Dkt. No. 119 at 13.

**<u>Analysis</u>**

The issue in dispute is whether the meaning of this term is reasonably certain. It is. The Court does not find Defendant's interpretation of this term to encompass an index to be a reasonable interpretation of "all of the parts of the content are included in all of the content slices." The claim phrase plainly refers to the content itself rather than an index of content. The Court, however, determines that this term would benefit from some construction to clarify that all of the slices each include all of the content. Claim 15, from which Claim 19 depends, recites "partitioning the content into a plurality of content slices" and "constructing the content from the . . . plurality of content slices" which indicates that all of the content is necessarily found in the collection of slices. Plaintiff's argument that the plain and ordinary meaning of Claim 19 is that all of the content is found in the collection of slices would render Claim 19 entirely redundant of Claim 15. Thus, Claim 19 would fail to "specify a further limitation of the subject matter claimed" in Claim 19, as required under 35 U.S.C. § 112(d). The better interpretation of Claim 19 is that it further limits the subject matter of Claim 15 by specifying that every content slice (all the content slices) includes all of the content. *See* '866 Patent col.71 ll.8–10 ("A method is disclosed for fetching to a first device a content . . . from N multiple locations each storing a copy of a part of, or the entire of, the content."), col.168 ll.48–50 ("The terms 'chunk' and 'slice' are interchangeably used herein to include, but not limited to, a part of, or the entire of, a content.").

Accordingly, Defendant has failed to prove the term "all of the parts of the content are included in all of the content slices" in Claim 19 is indefinite. Instead, the Court construes the term as follows:

- "all of the parts of the content are included in all of the content slices" means "all of the parts of the content are included in each of the content slices."

**T.    "part of the content is included in two or more content slices"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "part of the content is included in two or more content slices"<br><br>• '866 Patent Claim 22 | two or more slices including at least an overlapping part of the content | at least two of the plurality (more than just one) of portions of the fetched Internet content have overlapping content |

<u>**The Parties' Positions**</u>

Plaintiff submits: Defendant's proposed construction includes unnecessary and improper rewriting of claim language. For example, it changes "two or more" to "at least two of the plurality (more than just one)" and "content slices" to "portions." And it improperly refers to overlapping "content" rather than "part of the content." Dkt. No. 109 at 34–35.

Defendant responds: Its proposal "clarifies that the content slices comprise content that had been fetched over the Internet." Dkt. No. 115 at 31–32.

Plaintiff replies: Rewriting "content" as "Internet content" is unclear "given that the claimed content exists on the second server, whether or not it will be 'fetched over the Internet.'" Dkt. No. 119 at 13.

<u>**Analysis**</u>

The only issue in dispute appears to be whether "content" should be rewritten as "Internet content." As explained above, such a construction does not clarify claim scope but rather threatens

55

**Appx1409**

to confuse. The parties appear to otherwise agree that this term refers to content slices with content parts that overlap.

Accordingly, the Court construes "part of the content is included in two or more content slices" as follows:

- "part of the content is included in two or more content slices" means "two or more of the content slices each include some overlapping part of the content."

## IV.   CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. The Court further finds that Claim 108 of the '044 Patent is indefinite. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury, the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

   **SIGNED this 6th day of December, 2019.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

56

**Appx1410**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **LUMINATI NETWORKS LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  2:18-CV-00483-JRG** |
| | § | |
| **BI SCIENCE INC.,** | § | |
| | § | |
| **Defendant.** | § | |

### ORDER

The Court issues this Order *sua sponte*. The Court held a hearing in the above-captioned

case on Monday, February 3, 2020. (Dkt. No. 142.) In light of the Court's discussions with counsel

for the parties at such hearing, the Court is of the opinion that this case could benefit from renewed

mediation efforts.

It is therefore **ORDERED** that the parties shall conduct a mediation session with Mediator

William Cornelius not later than ten (10) days after the deadline to complete fact discovery. (*See*

Dkt. No. 124.)

**So ORDERED and SIGNED this 4th day of February, 2020.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| LUMINATI NETWORKS LTD. | § | |
| | § | |
| v. | § | Case No. 2:18-CV-0483-JRG-RSP |
| | § | |
| BI SCIENCE INC. | § | |
| | § | |

**JOINT MOTION TO STAY ALL DEADLINES AND NOTICE OF SETTLEMENT**

COME NOW, Plaintiff Luminati Networks Ltd. and Defendant BI Science (2009) Ltd.,

also known as BI Science Inc., (collectively, the "Parties"), and file this Joint Motion to Stay All

Deadlines and Notice of Settlement.  The Parties hereby notify the Court that all matters in

controversy between the Parties have been settled, in principle.  The Parties request that the

Court stay all deadlines in the case for thirty (30) days so that appropriate dismissal papers may

be submitted.

Dated:  February 23, 2020

By: */s/ Robert Harkins*
S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Capshaw DeRieux, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: 903-845-5770
ccapshaw@capshawlaw.com
ederieux@capshawlaw.com

Korula T. Cherian
Robert Harkins
CA State Bar No. 179525
RuyakCherian LLP
1936 University Ave, Ste. 350
Berkeley, CA  94702
(510) 944-0190

Email: sunnyc@ruyakcherian.com
Email: bobh@ruyakcherian.com

Ronald Wielkopolski
RuyakCherian LLP
1700 K St. NW, Suite 810
Washington, DC 20006
Email: ronw@ruyakcherian.com

Attorneys for Plaintiff


*/s/ Eric H. Findlay*_____
Eric H. Findlay (State Bar No. 00789886)
Brian Craft (State Bar No. 04972020)
Debby Gunter (State Bar No. 24012752)
Findlay Craft, P.C.
102 N. College Ave, Ste 900
Tyler, TX 75702
903-534-1100 (t)
903-534-1137 (f)
efindlay@findlaycraft.com
bcraft@findlaycraft.com
dgunter@findlaycraft.com

COUNSEL FOR DEFENDANT BI SCIENCE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| LUMINATI NETWORKS LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:18-CV-00483-JRG |
| | § | |
| BI SCIENCE INC., | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court is the parties' Joint Motion to Stay All Deadlines and Notice of Settlement. (Dkt. No. 166.) The Motion is **GRANTED**. It is therefore **ORDERED** that all deadlines in the above-captioned case are **STAYED** for thirty (30) days from the issuance of this Order, during which time appropriate dismissal papers shall be filed.

The hearing scheduled for Monday, February 24, 2020 in the above-captioned case is **CANCELLED**.

**So Ordered this**

**Feb 23, 2020**

_____

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE U.S. DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LUMINATI NETWORKS, LTD** | § | |
| | § | |
| **V.** | § | **CASE NO. 2:18-CV-00483-JRG** |
| | § | |
| **BI SCIENCE, INC.** | § | |

## SUPPLEMENTAL MEDIATOR'S REPORT

After Mediation was conducted on December 18, 2019, continuing discussions, negotiations, and a mediator's proposal have resulted in settlement of all claims.

## CERTIFICATE OF SERVICE

The mediator's report was served electronically in compliance with Local Rule CV-5(a) upon all known counsel of record via the Court's CM/ECF system, on February 24, 2020.

*/s/ William Cornelius*
WILLIAM CORNELIUS, MEDIATOR

**Appx1478**